UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Kevin Khottavongsa, As Trustee for the Heirs and Next of Kin of Sinthanouxay Khottavongsa,<br><br>Plaintiff,<br><br>v.<br><br>City of Brooklyn Center, Police Officers Alan Salvosa, Cody Turner, and Gregg Nordby, acting in their individual capacities as City of Brooklyn Center police officers,<br><br>Defendants. | Court File No. _____<br><br><br><u>**COMPLAINT**</u><br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1. Plaintiff brings this civil action against Defendants the City of Brooklyn Center, and Police Officers Alan Salvosa, Cody Turner, and Gregg Nordby, acting in their individual capacities as City of Brooklyn Center police officers, for depriving Sinthanouxay Khottavongsa of his rights under the Fourth Amendment and Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. § 1983, and the wrongful death statute of the State of Minnesota, Minn. Stat. §573.02.

2. The individual Defendants, acting within the scope of their employment and under color of state law, not only used excessive force but also failed to provide proper aftercare, resulting in Sinthanouxay Khottavongsa's injury and death. This action is also brought against the City of Brooklyn Center for its failure to properly train and

supervise the individual Defendants in the proper use of force and techniques to secure the arrest of individuals, failure to properly train and supervise the Defendants in the proper provision of reasonable care to victims injured from the use of a Taser and any resulting injuries, and for its establishment of policies, procedures, and customs that allow for such conduct to occur.

## PARTIES

3. Plaintiff, Kevin Khottavongsa, is the Trustee appointed to represent the Heirs of Sinthanouxay Khottavongsa, the decedent, and is a resident of St. Paul and the State of Minnesota. Mr. Sinthanouxay Khottavongsa was a resident of the State of Minnesota.

4. The following Police Officers are, on information and belief, citizens of the United States and residents of the State of Minnesota:

   a. Defendant Police Officer Alan Douglas Salvosa;

   b. Defendant Police Officer Cody Maurice Turner; and

   c. Defendant Police Officer Gregg Alfred Nordby; (hereinafter "Officer Defendants").

5. Defendant City of Brooklyn Center is a properly organized municipality located in Hennepin County, Minnesota.

## JURISDICTION AND VENUE

6. This action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

41453

7. The Court has subject matter jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343(a).

8. The Court has personal jurisdiction over Minnesota residents Officer Defendants Salvosa, Turner, Nordby, and the City of Brooklyn Center.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all of the events that gave rise to these claims took place within the judicial district of the District of Minnesota.

## FACTUAL ALLEGATIONS

10. Mr. Sinthanouxay Khottavongsa ("Khottavongsa") was a 57-year-old man. Originally from Laos, Khottavongsa spoke and understood very limited English.

11. On the night of January 16, 2015, Khottavongsa was at Coin Laundry in Brooklyn Center with his friend, Leang Sarin, the son of Taing Hong and Kear Som, the owners of Coin Laundry.

12. Shortly before 9:00 p.m., a woman and two men (hereinafter "Assailants") came into Coin Laundry and asked to use the restroom. Mrs. Hong advised them to leave as the restroom was closed. The Assailants began yelling at Mrs. Hong and Mr. Som. Mrs. Hong told her son, Sarin, to ask them to leave.

13. One of the male Assailants threatened to kill everyone in the laundromat.

14. The two male Assailants began fighting with Sarin, and grabbed Sarin by the collar and dragged him outside.  Som and Khottavongsa went outside and attempted to get the two men off Sarin, who was on the ground. One of the two male Assailants involved in the physical altercation with Sarin was significantly larger than Sarin,

41453

3

Khottavongsa, and Som. Som went back into the laundromat and came back out with a baseball bat and began to fight with the larger man in an attempt to get him off his son, Sarin.

15. Again, one of the male Assailants threatened to kill everyone.

16. At some point during the assault, Khottavongsa also went back into the laundromat and came back out with a crowbar to try and stop the men from assaulting Sarin and Som.  Khottavongsa never struck anyone with the crowbar.

17. While the Assailants were attacking Sarin, Som, and Khottavongsa, witnesses and employees of nearby businesses alerted the police.

18. At approximately 9:16 p.m., Officer Salvosa arrived on the scene with Cadet Jose Nochez. He parked his vehicle on the side of the street in a position that prevented the video recording capabilities of his squad car from capturing the incident.

19. However, shortly after Officer Salvosa and Cadet Nochez arrived at the scene, Officers Nordby, Turner, and other officers also arrived. All of these officers arrived from the same direction as Officer Salvosa, and all parked their squad cars in positions which allowed the cameras on their respective squad cars to capture the scene.

20. A voice captured on the audio recording from Officer Salvosa's dash camera states that Officer Salvosa ran to where the fight was happening.  Moments later, Officer Salvosa fired his Taser at Khottavongsa.

21. Officer Turner's dash camera recorded the moment Officer Salvosa fired his Taser at Khottavongsa.

22. Officer Turner's video clearly shows a subdued scene. All participants in the original assault stood calmly. Khottavongsa was not acting in a threatening manner and no one was attempting to move away from him.

23. Khottavongsa's conduct was not dangerous to Defendants nor anyone else in the direct vicinity. He was merely defending friends from their attackers. Khottavongsa was not committing a crime, did not present an imminent threat to the safety of the officers or others, and was not actively resisting arrest

24. Officer Salvosa fired his Taser within moments of arriving at the scene. He did nothing to assess the scene or attempt to determine the parties' identities or their roles in the earlier assault before firing his Taser. Later, upon learning that Khottavongsa was simply trying to stop the fight, Officer Salvosa expressed that he felt bad Tasering Khottavongsa.

25. Khottavongsa was holding the crowbar close to his chest in a non-threatening manner and his body was sideways to Officer Salvosa as Officer Salvosa fired his Taser into Khottavongsa.

26. Hit by the Taser, Khottavongsa's body went rigid and fell straight backwards onto the sidewalk. The audio recording captured the terrible sound of Khottavongsa's head hitting the concrete.

27. The severity of Khottavongsa's fall was obvious to all who witnessed it. Sarin immediately rushed to Khottavongsa's aid, only to be ordered onto the ground by the officers. Several witnesses commented on how hard Khottavongsa's head hit the ground. Sarin stated it sounded like a melon being smashed. Noting that Khottavongsa's

41453

5

head hit the sidewalk with great force, Sarin requested that Officer Salvosa render aid. Officer Salvosa disregarded this request.

28. The Officer Defendants immediately knew that Khottavongsa hit his head very hard, had sustained serious injuries, and was in a perilous medical condition. Dash cameras later recorded the Officer Defendants discussing the force with which Khottavongsa hit his head. Nevertheless, the Officer Defendants ignored Khottavongsa's serious medical condition.

29. The dash camera video recording shows Khottavongsa in severe pain, groaning loudly, and unable to control his movements after being Tasered. Khottavongsa not only suffered severe pain from the electrical shocks of the Taser, he suffered a skull fracture and other associated injuries from the fall caused by the Taser.

30. Even though Khottavongsa clearly was disabled by the initial Tasering, Officer Salvosa again pointed the Taser at Khottavongsa, who was lying on the ground face up, and threatened that Khottavongsa will "get it again" if he did not drop the crowbar, which Khottavongsa continued to harmlessly hold against his chest in part due to the reaction of his body to the electricity delivered by the Taser. At that point, Officer Salvosa had been joined by the other Officer Defendants with guns drawn. All Officers were yelling at Khottavongsa. By this time, the Officer Defendants knew Khottavongsa did not speak English. Recognizing Khottavongsa was no threat, Officer Turner told the other Officers he was going to take the crow bar away from Khottavongsa. Officer Turner then walked up to Khottavongsa and easily removed the crowbar from Khottavongsa's grasp. Khottavongsa did not resist in any manner.

41453

31. Officer Turner later stated that "I figured he didn't speak any English so that's why I grabbed the crowbar" and "he didn't speak English…he didn't have a fucking clue what we were saying." Officer Turner, in a mocking tone, said "No Ingles" multiple times in reference to Khottavongsa's lack of English.

32. Traumatized and disoriented from the initial Tasering and resultant head injury, Khottavongsa attempted to sit up very slowly. No reasonable person would have thought Khottavongsa was a threat to cause harm to anyone insofar as he no longer had the crowbar and was barely conscious. He was struggling to sit up when Officer Salvosa yelled at him to not get up or he would "get it again." Before Khottavongsa had a chance to comprehend or comply, Officer Salvosa fired his Taser into Khottavongsa a second time.

33. Khottavongsa again fell to the concrete hard, groaning in pain.

34. At the time of the second Tasering, Khottavongsa was not an immediate threat to the safety of law enforcement officers surrounding him or to others. He was in serious medical distress from the first Tasering and fall. He was unreasonably and unnecessarily Tasered and suffered further injury that exacerbated his perilous medical condition and caused pain and suffering.

35. Officers ordered Khottavongsa to roll over onto his stomach. At this point, after being Tasered twice by Officer Salvosa, Khottavongsa was even more disoriented and obviously unable to process information. One officer commented that Khottavongsa may have limited English. Officer Salvosa then kicked Khottavongsa's body in an attempt to roll him over to his stomach.

41453

36. Officer Nordby approached, also kicking Khottavongsa's body in an attempt to roll him over. Officer Nordby then attempted to flip him. Uncomprehending, Khottavongsa attempted to sit up.

37. While Officer Nordby tried to flip Khottavongsa, Officer Turner grabbed Khottavongsa's left arm and used his other hand to forcefully push Khottavongsa's head into the ground. Khottavongsa groaned in pain. Officers Turner and Nordby then handcuffed Khottavongsa's hands behind his back and performed a body search.

38. Khottavongsa was in severe pain and unable to control his movement. He continued to groan and mumble incoherently. His helpless condition was apparent to Officers Salvosa, Nordby, and Turner while they kicked and flipped his body.

39. Officers Nordby and Turner then ordered Khottavongsa to stand. When he could not, they lifted him and dragged Khottavongsa's limp body to a squad car.

40. Officers Nordby and Turner threw Khottavongsa down on the backseat of the squad car. Unable to sit up on his own, Khottavongsa immediately fell forward, causing his body to become wedged between the backseat and front divider. He was in obvious pain and his breathing was labored.

41. Officer Defendants left Khottavongsa wedged between the backseat and divider for several minutes.

42. As Khottavongsa endured obvious pain and suffering in the backseat of the police car, Defendants laughed, joked, and dealt with administrative matters.

43. Observing that Khottavongsa remained wedged between the backseat and divider and was immobile, Officer Norby and Turner told Khottavongsa to "hop out…or

41453

8

we will drag you, it doesn't matter to me." Even though they knew Khottavongsa was injured and did not speak English, Officers Nordby and Turner dragged Khottavongsa from the back of the squad car and threw him onto the ground. Khottavongsa continued to groan from pain while being manhandled.

44. Officer Defendants left Khottavongsa lying on the ground, saying to each other that Khottavongsa was "fine where he was at" (on the ground).

45. Despite Khottavongsa's obviously tenuous medical condition, Officer Defendants mocked him and displayed deliberate disregard for his medical needs. Their comments included: "He's doing this on purpose. He's just playing games. He's lucky he didn't get fucking shot[;]" "He's playing. He is just being dramatic[;]""He's in pout mode now where he's pretending like he's dying[;]" and "He's being a drama queen."

46. The Officer Defendants later admit in statements among themselves that, "you see the guy get hit with the Taser. He got a pretty good punishment already." This demonstrates the use of the Taser was not necessary to control or apprehend Khottavongsa and instead, that the Officers use of force and subsequent deliberate indifference to his medical needs was not a necessity, but was motivated by a desire to punish Khottavongsa.

47. After dragging Khottavongsa out of the squad car and onto the ground, Officer Defendants finally called for an ambulance. Officer Turner continued to tell jokes while waiting for the paramedics.

48. If Khottavongsa had received proper medical care sooner, he would have survived.

41453

49. One of the officers informed the EMT that Khottavongsa "bonked his head on the concrete pretty good…and fell backwards," and that they "had to drag him everywhere…he pissed his pants, he's got two probes in him, and he hit his head on the concrete," displaying their actual knowledge of his serious medical condition.

50. Officer Turner or Nordby then helped hoist Khottavongsa from the ground onto the gurney. No precautions, such as a neck brace, were taken for Khottavongsa's condition.

51. Officer Turner placed Khottavongsa in restraints in the back of the ambulance despite the fact he was not a threat to the safety of officers, EMTs or others.

52. The ambulance did not leave the scene for 15 minutes.

53. Khottavongsa was eventually transported to North Memorial Hospital where he was declared brain dead. The Hennepin County Medical Examiner's January 22, 2015, press release identified blunt force head injury as the cause of death and classified the manner of death as homicide.

## CAUSES OF ACTION

### COUNT I - 42 U.S.C. § 1983
### EXCESSIVE FORCE AND DELIBERATE INDIFFERENCE TO SINTH KHOTTAVONGSA'S SERIOUS MEDICAL NEEDS IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983

54. Plaintiff incorporates all prior paragraphs of this Complaint.

55. By the actions described above, Officer Defendants, under color of state law, deprived Khottavongsa of his clearly established and well-settled civil rights to be

41453

free from unreasonable searches and seizures and free from the use of excessive, unreasonable and deadly force in violation of the Fourth Amendment.

56. By the actions described above, Officer Defendants, under color of state law, also deprived Khottavongsa of his clearly established and well-settled civil right to be free from deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment.

57. Defendant Officer Salvosa's first use of the Taser was excessive in light of the facts and circumstances confronting Officer Salvosa, and eventually resulted in Khottavongsa's death.

58. Defendant Officer Salvosa's second use of the Taser was excessive in light of the facts and circumstances confronting Officer Salvosa, and eventually resulted in Khottavongsa's death.

59. Officer Defendants displayed deliberate indifference to Khottavongsa's serious medical needs. Officer Defendants were aware that Khottavongsa hit his head with great force on a concrete sidewalk after the initial Tasering. But instead of providing the attention and care that he needed, Officer Defendants were deliberately indifferent to his serious medical needs.

60. Defendant Officers Salvosa and Nordby kicking Khottavongsa – who was visibly injured, disoriented, and helpless – to get him to roll over was unreasonable, excessive, and offensive.

61. Defendant Officer Turner forcibly thrusting Khottavongsa's head into the ground was unreasonable, excessive, and offensive and only served to exacerbate his head injury and pain.

62. Defendant Officers Nordby and Turner throwing Khottavongsa into the back of the car and later dragging him out and throwing him down on the ground was unreasonable, excessive, and offensive, and only served to exacerbate his head injury.

63. Khottavongsa suffered injury and death as a direct and proximate result of Officer Defendants' conduct and omissions, and Officer Defendants are therefore liable in an amount to be determined at trial.

64. Plaintiff is entitled to recover Khottavongsa's compensatory damages, including medical and burial expenses, pain and suffering before death, loss of earnings, and hedonic damages, such as loss of enjoyment of life.

65. Plaintiff's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support.

66. At all relevant times Officer Defendants were in uniforms and acting under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Minnesota.

67. Plaintiff as the trustee appointed to represent the Heirs of Khottavongsa for claims in this complaint requests that the Court award compensatory and punitive damages against Defendants.

68. Officer Defendants subjected Khottavongsa to these deprivations of his rights in such a manner so as to render Officer Defendants liable for punitive damages.

69. Punitive damages are available against the Officer Defendants and hereby claimed as a matter of federal common law under Smith v. Wade, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

## COUNT II - 42 U.S.C. § 1983
### FAILURE TO IMPLEMENT APPROPRIATE POLICIES, CUSTOMS, AND PRACTICES AGAINST THE CITY OF BROOKLYN CENTER

70. Plaintiff incorporates all prior paragraphs.

71. The Officer Defendants claim to have acted in accordance with the policies, procedures, customs, and training of the City of Brooklyn Center which exhibited:

   a. failure to properly train the proper use of force in response to verbal noncompliance and/or passive resistance;

   b. failure to discipline police officers for the liberal, unnecessary use of Tasers;

   c. failure to train proper handling of already Tasered suspects;

   d. failure to emphasize the risks of Tasering a person multiple times when there is suspected injury;

   e. allowing officers to use unreasonable and/or excessive force when it is unconstitutional to do so as stated above; and

41453

13

  f. allowing officers to deliberately disregard serious medical needs in handling individuals who have been injured as a result of the aforementioned unreasonable and/or excessive force.

72. The aforementioned inappropriate policies, procedures, customs, and training were the moving force behind the violations of Khottavongsa's constitutional rights and a proximate cause of the Khottavongsa's death, mental anguish and physical suffering.

73. Plaintiff as the trustee appointed to represent the Heirs of Khottavongsa for claims in this complaint requests that the Court award compensatory and punitive damages against Defendants.

### COUNT III – Minn. Stat. §573.02
### WRONGFUL DEATH

74. Plaintiff incorporates all prior paragraphs.

75. Defendant Officer Salvosa committed a battery upon Khottavongsa by Tasering him the first time.

76. Defendant Officer Salvosa committed a battery upon Khottavongsa by Tasering him the second time when he was lying down on the ground, after having already suffered a severe head injury from the first Tasering.

77. Defendant Officers Salvosa and Nordby committed a battery upon Khottavongsa by intentionally and willfully kicking Khottavongsa to get him to roll over when Khottavongsa was already incapacitated from the two Taser shots and the fatal head injury.

41453

14

78. Defendant Officer Turner committed a battery upon Khottavongsa by intentionally and/or willfully forcibly thrusting Khottavongsa's injured head towards the ground.

79. Defendants Officers Turner and Nordby committed a battery upon Khottavongsa by intentionally and willfully throwing Khottavongsa in the squad car and by later dragging him out onto the ground.

80. At all times since the fatal head injury, Officer Defendants exhibited deliberate indifference to Khottavongsa's medical needs, which resulted in his death.

81. Throughout the entire incident, Khottavongsa was not an imminent threat to anyone, nor was he actively resisting or fleeing arrest.

82. The above-mentioned instances of contact were all unpermitted and offensive contact against Khottavongsa and were unnecessary to effectuate an arrest. These contacts were unreasonable, excessive, and without legal justification under the circumstances and violated Khottavongsa's statutory and constitutional rights.

83. Officer Defendants were also negligent in failing to attend to Khottavongsa's serious medical needs. Officer Defendants owed him a general duty of care and a special duty of care arising from Officer Defendants putting Khottavongsa in a perilous condition. Officer Defendants breached that duty of care by continuing to batter Khottavongsa and ignore his serious medical needs.

84. Officer Defendants' actions were a proximate and actual cause of Khottavongsa's injury and death.

85. At the time the above incident occurred, the Officer Defendants were acting within the scope of their employment for and at the direction of the Brooklyn Center Police Department.

86. Plaintiff as the trustee appointed to represent the Heirs of Khottavongsa for claims in this Complaint requests that the Court award compensatory damages against Defendants.

87. Plaintiff is entitled to recover Khottavongsa's compensatory damages, including medical and burial expenses, pain and suffering before death and loss of earnings.

88. Plaintiff's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support.

89. The notice requirements of Minn. Stat. § 466.05 have been satisfied, as Defendants have been on actual notice of sufficient facts to reasonably put Defendants on notice of a possible claim since the Khottavongsa's death, and were presented a demand prior to filing suit.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

A. Award compensatory damages, including for mental anguish and physical suffering, in an amount to be determined according to proof by Plaintiff against all Defendants;

41453

B.  Award punitive damages under 28 U.S.C. § 1983 as to Counts I and II, in such other amount as the jury may determine is sufficient to punish Defendants and deter others from committing the constitutional violations alleged in this Complaint;

C.  Permanently enjoin all Defendants from engaging in conduct and practices in violation of individuals' constitutional liberties, such as the conduct stated in this Complaint as well as that which may be proven at trial;

D.  Award Plaintiff his costs, expenses, and reasonable attorney's fees, costs and pre-judgment interest pursuant to 42 U.S.C. § 1988 and other applicable laws; and

E.  Grant such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury in this case as to all claims in this action.

Dated:  April 20, 2016

s/Daniel E. Gustafson
Daniel E. Gustafson (#0202241)
Amanda M. Williams (#0341691)
Joshua J. Rissman (#0391500)
**Gustafson Gluek PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone:  (612) 333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com
jrissman@gustafsongluek.com

William A. Gengler (#0210626)
**Lockridge Grindal Nauen P.L.L.P**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
wagengler@locklaw.com

*Attorneys for Plaintiff*

41453