UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Kevin Khottavongsa, as Trustee
for the Heirs and Next of Kin of
Sinthanouxay Khottavongsa,

                Plaintiff,

vs.

City of Brooklyn Center, et al.,

                Defendants.

Court File No. 16-cv-1031 RHK/DTS

---

## DEFENDANTS' SUMMARY JUDGMENT MEMORANDUM OF LAW

---

### INTRODUCTION

Sinthanouxay Khottavongsa ("K") refused to follow *any* commands of the officers responding to a dangerous nighttime fight involving many people and dangerous weapons including a baseball bat and crowbar. Based on the undisputed facts and squad video, it was objectively reasonable for officers to use the Taser when K refused to drop the crowbar and get on the ground, and to use the Taser a second time when K tried to get back up off the ground while continuing to ignore every single command he was given. Moreover, while his death was tragic, officers were not deliberately indifferent to K's medical needs and provided K with immediate medical care even though it appeared he was simply intoxicated and it was not clear he had sustained a serious internal injury.

## STATEMENT OF UNDISPUTED FACTS

### *Background*

As a preliminary matter, it is important to address Plaintiff's claim K spoke and understood very little English and allegedly could not understand what officers were saying. While Plaintiff testified K's English was "very broken," he conceded K understood common phrases and Plaintiff admitted he did not know whether the phrase, "get down on the ground" was something K would have understood. *Deposition of Plaintiff Kevin Khottavongsa, pages 61-62*. Also, according to those who knew him, he had no problem with English.

K was friends with Leang Sarin and his parents Taing Hong and Kear Som and would help them at their laundromat and auto shop. *Deposition of Leang Sarin, pages 5-6*. Sarin and K spoke English to each other and Sarin testified K could speak English around the same level as his parents and K could understand most of what Sarin said to him in English. *Id. at 8*. Taing Hong explained she had only known K for a couple of months when he came to the laundromat to help the electrician and had only spoken to him sometimes, but stated she used English and K understood her because he would then speak to her in English. *Deposition of Taing Hong, pages 28-29, 39*. She also noted K would work with the electrician who could tell K what to do, so "[h]e knows how to do that with that guy." *Id. at 5, 39*. Kear Som confirmed K's ability to speak English

and testified he only spoke English to K and never had problems with K understanding what he was saying. *Deposition of Kear Som, page 18*. In fact, Som said K spoke better English than he did and admitted K would have understood the phrases: "get down on the ground" and "drop it." *Id. at 19*.

Officer Gregg Nordby also explained officers learn during training it is uncommon for any person who immigrates here to not understand simple English words such as "hi," stop," or "you're under arrest." *Deposition of Gregg Nordby, pages 99-100*. Moreover, the police uniform is recognizable and creates a level of understanding. *Id. at 98*.

## Witness Statements

Sarin and K arrived at the laundromat the evening of January 16, 2015, and walked through to the auto shop to speak with Sarin's father. *Sarin Dep. 9*. Soon after, Sarin observed three people, two men and one woman, who "didn't look like they belonged in the laundry" hanging around and loitering. *Id*. When asked if they were African American, Sarin clarified, "[t]hey were black, inner city Americans, ain't no Africans." *Id. at 11*. Sarin went up to the three individuals and asked them to leave. *Id. at 10*. As they left, Sarin approached the laundromat door to lock it behind them so they could not return but the "bigger of the two [guys]" (Randall Jackson) grabbed Sarin and then the woman (Erika) and smaller guy (Jackson's friend) joined in to pull him outside." *Id. at 11-12*. Once outside,

he was spun around, trapped against a red SUV parked out front, and they "engaged in a scuffle." *Id. at 12*. Sarin started to defend himself against all three but was fighting more with Jackson. *Id. at 12-13*. His mother stepped in and sprayed Erika with mace. *Id. at 13*. K and Sarin's father were engaging Jackson's friend and at one point K had his belt and buckle out. *Id. at 16-17, 56-58; Som Dep. 13-14*. Kear Som admitted he had a baseball bat or something similar. *Som Dep. 41*. Som explained K initially was chasing the "little guy" but then Som took over and chased the "little guy" and told K to "go inside" and K complied. *Id. at 15, 23-24*. However, K came back outside with a crowbar from Som's auto shop. *Id. at 19*. Som said he did not know why K had the crowbar but thought it was to "hit the guy or do something." *Id. at 20*.

When police arrived and gave multiple commands for everyone to get down, Sarin immediately got down but could see his father and mother were standing. *Sarin Dep. 18-19*. He told them to get down. *Id. at 17-18*. Sarin did not tell K to get down, but wishes he had. *Id. at 51*. He could see K standing and holding a crowbar. *Id. at 16-17*. K was looking at Sarin who explained K was probably "holding stuff still" and "trying to make sure the guy doesn't get up and stuff." *Id. at 19-20*. When all the officers were yelling, K began turning but was hit with the Taser and fell. *Id at 20*. Sarin saw K's head hit and he could see K's eyes were not normal. *Id. at 21-23*. An officer approached Sarin and took him

to a squad car and Sarin told the officer to make sure he checked on his parents and on K. *Id. at 22-23*. He did not know if he told the officer K hit his head. *Id. at 23-24*. Sarin learned later officers checked on his parents and K, and when the ambulance arrived Sarin observed the paramedics go straight to K. *Id. at 24-25*.

Randall Jackson recalled a different version and testified his girlfriend Erika, and his friend stopped at the laundromat so Erika could use the restroom. *Deposition of Randall Jackson, pages 6-7*. Although one of the men was described by Sarin as being "the big guy," Jackson believes he and his friend were the same height and weight at around 5' 6" and 160 pounds. *Id. at 15-16*. Erika was told by the female laundromat owner she had to leave. *Id. at 7-8*. Jackson said there were other restrooms they could use, so they left. *Id*. However, once outside, K, Leang Sarin, Taing Hong, and Kear Som ran outside and one of them grabbed Jackson by the throat. *Id. at 8*. When they got him to the ground, one of the men tried to stomp him in the face and used a bat or pole to strike Jackson in the legs and Hong sprayed him with mace. *Id. at 17-18, 20-23*. While the men were attacking him, Jackson feared for his life and his only concern was that none of them would get hit in the head with the weapon because "you die from stuff like that." *Id. at 18, 23, 26, 31-32*. Jackson received several injuries to his leg and eyes and recalled "it was pretty bad." *Id. at 9*. When the police arrived, one of the officers pointed his gun at Jackson and told him to get on the ground, so Jackson

complied and sat down. *Id. at 20-21*. Jackson heard someone yelling to drop something, but was not aware of much else because he was blinded by blood and mace and he was focused on the officer's gun. *Id. at 21*.

Mohamed Elmi, the owner of the nearby Quick Shop, observed a group fighting and K was part of it. *Deposition of Mohamed Elmi, page 6*. He saw Sarin and Jackson holding and punching each other for about ten minutes. *Id. at 8*. He confirmed K had a crowbar and Som had a stick. *Id. at 11*. Elmi believed there were "sticks all over." *Id*. He called 911 and noted when the police arrived the fighting was still going on. *Id. at 9*. He heard officers tell K to "put it down, put it down" but K did not put the crowbar down, then he saw K Tased and fall flat to the ground, and he saw K try to move to a seated position. *Id. at 8, 14*.

Maria Cruz-Martinez was doing laundry in the laundromat and witnessed K's actions. *Deposition of Maria Cruz-Martinez, page 7*. She saw three African Americans jump Sarin and hit Som and Hong. *Id. at 12*. The female African American hit Hong in the head. *Id.* K then came out to help stop Som, Sarin, and Hong from being hit by the three African Americans, but they turned on him:

> So they hit [K]. They threw him to the ground. They were stomping on him, and he was trying to get up, but they wouldn't let him get up, so then [Som] went inside and he brought out a bat, and he was trying to scare them away. I didn't see him swing at anybody, when he was trying to get [K] off the ground. And then as soon as he got the bat out, I called the cops again, for like the fifth time. Nobody was there still, and I was like, 'You know what? There's a bat involved. Somebody needs to come now.'

*Id. at 14.* Martinez said she could see while K was being kicked he was in a fetal position and his hand was on his head. *Id. at 17-18.* Bystanders jumped in and it became a "big brawl." *Id. at 14.*

Guadalupe Galarza confirmed her friend Cruz-Martinez's version and added she saw K initially come out with a bat and he was swinging it trying to scare the African Americans off Sarin. *Deposition of Guadalupe Galarza, page 10.* She saw people hitting K and people from neighboring stores came and started hitting K as well. *Id. at 10-11.*

Plaintiff Kevin Khottavongsa was not a witness but testified he later learned from Sarin that K grabbed a crowbar to defend himself and his friend Sarin but K was grabbed by the neck and physically assaulted by the people who had jumped Sarin. *Plaintiff Dep. 18, 26-28.*

<u>**Officer Statements**</u>

Officer Salvosa testified when he arrived on scene he knew there was a fight and weapons present and his primary concern was the safety of everyone so he wanted to stop the guy with the weapon and prevent further injuries. *Deposition of Alan Salvosa, pages 60-61.* Salvosa ran toward the group and noted K was in the middle. *Id. at 62.* He yelled to the group, "Get down on the ground," and people seemed to stop fighting. *Id. at 63-64.* However, K walked around gripping the crowbar with "tense body language." *Id. at 64-65.* Salvosa recalled

lots of yelling and screaming, but he continued to focus on K. *Id. at 69*. He told K to "drop it" numerous times but K refused. *Id. at 70*. Salvosa gave K the opportunity to comply and waited to Tase him until the last possible moment. *Id. at 70-71*. He knew he had other options to choose from including deadly force, but he chose the Taser as the most reasonable level of force to ensure everyone's safety and to take K into custody without incident. *Id. at 71*. After not complying with any of his commands, K made eye contact with Salvosa and turned away from him while still holding the crowbar and in close proximity to other people. *Id. at 71-73*. Salvosa was also concerned for his own safety because he had closed the distance between himself and K to ten feet and K could have easily turned and come at him. *Id. at 74*. Salvosa felt K was the biggest threat out of those fighting because he was holding the crowbar, but he still gave commands to "get down" to the whole group because he had no idea who was a victim, witness, or suspect. *Id. at 95-97*. As K turned away, Salvosa deployed his Taser and the probes struck K in the back. *Id. at 109-110*. Salvosa knew K fell, but did not know whether K struck his head. *Id. at 104-105*. He knew K would have injuries but he could not address those injuries yet because he still had four or five other people standing, not complying, had not been searched, and had not been taken into custody. *Id. at 105*. Moreover, backup officers had not arrived at the scene and Salvosa did not know what the others may do to him or if there were other

weapons, so he needed to make the scene safe before he could treat any injuries. *Id. at 105-106*. Even after K was on the ground and the crowbar was taken from him, Salvosa believed K was still an immediate threat because he had just been violent, was still not compliant, he gave no indication he planned to become compliant, and had not been searched or cuffed. *Id. at 127*. As a result, when K started to get up from the ground and braced himself with his hand, Salvosa Tased him again because he believed that was the best option. *Id. at 134, 137-138*. After this second Tasing, Salvosa did not know if K was injured because he did not see visible injuries. *Id. at 140-141*. Additionally, Salvosa explained any of K's moaning or groaning could have simply been because of pain from being Tased or because he was drunk. *Id. at 156-159*. After he used his foot to help roll K over to his stomach, Officers Turner and Nordby took control of K. *Id. at 141, 152*. Salvosa thought K's failure to stand on his own was because he was drunk or he was trying to be difficult. *Id. at 160*.

Officer Turner arrived shortly after Salvosa and learned from dispatch there was a chaotic fight involving several people. *Deposition of Cody Turner, pages 29-30*. As he neared the scene, he observed a large group fighting and could see one person holding some type of long sword-like object. *Id. at 30, 34-35*. Once he arrived, Turner quickly exited his squad car with his firearm out and began ordering people to the ground. *Id. at 49*. He observed K walk away from Salvosa

who was yelling commands and saw K Tased and fall to the sidewalk. *Id. at 49-51.* K continued to hold the crowbar which Turner saw as an immediate threat to those around him, so Turner approached K while Officer Nordby covered him with his firearm and removed the crowbar from K's grip. *Id. at 64-65, 68-69.* Turner recalled it was difficult to remove the crowbar from K's hand and he had to tug at it. *Id. at 69-70.* Turner thought K did not understand the commands being given him because he was either not listening or intoxicated and later he thought K may not understand English. *Id. at 70-71, 81.* Even after removing the crowbar from K, Turner felt K was still an immediate threat because he might fight again. *Id. at 87.* In fact, as Turner and Nordby attempted to roll him to his stomach and handcuff him, K tensed his arms and would not roll over. *Id. at 88-89.* After K was handcuffed and searched, he still thought K was a threat because he had the use of his legs. *Id. at 108.* Turner and Nordby lifted K off the ground and told him to walk, but he would not comply so they carried him to the squad car. *Id. at 109.* Turner thought K understood their commands and was intentionally not complying with them including intentionally refusing to walk and intentionally refusing to get into the squad car. *Id. at 113 and 116.* Turner decided to remove K from the back of the car because he was not sitting up and not listening. *Id. at 121.* Turner never saw K lose consciousness and thought K's failure to sit up under his own power was because he was intoxicated and not

because he was injured. *Id. at 85, 107 and 123*. Nevertheless, Turner thought K should be checked out by a paramedic. *Id. at 123, 135 and 143.*

Officer Gregg Nordby arrived on the scene with his firearm out to protect himself and the other officers since this was a deadly force situation as K was armed with a dangerous weapon. *Nordby Dep. 60-61, 74*. He explained he would have fired his gun if K attempted to strike anyone with the crowbar. *Id. at 62*. Nordby knew K had been Tased once already, but he still was not listening which was not a common response. *Id. at 47*. Based on K's actions, Nordby felt K could still have been violent toward the officers. *Id*. It also seemed to take longer than usual for them to deal with K and his crowbar and to gain control of the others involved in the fight. *Id. at 49*. K was "gripping onto the crowbar so tight, his knuckles were white" and his face looked like he was not happy with them. *Id. at 64-65*. After the crowbar was taken, Officers gave K more commands, but he tried to get up so Officer Salvosa deployed the Taser again. *Id. at 70*. Nordby thought there was still a possibility K could have gotten up, turned to his side, or done something else that would have warranted additional use of force. *Id. at 80*. Overall, Nordby thought K was intentionally disobeying their commands either because he was upset he was being arrested or because he was intoxicated. *Id. at 150, 152*. He explained K's moaning and groaning was something that commonly happens with people who are drunk. *Id. at 153*. Nordby also noted he did not

have concerns about K's breathing because the moaning and groaning was evidence K's breathing was fine. *Id. at 154*. He also never saw K lose consciousness. *Id. at 155*. When he and Turner attempted to handcuff and search K, he tensed up and tried to flip the opposite way the officers were turning him. *Id. at 148, 157*. Based on his behavior, Nordby thought K was still a potential threat until he was searched. *Id. at 159*. Even after he was cuffed and searched, K refused to walk, tensed up, and attempted to move his arms. *Id. at 158*. After K was in the squad car, Nordby noticed K was acting weird. *Id. at 169*. Although Nordby believed K was just being dramatic up to this point, he started to think there was more going on. *Id. at 170, 176*. He did not think K was in pain, but still believed K was intoxicated. *Id. at 177*. Once they removed him from the squad car, Nordby realized K's breathing was getting labored so they not only called for a second ambulance, they also redirected the first ambulance to K when it arrived shortly thereafter. *Id. at 180, 183*.

### *Timeline of Events*

| | |
|---|---|
| 9:12:39 | 911 caller reports "big fight" with "several people," "this African guy is beating up this Asian guy" with "8 people" physically fighting," and "more coming in." Dispatch informs Salvosa. *Deposition of Michael Coleman, Ex 5 (CAD); Salvosa Dep. Ex 3 (Report).* |
| 9:12:52 | Two officers are dispatched to the scene. *CAD and Report.* |
| 9:14:17 | 911 caller reports a "baseball bat." Dispatch provides this information to Salvosa in his squad car. *CAD and Report.* |

12

| | |
|---|---|
| 9:14:56 | 911 caller reports, "a big 'ole fight over here, there's a man hitting somebody with a bat, it's crazy over here right now." *CAD and Report.* |
| 9:16:00 | Cadet Nochez arrives with Salvosa and says "Oh, they're still beating the crap out of someone over there." *Salvosa Dep. Ex 6 (Salvosa Video); Deposition of Jose Nochez, pages 25-26.* Nochez had no weapon and could not get involved. *Nochez Dep. 123; Salvosa Dep. 41.* |
| 9:16:12 | Salvosa yells, "get down on the ground." *Salvosa Video.* |
| 9:16:23 | Salvosa yells, "Hey, get down on the ground, get down on the ground, get down on the ground." *Salvosa Video.* |
| 9:16:26 | K ignores Salvosa's commands to get down, continues holding the crowbar, and turns away from Salvosa who yells: "Drop it, come on back, drop it." *Salvosa Video.* |
| 9:16:30 | Salvosa discharges his Taser. *Salvosa Video.* K is standing when struck with the Taser probes but immediately falls. *Nordby Dep., Ex 5 (Turner Video (Front)).* |
| 9:16:32 | K falls and six people are still standing and not complying with Salvosa's commands to get on the ground. *Turner Video (Front).* |
| 9:16:37 | Salvosa and Turner yell, "Everybody get down on the ground, everybody get down on the ground now, get down on the ground, all of you, get down on the ground, now, down on the ground now, ground, get down on the ground, get down on the ground, down on the ground." *Turner Video (Front).* |
| 9:16:51 | An officer says, "drop that crowbar" as Salvosa continues to say "down on the ground." *Turner Video (Front); Nordby Dep. Ex 6 (Deering Video).* |
| 9:16:57 | Salvosa yells, "drop that crowbar or you're gonna get it again." *Turner Video (Front); Deering Video.* |
| 9:17:03 | Turner grabs crowbar from K's hand after K ignored all commands including to drop the crowbar. *Turner Video (Front); Deering Video.* |

9:17:13    Salvosa says, "lay flat on your stomach, lay flat on your stomach." *Turner Video (Front); Deering Video.*

9:17:24    K starts to sit up and Salvosa says, "don't get up or you're gonna get it again." *Turner Video (Front); Deering Video.*

9:17:25    K plants his left hand on the sidewalk as he's getting up and Salvosa yells, "don't get up." *Turner Video (Front); Deering Video.*

9:17:27    Salvosa activates the Taser a second time and K groans and falls back to the pavement. *Turner Video (Front); Deering Video.*

9:17:56    Salvosa says, "Ok sir, roll over to your stomach, roll over to your stomach sir or you're gonna get it again." *Turner Video (Front); Deering Video.*

9:18:06    K ignores commands to roll to his stomach so officers roll him themselves using their feet. *Turner Video (Front); Deering Video.*

9:18:17    Officers grab K's arms and place him on his stomach and begin handcuffing and searching him; K grunts and groans. *Turner Video (Front); Deering Video.*

9:19:20    Officer Whittenburg calls dispatch to have North Paramedics respond for eye injury. *CAD; Turner Video (Front); Deering Video.*

9:19:58    K is placed in the back of the squad car and is breathing heavily. *Turner Video (Rear).*

9:21:36    Turner observes K is lying down in the backseat and begins to pull K out of the squad car. *Turner Video (Rear).*

9:23:50    Nordby tells Turner, "he's still acting weird" and Turner asks, "should I have North come and look at him?" *Turner Video (Front).*

9:24:08    Turner calls for North Paramedics for K. *Turner Video (Front); CAD.*

9:27:57    Ambulance arrives and parks at the scene. *Salvosa Video.*

9:28:18  Officer Turner tells the Paramedics to check K first because he might have hit his head on the concrete when he fell backwards. *Turner Video (Front); Nordby Dep. 180.*

9:32:15  K is loaded into the ambulance and taken to North Memorial Emergency Department. *Salvosa Video; Incident Report.*

## *Cause of Death*

Defendants' medical expert Dr. Uzma Samadani is a board certified neurosurgeon with a clinical and research focus on traumatic brain injuries. *Deposition of Uzma Samadani, Ex 2 (Expert Report)*. She practices at Hennepin County Medical Center which is the busiest level 1 trauma center in Minnesota. *Id*. Based upon her review of K's CT scan when admitted to North Memorial Hospital, the autopsy report, and medical records, she noted K had a scalp hematoma on the front of his scalp and a frontal skull fracture on the top front of his skull near observed scalp swelling. *Id*. It is her opinion to a reasonable degree of medical certainty K's fatal injuries were inflicted with a blow to the top of his head ***before*** Officers arrived and less likely they were caused by a blow to the back of the head from falling after Tasing. *Id*. Moreover, she opined K's brain injury could only have been diagnosed with a CT scan or equivalent imaging and substantive experienced neurologic expertise. *Id*. She believes K's injury would have killed him no matter how soon he arrived at the hospital and even diagnosing it sooner would not have changed the outcome. *Id*.

**STANDARD OF REVIEW**

Summary judgment is appropriate when there is no dispute between the parties about any genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If "opposing parties tell two different stories," the court reviews the record to determine which facts are material and genuinely disputed, and then views those facts in a light most favorable to the nonmoving party – as long as those facts are not so "blatantly contradicted by the record . . . no reasonable jury could believe" them. *Id.; Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).

The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995). To withstand the motion for summary judgment, a plaintiff must substantiate his allegations with "sufficient probative evidence that would permit a finding in his favor without resort[ing] to 'speculation, conjecture, or fantasy.'" *Reed*, 561 F.3d at 790 (quotations omitted).

<h1 style="text-align:center;">LEGAL ARGUMENTS</h1>

**I.      OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY.**

Qualified immunity shields police officers from suit if a reasonable officer could have believed his or her conduct was lawful based on the information the officer possessed. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted). An officer is entitled to qualified immunity unless his conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S., at 818-19. Qualified immunity is a question of law to be decided by the district court, and it is "immunity from suit rather than a mere defense to liability." *Hunter*, 502 U.S. at 227-28. Simply put, "[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)). Like absolute immunity, qualified immunity is effectively lost if a case is erroneously permitted to go to trial. *Id.*

Courts have traditionally applied a two-step analysis to determine whether a government official is protected by qualified immunity. *Saucier*, 533 U.S. at 200-01. First, courts consider whether, "taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." *Serna v. Goodno*, 567 F.3d 944, 951–52 (8th Cir.

17

2009) (citing *Saucier*, 533 U.S. at 201). Second, courts ask "whether the right was clearly established." *Id*. Because the sequence set forth under *Saucier* is not always convenient, the Supreme Court eliminated the mandatory aspect of the sequential analysis, permitting courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

### A.   No Excessive Force.

Count One states K was deprived of the right to be free from the use of excessive force in violation of the Fourth Amendment. However, the officers are entitled to qualified immunity because their use of force was objectively reasonable given K's actions.

A claim of excessive force under § 1983 invokes the Fourth Amendment's guarantee of the right to be free from unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1870–71 (1989). To establish a seizure in violation of the Fourth Amendment, a plaintiff must prove (1) his person was seized; and (2) the seizure was unreasonable. *Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S. Ct. 1378, 1382–83 (1989); *Andrews v. Fuoss*, 417 F.3d 813, 816 (8th Cir. 2005). Apprehending a suspect "'by means of physical force'" qualifies as a "'seizure' triggering the Fourth Amendment's protections." *Graham*, 490 U.S. at

395 n. 10 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968)). Whether the seizure is unreasonable must be judged under the Fourth Amendment's objective reasonableness standard. *Graham*, 490 U.S. at 395-97.

The use of force is objectively reasonable in a number of situations, including where a suspect resists arrest, *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017), attempts to flee, *McKenney v. Harrison*, 635 F.3d 354, 359–60 (8th Cir. 2011), or fails to comply with officer orders. *Schoettle v. Jefferson County*, 788 F.3d 855, 859–60 (8th Cir. 2015). The use of deadly force is also objectively reasonable where an officer has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or to others. *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S. Ct. 1694, 1701 (1985); *Brosseau v. Haugen*, 543 U.S. 194, 199–201, 125 S. Ct. 596, 599–600 (2004); *Hassan v. City of Minneapolis, Minn.*, 489 F.3d 914, 919 (8th Cir. 2007); *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005); *Gardner v. Buerger*, 82 F.3d 248, 252 (8th Cir. 1996).

Whether a seizure is reasonable is determined by the totality of the circumstances and must be judged from the viewpoint of a reasonable officer on the scene, "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Determining reasonableness "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against

the countervailing governmental interests at stake." *Id.* at 396. "The calculus of reasonableness" allows officers deference because they "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Proper application of this test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 386. Courts must not use the benefit of hindsight and calm deliberation when reviewing an officer's judgment about the amount of force necessary in a given situation. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012); *Cook v. City of Bella Villa*, 582 F.3d 840, 851 (8th Cir. 2009).

### 1.    First Use of the Taser was Objectively Reasonable.

In *Loch v. City of Litchfield,* 689 F.3d 961 (8th Cir. 2012), the Eighth Circuit affirmed the granting of summary judgment for use of deadly force when an unarmed suspect disregarded repeated requests to get on the ground. Officers were dispatched to a domestic disturbance at a residence. *Id.* at 963–64. Loch was sitting in a truck which had been blocked in by family members in an attempt to prevent Loch from driving away. *Id.* When he arrived at the scene Officer Travis Rueckert began walking toward Loch's truck, before being told by Loch's

brother-in-law, Seth Rokala, Loch had a gun. *Id*. Rueckert drew his firearm and

retreated to his vehicle. *Id*. Loch threw his gun out the truck window, exited his

truck, and got into a confrontation with Rokala. *Id*. Fearing for Rokala's safety,

Rueckert pointed his firearm at Loch and ordered everyone to get on the ground.

*Id*. Rather than heed this command, Loch turned and began walking toward

Rueckert with his hands raised above his head or extended out to his sides. *Id*. As

Loch continued toward him, Rueckert began backing up and repeatedly ordered

Loch to the ground. *Id*. Loch did not comply with the directives, and as he

continued toward Rueckert he slipped on a snowbank. In an attempt to keep

himself from falling one of Loch's hands moved toward his side near a cell

phone holder clipped to his hip. Rueckert began firing his gun shooting Loch

eight times. In affirming the district court's grant of summary judgment, the

court noted Loch was unarmed when Rueckert shot him eight times. However,

the court stated even "if a suspect is ultimately 'found to be unarmed, a police

officer can still employ deadly force if objectively reasonable.'" *Id*., 689 F.3d at

966 (quoting *Billingsley v. City of Omaha*, 277 F.3d 990, 995 (8th Cir. 2002)). The

court accepted Loch moved toward Rueckert with his arms raised above his head

or extended at his sides in order to find a suitable place to get on the ground. *Id*.

But the court found even if Loch's "motives were innocent, a reasonable officer

on the scene could have interpreted [his] actions as resistance. . . . Thus, a

reasonable officer could believe that [Loch's] failure to comply was a matter of choice rather than necessity." *Id*.

The court concluded "Rueckert's use of force was objectively reasonable." *Id.* They did so despite individuals on the scene yelling Loch was unarmed, and despite Rueckert not issuing a warning prior to shooting Loch eight times. Regarding the need for a warning the court found:

> Although Rueckert did not issue a specific warning before firing, he acted reasonably. Rueckert drew his firearm, pointed it at [Loch], and repeatedly ordered him to get on the ground. Rueckert's conduct should have put [Loch] on notice that his escalation of the situation would result in the use of the firearm. The lack of a more specific warning does not render Rueckert's use of force unreasonable. The district court properly granted summary judgment in favor of Rueckert on Lochs' § 1983 claim.

*Id*., 689 F.3d at 967 (quotation and citation omitted).

Officers would have been justified in using deadly force against K. Here, as in *Loch*, there is no question officers believed K posed an immediate threat of serious physical harm. Officers responded to reports of a big fight involving eight individuals who were getting aggressive, one of whom reportedly had a bat. Officer Salvosa arrived on the scene to find the magnitude of the fight had been accurate and, since Cadet Nochez was unarmed and required to stay back, Salvosa was outnumbered eight-to-one. Salvosa shouted four times for the individuals to get on the ground. The entire group ignored the command. Salvosa noted K held a long metal object and appeared to be using it as a

weapon. Salvosa could not identify the object, but it appeared to glimmer in the light like a blade or a sword. He ordered K three times to drop the weapon. However, K did not comply with any of these orders. Rather, as people backed away from K, he began moving toward them with the weapon. Salvosa saw K make eye contact with him, and recognize Salvosa was shouting orders at him with his Taser drawn and pointed in K's direction. K broke eye contact with Salvosa and turned with the weapon while in close proximity to several others.

For the same reasons Salvosa would have been justified in using deadly force, his use of the Taser to apprehend K was objectively reasonable under the *Graham* factors. In evaluating excessive force claims, a suspect's subjective intentions do not matter; rather, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective" of an officer. *Saucier*, 533 U.S. at 205*; Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (citing *Graham*, 490 U.S. at 396). *Loch* involved a response to a call concerning a single individual who was intoxicated and attempting to drive. The situation was dangerous because the individual was unpredictable. Here officers responded to a call concerning a large fight with weapons. Officers were already on notice the individuals were violent. Facts evidencing a potential for violence known to an officer at the time are relevant to the threat to officer safety and the reasonableness of deadly force. *Nelson v. County of Wright*, 162 F.3d 986, 990–91

(8th Cir. 1998). In *Loch*, the court found the use of deadly force reasonable where one individual ignored the order to get on the ground. Here, K and the rest of the group ignored the same orders. The danger confronting Salvosa was certainly greater here where Salvosa confronted the large group of aggressive individuals and none appeared to be willing to comply with commands. The use of force where an officer is outnumbered and the suspects are noncompliant is "objectively reasonable as a matter of law." *Cook*, 582 F.3d at 849. However, the danger of the situation escalated when Salvosa began giving specific commands to K. K was visibly brandishing a weapon, and refused to drop it despite commands to do so. Like in *Loch*, K recognized Salvosa was pointing his Taser at him and commanding him to drop the weapon. However, K ignored the order and turned with the weapon toward nearby individuals. The "use of deadly force" on an individual is "not constitutionally unreasonable" where the individual is aggressively brandishing weapons in a threatening manner, despite being repeatedly asked to drop them. *Hassan*, 489 F.3d at 919. Officer Salvosa would have been justified in using deadly force. However, he did not use deadly force, but rather deployed his less-lethal Taser.

> **2.     Second Use of The Taser Was Objectively Reasonable.**

After the first Taser use, Salvosa directed his attention to the remaining individuals involved in the fight. Salvosa continued to order the other

individuals to get on the ground. He was joined by Officers Turner and Nordby who also ordered individuals to get down on the ground. As individuals began to comply with the officers' orders, K began moving his hands while still clutching the weapon to his chest. When K's movement alerted another officer to the fact K was still holding the weapon, officers began yelling at K to drop the crowbar. Numerous officers repeated the order; however, K remained noncompliant. Turner approached K, grabbed the weapon from his hand, and threw it off to the side. Officers continued to shout orders to get down on the ground as a number of the individuals involved remained noncompliant. As the officers continued ordering people to the ground, another individual came running up to the scene. An officer shouted at the individual not to come running up to where the officers were. As one of the officers moved toward the individual's location, K began looking around at the officers, before quickly pushing himself up to his elbows. Salvosa shouted at K directing him not to get up. K did not comply, and continued getting up off the ground. With the Taser pointed at K and the barbs still attached, Salvosa ordered K not to get up or he would receive a second Tasing. K did not comply and continued getting up. K was able to get into a sitting position with his palm planted on the concrete, and as he began to bend his legs he turned away from Salvosa and moved his hand

toward his waistband. Salvosa initiated a second Taser cycle, which brought K back to the ground.

Salvosa had to make a split-second decision on the use of force under rapidly evolving circumstances. While more officers were now on the scene, they were still outnumbered. A number of the individuals involved in the fight continued to not comply with orders to get to the ground. Officers did not have an opportunity to search any of the individuals to determine if there were other weapons. Additionally, just before K began to get off the ground an individual came running up on the scene.

Officer Salvosa's second use of the Taser was objectively reasonable. It is undisputed K's noncompliance continued after the first Taser cycle. K first failed to comply with commands to drop his weapon, and then failed to comply with commands to stay on the ground. Failure to comply with commands alone is enough to justify the use of force because an "officer reasonably perceives a heightened risk of serious physical harm when a suspect disobeys the officer's orders." *Billingsley v. City of Omaha*, 277 F.3d 990, 993-94 (8th Cir. 2002) (failing to halt after being ordered to stop multiple times). This principle is well established in this circuit. *See Boude v. City of Raymore, Missouri*, 855 F.3d 930, 933 (8th Cir. 2017); *Ehlers*, 846 F.3d at 1011; *Schoettle v. Jefferson Cty.*, 788 F.3d 855, 859–60 (8th Cir. 2015); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012); *Mann v. Yarnell*, 497

F.3d 822, 826–27 (8th Cir. 2007); *Wertish v. Krueger*, 433 F.3d 1062, 1066–67 (8th Cir. 2006).

K's noncompliance, in conjunction with his involvement in the violent confrontation, his previous use of a weapon and possible proximity to additional weapons, his earlier resistance to unequivocal commands, his aggressive and threatening behavior, as well as tense and rapidly evolving circumstances Salvosa was faced with, all contribute to the decision to deploy the Taser a second time. In such situations the second use of a Taser is objectively reasonable. *Procknow v. Curry*, 26 F. Supp. 3d 875, 887 (D. Minn. 2014).

### 3. Use of Force to Apprehend K was Objectively Reasonable.

Plaintiff claims officers kicked K and pushed his head into the ground. While the squad video shows no such conduct, officers did use force to turn K onto his stomach. Even assuming Plaintiff's description of the conduct is accurate, the officers' use of force was reasonable. Plaintiff admits when officers attempted to turn K to his stomach, K disobeyed officers' commands and attempted to get up. *Complaint ¶ 36*. Plaintiff also admits before subduing K, officers were unable to perform a weapons check. *Id., at ¶ 37*. Officers were entitled to use reasonable force to subdue K, who continued to be noncompliant, and secure the premises to ensure K would not pose a threat to anyone on scene. *Schoettle*, 788 F.3d at 860–61; *Carpenter*, 686 F.3d at 649–50; *Wertish*, 433 F.3d at

1066–67. While Plaintiff claims K's noncompliance was due to his head injury, this claim is immaterial. Even if K's "motive was innocent," the officers "on the scene reasonably could have interpreted [his] actions as resistance and responded with an amount of force that was reasonable to effect the arrest" and before officers could consider his medical condition "they had to subdue him and secure the premises." *Carpenter*, 686 F.3d, at 650.

**B.    Officers Not Deliberately Indifferent to Serious Medical Needs.**

Plaintiff claims the actions of the officers violated K's right "to be free from deliberate indifference to his serious medical needs." As an arrestee who had already been seized, K's claim is properly analyzed under the standard applied to a pretrial detainee under the substantive due process clause of the Fourteenth Amendment. *Stetter v. Riddick*, 6 F. App'x 522, 522–23 (8th Cir. 2001). The due process clause entitles persons who have been injured while in police custody protection at least as great as that afforded convicted prisoners under the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983). Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying needed medical care only if the person "knows of and disregards an excessive risk" to health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994). An official must

"both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The Eighth Circuit applies the deliberate indifference standard to denial-of-medical-care claims brought by arrestees. *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). The deliberate-indifference standard requires "both an objective and subjective analysis." *Id.*

To meet the objective component of the deliberate-indifference standard, Plaintiff must plead facts sufficient to demonstrate K "suffered from an objectively serious medical need." *Id.* "To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.*

The subjective component requires a showing the officers actually knew K "needed medical care and disregarded a known risk to the arrestee's health." *Id.*, at 965. "This showing requires a mental state akin to criminal recklessness. *Id.* "A complaint must allege facts that demonstrate more than negligence, more even than gross negligence." *Id.* Plaintiff must also prove causation; that officials' "unconstitutional actions in fact caused [K's] injuries." *Senty-Haugen v. Goodno*, 462 F.3d 876, 890 (8th Cir. 2006).

Furthermore, where there is no dispute officers ultimately provided medical assistance, and the plaintiff claims "a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). An individual's "failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs." *Id.*, see also *Senty-Haugen*, 462 F.3d 890; *Reece v. Groose*, 60 F.3d 487, 491-92 (8th Cir. 1995).

Plaintiff cannot meet the objective component of the deliberate indifference standard. K's injury was not so obvious even a layperson would easily recognize the necessity for a doctor's attention. The officers had no knowledge K had suffered trauma to his head to the extent a substantial risk of serious harm existed. K's injuries, though ultimately severe, were internal and invisible to the officers attending to him. The officers attending to K found he was acting consistent with an intoxicated person, or one who does not want to be arrested. The evidence shows K acted consistent with a heavily intoxicated person in that he maintained consciousness, his breathing was labored, he was unsteady on his feet and appeared disoriented.

Nor can Plaintiff meet the subjective component of the deliberate indifference standard. There is nothing in the record showing officers refused to treat K, ignored his symptoms, treated him incorrectly, or acted with disregard for K's serious medical needs. Without knowledge of K's injury, the officers could not act with deliberate indifference or disregard for his medical needs. Nor is there any dispute that when it became clear K was injured officers called an ambulance to take K to the hospital. More importantly, an ambulance was called for someone else just seconds after K was Tased for the second time and this first ambulance was diverted to care for K when it arrived. As a result, K was being seen by paramedics just ten minutes after he was finally under control.

Furthermore, Plaintiff has failed to prove causation, and failed to place verifying medical evidence in the record to establish the detrimental effect of any delay in medical treatment. Because officers were not aware of K's injuries, they could not deliberately disregard his medical needs, thus there was no unconstitutional action that can serve as the cause-in-fact of K's injuries. Plaintiff will likely argue officers should have called an ambulance sooner, and when they did call an ambulance they should have requested the ambulance respond under an emergency code three. However, there is no constitutional requirement officers must call an ambulance for someone exhibiting signs of intoxication, nor is there a requirement that officers must treat every possible head injury as an

emergency. Even if the officers were required to request an ambulance respond under an emergency code when they became aware K could be injured, Plaintiff failed to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment, thus precluding a claim of deliberate indifference to medical needs. *Coleman*, 114 F.3d at 784. Plaintiff has provided no evidence to support the claim that had officers requested the ambulance respond under an emergency code, K would have been treated any sooner than he already was. Because, again, the first ambulance was called at about the same time K was Tased for the second time and was diverted to care for K when it arrived about ten minutes later. Moreover, there is no evidence the second ambulance would or could have arrived sooner than the first ambulance even if it had traveled faster under an emergency code. Accordingly, any argument based upon when K's ambulance was called, or the code used to request the ambulance must fail.

Plaintiff is precluded from maintaining his denial-of-medical-care claim. There was no obvious injury or indication a substantial risk of serious harm existed when officers attended to K. There is no evidence officers initially disregarded K's medical needs, or ignored his symptoms when they became aware he required further medical attention. The officers responded to K's changing medical condition, and placed him in the first ambulance that arrived

on scene. In fact, the first ambulance was called by officers seconds after K was Tased and fell the first time. The officers' actions are inconsistent with the claim they were deliberately indifferent to K's medical needs, and their decisions did not amount to a constitutional violation.

## C.    Not Clearly Established.

Even if this Court concludes the officers' use of force or response to K's medical needs violated a constitutional right, Plaintiff cannot establish any of the officers' actions violated a clearly established right. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639-40 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. Clearly established law should not be defined at a high level of generality, but rather must be particularized to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*

As the foregoing case law illustrates, the officers' use of force does not amount to a constitutional violation where the officer had cause to believe the

suspect posed an immediate risk of harm to the officer or others in the vicinity. Furthermore, the officers' response to K's medical needs is inconsistent with a claim that officers were deliberately indifferent. Therefore, the officers did not violate K's clearly established constitutional rights and thus are entitled to qualified immunity.

## II.    NO *MONELL* CLAIM.

Under § 1983, a political subdivision is not vicariously liable for the unconstitutional acts of its employees unless the acts implement unconstitutional policy or custom. *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535–36 (8th Cir. 1999). Liability only exists if a municipal policy or custom caused the constitutional violation. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 395 (8th Cir. 2007). A municipality may be liable only if a plaintiff can show that an official policy of the government is "the moving force of the constitutional violation." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978). Plaintiff's Complaint fails to allege any City of Brooklyn Center policies or customs were unconstitutional. Moreover, no City policies or customs were the moving force behind any alleged unconstitutional acts.

Furthermore, for municipal or supervisory liability to attach, individual liability first must be found on an underlying substantive claim. *McCoy v. City of Monticello*, 411 F.3d 920, 922–23 (8th Cir. 2005); *Carpenter*, 686 F.3d at 651;

*Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 673–74 (8th Cir. 2007); *Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011). As discussed above, Plaintiff failed to establish any officers violated his constitutional rights. Because he failed to establish the officers violated K's constitutional rights, Plaintiff cannot maintain this action against either the officers or the City. *Schoettle*, 788 F.3d at 862. Accordingly, Brooklyn Center is entitled to summary judgment as a matter of law on Plaintiff's *Monell* claims.

## IV.    OFFICERS ARE ENTITLED TO OFFICIAL IMMUNITY.

Plaintiff alleges all the officers committed a battery and wrongful death under Minnesota state law. The officers are entitled to summary judgment based on official immunity because they acted within their authority and discretion in using a reasonable degree of force to apprehend K.

The common law doctrine of official immunity protects governmental officials from suit for discretionary actions taken during the course of their official duties. *Kari v. City of Maplewood,* 582 N.W.2d 921, 923 (Minn. 1998). Under the common law doctrine of official immunity, a public official exercising discretionary judgment is not personally liable for damages unless the official's actions constitute "a willful or malicious wrong." *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988). Official immunity enables "public employees to perform their duties effectively, without fear of personal liability that might

inhibit the exercise of their independent judgment." *Vassallo ex rel. Brown v.*

*Majeski*, 842 N.W.2d 456, 462 (Minn. 2014) (citing *Anderson v. Anoka Hennepin*

*Independent School District 11,* 678 N.W.2d 651, 655 (Minn. 2004)).

To determine whether official immunity applies, the Court looks to three

factors:

(1)    the conduct at issue;
(2)    whether the conduct is discretionary or ministerial and, if ministerial, whether any ministerial duties were violated; and
(3)    if discretionary, whether the conduct was willful or malicious.

*Vassallo*, 842 N.W.2d at 462. As the Minnesota Supreme Court noted in *Vassallo*,

at this stage the task is simply to determine whether a duty is discretionary or

ministerial, not to consider whether any such duty might have been violated, and

a court that does so answers "the wrong question." *Id.*, at 463.

The legal determination of whether a duty is discretionary or ministerial is

made by reference to the public official's decision-making process. In the context

of official immunity, discretionary duties are those that require making choices

between alternatives and balancing competing factors. By contrast, a ministerial

duty does not involve making a decision based on competing factors, but rather

involves fixed and designated facts that call for the mere execution of a specific

duty that is absolute, certain, and imperative. *Id.*, at 463.

Police officers are generally classified as discretionary officers entitled to

official immunity. *Johnson v. Morris,* 453 N.W.2d 31, 42 (Minn. 1990) (*citing*

*Elwood*, 423 N.W.2d at 677). Peace officers are charged with the duty to prevent crime and enforce laws, and "are not purely ministerial officers, in that many of their duties are of an 'executive character involving the exercise of discretion.'" *Johnson v. Dakota County,* 510 N.W.2d 237, 239 (Minn. App. 1994).

If the duties are discretionary, the court next determines whether the official acted willfully or maliciously. *Elwood*, 423 N.W.2d at 679. Malice is the "intentional doing of a wrongful act without legal justification or the willful violation of a known right." *Rico,* 472 N.W.2d at 107. In the context of official immunity, malice is an "objective inquiry into the legal reasonableness of an official's actions." *Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 570 (Minn. 1994). Malice "requires proof of a wrongful invasion of the rights of another." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999). "Mere allegations of malice are not sufficient to support a finding of malice, as such a finding must be based on 'specific facts evidencing bad faith.'" *Semler v. Klang*, 743 N.W.2d 273, 279 (Minn. App. 2007) (citing *Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn. App. 1990)). To deny official immunity, the evidence must show that "the public employee so unreasonably put at risk the safety and welfare of others that as a matter of law it could not be excused or justified—only under such circumstances will malice be found and immunity be lost." *Kari*, 582 N.W.2d at 924 (Minn. 1998). The question is not whether the police officer *intentionally*

committed the act, but whether the officer had reason to believe the conduct being challenged was prohibited. *Johnson,* 510 N.W.2d at 240.

Here Plaintiff's claims of battery are barred by official immunity. Minn. Stat. § 609.06 authorizes police officers to use reasonable force when making arrests. Because police officers may have contact with individuals for legitimate purposes, the force used must be excessive to constitute battery. *Johnson v. Peterson*, 358 N.W.2d 484, 485 (Minn. App. 1984) (force used by police not excessive and therefore did not constitute a battery).

As discussed earlier, officers acted within the scope of their duties and discretion as law enforcement officials in using a reasonable degree of force to apprehend K. Plaintiff simply cannot produce any evidence the officers acted in bad faith or with malicious intent to defeat the application of official immunity. Accordingly, the Brooklyn Center Officers are entitled to summary judgment based on official immunity.

Since the officers are entitled to official immunity, Brooklyn Center is entitled to vicarious official immunity. Vicarious official immunity protects the governmental employer from liability when its public official is entitled to official immunity. *Pletan,* 494 N.W.2d at 42, 44. If official immunity applies to a public official's conduct, vicarious official immunity will apply to the governmental employer. *Watson ex rel. Hanson v. Metro. Transit*, 553 N.W.2d 406,

415 (Minn. 1996). Vicarious official immunity protects municipalities because a threat of liability against a governmental entity would also influence government employees and hinder them from exercising independent judgment. *Pletan,* 494 N.W.2d at 42. If vicarious official immunity is not granted, and the officers' conduct is reviewed for the purpose of holding the City liable, "the purpose of official immunity" – to shield public officials' exercise of independent judgment from civil adjudication – "is, as a practical matter, defeated." *Id.* Therefore, Brooklyn Center is entitled to vicarious official immunity.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant their Motion for Summary Judgment and dismiss Plaintiff's claims in their entirety, with prejudice, together with costs and disbursements.

IVERSON REUVERS CONDON

Dated:  July 10, 2017                    By  s/Jason M. Hiveley
                                            Jason M. Hiveley, #311546
                                         9321 Ensign Avenue South
                                         Bloomington, MN  55438
                                         jasonh@irc-law.com
                                         (952) 548-7200

                                         *Attorneys for Defendants City of Brooklyn Center, Alan Salvosa, Cody Turner, and Gregg Nordby*