# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Khottavongsa,
As Trustee for the Heirs
and Next of Kin of
Sinthanouxay Khottavongsa,

              Plaintiff,

      v.

City of Brooklyn Center, Police Officers Alan
Salvosa, Cody Turner, and Gregg Nordby,
acting in their individual capacities as City of
Brooklyn Center police officers,

              Defendants.

Court File No. 16-cv-1031 RHK/DTS

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT**

## INTRODUCTION

Sinthanouxay Khottavongsa ("Khottavongsa"), was a 57-year-old, 5'4 145 pound Laotion immigrant, who spoke little English. Even with common phrases, Khottavongsa would look for clarification from others, or gesturing. Rissman Declaration Exhibit O, Kevin Khottavongsa Tr. 60:22-62:18. Khottavongsa was a man who was "always helping." *Id.* 65:5-16. In that spirit, he wanted to help his friends when they were under attack from a group of criminals on January 16, 2015. Yet it was not those criminals who ended his life, but the excessive force of Brooklyn Center police officers Alan Salvosa, Cody Turner and Gregg Nordby.

Salvosa shot first and asked questions later. Despite having the time to assess the scene, and learn that Khottavongsa was one of the victims in a conflict that had already

de-escalated, Salvosa sprinted out of his car and tased Khottavongsa within seconds of arrival. Salvosa tased him one second after Khottavongsa turned around to discover he was a police officer, despite no threatening movements.  Khottavongsa received a violent blow to the head after falling on the concrete.  His injury was obvious to all.  Salvosa, Turner and Nordby ignored the obvious injury and tased him again, subjecting him to a second forceful blow to the concrete.  They continued to exacerbate his head injury by subjecting to further rough treatment and dragged him across the parking lot when he could no longer walk.  By the time the ambulance arrived, it was too late: Khottavongsa's brain injuries were irreversible.  He died at the hospital after being in a coma for two days.

Khottavongsa's son and wrongful death trustee bring this action pursuant to 28 § 1983 and Minnesota Wrongful Death statute.  There are few undisputed facts in this case. Summary judgment should be denied.

## FACTS

### I.      Khottavongsa Defends His Friends From an Assault

On the night of January 16, 2015 Khottavongsa was visiting his friend Kear Som, and his wife Taing Hong, and their son Leang Sarin at the Sarin Autobody shop, which is connected to the Sarin's adjoining the business, the Coin Laundry.  Near closing time, Randall Jackson, Erika Phillips and a third unidentified male ("Jackson group") came to the Coin Laundry, to use the bathroom.  Rissman Declaration Exhibit B, Cruz-Martinez Tr. 8:8-9:16; Rissman Declaration Exhibit C, Hong 5:14-7:18. Jackson and the other male were high.  Rissman Declaration Exhibit A, Jackson Tr. 7:9-10.  Taing Hong, who

45588

is similar in age and size to Khottavongsa, was along in the Coin Laundry getting ready to close up. Hong said they could not use the bathroom and told them to leave, because they were not customers. Cruz-Martinez Tr. 8:8-9:16; Hong 5:14-7:18. The Jackson group refused, and began threatening Hong with violence and using profanities towards her. *Id.*

Hong went and got her son Sarin from the autobody shop to help. Sarin came in the laundry and told them to leave, showing them the door. Rissman Declaration Exhibit D, Sarin Decl. ¶ 6-11. As the Jackson group began to leave, they pulled Sarin outside and began beating him. *Id.*; Rissman Declaration Exhibit E, Leang Sarin Tr. 10:18-13:1. Sarin escaped their grasp, but the altercation continued for several minutes. *Id.*

Eventually Khottavongsa and Som came outside to help Sarin. Cruz-Martinez Tr.13:25-15:5; Sarin Decl. ¶ 11. Khottavongsa was assaulted, and was on the ground getting kicked and punched in the legs and torso. *Id.* 13:25-15:5; 17:9-18:12. Cruz-Martinez testified Khottavongsa was not struck in the head. *Id.* 17:9-18:12.

Kear Som went and got a bat to defend Khottavongsa and his son. Rissman Declaration Exhibit F, Som Tr. 14:2-16; Cruz-Martinez Tr. 14:2-13. Certain 911 calls report that someone had a bat, others did not. Rissman Declaration Exhibit G, 911 Transcript. The 911 callers did not say anyone was being assaulted with the bat. *Id.* Khottavongsa did not have the bat. Som Tr. 14:2-16. The police concluded there was no credible evidence of Jackson getting hit with a bat. Rissman Declaration Exhibit H, Coleman Tr. 89:9-90:18. There is absolutely no evidence the Jackson group got hold of

the bat, or used blunt object to hit Khottavongsa in the head. As Jackson put it, everyone was alive before the police got there. Jackson Tr. 25:14-20.

Khottavongsa went back inside the laundromat after Som got him off the ground. Cruz-Martinez Tr. 20:11-21. Sarin was outnumbered and getting punched repeatedly. Coleman Tr. 86:12-24. Khottavongsa came outside of the laundromat with a crowbar to "break the fight up." *Id.* 83:18-22. He also wanted to protect Sarin, Som and Hong, who were assaulted by the Jackson group. *Id.* 68:24-69:4; 80:9-18.

By time Khottavongsa got the crowbar from the adjoining mechanic shop and came back out, the fight was breaking up and participants had fled. Cruz-Martinez Tr. 20:11-21; 26:7-17. Leang Sarin testified that the fighting had stopped 3-4 minutes before police arrived. Saring Tr. 32:2-33:6. Sarin had "choked out" the main aggressor Randall Jackson and sat him down on the sidewalk in front of the laundromat, and was waiting for the police to show up. *Id.* 15:9-16:1; 32:2-33:6. Sarin wanted the police to come. *Id.* 34:7-11. Sarin testified they never re-engaged, one of the other aggressors had run off, and the other aggressor Erika Phillips, had been maced and was no longer engaged. *Id.* 32:15-20. No one else was fighting. *Id.* 33:4-6. Khottavongsa had just taken a few steps outside with the crowbar when the police arrived. Cruz-Martinez Tr. 20:11-21; 26:7-17.

Although the fight had broken up when Salvosa arrived, certain members were still present and yelling. According to Nochez, they were not fighting, but instead were moving back and forth. Nochez Tr. 25:18-29:10; 33:3-16. Nochez clarified that his comment which can be heard Salvosa's audio recording that "they are beating the crap

out of each other" did not actually mean physically fighting, just that there were people still at the scene and that they were moving. Nochez Tr. 33:17-35:5.

## II.    Officer Salvosa Reacted Too Quickly in Tasing Khottavongsa

Salvosa was accompanied by Cadet Nochez, who was his mentee. 911 calls identified that the perpetrators were African-American and the victims were Asian. 911 Transcript. It is common practice for dispatchers to relay identifying information to officers. Coleman Dep. Tr. at 38:5-7. Salvosa was informed there was a fight, and possibly a baseball involved. Nochez Tr. 22:3-6. Salvosa claimed to have been told there was something sharp just as he pulled, and that it appeared on the notes of the CAD report. Rissman Declaration Exhibit L, Salvosa Tr. 33:11-34:18. The CAD notes do report an individual with something sharp, but the notation were made after Salvosa tased Khottavongsa. Rissman Declaration Exhibit FF, CAD Report. Salvosa admitted he would not have had the information prior to the first tasing. Salvosa Tr. 39:21-40:10. Salvosa clearly read the CAD after the altercation or in the course of the litigation, and has falsely claimed he had the information at the time. *Id.*; Nochez Tr. 22:7-9 (contradicting Salvosa).

Salvosa approached the scene at over 60 mph. Salvosa Video 9:15:15. Knowing there was a fight, Salvosa planned to get his taser out before he arrived and assessed the scene. Salvosa Tr. 40:16-41:3. Instead of pulling into the parking lot where the altercation was proceeding, he chose to park his car to not allow the dashcam video to capture his pre-determined use of his Taser. Rissman Declaration Exhibit M, Salvosa Dep. Exhibit 5 (handwritten "C" is where Salvosa parked). His excuse was pulling in the

parking lot would have required a U turn, which is demonstrably false. *Id.*; Salvosa Tr. 50:18-51:15.

Salvosa got out of the car and sprinted onto the scene, accompanied by Nochez. Salvosa Tr. 60:13-61:2. Nochez could assist if Salvosa was in trouble, and he was equipped with weapons, handcuffs and was trained in defensive tactics. Salvosa Tr. 41:18-42:13. Salvosa knew Turner was three blocks away, and that Deering was close. *Id.* 88:14-89:20. While running he yelled to the group to "get on the ground." Rissman Declaration Exhibit N, Salvosa Video at 9:16:06. He then stood there for 10 seconds, not giving any commands to anyone. *Id.* He then said to the group in a slightly elevated pitch, "get on the ground, get on the ground, get on the ground." *Id.* He then said to Khottavongsa, "drop it, drop it, drop it" in rapid succession with no significant breaks in between. *Id.* His final "drop it" command was yelled. Salovsa testified "drop it" was the first command he gave to Khottavongsa. Salvosa Tr. 65:20-66:2. Salvosa fired the taser 4 seconds after initially telling Khottavongsa to drop it, and 7 seconds after initiating commands for the group to get on the ground. Def. Memo, at 13. These commands initiated 17 seconds after Salvosa arrived, prior to which he gave no commands to Khottavongsa. Salvosa Tr. 96:8-97:2. Salvosa got out of the car, ran to the scene and tased Khottavongsa within 24 seconds. *Id.* 87:8, 94:7-16.

Critically, Khottavongsa had his backed turned to Salvosa when he was giving these commands, and could not have seen Salvosa's uniform. Salvosa did not identify himself as a police officer. Salvosa Tr. 64:18-20. Salvosa did not put his sirens or lights on, and parked out of sight. Salvosa Video 9:15:50. Salvosa yelling "drop it" the second

45588

6

or third time may have got Khottavongsa's attention.  According to Salvosa,

Khottavongsa looked over his shoulder towards Salvosa's direction in that final second

before Salvosa pulled the trigger.

> **Q.   He looks over his shoulder?**
> A.    Yeah, he kind of turns -- he makes eye contact
> with me, and he turns away and raises the crowbar.
> **Q.   Was that kind of a split second?**
> A.    Give or take. It would be a second or two, at
> tops.

Salvosa Tr. 73:1-6.  Khottavongsa did not immediately understand and looked at Leang

Sarin for guidance. Sarin Tr. 17:12-23; K. Khottavongsa 60:22-62:18. Sarin testified:

> Q. What was Sin doing when the taser was deployed, right
> before?
> A. Turned. Like, he -- he was looking at me. When I saw him,
> he looked at me. I think he was just kind of back there
> …
> When all this ruckus is happening, he turned, and then that's
> when he got hit, you know. **Still nothing. His hand is down.**
> **The body just turned.**
> Q. He was turning towards the officer?
> A. **Just probably to see what was going on**. I mean,
> everything -- you got five or six officers and a bunch of people
> yelling and stuff. Lights are flashing. I don't know.
> …
> Q. Okay. But, then, was **it while he was turning that the**
> **taser hit him**?
> A. Hit him.
> Q. Then what did he do?
> A. Fell straight back, nothing, no – just straight. And his head
> landed, probably, a couple feet away from my head.

Sarin Tr. 19:21-20:23. Only a split second or two later, Salvosa fired his taser at

Khottavongsa in dart mode, striking Khottavongsa in the back.  Thus, Salvosa afforded

Khottavongsa a split second or two to comply with his commands, once Khottavongsa

45588

could have possibly seen he was a uniformed officer. Even if Khottavongsa comprehended every single command through the noise, and knew he was a police officer despite his back being turned, he only afforded Khottavongsa 4 seconds.

The audio recording makes Salvosa's final commands sound clear because of the microphone on Salvosa. Salvosa Video 9:16:20. This is not what Khottavongsa heard, nor other bystanders. Several witnesses, including Salvosa, reported other people yelling and ruckus while Salvosa was giving commands. Salvosa Tr. 95:8-11 ("There's a lot of commotion, people yelling"); Sarin Tr. 38:15-39:22; Hong Tr. 16:9-13 ("too much noise" to hear commands to drop it); Hong Tr. 35:18-19 ("the people were yelling"); Jackson Tr. 10:16-19 ("it was just a lot of commotion and it happened really really quick"); Jackson Tr. 18:23-19:5 ("there was a lot of yelling…"). Nochez said no one reacted to the commands and couldn't remember anyone looking towards Salvosa or Nochez when they gave the commands. Nochez. Tr. 48:19-23.

Multiple witnesses in the same general area, testified their first indication the police had arrived were squad car lights, not Salvosa's commands. Salvosa did not park his car on the scene, and the bright lights witnesses saw were Turner's lights. *See* Sarin Tr. 48:5-15; Rissman Declaration Exhibit J, Turner Video 9:16:30. Turner pulled in the parking lot after Salvosa had already pulled the trigger, just as Khottavongsa was falling. *Id*. In Turner's video, you can hear Turner repeatedly yelling for everyone to get on the ground, and then yell for Khottavongsa to drop the crowbar. *Id.* At this point Khottavongsa was lying flat on the ground after suffering a violent blow to the head, and

was holding the crowbar but not moving.   Sarin was asked shortly after the incident whether he heard Salvosa's commands:

> "I didn't hear. . . There was a lot of noise and stuff like that. I saw lights and went down."

Sarin Tr. 38:15-19; 39:7-40:10. He describes the lights as from a car parked 25-30 feet away, matching the location of Turner's squad car.  *Id.*  Sarin could not say if he heard any police commands before Khottavongsa was tasered, correcting his earlier testimony as to the order of events.  Sarin Tr. 49:21-24; 47:1-21.  Sarin testified he dropped to the ground right away once Turner arrived, which he can be seeing doing in the Turner video, after Khottavongsa was tased.  Sarin Tr. 18:2-4; Turner Video 9:16:30.

Som similarly testified that his first indication of police presence were the lights, and the fact he knew someone had called 911. Som Tr. 24:9-25:13. Som testified he dropped to the ground as soon as he heard officers command him to. Som Tr. 22:11-14. He testified the first commands he heard are what can be heard at 9:16:46-55 on the Turner video, when Khottavongsa had already fallen.  Som Tr. 47:7-48:13. These would have been Turner's commands to get on the ground, and to drop the crowbar, after Khottavongsa was already tasered.

Taing Hong did not remember the police giving commands before Khottavongsa was tasered and fell, because there was too much noise.  Hong Tr. 16:9-13.  Hong turned around towards Salvosa after she heard the pop of his taser, as Khottavongsa was falling to the ground.  Hong Tr. 14:9-19.  The first thing Hong saw were the lights from Turner's squad car.  Hong Tr. 34:4-20.  Hong testified she heard "go down," when the police came

out from the squad car.  Hong Tr. 14:9-16:6. Turner was the first squad car to arrive in the parking lot.

Jackson had surrendered and was sitting on the stoop in front of the laundromat. He couldn't see well because he had been maced.  Similar to Sarin, Som and Hong, Jackson first recalls a police officer with a gun out yelling to get on the ground.  Jackson Tr. 20:7-14.  This description is consistent with the Turner video, which demonstrates the command Jackson heard was after Khottavongsa had been tased.

 In fact, Som, Sarin, Taing Hong and Randall Jackson all appear to freeze just after Khottavongsa is tasered.  Turner Video 9:16:30. There is a brief moment were no commands were issued, and then Turner started issuing commands.  *Id.*  Some persons immediately dropped to the ground, but for others it took multiple warnings.  Hong, who speaks some English, required several commands before she understood officers were speaking to her, and then she followed the directions.  Hong Tr. 15:15-25.

Witnesses at the scene agreed Salvosa tasered Khottavongsa too quickly.  One witness reported to doctors at the hospital, "the patient does not speak much English and says that the police didn't even give him a chance before they tased him twice."  Rissman Declaration Exhibit P, Khottavongsa_00106, at 120. Mohammed Elmi, owner of the quick shop next door, told investigators shortly after the incident that, "I don't know if he had a chance to drop it."  Rissman Declaration Exhibit Q, Elmi Tr. 21:16-19.  Elmi testified that officers "shot him right away . . . the whole thing happened in seconds." Elmi Tr. 21:6-15.  Guadalupe Galarza testified they gave him only seconds before tasing him.  Rissman Declaration Exhibit R, Galarza Tr. 14:6-15.  Leang Sarin stated the police

45588

10

"reacted too quickly." Sarin Decl. ¶ 20. Elmi testified he didn't think anyone would have

been in danger if they gave him more time to comply. Elmi Tr. 24-20.

Police officers should be trained to avoid "Time Compression," where:

> an officer becomes so emotionally involved by a person
> he/she perceives as resistant that the officer over reacts and
> rushes into a situation when he/she didn't have to. Typical
> symptoms would be… shouting/screaming confusing
> commands and/or engaging an agitated person who doesn't
> present an immediate threat.

Rissman Declaration Exhibit S, Police Conduct Expert Chuck Drago Rpt. ¶ 42.  Drago

opined that police officers are trained to deescalate situations when there is only a

potential, non-immediate threat *Id.* ¶ 41.

### III.    It was Obvious Khottavongsa did not Comprehend Salvosa's Commands.

Witnesses who did not know Khottavongsa, or the fact he did not speak much

English,[1] immediately observed that he was not understanding police commands and may

not have spoken English. Cruz-Martinez Tr. 32:8-33:10; Galarza Tr. 14:6. It took Turner

only eight seconds to assess that Khottavongsa did not understand, because he did not

speak English. Rissman Declaration Exhibit T, Turner Tr. 71:21-74:15.

Drago opined that officers should be trained to recognize people who do not

comprehend commands, including because they do not speak English.  Drago Rpt. ¶ 39.

---

[1] Defendants make much of their claim that Khottavongsa really did speak English.  First,
this a fact dispute for the jury.  Second, the witnesses he relied upon all told police days
after the incident that Khottavongsa did not speak English well.  Hong Tr. 38:8-39:7;
Som Tr. 55:8-15 ("I barely understood him").

If a person does not speak English and is only a non-immediate threat, officers should attempt other tactics to gain compliance. *Id.*

### IV. It is Disputed Whether Khottavongsa Raised or Threatened Anyone with the Crowbar

Salvosa did not feel the need to tase Khottavongsa right away, just because he had a crowbar. Salvosa claimed he tasered Khottavongsa because he raised the crowbar as if to strike someone. Salvosa testified that had Khottavongsa turned away and not raised the crowbar, he would not have tased him:

> Q. **Was raising the crowbar sort of the final straw, I guess? Is that a fair way to put it?**
> A. That, coupled with making eye contact, breaking it and turning away from me and raising it, I guess, is kind of the -- *had he kept it by his side and not done anything, I probably would have tried to talk to him more and -- and figure things out,* but kind of when you break eye contact, turn your body away and raise it, I guess there's really no way to talk to someone's back and hope that they're -- *I mean, had he turned away from me and lowered it, it would have been a different story,* but he turned away and raised it, so I guess that was kind of the final straw, yes, sir.

Salvosa Tr. 84:2-14 (emphasis added). Salvosa further claimed that Khottavongsa had been swinging it prior to Salvosa giving commands. *Id.* 83:6-16.

Turner, Nochez, Sarin, Som, Galarza, Cruz-Martinez, and Elmi all contradict Salvosa's testimony, and testified Khottavongsa did not raise the crowbar in that final moment, or ever. Each of these seven witnesses had different vantage points, different biases and differing roles in the altercation. These witnesses also dispute Salvosa's testimony that Khottavongsa had been engaged in the brawl just prior to Salvosa's arrival, that he had been swinging the crowbar, walking "aggressively," or that people

45588

12

were backing away from him.  He had just walked out of the laundry and then turned back towards the laundromat, looking towards Sarin.

Turner testified that Khottavongsa had lowered the crowbar, and he did not believe Khottavongsa was going to hit anyone because he was walking away from Salvosa.  Turner Tr. 54:5-13.  Nochez testified he did not see Khottavongsa raise the crowbar in a threatening manner in the final moment.  Rissman Declaration Exhibit K, Nochez Tr. 84:10.  Sarin also testified that the crowbar was in down position when he was Tasered.  Sarin Tr. 17:12. Sarin said he did not see Khottavongsa threaten anyone with the crowbar, and the "distance [was] too far" for anyone to feel immediately threatened. *Id.* 36:13. Som, who was closest to Khottavongsa when he was tased, testified that he never saw Khottavongsa swing the crow bar at anyone and that the crowbar was in a downward position. Som Tr. 20:12-14.

Galarza testified that Khottavongsa was holding the crowbar down and that he did not threaten anyone. Galarza Tr. 13:15. Maria Cruz-Martinez also testified that Khottavongsa never raised the crowbar and that he kept it close to his body:

**Q. And what did you see him doing with the crow bar?**
A. He was just standing there.
**Q. Just standing there?**
A. It was close to him, though. It was like close to his body…It wasn't like out. His hands were not stretched out. It was close to his body… Because, I guess, when he saw the police, he just hold it there.
…
**Q. Okay. Did you see him raise it above his head
at any time?**
A. No.
**Q. Did you see him hit anybody with the crowbar?**
A. No.

45588

**Q. Did you see him threaten to hit anybody with the crowbar?**
A. No.

Cruz-Martinez Tr. 21:25-22:23. Cruz-Martinez speculated Khottavongsa was trying to go

back in the laundromat, because he turned "a little bit." *Id.* 23:6. Despite being in the

laundromat with her 9 year old son, she was not concerned for safety, and did not witness

others who appeared to backing away from Khottavongsa in fear. *Id.* 23:23-24:16.

Mohamed Elmi was in agreement with the other independent witnesses that

Khottavongsa didn't wave the crow bar at anyone nor did he threaten anyone:

**A. He was standing in the front of the laundry.**
Q. Okay. And you said he was just standing there, right?
**A. Yeah. He was just standing. When the police came, he was standing with the stick in his hand. He was standing there. He was not fighting or anything else going on –**
…

And you just indicated that he was holding the crowbar in a downward position?
**A. Yes, yes. In his right hand, I believe, in his right hand.**
…
Q. Okay. Did you see him wave it at anybody?
**A. Waving?**
Q. Yes.
**A. No.**
Q. Was he going to strike somebody with it?
**A. No.**
Q. Did you see him threaten anybody with it?
**A. No.**
Q. Did you see anyone backing away in fear, like they were scared of Mr. Khottavongsa and putting their hands up? Did you see anyone scared of him?
**A. No.**
Q. Did you see him threaten the officers with the crowbar?
**A. No.**

Elmi Tr. 21:20; 22:12-24:1.

The video evidence demonstrates it was physically impossible for Khottavongsa to

have raised the crowbar when he was tased. At 9:16:30 on the Turner video,

45588

Khottavongsa can be seen a split-second after he is tased. Drago opined that his body went into Neuromuscular Incapacitation (NMI). Drago Rpt. ¶ 29. Brooklyn Center Chief Gannon agreed, testifying Khottavongsa went into "body lockup," where "you fall in the position you were Tasered in." Rissman Declaration Exhibit U, Brooklyn Ctr. 30(b)(6) Tr. 186:2. Nochez also testified the crowbar was in the same position when Khottavongsa hit the ground as it was when he was standing. Nochez Tr. 85:11. Khottavongsa fell with the crowbar down and close to his body, therefore that was the position the crowbar was in when he was tased.

Officers at the scene did not believe Khottavongsa attempted to hit anyone with a crowbar. Threatening to hit someone with a crowbar is a serious offense- a felony second degree assault. In contrast, Khottavongsa was charged with disorderly conduct and obstruction of legal process without force. Coleman Tr. 80:19-22. Turner recommended disorderly conduct despite witnessing the events and agreed that swinging a crowbar is not consistent with Khottavongsa's charges. Turner Tr. 130:4-20. To justify his actions, Salvosa initially recommended second degree assault, but Sergeant Coleman disagreed because Khottavongsa was trying to break up the fight and defend the owners of the store. Coleman Tr. 80:9-18.

Coleman conducted the on-scene assessment. After conferencing with all the officers at the scene, Coleman concluded that Khottavongsa had failed to follow commands, but never physically resisted arrest or was violent. Coleman Tr. 92:5-22; 105:5-20.

## V.     Officers Easily Remove the Crowbar from Khottavongsa, but Do Not Take Him Into Custody

After Khottavongsa fell, the scene is captured on Officer Turner's squad video. Officer Turner got out of the squad car and yelled for everyone to get on the ground. Turner Video 9:16:30. Khottavongsa remains on the ground, complaint with Officer Turner's command (if he even understood it). *Id.* While it took repeated commands for everyone to get on the ground, all persons were passive and not resisting. Jackson puts his hands up, as did Sarin. *Id.*

Nordby and Deering arrived next, followed shortly thereafter by Whittenburg and Coleman. *Id.*; Rissman Declaration Exhibit Y, Deering Video 9:16:40. Coleman's first action was to put on gloves because he did not want to get his hands dirty, demonstrating the lack of any immediate threats that needed attention. Coleman Tr. 53:14-24.

The officers were issuing different commands and didn't identify who they were talking to, which goes against best police practices for controlling crowds. Drago ¶ 50. Within those commands were orders from the officers to drop the crowbar. Turner Tr. 9:16:45. Khottavongsa had the crowbar in his right hand which was lying against his torso. *Id.*; Deering Video 9:16:45. Khottavongsa can be seen rubbing his head periodically with his left hand. *Id.* Khottavongsa's movements were slow and he was not making any aggressive movements. *Id.* Khottavongsa did not attempt to get up with the crowbar. Turner Tr. 67:25-68:2.

45588

Turner understood at this moment Khottavongsa did not understand them, and suspected he did not speak English. Turner Tr. 71:23-73:11. Turner explained his actions very shortly after the incident:

> "That's why he wasn't listening to our commands. I figured it was probably English related that's why I figured okay he's gonna be there all fucking night so I might as well grab the god damn thing while Al has him on the probes"
> …
> "He didn't have a fucking clue what we were saying."

Turner Tr. 71:23-72:14. Turner testified those statements were descriptions of why Turner went and got the crowbar. *Id.* Turner put in his police report:

> After commanding the male several more times to release the crowbar, **I then determined that he did not understand what I was saying at the time**, and as there were several more officers on scene at that time giving good protective cover of all parties, I advised them that I was going to remove the crowbar from his grip while he lay on the sidewalk.

Turner Tr. 76:1-16, Deposition Exhibit, Brooklyn Ctr. 6005, at 6007. Turner explained that he believed Khottavongsa did to not understand because Khottavongsa did not speak English. Turner Tr. 146:15-148:7.[2] Turner also thought Khottavongsa was disoriented, and that disorientation is not a normal result of a taser, indicating a secondary issue such as an injury from a fall. Turner Tr. 127:21-24.

Drago opined that an officer would maintain a distance from someone with a crowbar if he perceived the subject to be a threat. Drago Rpt. ¶ 49. Turner casually

---

[2] Turner later asserted he did not have an opinion on whether Khottavongsa spoke English at the time, and formed it later on. Turner Tr. 75:2. Which Turner testimony is to be given credence, should be left to the jury.

45588

informed the officers, "I'm gonna go up and grab it." Turner Video 9:16:59.

Recognizing Khottavongsa was no threat and simply did not understand the officer's commands, Turner grabbed the crowbar and easily removed it from Khottavongsa's grasp. *Id.*; Coleman Tr. 47:20-22. Khottavongsa made no voluntary movement. *Id.* If Khottavongsa meant officers harm, he could have swung the crowbar as Turner approached, but he did not. Turner threw the crowbar several feet away. *Id.*

Despite removal of the crowbar, Officers failed to take Khottavongsa into custody. This violates best police practices, as it puts the subject and the officers at greater risk. Drago ¶ 51. Officers at the scene admitted there was no reason why Khottavongsa could not have been put in handcuffs at the moment the crowbar was removed. Deering Tr. 54:12; Coleman Tr. 56:14.

### VI. Salvosa Tases an Unarmed, Injured Khottavongsa Again

Officers Turner, Salvosa and Deering begin shouting over the top of each other a series of contradictory commands. They made no effort to specify who they want to comply with each command, in violation of established police practices. Turner yelled, "get down, flat on the ground." Turner Video 9:17:08. Khottavongsa remained flat on the ground. *Id.* Turner then commands "flat on the ground, on your stomach." *Id.* Coleman yelled "do not come running up here." This command was to Erika Phillips who approached the scene.[3] Turner yelled again, "lay flat on your stomach, LAY FLAT

---

[3] Deering points her taser at Erika Phlilips but does fire the taser because she was "semi-compliant." Deering Tr. Coleman did not deem her a threat once she complied. Coleman Tr. 52:5-9.

45588

ON YOUR STOMACH." *Id.* Turner Video 9:14:15-17. Deering was simultaneously yelling "get down on the ground." Khottavongsa, who was lying flat on his back, cannot simultaneously roll over to his stomach and continue to stay on the ground. Just seconds after Turners' command to lay flat of his stomach, Khottavongsa put weight on his right arm and pushed laterally with his left arm, moves his left shoulder laterally, and slightly bends his left knee as one would do to roll over on their stomach. Turner Video 9:17:23. Cruz-Martinez testified he "rolled to his side." Cruz-Martinez Tr. 28:18. Salvosa contradicted Turner and said, "don't get up, don't get up you're going to get it again," finishing his command at 9:17:26. **Officer Salvosa applies a second application of the taser no more than one second later.** Turner Video 9:17:16. Salvosa admitted Khottavongsa seemed confused:

> Q.  Prior to tasering him a second time, did he appear confused?
> A.  Sure.  I mean, he had just gotten tased.  There's a lot of yelling.  There's a lot of movement around him.  I'd be confused, too.
> Q.  Okay.  Disoriented?
> A.  Sure, there's a lot of people yelling, there's -- he just got tased, and there's a lot of yelling and a lot of movement around.  Like I said, I'd be disoriented, too, if I had a bunch of people yelling things and I had just gotten tased.

Salvosa Tr. 133:15-35. Salvosa agreed Khottavongsa did not get up quickly, or jump up.[4]

*Id.* 140:22-24.

---

[4] Defendants claim, without citing any testimony or video evidence, that Khottavongsa "reached for his waistband." This absurd, unsupported allegation can be easily cast aside.

45588

During this period, there were six police officers and one cadet on scene. Defendants claim they were "outnumbered,"[5] although there were only six people under police control. More importantly, not one of the civilians was being violent, aggressive, threatening, or resisting arrest, either passively or actively/physically. Turner Video 9:17:30; Drago ¶ 63; Rissman Declaration Exhibit Z, Whittenburg Tr. 44:4-8. Moreover, they were hardly an intimidating bunch- Khottavongsa was 5'4" 145-pounds and was 57-years-old. Sarin is similar sized. Sarin Decl. ¶ 11. Hong and Som were described as elderly, petite, and approximately 5'1"-5'3". Cruz-Martinez Tr. 15:2-24. Jackson was bleeding from his eye and was maced. Phillips was apparently pregnant and had also been maced. In contrast, Nordby is 6'1, 240 pounds and can bench press 330 pounds. Nordby Tr. 10:16-12:3. Salvosa can do 50-60 pushups at a time. Salvosa Tr. 10:20-11:18. Turner is 6'3" and Whittenburg is 6'1", both regularly lift weights. Turner Tr. 9:19-10:4; Whittenburg 11:20-25. All 6 officers were trained in defensive tactics. Coleman Tr. 235:15. At least 4 officers- Salvosa, Nordby, Whittenburg and Turner, as well as Nochez, were available to handcuff and control Khottavongsa. *See* Turner and Deering videos.

Regardless of whether Khottavongsa was compliant with commands, the other officers and witnesses did not believe he was a threat, or at worst only a potential threat. Just before Salvosa tased Khottavongsa for a second time, Nordby approached Khottavongsa as he started to rise. Nordby had intended to use his foot to push

---

[5] Defendants appear to include in their calculus the witnesses who were inside the laundromat, and perhaps Cruz-Martinez's nine-year-old.

45588

Khottavongsa back to the ground, significantly less force than a second application of the taser in dart mode.    Nordby 80:1-81:25.  Nordby believed his physical strength and standing position gave him an advantage over Khottavongsa.  *Id.*  As the person closest to Khottavongsa, Nordby testified "the danger which Khottavongsa presents to me is – at this point probably pretty minimal…"  *Id.* at 81:18-21. Although he claimed Khottavongsa was a hypothetical threat to others, *id.*, he testified that "leaning up" presented only a potential threat, not immediate.  Nordby Tr. 72:5-12.

Officer Whittenburg was next closest to Khottavongsa in proximity.  Deering Video 9:17:20-30.  Whittenburg saw Khottavongsa start to rise upwards, and stood still doing nothing.  *Id.*; Whittenburg Tr. 39:7-12. Whitenburg admitted standing still and doing nothing are not what an officer does when he perceives a threat.  Whittenburg Tr. 25:22-26:2.  Whittenburg testified Khottavongsa did not present an immediate threat to him or others.    Whittenburg Tr. 43:13-15; 44:1-3.  Coleman was close by and glanced up as Khottavongsa moved.  Deering Video 21:17:23. Coleman recalled no threats to his safety or the safety of others from Khottavongsa.  Coleman Tr. 55:3-7.  Deering walked to the other side of Khottavongsa.  Turner Video 21:17:00-29.  Deering Tr. 59:25-60:10. Deering did not observe any threat from Khottavongsa.  Deering Tr. 61:3-10.  Nochez, who was near Khottavongsa, similarly did not view Khottavongsa's attempt to sit up as a threat because the crowbar had been removed.    Nochez Tr. 106:21. Witness Elmi similarly testified Khottavongsa was not a threat to anyone when he started sitting up. Elmi Tr. 17:8-22.  Elmi testified Khottavongsa was not moving quickly and was not

45588

trying to stand up, just sit up.  *Id.* 17:24-18:5.  Galarza testified Khottavongsa appeared

injured when he was trying to roll over and sit up.  Cruz-Martinez Tr. 28:14-29:13.

Only hours after the incident, Salvosa justified tasing Khottavongsa on his police

report as follows:

> I immediately ordered him to drop it, and he did not.  I then
> used my foot to kind of roll him over to his stomach, and he
> began to push back.  He then attempted to get up and **fearing
> that he would use the crow bar again** I pulled the trigger on
> the Taser and he was shocked for another five seconds.

Rissman Declaration Exhibit AA, Salvosa Dep. Exhibit 3, Brooklyn Ctr. 5030, at 5034.

Later, however, Salvosa admitted his police report is wrong.  Salvosa Tr. 185:9-186:22.

Khottavongsa obviously did not have the crowbar when he attempted to roll to his

stomach or sit up, nor did Salvosa attempt to roll Khottavongsa with his foot before

tasing him a second time.  *Id*.  Officer Salvosa denied intentionally falsifying the report.

Salvosa Tr. 188:16-21.  Gannon and Coleman testified it was uncommon for an officer to

get something totally wrong on his police report. Coleman Tr. 105:1; Brooklyn Center

30(b)(6) Tr. 105:10-12. *See* Drago Report ¶ 59-62.  Shortly after writing his report,

Salvosa admitted to Nochez that Salvosa was "freaking out" about using force.  Rissman

Declaration Exhibit CC, Salvosa Video 10:24:44. Whether Salvosa falsified his report is

a credibility determination for the jury.  If he did, it is a reasonable inference Salvosa was

without justification for tasing Khottavongsa.  Regardless, the basis for Salvosa tasing the

second time does not exist in his police report, the place where he was supposed to justify

his use of force.  Drago Rpt. ¶ 60.

45588

**VII.    Officer Turner and Nordby Failed to Intervene on the Second Tase**

Salvosa testified other officers would have heard his commands and known that he intended to use the taser.  Salvosa Tr. 165:4-18.  Turner still had not told other officers Khottavongsa did not speak English.  Officer Salvosa testified he would have liked to know Khottavongsa did not speak English.  Salvosa Tr. 150:2-11. Turner eventually told Salvosa that Khottavongsa did not speak English.  Turner said he was busy, although the video shows him holding flashlight, standing still.  Turner Tr. 101:23-102:17; Deering Video 9:17:25. Turner offered no reason why he could not have done so after removing the crowbar from Khottavongsa.  *Id.*

Nordby admitted to hearing Salvosa threaten to use the taser a second time. Nordby Tr. 81:22-82:11. Nordby was prepared to use a much lesser force on Khottavongsa- merely restraining him with his foot.  Nordby did not communicate his intention with Salvosa. Salvosa testified he would have like to know what Nordby was going to do.  Salvosa Tr. 164:22-165:3. Salvosa implied he may not have tased Khottavongsa if knew what Nordby was going to do.  Salvosa Tr. 165:19-166:3.  Nordby was also right in front of Salvosa and easily could have intervened.  Turner Video 9:17:20.

After tasering him a second time, the officers fail to utilize the window of opportunity to handcuff Khottavongsa.  Salvosa then ordered Khottavongsa to roll over.  Khottavongsa was unresponsive.  Salvosa then threatens to tase Khottavongsa a third time for not rolling over.  Salvosa Tr. 148:20-22, which he admitted would have been improper.  Salvosa Tr. 149:12-150:1. Turner finally intervened and told Salvosa that

Khottavongsa did not speak English. After learning this, Salvosa stopped threatening to use the taser, and put the taser away. Turner Video, 9:17:45. Nordby uses a "roll over" gesture.

### VIII. Defendants Did Not Take Account of Khottavongsa's Medical Condition in Using Force to Effect His Arrest

After being tasered a second time and with their knowledge of his potential injury, Officers Nordby and Turner forcefully begin kicking Khottavongsa in an attempt to roll him over. Turner Video 21:18:04. Khottavongsa can be heard moaning and groaning in clear pain as the officers forcefully moved him. *Id.* Once Nordby and Turner forced Khottavongsa to roll, Turner grabs the back of Khottavongsa's head or neck and forcibly pushes his face down to the ground. Turner Video 21:18:17; Nordby Tr. 160:11-15. Khottavongsa was not an immediate threat when they initiated contact, and no threat at all once in handcuffs. Nordby Tr. at 159:3-13; 160:16-19. Khottavongsa can be heard moaning in pain for a nearly a minute straight. Turner Video 21:18:17. Salvosa is present but claimed to not be concerned because, "kids moan and groan. We don't call an ambulance every time a kid has a tummy ache; right?" Salvosa Tr. 158:23-159:7.

Turner and Nordby then lifted Khottavongsa off the concrete in an attempt to stand him up. *Id.* at 21:19:32. Khottavongsa is limp. *Id.* Turner yelled at Khottavongsa to stand, and when he cannot, the two officers then dragged Khottavongsa to the police car with him continuing to moan and groan in pain the entire time. *Id.* Both officers acknowledge they heard him moaning, but assumed that Khottavongsa was merely "faking" or "playing games." Nordby Tr. 176:16; Turner Tr. 135:7-11. Turner angrily told Khottavongsa to

45588

"get in the back of the fucking car." Turner Video 21:19:50. Khottavongsa did not have be brought to the car and could have been left on the curb. Turner Tr. 115:10-16.

While in the car, Khottavongsa slipped down in the space between the driver and passenger seats, because he was not restrained. Turner Video 9:20:16 Officer Turner noticed that Khottavongsa fell between the seats. *Id.* 9:21:22. Turner and Nordby then pulled him from the vehicle without supporting his head or neck. *Id.* Turner can be heard telling Khottavongsa to "hop out or we'll drag you it doesn't matter to me." *Id.* at 9:21:30. As the officers pulled Khottavongsa from the car he visibly hits his head against the car door. *Id.* The officers then lay him on the ground, face first. Nordby Video 9:21:45.

After being tasered by Officer Salvosa, Khottavongsa was repeatedly moved by Officers Nordby and Turner. *See* Turner Video. Salvosa witnesses part of this, but did nothing to intervene. Throughout the entire process, no officer attempted to stabilize his head or neck. *Id.* After reviewing the video, Chief Gannon admits that "less movement could have occurred." Brooklyn Ctr. 30(b)(6) Dep. Tr. 71:22-23. Whittenburg testified he would not have moved him if knew Khottavongsa hit his head, and would have stepped up the paramedic call to an emergency. Whittenburg Tr. 54:7-55:22.

Eventually, Officer Turner and Officer Nordby agree to call for an ambulance, but only to "CYA" which stands for "Cover Your Ass." Nordby Tr. 184:12-185:12. Paramedics eventually arrived and transported Khottavongsa to North Memorial Hospital. However, the paramedics were never informed of an emergency as officers called in the incident as "routine" instead of "lights and sirens." Whittenburg Tr. 50:1-52:4.

## IX. Khottavongsa Showed Obvious Signs of Injury Throughout the Incident

Khottavongsa fired his taser in probe mode and Khottavongsa was completely incapacitated. Turner Video 9:16:30. His body locks up and he falls straight down, with his head hitting the concrete. *Id.* Officers Salvosa, Turner and Nordby all saw him fall. Salvosa told others at the scene that Khottavongsa hit his head on the concrete, although he later denied knowledge in his deposition[6]:

> Nordby: Hey, Al, did this guy hit his head on the ground or anything?
>
> [Al] Salvosa: Yeah, he may have.
>
> Turner: Yeah he got a good clunk

Nordby Video 21:27:59; Nordby Tr. 185:19-186:7; Salvos. Unlike Salvosa, Turner admitted he knew Khottavongsa hit head, and that he fell hard. Turner Tr. 112:19-22. Turner also eventually told paramedics "he hit his head on the concrete." Nordby agreed with the description that Khottavongsa fell like a tree getting cut off at the bottom, and that he did not brace himself. Nordby Tr. 42:7-12; 41:11-17.

Witnesses at the scene testified it was obvious Khottavongsa hit his head very hard, and immediately believed he was injured. Sarin testified Khottavongsa "fell straight back" and that "it is not normal for a head to hit like that." Sarin Tr. 20:16-21:4; 53:14-24. Sarin described the sound of his head hitting the ground like "the pop of someone dropping a watermelon from five feet in the air." Sarin Decl. ¶ 19; *see also*

---

[6] Salvosa Tr. 103:6-14.

Sarin Tr. 28:7-14. Khottavongsa was "totally unresponsive at that point. His body was motionless and was twitching." *Id.*

Cruz-Martinez testified Khottavongsa hit his head on the concrete, and he appeared injured. Cruz-Martinez Tr. 27:22-29:13. His head made a "big boom" when it hit the ground. Khottavongsa fell flat and didn't put his hands out to catch himself. Cruz-Martinez Tr. 30:22-31:2. Galarza she saw Khottavongsa hit his head and that he wasn't moving afterwards. Galarza. Tr. 13:2-10; 14:17-25. Elmi testified Khottavongsa hit head on the ground, falling from "toe to head." Elmi Tr. 13:16-21. Elmi testified Khottavongsa fell hard on the concrete, didn't break his fall and that Elmi believed Khottavongsa was injured. Elmi Tr. 15:3-16:4. Witnesses described Khottavongsa as dizzy and disoriented. Elmi Tr. 16:23-17:1; Turner 127:21-24. Turner testified people are not typically disorientated after being tasered. Turner Tr. 84:6-8. Salvosa agreed Khottavongsa was confused and disoriented. Salvosa Tr. 133:13-25. Nordby said he appeared to be in an altered mental state. Nordby Tr. 141:14. Linda Miller thought it was obvious he hit his head, heard his head hit the ground, and that he was obviously injured. Rissman Declaration Exhibit DD, Miller Tr. 68:14-69:25. Despite no first responder or medical experience, "you can just tell in his face that he was dazed and something was wrong. You could look at him and tell he needed medical attention right away." *Id.* Even Salvosa admits he knew Khottavongsa was "going to have some injuries." Salvosa Tr. 105:1-4.

After Salvosa tased Khottavongsa a second time, Khottavongsa's body can be seen going rigid, and his head accelerating back towards the concrete where it makes impact.

45588

Rissman Declaration Exhibit EE, Deering Video 21:17:25. Prior to the second blow to the head, Khottavongsa was injured but at least able to slowly sit up and comply with Turner's commands to roll over. After the second blow, Khottavongsa no longer appeared to be able to move, although he is still conscious. *Id.* He can be seen rubbing his head, as he was doing after being tasered the first time. *Id.* Khottavongsa can be heard crying out in pain after the tasing and fall. *Id.* Salvosa admitted he was concerned Khottavongsa was injured. Salvosa Tr. 152:7-10. However, Salvosa would not admit Khottavongsa hit his head because, "I'm not a fall expert." Salvosa Tr. 143:3-21. Nordby interpreted the moaning and groaning as a sign he was injured, but did not act on that knowledge until after Khottavongsa had been dragged in and out of the squad car. Nordby Tr. 160:9-163:7.

Defendant's conduct violated their own training. Officers Nordby, Turner, and Salvosa all apparently attended first responder training. However, proper first responder training instructs officers to stabilize individuals who appear to have head injuries. Deering Dep. Tr. 15:17-17:4 ("you want to move them as little as possible if you know there's a head injury); Gannon Dep. Tr. 71:2-10 ("to move the victim as little as possible, maintain an open airway, and provide oxygen therapy"); Whittenburg Dep. Tr. 55:13-22.

### X. Khottavongsa' s Violent Fall was the Exact Scenario Brooklyn Center Police Officers Should be Instructed to Avoid

Khottavongsa was at a high risk of injury and death from use of a Taser, because he standing on concrete. Brooklyn Center Taser Training warns officers to, "Be aware of foreseeable primary risks and risk of secondary injury, especially from falls from heights

45588

or **hard surfaces**." Brooklyn Ctr. 9981, at 10034. Officer Salvosa was told that

Neuromuscular Incapacitation (*ie* body lockup) from tasers "frequently causes subject to

fall" and that "falls are often uncontrolled and subject is often unable to protect or catch

himself." Brooklyn Ctr. 9981, at 10137. Critically, Brooklyn Center officers are

supposed to be trained that:

- Falls, even from ground level, can cause serious injuries or death
- Consider the environment (including the ground surface) and the likelihood of a fall related injury

*Id.*; Salvosa Tr. 22:9-12. Brooklyn Center taser training gives the example that the use of

a Taser in probe mode on "a subject who is standing on ***concrete*** is a higher quantum of

force than using a [taser] on a subject who is standing on grass because the foreseeable

likely fall related injury on concrete is greater than the likelihood of such an injury when

falling on grass." Rissman Declaration Exhibit X, Brooklyn Ctr. 30(b)(6) Deposition,

Exhibit 11, at 49 (emphasis added); Salvosa Tr. 136:23-137.

## XI. Brooklyn Center Did Not Have a "Cultural Competency" Training in Place the Night of the Incident.

Brooklyn Center is a diverse community. Gannon Dep. Tr. 83:11. The city has a

population consisting of Hmong, Laotian, Somali, Liberian, Hispanic, and individuals from

several other races. *Id.* at 83:23-25. Currently, the population of Brooklyn Center has a

greater percentage of "non-white" than "white" individuals. *Id.* at 83:14-15. On the evening

Khottavongsa was killed, Brooklyn Center did not have a specific training in place to

instruct officers on handling situations with non-English speaking citizens. *Id.* at 89:1-3.

However, after the incident, Defendants completed "Cultural Competency and Conflict

45588

29

Resolution" training. Nordby Tr. 96:24-97:5; Turner Tr. 21:8-10; Salvosa Dep. Tr. 29:4-6. This training assists officers in dealing with non-English speakers, including those who may not understand commands. Deering Tr. 19:18-23:16

## XII. Officer Salvosa has a Well-Documented Habit of Panicking Under Pressure.

Salvosa's supervisors were previously aware the he struggled in "stressful" situations. Salvosa Dep. Tr. 209:3-7. "When subjects become verbally aggressive or non-complaint Al tends to raise his voice at them, which at times has caused added tension to the situation." Rissman Declaration Exhibit JJ, Salvosa Dep. Exhibit 11, at 0356. Recently, Salvosa was reprimanded getting involved in a high-speed chase without receiving authorization. Rissman Declaration Exhibit HH, Critical Incident Review. He then raced through a "partially obstructed intersection" without attempting to apply his brakes. *Id.* The supervising officer determined that his reckless driving violated policy. *Id.* Salvosa told suspects: "don't move or I'll blow your head off" and "drop your hands and I drop you." *Id.* His supervisor found these "disturbing" statements violated policy as well. *Id.* Officer Salvosa served the Iraq war in the U.S. Army. Salvosa Dep. Tr. 209:13-211:7. Salvosa suffers flashbacks from these experiences. *Id.* Brooklyn Center was aware of the flashbacks. *Id.*

## ARGUMENT

### I. Legal Standard

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). The first prong

45588

is the whether the facts, "taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right." *Id.* (quotation omitted). The second prong is whether the right was clearly established. *Id.* at 1866. In analyzing both prongs, the court must resolve factual disputes and make all reasonable inferences in favor of the plaintiff. *Id.*

## II. The First Tase was Unreasonable

### a. Reasonableness of the Tase in Light of the Foreseeable Risk of Serious Injury and Death

'To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances.'" *Johnson v. Carroll,* 658 F.3d 819, 824 (8th Cir. 2011). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . ." In determining reasonableness, the Court examines the totality of the circumstances including the three *Graham* factors: "the severity of the crime at issue, the immediate threat the suspect poses to the safety of the officer or others, and whether the suspect is actively resisting or attempting to evade arrest by flight.'" *Graham v. Connor,* 490 U.S. 386, 396 (1989); *Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012) (applying *Graham* factors to taser case).

To determine reasonableness of a particular use of force, the court "must consider the risk of bodily harm that [the officer's] actions posed to [the plaintiff] in light of the threat to the public that [the officer] was trying to eliminate." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (discussing dangerous but not always deadly uses of force). "The use of

tasers requires sufficient justification for their use to be reasonable." *McKenney v. Harrison*, 635 F.3d 354, 364 (8th Cir. 2011) (J. Murphy, concurring). In addition to the risk, the court should consider the result of the force in determining reasonableness. *McKenney*, 635 F.3d at 359.

Tasers can be used in two modes: dart mode, and drive-stun mode. "When the taser is in drive stun mode, it only causes discomfort and does not incapacitate the subject." *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 n.4 (8th Cir. 2014). In dart mode, the taser fires two darts and the electric current incapacitates the body, causing the subject to fall. Dart mode is considered a greater use of force and has much greater risk of injury and death. *Brooks v. City of Seattle,* 599 F.3d 1018, 1026–31 (9th Cir. 2010).

Death or serious injury from being tased in dart mode is a foreseeable consequence. *See Bachtel v. TASER Int'l, Inc.*, 747 F.3d 965, 969 (8th Cir. 2014) (noting the death of the plaintiff was "unfortunately not unique.") The taser in dart mode:

> . . . effectively commandeer[s] the victim's muscles and nerves. . . Moreover, tasering [may cause] serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled falls. The [taser] thus intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not.

*McKenney* 635 F.3d at 363–64 (quotation omitted). Brooklyn Center should be trained to recognize that an incapacitated fall on concrete results in a higher quantum of force. Thus, the reasonableness of the tasing of Khottavongsa must be judged in light of the foreseeable risk and ultimate result of an uncontrolled fall on the concrete and suffering a brain injury.

### b. Khottavongsa was not "Actively Resisting" Because he did not know Officers had Arrived and Stood Still.

Rather than analyzing of the three *Graham* factors, Defendants based their entire argument on the blatantly incorrect notion that noncompliance with a command gives officers the right to tase in dart mode, or even shoot Khottavongsa, no matter the circumstance. Based on the *Graham* factors, Salvosa did not give an effective warning or opportunity to comply before either application of the taser, and Khottavongsa was not actively resisting.

Whether Salvosa uttered commands is not the end of the inquiry. An officer must "first identify[] himself as a law enforcement official" and then give the subject "an opportunity to comply." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1210 (8th Cir. 2013); *Smith v. Kansas City, Missouri Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009) (holding police officer gave plaintiff no opportunity to comply with his request).

In *Atkinson*, the court denied qualified immunity for a forceful arrest, where plaintiff was unaware of police presence and believed the commands to be those of "an irate citizen." *Id.* Thus, he could not have actively resisted, because he did not know he was resisting an officer. *Id.; see also Rogers v. Carter*, 133 F.3d 1114, 1118 (8th Cir. 1998) (acknowledging it was "prudent" for plaintiff to retreat from plainclothes officer who "did nothing more than declare himself a police officer").

Similarly, in *Mattson v. Becker Cty., Minn.*, No. CIV.07-1788ADM/RLE, 2008 WL 3582781, at *7 (D. Minn. Aug. 12, 2008), an officer in uniform and in a marked squad car tased the plaintiff after commanding him "Get back. Stop right there or I'll

shoot" without identifying himself as a police officer. The plaintiff was looking at the officer, but it was dark and the officer's headlights were shining in the plaintiffs eyes. *Id.* The plaintiff walked away. The court concluded, "A reasonable officer would clearly know that . . . using a taser to restrain that person without first identifying oneself as law enforcement is unlawful." *See also Marth v. Herman*, No. CIV. 10-4842 ADM/TNL, 2012 WL 3079256, at *8 (D. Minn. July 30, 2012) (denying qualified immunity where it was unclear whether defendant identified himself as a police officer).

The facts of *Mattson* are quite similar to this case on the first tase. While Salvosa was in uniform, Khottavongsa's back was turned while Salvosa gave commands. With his back turned, Khottavongsa reasonably could assume an "irate citizen" was shouting, namely one of the people who had been assaulting him previously. *See Atkinson*, 709 F.3d at 1210. It would not have been "prudent" for Khottavongsa to have dropped his crowbar and given up his means of protection. *See Rogers,* 133 F.3d at 1118.

In addition, many other "irate citizens" were yelling at the same time as Salvosa. Witnesses in the same area as Khottavongsa did not hear the commands, and remembered seeing Turner's lights before hearing Salvosa say anything. Salvosa also approached on foot from the east, and could not have been seen until he surprised everyone.

Not until Khottavongsa turned to look over his shoulder, when Salvosa yelled his final command, could he have known there was a police officer there, much less comprehend what he was saying given the other people shouting. Salvosa tasered Khottavongsa only a split second after Khottavongsa looked at him, when Khottavongsa turned his head to the side to look at Sarin for guidance. Salvosa had reason to suspect

Khottavongsa may not have spoken English given the obviousness of this fact to other witnesses, Salvosa's experience with non–English speakers, Khottavongsa's race and the community makeup. *See Shekleton,* 677 F.3d 361, (relevant factor was the well-known fact in the community that plaintiff had arm injury).

In this case, given the facts that Khottavongsa was the victim of the assault reported on the 911 call, and reasonably would have believed the police were there to help him, was just seeing the police for the first time in that moment, and could not have clearly heard the prior commands, and given the fact that Salovsa had reason to know Khottavongsa may not have understood English, it was unreasonable for Salvosa to afford Khottavongsa only a split-second to comply. *Cf. DeSalvo v. City of Collinsville, Ill.*, No. 04-CV-0718-MJR, 2005 WL 2487829, at *2 n.1 (S.D. Ill. Oct. 7, 2005) (denying qualified immunity where officer used stun gun "immediately" after giving order, which was 6 seconds, and plaintiff merely stood still). Several witnesses reached the same conclusion, that Khottavongsa was not given a chance to drop the crowbar. *See Smith*, 586 F.3d at 581.

Contrary to Defendant's position, noncompliance does not amount to active resistance. *Tatum v. Robinson*, 858 F.3d 544, 550 (8th Cir. 2017).[7] In *Tatum*, the plaintiff was told he was under arrest and was given an reasonable opportunity to comply before being pepper sprayed. *Id.* at 550. Pepper spray is a similar level of force to a taser

---

[7] *Tatum* cites to *Brown* for the proposition that pepper spray is a similar level of force as a taser. *Brown* was a drive-stun taser case, not a dart-mode taser case. Therefore, pepper spray is a lesser use of force than a taser in dart-mode.

45588

in drive stun mode; therefore, a lesser use of force than a taser in dart mode. *Id.* The court held that while some force may have been necessary, a significant level of force was unreasonable.

Like *Tatum*, courts regularly deny summary judgement for tasing a non-violent, non-aggressive subject who is non-complaint with police commands, even when the taser is only in drive-stun mode. *Brown v. City of Golden Valley,* 574 F.3d 491, 497 (8th Cir. 2009). In *Brown*, the plaintiff refused to comply with officer commands to end her cell-phone call, scooted herself away from the officers, drew her knees towards her chest, and acted as if she was about to kick one of the officers, and was near a glass tumbler which officers believed could be used as a weapon. *Id.* The officer tasered plaintiff in drive stun mode. *Id.* The Eighth Circuit held whether the officer "reasonably interpreted her refusal [to comply] as a realistic threat to his personal safety or whether it constituted nothing more than an affront to his command authority is a matter for a jury to decide." *Id.*

This court has repeatedly held the use of a taser on an uncooperative, but non-violent person is excessive force. *E.g. Van Raden v. Larsen*, No. CIV. 13-2283 DWF/LIB, 2015 WL 853592, at *7 (D. Minn. Feb. 26, 2015) (non-violent resistance did not warrant use of a taser); *B.J.R. ex rel. Garcia v. Golgart*, No. CIV. 11-1105 JRT/SER, 2013 WL 3455598, at *6 (D. Minn. July 9, 2013) (plaintiff pulled her arm away from officer, and after being warned to stop resisting and was tased in drive-stun mode); *Haggins v. Sherburne County*, No. 10-2554, 2012 WL 4372545, at *2 (D. Minn. Sept. 25, 2012) (use of Taser on uncooperative but nonthreatening suspect is unreasonable and

excessive); *Willenbring v. City of Breezy Point*, No. CIV. 08-4760, 2010 WL 3724361, at

*4 (D. Minn. Sept. 16, 2010) (plaintiff "was admittedly resistant" but posed no realistic

threat to the officers); *Orsak*, 675 F. Supp. 2d at 954-56; *Mahamed v. Anderson*, No. 07-

4815, 2009 WL 873534 at *4–5 (D. Minn. Mar. 30, 2009) (plaintiff was "uncooperative

but not dangerous or threatening").

Defendants shockingly clam that Officers can use deadly force solely for failing to

follow commands. Defendants cite to *Loch v. City of Litchfield*, 689 F.3d 961 (8th Cir.

2012) and *Hassan v. City of Minneapolis,* 489 F.3d 914, 919 (8th Cir. 2007).[8]

In *Loch,* the responding officer was told the individual had a gun. The officer observed

the decedent be aggressive towards a woman. When confronted, decedent began walking

toward the officer, said the word "kill," and then appeared to be reaching for a gun. *Id.* In

*Hassan*, the decedent took multiple swings at police with a machete over an eleven

minute period, after being given multiple prolonged opportunities to comply. 489 F.3d at

919. It was the undisputed violence of the decedent, not the failure to follow commands

that justified the use of force in that case. *Cf. Capps v. Olson*, 780 F.3d 879, 882 (8th Cir.

2015) (denying qualified immunity where officer shot decedent in the back who was not

compliant with officer commands.) The fact issue in *Capps* was whether the decedent

made a move towards the officer with his weapon. *Id.*

---

[8] Defendants also attempt to quote *Billingsley v. City of Omaha*, 277 F.3d 990, 995 (8th
Cir. 2002), however the quote is not found in the opinion. Def.'s Memo. at 26. In that
case, qualified immunity was denied and the case went to a jury.

45588

Similar to *Capps*, in a very recent Eighth Circuit case, the decedent was holding a pipe. *Lancaster v. Bd. of Police Commissioners;* No. 15-3769, 2017 WL 3203543, at *1 (8th Cir. July 28, 2017). The officer came around the corner of a building and yelled "Stop!," and shot him after the decedent turned his see who was coming. *Id.* The court not only denied qualified immunity, but held that no significant level of force would have been permitted against the plaintiff, including use of a taser. *Id.* at *3. The key disputed fact was whether the plaintiff was compliant. *Id.*

The obvious violence and immediate threat to officer safety in *Loch* and *Hassan*, stands in stark contrast to Khottavongsa, who was "just standing there" with the crowbar down, and made no movement towards officers or others. As in *Capps* and *Lancaster*, it is disputed whether Khottavongsa made a move towards other bystanders or raised the crowbar, or whether he had an adequate warning and reasonable opportunity to comply. It is undisputed he made no move towards officers. Although Salvosa did not use deadly force, he used a significant level of force that had the foreseeable risk of killing or seriously injuring Khottavongsa. He was not permitted to do so if Khottavongsa was merely standing there with the crowbar, with no time to react to the commands. *See Lancaster*, 2017 WL 3203543.

### c. Khottavongsa was Not an Immediate Threat.

"[N]on-violent . . . subjects have a clearly established right to be free from the use of tasers. *De Boise*, 760 F.3d at 897. In *DeBoise*, the court granted qualified immunity where it was undisputed decedent was violent and aggressive towards police officers by jumping to his feet and clenching his fists, swinging his arms and kicking officers. *Id.* In

45588

contrast, the court in *Ward*, 939 F. Supp. 2d at 962, denied qualified immunity for using a taser in drive-stun mode where the officer's testimony was disputed that the plaintiff made a physical threat of violence and became "physically combative by balling up his fist and assuming a fighting position prior to arrest."

Courts regularly deny qualified immunity, where officers respond to a 911 call, fail to assess who the victim is, and then use force on that victim, even if that victim has a deadly weapon. *See Ngo v. Storlie*, 495 F.3d 597, 603 (8th Cir. 2007) ("[T]he failure to take an extra moment to assess the situation adds to the unreasonableness of [the officer's] actions under the circumstances."); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) (officer shot man who had wrested a gun from a carjacker, but pointed gun upwards); *Sieff v. Juell*, No. 15-cv-419, 2017 WL 933030 (D. Minn. March 8, 2017) (denying qualified immunity where hostage had grabbed for knife from aggressor). Deadly force cases have the same immediacy requirement as to do less-lethal, significant levels of force cases. *See Sieff*, 2017 WL 933030 (citing *Graham* factors). There's no dispute that a gun, knife, machete, pipe or crowbar has the potential to cause serious bodily harm, the question was whether under the circumstances that potential danger had become immediate.

In addition, Defendants claim it was a "tense and rapidly evolving situation" and that Salvosa was faced with a "large group of aggressive individuals." Def. Brief, at 24-25. In *Johnson,* the Eighth Circuit reversed the district court where it had improperly "credited the officers' characterization of the crowd and determined that the circumstances were 'tense, uncertain, and rapidly evolving,' thus justifying the officers'

use of force against [the plaintiff]." 658 F.3d at 826. *Cook v. City of Bella Villa*, 582 F.3d 840, 851 (8th Cir. 2009) is distinguishable because the plaintiff stepped towards the officer while yelling, presenting an immediate threat.

While the 911 calls reported a fight and a bat, that was not the situation Salvosa faced when he arrived. Salvosa was accompanied by a cadet who could use force if necessary, and Salvosa knew backup officers were only three blocks away. The fighting had stopped, most participants had fled, Erika Phillips was maced and out of the scene, Jackson was sitting down with his head in his hands, and the four victims of the assault including Khottavongsa, were waiting for police as seen calmly standing in the Turner video. No one even saw Salvosa until the last second, no one was yelling at him and no one made aggressive movements towards Salvosa. At most, people other than Khottavongsa were present and yelling to let Jackson go, but that does not explain why Khottavongsa needed to be tased. *See Johnson*, 658 F.3d at 826.

Moreover, the fact that Salvosa gave no commands for 10 seconds once he arrived demonstrates nothing was rapidly evolving or tense, nor that Khottavongsa was involved in a "violent confrontation" as Defendants claim without factual support. A reasonable officer certainly would have immediately commanded Khottavongsa to drop the crowbar if he saw him swinging it, or told others to cease fighting if they were.

More importantly, witnesses testified Khottavongsa had not been involved in the altercation immediately prior to police arriving, and had just come back out of the laundromat. Salvosa tased Khottavongsa less than 24 seconds after arriving. *See Van Raden*, 2015 WL 853592, at *7 (holding the short time between the officer's arrival and

45588

40

use of taser weighed against reasonableness). Salvosa's habit of reacting too quickly under pressure and escalating the situation was the only thing that made this a tense and uncertain situation.

Just as the gun pointed upwards in *Craighead* was not deadly, a crowbar in a lowered position does not pose an immediate threat. The witnesses testified Khottavongsa was standing still, the crowbar was in a downward position, Khottavongsa was not threatening anyone, moving rapidly towards anyone, nor was anyone moving away from Khottavongsa in fear. Salvosa testified that neither Khottavongsa's prior conduct, nor the alleged failure to follow commands, nor the fact he was holding a crowbar, presented the type of immediate threat that required him to fire the taser probes. Rather, Salvosa testifies he tased Khottavongsa because after Khottavongsa turned over his shoulder, and looked back, he raised the crowbar as if to strike someone. Salvosa admits he could have continued to give commands if the crowbar was not raised. If the jury believes Khottavongsa raised the crowbar, they arguably could find for Salvosa. However, Salvosa's testimony is contradicted by seven witnesses, notably Turner and Nochez. What Khottavongsa did with the crowbar is the central fact dispute on the first tase, and it is one for the jury to decide.[9]

### d. The Severity of the Crime was Minimal

Khottavongsa was charged with two misdemeanors: obstruction of legal process *without* force for failing to follow commands, for disorderly conduct for "creating a disturbance." *See Johnson*, 658 F.3d at 827. Regardless of what he was told before he

---

[9] Defendants attempt to avoid this central fact dispute by failing to acknowledge Salvosa's own testimony as to what factor necessitated his use of the taser.

arrived, Salvosa did not witness any severe crime unfolding, the situation had de-escalated.

### III.  The Second Tase was Unreasonable

#### a.  The Second Tase put Khottavongsa at a Foreseeably Increased Risk

Each tase must be justified.  *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). "Force is reasonable only when exercised in proportion to the threat posed . . . and as the threat changes, so too should the degree of force. . ." *Id.*

The quantum of force of the second tase was even greater than the first.  Per Brooklyn Center policy, multiple tasings are not recommended due to the increased risk to the subject, particularly when other officers were present.  Moreover, Khottavongsa was still on the concrete and as discussed *infra*, there was an obvious risk he was seriously injured.  Because the taser fully incapacitated Khottavongsa the first time, another application of the taser through the same probes would result in the same incapacitation and cause Khottavongsa fall back to the concrete.

#### b.  Khottavongsa Did Not Actively Resist Commands

Khottavongsa can be seen attempting to roll over and lay flat on his stomach, which is what Officer Turner had told him to do only seconds prior.  Khottavongsa did not disobey earlier requests to stay on the ground.  Salvosa admitted that Khottavongsa seemed confused and disoriented at this point, and admitted that he would be too if all these people were yelling at him.  Confusion and disorientation are not threats or active resistance. This series of contradictory commands rendered it impossible to be compliant with both Salvosa, Turner and Deering.  *See Orsak*, 675 F. Supp. 2d at 954-55

45588

(concluding plaintiff did actively resist where he was "given a series of contradictory orders").

At the time of the second tasing, Salvosa had even more time to assess and realize that Khottavongsa did not speak English. Officer Turner, who was in the same position as Salvosa, immediately assessed Khottavongsa did not speak English when he did not drop the crowbar, but was also not attempting to hit officers with the crowbar.

Khottavongsa was compliant- Officer Salvosa told him not to get up, he did not get up. Khottavongsa only attempted to sit up or roll over. Moreover, Salvosa gave Khottavongsa one second to comply with his commands. This is consistent with Salvosa's well-documented habit of overacting in the face of perceived non-compliance. Khottavongsa was moving slowly and unsteadily. It took Khottavongsa 4-5 seconds to even get to a partial sitting position. It would have taken him several more seconds to reach his feet, and there was time to give more warnings or use lesser force.

### c. Khottavongsa's Actions Did Not Justify a Second Tasing Regardless of the Warning

#### i. Sitting Up is Not Active Resistance

Courts routinely deny qualified immunity where a plaintiff is tased after merely sitting up, even after being warned. *E.g. Moore v. City of Ferguson, Missouri*, 213 F. Supp. 3d 1138, 1144 (E.D. Mo. 2016); *Cyrus,* 624 F.3d at 863; *Oliver v. Fiorino,* 586 F.3d 898, 907 (11th Cir. 2009); *Kaady v. City of Sandy*, No. CV. 06-1269-PK, 2008 WL 5111101, at *19 (D. Or. Nov. 26, 2008); *see also Orsak*, 675 F. Supp. 2d at 955 ([plaintiff's] attempts to regain his balance were passive, rather than active resistance).

45588

43

Rising from a lying down to a sitting position up does not present an immediate threat. *Tolan v. Cotton*, 134 S.Ct. 1861, 1867 (2014). The Court unanimously held the issue of whether the plaintiff went from a lying down position to standing up, or merely rose to his knees, was a material fact dispute the lower court had failed to consider. *Id.* The court credited plaintiff's testimony that he "didn't jump up" and "wasn't going anywhere" in assessing the threat. *Id.* Although a deadly force case, the court in *Tolan* was assessing the immediacy of the threat. *Id.* at 1865.

In *Moore,* the Plaintiff was tasered multiple times and died as a result. The plaintiff attacked the officers and the first tasing was deemed reasonable. 213 F. Supp. 3d at 144. However, there was a fact dispute on the secondary tasings because the only purportedly threatening act was the plaintiff sitting up, and it was disputed whether 1-2 seconds was enough time to comply with his commands. *Id.* "[M]any factors are at play . . . how upright Mr. Moore was able to get himself in between Tasings, and the general threat Mr. Moore could have posed to Officer Kaminski as an unarmed person who never became completely vertical before being serially Tased." *Id.* at 1145. One of the fact disputes in Moore was whether decedent had risen up as far as his knees, or whether he was only a few inches off the ground. *Id.* at 1144. The court held it was for the jury to decide whether rising up between tasings was active resistance. *Id.* at 1145; *see also Zubrod v. Hoch*, No. 15-CV-02065-CJW, 2017 WL 82478, at *15 (N.D. Iowa Jan. 8, 2017) (distinguishing between "attempting to rise after being Tased" and "violently fight[ing] with officers over a long period of time.")

In *Oliver*, the court held that multiple tasings resulting in the death of the plaintiff were unreasonable after the plaintiff tried to get off the ground after having struggled with an officer.  586 F.3d 898.  The court credited witnesses' testimony that the plaintiff attempted to sit up, but never saw him "struggling with, hit, kick, punch, or threaten" the officer.  *Id.* at 903.  The court held he flopped down like a "wet cloth" after being tased because he had no control over his body.  Importantly, the court held he did not actively resisted by sitting up.  *Id.* at 907.

In contrast to sitting up, Courts have granted qualified immunity on secondary tasings where the plaintiff *stood* up, and was violent or actively resisted arrest.  *De Boise,* 760 F.3d 892 at 897; *Brossart v. Janke*, 859 F.3d 616, 625 (2017) (plaintiff made "threats of violence sufficient to support conviction of a terrorizing felony, then physically resisted a lawful arrest").  In *Brossart*, it was undisputed the plaintiff continued to *stand up* in a "very hostile, aggressive manner." *Id.*  Given that the plaintiff had threatened to shoot the officer, and continued to resist, the threat level did not diminish such that the use of the taser was unreasonable.  *See id.*

### ii.     The Second Tase was Grossly Disproportionate

The Eighth Circuit recently reaffirmed that, "[w]hen a suspect poses a non-immediate safety threat by repeatedly refusing to comply with officers' reasonable, lawful commands, officers may reasonably use some force," but the officer "may act unreasonably . . . by tasing them secure compliance." *Tatum*, 858 F.3d at 550.  *Id.* (citing drive stun cases); *see also Haggins*, 2012 WL 4372545, at *2 ("no attempt to control the situation through means less drastic than deploying a Taser").   In *Tatum*, the use of the

45588

45

pepper spray, less force than a taser in dart-mode, was unreasonable and disproportionate because there was a fact dispute as to whether the plaintiff physically struggled or threatened the officer.

Lesser force is also required in situations where the officer knows the plaintiff is injured. *Schoettle v. Jefferson Cty.*, 788 F.3d 855, 860 (8th Cir. 2015) ("knowledge of an arrestee's medical condition can be relevant to a determination of whether the officer employed excessive force"); *Van Raden*, 2015 WL 853592, at *7 (although plaintiff was resisting, he was in obvious distress).

 In addition, where there is significant physical disparity between the officer and the subject, significant uses of force should not be used to merely restrain a slightly resistant subject. *B.J.R.*, 2013 WL 3455598, at *6. In *B.J.R.*, the officer outweighed the plaintiff by nearly 100 pounds, which made the use of a taser in drive-stun mode disproportionate to the slight resistance she offered. *Id.*

Defendants' citations to *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) and *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) are misplaced because the taser was only used in drive-stun mode. The difference could not be more important- had Defendants only drive-stunned Khottavongsa, he would not have been incapacitated, and would not have hit his head the second time. Moreover, in *Carpenter* and *Ehlers* the plaintiff failed to show their hands after repeated warnings, which is considered active resistance because they could be reaching for weapons. Defendants' other citations involve other lesser uses of force, or cases where the plaintiff was being violent and aggressive.

45588

The presence of multiple officers further weighs against the use of a taser. *Brown*, 574 F.3d at 498; *Cf. Procknow v. Curry*, 26 F. Supp. 3d 875, 887 (D. Minn. 2014) (second use of the taser was reasonable because officer was by himself facing a dangerous felon who had previously fled and appeared to resume flight within seconds of initial tase).

The repeated use of a taser is also unreasonable where there are multiple officers on-scene and they fail to put the subject in handcuffs when they have an opportunity to do so:

> The stun gun is intended to temporarily incapacitate a threatening person, and to give the officers involved momentary advantage and a chance to neutralize the threat…the six or seven officers … did not take advantage of Hickey's incapacitation to neutralize any perceived threat to their safety. At no time did they attempt to remove, isolate, or restrain [the plaintiff].

*Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993); *cf. De Boise*, 760 F.3d at 897 (holding placement of taser probes made handcuffing unfeasible).

According to Salvosa, he fired the taser before Khottavongsa even sat up, much less stood up. The video and witness testimony indicate his motions were slow and deliberate, and that he was not trying to stand up. He did not fight, kick or swing at officers, and was not aggressive or violent in any way. It is undisputed he was confused and disoriented. Khottavongsa was also obviously injured. The officers surrounding Khottavongsa did not believe Khottavongsa posed any threat to their safety in a sitting position.

A much lesser use of force was also readily available. Nordby was prepared to restrain Khottavongsa by pushing him back down with his foot. Nordby weighed about

45588

100 pounds more than Khottavongsa, who was also clearly injured. Moreover, there were six officers on the scene. Unlike *De Bevois*, officers testified there was no reason Khottavongsa could not have been handcuffed after the crowbar was removed. While some officers needed to deal with other suspects, there was no physical resistance from anyone at the scene. The great number of fact disputes as to whether Khottavongsa presented an immediate threat or was actively resisting, preclude summary judgement.

### IV. Officers Turner and Nordby Failed to Intervene in the Second Tasing

Defendants do not move for summary judgment on the failure to intervene claim, and are precluded from doing so on reply. Even if they did, there is sufficient evidence Turner and Nordby failed to intervene when Salvosa tased Khottavongsa a second time. An officer may be liable for failing to intervene when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring. *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009). After the first tase, the probes were still attached to Khottavongsa. In addition to stating his intention to use the taser again, it would be reasonable to assume Salovsa would tase Khottavongsa, particularly when he was not placed into custody.

After removing the crowbar, Turner could have passed on his belief to Salvosa that Khottavongsa did not speak English. Salvosa testified it was information he wanted to know. The impact cannot be understated- Salvosa was prepared to use the taser a third time, but once he was told Khottavongsa did not speak English, Salvosa stood down and put the taser away. Had Turner told Salvosa he did not speak English, he would not have

tasered him the second time for allegedly failing to follow commands. Nordby similarly could have told Salvosa he was able to handle Khottavongsa with his foot. He was also close enough to Salovsa to verbally or physically confront him.

## V. Defendants' used Excessive Force to Restrain and Move Khottavongsa

When officers fail to consider an injury or condition while effecting an arrest or using force, such conduct is excessive and unreasonable. *Schoettle*, 788 F.3d at 859–60 (citing *Graham*, 490 U.S. at 396).

As Plaintiff demonstrates in section VI *supra*, the officers were aware of the risk of Khottavongsa's injuries. Khottavongsa sustained significant blows to his head. Despite this knowledge, the officers continued to use force in restraining and dragging Khottavongsa: Salvosa kicks Khottavongsa and flips him over; Turner takes his neck and drives him to the ground, with a knee on his back; Turner and Nordby drag him in and out of the squad car, hitting his head a third time. Nordby testified he was not an immediate threat, and no threat once in handcuffs. Turner admitted Khottavongsa did not have be brought to the car. Significantly, several of the officers' actions occurred after Khottavongsa was in handcuffs and the scene was secured, making the cases Defendants cite distinguishable on their facts.

Defendants claim he was "noncompliant." Given that Turner, Nordby, and Salovsa subjectively knew Khottavongsa did not speak English at this point, and witnesses described his obvious disorientation and inability to walk, fact disputes exist as the whether the use of force by Defendants was excessive in light of his obvious injuries.

45588

## VI. Officers Failure to Stabilize Khottavongsa and Immediately Call Paramedics was *Deliberately Indifferent* to His Safety

To succeed on a deliberate indifference claim, a plaintiff must first "show there was a substantial risk of serious harm to the victim, an objective component." *Letterman v. Does*, 789 F.3d 856, 861 (8th Cir. 2015). Then, "a plaintiff must show that the [defendant] was deliberately indifferent to that risk of harm, a subjective component." *Id.* at 862.

To prove knowledge, "the evidence must show that the officers recognized that the substantial risk of harm existed." *Id.; Coleman v. Parkman*, 349 F.3d 534, 538-39 (8th Cir. 2003) ("Once an official knows of a risk, [the Constitution] requires the official take reasonable measures to abate the risk.") This mental state "may be established through circumstantial evidence as a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the medical need was obvious." *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017). The Eighth Circuit has held that knowledge a subject had fallen and hit his head creates a fact issue as to whether the defendant knew of the risk, even where the Defendant denied knowledge. *Letterman*, 789 F.3d at 864 (defendant knew decedent "bang[ed] his head against the concrete); *Ryan*, 850 F.3d at 425 (defendant knew decdent "screamed, howled, and banged his head against the door of his cell").

A deliberate indifference claim is actionable where there is a delay in treatment the officers are trained to provide or a delay in calling for paramedics. *Tlamka v. Serrell,* 244 F.3d 628, 633–34 (8th Cir. 2001) (ten-minute delay in providing CPR); *Estate of*

*Booker v. Gomez*, 745 F.3d 405, 432 (10th Cir. 2014) (denying qualified immunity where three minutes elapsed between the end of the use of force and efforts to seek medical assistance).

Officers Nordby, Turner, Salvosa all saw Khottavongsa fall. Turner admits he fell, Salvosa admitted at the scene and now denies it, and Nordby denies it. Regardless of any denial, it was obvious to many lay witnesses that he hit his head and even more obvious he was injured. Defendants all saw the same thing those witnesses saw. Moreover, Defendants admit to other obvious symptoms of head injury such as disorientation, not being able to walk, being unfocused, and moaning and groaning. All of these symptoms were observed prior to them moving Khottavongsa. The significant evidence of the obviousness of Khottavongsa's condition, and the specific admissions of Turner and Salvosa, are more than sufficient to create a fact issue as to knowledge that Khottavongsa hit his head, precluding summary judgement.

Despite the knowledge of the risk of injury, Officers Nordby and Turner abandon protocol and fail to stabilize Khottavongsa, as detailed *infra*. Officer Salvosa, the person who caused the initial injury, does nothing for Khottavongsa. Meanwhile, Nordby and Turner continue to ignore the obvious risk and just assume Khottavongsa is "playing games" or "faking" "being a drama queen" or is just drunk. Turner tells him to "hop out or we'll drag you it doesn't matter to me." Turner's words are telling. Khottavongsa's injuries did not matter to the officers. Yet Defendants do not address why an officer who knows the obvious risk Khottavongsa was injured, is permitted to shrug that risk away, and continue to treat Khottavongsa so poorly. A jury could also reasonably view these

45588

excuses as *post hac* rationalizations given Defendants' many admissions.  Moreover, the large majority of these actions were undertaken after Khottavongsa was in handcuffs and the scene was secure.

Defendants claim the delay in treatment did not exacerbate the fatal condition. Khottavongsa's brain hemorrhage continued bleed due to the continued blows to the head.  Neurosurgery expert Dr. Beatty will testify, "each minute that passes increases the amount of blood in the brain and decreases the ability of surgeons to operate."  Beatty Rpt. ¶ 17.  *See Letterman*, 789 F.3d at 861 ("Each moment that passed without medical attention increased Danial's chance of injury and death.") The fact plaintiff cannot show the precise time the ambulance would have got there does not alter the result.

Defendants also claim that an ambulance was called within minutes of the injury, and that an ambulance was eventually called, so there was no delay.  First, Turner rejected the opportunity to step up the paramedic call to an emergency, because he claimed Khottavongsa was just faking it.  Second, the fact Defendants eventually were concerned enough to "CYA" and call an ambulance does not excuse their prior delay. *Estate of Booker*, 745 F.3d at 432.

## VII.    There are Fact Disputes as to Whether the Violations Were Clearly Established

There is no requirement there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Fact disputes on the clearly established prong preclude summary judgment.  *Tolan*, 134 S.Ct. at 1867. In 2015, "[N]on-violent . . . subjects have

a clearly established right to be free from the use of tasers." *De Boise*, 760 F.3d at 897.

It is clearly established an officer must identify themselves and give a reasonable

opportunity to comply. *Atkinson*, 709 F.3d at 1212. "It was clearly established by 2008

that a pretrial detainee . . . has a right to be free from deliberately indifferent denials of

emergency medical care. *Ryan*, 850 F.3d at 427. Therefore, summary judgement is

inappropriate because there are fact disputes as to each of these issues.

### VIII.  The City of Brooklyn Center is Liable for Failing to Supervise and Train

Defendants argue that municipal liability must not apply, because Plaintiff has failed

to demonstrate individual liability. Thus, summary judgment must be denied on the

municipal claims if summary judgement is denied on the claims against individual officers.

*Lancaster*, 2017 WL 3203543, at *4; *Smith v. City of New Hope*, No. 05-872 2006 WL

2033782, at *4 (D. Minn. July 18, 2006).

#### a.  Brooklyn Center's is Liable for Failing to Provide Officers with Training on Interaction with Non-English Speaking Citizens

A police department is liable for failing to train its officers, if the inadequacy is

likely to result in a violation of constitutional rights. *City of Canton v. Harris*, 489 U.S.

378, 388-89 (1989). Courts have denied summary judgment on municipal liability where

cities had no policy in place to train employees on a particular issue the municipalities'

employees would face. *See Kirkpatrick v. County of Washoe*, 843 F.3d 784, 796 (9th Cir.

2016); *Sell v. City of Columbus*, 47 Fed. Appx. 685, 695 (6th Cir. 2002).

Brooklyn Center is liable under § 1983 for failing to train its officers to handle

situations with non-English speaking individuals, despite the highly diverse city

population which speaks multiple languages. *See* Drago Rpt. Opinion M. After

45588

Khottavongsa is injured and Turner suspected he spoke limited English, none of the responding police officers changed their tactics nor did Turner inform other officers of his belief. As a result, Khottavongsa was continually mistreated. As plaintiff has already demonstrated, this treatment undoubtedly violated Khottavongsa's constitutional rights. The officers lack of training was the moving force of these violations. The absence of training was so obvious that Brooklyn Center began "Cultural Competency" training shortly after this incident.

### b. Brooklyn Center is Liable for Failing to Supervise Officer Salvosa

A city may be similarly liable for failing to supervise its employees where the failure is deliberately indifferent to the rights of others. *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998). Brooklyn Center knew Officer Salvosa does not react well under pressure, and tended to escalate situations rather than de-escalate them. Recently, Salvosa told a citizen that he would "blow [the citizen's] head off," which the department found "deeply disturbing." He also suffers from flashbacks. Putting such an officer into the field who cannot handle stressful situation was deliberately indifference to Khottavongsa's rights. Officer Salvosa acted consistent with his habit of overacting when he tased Khottavongsa, thus the Brooklyn Center's failure to supervise Salovsa was the moving force in Khottavongsa's death. The City is liable under § 1983.

### IX. Defendants are Liable for Wrongful Death

Plaintiff asserts that Defendants are liable for battery and the wrongful death of Khottavongsa under Minnesota law. Official immunity is eviscerated when the plaintiff alleges, and proves, that the official acted willfully and maliciously." *Id.* at 1021. As

45588

54

detailed *supra*, Defendants were willfull and malicious toward Khottavongsa. Therefore, Defendants' motion is properly denied.

## CONCLUSION

For the foregoing reasons, summary judgment should be denied.

Dated: July 31, 2017       Respectfully submitted,

               s/Joshua J. Rissman
               Daniel E. Gustafson (#202241)
               Joshua J. Rissman (#391500)
               Riley A. Conlin (#398860)
               **Gustafson Gluek PLLC**
               120 South Sixth Street, Suite 2600
               Minneapolis, MN 55402
               Phone: (612) 333-8844
               dgustafson@gustafsongluek.com
               jrissman@gustafsongluek.com
               rconlin@gustafsongluek.com

               William A. Gengler (#0210626)
               **Lockridge Grindal Nauen P.L.L.P**
               100 Washington Ave S, Suite 2200
               Minneapolis, MN 55401
               Phone: (612) 339-6900
               wagengler@locklaw.com

               *Attorneys for Plaintiff*

45588