# EXHIBIT L

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MINNESOTA
   _____
3

4    Kevin Khottavongsa,
     As Trustee for the Heirs
5    and Next of Kin of
     Sinthanouxay Khottavongsa,
6
                              Plaintiff,
7
          vs.                      Case No. 16-cv-1031-RHK-KMM
8

9    City of Brooklyn Center Police Officers
     Alan Salvosa, Cody Turner, and Gregg
10   Nordby, acting in their individual
     capacities as City of Brooklyn Center
11   police officers,

12                            Defendants.

13
        _____
14

15

16

17                          Deposition of

18                          Alan Salvosa

19                    Thursday, March 30, 2017

20                          9:00 a.m.

21

22

23

24

25

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MINNESOTA
     _____
3

4    Kevin Khottavongsa,
     As Trustee for the Heirs
5    and Next of Kin of
     Sinthanouxay Khottavongsa,
6
                           Plaintiff,
7
          vs.              Case No. 16-cv-1031-RHK-KMM
8

9    City of Brooklyn Center Police Officers
     Alan Salvosa, Cody Turner, and Gregg
10   Nordby, acting in their individual
     capacities as City of Brooklyn Center
11   police officers,

12                         Defendants.

13
     _____
14

15

16

17                      Deposition of

18                      Alan Salvosa

19              Thursday, March 30, 2017

20                      9:00 a.m.

21

22

23

24

25

ALAN  SALVOSA  -  03/30/2017          Pages  2..5

```
                                 Page 2                                        Page 4
 1              * * *                    1           I N D E X
 2                                       2  EXAMINATION OF MARIA CRUZ-MARTINEZ:
 3          Deposition Testimony of Alan Salvosa at  3    By Mr. Rissman -  Page 5
 4  the law offices of Gustafson Gluek, PLLC, 2600 Canadian  4
 5  Pacific Plaza, 120 South Sixth Street, Minneapolis,   5           EXHIBITS
 6  Minnesota, on Thursday, March 30, 2017, commencing at     NUMBER    DESCRIPTION              PAGE:
 7  9:00 a.m. before Barbara J. Carey, a Registered    6
 8  Professional Reporter.                   Exhibit 1 ........................................   16
 9                                       7         Taser Protect Life, User Certification
10                                                 Course, TASER X26 Conducted Electrical
11                                       8         Weapon Version 19 Released April 2013
12                                                 Bates Stamped Brooklyn Ctr 9981 to
13                                       9         10211
14                                      10
15                                         Exhibit 2........................................   28
16                                      11         Officer Alan Salvosa Officer Training
17              * * *                             Schedule Bates Stamped Brooklyn Ctr
18                                      12         0435 to 0437
19                                      13  Exhibit 3 ........................................   35
20                                                 7/2/15 Police Report Bates Stamped
21                                      14         Brooklyn Ctr  5030 to 5053
22                                      15  Exhibit 4.........................................   47
23                                                 Salvosa Statement Supplemental Report
24                                      16         Bates Stamped Brooklyn Ctr 0027 to 0034
25                                      17  Exhibit 5........................................   51
                                                   Aerial Photo (1 page)
                                        18
                                           Exhibit 6........................................   84
                                        19         Photo of "Salvosa" CD (1 page)
                                        20  Exhibit 7.........................................  111
                                                   Brooklyn Center Police Department Report
                                        21         Of Resistance Bates Stamped
                                                   Brooklyn Ctr 5999 to 6004
                                        22
                                        23  Exhibit 8........................................  178
                                                   Brooklyn Center Police Department
                                        24         Policy 301, Use of Force - Administrative
                                                   Review Bates Stamped Brooklyn Ctr 0745
                                        25         to 0746
```

Page 4

I N D E X

EXAMINATION OF MARIA CRUZ-MARTINEZ:
  By Mr. Rissman -  Page 5

EXHIBITS

NUMBER    DESCRIPTION              PAGE:

Exhibit 1 ........................................   16
        Taser Protect Life, User Certification
        Course, TASER X26 Conducted Electrical
        Weapon Version 19 Released April 2013
        Bates Stamped Brooklyn Ctr 9981 to
        10211

Exhibit 2........................................   28
        Officer Alan Salvosa Officer Training
        Schedule Bates Stamped Brooklyn Ctr
        0435 to 0437

Exhibit 3 ........................................   35
        7/2/15 Police Report Bates Stamped
        Brooklyn Ctr  5030 to 5053

Exhibit 4.........................................   47
        Salvosa Statement Supplemental Report
        Bates Stamped Brooklyn Ctr 0027 to 0034

Exhibit 5........................................   51
        Aerial Photo (1 page)

Exhibit 6........................................   84
        Photo of "Salvosa" CD (1 page)

Exhibit 7.........................................  111
        Brooklyn Center Police Department Report
        Of Resistance Bates Stamped
        Brooklyn Ctr 5999 to 6004

Exhibit 8........................................  178
        Brooklyn Center Police Department
        Policy 301, Use of Force - Administrative
        Review Bates Stamped Brooklyn Ctr 0745
        to 0746

```
                                 Page 3                                        Page 5
 1  APPEARANCES:                          1           INDEX CONTINUED:
 2                                        2
 3  ATTORNEY FOR PLAINTIFFS:                        EXHIBITS
 4      Mr. Joshua J. Rissman            3
        Attorney at Law                     NUMBER    DESCRIPTION              PAGE:
 5      GUSTAFSON GLUEK, PLLC            4  Exhibit 9........................................  181
        120 South Sixth Street, Suite 2600          Brooklyn Center Police Department
 6      Minneapolis, Minnesota 55402     5         Policy 321 Report Preparation Bates
        jrissman@gustafsongluek.com                Stamped Brooklyn Ctr 5484 to 5487
 7      612.333.8844                     6
 8      Also Present:  Mr. Riley Conlin, Law Clerk     Exhibit 10.......................................  192
                        Mr. Kevin Khottavongsa   7         Defendant Alan Salvosa's Supplemental
 9                                                 Answers to Plaintiff's First Set of
    ATTORNEY FOR DEFENDANTS:             8         Interrogatories, Number 1 (3 pages)
10                                       9  Exhibit 11.......................................  204
        Mr. Jason M. Hiveley                       Brooklyn Center Police Department
11      Attorney at Law                 10         Performance Evaluation for Alan Salvosa
        IVERSON REUVERS CONDON                     Bates Stamped Brooklyn Ctr 0313 to 0411
12      9321 Ensign Avenue South        11
        Bloomington, Minnesota 55438    12
13      jasonh@irc-law.com              13
        952.548.7200                    14           * * * * *
14                                      15
15                                      16
16                                      17
17                                      18
18                                      19
19                                      20
20                                      21
21                                      22
22                                      23
23                                      24
24                                      25
25
```

Page 5

INDEX CONTINUED:

EXHIBITS

NUMBER    DESCRIPTION              PAGE:

Exhibit 9........................................  181
        Brooklyn Center Police Department
        Policy 321 Report Preparation Bates
        Stamped Brooklyn Ctr 5484 to 5487

Exhibit 10.......................................  192
        Defendant Alan Salvosa's Supplemental
        Answers to Plaintiff's First Set of
        Interrogatories, Number 1 (3 pages)

Exhibit 11.......................................  204
        Brooklyn Center Police Department
        Performance Evaluation for Alan Salvosa
        Bates Stamped Brooklyn Ctr 0313 to 0411

        * * * * *

**Page 6**

1          WHEREUPON, the following proceedings
2  were duly had:
3          THE REPORTER:  Raise your right hand and
4  I'll swear you in.
5          (The oath was administered by the court
6  reporter.)
7          WITNESS RESPONSE:  I do.
8          THE REPORTER:  Thank you.
9              ALAN SALVOSA,
10  After having been first duly sworn, was called as a
11  witness and testified as follows:
12              EXAMINATION
13  BY MR. RISSMAN:
14      Q.   Can you please state your name for the record?
15      A.   Alan Salvosa.
16      Q.   Could you spell it?
17      A.   A-L-A-N, last name Salvosa, S-A-L -- V, as in
18  Victor -- O-S-A.
19      Q.   My name is Josh Rissman.  I am the attorney
20  for Kevin Khottavongsa who is present today as the
21  plaintiff in this case.
22          And have you ever had your deposition taken
23  before?
24      A.   No.
25      Q.   Have you testified in court before?

**Page 7**

1      A.   Yes.
2      Q.   It's pretty similar to testifying in court.
3  You're under oath.  I just want to go over a few ground
4  rules.
5          You should wait until I finish my question
6  before you answer, and I'll do my best to not interrupt
7  you.
8          Your attorney, Mr. Hiveley, may object from
9  time to time.  Unless he instructs you otherwise, you can
10  then answer the question once he finishes the objection.
11      A.   Right.
12      Q.   It's important we don't talk over each other
13  because the court reporter is taking down everything you
14  say.
15          If you need to take a break, we can take a
16  break.  We just ask that if a question is pending, you
17  answer the question and we take a break.
18      A.   Sure.
19      Q.   If you don't understand a question, let me
20  know, and I can try to repeat it or rephrase it, but if
21  you answer the question, we'll assume you understood it.
22      A.   (Witness nodding head.)
23      Q.   Are you on duty right now, Officer Salvosa?
24      A.   Yes, my duty is being here.
25      Q.   And you're currently armed?

**Page 8**

1      A.   Yes, sir.
2      Q.   Did you do anything to prepare for today's
3  deposition?
4      A.   Sure.  I read my reports, talked with my
5  attorney.
6      Q.   Did you have a meeting with your attorney?
7      A.   We had a conversation when he got here, but
8  yes.
9      Q.   Prior to that conversation, did you have a
10  meeting with regards to today's deposition?
11      A.   Yes, we had a couple meetings over the past
12  couple weeks and months.
13      Q.   Was anybody else at those meetings other than
14  your attorney, Mr. Hiveley?
15      A.   Sure.
16      Q.   Who -- what other people were there?
17      A.   The chief at one meeting, a couple of the
18  other officers.
19      Q.   Would that be Officers Nordby and Turner?
20      A.   Nordby, Turner, Deering, Cadet Nochez -- or
21  former Cadet Nochez was at one.
22      Q.   So you said you reviewed your reports?
23      A.   Yes.
24      Q.   Would that also be your statement to Hennepin
25  County?

**Page 9**

1      A.   Yes, sir.
2      Q.   Did you review any other documents?
3      A.   My attorney provided the timeline, a breakdown
4  video timeline of the incident.  Other than that --
5      Q.   Did you look at any policies?
6      A.   Yes.
7      Q.   Which policies did you look at?
8      A.   Use of force, Conducted Energy Devices,
9  General Patrol Operations, Use of Force Incident Review.
10      Q.   Did you look at any training materials?
11      A.   Not that I'm aware of.
12      Q.   Did you review any videos?
13      A.   Yes, with my attorney.
14      Q.   Did those videos refresh your memory of past
15  events?
16      A.   Yes.
17      Q.   What videos did you watch?
18      A.   Squad videos.
19      Q.   That would be your squad video?
20      A.   Yes.
21      Q.   Anybody else's?
22      A.   I believe Officer Turner's.
23      Q.   Officer Turner's?
24      A.   Yes, sir.
25      Q.   Anybody else?

Page 10

1     A.   Not that I recall.
2     Q.   Did you ever watch Officer Deering's video?
3     A.   I don't believe so, no.
4     Q.   How old are you, Officer Salvosa?
5     A.   35, sir.
6     Q.   So today, I'm going to be referring to the
7  incident.
8          You understand that to be the incident on
9  January 15, 2015, the subject of this case?
10    A.   Yes.
11    Q.   So the day of the incident, you were 33?
12    A.   Yes, sir, or 32.  I would have turned 33 in
13 February.
14    Q.   32.  How tall are you?
15    A.   5-foot-8, sir.
16    Q.   Okay.  And what do you weigh?
17    A.   About 190 pounds, sir.
18    Q.   Similar size when you were 32?
19    A.   Give or take, minus a couple pounds.
20    Q.   Okay.  What do you do?  Do you do physical
21 training?
22    A.   Sure.
23    Q.   Weights?
24    A.   Weights, pushups, situps, running.  Sometimes
25 I go to a gym.

Page 11

1     Q.   Do you have, like, a weight facility at
2  Brooklyn Center --
3     A.   We do.
4     Q.   -- police department?
5          Do you bench press?
6     A.   Sometimes.
7     Q.   Do you have any ballpark how much you can
8  bench press?
9     A.   Not off the top of my head.  I don't do it
10 that often, so.
11    Q.   Fair enough.
12         You mentioned pushups.  Do you know how many
13 pushups you can do, unbroken?
14              MR. HIVELEY:  Consecutively, or like in
15 a year?
16 BY MR. RISSMAN:
17    Q.   Consecutively.
18    A.   Probably anywhere from 50 or 60 on a good day.
19    Q.   What's your level of education?
20    A.   I have an associate's degree.
21    Q.   What where is that from?
22    A.   Normandale.
23    Q.   What's that in?
24    A.   Law enforcement.
25    Q.   And you are currently a Brooklyn Center Police

Page 12

1  Department -- police officer?
2     A.   Yes, sir.
3     Q.   How long have you been a police officer?
4     A.   Since 2010, so going on seven years now, sir.
5     Q.   Are you currently in the Patrol Division?
6     A.   Yes.
7     Q.   Have you always been in the Patrol Division?
8     A.   Yes, sir.
9     Q.   Who is your current sergeant?
10    A.   Sergeant Pastor.
11    Q.   And the night of the incident your Sergeant
12 was Sergeant Coleman?
13    A.   I believe so, yes, sir.  Or he was the
14 Sergeant working at the time.
15    Q.   Do you report to different sergeants?
16    A.   You have one sergeant that supervises you, and
17 then, if that sergeant is out or sick or vacation, whoever
18 the acting sergeant is would be who you would report to
19 that day.
20    Q.   So you don't recall whether Sergeant Coleman
21 was your acting sergeant or your assigned Sergeant?
22    A.   He might have been the acting.  I'm not quite
23 sure.  I was in a weird shift where I didn't actually have
24 a shift because I was a power car, so I didn't have an
25 actual shift that I started with.  So I don't recall who

Page 13

1  my supervisor would have been that year.
2     Q.   Okay.  And a power car is you start a shift
3  not at the normal time; is that right?
4     A.   Yep, you kind of cover the overlap between
5  shift changes.  So I don't start with the same people.  I
6  kind of overlap between the day shift and night shift,
7  so --
8     Q.   And so the night of the incident, what was
9  your shift?
10    A.   I believe it was noon to midnight.
11    Q.   As a Brooklyn Center police officer, do you
12 receive training?
13    A.   Yes.
14    Q.   Do you receive Use of Force training?
15    A.   Yes.
16    Q.   Are you familiar with the Brooklyn Center
17 Use of Force Policy?
18    A.   Yes.
19    Q.   And are you aware of a policy on the
20 reasonableness of force?
21    A.   Yes.
22    Q.   And are there various factors to consider when
23 you're deciding whether or not to use force?
24    A.   Yes.
25    Q.   What are -- you don't have to list all of

ALAN SALVOSA - 03/30/2017          Pages 14..17

Page 14

1  them, but what are some of the factors at that come to
2  you?
3       A.   Severity of the crime, safety concerns,
4  proximity to weapons, officer conditioning, physical
5  stature of the officer versus the subject, single officer
6  versus multiple suspects type of incident.  I mean,
7  there's a whole bunch of factors.
8       Q.   I believe you said physical stature of the
9  officer versus the subject.
10      A.   Yep.
11      Q.   Would you consider the person's -- the
12 subject's age?
13      A.   Sure.
14      Q.   Would you consider any physical injuries they
15 might have that you're aware of?
16      A.   Sure, if I could see it.  I mean, physical
17 injuries, it's kind of subjective.  Like, I can look at
18 someone and not tell they're injured unless they're, like,
19 in a cast or in a wheelchair or, you know, have a bandage
20 over their head -- I'd, obviously, be able to tell that,
21 but I wouldn't be able to tell if someone was just walking
22 around, they could be injured and I wouldn't be able to
23 see it.
24      Q.   What if you saw them get injured; would that
25 affect your -- would that play a role in your analysis?

Page 15

1       A.   Yes and no.  It depends.
2       Q.   So there are situations where it would?
3       A.   Depending, yes.  Obviously, someone can get
4  hit and get stunned and be fine.  Obviously, it's hard to
5  evaluate someone who just got hit, how it affects them
6  because I can't interpret how they feel or what they're
7  doing.  I can only interpret their body language and their
8  actions.  So I wouldn't be able to medically, I guess, say
9  that someone is more injured than the other.  I'd only be
10 able to evaluate the things that they're physically doing.
11      Q.   Are you familiar with the -- well, you're
12 trained in the taser; correct?
13      A.   Yes, sir.
14      Q.   Okay.  What does your training consist of?
15      A.   I had to get certified in it.  We do annual
16 certifications.  We do -- we test-fire them, or we
17 practice firing them.  We go through our whole
18 presentation.  We take a test.  And then we integrate it
19 into our scenarios, our scenario training.
20      Q.   Are you -- are you familiar with the term
21 "quantum of force"?
22      A.   Not specifically "quantum of force," but I
23 kind of have an idea what you're talking about, but I've
24 heard the term, but I've never used that term.
25      Q.   Have you been trained in what that term means?

Page 16

1       A.   Not to my recollection.  I kind of have an
2  idea where you're going, but we might not be on the same
3  page.
4       Q.   Sure.
5            MR. RISSMAN:  Let's go off the record
6  for one second.
7            (Whereupon, a recess was taken
8            from 9:19 a.m. to 9:21 a.m.)
9            (Whereupon, Exhibit 1 was marked.)
10 BY MR. RISSMAN:
11      Q.   Officer Salvosa, you've been handed what's
12 been marked as Exhibit Number 1, Brooklyn Ctr 00981
13 through Brooklyn Ctr 10211.  When I say those numbers,
14 those are the Bates Stamps at the bottom of the page.
15      A.   I see that.
16      Q.   Okay.  Have you ever seen this document
17 before?
18      A.   Not on paper, but probably in the PowerPoint
19 presentation.
20      Q.   This would be the PowerPoint presentation you
21 received?
22      A.   Sure.
23      Q.   Okay.  If you want to turn to
24 Brooklyn Ctr 10029, do you see it says, "Quantum of
25 Force?"

Page 17

1       A.   Sure.
2       Q.   And you see it, basically, means "Reasonably
3  foreseeable (to the officer).  Effects and injuries of a
4  chosen force option.  Under the totality of the
5  circumstances."
6            Do you see that?
7       A.   Yep.
8       Q.   Do you understand what that means?
9       A.   Yes.
10      Q.   Is it basically saying you should -- your
11 force should be the -- the level of force is just what is
12 the reasonably foreseeable injury to the subject; is that
13 correct, something like that?
14      A.   I think reasonably foreseeable.
15           MR. HIVELEY:  Hold on.  I'll make an
16 objection to form and misstates the facts.
17 BY MR. RISSMAN:
18      Q.   Okay.  I'll ask it a different -- well, why
19 don't you tell me what you think it means.
20           MR. HIVELEY:  Just -- yeah, go ahead and
21 answer.
22           THE WITNESS:  The way I interpret this,
23 is reasonably foreseeable to the officers is reasonably
24 foreseeable to what options I can use.  It doesn't say
25 reasonably foreseeable injuries to anyone.  It's just

ALAN SALVOSA - 03/30/2017          Pages 18..21

Page 18

1  reasonably foreseeable to the officers.  So I see it --
2  reasonably foreseeable, to me, that this is the best
3  option at the time.  That's how I interpret it, unless it
4  worded it better.
5  BY MR. RISSMAN:
6       Q.   How do you interpret the "effects and
7  injuries" portion?
8       A.   It's kind of the same thing.  The effect and
9  injury to the parties.  There's different effects that it
10 could have.  There's different ways it could affect
11 people, from intimidating them into compliance, from --
12 obviously, any type of force has injuries, and there's
13 no -- you can't use force and say there's no injuries;
14 right?  Otherwise, you'd never use force.
15      Q.   So is it to say that when you're thinking
16 about how much force you're using, you should be looking
17 at the effects and injuries that are foreseeable to you
18 from your chosen force, your choice of force?
19      A.   Sorry, could you repeat that?
20      Q.   Yeah.  Is it to say that you are trained that
21 you should think about the reasonably foreseeable effect
22 and injuries that could result from the specific force
23 option that you choose?
24      A.   Sure.  I mean, that's kind of a natural
25 progression.  If you're going to punch someone, you know

Page 19

1  it's going to hurt them.  If you're going to grab them by
2  the wrist, it's going to cause them minor discomfort.  If
3  you're going to yell at someone, you may hurt their
4  feelings.  I mean, so yes.
5       Q.   So in the case of using a taser, the
6  foreseeable effects and injuries on the person are
7  different depending on the situation; correct?
8       A.   Yes.
9       Q.   So for example, tasering someone who is
10 standing on the edge of a 25-story building would have --
11 it would be foreseeable that they could likely die; right?
12      A.   Sure, foreseeable that they could fall from a
13 great distance, yes.
14      Q.   And on the other end of the spectrum, someone
15 who is being tased who is on a mat with two spotters,
16 there's much less likelihood of, at least, a fall-related
17 injury; correct?
18      A.   Yes, although you're comparing a training
19 scenario to real life.
20      Q.   Sure.
21      A.   So there's obviously differences between
22 training and real-life practicality.
23      Q.   Sure.  For example, someone who's on a beach,
24 standing in sand, that would be much less likelihood of
25 injury than a person who is standing on a 25-foot story

Page 20

1  building; correct?
2       A.   Absolutely.
3       Q.   And so, would another example be that the
4  reasonably foreseeable effects and injuries of someone who
5  is standing on concrete is higher than someone who is
6  standing on grass?
7            Is that an example that you think is
8  consistent with your training?
9       A.   Yes and no.  I mean, that's kind of a -- I
10 guess that's super specific.  On top of -- I mean,
11 realistically speaking, it's one of those things where I
12 don't determine the ground or the location of most of the
13 incidents that I respond to.  So I'm dealt the terrain
14 that I'm dealt, and I have to make decisions based off
15 that.  I can't exactly tell people to move to grass or
16 move to a mat or place a carpet under them.
17      Q.   Sure.  Are you trained to consider where the
18 surface of the ground that they are -- they're standing on
19 when you decide to taser someone or not to taser somebody?
20      A.   Sure.  I mean, depending on the circumstance.
21 If somebody is in the water, I probably wouldn't want to
22 taser them in a swimming pool or water.
23      Q.   And you are trained that fall-related injuries
24 are -- are possible; correct?
25      A.   Fall-related injuries are possible with

Page 21

1  everything.  People could slip on the ice.  I could try to
2  grab someone by the wrist and they could fall.
3       Q.   But as a part of your taser training, are you
4  specifically trained that fall-related -- you should be on
5  the lookout for fall-related injuries?
6       A.   I don't think that it says specifically I know
7  that they're going to fall, so --
8       Q.   I'm asking what you're trained in.
9            You don't recall any specific training in --
10      A.   I know that they said there's obviously a risk
11 in falling, but that's, like I said, like any other use of
12 force option, that's always there, whether I take someone
13 to the ground, whether I throw someone to the ground,
14 that's kind of -- I mean, it's common sense that someone's
15 going to fall and get hurt; right?  I mean, ideally, it
16 wouldn't have to come to that, but if I'm wrestling with
17 someone, there's a risk of falling.  I don't think a taser
18 is much more exception other than, obviously -- I mean, I
19 don't have control because of the distance, but it's no
20 different than tackling someone, there's a risk of fall in
21 that.  It's no different than grabbing someone by the arm
22 and trying to take them to the ground, there's a risk of
23 fall in that, or tripping their leg to get them to fall to
24 get them on the ground to take them into custody.  I guess
25 there's always a risk, like I said, in using force.

Page 22

1          So I don't specifically think that falling is
2  something that, you know, is entirely preventable.
3      Q.   Sure.  When someone is tasered, they -- when
4  the taser is effective, they go into body lockup; right?
5      A.   Yes.
6      Q.   And when they go into body lockup, they're not
7  able to catch themselves if they're falling; correct?
8      A.   Yes.
9      Q.   And are you trained that -- that falls --
10 taser-related falls, even from ground level, can cause --
11 have caused serious injuries or death?
12     A.   Sure.
13     Q.   Are you trained that you should generally
14 avoid -- that multiple applications of a taser are
15 generally not recommended?
16     A.   Generally not recommended, yes.  Depending on
17 the circumstance, I think that's, again, subjective to --
18 anything written in paper or policies is, obviously, in a
19 perfect scenario.  It's not obviously practical or not
20 always -- it doesn't account for every situation that
21 every officer could ever face.
22     Q.   Sure.
23          MR. HIVELEY:  Let's take one minute.
24          MR. RISSMAN:  Sure.
25          (Discussion off the record.)

Page 23

1  BY MR. RISSMAN:
2      Q.   Are you trained that a second application or
3  third application of a taser poses an increased risk to
4  the person who is on the other end of a taser?
5      A.   Yes.
6      Q.   Are you trained as a first responder?
7      A.   Yes.
8      Q.   Are you trained to watch for symptoms of
9  injuries?
10     A.   Yes.
11     Q.   Do you think someone rubbing their head would
12 be -- could be a symptom of an injury if you've seen them
13 fall?
14     A.   It's possible.
15     Q.   How about if they seemed -- after seeing
16 someone fall, they seemed dazed?
17     A.   It's possible.
18     Q.   If you know someone has a head injury, what
19 are you trained to do for that person?
20     A.   Stabilize them, call an ambulance, provide
21 basic first responder-level care.
22     Q.   Do you know why you're trained to -- well, can
23 you tell me why you don't want -- why you want to
24 stabilize them?
25     A.   Prevent further injury.

Page 24

1      Q.   Are you familiar with the -- going back to the
2  Use of Force Policy, are you familiar with the medical
3  consideration portion of that policy?
4      A.   Yes.
5      Q.   And is that that someone who you use force on,
6  you should get medical care for that person, if necessary?
7      A.   Yes.
8      Q.   I'm sorry, if you believe that they're
9  injured?
10     A.   Yes.
11     Q.   Prior to January 15, 2016, were you given any
12 training on recognizing individuals who may not be
13 understanding your commands for any reason?
14     A.   I'm sure I have.  I don't remember,
15 specifically, but --
16     Q.   Can you tell me specific training that you
17 received along those lines?
18     A.   I don't know, on-the-job training, basically
19 dealing with different people.  I mean, people who are
20 intoxicated, people who are on drugs don't, obviously -- I
21 mean, they don't obviously understand.  People that are
22 high, you know, people that are deaf, people that are
23 mute, people that have physical disabilities, you know,
24 people that speak a different language.
25     Q.   What training are you given with respect to

Page 25

1  people that speak a different language?
2      A.   You know, we're basically we're taught to --
3  I'm going to assess and try to figure out what language
4  they speak.  We have, obviously, interpreters.  We have a
5  language line that we use to, basically, try to facilitate
6  a conversation.
7      Q.   And what training -- when did that training
8  occur with regard to people who speak English as a second
9  language?
10     A.   I don't recall.  I know part of it is field
11 training.  They give us training on how to use a language
12 line.  It's basically a telephone service that we would
13 use to communicate with people and, basically, on-the-job
14 training dealing with different people.
15     Q.   Have you dealt with people in your time as
16 a -- Brooklyn Center police officer that speak English as
17 a second language?
18     A.   Yes.
19     Q.   Do you do that with people that spoke limited
20 English?
21     A.   Yes.
22     Q.   Have you dealt with people who speak no or
23 very little English?
24     A.   Yes.
25     Q.   Do you speak any other languages?

Page 26

1      A.    Yes.
2      Q.    What do you speak?
3      A.    Tagala.  It's Filipino.
4      Q.    And how did you come to speak that?
5      A.    I grew up in the Philippines for a while,
6  so --
7      Q.    So you were born there?
8      A.    No, I was born here and we moved back there
9  for a while.
10     Q.    Are your parents English-as-a-second-language
11 speakers?
12     A.    Yes.
13     Q.    Do they speak English well?
14     A.    Yes.
15     Q.    Do you have other family members that do not
16 speak English very well, in the United States?
17     A.    No.  Most of my family is in the Philippines,
18 so --
19     Q.    And so, when did you -- when did you go to the
20 Philippines?
21     A.    When I was 4.
22     Q.    When you were 4.  When did you come back?
23     A.    When I was 16.
24     Q.    Would your training include people who you
25 believe were -- your training with respect to people who

Page 27

1  may not be understanding the command, would that include
2  people who are mentally ill?
3      A.    Possibly.
4      Q.    Well, I'm asking if you've had any training
5  with regard to people who are mentally ill?
6      A.    Yes.
7      Q.    And you've been given strategies for
8  communicating with those people?
9      A.    Yes.
10     Q.    Do you know if that was before January 15th,
11 2016?
12     A.    Before.
13     Q.    Was that a specific training, or was that just
14 kind of as part of, as you said, on-the-job training, I
15 think?
16     A.    Part of it.  I think I went to a class.  I
17 forget what it was called, but there was a training where
18 it specifically dealt with people in crisis, people who
19 are under the influence, things like that, on top of
20 on-the-job training; dealing with people at different
21 points in their lives and try to sort through and help
22 them.
23     Q.    Training like Minnesota EDPs in crisis?
24     A.    It possibly could be.  I couldn't say for
25 sure.

Page 28

1          (Whereupon, Exhibit 2 was marked.)
2  BY MR. RISSMAN:
3      Q.    Officer Salvosa, you've been handed what's
4  been marked as Exhibit 2.
5            Do you know what this document is?
6      A.    Yes, sir.  It appears to be my training -- all
7  the training I've had.
8      Q.    It's Brooklyn Ctr 0435 through 0437.
9            Do you see, four lines down, there's a "Mental
10 Health De-escalation Strategies."
11           Do you see that?
12     A.    Yes, sir.
13     Q.    Is that the training you were referring to?
14     A.    Could be.
15     Q.    Do you see -- so the date of that was
16 April 12th, 2016.
17           Do you see, in this training, any other
18 training specific to people with mental health issues?
19     A.    Probably on 4 -- 4/7, "Cultural Competencies
20 and Conflict Resolution."  There would probably be some in
21 there.  I don't know off the top of my head.
22     Q.    So that would be 4/7/2015 through 4/9/2015?
23     A.    Yes, sir.
24     Q.    It says, for that one -- that was after the
25 incident; correct?

Page 29

1      A.    Sorry.  Yeah, probably would be.
2      Q.    I'm sorry, did you say "yes" to my question?
3      A.    Sorry, what was the question?
4      Q.    The question was the "Cultural Competency
5  Conflict Resolution" was after the incident in question?
6      A.    It appears so.
7      Q.    One quick question with that.
8            If you look over to the right, it says, "Class
9  Hours and Training Hours," and for the "Cultural
10 Competency and Conflict Resolution," there are zero hours
11 there.
12           Do you see that?
13     A.    Uh-huh.
14     Q.    Do you know why that is?
15           MR. HIVELEY:  You have to say "yes" or
16 "no."
17     A.    Yes, I see that.  You'd have to talk to the
18 record people.  I don't know why they would put zero
19 there.
20 BY MR. RISSMAN:
21     Q.    Do you recall attending this training?
22     A.    I believe so, yes.
23     Q.    It was, what, three days?
24     A.    I think they put that for the days it was
25 offered.  I don't think it was three days, at least I

Page 30

1  don't recall.
2       Q.    Well, let me ask you:  Do you recall this
3  training?
4       A.    Yes.
5       Q.    Do you think it was one day?
6       A.    Possibly.  I'm not sure off the top of my
7  head.
8       Q.    Okay.  And then, so prior to the Cultural --
9  in addition to the Cultural Competency on 4/7/2015 and the
10 De-Escalation Training on 4/12/2016, are there any other
11 training specific to mental health or communicating with
12 people who are -- may not understand a command?
13      A.    On 3/16/2012, there was "Managing the
14 Emotionally Disturbed."
15      Q.    Okay.  So that was an eight-hour class?
16      A.    It looks like it, according to the sheet, sir.
17      Q.    Do you recall that training?
18      A.    Yes, sir.
19      Q.    So did you -- in that training, did you --
20 what did you learn?
21      A.    It's been a while, but I don't recall
22 specifically what.  It's been a while, but --
23      Q.    So you don't recall anything you learned at
24 that training; is that correct?
25      A.    No, it's been a while.  I'd have to think

Page 31

1  about it, but I remember they did scenarios on dealing
2  with difficult people, dealing with people in crisis and
3  things like that.
4       Q.    And were those scenarios -- were any of the
5  scenarios that you were trained on, were any of those
6  emergency situations?
7       A.    I don't recall, but I believe so.  They would
8  have been calls that police officers would have responded
9  to, so --
10      Q.    Right.  Would that include situations where
11 there's a possibility of using force?
12      A.    I don't recall specifically, but I would
13 assume so, yes.
14      Q.    Okay.  You can put that one aside.
15            MR. RISSMAN:  Can we take a quick break,
16 a quick bathroom break?
17            (Whereupon, a recess was taken
18            from 9:45 a.m. to 9:52 a.m.)
19 BY MR. RISSMAN:
20      Q.    The night of the incident, you said you were
21 working the -- was it the noon to midnight shift?
22      A.    Yes, sir.
23      Q.    Okay.  And do you recall responding to the
24 incident?
25      A.    Yes, sir.

Page 32

1       Q.    Where were you when you first got the call to
2  respond?
3       A.    Probably Shingle Creek Parkway coming up to
4  John Martin or Summit.
5       Q.    Approximately how far away?  Is that far from
6  the -- from the coin laundry or pretty close?
7       A.    No, probably -- I don't know, three, four
8  blocks, give or take.  I had to make two right turns to
9  get there, so it wasn't that far.
10      Q.    Did you put your sirens on?
11      A.    I believe so.  I had to go through a red
12 light, so I kind of used it to go through the red light.
13      Q.    And then turned it back off?
14      A.    Yes.
15      Q.    When you pulled up to the scene, were your
16 lights on?
17      A.    I don't believe so, no.
18      Q.    And I assume no sirens?
19      A.    No, sir.
20      Q.    What did you learn from dispatch?
21      A.    There was a fight at the coin laundry, or I
22 think it came out as Pizza Hut originally, or that area.
23      Q.    Originally Pizza Hut.  And Pizza Hut is -- is
24 two businesses to the west of the coin laundry; is that
25 correct?

Page 33

1       A.    I believe so, yes.  It's the corner business.
2       Q.    And in between, there's a convenience store?
3       A.    Yes.
4       Q.    Quick Shop, I think?
5       A.    Yes, sir.
6       Q.    Did you learn anything else from dispatch?
7       A.    Originally, there were no weapons, however,
8  just before I got there, they updated that there was
9  possibly a bat and other weapons involved.
10      Q.    So -- so there was possibly a bat.
11            Did they -- they updated you that there were
12 other weapons, as well?
13      A.    Possibly.
14      Q.    Did they describe those weapons?
15      A.    I don't recall.  I think someone -- there was
16 something about something sharp in the notes.  I caught a
17 glimpse of it as I came around the corner as I was trying
18 to read the notes and listen and watch at the same time.
19      Q.    So describe to me how that works.  Is there a
20 computer that puts up notes?
21      A.    Yes.
22      Q.    And would that be what the dispatchers, are
23 they talking and typing at the same time, or are they
24 different people, or how does that work?
25      A.    I don't specifically know how it works.  I

Page 34

1  know they call us on the radio generally.  After we
2  acknowledge it, they send it to our screen and it pops up
3  with the address of the business, the type of call, and
4  then any notes.
5        And depending on the call or the situation,
6  they will, more than likely, just update the notes.  If
7  it's a fluid situation, they'll also update you over the
8  radio, so there's a bit of a -- there's a lot going on, I
9  guess.
10       Q.   Okay.  Is -- do they update you on the -- did
11  you get any update at the time, either on the radio, on
12  your notes, on the identity of the people involved?
13       A.   No.
14       Q.   And who -- who might be the aggressor in the
15  situation?
16       A.   No, it was just notes of people fighting, a
17  bat involved, and then something shiny or sharp is the
18  last comment I saw before I pulled up.
19       Q.   Have you reviewed any 911 transcripts in this
20  case?
21       A.   A long time ago.  Not recently.
22       Q.   Do you review them in preparing your report?
23       A.   No.
24       Q.   Did you review them prior to giving your
25  statement to Hennepin County?

Page 35

1        A.   No.
2             (Whereupon, Exhibit 3 was marked.)
3  BY MR. RISSMAN:
4        Q.   Officer Salvosa, you've been handed what's
5  been marked as Exhibit 3, Brooklyn Ctr 5030.
6        A.   Yes, sir.
7        Q.   Have you seen this document before?
8        A.   Yes, sir.
9        Q.   What is this?
10       A.   It's a police report, sir.
11       Q.   And if you flip to -- if you flip to page
12  5046 -- actually, starting on 5045, there's a series of
13  911 call transcripts.
14            Do you see that?
15       A.   Uh-huh.
16            MR. HIVELEY:  Is that a "yes"?
17       A.   Yes, sorry.
18  BY MR. RISSMAN:
19       Q.   And do you have any reason to believe these
20  transcripts were not accurately transcribed?
21       A.   No, sir.
22       Q.   If you look at the second 911 call on 5046.
23       A.   Uh-huh.
24       Q.   Do you see three down -- well, first of all,
25  it says:

Page 36

1             "911 dispatch."  It says, "Thank you."
2             And the caller says:  "Um, hi.  Yeah, we're at
3  the Pizza Hut by Cub Foods and Holiday."
4             And 911 dispatch says:  "K."
5             Caller says:  "And there's three
6  African-American guys swearing at this old lady, and the
7  lady told them, 'You got to leave my property,' and they
8  start swearing at her and threatening her saying they're
9  going to bring her -- going to bring their homeboys and
10  they were going to kick their ass, and right now this
11  African guy is beating up this Asian guy."
12            Do you see that?
13       A.   Yes, sir.
14       Q.   Were you ever informed of any information
15  along those lines -- before you arrived?
16       A.   No, sir.  Nothing this specific.
17       Q.   Were you informed of the -- does this refresh
18  your memory that you were informed of the descriptions of
19  people involved in the incident prior to arrival?
20       A.   No, sir.  I just knew there was a fight, five
21  to eight people, I think, was what I got, a bat and
22  something shiny.
23       Q.   Five to eight people?  And if you flip to
24  Brooklyn Ctr 5048.
25            Do you see that?

Page 37

1        A.   Uh-huh.
2             MR. HIVELEY:  "Yes"?
3        A.   Yes, sir.  Sorry.
4  BY MR. RISSMAN:
5        Q.   You'll get used to it.
6             Third from the bottom, 911 dispatch:  "Okay,
7  do you see any weapons?"
8             Caller:  "No, I don't see it.  I just see just
9  a baseball bat."
10            And then:  "There's people with baseball
11  bats?"
12            "Uh, some.  I don't know.  I don't see that."
13            The 911 dispatch:  "Are there baseball bats or
14  not?"
15            Caller:  "Let me see."
16            And then the call appears to end.
17            Do you see that?
18       A.   Yes, sir.
19       Q.   So we see there's a call, at least someone's
20  talking about a baseball bat; correct?
21       A.   Yes, sir.
22       Q.   And then, on the next page, 5050, there is a
23  reference to -- do you see a reference to a man hitting
24  somebody with a bat?
25            Do you see that?

ALAN SALVOSA - 03/30/2017                  Pages 38..41

Page 38

1     A.   Yes, sir.
2     Q.   And these calls appear to be in time order;
3 correct, meaning the earliest call was first and the last
4 call was last?
5          Do you see that from the time stamp on the
6 top?
7     A.   The --
8     Q.   If you go to page --
9     A.   I see that now, sir.  Yes.
10    Q.   So we had -- the first one was at 9:12 and
11 then the one we just read was at 9:14, and if you go two
12 more, to page 5052.
13    A.   Yes, sir.
14    Q.   Okay.  Do you see that call was on 21:15?
15    A.   Yes, sir.
16    Q.   And then a few from the bottom, do you see the
17 one that says, "Okay, what kind of weapons do you see?"
18    A.   Yes, sir.
19    Q.   And the caller says:  "I already saw the
20 police."
21         Actually, I'll go two up.  I'll start again.
22 "Yes, we have officers en route.  What kind of
23 weapon do you see?"
24         Caller:  "I already saw the police."
25         911 dispatch:  "Okay, what kind of weapons do

Page 39

1 you see?"
2         Caller:  "I already saw the police."
3         911 dispatch:  "I know.  I'm asking you if you
4 saw the weapon.  What kind of weapons do you see?  Do you
5 see a knife, a gun?"
6         Caller:  (Inaudible.)  "Sharp knife."
7         911 dispatch:  "A sharp what?"
8         Caller:  "A sharp thing.  I don't know what it
9 is.  The police already shocked him."
10        911 dispatch:  "But the police have the
11 guy with it?"
12        Caller:  "Yeah, they already shocked him."
13        911 dispatch:  "Okay.  But you're saying that
14 the police are with the right person that had the weapon?"
15        "Yeah, they already shocked the person that
16 had the weapon."
17        911 dispatch:  "Okay, what's your name?"
18        "Marie."
19        Do you see that?
20    A.   Yes.
21    Q.   Does that indicate to you, sir, that for at
22 least this call, you would not have received the
23 information from this 911 call on page 5052?
24    A.   Can you repeat the question, sir?
25    Q.   Well, you were the first to arrive; correct?

Page 40

1     A.   Yes, sir.
2     Q.   And we're going to talk about it more, but
3 you -- you tasered Mr. Khottavongsa; correct?
4     A.   Yes, sir.
5     Q.   Okay.  And so does the fact that this caller
6 is saying that they already shocked him, does that -- and
7 that the police are already there, does that indicate to
8 you that you would not have had this information from this
9 call prior to getting out of the police car?
10    A.   I don't recall specifically, but yes, sir.
11    Q.   You can put that one to the side for a moment.
12 I guess I'll ask you one more question.
13         Do you see any other 911 calls referencing
14 anything other than -- any sort of sharp thing?
15    A.   I don't believe so, sir.
16    Q.   Do you have experience responding to fights?
17    A.   Yes, sir.
18    Q.   And at the time of the incident, had you
19 responded to fights before?
20    A.   Yes.
21    Q.   Did you believe that showing -- is it your
22 belief, at that time, that showing a taser would be --
23 could be an effective way of diffusing the fight?
24    A.   Yes, sir.
25    Q.   And so, when you were en route and arriving on

Page 41

1 scene, did it cross your mind that you were going to get
2 your taser out?
3     A.   Yes, sir.
4     Q.   And was anybody with you at the time?
5     A.   Cadet Nochez -- or former Cadet Nochez.
6     Q.   And you were his mentor?
7     A.   Yes, sir.
8     Q.   And are there special safety considerations
9 for a cadet responding to a call?
10    A.   No more than having a ride-along, sir.
11    Q.   Is he supposed to stay behind you or
12 something?
13    A.   Yes, sir.
14    Q.   Was there an approximate distance, or just
15 sort of behind you?
16    A.   Behind me.  It's all relative to the
17 situation, sir.
18    Q.   Could he -- was he able to -- like, if you
19 were overcome by resistance, would he be allowed to help
20 you?
21    A.   Yes, sir.  At least I would hope he would.
22    Q.   Yeah.  But he does not carry a weapon;
23 correct -- or, I'm sorry, does he carry a gun?
24    A.   He did not, sir.
25    Q.   Does not?

ALAN SALVOSA - 03/30/2017          Pages 42..45

Page 42

1    A.   He would have had a baton, mace, handcuffs.
2    Q.   Baton, mace, and handcuffs?
3    A.   And he would have been trained in Use of Force
4  and handcuffing and things like that, and taking people
5  into custody.
6    Q.   Would he have been trained in any sort of --
7  are you given training in any sort of hand-to-hand
8  operations?
9    A.   Yes, sir.
10   Q.   Would he have been trained in that?
11   A.   Yes.
12   Q.   How to -- essentially, how to fight somebody?
13   A.   Yes, sir.
14   Q.   Do you have any martial arts training?
15   A.   Yes, from a long time ago.
16   Q.   Long time ago.
17        Do you -- you don't keep up with it?
18   A.   No, sir.
19   Q.   Have you ever utilized it as a police officer?
20   A.   No, sir.
21   Q.   What kind of training was that?
22   A.   Tae Kwon Do.
23   Q.   Tae Kwon Do.
24        What level of belt were you?
25   A.   I was a brown belt, but that was when I was a

Page 43

1  teenager, so --
2    Q.   I was a yellow belt with a green stripe.
3        Okay.  So -- so can you describe -- so you
4  said you took two right turns to get there.
5        So what street were you on when you were
6  pulling in?
7    A.   Shingle Creek Parkway, sir.
8    Q.   And you said -- did you take a right onto
9  Northway?
10   A.   I would have taken a right on to County
11  Road 10, or Bass Lake Road, and I would have taken another
12  right on to Northway.
13   Q.   So you were approaching from the east?
14   A.   Yes, sir.
15   Q.   Okay.  And was it dark?
16   A.   Yes, sir.
17   Q.   Could you see what -- could you see what was
18  happening at the -- well, so let me back up.
19        So originally, you were told that it was at
20  the Pizza Hut; correct?
21   A.   Yes, sir.
22   Q.   And so, were you looking in that general
23  direction when you were arriving?
24   A.   Yes, sir.
25   Q.   When you arrived, did it appear to be at the

Page 44

1  Pizza Hut?
2    A.   Yes, sir, or in the parking lot.  It's a strip
3  mall parking lot, so yes.
4    Q.   In the parking lot.  Was it -- and that strip
5  mall has a sidewalk that connects the businesses; correct?
6    A.   Yes, sir.
7    Q.   And there's -- so there's a sidewalk, and then
8  just further south, I think -- or north, just further
9  north, there would be parking spots by the sidewalk?
10   A.   Yes, it's a parking lot, like a strip mall
11  parking lot.
12   Q.   Sure.  And then there would be -- and then
13  there would be, like, the part of the parking lot where
14  cars drive?
15   A.   Yes, sir.
16   Q.   So were -- what part of the -- of the scene
17  were people on?  What did you see?
18   A.   In the -- in the parking spaces and in the
19  street.
20   Q.   Parking spaces and sort of the middle section?
21   A.   Yes, sir.
22   Q.   And they were by the coin laundry -- I'm
23  sorry, they were by the Pizza Hut?
24   A.   Yes, sir.
25   Q.   Did you see anybody by the coin laundry at

Page 45

1  that time?
2    A.   I don't recall, sir.
3    Q.   How many people did you see when you arrived?
4    A.   Five to eight.
5    Q.   Five to eight.
6        And did you use your spotlight?
7    A.   Yes, sir.
8    Q.   Did that fully illuminate the scene or --
9    A.   Just part of it.
10   Q.   Parts of it.
11        Did you have trouble seeing what was going on?
12   A.   A little bit.  I mean, I saw shadows, I saw a
13  big group, kind of looked like they were actively
14  fighting, so I used my spotlight to illuminate them, also,
15  to let them know that I was there.
16   Q.   What were people's response to the spotlight
17  being shined on them?
18   A.   I don't think they noticed it.  They were
19  pretty actively going at it.
20   Q.   Didn't notice.
21        So when you say "actively going at it," did
22  you see people throwing punches?
23   A.   It looked like it.  I was a distance away, but
24  it looked like it.  It looked like a pretty good brawl.
25   Q.   Did you see people locked up?

Page 46

1    A.   Yep, it looked like they were wrestling and
2  they were -- a lot of movement.  It was hard to
3  distinguish with the whole group there.
4    Q.   **Was there yelling?**
5    A.   When I pulled up, I couldn't really hear.  I
6  was probably towards the end of the businesses, so --
7    Q.   **Uh-huh.  And you did not pull into the parking**
8  **lot?**
9    A.   No, sir.
10   Q.   **And that is because you believed it would**
11 **require you to make a U-turn?**
12   A.   Yes, sir.  It would have put me at a tactical
13 disadvantage.
14   Q.   **How so?**
15   A.   So I knew my partners were probably going to
16 be coming in from the west because, I think right before I
17 pulled up, I said I was arriving, and I know someone said
18 that they were 55th and Xerxes.  So the only logical way
19 for them to get there quick would be to come up Xerxes and
20 come in from the west.
21        I also knew that, coming from the east and my
22 partners are coming from the west, had I went into the
23 parking lot, they would have fled east, and now my vehicle
24 would have been blocked in because everyone would have
25 blocked me in coming up behind me.  I also would have had

Page 47

1  to drive past them, losing sight of them, and then come
2  around, which puts me at a tactical disadvantage of, if I
3  see them, I really don't want to keep my eye off them and
4  put my back to them.  It also puts me at a greater
5  disadvantage to come around and then be face-to-face with
6  them while still in my car and not have the option to
7  disengage or get to any of my equipment.
8    Q.   **So let me just make sure I understand this.**
9        **You believe that if you pulled into the**
10 **parking lot, you would lose sight of them?**
11   A.   I would have to.  I would have to drive past
12 them and then flip a U-turn (indicating).
13   Q.   **And you also said you didn't want to be**
14 **overwhelmed by them.**
15   A.   Right.
16   Q.   **Is that a fair summary?**
17   A.   Not overwhelmed.  I wanted to put myself in
18 the best tactical position.  Driving up to them and not
19 being out of the car kind of puts me in a position where
20 I'm trapped in the car and they're all around me.
21        (Whereupon, Exhibit 4 was marked.)
22 BY MR. RISSMAN:
23   Q.   **Officer Salvosa, you've been handed what's**
24 **been marked as Exhibit 4.**
25   A.   Yes, sir.

Page 48

1    Q.   **Have you seen this document before?**
2    A.   Yes, sir.
3    Q.   **What is this document?**
4    A.   It appears to be a transcription of my
5  statement to Hennepin County Investigator Chelmo and
6  Nelson.
7    Q.   **You gave this statement on January 26th, 2016?**
8    A.   Yes, sir.
9    Q.   **That would be about 10 days after the**
10 **incident?**
11   A.   Yes.
12   Q.   **Events were still fresh in your mind at the**
13 **time?**
14   A.   Yes, as I recall.
15   Q.   **And you understood, at this point, that**
16 **Mr. Khottavongsa had passed away?**
17   A.   I don't recall specifically if he had passed
18 away at this point.  I don't -- I don't recall.  I --
19   Q.   **If you look at page 1 of 7 Brooklyn Ctr 0028,**
20 **the first question is:  "Do you understand that this is a**
21 **death investigation and you are free to give or not give a**
22 **statement?"**
23        **Answer:  "Yes."**
24        **Do you see that?**
25   A.   Yes.

Page 49

1    Q.   **Does that refresh your memory you were aware**
2  **that he had passed away?**
3    A.   Yes.
4    Q.   **And did you tell the truth when you were**
5  **making this statement?**
6    A.   Yes.
7    Q.   **Did you answer the questions fully to the best**
8  **of your ability?**
9    A.   Yes, sir.
10   Q.   **If you go to the last page of this statement,**
11 **the last page where there's questions, Brooklyn Ctr 0033.**
12   A.   Yes.
13   Q.   **It says:  Question -- third from the bottom --**
14 **"Is there anything else you can think of we need to know**
15 **about at this time, about this incident?"**
16        **"Not at this time."**
17        **Do you see that?**
18   A.   Yes, sir.
19   Q.   **Is that sort of a catchall where if they asked**
20 **you -- they didn't ask you a question but if you thought**
21 **something was important, you could add it there?**
22   A.   Yes, sir.
23   Q.   **And you say:  "Is this statement true and**
24 **correct to the best of your knowledge?**
25        **Answer:  "Yes."**

ALAN SALVOSA - 03/30/2017          Pages 50..53

Page 50

1          Were you given a chance to review this
2   statement in typed form?
3          A.   Yes.
4          Q.   And it says: "After reading the statement and
5   finding it to be true and correct, are you willing to sign
6   it?"
7               Answer:  "Yes."
8               Do you see that?
9          A.   Yes, sir.
10         Q.   If you flip the page, is that your signature?
11         A.   Yes, sir.
12         Q.   And so, if you look at the fourth question
13  from the bottom on page 0033, do you see that?
14              Question:  "If your squad car is equipped with
15  audio and video recording capabilities, why didn't you
16  position your squad car in the position to capture the
17  incident?"
18              And you answer:  "As they were moving towards
19  the transit center, they were moving closer to me.  If I
20  attempted to get my car in a position to record this, I
21  would have had to drive past them with my back towards
22  them and make a U-turn into the one entrance at the far
23  end of the lot losing sight of the group."
24              Do you see that?
25         A.   Yes, sir.

Page 51

1          Q.   Is that an accurate statement?
2          A.   Yes, sir.
3          Q.   And that's what you described today
4   regarding -- similar to what you described today regarding
5   the U-turn and losing sight of the group; is that correct?
6          A.   Yes, sir.
7          Q.   And you said that you wanted to put yourself
8   in the best tactical position, that "driving up to them
9   and not being out of the car kind of puts me in a position
10  where I'm trapped in the car and they're all around me;"
11  is that correct?
12         A.   Yes, sir.
13         Q.   And you do not say that in your statement; is
14  that correct?
15         A.   No, sir.  I do not say that in that statement.
16              (Whereupon, Exhibit 5 was marked.)
17  BY MR. RISSMAN:
18         Q.   Officer Salvosa, you've been handed what's
19  been marked as Exhibit 5.  For the record, this is a
20  Google satellite printout of the corner of Xerxes and
21  Northway.
22         A.   Yes, sir.
23         Q.   Does that look accurate to you?
24         A.   Yes, sir.
25         Q.   Had you driven on Northway before?

Page 52

1          A.   Yes, sir.
2          Q.   And in fact, there's a transit center to
3   the -- what is that -- is that --
4          A.   Southeast.
5          Q.   Thank you.  Southeast; correct?
6          A.   Yes, sir.
7          Q.   And have you had problems there before?
8          A.   Yes, sir.
9          Q.   So you're generally familiar with the area?
10         A.   Yes, sir.
11         Q.   And you -- do you see where the -- there's a
12  parking lot there; correct?
13         A.   Yes, sir.
14         Q.   And there are two concrete slabs jutting out.
15              Do you see that?
16         A.   Yes, sir.
17         Q.   And the concrete slab to the left is the coin
18  laundry; correct?
19         A.   Yes, sir.
20         Q.   And the one to the right is the Quick Shop;
21  correct?
22         A.   Yes, sir.
23         Q.   And then, the -- further over that, there is a
24  Pizza Hut; is that correct?
25         A.   Yes, sir.

Page 53

1          Q.   And you parked your car -- so you see there's
2   the entrance to the parking lot?
3          A.   Yes, sir.
4          Q.   Can you mark with a "C" where you parked your
5   car?
6          A.   (Drawing).  Probably approximately there, sir
7   (pointing).
8          Q.   Okay.  Okay.  And then can you -- and so, at
9   the time, it was winter; correct?
10         A.   Yes, sir.
11         Q.   And there was snow on the ground?
12         A.   Yes, sir.
13         Q.   Okay.  To be fair, this is probably a
14  summertime picture because there's leaves on the trees;
15  right?
16         A.   Yes.
17         Q.   But were the trees obstructing the view in any
18  way?
19         A.   Probably a little bit, but not enough that I
20  couldn't make out what was happening, sir.
21         Q.   Okay.  And then, could you mark with an "S"
22  the furthest west point that you saw the fight?
23         A.   (Drawing).  Probably there, sir.  Just this
24  general area, (pointing).
25         Q.   Can you mark with an "F" the furthest east

ALAN SALVOSA - 03/30/2017          Pages 54..57

Page 54

1  point that you saw the fight?
2      A.  That I saw the fight?
3      Q.  Approximately, yeah.
4      A.  It's hard to tell from the diagram, but I
5  would probably say here (drawing).
6      Q.  Okay.
7      A.  It was fluid; it was obviously moving.
8      Q.  Give or take.
9      A.  Approximately.
10     Q.  And the entrance to the parking lot would have
11 been here (pointing); correct?
12     A.  Yes, sir.
13     Q.  And so, that would have required you to make a
14 left turn into the parking lot?
15     A.  Yes, sir.
16     Q.  Okay.  And given the markings that you put --
17 that you just put on the paper, does that indicate to you
18 that it was not a U-turn -- you were not required to make
19 a U-turn to see the fight?
20     A.  Right here, no, but obviously in a fluid
21 situation, if they had ran, I would have had to make a
22 U-turn.
23     Q.  To catch them?
24     A.  Yes, sir.
25     Q.  But you would not -- if you had turned into

Page 55

1  the parking lot, you would not have lost sight of them;
2  correct?
3      A.  That's if they stood still, sir.  Obviously,
4  if they're fighting and attacking each other, and
5  generally, when the police pull up on people, they tend to
6  flee.
7      Q.  Uh-huh.
8      A.  So had they fled and saw me at any point
9  before I got here (pointing), as I make that turn, they're
10 fleeing here (pointing), and now my car is stuck in a lot
11 and my partners are coming here, backing me in.  And
12 there's no other exit in this lot, so tactically, if I get
13 in this lot, there's one way and one way out, and there's
14 no way to get a squad car out without backing everyone up.
15         More than likely, based off the geographical
16 location, they would flee to the transit center or flee
17 west -- or flee east, so that's what I meant by U-turn; is
18 that, yes, they're fighting here (pointing), but
19 understanding that people might flee and move, and they're
20 not going to, obviously, stand still as the cops are
21 rolling up on them.  I would be at a tactical disadvantage
22 to pass them, try to make that turn as they flee this way
23 (pointing), and now I'm boxed into a parking lot where my
24 only option would have been to jump curbs, knock down
25 fences and to chase them in my car.

Page 56

1      So that's what I meant by losing sight with a
2  U-turn, obviously.  Static, yes, I would have had to make
3  a turn here (pointing).  Real world situation, active
4  fight, people possibly fleeing, if I make a left turn here
5  and they move here (pointing), this is where the U-turn
6  would have come in, sir.
7      Q.  But you got out of your car; correct?
8      A.  Yes, sir.
9      Q.  So would you have to run back to your car to
10 get in your car to chase people?
11     A.  Yes, sir.
12     Q.  Did you see people flee?
13     A.  Prior to my arrival, I learned that one person
14 had fled going north, and then there was, obviously, a lot
15 of commotion.
16     Q.  Were some people walking away?
17     A.  I couldn't tell, sir.  It was very quick.  I
18 just knew there was an active brawl here (pointing).
19     Q.  Okay.  And you're aware that the other
20 officers who arrived did, in fact, pull into the parking
21 lot?
22     A.  Yes, sir.
23     Q.  Okay.  So when you said, in your statement,
24 that you would have had to drive past them, "my back
25 towards them," that's only in the scenario -- that's if

Page 57

1  they flee; correct?
2      A.  Yes, or if they moved at any -- you know,
3  they're obviously not going to stand still.
4      Q.  So if the whole fight moved to the other end
5  of the parking lot, then you would -- your back would be
6  towards them?
7      A.  If they moved where, sir?
8      Q.  I'm sorry, I guess if they moved all the way
9  east?
10     A.  If they moved all the way east?
11     Q.  Yeah.
12     A.  I probably would have parked here.  I mean,
13 it's all relative to what I saw at the time, sir.  I had
14 to make that decision pretty quick.  My biggest concern
15 was it's a one-entrance parking lot, and the tendency
16 would have been for -- ideally, we wouldn't have gone in
17 the parking lot, but obviously, once I was engaged already
18 inside, that's when my partners pulled in.  I don't know,
19 necessarily, that had I not got out or had we arrived at
20 the same time, things might have been different, but I
21 don't know; I can only speculate.
22     But given the time, being the first to arrive,
23 the tactical decision is do I risk passing them and
24 putting myself at a disadvantage.  If they stay in the lot
25 and I pull up to them, I'm swarmed and I'm not even out of

Page 58

1   my car.  If they flee, I've now boxed myself into a
2   parking lot.  I also would put myself at a disadvantage to
3   be parallel to them in a vehicle.  So based on my
4   assessment at the time, I made the decision that I thought
5   was best.
6        Q.   And when you -- you were giving a statement,
7   that tactical decision was fresh in your mind?
8        A.   Yes, sir.
9        Q.   Fresher than it is today?
10       A.   I don't know how -- I guess I don't know.
11  That's all relative, sir.
12       Q.   Do you remember the incident better now than
13  you did on January 26th, 2015?
14       A.   Yes and no.  I mean, obviously, I've had more
15  time to think about it.  I've had more time to analyze.
16  I've read the entire case file, so I have more knowledge
17  now than I did at the time.  So I guess it's hard to say
18  that I'm more aware of one than at the time, 10 days
19  later, I knew what I did, but now, I have lots more
20  information; I've read entire case files, I watched
21  videos.
22       Q.   Right.  I'm just asking what you remember you
23  did.
24       A.   Right.
25       Q.   So you had a better memory of what you did --

Page 59

1        A.   Probably at 10 days after the incident.
2   Sorry.
3        Q.   So you mentioned in your statement the concern
4   that the fight was moving; correct?
5        A.   Yes, sir.
6        Q.   And -- but there's not a mention of the
7   possibility of fleeing; is that right?
8        A.   In the statement, no, sir, there's no mention
9   of it.
10       Q.   Okay.  You can put that one aside for now and
11  the map, too.
12       A.   Yes, sir.
13       Q.   If you don't mind, I'm just going -- I'll put
14  that back.  Okay.  You described that people were
15  fighting?
16       A.   Yes, sir.
17       Q.   What else did you see when you were -- when
18  you were still pulling up, if anything?
19       A.   Just it looked like arms were being swung, and
20  there was a lot of pulling and a lot of grabbing and
21  grappling.
22       Q.   Okay.  And then, did you -- did you begin the
23  process of exiting your car prior to stopping the car?
24       A.   I don't recall, but probably.  I was probably
25  stepping on the brake and unbuckling my seatbelt.

Page 60

1        Q.   Okay.  Officer Turner mentioned yesterday a
2   tactic I hadn't considered; that you could, basically,
3   begin the process of exiting the car while the car is
4   still moving.
5             Are you familiar with that tactic?
6        A.   Sure.  When you -- you learn to do a lot of
7   things, I guess, so --
8        Q.   Sure.  I was just wondering if that's what you
9   did here, or was it more you stop and get out?
10       A.   I don't specifically recall.  More than
11  likely, I was stepping on the brake and unbuckling my
12  seatbelt and getting ready to exit.
13       Q.   And once you exited the car, did you -- I
14  assume you approached the scene; yes?
15       A.   Yes, sir.
16       Q.   And did you walk or run?
17       A.   Run, sir.
18       Q.   You ran.  Did you consider it like a full
19  sprint or more of a kind of a -- somewhere between more
20  like a jog?
21       A.   I'd say probably a good sprint.  I was
22  concerned at the time because I saw someone swinging a
23  crowbar or swinging something.  I learned that there were
24  weapons, and obviously, my concern was the safety of
25  everyone and making sure that I could stop the guy who was

Page 61

1   swinging the weapon and prevent any further injuries or
2   anything like that.
3        Q.   And when did you first see the person -- when
4   did you first see this person swinging a crowbar?
5        A.   Probably when I was pulling up and during the
6   fight.
7        Q.   So as you were still -- were you still in the
8   car?
9        A.   Yes.
10       Q.   And you saw -- and so can you -- and where was
11  that person positioned when you saw them?
12       A.   In the group.
13       Q.   And where was the group?
14       A.   In the parking lot.
15       Q.   Were they at this point -- were they -- when
16  you saw him swinging it, was it more by the Pizza Hut, or
17  was it more by the Quick Shop -- or I'm sorry, by the coin
18  laundry?
19       A.   Probably in between the Quick Shop and the
20  Pizza Hut, that part of the lot.
21       Q.   Quick Shop and Pizza Hut?
22       A.   (Witness nodding head.)
23       Q.   And so were you immediately focused on that
24  individual?
25       A.   Yes.

ALAN SALVOSA - 03/30/2017          Pages 62..65

Page 62

1     Q.   And so you -- did you run towards him in
2   particular or just the group in general?
3     A.   He was in the middle of the group, so probably
4   to all of them, but generally my focus was drawn to him.
5     Q.   At what point do you start giving commands?
6     A.   I don't recall, but probably as I got close
7   enough where they could see me.
8     Q.   So were you still running?
9     A.   I'm not sure.  Probably.
10    Q.   What is the first -- so at any point when you
11  were running towards them, did anybody seem to notice you,
12  or did you see people looking at you?
13    A.   I don't recall.
14    Q.   Did the fighting seem to dissipate?
15    A.   As I got closer and repeated a couple
16  commands, it seemed I got some people's attention, I
17  believe, and they kind of backed off and disengaged.  It
18  wasn't as active as when I was pulling up in my car.
19    Q.   And so, as you were approaching -- so when you
20  first gave your first command, do you know where people
21  were positioned?
22    A.   I don't recall.  I know it was moving back
23  towards the coin laundry.  As I'm running, it's
24  starting -- fighting over here (indicating), and it's
25  moving towards that, I guess, lip or landing in front of

Page 63

1   the coin laundry.
2     Q.   Okay.  The person you saw swinging the
3   crowbar, how many times did you see him swing it?
4     A.   I don't recall.  At least two or three times
5   initially, and then he obviously had it as I got closer.
6     Q.   And did he -- can you describe the motion that
7   you witnessed?
8     A.   Kind of a -- (indicating).
9     Q.   So full -- a full swing from left to right and
10  right to left?
11    A.   Something like that.  It was from a distance
12  in the middle of a melee, but it did stand out because it
13  was the one motion with a -- whatever it was.
14    Q.   Sure.  Were people being struck by the
15  crowbar?
16    A.   I don't recall.  I saw it swing and I don't
17  know if it made contact or not.  I can --
18    Q.   You see anybody -- did you see anybody go down
19  as a result of the crowbar?
20    A.   No.
21    Q.   Did you see anybody covering their head with
22  their hand?
23    A.   It's hard to tell.  It was a big group, so I
24  guess I didn't specifically focus on each individual.  I
25  just kind of was trying to get people under control.

Page 64

1     Q.   So you don't recall seeing that -- seeing
2   someone -- seeing anyone protect themselves from the swing
3   of the crowbar?
4     A.   I was more focused on the guy with the
5   crowbar, so --
6     Q.   So no, you do not recall seeing that?
7     A.   No, I don't recall specifically seeing someone
8   duck from the crowbar.
9     Q.   And maybe I asked you this already, but do you
10  recall what the first command you gave was?
11    A.   Probably, "Get down on the ground."
12    Q.   I believe you said after you gave that
13  command, some people disengaged?
14    A.   I think I caught some of their attention, like
15  it was kind of like they're in the middle of it, and all
16  of a sudden, you introduce someone new to the situation,
17  and it kind of catches everyone's attention.
18    Q.   Did you identify yourself as a police officer,
19  verbally?
20    A.   I don't believe so.
21    Q.   Once you gave your first command and some
22  people disengaged, what was the person with the crowbar
23  doing?
24    A.   Walking around with it to his side.
25    Q.   Okay.  At that point, when you saw him walking

Page 65

1   around with it to his side --
2     A.   It was down.  I mean, he was walking around
3   with it.
4     Q.   It was down?
5     A.   I mean, it was at his side, like here
6   (indicating).
7     Q.   So the crowbar was facing down?
8     A.   Like he was holding it, like he was just done
9   swinging, and he was walking around.  He had a tense body
10  language, kind of like he was gripping it like this
11  (indicating).
12    Q.   Let me just make sure I'm understanding.
13         So his hand was by his side; correct?
14    A.   Like here, yes.  Like here, yes (indicating).
15    Q.   Was the crowbar facing down or up?
16    A.   Kind of parallel to the ground.
17    Q.   Parallel to the ground?
18    A.   So it wasn't like that, down, it was like this
19  (indicating).
20    Q.   Okay.  Did you immediately tell him to drop
21  it?
22    A.   Yes.
23    Q.   Was that your first command specifically, you
24  know, that you wanted him to hear?
25    A.   Yes.

ALAN SALVOSA - 03/30/2017          Pages 66..69

Page 66

1      Q.   Was, "Drop it"?
2      A.   I believe so, yes, sir.
3      Q.   And how far -- where did you see him walk to?
4      A.   He walked towards the coin laundry where all
5  the other group had kind of gathered.  They all kind of
6  went to the windows of the coin laundry.  There were a
7  couple of people in the inside of the coin laundry by the
8  glass and he walked over there, toward the group, I guess,
9  that had kind of disengaged.
10     Q.   So did you tell him to drop it -- so where
11 were you at this point?  Where were you when you saw him
12 walking towards the coin laundry?  Where were you
13 positioned?
14     A.   Can I use the map?
15     Q.   Sure.  Why don't you mark a "1."
16     A.   So probably here (drawing).
17     Q.   Okay.  So maybe three marking spots over from
18 the --
19     A.   Give or take.
20     Q.   Give or take?
21     A.   They had kind of disengaged and were all kind
22 of running back here, and he was --
23     Q.   And you were -- you had given him a command at
24 that point to drop it?
25     A.   I was giving them the whole time I was running

Page 67

1  up there, so --
2      Q.   You were giving commands the whole time; is
3  that correct?
4      A.   I think as soon as they were in earshot or I
5  thought that they could hear me, I was giving pretty loud
6  commands.  And it was more like an aggressive walk.  He
7  wasn't just walking like a Sunday stroll.  Obviously, he
8  was walking towards the -- walking back towards the group
9  and kind of in an aggressive manner.
10     Q.   What does it mean to walk in an aggressive
11 manner?
12     A.   Tense body language.  Obviously, still
13 gripping a crowbar.  It wasn't just a leisurely Sunday
14 walk, if that makes any sense.
15     Q.   You mentioned a group who had disengaged.  How
16 many people were in that group?
17     A.   I don't recall.  It was five to eight, so I
18 guess they just started peeling off or backing away from
19 them with the crowbar.
20     Q.   The people that were -- were those people by
21 the coin laundry?
22     A.   Kind of.  They kind of moved towards the coin
23 laundry.
24     Q.   And they appeared to be -- you said they were
25 running away or fleeing from him?

Page 68

1      A.   Kind of disengaging, I think.
2      Q.   Well, disengaging generally or disengaging
3  from the person with the crowbar?
4      A.   It more looked like disengaging from the
5  person with the crowbar.
6      Q.   Did you see people -- did you see any of those
7  people flinch or kind of put their hands up as to -- as
8  someone would if they were being struck with an object?
9      A.   I recall someone was on the ground and someone
10 was kind of doing this (indicating).
11     Q.   Someone was on the ground?
12     A.   Someone.
13     Q.   And they had their hands up?
14     A.   (Witness nodding head.)
15     Q.   Is that correct?
16     A.   (Witness nodding head.)
17     Q.   Okay.  What was that -- can you identify that
18 person?
19     A.   I don't recall.  There were a couple of people
20 in the laundry shop.  There was someone in the car --
21 there was like a red car with a female in it, and there
22 was someone kind of by the red car on the ground.  I don't
23 recall who.
24     Q.   Was it to the west or east of the red car?
25     A.   Kind of just by the front -- front passenger

Page 69

1  side.
2      Q.   Front passenger side.  And was that red car
3  parked -- I believe that was parked -- was that just to
4  the east of the cement slab?
5      A.   Yeah, probably right there (pointing).
6      Q.   And that person was the one that was on the
7  ground?
8      A.   Or something like that.  It was kind of
9  chaotic.
10     Q.   What do you mean "something like that"?  Can
11 you describe how they were on the ground?
12     A.   It just appeared there was someone on the
13 ground.  There were people all around.  There was lots of
14 movement.  There was people at the coin laundry, on the
15 inside of the coin laundry.  There was lots of yelling,
16 lots of screaming, and my attention was primarily on the
17 guy with the crowbar.  My peripheral vision kind of caught
18 it.  I wasn't particularly focused on him at the time
19 because I had a guy with a crowbar, so --
20     Q.   The person on the ground?
21     A.   Yes.
22     Q.   Do you know if it was a male or female?
23     A.   I don't recall.  I think it was a male, but I
24 don't specifically recall.
25     Q.   And was that person -- do you know if that

Page 70

1  person was eventually taken into custody or gave a
2  statement?
3      A.   I assume so.  I don't know for a fact.
4      Q.   Were they at the scene when the other police
5  arrived?
6      A.   You'd have to ask them.  I believe so.  I
7  think we detained everyone there, but we also had people
8  running as you go, so it's kind of hard to say specifically that
9  that person was in view.
10     Q.   So in this entire time, you're giving the
11 person with a crowbar commands to drop it?
12     A.   Yes.
13     Q.   How many commands do you think you gave him?
14     A.   I couldn't tell you.
15     Q.   Was it more than 10?
16     A.   Probably.  I didn't count, so -- but -- more
17 than five, for sure.  I don't specifically know what the
18 max number would have been, but --
19     Q.   More than five, for sure.  Maybe more than 10?
20     A.   Possibly.  I wasn't counting, so --
21     Q.   And after not complying with your initial
22 command, why did you not taser him?
23     A.   So I gave him an opportunity, obviously.  I
24 wanted, basically, to wait to the last possible moment in
25 case he complied.  Kind of just telling someone to do

Page 71

1  something and tasing them right away doesn't give them the
2  chance to comply.
3      Q.   So just the fact that he had the crowbar and
4  there was this tense situation, you didn't feel the
5  immediate need to taser him; is that correct?
6      A.   Sorry, can you repeat that?
7      Q.   Uh-huh.  So just the mere fact that he had a
8  crowbar and it was a fight and observing what you
9  observed, you didn't believe you immediately needed to
10 taser him; is that correct?
11     A.   No.  I could have tasered him.  I chose to,
12 basically, give him the opportunity to comply.  I mean,
13 there were a lot of options to do, but at that time, I
14 waited until the last possible moment where I felt that
15 maybe he would still comply before I did it.  At any
16 point, I could have used more force at the time, but I
17 felt that this was probably going to be, in my mind at the
18 time, the most reasonable to ensure everyone's safety and
19 to take him into custody without incident.
20     Q.   So in that period that you just described, did
21 he raise the crowbar as if to strike someone in that
22 period?
23     A.   Yes.
24     Q.   And then -- so was that while he was walking
25 around, or was that after?

Page 72

1      A.   They walked up to the group and the group kind
2  of gathered in front of the coin laundry.  At that point,
3  I had been yelling at him for a little bit.  He looked at
4  me, turned away from me and raised the crowbar, and that's
5  when I tased him.  That was my concern, is that he had
6  made eye contact with me, turned away and then raised it,
7  and there were people in close proximity to him, and I
8  didn't know what I could have done differently short of
9  moving up to deadly force.
10     Q.   And so he -- so where was he positioned at
11 that moment when you said he raised it?
12     A.   With his back towards me.
13     Q.   Right.  But where on the --
14     A.   In front of -- he was on the landing, kind
15 of -- at a 45-degree angle off the door.  So if the doors
16 are here (indicating), he's kind of at a 45-degree angle
17 facing to the southeast.
18     Q.   Southeast point?
19     A.   Southeast facing this way (indicating).  So
20 he's kind of in the middle of the landing, and there's
21 people in the glass, and there's everyone kind of around
22 him.
23     Q.   Okay.  So he's facing southeast, and he turns
24 towards you?
25     A.   He gives me a look.

Page 73

1      Q.   He looks over his shoulder?
2      A.   Yeah, he kind of turns -- he makes eye contact
3  with me, and he turns away and raises the crowbar.
4      Q.   Was that kind of a split second?
5      A.   Give or take.  It would be a second or two, at
6  tops.
7      Q.   And which hand did he have the crowbar in?
8      A.   I believe his right.
9      Q.   One hand -- he was holding it one-handed?
10     A.   Yep, he raised it.
11     Q.   And I assume -- so that would be your -- you
12 indicated it was above -- above his head?
13     A.   Yep, kind of like (indicating).
14     Q.   At a 90-degree angle?
15     A.   Just kind of this motion (indicating).  He
16 raised it, I think I yelled at him one last time, and then
17 I deployed my taser.
18     Q.   When you raised -- when you said you saw him
19 raise -- and so -- I think we can say -- did you
20 understand this individual to be Mr. Khottavongsa?
21     A.   Yes.
22     Q.   And who was the -- who was the closest person
23 to him when you saw him raise it?
24     A.   I don't recall.  I know there was a lady in
25 the Laundromat by the windows.  There were people all

ALAN SALVOSA - 03/30/2017          Pages 74..77

Page 74

1   around.
2       Q.   So there wasn't a particular person you were
3   concerned for?
4       A.   I was concerned for everyone.  I mean, I
5   don't -- I guess I don't rationalize it by saying I'm only
6   concerned about that person or that person when there's a
7   guy swinging a crowbar around.
8       Q.   Is -- well, I'm just asking if there was one
9   person who he appeared to be striking?
10      A.   No, there were plenty of people in close
11  proximity.  He could have struck any of them.
12      Q.   Right.  But I'm saying he didn't raise it at a
13  particular person.
14      A.   Well, there's a group of people there.  It's
15  hard to say if I raise this and there's two of you there,
16  it's hard to go, "I think you're aiming for that person
17  versus that person."  I'm just assuming that you're
18  raising it after being told by a cop whose got a taser
19  pointed at you that you mean to do someone harm.  I mean,
20  it's an assumption, but it's based off of what I see.
21      Q.   When he raised the crowbar, were you in fear
22  for your own safety?
23      A.   A little bit, sure.  He could have easily
24  turned.  I had closed the distance to 10 feet, so he could
25  easily have turned and come at me.  It's a possibility.

Page 75

1       Q.   So was he standing in the same position when
2   he turned -- when he turned towards you, was he standing
3   in the same position when he turned away and raised the
4   crowbar, standing in the same spot?
5       A.   For the most part.  I mean, it's a fluid
6   situation.  He's moving.  He's kind of walking around,
7   there's a group of people around.  He turns to me
8   (indicating), raises it, turns away (indicating).
9       Q.   Prior to, sort of, I guess we'll say the
10  final -- final time you say he raised it, do you recall
11  anybody in particular that you saw him raise it at?
12      A.   The group of people.  There was people at
13  the -- in the glass by the -- on the inside glass of the
14  coin laundry, there was a woman in the car, there was
15  somebody on the ground by the car, there were other people
16  all around.
17      Q.   And he raised it to all those people?
18      A.   Just in their general direction.  Like I said,
19  it's like you both standing there and I turn and raise a
20  crowbar.  I can't distinguish who you're aiming at.  I
21  just know that it obviously doesn't look good.
22      Q.   But did he approach each of these people and
23  raise it at each of them?
24      A.   He raised it at the group.  Like I said, if
25  you're both standing there and I came and walked in with a

Page 76

1   crowbar, like I said, I don't distinguish between trying
2   to figure out, does he just mean you harm, or you harm, or
3   you harm, or him harm (pointing).  I mean, it's --
4       Q.   Right.  I guess we should maybe narrow it down
5   a little bit.
6       A.   Sure.
7       Q.   Or try to be more specific.
8       A.   Sure.  Sorry if I'm not understanding.
9       Q.   No, it's probably just a bad question.
10          So prior to the final moment where he -- you
11  say he raised it at the people that were there, did you
12  see him, you know, threaten anyone else prior to that, in
13  particular?
14      A.   I mean, you're asking to be specific when he
15  was swinging a crowbar at a crowd of people, so -- I guess
16  I'm confused if you're -- if you're trying to isolate do I
17  know each individual that he was specifically targeting
18  with the crowbar, no.
19      Q.   Did you notice anyone in particular?
20      A.   No, it's the group of people.  He's there with
21  the crowbar in close distance to a group of people.  It
22  would be -- I guess --
23      Q.   So let me just see if I can understand the
24  timeline here.
25          So you see him, I think you said, swinging it

Page 77

1   two or three times when -- when he's still with the group
2   initially?
3       A.   By the Pizza Hut, yes.
4       Q.   Yes, okay.  And then you see him walking with
5   it?
6       A.   Kind of the group kind of disengages, and they
7   all kind of move.  I mean, it's not a full-on sprint, but
8   they kind of move towards the coin laundry, right.
9       Q.   And then, so in-between the time where they
10  were -- after you saw the initial two to three swings and
11  then between the time where he raises it the final time
12  and you tasered him, did you see him raise it any other
13  times?
14      A.   I don't recall.  It was a fluid situation, so
15  he may have, but I'm also running and trying to assess the
16  situation, so he may have.
17      Q.   But did you not witness him raise it another
18  time, in-between that period?
19      A.   In-between when he walked the 10, 15 feet
20  towards the other group?  I don't recall.
21      Q.   You do not recall witnessing him raise it when
22  he was walking those 10 to 15 feet; is that correct?
23      A.   Right.  I mean -- yeah.  They disengaged, and
24  he moves over to the crowd, and he raised it then.
25      Q.   And so, in terms of your commands, the two to

ALAN SALVOSA - 03/30/2017          Pages 78..81

Page 78

1  three times you saw him swing it, had you already given
2  him a command at that point?
3       A.   I don't recall specifically when the command
4  was given and when -- I mean, it's pretty much as I'm
5  running up there, the fight's going on and I'm yelling to
6  get their attention, so it's hard to -- I guess I don't
7  think of when I give the command and think of -- I don't
8  timestamp everything.  It's just they're fighting, "Get
9  down.  Get down.  Get down on the ground.  Drop it.  Drop
10 it.  Drop it."
11      Q.   So would you say it was about that quick, how
12 you just described it?
13      A.   Probably a little longer, but it felt like it
14 was pretty quick.
15      Q.   But it's -- you did -- I believe you said -- I
16 just want to make sure I understand, so I'm sorry if
17 I'm asking the same questions.
18      A.   It's okay.
19      Q.   You did say when you saw him swing the
20 crowbar, you told him to drop it; is that correct?  When
21 you first saw him with the crowbar, you told him to drop
22 it; is that correct?
23      A.   No, I would have first seen him drop it when I
24 was in the car pulling up and the fight was still going
25 on.

Page 79

1       Q.   And so, when did you first give him the
2  command to drop it?
3       A.   I don't recall.  Probably as soon as I got
4  close enough where I thought they could hear me and they
5  could see me.
6       Q.   And you said you were running.  So I guess the
7  first command you gave, you would have -- do you know how
8  close you were, approximately?
9       A.   (Witness shaking head.)
10      Q.   Would it have been in earshot of the group?
11      A.   Sure, and I also was very loud.  I was yelling
12 at the top of my lungs.
13      Q.   Okay.  At any point prior to tasing him, could
14 you tell what it was he was holding?
15      A.   No, not -- no.  It was dark.  It had kind of a
16 glimmer to it, like it could have been a sword or a blade
17 or something.  I knew it was just like a -- it was some
18 kind of, I guess, impact weapon is kind of the best way to
19 describe it.  I couldn't really tell that it was a
20 crowbar.
21      Q.   Do you think a crowbar is more or less
22 dangerous than a sword or a blade?
23      A.   Do I think a crowbar is -- I guess it all
24 depends on how it's used.
25      Q.   So if someone is wielding a crowbar or

Page 80

1  swinging a crowbar versus swinging a sword, do you think
2  they're about the same level of impact?
3       A.   I guess it depends on your preference of
4  whether you want to get bashed in the head or stabbed.  I
5  mean, I mean you're kind of -- I guess I don't understand.
6       Q.   Do you see one as, in any significant way,
7  less dangerous than the other?
8       A.   No.  Like I said, it's kind of a difference
9  between getting your head bashed and getting stabbed.  If
10 you have a preference, one or the other, more power to
11 you.  I don't distinguish that, I guess.
12      Q.   The group that was in front of the coin
13 laundry --
14      A.   Yes, sir.
15      Q.   -- did you see, in the moments prior to
16 tasering Mr. Khottavongsa, did you see any of them
17 fighting or -- in any way?
18      A.   They were gathering around him.  It was kind
19 of like they were backing off from him, so I guess you
20 could sort of say it was a fight where they were just kind
21 of retreating and --
22      Q.   They were backing off from Mr. Khottavongsa?
23      A.   It's hard to say.  They were probably backing
24 off from me and him.
25      Q.   Just backing off, in general?

Page 81

1       A.   Correct.  Generally backing away from the two
2  people that had weapons, me and Mr. Khottavongsa, so --
3       Q.   I believe you said your initial command was
4  for everyone to get on the ground, something along those
5  lines.
6       A.   I believe so.
7       Q.   Did anybody get on the ground?
8       A.   I don't recall.  My command was more
9  specifically for him, but generally, I prefer everyone got
10 on the ground, but it was more for him since he had the
11 weapon.
12      Q.   And you were yelling those commands loudly, I
13 believe you said?
14      A.   Yes.
15      Q.   Top of your lungs?
16      A.   Yes, sir.  As loud as I could.
17      Q.   Did you ever see him actually make contact
18 with anybody with the crowbar during the incident?
19      A.   Sorry, did I --
20      Q.   Did you see him actually connect with anybody
21 with the crowbar?
22      A.   No, sir.  I didn't specifically see him
23 connect.  I saw him swing it at people.  I don't know if
24 it actually connected because I was running and there's a
25 bit of a distance, so -- the time before I tased him, no.

Page 82

1     Q.   Did you say, "Before the time I tased him,
2  no"?
3     A.   I didn't actually see him make contact.  I saw
4  him swing at people.  I didn't actually see him hit
5  people.  It could have been just the angle, it could have
6  been a lot of things.
7     Q.   I didn't hear you.
8     A.   I apologize, yes.
9          MR. RISSMAN:  Take a five-minute break.
10          (Whereupon, a recess was taken
11           from 11:07 a.m. to 11:24 a.m.)
12  BY MR. RISSMAN:
13     Q.   In the final time when you saw
14  Mr. Khottavongsa, you said, raise the crowbar, and then
15  you tasered him; correct?
16     A.   Yes, sir.
17     Q.   Okay.  Prior to you tasering him, did you see
18  him lower it?
19     A.   No.  He raised it, he got tased, and he fell
20  backwards with it across his chest.
21     Q.   So his arm was still in the air when he got
22  hit with the taser probes; is that correct?
23     A.   I believe so, sir, yes.
24     Q.   And when you decided to taser him, you were
25  fearful for the safety of the people in front of the

Page 83

1  Laundromat?
2     A.   Yes.  I didn't want anyone in close proximity
3  to him where he could have taken a swing at them.
4     Q.   Anyone in close proximity?
5     A.   (Witness nodding head.)
6     Q.   And that was because he raised the crowbar?
7     A.   Yep, and he had already been swinging it; the
8  nature of the call is a fight call; he's non-compliant
9  with verbal commands; he's non-compliant with me pointing
10  a taser at him.  You know, I don't -- I guess in terms of
11  him de-escalating it, he escalated it by raising the
12  crowbar and turning away from me after making eye contact.
13  I saw him see me, he saw me pointing the taster, and he
14  turned away and raised it.  So I guess I don't know what
15  his intent was, but I know it wasn't, obviously, to comply
16  with me and be taken into custody.
17     Q.   Did you have the taser pointed at him the
18  whole interaction, as soon as you were close enough to
19  him?
20     A.   I believe so, yes.
21     Q.   Does that taser, does it have a flashlight on
22  it?
23     A.   Yes, it has a flashlight and laser site.
24     Q.   They were both on at that point?
25     A.   Yes.

Page 84

1     Q.   And so, you mentioned a few reasons.
2          Was raising the crowbar sort of the final
3  straw, I guess?  Is that a fair way to put it?
4     A.   That, coupled with making eye contact,
5  breaking it and turning away from me and raising it, I
6  guess, is kind of the -- had he kept it by his side and
7  not done anything, I probably would have tried to talk to
8  him more and -- and figure things out, but kind of when
9  you break eye contact, turn your body away and raise it, I
10  guess there's really no way to talk to someone's back and
11  hope that they're -- I mean, had he turned away from me
12  and lowered it, it would have been a different story, but
13  he turned away and raised it, so I guess that was kind of
14  the final straw, yes, sir.
15          (Whereupon, Exhibit 6 was marked.)
16  BY MR. RISSMAN:
17     Q.   Officer Salvosa, you've been handed what's
18  been marked as Exhibit 6.
19     A.   Yes, sir.
20     Q.   This is a copy of a CD with your last name on
21  it.
22          Do you see that?
23     A.   Yes, sir.
24     Q.   Okay.  You had an audio and video of your dash
25  cam playing during the incident; is that correct?

Page 85

1     A.   Yes, sir.
2     Q.   Do you have any reason to believe it was not
3  functioning?
4     A.   No, sir.
5     Q.   You've reviewed that audio before?
6     A.   Yes, sir.
7     Q.   And the video?
8     A.   Yes, sir.
9     Q.   Did you notice any gaps in the video?
10     A.   Not to my recollection, sir, no.
11     Q.   How about in the audio?
12     A.   No, sir.
13     Q.   See if we can do this --
14          Do you want me to come around?
15     Q.   Is that better for you, or do you want to sit
16  there?
17          MR. RISSMAN:  Jason, do you want to see
18  it?  It's not a lot to see.
19          MR. HIVELEY:  I'd say just stay because
20  she needs to see your mouth, so if you start moving, I
21  think that makes it tricky.
22          THE WITNESS:  Okay.
23  BY MR. RISSMAN:
24     Q.   Are you okay if I kind of come around over
25  there?

ALAN SALVOSA - 03/30/2017          Pages 86..89

Page 86

1      A.   Absolutely, sir.
2           Do you want to maximize -- you can hit the
3  feature button, and that will maximize the front screen.
4      Q.   That's the first time someone told me.  Man,
5  this whole time we didn't know that.  That's unreal.  I'm
6  pretty upset right now.  Okay.  Well, you just gave away
7  your case strategy.
8      A.   I'll ask my attorney first if that's okay.
9           MR. HIVELEY:  Move to strike that
10 advice.
11          THE WITNESS:  On the advice of my
12 attorney --
13 BY MR. RISSMAN:
14     Q.   You don't know how many times I wanted to make
15 that bigger.
16          Okay.  Starting at Salvosa Exhibit 6, Salvosa
17 video 21:14:09.
18          (Video audio playing.)
19 BY MR. RISSMAN:
20     Q.   Stopping at 21:15:21.
21          First of all, does this appear to be a true
22 and accurate copy of your dash cam video?
23     A.   Yes, sir.
24     Q.   You have no reason to believe it's not your
25 dash cam video?

Page 87

1      A.   No, sir.
2      Q.   First of all, did we just hear the radio tell
3  you that there was possibly a bat involved?
4      A.   Yes, sir.
5      Q.   Okay.
6           (Video audio playing.)
7  BY MR. RISSMAN:
8      Q.   Stopping at 21:16:07.
9           First of all, so is this about the time you
10 get out of the car?
11     A.   Give or take, yes.
12     Q.   Would you say -- do you think it was earlier,
13 or do you think it was about --
14     A.   You can kind of hear me already shifting and
15 stepping on the break.
16     Q.   Yeah, let's just kind of go through the sound.
17          (Video audio playing.)
18     A.   That's already my seatbelt coming off and
19 going in park.
20 BY MR. RISSMAN:
21     Q.   At 21:16:06?
22     A.   Yes, sir.
23     Q.   Is that fair?
24     A.   Yes.
25     Q.   And at this point, you testified that you have

Page 88

1  already seen Mr. Khottavongsa with the crowbar; is that
2  correct?
3      A.   Kind of.  As I'm -- they're starting to fight,
4  and I can kind of see some -- a lot of movement as I get
5  closer, and this is also where, if you listen to the
6  audio, you can hear Cody say he was 57th and the
7  Boulevard, which is, basically, Brooklyn Boulevard is the
8  next major intersection up here, and he's at 57th.  So
9  he's about three blocks away, give or take, or less.
10          Officer Deering just said she was passing the
11 Target, which is where I just was when this started, so I
12 have an idea of where my partners are and where they're
13 coming in.
14     Q.   And you knew Officer Turner was relatively
15 close?
16     A.   Yeah, 57th and Brooklyn Boulevard.  So if you
17 look at this map, Brooklyn Boulevard would be probably
18 here (pointing) -- this is not to scale -- so he's at this
19 intersection right here (indicating).
20     Q.   So he's three blocks away?
21     A.   Yeah.  So this road would go all the way to
22 here (pointing), if this was to scale.  So he's that far
23 away, literally.  You know, he has to make one turn.  Or
24 if he's on 57th, he would just have to come up this road
25 and come in this way.  So I know he's already coming from

Page 89

1  the west (indicating).
2      Q.   You heard Officer Deering saying she had --
3  where did she say she was?
4      A.   She was near the Target.
5      Q.   And how close is that?
6      A.   Probably where I started the video.  Where my
7  video starts, probably two, three blocks past where I
8  started.  So she's behind me.
9      Q.   Okay.
10     A.   So not behind me, but by the time she aired it
11 up, she was just passing the Target on Shingle Creek.  So
12 Shingle Creek -- looking at the map -- Target would have
13 been right here (indicating).
14     Q.   Why don't I pull a chair up so I don't have to
15 stand?
16     A.   If we were to map this out --
17     Q.   That's okay, you don't have to.  I just want
18 to know -- so basically, you knew she was going to be
19 there soon?
20     A.   Yep.
21     Q.   So you think you would have -- I believe
22 earlier you said this is about the time when you saw
23 Mr. Khottavongsa with the crowbar?
24     A.   Yep.
25     Q.   Would it have been later?

Page 90

1     A.   About the time.  I mean, give or take a couple
2  of seconds.  I mean, obviously, you could hear Cadet
3  Nochez said that they were still beating the crap out of
4  somebody.  That's probably close to there.  If I didn't
5  see the crowbar at that point, I would have seen it as I
6  got closer, but there was obviously the commotion.
7     Q.   Uh-huh.
8          (Video audio playing.)
9  BY MR. RISSMAN:
10    Q.   Did you say, "Get down on the ground"?
11    A.   Yep.
12    Q.   And that's at 21:16:13?
13    A.   Yes.
14    Q.   And were you still running at that point, or
15 had you already left?
16    A.   I believe I was still running, based off the
17 sounds -- you can hear all my gear --
18    Q.   Sure.
19    A.   -- going back and forth.
20    Q.   That's kind of what I thought, too, yeah.
21         I believe you said you started giving commands
22 when you thought people were in earshot; is that right?
23    A.   Yes, sir.
24    Q.   And there is -- do you have to run through
25 some snow?

Page 91

1     A.   A little bit of snow, sidewalk, and then
2  probably the snow or the treeline would be here
3  (pointing).
4     Q.   Okay.
5     A.   So probably snow and the curb, sidewalk, snow
6  and the curb, or snow after.
7     Q.   Did that slow you down at all?
8     A.   Not really.  It was pretty light.
9     Q.   Were you wearing boots or something?
10    A.   Yes, I was wearing boots.
11    Q.   Okay.
12         (Video audio playing.)
13 BY MR. RISSMAN:
14    Q.   Stopping at 21:16:24.
15         I believe the second earlier, at 21:16:23, we
16 heard you say, "Everyone get on the ground"?
17    A.   Yep, and then I got on my radio and said,
18 "I've got them at the coin laundry."
19    Q.   That was -- what you said on the radio was
20 prior to saying, "Everyone get on the ground"?
21    A.   I said, "Get down -- get down on the ground,"
22 and then, after that, I said -- yes, I got on the radio
23 and said, "I got them in front of the coin laundry."
24    Q.   Let me make sure I got everything here.
25         (Video audio playing.)

Page 92

1  BY MR. RISSMAN:
2     Q.   So you say your next command is at 21:16:23,
3  "Everyone get on the ground"?
4     A.   "Get on the ground.  I've got them in front of
5  the coin laundry.  Get on the ground."
6          (Video audio playing.)
7  BY MR. RISSMAN:
8     Q.   Can you stop it --
9          So we hear this first command at 21:16:13.
10    A.   Okay.
11    Q.   Do you want to stop it when you hear yourself
12 give the next command?
13    A.   Sure.
14         (Video audio playing.)
15 BY MR. RISSMAN:
16    Q.   Okay.  So that would be 21:16:23; correct?
17    A.   Yes, sir.
18    Q.   Okay.  And so let me just go back one.
19         (Video audio playing.)
20 BY MR. RISSMAN:
21    Q.   So I kind of want to run through those various
22 commands.
23         So I believe you say, starting at 21:16:23,
24 you give a command to get on the ground three times?
25    A.   I believe so, three, yes.

Page 93

1     Q.   Okay.  So that would be between -- let's
2  listen to this probably a few times, so --
3          (Video audio playing.)
4  BY MR. RISSMAN:
5     Q.   And so we're between -- so the three commands
6  to get down on the ground were between 21:16:23 and
7  21:16:26; is that correct?
8     A.   Yes.
9     Q.   And then I believe you, at 21:16:26, you are
10 beginning to say, "Drop it"; is that correct?
11    A.   Yes, sir.
12         (Video audio playing.)
13 BY MR. RISSMAN:
14    Q.   And you say, "Drop it" two more times.  So
15 three "drop-its" between 21:16:26 and 21:16:29; correct?
16    A.   Yes, sir.
17    Q.   And did you -- was the third "drop-it" your
18 final warning, or had you already fired the taser at that
19 point?
20    A.   I think it would have been the last one where
21 you can hear my voice kind of strain.
22    Q.   The last one, your elevated pitch?
23    A.   Yes, sir.
24    Q.   Okay.  Let's just -- if you could, could
25 you -- if you could -- if you can, I think I hear the

Page 94

1  sound of the taser, but maybe you could tell me better so
2  play it from 21:16:28.
3      A.   Okay.
4               (Video audio playing.)
5      A.   You could hear, like, the pop.
6  BY MR. RISSMAN:
7      Q.   Is that the pop of the taser?
8      A.   Yep, it would be the pop of the injection
9  doors on the CO2 cartridge that shoots the two darts out.
10     Q.   Okay.
11     A.   So you can hear kind of that pop.
12     Q.   Uh-huh.
13              (Video audio playing.)
14 BY MR. RISSMAN:
15     Q.   So about 21:16:30, 21:16:31; is that right?
16     A.   Yes, sir.
17     Q.   You -- you taser him; is that correct?
18     A.   Yes.
19     Q.   And then -- key question -- you hear someone
20 say, "Tase his ass.  There you go."
21     A.   I didn't hear that.
22     Q.   You don't recall that?
23     A.   I don't recall hearing that, sir.
24     Q.   You don't know who would have said that?
25     A.   No, sir.

Page 95

1               (Video audio playing.)
2  BY MR. RISSMAN:
3      Q.   Do you hear the sort of thud sound after the
4  taser?  Is that Mr. Khottavongsa hitting the ground?
5      A.   I don't know.  I can't tell what the sound is
6  from watching the video.  I hear it, but I don't know what
7  that sound is.
8      Q.   You don't think -- you don't know anything
9  else that would be?
10     A.   I couldn't -- there's a lot of commotion.
11 There's people yelling, so I can't tell you, sir.
12     Q.   Okay.  I think we're good there.
13          So there's an initial command to get on the
14 ground, and then a pause, at least in terms of commands
15 that you're giving, and then the next -- so you say
16 there's three commands to get on the ground and then,
17 "Drop it.  Drop it.  Drop it."
18          Is that correct?
19     A.   I believe so, yes.
20     Q.   The three commands prior to "drop it," to get
21 on the ground, do you recall if those were directed --
22 were you directing those to Mr. Khottavongsa, or were you
23 just kind of yelling to the group, generally?
24     A.   I think the first one was to the group, and
25 then, when they kind of disengaged from him and kind of

Page 96

1  created some distance, it was specific to Mr. Khottavongsa
2  because he's now isolated where I have a shot, because I
3  can't, obviously, tase a group of people.  They kind of
4  broke.  He's isolated.  The other two commands probably
5  would have been directly towards him as he's now the sole
6  aggressor, at least in my mind, the biggest threat at the
7  time.
8      Q.   And so -- so that initial command, the
9  initial -- when you're still running, like everyone, "Get
10 on the ground," that was meant for the group; is that
11 correct?
12     A.   Yes, sir.
13     Q.   So it was your testimony earlier that you
14 witnessed Mr. Khottavongsa swinging the crowbar as you
15 drove up or as you got out of the car; right?
16     A.   Yes, sir.
17     Q.   And that was, as we established, around
18 21:16:06, give or take a second or two; is that correct?
19     A.   Yes, sir.
20     Q.   So then, so it would have been another 17
21 seconds until you gave -- give or take a second or two --
22 gave a command to Mr. Khottavongsa directly?
23     A.   Sure.  Yes, sir.  I wasn't timing myself, so I
24 guess.
25     Q.   Right.  Just from what we established on the

Page 97

1  video.
2      A.   Sure.
3      Q.   Okay.  And then -- and then it would have been
4  another six to seven seconds, approximately, where you
5  tasered him?
6      A.   Yes, sir.
7      Q.   And I believe you testified earlier that
8  getting out of the car and approaching the scene, you were
9  most focused on Mr. Khottavongsa; is that correct?
10     A.   Yes, sir.
11     Q.   Okay.  Why did you -- why didn't you -- why
12 did it take you 17 seconds to give him a direct command?
13     A.   Probably because the group was obviously
14 fighting, and like I said, they disengaged.  Once they
15 disengaged, it was clear that I could isolate him.  Also,
16 running up there and trying to assess and trying to figure
17 out the group's fighting, he's got this crowbar in the
18 middle, trying to figure out who's victim, who's witness,
19 who's whatever.  I mean, you're trying to assess
20 everything in the middle of chaos.
21          Obviously, they disengage.  After they get
22 down or start to break up, he gets isolated -- or not
23 isolated, but he's separated from the group enough where
24 he's by himself where I have direct line of sight and
25 people are far enough away that I have to, basically,

Page 98

1  engage him only -- or not him -- or deal with him first
2  before I move on to everyone else.
3        Q.   Weren't you concerned that, in the middle of
4  the group, he was going to hit someone with the crowbar?
5        A.   I was.
6        Q.   But you did not give him -- you didn't yell
7  "Drop the crowbar" or something?
8        A.   It's kind of chaos to see who had it.  So
9  they're in the middle.  I say, "Get down on the ground."
10 They're starting to disengage and break off.
11       Q.   Did you lose sight of him at that point?
12       A.   No.
13       Q.   So -- but it was difficult to see who had it?
14       A.   There's a group of people.  It's kind of hard
15 to see who specifically had it.  They're kind of all
16 together.  They're breaking apart.  People are getting out
17 of the melee, and then he's left, basically, with the
18 crowbar, and everyone's kind of backing off from him.
19       Q.   So at some point, when you were approaching,
20 did you lose sight of the crowbar?
21       A.   Sure.  It was probably in the -- there's a
22 group of people.  There's a crowbar, it's hard to -- I
23 mean, I wouldn't say lost sight, but my view was blocked
24 by other people in close proximity.  I know it's still
25 there because I didn't see it get chucked or thrown.  I

Page 99

1  just know that there's a bunch people, and then they
2  separate, and then Mr. Khottavongsa is the only one
3  holding the crowbar.
4        Q.   And that's the point at which you give him
5  direct commands, and then -- you give him direct commands,
6  and at that point, he's walking to the Laundromat; is that
7  correct?
8        A.   Yep, it's almost as if he's walking after the
9  people that disengaged from him.  Like I said, it wasn't a
10 Sunday stroll; more of an aggressive walk.  He's swinging
11 crowbars, people kind of scatter.  He's walking towards
12 the people that just scattered, with the crowbar.
13       Q.   He walks towards -- and that would be in front
14 of the Laundromat?
15       A.   Yes, sir.
16       Q.   And as I believe you testified already, in
17 that -- in that walk, he doesn't -- until you see him
18 raise it the final time, you don't see him raise it to
19 anybody else in that walk?
20       A.   No, but he's aggressively walking towards the
21 people with it (indicating).
22       Q.   Out by his side?
23       A.   Yes, and it's parallel to the ground.  It's
24 not like it's down.  It's up parallel to the ground.  So
25 if it was this pen, it would be like this and not like

Page 100

1  this (indicating).
2        Q.   Perpendicular to his body?
3        A.   Yes, parallel to the ground, and he's walking
4  up to the people like this (indicating).
5        Q.   Did you see those people flee in seeing him
6  approach?
7        A.   They kind of were backing off from him, almost
8  like cowering a little bit or kind of trying to get
9  distance.
10       Q.   So it's true that you, going back to when
11 you're approaching, you did not give him the command to
12 drop it as soon as you saw the crowbar; is that correct?
13 You waited until it was -- the group dispersed?
14       A.   It kind of happened all fast, but yes.  He
15 kind of -- trying to get them to stop, to get their
16 attention, and then, before I could give the next command,
17 they had kind of separated, scattered, and he's the one
18 left holding the crowbar.
19       Q.   And then you gave him the command?
20       A.   Yes.
21       Q.   At that point in time, after the -- you say he
22 was isolated, did he ever lunge towards you?
23       A.   No, he did not.
24       Q.   At this period of time, do you recall seeing
25 an African-American male sitting on a windowsill by the

Page 101

1  Laundromat?
2        A.   There were a lot of people.  I wasn't
3  particularly focused on him.  I'm sure there was, but I'm
4  more focused on Mr. Khottavongsa, and I can see other
5  people in the peripherals.
6        Q.   Sure.
7        A.   But specifically, I couldn't tell you.
8        Q.   This is Officer Turner's dash cam video.
9  Have you seen this video before?
10       A.   Yes, sir.
11       Q.   I'll just play it for you once.
12            (Video audio playing.)
13 BY MR. RISSMAN:
14       Q.   Stopping at 21:16:31, can you see yourself
15 tasering Mr. Khottavongsa?
16       A.   Yes, sir.
17       Q.   And he appears to have already started his
18 fall?
19       A.   Yes, sir.
20       Q.   Okay.  And you can see next to him on his --
21 well, facing east, there is a man there, there's a person?
22       A.   Yes, sir.
23       Q.   And you see that there are two people -- two
24 or three people to the -- to the west?
25       A.   Yes, sir.

Page 102

1    Q.   Was it those people that -- whose safety you
2  feared for?
3    A.   Yes, sir.  And the people behind the glass in
4  the --
5    Q.   The people in the Laundromat?
6    A.   Yeah.
7    Q.   And he is approximately directly in the middle
8  of the slab; is that correct -- well, I should say he's in
9  the middle, from an east-to-west perspective, he's in the
10  middle; correct?
11    A.   Yes, sir.
12    Q.   But he's towards the back?
13    A.   Yes, sir.
14    Q.   Anybody else's safety that you were concerned
15  with at this particular moment, at least immediately,
16  concern you?
17    A.   Yes, everyone's.
18    Q.   So people who were not in this shot?
19    A.   Not in shot, no.  Just the people that were in
20  close proximity to him.
21    Q.   And so, after you taser him, you witness him
22  fall?
23    A.   Yes, sir.
24    Q.   And his body -- did his body appear to lock up
25  prior to the fall?

Page 103

1    A.   Yes, sir.
2    Q.   So he -- some witnesses have described it as a
3  tree being cut off from the bottom, the falling.
4         Would you say that's an accurate description?
5    A.   Yes, sir.
6    Q.   And did he appear to catch his fall in any
7  way?
8    A.   No, sir.
9    Q.   At that time, did you believe that he had hit
10  his head?
11    A.   I don't know, sir.
12    Q.   You don't know?
13    A.   I saw him fall.  I didn't -- I wasn't
14  particularly watching his head.  I was more concerned of
15  making sure he got down and then started drawing attention
16  to everyone else to get down on the ground and make sure
17  they weren't armed or they weren't a danger to me or
18  anyone else coming in.  So once he was down, I knew that
19  I, at least, had him under control to the extent of, if he
20  got back up, I could tase him again.
21         My next concern was now everyone else who's
22  still standing is a possible threat, and he's at least
23  somewhat under control at that point.  So it was -- I knew
24  it worked.  Now I've got to transition to the other
25  people, make sure that they're taken into custody or they

Page 104

1  don't have weapons or they're not going to try to harm me.
2    Q.   So you were -- you said you were transitioning
3  to other people; is that correct?
4    A.   Right, because I knew I had him -- for the
5  most part, under control.  He was on the ground, which is
6  one of the safer tactics for me is that he's somewhat
7  isolated in the sense that he's on the ground.  And now my
8  attention is drawn to all the people standing.  I know
9  that, if he was to get up again, I could immobilize him
10  again with the taser or at least control him, and now I
11  had to start working on other people who were there
12  because I don't know the circumstances other than he's
13  attacking people with the crowbar.  There could be other
14  weapons involved, other people all around.  I have to now
15  make the situation safe for everyone before I can do
16  anything else.
17    Q.   Did you see him -- I believe you said you saw
18  him fall.
19         Did you see him hit the ground?
20    A.   Yes, I saw his body hit the ground.
21    Q.   Did you believe, at that time, he did not hit
22  his head?
23    A.   I don't know.
24    Q.   You didn't have an opinion one way or the
25  other?

Page 105

1    A.   I just knew that he fell.  I wasn't, I guess,
2  in particular -- it's possible, but I'm not focused on did
3  this person -- I just knew that he's fallen.  He's,
4  obviously, going to have some injuries, but I can't
5  address that at the moment because I still have four, five
6  other people who are still standing.  I don't know if
7  there's any other weapons involved.
8         So in terms of making sure he was okay or
9  anything like that, it's secondary to making sure
10  everyone's safe because it makes no sense for me to focus
11  on his injuries while I've still got other people who are
12  not taken into custody or cooperative and I'm by myself at
13  that point until my partners arrive, and even then, people
14  haven't been searched, people haven't been detained,
15  no one's complying.
16         He, obviously, just got tased.  I don't know
17  if these guys are his friends and now are going to rush me
18  and now I'm at a disadvantage because I have my taser,
19  which is only used a single shot.  I don't have a backup
20  taser, or if someone else tries to rush me or pulls out
21  another weapon, I now have to transition to something
22  different.
23         So yes, he fell.  Yes, I was concerned about
24  his injuries, but it was secondary to making sure everyone
25  was safe before I could start making any kind of

Page 106

1  assessment of anybody and making sure people got
2  treatment.
3       Q.   And why were you concerned about his injuries?
4       A.   Well, I'm concerned any time we use force
5  about anyone's injuries.  That's part of being a police
6  officer.  When you use force, you know there's going to be
7  injuries, so I'm concerned about that, but it's also --
8  it's not paramount to seeing safety.  It's almost like
9  trying to do first aid to someone on the middle of a
10 highway; right?  It doesn't make sense to try to treat
11 someone who's injured in the middle of a highway and get
12 hit by a semi or a truck.  I've got to make the scene safe
13 first before I can treat any injuries.
14      Or, you know, trying to do CPR to someone in a
15 burning house.  You're probably not going to do it.
16 You're going to get them out of the house first to
17 someplace safe, control the environment, and then assess
18 the injuries.
19      Q.   But I believe you -- just kind of more a basic
20 question.
21      You said -- I believe you testified that he
22 was obviously going to have some injuries; is that
23 correct?
24      A.   Like I said, any time you use force, people
25 are going to have injuries.  It's almost impossible to use

Page 107

1  force and no one have injuries; right?  Otherwise, you
2  wouldn't have used force.  It's, you know --
3       Q.   And generally speaking, with a taser, once
4  the -- it's very painful to be tased; correct?
5       A.   Yes, sir.
6       Q.   Once that pain -- once the electric charge is
7  off --
8       A.   Yes, sir.
9       Q.   -- that pain goes away; right, in a normal
10 case?
11      A.   Yes and no.  It affects people differently so
12 I can't speak.  I know that, from personal experience, you
13 feel very, very sore.  The pain of the actual electrical
14 shock that -- not the -- the pain of the tasing itself
15 goes away, but that doesn't negate the -- the other pains,
16 you know, the -- it's almost like doing a really
17 exhaustive workout; you're sore, you ache, so that pain is
18 still there.  The pain of -- the pain of the taser itself
19 is gone because there's no more -- no more current running
20 through your body, but the pain of everything else is
21 still there.
22      Q.   Would you consider that the soreness you
23 described, the sort of -- kind of like that soreness
24 feeling you get after a workout?  Would you describe that
25 as an injury?

Page 108

1       A.   Sure.  I mean, it hurts.  I mean, you're
2  not -- you weren't how you felt before; right?
3       Q.   It's not a serious injury, though, is it;
4  being sore?
5       A.   It depends on the person.  Some people, aches
6  and pains are more severe to other people.  I mean,
7  you're -- some people who work out regularly don't think
8  anything about aches and pains.  Someone who doesn't work
9  out will obviously think that a bruise is the worse thing
10 in the world.  It all depends on the individual's pain
11 compliance.  I guess I can't speak for other people.  I
12 can only speak from my personal experience and how they
13 react after they're tased.
14      Q.   Did you think, because he had fallen, that he
15 was going to have some injuries?
16      A.   It's possible.  Like I said, force equals the
17 possibility of injuries.  There's no -- I guess I keep
18 saying, there's no way to use force and have zero
19 injuries.  There's always some kind of injury, whether
20 it's pain compliance, something.  Otherwise, we wouldn't
21 use force.
22      Before we get to the next question, could I
23 use the bathroom?
24      MR. RISSMAN:  This is a pretty good time
25 for a lunch break.

Page 109

1       MR. HIVELEY:  That's fine.
2       (Whereupon, a recess was taken
3       from 12:08 p.m. to 1:03 p.m.)
4  BY MR. RISSMAN:
5       Q.   Welcome back, Officer Salvosa.
6       You understand you're still under oath?
7       A.   Yes, sir.
8       Q.   I just wanted to clarify one thing.
9       When you said he turned his back to you before
10 you fired the taser?
11      A.   Yes, sir.
12      Q.   Was his -- was his back completely to you or
13 was he partially to the side of you?
14      A.   Kind of like at an angle.  Like, he looked at
15 me like (indicating).  If I was over there by that flower
16 (pointing), and turned.  So kind of -- does that make
17 sense?
18      Q.   Yeah.
19      A.   So he's at an angle (indicating).  He looks at
20 me, turns away, and then his back is to me.
21      Q.   Did you see his whole back?
22      A.   Yes, I got a good -- I guess my taser shot was
23 directly into his back, so --
24      Q.   And where -- you don't remember where the
25 taser probes made impact?

Page 110

1      A.   One into his back, and then the other one
2  somewhere lower.  I don't know if they both went into his
3  back or one went into his leg, but I know my first one was
4  probably in his upper back, and the other one's got an
5  8-degree angle, so 8 degrees from that distance, so --
6      Q.   And is it true that the greater the spread,
7  the more effective the taser is?
8      A.   Yes, sir.
9      Q.   Would that be considered a very effective
10 spread?
11     A.   Yes, sir.
12     Q.   And so, does he appear -- did the taser make
13 him spin around at all?
14     A.   No, sir.
15     Q.   He just -- he was tasered and he fell flat
16 back?
17     A.   Yes, sir.
18     Q.   But he fell -- he fell backward, but he was
19 facing east; correct?
20     A.   Southeast.
21     Q.   Southeast?  Okay.
22          But if you're -- his back was completely
23 facing you and he fell backward, wouldn't he have fallen
24 south?
25     A.   So he's -- it's kind of at an angle.  I mean,

Page 111

1  he turns, but he's going to fall backward.  I kind of get
2  what you're saying, but it wasn't directly south.  I
3  guess, if you consider the store directly south, he's in
4  front of it.  He turns to look at me, raises it, and he's
5  kind of turning and raising it as I tase him.  So he
6  fell -- obviously, if you look at the video, he also fell
7  kind of at an angle still facing southeast (indicating).
8      Q.   So he was still turning and raising it as you
9  tasered him?
10     A.   To the best of my recollection, yes.  He,
11 basically, gave his back to me and raised it, and that's
12 when I tased him, so --
13          (Whereupon, Exhibit 7 was marked.)
14 BY MR. RISSMAN:
15     Q.   Officer Salvosa, you've been handed what's
16 been marked as Exhibit 7.
17     A.   Yes, sir.
18     Q.   Brooklyn Ctr 5999 through 6004.
19     A.   Yes, sir.
20     Q.   Do you know what this document is?
21     A.   It appears to be a Use of Force Report and a
22 Supplemental Narrative by Sergeant Coleman.
23     Q.   That's -- the Use of Force Report is known as
24 a Report of Resistance?
25     A.   Yes, sir.

Page 112

1      Q.   And you are required to fill this out every
2  time you use force?
3      A.   Yes, sir.
4      Q.   And you would have filled that out at 21:12,
5  so that's -- what is that?
6      A.   That's the time of the incident, sir.
7      Q.   That's the time of the incident, okay.  Not
8  when you filled out the report?
9      A.   Yes, sir.
10     Q.   Did you fill this report out immediately after
11 the incident?
12     A.   I don't know about immediately after.
13 Sometime after of the incident.
14     Q.   Sure.  And would that have been before you had
15 learned -- at some point, you later learned that
16 Mr. Khottavongsa either died or his injuries were --
17     A.   Yes.
18     Q.   -- he was going to die; is that correct?
19     A.   I think it was pretty severe injuries that
20 they -- I don't know that said he was going to die.  They
21 just said he was seriously injured and there was a
22 possibility.
23     Q.   Uh-huh.  Did you fill out this report before
24 learning that?
25     A.   Yes.

Page 113

1      Q.   Part -- a question -- there's each sort of a
2  box seems to have a number.
3          So looking at Number 18, do you see "At the
4  time of the arrest --"?
5      A.   Yes.
6      Q.   "-- subject appeared to be:"  And you checked
7  "mentally impaired or mentally ill," and you checked
8  "suspected to be under the influence of alcohol/drugs."
9          Do you see that?
10     A.   Yes, sir.
11     Q.   Did you get that impression from your
12 interaction with Mr. Khottavongsa prior to tasing him?
13     A.   Yes, sir.  In the brief couple seconds, yes.
14     Q.   And you are trained that someone who's
15 mentally impaired or mentally ill may not be capable of
16 understanding your commands; is that correct?
17     A.   There's the possibility, yes.
18     Q.   Same question for someone who is suspected to
19 be under the influence of alcohol and drugs?
20     A.   Yes.
21     Q.   Okay.  You can put that one aside.
22          In your encounter -- encounter in the parking
23 lot -- well, strike the question.
24          At the incident, did you take note of the --
25 of Mr. Khottavongsa's race?  Did you notice what his race

Page 114

1  was at the time?
2       A.   Sure.  As I got -- as I got closer, right
3  before I tased him.
4       Q.   Did you -- and what did you -- what did you
5  observe?
6       A.   He appeared to be Asian.
7       Q.   And at that point, he had not followed your
8  commands; is that correct?
9       A.   Yes.
10       Q.   Did failure to follow commands and the
11  observation of his race indicate to you that he may not
12  speak English?
13       A.   No.
14       Q.   When you saw him with the crowbar, did he
15  appear to have any -- did he appear to have any injuries
16  on his face?
17       A.   Not that I could see.  It was very quick.  I
18  only saw his face fully when he turned to look at me,
19  right before he turned away and raised the crowbar.
20       Q.   Did you -- I believe we looked at the scene in
21  front of the coin laundry?
22       A.   Yes.
23       Q.   Did you see anybody striking any of the
24  individuals who were at that scene?
25       A.   Can you repeat the question?

Page 115

1       Q.   Yeah.
2       A.   Did I see --
3       Q.   Yeah.  Did you see anybody who -- did you see
4  anybody strike any of those individuals who were --
5       A.   Any of which individuals, sir?
6       Q.   The people who were standing in front of the
7  coin laundry immediately prior to Mr. Khottavongsa being
8  tasered.
9       A.   Did I see any of those people who were --
10       Q.   Any of the other people.
11       Did you see people other than
12  Mr. Khottavongsa?  Did you see anybody hit any of those
13  people that are standing in front of the coin laundry?
14       A.   Sorry, I'm just trying to understand.
15       So did I see any of the people in front of the
16  coin laundry strike anybody else?
17       Q.   Or did you see -- actually, my question is,
18  did you see anyone hit them?
19       A.   Who is them?  I guess I'm --
20       Q.   The "them" would be the people standing in
21  front of the coin laundry.
22       A.   Did I see any of the people in the coin
23  laundry strike anybody else?  I mean, I guess I'm
24  confused.  There's "them" and "people," and who are we
25  talking about here?

Page 116

1       Q.   Sure.  Sure.
2       A.   Sorry.
3       Q.   So there were -- why don't we just watch the
4  video, set the scene here.
5       A.   Okay.
6       Q.   Okay.  Turner video 21:16:32.
7       Do you see, apart from Mr. Khottavongsa, there
8  appears to be one, two -- three and I think a fourth
9  person --
10       A.   Uh-huh.
11       Q.   -- standing outside the Laundromat?
12       A.   Yes.
13       Q.   Did you see anyone other than Mr. Khottavongsa
14  strike any of those people?
15       A.   Do you mean were they all fighting each other?
16  Is that your question?
17       Q.   Not each other.  Well, did you -- well, I'll
18  ask it a different way.
19       Did you see any of these people either hit
20  someone or get hit?
21       A.   Sure.  They were all part of the fight at the
22  Pizza Hut that ended up here.  So there was obviously that
23  melee at the Pizza Hut that ended up here.  So there
24  were -- I couldn't specifically tell you who, but fists
25  were flying, there was a lot of pushing, shoving, a lot of

Page 117

1  swinging.  So they transitioned from the Pizza Hut to
2  there.  So yeah, they were all involved in a fight, and
3  they were all striking each other at some point.  I
4  couldn't specifically say.  You show up at a big fight and
5  people are swinging.  I couldn't point out specifically
6  who was striking who, but --
7       Q.   Okay.  Once Mr. Khottavongsa fell from being
8  tasered, what happened after that?
9       A.   I gave additional commands to everyone else to
10  get down on the ground.  Other officers arrived.  We tried
11  to get people to comply, take them into custody.  I told
12  Mr. Khottavongsa to get rid of the crowbar, to drop it, to
13  basically disarm himself, drop the crowbar.
14       He started to get up, in which case I told him
15  to stay down on the ground.  He then started to get up.
16       Q.   And then what did you do?
17       A.   I tased him again.
18       Q.   And was he holding the crowbar at that point?
19       A.   At that point, Officer Turner, I believe, had
20  removed the crowbar from him.
21       Q.   In-between the point which you taser him a
22  second time -- well, let me ask you -- let's kind of back
23  up.
24       In-between the time when you taser him and
25  when Officer Turner removes the crowbar --

ALAN SALVOSA - 03/30/2017        Pages 118..121

Page 118

1    A.   Uh-huh.
2    Q.   -- did you see him try to get up?
3    A.   He was moving a lot, so it's possible he was
4  trying to at that time.  There was a lot of movement.
5  Like I said, I'm also trying to focus on all the other
6  people.  Sure, he was moving.  I guess I don't -- I
7  wouldn't know specifically at what point he was trying to
8  get up other than until his body actually got off the
9  cement, but he was moving.
10   Q.   Did you observe him -- did you -- do you
11 recall thinking that he was trying to get up?
12   A.   Yes.  I mean, he obviously got up.  He got his
13 back off the ground at an angle.
14   Q.   Yeah, I'm referring to a specific period of
15 time prior to Officer Turner removing the crowbar from
16 him.
17   A.   Uh-huh.
18   Q.   Did you see him -- did you make the
19 observation he thought he was trying to get up?
20   A.   Sure.  He began to move.
21   Q.   So that was based on him moving?
22   A.   Sure.
23   Q.   And how was he moving?
24   A.   He was kind of groaning and trying to -- like,
25 he was regaining his senses, like, he would kind of move

Page 119

1  his shoulders.  He was still kind of stiff.  It's like the
2  taser was wearing off and he was getting sore and he was
3  just coming to.  It looked like he was, basically,
4  regaining his strength.
5    Q.   Did he appear to be unconscious at any point?
6    A.   Not that I recall, no.
7    Q.   And you recall Officer Turner removing the
8  crowbar from Mr. Khottavongsa?
9    A.   Yes.
10   Q.   He announces his intention to do so?
11   A.   I believe so, yes.  I think he said something
12 like, "Cover me, I'm going to go grab it."  Because we had
13 given multiple commands to drop it, and he wasn't doing
14 it.
15   Q.   Did the fact that you were giving him multiple
16 commands to drop it make you think that he didn't
17 understand what you were saying?
18   A.   No.  Just because someone's ignoring me
19 doesn't mean I automatically assume they don't understand
20 what I'm saying.  People can choose to ignore people
21 because they don't want to listen.
22   Q.   Did you see him -- before Officer Turner
23 removes the crowbar, did you see him swing the crowbar at
24 anyone?
25   A.   No, it was just kind of clutched across his

Page 120

1  chest like this (indicating).
2    Q.   Was the crowbar resting on his chest?
3    A.   I wouldn't say "resting."  He had a good grip
4  on it.  I mean, he was holding it tight with his fist and
5  his hand, and it's up here.
6    Q.   He wasn't holding it above his chest?
7    A.   No, it was resting, but he still had a good
8  grip.  Resting would imply it's just sitting there and
9  he's not holding it.  He's got a good grip on it and it's
10 there.  To me, resting would be, had he dropped it and
11 he's not making contact, that would have been resting.
12   Q.   So gripping with at least part of the bar
13 lying across his chest?
14   A.   Sure.
15   Q.   So Officer Turner, did you hear -- did you see
16 Officer Turner throw the crowbar?
17   A.   Yes.
18   Q.   Did you hear it hit the ground?
19   A.   No.
20   Q.   Did it seem like it was -- he threw it close
21 to Mr. Khottavongsa?
22   A.   I don't know where he threw it.  He threw it
23 away from him.
24   Q.   Did it appear to be in reach of
25 Mr. Khottavongsa?

Page 121

1    A.   I don't believe so.  I didn't see where it
2  landed, but I know he threw it away from him, so it
3  wasn't -- it wasn't in arm's reach, I guess.
4    Q.   And I believe you said after the crowbar is
5  removed, Mr. Khottavongsa started to get up; is that
6  correct?
7    A.   Uh-huh.  Yes.
8    Q.   What happened in-between those two events?
9    A.   What do you mean?
10   Q.   What happened in-between Officer Turner
11 removing the crowbar and Mr. Khottavongsa getting up?
12 What did you do?
13   A.   I was still giving commands to everyone else
14 to be taken into custody.  We had a couple people run up
15 from the east who we started to address.  We started
16 trying to take people into custody and separate them and
17 search them for weapons.
18   Q.   How many officers were on scene at that point?
19   A.   Officer Turner, Officer Nordby, I think
20 Officer Deering had arrived, Sergeant Coleman had arrived,
21 Officer Whittenburg may have just been arriving.
22   Q.   Six, including you?
23   A.   Give or take, yes.
24   Q.   In a scene where you got multiple people like
25 that and multiple officers, is communication key to --

Page 122

1  among the officers, to figure out what's going on?
2      A.   Sure.
3      Q.   After the crowbar is removed, did you have a
4  sense at that time of sort of who's -- who was in charge
5  of Mr. Khottavongsa?
6      A.   It would have been me at that point since I
7  had the taser that was still attached to him.  So I had,
8  probably, the most control over him as opposed to anyone
9  else.
10     Q.   Anybody else?
11     A.   No.  Officer Turner was close, but like I
12 said, I had the taser on him, so it wouldn't have made
13 sense for someone else to try to handle him or do
14 something to him while I still have a live taser attached
15 to him.
16     Q.   For fear of getting shocked?
17     A.   What's that?
18     Q.   For fear of getting shocked?
19     A.   Sure, that's one of the reasons.
20     Q.   Can you go hands-on with a -- with a suspect
21 while the person is being shocked?
22     A.   You can.
23     Q.   And without the officer themself being
24 shocked?
25     A.   It's possible.

Page 123

1      Q.   Isn't that what's known as cuffing under
2  power?
3      A.   Sure.
4      Q.   Are you guys -- are you trained in how to cuff
5  under power?
6      A.   Sure.  It wouldn't have been recommended at
7  that time or it wouldn't have made sense at that time.
8      Q.   Because of the electricity was -- he was no
9  longer being shocked?
10     A.   Right.  But you still had to take all these
11 other people into custody who don't have tasers in them
12 who we don't have under control, who we haven't been
13 searching and haven't been cuffed.  If Mr. Khottavongsa
14 got up again, he would gotten tased.  He'd have been easy
15 to control.  He's not the biggest threat at the time.  The
16 biggest threat is all the other people who have not been
17 searched, not been detained, not been cuffed.
18          Mr. Khottavongsa, at least, was under control
19 in the sense of he just got tased so he is kind of down.
20 Everyone else is still trying to get on the ground.  We
21 have people running up.
22     Q.   How many people ran up?
23     A.   I don't know, one or two.  I don't know.  I
24 just heard people yelling at someone, "Don't come up here.
25 Don't come up here."

Page 124

1      Q.   Did Officer Deering handle that person?
2      A.   You'd have to ask her.  I don't recall.
3      Q.   What was Officer Nordby doing at this time?
4      A.   I don't recall.  I'm sure he was addressing
5  the other people there.  My concern was kind of watching
6  everyone and primarily making sure Mr. Khottavongsa didn't
7  get up, didn't reach in his pockets, didn't grab anything
8  else, didn't have anything else.
9      Q.   As a person who has the taser on him, are
10 you -- do you not feel comfortable arresting someone?
11     A.   What do you mean?
12     Q.   Well, at some point, you know -- well, as a
13 general principle, the purpose of tasering someone is to
14 put them into custody correct?
15     A.   Yep.
16     Q.   How do you do that?  If you're holding the
17 taser, can you then go arrest somebody, or how does that
18 work?
19     A.   What do you mean, how does it work?
20     Q.   Well, do you -- do you put the taser in your
21 pocket, or do you reholster the taser, or do you command
22 another officer?
23     A.   It's situation-dependent.  It varies from
24 situation to situation.  There's no standard way to do it.
25 Ideally, if he was by himself and there's no one else, I

Page 125

1  would give him commands to, "Roll on your stomach.  Put
2  your hands behind your back," and I would have cuffed him.
3          Obviously, when there's other factors at play,
4  like other people, he hasn't been searched, he just had a
5  weapon, he was swinging it at people, I already know he's
6  violent.  I'm kind of at a -- I'm at a disadvantage to try
7  to do it in that way, right.
8      Q.   You're at a disadvantage -- how -- did you
9  think you were at a disadvantage after five other officers
10 were on scene?
11     A.   With a bunch of other people that haven't been
12 searched, sure.
13     Q.   Was anyone else -- was any of the other
14 suspects -- there was one -- at least one person running
15 up; correct?
16     A.   Sure.
17     Q.   Were any of the other people at the scene
18 resisting?
19     A.   Define "resisting," I guess.
20     Q.   Well, had they -- had they gotten on the
21 ground?
22     A.   Not initially.  There was a lot of resistance;
23 hence, the repeated commands; right?  It wasn't -- it
24 wasn't compliance right away.  It was constant yelling,
25 telling people to comply.  It was isolating people one by

Page 126

1  one and taking them into custody one by one.  I mean, so
2  in terms of resistance, yeah, they're non-compliant.
3  They're in a fight, there's a crowbar, there's people
4  running up.  We're constantly having to yell at multiple
5  people, we're isolating them one by one because we don't
6  know if there are additional weapons, so --
7        Q.   Did you see any of those people -- well, let
8  me back up.
9             At some point, they do comply; correct?
10       A.   Eventually, yes.
11       Q.   Was that before or after you tasered
12  Mr. Khottavongsa a second time?
13       A.   I couldn't tell you.  There's, obviously, a
14  lot going on.  My focus was other people, and then once
15  they removed the crowbar, it was making sure
16  Mr. Khottavongsa stayed down so that he could be taken
17  into custody after everyone else was --
18       Q.   So you feel he had to be taken into custody
19  after everyone else was?
20       A.   I didn't feel that.  It just made the most
21  sense where he's at least immobilized -- not immobilized,
22  he's at least isolated where I have him under control
23  where if he tries to do anything, he can get tased again,
24  or he can be controlled, as opposed to everyone else who
25  still has the ability to flee, to grab something, to

Page 127

1  fight.  He's, at least, isolated in that sense of he's
2  still a threat, and he's probably the biggest threat
3  because of his actions, but all the unknown threats we now
4  have to start piecing together.  He's controlled, for the
5  most part, by the fact that he's got tasers in him --
6  taser probes in him.
7        Q.   Do you deem him to be an immediate threat when
8  he's on the ground without the crowbar?
9        A.   Sure.  He hasn't been searched.  He was just
10  being violent.  He's not in cuffs.  He hasn't been
11  searched, so there's all those factors going into play.
12  He could have easily have rolled, broken the tasers, got
13  up and charged us.  He could have easily reached into his
14  pocket, pulled out a gun.  I mean, there's 100 different
15  scenarios; right.
16       Q.   Did he do any of those things?
17       A.   No, but I obviously don't know that.  I
18  can't -- I can't assume that he's going to be compliant
19  after he swinging a crowbar; right?  I mean, generally
20  people that are swinging crowbars get tased and don't
21  listen, don't comply aren't going to be like, "I'll listen
22  now."
23       Q.   So that would change your opinion of his
24  threat level if he had not been swinging a crowbar?
25       A.   Yes, and complied and gave me any kind of

Page 128

1  indication that he understood what he was saying or that
2  he was going to comply, whether it was a look, body
3  language, something to indicate to me that he had to
4  comply and that -- does that make sense?  I mean, I needed
5  some kind of queue that he was going to comply or that I
6  had control over him for him not to be a threat.  Until I
7  know that I have absolute control over him in terms of
8  being handcuffed, searched, he is a threat and, at that
9  point, the biggest threat, next to all the people that are
10  unknown that haven't been searched.
11       Q.   So he's the biggest threat -- so is the
12  biggest threat him or the other people?
13       A.   Him at the time of the crowbar, and still him
14  because he's probably the most -- he was the most violent
15  person at the scene.  Everyone else is obviously a factor
16  into this, but they haven't been searched or detained or
17  they're not in custody or not searched.  So everyone's a
18  threat.  So he's the biggest threat because of his
19  actions.
20       Q.   And you said that a look or body language
21  could indicate to you that he was going to comply?
22       A.   Sure.
23       Q.   What does -- what does that mean?
24       A.   He could have given me a facial expression
25  that he understood.  He could have said, "Okay."  I could

Page 129

1  have seen the look of someone who's complying.  He could
2  have dropped the crowbar.  He could have put his hands up.
3  He could have done a lot of things that indicated that he
4  understood what was going on, to some extent.  I mean --
5        Q.   Do you think he didn't understand what was
6  going on?
7        A.   I don't know.  You'd have -- I mean --
8        Q.   I'm asking you that.
9        A.   I don't know.  I just know he wasn't
10  complying.  Whether he understood or not, I can't really
11  predict if he didn't understand me or if he was just --
12  understood me but didn't want to comply.  That's kind of
13  subjective; right?  I just know that he wasn't complying,
14  and I didn't get an indication that he understood and was
15  going to comply.
16       Q.   Were you suspicious at the time that he was
17  not -- that he was not understanding your commands?
18       A.   No.
19       Q.   The thought did not cross your mind?
20       A.   In those instants, no.  It wasn't like we had
21  a long time to build rapport.  It was an immediate he
22  needs to be taken into custody before he hurts someone, so
23  I'm going to give commands and go from there.  I don't
24  have the luxury of trying to negotiate safety of everyone
25  concerned to see if someone understands me.  I give the

Page 130

1  commands with the assumption that you understand, or if
2  you don't understand verbally what I'm saying, it's kind
3  of a universal sign when someone in a uniform shows up and
4  points a weapon at you, that you comply.  I mean, could
5  you go on a vacation somewhere and not speak the language,
6  and if a cop showed up and pointed a gun at you, most
7  people's reaction is to comply or give some kind of body
8  language sign that, yep, I understand.
9         I mean, it's -- generally, when people are
10 pointing weapons at you, you should know that you're in
11 some kind of trouble or you have to, at least, make
12 yourself not a threat to them.
13     Q.   Prior to tasing him, I believe you testified
14 you -- the first time, prior to tasing him the first time,
15 you suspected he was mentally ill; correct?
16     A.   Sure, it's a possibility.  I mean, anyone
17 who's swinging a crowbar at people, it's a possibility.
18     Q.   Why did you -- if you thought he was mentally
19 ill, why did you assume that he understood you?
20     A.   Just because someone's mentally ill, doesn't
21 mean they don't understand.  Those are two separate
22 issues.  Mental illness doesn't mean you don't understand
23 things.
24     Q.   Can it?
25     A.   It can.  If I had the luxury of time to

Page 131

1  negotiate.
2      Q.   Do you believe that is consistent with your
3  training, that you should assume someone -- you should
4  always assume someone understands you?
5      A.   No, it's situation-dependent.  Obviously, I
6  have to attempt to communicate first and then go from
7  there.
8      Q.   So in what situations would you -- would you
9  not just assume that he understood -- that someone you
10 knows you?
11     A.   Sorry, can you repeat it?  In what situations
12 would I assume that someone doesn't understand me?
13     Q.   Yes.
14     A.   If we're having a conversation, they look
15 confused, if they say they don't speak English, if they
16 give me a puzzled look on their face, if someone tells me
17 that the person doesn't speak English, if I had prior
18 contacts where they -- where I know that they don't speak
19 English, if I have prior contacts where I know he's got a
20 disability, if they communicate with their hands showing
21 that they don't understand.  Those are all signs that they
22 obviously don't understand.
23     Q.   Do you recall Officer Turner telling you, at
24 some point in the encounter, that he didn't believe
25 Khottavongsa -- Mr. Khottavongsa spoke English?

Page 132

1      A.   I don't recall.  He may have said it, but
2  there was a lot going on, so I don't specifically recall
3  us having a conversation about whether or not he spoke
4  English.
5      Q.   You don't recall one way or the other?
6      A.   (Witness shaking head.)
7      Q.   In the time between when Officer Turner
8  removes the crowbar and you taser Mr. Khottavongsa a
9  second time, did you communicate anything to any other
10 officers?
11     A.   I'm sure they heard me yelling, "Don't get up.
12 Don't get up or you're going to get tased again."
13     Q.   Anything else?
14     A.   Not to my recollection, but I did yell that
15 loudly so they would have obviously heard, so they know
16 they would have to stay away from him, or at least know
17 that he was going to get shocked again.
18     Q.   Do you believe that other officers could have
19 approached Mr. Khottavongsa and forcefully taken him into
20 custody?
21     A.   They did, eventually.
22     Q.   Is there any reason they couldn't have done it
23 prior to you tasering him?
24     A.   Sure, they had all these other people they had
25 to deal with.

Page 133

1      Q.   So all officers were occupied?
2      A.   Uh-huh.  There was a bunch of people that, you
3  know, still hadn't been searched.  There's a lot going on.
4             MR. HIVELEY:  Was that a "yes" earlier?
5      A.   Yes, sorry.
6  BY MR. RISSMAN:
7      Q.   And so, at this time, you were -- were you
8  mainly focused on Mr. Khottavongsa?
9      A.   For the most part, yes.
10     Q.   Were you watching his face?
11     A.   Yes, his face, his body and everything else
12 going on around me.
13     Q.   Okay.  So prior -- I just want to pinpoint the
14 time period.
15         Prior to tasering him a second time, did he
16 appear confused?
17     A.   Sure.  I mean, he had just gotten tased.
18 There's a lot of yelling.  There's a lot of movement
19 around him.  I'd be confused, too.
20     Q.   Okay.  Disoriented?
21     A.   Sure, there's a lot of people yelling,
22 there's -- he just got tased, and there's a lot of yelling
23 and a lot of movement around.  Like I said, I'd be
24 disoriented, too, if I had a bunch of people yelling
25 things and I had just gotten tased.

ALAN SALVOSA - 03/30/2017          Pages 134..137

Page 134

1      Q.   And I believe you said you never saw him lose
2  consciousness; is that correct?
3      A.   Yes.  I never saw a point where he was eyes
4  closed, not waking up.
5      Q.   Uh-huh.  Did you see him rubbing his head?
6      A.   Not that I recall.
7      Q.   So did he stand all the way up before you
8  tasered him?
9      A.   He got his back off the ground, probably a 45
10  degree angle.  It looked like he kind of braced himself
11  and was sitting up.
12     Q.   He was in a sitting position?
13     A.   Or was trying to.
14     Q.   Not even, quite?
15     A.   I don't remember at what point I actually
16  tased him and he fell back down, but he was -- obviously,
17  his back lifted off the ground as if he was trying to get
18  up.
19     Q.   Is it your view that there were no other
20  lesser force options available?
21     A.   Which time?
22     Q.   To subduing him when he raised his back at a
23  45-degree angle?
24     A.   Not at the time, no, not with two taser probes
25  in him.  It just made more sense that they're already in

Page 135

1  him.  There's less risk now because he's on the ground, so
2  he's no longer standing, so there's less risk of that.
3          The other option would have been flipping him --
4  flipping him over, kicking him, striking him, punching
5  him, wrestling with him.
6      Q.   Would you wrestle with him or any of the
7  things you said, would that be only if he appeared to be
8  striking you?
9      A.   Well, you don't know.  I mean, obviously, the
10  point is to get him under control.  So if I wasn't going
11  to tase him, that would require one or two officers to
12  flip him onto his stomach and hope he doesn't fight, and
13  try to grab his arms, yank on them to try to cuff him;
14  right?  Thus, creating more injury, and if he starts to
15  resist, then, obviously, then you have the issue of it
16  becomes a wrestling match.  And once it becomes a
17  wrestling match, then you have plenty of things that could
18  hurt him more.  Five seconds of inconvenience versus
19  trying to wrestle with him with the potential of more
20  strikes happening, I think the taser is a better
21  option -- the best option at the time being that I can
22  incapacitate him for five more seconds while we get things
23  under control, or I could try to have two officers flip
24  him and possibly wrestle with him, and now more strikes
25  are being thrown at him to get him to comply.

Page 136

1      Q.   When assessing with force your discussion of
2  flipping him, does the relative size of the officers
3  versus the suspect, do you take that into account?
4      A.   Sure.
5      Q.   And isn't it true that Officer Nordby
6  approached Mr. Khottavongsa as he started to get up?
7      A.   I don't recall.  He may have been.  Like I
8  said, it was a chaotic scene.
9      Q.   So you don't recall noticing Officer Nordby
10  approach Mr. Khottavongsa when you tasered him?
11     A.   He was there.  He was moving.  I don't know
12  that -- you'd have to ask him what his intent was.  I
13  don't specifically --
14     Q.   I'm just asking what you saw.
15     A.   I saw him moving around.  I don't know that he
16  was specifically going towards Mr. Khottavongsa.
17     Q.   I believe you referred to your selection of
18  force, using the taser, as 5 seconds of inconvenience; is
19  that correct?
20     A.   If that's what I said, sure.  Inconvenient in
21  terms of he's immobilized for 5 seconds versus he gets
22  flipped and then gets wrestled with.
23     Q.   I believe, earlier, we talked about the
24  quantum of force or the reasonably foreseeable injuries
25  someone might have.

Page 137

1          Do you recall that, our discussion?
2      A.   Yes.
3      Q.   In a situation -- so I guess, backing up to
4  the first tase, he was standing on concrete; yes?
5      A.   Sure.  Yes.
6      Q.   So that would be an increased risk of injury,
7  standing on concrete versus a softer surface?
8      A.   Yes.
9      Q.   And before you taser him the second time, he's
10  still on the concrete?
11     A.   Yes.
12     Q.   And you are trained that a second taser
13  increases the risk of injury?
14     A.   Yes.
15     Q.   And you did see him fall; correct?
16     A.   Yes.
17     Q.   So if he was already injured, might he get
18  injured again from getting tasered again, or could those
19  injuries get worse?
20     A.   Yes, but he was also no longer falling from a
21  greater distance.  He was just getting up.  So his fall
22  would have been a couple inches, if that.  So it's less of
23  a fall from the initial tase.  He also still was
24  potentially a threat.  He hadn't been searched, he was
25  non-compliant.  He had a crowbar up until Officer Turner

Page 138

1  removed it from him. We didn't know if he had any
2  additional weapons.
3      Q.   Yeah, I'm just asking you about the risk to
4  Mr. Khottavongsa.
5      A.   Sure.
6      Q.   So --
7      A.   Again, any time you use force, there's risk.
8      Q.   This was -- but some of the factors you've
9  been trained in, the second tasering was -- there was
10  increased risk of injury to Mr. Khottavongsa given that it
11  was a -- he had already been tasered once, and he was on a
12  hard surface; correct?
13      A.   Yes, I guess I -- increased from getting up to
14  going back down a couple inches, I don't think that's a
15  dramatic increase.
16      Q.   So you believe he -- you tasered him when he
17  was a couple of inches off the ground?
18      A.   Started to get up, sure. I don't know the
19  exact measurement.
20      Q.   Yeah, approximately.
21      A.   Approximately. I mean, he was just going to
22  get up.
23      Q.   And that initiation of getting up, you believe
24  tasering was your only option?
25      A.   Best option.

Page 139

1      Q.   Do you recall Officer Nordby standing over
2  Mr. Khottavongsa with his firearm drawn while he was still
3  on the ground before you tasered him the second time?
4      A.   I don't specifically recall that, but he might
5  have.
6      Q.   Are you trained to avoid tasering someone a
7  second time, particularly when other officers are present
8  and able to assist?
9      A.   No, we're not specifically trained to say just
10  because there's other officers that are able to assist,
11  there's no policy saying I can't taser anyone just because
12  others are present. It's all situation-dependent. So,
13  no.
14      Q.   Would you certainty take into account the fact
15  that other officers are available --
16      A.   Sure.
17      Q.   -- in deciding whether to taser someone?
18      A.   It's taken into account, but the ultimate
19  decision rests on me and what I think is the best option
20  to -- to do it, in the limited amount of time I have to
21  make that decision before things escalate.
22      Q.   How much time do you think you had to make
23  that decision?
24      A.   Very little time. Seconds.
25      Q.   Did you -- strike the question.

Page 140

1      Q.   You would agree that the degree of risk
2  Mr. Khottavongsa posed to you was significantly lessened
3  by removing the crowbar?
4      A.   Yes and no. Yes, there was no longer a
5  crowbar. No, because he still hadn't been searched.
6      Q.   So he posed the same risk with or without the
7  crowbar?
8      A.   So he posed the same -- sorry, you were saying
9  he posed the same risk?
10           No, the risk was greater with the crowbar, but
11  he was still a risk without the crowbar because he had not
12  been searched, and all of the things that led up to that
13  are still present: He's still non-compliant, he's still
14  giving no indication of compliance, he has not been
15  searched.
16      Q.   Well, prior to him being tasered and after
17  he -- the crowbar is removed from him, was he doing
18  anything -- was he doing anything at all?
19      A.   He looked like he was moving around, getting
20  his bearings. He was, obviously, starting to come to --
21  to move, starting to sit up.
22      Q.   Did he sit up quickly? Appear to be
23  fast-moving, like he was jumping to his feet?
24      A.   No, he put his arm up to get up.
25      Q.   Did he appear to be injured at that point?

Page 141

1      A.   I don't know. Hard to tell. I didn't see any
2  visible injuries. Like, I didn't see an arm deformed or a
3  leg broken or any kind of bleeding, any kind of indication
4  that it was something serious.
5      Q.   Uh-huh. After you tasered him a second time,
6  what did you do after that?
7      A.   I think things -- we had started taking people
8  in custody. I think I used my foot to try to get him to
9  roll over on to his stomach so we could get his hands
10  behind his back, and then Officer Nordby and
11  Officer Turner came and they were able to cuff him.
12           And at that point, we had enough hands because
13  I believe Officer Deering told me to take the cartridge
14  out of my taser, thinking that was probably a good time to
15  disengage with the taser, it was no longer going to be
16  useful, because we had enough people to take him into
17  custody.
18      Q.   Yeah, I believe she tells you to drop it,
19  something like that?
20      A.   Drop the cartridge, yes. That would eliminate
21  the chance of possibly shocking my partners because we had
22  enough people at that point, and things had kind of calmed
23  down to the point where we could then take him into
24  custody.
25      Q.   So it's your view that in the seconds

Page 142

1  immediately -- or strike the question.
2          So it's your view -- well, how much time
3  elapsed after you tasered him, approximately, to when you
4  started to initiate the process to arrest him?
5          A.   I couldn't tell you.  Seconds to maybe a
6  minute.  I don't know.  I think once we had kind of got
7  ourself centered and people were complying to the point
8  where it was safe to take him into custody, I believe
9  that's when Officer Deering told me to drop the cartridge,
10 which I did, and then we tried to nudge him to roll him
11 over onto his stomach, and obviously, they took him into
12 custody.
13         Q.   Did you threaten to taser Mr. Khottavongsa a
14 third time?
15         A.   I don't recall.  I'd have to check.  Possibly
16 after the second, I might have said, "If you try to get up
17 again, you'll get tased again."  I'd have to look.
18         Q.   Why don't we play the tape here.  So this is
19 starting at 19 -- start this just right before
20 Officer Turner removes the crowbar.
21             Starting Turner video at 21:17:01.
22             (Video audio playing.)
23 BY MR. RISSMAN:
24         Q.   Stop it there 21:18:15.
25             So a couple things.  So after you saw him

Page 143

1  getting tasered a second time --
2          A.   Yes, sir.
3          Q.   -- and was he -- did you -- did you see him
4  hit his head in this video?
5          A.   I couldn't really see.  I saw him go back
6  down, but I don't --
7          Q.   Did he appear to catch his fall?
8          A.   Did not appear to catch his fall, no.
9          Q.   And at the time -- did you recall thinking he
10 may have hit his head?
11         A.   It's a possibility.  It's a possibility when
12 anyone falls.  I guess I don't -- I didn't think that,
13 because I tased him, he was going to hit his head.
14         Q.   If someone is in a sitting position or a
15 semi-sitting position and they -- he went straight
16 backward; right?
17         A.   Sure.
18         Q.   Do you think it would be likely, in that
19 scenario, that someone would hit their head?
20         A.   All depends.  I don't -- I guess I'm not a
21 fall expert.  I don't -- people could have fallen
22 10 different ways.  He could have fallen and rolled.
23 There's a bunch of possibilities.  I guess you're --
24         Q.   And the way that he fell, Mr. Khottavongsa
25 fell, did it appear more likely that --

Page 144

1          A.   I saw him go back down on the ground.  That
2  was my concern, is that he gets back on the ground while
3  they're still taking people into custody, and that he
4  remains there until it's safe for us to take him into
5  custody while everyone else is being taken into custody.
6          Q.   Did he have to be taken in custody last?
7          A.   I don't recall.
8          Q.   I'm just asking -- well, you gave a view that
9  everyone else had to be dealt with, so I'm just asking,
10 did he have to be taken into custody last?
11         A.   He would -- he had the most -- he would have
12 been the most difficult to take into custody due to the
13 fact that he was the most noncompliant, he still had taser
14 probes in him, and he was the one with the weapon,
15 initially, and he may have still had a potential weapon.
16 I guess, in terms of people who are danger, I would go
17 with the guy who had the weapon first and then --
18         Q.   Well, if he was the most dangerous, wouldn't
19 you want him in cuffs first?
20         A.   Well, he was -- like I said, he was isolated
21 with the taser.  That had prevented him from making any
22 further issues while everyone else was taken into custody.
23 He wouldn't have the ability to, say, grab things or run
24 or charge at us because I had the taser on.  Everyone else
25 still had the ability to flee, they weren't going to be

Page 145

1  sore from the taser.  I mean, everyone else was, for the
2  most part, still capable of more physically because they
3  didn't have taser probes in them.
4          So I guess I had the most control in terms of
5  he was controlled because he had taser probes in him, that
6  had he tried anything, he would have gotten tased again to
7  prevent any issues.
8          Q.   In that scenario, aren't you almost just
9  condemning him to the fate of being tasered a second time?
10         A.   No.
11         Q.   I think you said you thought he was -- you saw
12 him moving and starting to come to; is that right?
13         A.   Sure.  And you notice I didn't tase him until
14 he got up.  He could have come to and gave me a sign and
15 said, "Officer, I give up."  He wouldn't have been tased.
16 He could have said, "Officer, I give up," or he could have
17 given me that look of, "I'm not going to move," and stayed
18 perfectly still.
19         He could have done a million things where he
20 didn't get tased.  You noticed that I gave him plenty of
21 commands and told him what was going to happen, and only
22 when he started to sit up did he get tased.  If I would
23 have just condemned him to being tased, I could have just
24 held the trigger and let it tase him until I let go of
25 that trigger.  And I could hold that trigger for -- until

Page 146

1  the battery runs out if I was condemning him.
2          So no, it wasn't -- I wasn't condemning him.
3  I didn't inflict pain on him.  I've been tased three
4  times, and it's the most painful thing in the world.  And
5  I'm sorry that he experienced it, but I didn't have any
6  other choice.  So to say that I condemned him to being
7  tased again implies that I'm malicious and I have no idea
8  how painful a taser is.
9      Q.   Yeah, what I'm trying to say is -- what I'm
10 trying to ask about is the approach of sort of dealing
11 with, rather than dealing with him first, dealing with him
12 last.  I guess it just seems to, at least, increase the
13 risk that a second tase will be necessary.
14          Would you agree with that?
15     A.   Sorry, can you say that again, sir?
16     Q.   Well, if, instead of dealing with him -- if
17 you had dealt with him first rather than dealing with him
18 last -- well, strike the question.
19          It seems -- it seems the approach of dealing
20 with him last rather than first increases the risk that a
21 second tase will be needed.
22          Would you agree with that?
23     A.   No, it's situation-dependent, sir.  There's
24 all these other factors to consider, like I said.  It's
25 also looking at what my partners are doing and assessing

Page 147

1  the situation and re-evaluating it realtime what the best
2  solution is.  So it's hard to go, "We should do him first
3  over him first" while the situation is fluid.  It's all
4  dependent on how you read the situation, what your
5  partners are doing and how you assess everything.
6          If you notice, people got taken into custody,
7  and then, eventually, he was taken into custody, but it
8  was methodical.  It wasn't a melee of, "Everyone just grab
9  somebody and let's all just hook them."  It was methodical
10 in how it was done.
11     Q.   Who was -- who was communicating how it should
12 be done?
13     A.   I think we all kind of did.  We all worked
14 together for a while.  So you kind of know that you have
15 to do it one by one.  You don't all just grab somebody.
16 So it was kind of if you see someone taking someone into
17 custody, you kind of know, "I'm going to hold off while
18 they're taken into custody."  Once they're secure, we'll
19 move onto the next person.  So it kind of just happened
20 naturally through communication, working with people for
21 so long, you kind of get a read for the situation.
22     Q.   So you had worked together so long that you
23 just kind of knew what -- you each -- without having to
24 say anything, everybody knew what to do?
25     A.   Well, you just kind of -- you understand that

Page 148

1  if they're taking someone into custody, your job is just
2  to watch these people while they're taken into custody.  I
3  mean, it's kind of a -- it's a natural progression of when
4  you work with someone and the way we train people, we know
5  that you kind of isolate people one by one.  You don't try
6  to throw five different people into five different squad
7  cars all at the same time because you lose your resources
8  if something goes wrong.
9          So it's kind of methodical where that person
10 was being taken into custody, that officer was addressing
11 that person.  We don't try to micromanage.  We just know
12 that that person's doing that, that person's doing that,
13 and I read off what they're doing and they read off what
14 I'm doing, and we try to make the best of the situation.
15     Q.   In the clip we just watched, after you tasered
16 him a second time, you -- I believe you give him -- I'm
17 not sure how many, but at least some warnings to not --
18 not get up or get it again; is that correct?
19     A.   Yes.
20     Q.   And then you say, "Roll over or you're going
21 to get it again"; is that correct?
22     A.   I believe so, yes.
23     Q.   If he -- and so -- at that point, I don't know
24 if you heard it, but there is a different voice that says,
25 "I don't think he speaks English."

Page 149

1          Did you hear that?
2      A.   I don't recall hearing it at the time.
3      Q.   Did you recall hearing it just now?
4      A.   Sure.  Watching the video, yes, I heard it.
5      Q.   Okay.  And after that, I don't hear you
6  threaten to use the taser again; is that correct?
7      A.   Yes.
8      Q.   And instead of saying, "Roll over or you'll
9  get it again," you just say, "Roll over;" is that correct?
10     A.   Yes, and at that point, he had kind of rolled
11 over already and my partners were already there.
12     Q.   If he had not complied with your command to
13 roll over, would you have tasered him again?
14     A.   Depends on the situation.
15     Q.   How about in this situation, were you prepared
16 to?
17     A.   If he didn't roll over?
18     Q.   Uh-huh.
19     A.   No, he would have had to have done something
20 more than not just roll over.  Just because he's not
21 complying doesn't mean he gets tased.  He'd have to,
22 again, do something more than just not listen.  Somebody
23 not listening to somebody isn't a reason to get tased.
24 Obviously, he would have had to get up, make a movement
25 where I thought he was trying to do something to harm me

ALAN SALVOSA - 03/30/2017        Pages 150..153

Page 150

1 or my partners to tase him again a third time.
2    Q.   You heard -- so in the video, you heard
3 Officer Turner tell you that he doesn't speak English.
4         Would that have been information you would
5 have liked to have known at some point prior in this
6 situation?
7    A.   Would the information that he didn't speak
8 English?
9    Q.   Yes.
10    A.   Sure, any information you can have prior to
11 any encounter is, obviously, good information to have.
12    Q.   Would it have changed your approach?
13    A.   Depends.
14    Q.   Well, I believe you gave him a command to not
15 get up or he was going to get it again; correct?
16    A.   Sure.
17    Q.   Prior to tasering him a second time.
18         If -- if you had the knowledge that he didn't
19 speak English at that point, do you think you would have
20 just continued to have given that command, or would you
21 have tried a different tactic?
22    A.   Tried a different tactic, but obviously, how
23 do I know that that's the actual reality?  Just because
24 someone says, "I don't think he speaks English," and does
25 he actually speak English are two different things; right?

Page 151

1 I mean, just because I assume he doesn't speak English
2 doesn't mean that that's true, and just because I assume
3 he speaks English doesn't mean it's true.
4    Q.   Right.  You don't know -- you can't get inside
5 that person's mind?
6    A.   Right.
7    Q.   But if you have reason to believe they don't
8 speak English or just don't understand for any reason --
9    A.   Sure.
10    Q.   Let me finish my question.
11    A.   I apologize.
12    Q.   That's okay.
13         But if you have reason to believe that they
14 don't speak English or don't understand for any reason,
15 that information would -- or would it have, in this case,
16 altered your approach?
17    A.   Depends.
18    Q.   Well, would you have tried something different
19 than just giving commands?
20    A.   I'd have to see some kind of -- some kind of
21 acknowledgment that he understands or doesn't understand
22 or didn't look like non-compliance, I guess, would be kind
23 of -- and that's kind of that fine line between does he
24 not understand or is he being non-compliant, and sometimes
25 those lines aren't very clear.

Page 152

1         And in a fluid situation where it's dangerous,
2 it's -- like I said, it's at a detriment to everyone
3 else's safety just to assume that they don't understand
4 commands, because then, theoretically, you would never be
5 able to fight anyone and say they just don't understand
6 and I'm going to try a different tactic.
7    Q.   Uh-huh.  After you saw him tasered, a second
8 time, were you concerned that he was injured?
9    A.   Sure, like I said, any time you use force
10 there's always a concern for injury.
11    Q.   And after you, sort of, roll him over with
12 your foot; is that correct?
13    A.   Yes, sir.
14    Q.   Officer Turner and Officer Nordby, would you
15 say, with respect to Mr. Khottavongsa, kind of took it
16 from there?
17    A.   Yes, sir.
18    Q.   Did you have any -- after that, any encounter
19 with Mr. Khottavongsa?
20    A.   No, sir.
21    Q.   What did you do to assess his injuries, if
22 anything?
23    A.   I didn't.  He was in the care of
24 Officer Nordby and Officer Turner.
25    Q.   Officer -- did you know whether or not

Page 153

1 Officer Turner and Officer Nordby saw everything that you
2 saw, with respect to Mr. Khottavongsa's potential for
3 injuries?
4    A.   Sorry, can you repeat that?  Do I know if --
5    Q.   Did you know, at the time that Officer Turner
6 and Officer Nordby saw everything that you saw, with
7 respect to Mr. Khottavongsa's potential for injuries?
8    A.   I can't answer that.  I don't know what they
9 saw because I wasn't in their head and --
10    Q.   Yeah.  Did you have a belief that they saw
11 everything that you saw?
12    A.   Again, that's subjective.  I don't know what
13 they saw versus what I saw.  We're all there.  You'd have
14 to ask them what they saw.  I know they were there to
15 testify to what they specifically saw, I really don't want
16 to --
17    Q.   Well, I'll ask it a different way.
18         You were the first on the scene; correct?
19    A.   Yes.
20    Q.   You had the best view of Mr. Khottavongsa
21 falling and hitting his head or falling; correct?
22    A.   I had my view, yes.
23    Q.   Well, you were the closest -- you were the
24 closest officer to him; is that correct?
25    A.   So was Officer Turner as he pulled in.

ALAN SALVOSA - 03/30/2017          Pages 154..157

Page 154

1      Q.   He was as close as you were?
2      A.   I don't know as close. I wasn't -- I guess I
3 wasn't measuring distances, but he saw him fall.
4      Q.   Do you think everybody saw him tasered a
5 second time?
6                MR. HIVELEY:  I'll object; calls for
7 speculation.
8 BY MR. RISSMAN:
9      Q.   Do you think it was obvious that he got
10 tasered a second time?
11     A.   Obvious to who?
12     Q.   To the other officers around.
13     A.   If they -- if they saw him and saw me pull the
14 trigger and saw him go back down, yes.
15     Q.   Have you seen other officers' police reports
16 and supplemental narratives in this case?
17     A.   Yes.
18     Q.   Notably absent from many of the reports is any
19 mention of the second tase.
20          Would you agree with that?
21     A.   I'd have to look.  I don't specifically
22 recall.
23     Q.   Other officers have testified that they do
24 not -- did not see the second tase or did not realize that
25 Mr. Khottavongsa was tasered a second time.

Page 155

1          Are you aware of that?
2      A.   No, I was not aware of that.
3      Q.   Given that you were the person that pulled the
4 trigger on the taser twice, do you think that created some
5 sort of duty for you to personally investigate
6 Mr. Khottavongsa's injuries?
7      A.   No.  He was in the hands of another
8 well-trained officers.  There were paramedics also on the
9 way who would provide a better level of care.  No level of
10 care that I could have provided would have been any
11 different than the level of care they could have provided,
12 and no level of care I could have provided would have been
13 better than an ambulance and paramedics who were at a
14 higher level.
15     Q.   There was an ambulance on the way as soon as
16 you ended your encounter with Mr. Khottavongsa?
17     A.   I don't exactly recall when an ambulance was
18 on the way.  I know one was started.
19     Q.   At some point?
20     A.   At some point.  And typically, in taser cases,
21 we generally get an ambulance started when things calm
22 down for -- to assess.
23     Q.   Right away?
24     A.   As soon as it's safe.  You're not going to
25 call them in the middle of a fight while we're fighting

Page 156

1 with people, but once things calm down and we start
2 assessing people, typically we do our best to call an
3 ambulance out to evaluate people.
4      Q.   So you assumed that Officer Turner and
5 Officer Nordby would do their jobs and medically assess
6 Mr. Khottavongsa?
7      A.   Yes, as would any other police officer that
8 was there.
9      Q.   Were you still in close proximity with
10 Mr. Khottavongsa when he was being handcuffed?
11     A.   Probably.  I was probably behind.  My partners
12 were handcuffing him.
13     Q.   Do you recall him moaning and groaning at that
14 point?
15     A.   Sure.  Yes, sir.
16     Q.   Did that indicate to you that he was injured?
17     A.   It indicated he was in some kind of pain, so
18 yes.  No different than when I got tased and I would groan
19 and do the same thing, because it's painful.
20     Q.   Well, to this point, though, he's -- the
21 electricity is no longer running through him; correct?
22     A.   Sure.
23     Q.   And so -- so after the fact, do you believe
24 that his moaning was just typical of someone who --
25     A.   Sure.

Page 157

1      Q.   -- was expressing discomfort after being
2 tasered?
3      A.   Like I said, it's like a strenuous workout
4 where you're groaning and moaning after you work out and
5 you're fatigued.  So I certainly groaned and moaned after
6 I got tased, so I've seen people who have been tased who
7 have groaned and moaned because it's painful and you get
8 sore, and he had been handcuffed and I've seen people
9 groan and moan over being handcuffed.  So I guess moaning
10 and groaning, to me, as indicated, sure they're in some
11 kind of pain.  So what level, I don't think I've ever been
12 properly trained to assess a moan and groan to injury.
13     Q.   I'll start Turner 21:18:15?
14          (Video audio playing.)
15 BY MR. RISSMAN:
16     Q.   Stopping at 21:19:39.
17          Did you hear Mr. Khottavongsa moaning and
18 groaning on the ground?
19     A.   Sure.
20     Q.   Do you believe that's the same type of moaning
21 and groaning that you get when you're fatigued from a
22 workout?
23     A.   Sorry.  Say that again.
24     Q.   Do you believe that moaning and groaning you
25 just heard on the video is the same type of moaning and

Page 158

1  groaning that you might -- that you might -- the same type
2  of moaning and groaning that you might do after you're
3  fatigued from a workout?
4        A.   Probably not, but I mean, everyone moans and
5  groans differently.  I guess it's kind of subjective.
6        Q.   Does it appear more severe or you just think
7  different?
8             MR. HIVELEY:  Does what appear more
9  severe?
10  BY MR. RISSMAN:
11        Q.   His moaning and groaning.  Does it indicate a
12  more severe injury than just --
13        A.   I don't think I've ever been properly trained
14  to assess moaning and groaning as to severity of injury.
15  I mean, theoretically, I could moan and groan right now
16  and make it sound like I'm injured, but I'm not.  So I
17  don't -- I don't know how to access severity of injury to
18  moaning and groaning.
19        Q.   Did they put you on notice that he is -- his
20  injury required immediate medical care?
21        A.   What injury?  I guess I don't see any visible
22  injuries that --
23        Q.   Did you -- did that type of moaning and
24  groaning put you on notice that he should be given -- that
25  an ambulance should be called right away?

Page 159

1        A.   No.  Drunks moan and groan.  Lots of people
2  moan and groan.  I guess, again, if someone were to moan
3  and groan and I called an ambulance every time, that's
4  kind of a -- I mean, kids moan and groan.  We don't call
5  an ambulance every time a kid has a tummy ache; right?  We
6  assess.  It's got to be more than moan and groans; right?
7  People also tend to fake things.
8        Q.   I mean, did you think Mr. Khottavongsa was
9  faking it at the time?
10        A.   I didn't really have contact at this point, so
11  I wouldn't know.
12        Q.   Do you think, one way or another, that
13  Mr. Khottavongsa was faking it?
14        A.   I didn't see that part.  When he was being
15  hauled away, I did not have contact with him.  I heard the
16  moaning and groaning.  I trusted my partners to make the
17  best decision.
18        Q.   Did the moaning and groaning.  Did you think
19  that he was faking it when he was moaning and groaning?
20        A.   I don't know.  You're asking me to --
21        Q.   I'm asking you what you believed at the time?
22        A.   I don't know.  I'd have to have more
23  information.  Obviously, if he's just moaning and
24  groaning, I'd probably talk to him and ask what hurts.
25  "Does this hurt, does that hurt?"  I'd start assessing.

Page 160

1  But I wasn't there.  So I didn't assess him so I wouldn't
2  be able to tell.  Like I said, moaning and groaning by
3  itself does not -- I guess, is a subjective analysis of
4  giving someone medical care.
5        Q.   You believe that you would have had -- you
6  were the who was taking him to the car, you would have
7  talked to him and assessed him; is that correct?
8        A.   Sure, just like my partners did.  I mean,
9  technically, every time you're in contact with him, you're
10  assessing him.  When they lifted him up, they're assessing
11  him.  Every second you're talking to someone, you're
12  assessing them.
13        Q.   You just saw the video of them lifting him up?
14        A.   Sure.
15        Q.   Did you believe they were -- did you see or
16  did you have any reason to believe they were assessing
17  him, from that clip that you saw?
18        A.   Sure, you're always assessing people.  You
19  kind of read people's body language, read them.  Is the
20  fact that he's not standing up on his own, is that because
21  he's drunk, is that because he's high, is that because
22  he's not compliant, is that because difficult?  You're
23  assessing.  Every time you have contact with someone,
24  you're assessing them, subconsciously or not.  You're
25  making an evaluation based off what you do next.  You're

Page 161

1  making an evaluation whether he stood up, whether he said
2  anything, whether he's being stubborn, whether he's faking
3  it, whether he's got any serious injuries.  I mean, it's a
4  constant assessment.  Assessment isn't just a one time
5  thing where he looks good and I'm never going to look at
6  him again; right?  We're assessing him.  We're evaluating
7  if his condition changes.  That's why we don't just stick
8  people in squad cars and leave them alone; right?  We
9  double-check.  We see if things have changed.  I mean,
10  we're -- it's a constant evaluation.  It isn't, "He's
11  good" and leave him there for the rest of however long.
12  It's if things start to change because, like anything,
13  things can deteriorate really quickly, you're constantly
14  assessing people.
15        Q.   Do you think -- do you recall the time hearing
16  Officer Turner tell him to stand?
17        A.   Not at the time from the video.  It looks like
18  I was already walking away into the store to interview
19  people and figure out what was going on or what started
20  all of this.
21             MR. RISSMAN:  Should we take a
22  five-minute break?
23             MR. HIVELEY:  Sure.
24             (Whereupon, a recess was taken
25             from 2:27 p.m. to 2:39 p.m.)

ALAN SALVOSA - 03/30/2017          Pages 162..165

Page 162

1  BY MR. RISSMAN:
2      Q.   I'm going to show the Turner video again at
3  9:17:21, and if you could, on the right side of the cement
4  slab, does that appear to be Officer Nordby?
5      A.   It's hard to tell.  It looks like
6  Officer Turner but I don't know for sure certain.
7      Q.   Okay.  I guess whoever it is, why don't you
8  pay attention to them.  And this is Turner 21:17:21, and
9  just for background, it's prior to the second tasing and
10  after the crowbar is removed.
11     A.   Yes, sir.
12          (Video audio playing.)
13  BY MR. RISSMAN:
14     Q.   Did you see -- did you see that officer that
15  we just described approach Mr. Khottavongsa?
16     A.   Yes, sir.
17     Q.   Okay.  And does he appear to put his foot out?
18     A.   Yes, sir.
19     Q.   And I guess -- I believe that to be
20  Officer Nordby.
21          Can you -- seeing that clip, do you know if
22  that's --
23     A.   I believe it's Officer Nordby, yes, sir.
24     Q.   And did you not see that at the time?
25     A.   I don't recall, sir.

Page 163

1      Q.   Does it appear that Officer Nordby is trying
2  to sort of push him back down with his foot?
3      A.   It appears that way, yes, sir.
4      Q.   And Officer Nordby, as we learned in his
5  deposition, is a big, strong guy?
6      A.   If you say so, sir.
7      Q.   Do you not think he is?
8      A.   I guess I never think of him that way, but
9  sure.
10     Q.   Sounds a little weird, I guess.
11          Well, he's -- I mean, do you know him to be --
12  do you know him to be a large male?
13     A.   Sure.  Yes, sir.
14     Q.   And large in the sense of strong?
15     A.   Sure.  Yes.
16     Q.   Okay.  Is there any reason Officer Nordby --
17  and do you also see that Officer Nordby has his firearm
18  out?
19     A.   It appeared that way.  I have to look at it
20  again, but --
21     Q.   You can.  I'm not trying to trick you here.
22          (Video audio playing.)
23  BY MR. RISSMAN:
24     Q.   I guess the last question was does he appear
25  to have his firearm?

Page 164

1      A.   Yes, sir, it appears he's got something in his
2  handle.  I think it's his firearm, but I don't know.
3      Q.   Okay.  Do you know any reason why he couldn't
4  have -- Officer Nordby could not have restrained
5  Mr. Khottavongsa without the use of a taser, given the
6  approach that you witnessed?  Well, let me ask the
7  question again, or a different way.
8      A.   Okay.
9      Q.   Do you know any reason why Officer Nordby
10  couldn't -- sorry, let me try again -- any reason why
11  Officer Nordby pushing him back down with his foot would
12  not have restrained Mr. Khottavongsa?
13          MR. HIVELEY:  Objection; speculation.
14  You can answer if you know.
15          THE WITNESS:  I don't know.
16  BY MR. RISSMAN:
17     Q.   Do you think -- do you see any reason why that
18  would have been unsuccessful?
19     A.   You're asking me to speculate, I don't know.
20  I mean --
21     Q.   I'll ask you a different question.
22          Would you have liked for Officer Nordby to
23  have communicated to you that he was going to -- going to
24  handle Mr. Khottavongsa with his foot or -- or in any sort
25  of general sense?

Page 165

1      A.   Yes.  I mean, it would be nice to know what
2  people are doing sometimes, especially when there's a lot
3  going on, but --
4      Q.   And I believe you said -- and as we heard on
5  the tape, you do give -- you let the other officers know
6  that you're -- you said, "Don't get up you're going to get
7  it again;" correct?
8      A.   Yes, sir.
9      Q.   So everyone -- and I believe you said
10  earlier -- you testified earlier that all the officers
11  would have heard you say that or you said it loud enough
12  so they could?
13     A.   Yes, sir, whether they heard it or not, I
14  don't know, sir.
15     Q.   Right.  But it was --
16     A.   I said the words, yes.
17     Q.   And you said it loudly?
18     A.   Yes, sir.
19     Q.   Okay.  And with that knowledge that
20  Officer Nordby was planning to restrain Mr. Khottavongsa,
21  would you have tasered him again?
22     A.   I didn't know that at the time, sir, so I
23  wouldn't have been -- had Greg said he was going to do it,
24  we might have had a quick discussion about it.  At the
25  same time, he moved pretty quickly and he was up, so it

ALAN SALVOSA - 03/30/2017          Pages 166..169

Page 166

1 was -- it wasn't like we had a lot of time to discuss what
2 to do, which is kind of -- we both decided to do
3 something, and --
4    Q.   Well, you had reached the -- at this point --
5 at the point where Officer Nordby -- well, from your view
6 of the video, does it appear Officer Nordby gets there
7 just after you taser him?
8    A.   It looks like that, probably split second.
9    Q.   Split second?
10   A.   Yes.
11   Q.   And at that point, Mr. Khottavongsa was in a
12 sitting position, or maybe not even a sitting position?
13   A.   Yes, sir, he was starting to get up.
14   Q.   Is he a threat to anybody in a sittings
15 position?
16   A.   Depends, sir.
17   Q.   Well, would you agree he's more of a threat in
18 a standing position?
19   A.   That's, again, it all depends on the
20 situation, sir.  From a sitting position, he could easily
21 lunge forward and grab someone by the ankles and take an
22 officer down.  From a sitting position, he could easily
23 yank himself up and grab someone's gun belt.  There's a
24 myriad of options, sir.  I don't necessarily know that
25 standing versus sitting, it's all situation-dependent,

Page 167

1 sir.
2    Q.   Standing versus sitting, one is not more
3 dangerous than the other?
4    A.   It's situation-dependent, sir.
5    Q.   So as a general rule, one versus the other is
6 not more dangerous?
7    A.   It depends on the situation.
8         MR. HIVELEY:  I'm going to object; asked
9 and answered, misstates his testimony.
10 BY MR. RISSMAN:
11   Q.   I'm just asking the question.
12        MR. HIVELEY:  Again.  He was asking the
13 question again is why I said, "Objection; asked and
14 answered."
15 BY MR. RISSMAN:
16   Q.   Were you in fear for your own safety when you
17 tasered Mr. Khottavongsa the second time?
18   A.   Yes, and for the safety of my partners, sir.
19   Q.   Do you believe that threat was, at that
20 time -- was it a possible threat or immediate threat?
21   A.   They seem kind of the same things.  Possible
22 threat is an immediate threat.  Anything is possible.
23 Anything could be immediate.  I guess I'd need a little
24 bit of clarification on how you define the two.
25   Q.   You don't have -- you believe that

Page 168

1 immediate -- immediate threat and a possible threat are
2 the same thing?
3    A.   I guess I'm not sure how you're asking them,
4 sir.  If you -- in terms of the situation, any possible
5 threat is immediate threat, given the circumstances
6 surrounding this incident.
7    Q.   Well, doesn't a threat, at some point, I mean,
8 any one of those people there is a potential threat;
9 correct?
10   A.   Yes, sir.
11   Q.   They have to take -- does an action have to be
12 taken to make something -- to add immediacy to that
13 threat?
14   A.   That's the totality of the circumstances, sir.
15   Q.   Okay.
16   A.   It's not just one particular thing, sir.
17   Q.   Right.
18        Switching gears here, did you -- you took some
19 witness interviews?
20   A.   Yes, sir.
21   Q.   Okay.  And then after the witness interviews,
22 did you have a discussion with Sergeant Coleman about
23 what -- what appropriate charges there -- what -- what --
24 what charges would be appropriate for Mr. Khottavongsa?
25   A.   Yes, sir.

Page 169

1    Q.   Do you remember which charge you initially
2 recommended?
3    A.   I believe it was second degree assault, sir.
4    Q.   And do you recall officer Coleman's reaction
5 to your recommendation?
6    A.   I think he said I should interview people and
7 get the whole picture first before making any final
8 decision.  I don't recall it specific but I think that's
9 what he said is talk to all the witnesses and kind of
10 get -- piece it together and make sure we have --
11   Q.   And did you do that?
12   A.   Yes.
13   Q.   Okay.  And after you pieced it together, you
14 dropped -- well, I'll ask you.
15        What was your recommendation after you pieced
16 it together?
17   A.   I think we decided to go with disorderly
18 conduct and obstruct without force.
19   Q.   And did you, at some point, learn or have
20 reason to believe that Mr. Khottavongsa was trying to
21 break up the fight?
22   A.   Yes, or at least it was very possible that
23 there was some kind of self-defense in there.  It wasn't
24 as clear-cut as a second degree assault where he was just
25 assaulting people, sir.

ALAN SALVOSA - 03/30/2017          Pages 170..173

Page 170

1      Q.   Did -- did Sergeant Coleman, he didn't witness
2  the -- he didn't witness what you witnessed prior to you
3  tasering Mr. Khottavongsa?  He wasn't there; right?
4      A.   Yes, sir.  He wasn't there at the time that I
5  tased him the first time.
6      Q.   Right.  And why did him raising the crowbar in
7  the way that you described, why didn't that constitute
8  second degree assault?
9      A.   Well, given the totality of the circumstances
10  after figuring out the whole story, it made more sense
11  that maybe he was trying to defend himself or trying to
12  help the other people there.  I mean, as far as I could
13  tell, it wasn't -- it wasn't as plain as a second degree
14  assault where he was just assaulting people.  There were
15  other factors to consider, again, going back to the
16  totality of the circumstances, sir.
17      Q.   Did that change your view of -- did that make
18  you feel differently about your decision to taser him?
19      A.   No, sir.
20      Q.   Did you feel bad about tasering him, knowing
21  what you learned in hindsight, at the time?  Let me
22  rephrase the question.  It was a poor question.
23           Did you feel bad at the time, minutes after
24  this scene had become stable, learning what you learned,
25  about tasering him.  Did you feel bad about tasering him?

Page 171

1      A.   I feel bad anyone's tasered, sir, because I
2  just know how painful it is.  I generally feel bad any
3  time I have to use force because it's not obviously
4  pleasant and it's not something I particularly enjoy
5  doing, sir.
6      Q.   Sure.  Yeah.  I think that's -- I hope -- I
7  assume that will go without saying.
8      A.   Yes, sir.
9      Q.   But did you feel bad about the decision to
10  taser him?  Do you feel like you made the wrong decision?
11      A.   No, sir.  I would have made the same decision.
12  I can still feel bad about it, but it was the best
13  decisions I could make at the time, given the
14  circumstances that I knew at that time, sir.
15      Q.   Were you concerned that Sergeant Coleman was
16  not pleased with your performance at that time?
17      A.   Not that I recall, sir.  He never said
18  anything to me directly, sir.
19      Q.   Did he seem angry or annoyed with you, in any
20  way?
21      A.   Not that I recall, sir.
22      Q.   I'm going to play a portion from your audio.
23  It's just the audio so there's nothing -- I don't need to
24  bring it over.  Can you see it?
25      A.   Yes.

Page 172

1      Q.   You might have to play it a couple of times
2  because I think there's some interference, so we'll do our
3  best.
4      A.   Yes, sir.
5      Q.   Starting at Salvosa Exhibit -- Exhibit 6,
6  21:29:34.
7           (Video audio playing.)
8  BY MR. RISSMAN:
9      Q.   Can you hear the sound of your own voice
10  there?
11      A.   I do, sir.
12      Q.   Did you say, "I feel bad now, knowing that in
13  hindsight, but he was raising it at people"?
14      A.   Yes, sir.
15      Q.   After that do you say, "I don't know."
16      A.   It's hard to make out.
17      Q.   Yeah, I'll play it again.
18      A.   Yes, sir.  Thank you.
19           (Video audio playing.)
20  BY MR. RISSMAN:
21      Q.   Did you hear an, "I don't know" at the end of,
22  "He was raising it at people"?
23      A.   Something like that, sir.
24      Q.   Do you recall who you were speaking to when
25  you made that statement?

Page 173

1      A.   I don't recall, sir.  It was probably one of
2  the officers there.  Again, I have to -- I don't recall
3  specifically, no, sir.
4      Q.   A clip here, 9:30:38.
5           (Video audio playing.)
6  BY MR. RISSMAN:
7      Q.   9:30:37.
8           (Video audio playing.)
9  BY MR. RISSMAN:
10      Q.   Okay.  I don't think we caught all of that,
11  but I at least heard and you can tell me -- do you
12  recognize the sound of your voice there?
13      A.   I do, sir.
14      Q.   Okay.  I heard, "Now that I know he was trying
15  to help," did you hear that?
16      A.   Something like that, sir, it's kind of hard.
17      Q.   Something along those lines.  And I heard,
18  "But he raised it at a couple people and turned his back
19  to me"?
20      A.   Something like that, sir.
21      Q.   And then I heard a -- sort of -- appeared
22  where you couldn't hear anything and then, "I tased him"?
23      A.   Can I ask my attorney something?
24      Q.   Sure.
25           (Discussion off the record.)

ALAN SALVOSA - 03/30/2017          Pages 174..177

Page 174

1        MR. HIVELEY:  He would like to provide
2   you some additional technical advice.
3   BY MR. RISSMAN:
4        Q.   Great.  Are you -- I turned the tube off.
5        A.   You did already?
6        Q.   Yeah.
7        A.   One of them is the body mic and one of them is
8   the in-car mic.
9        Q.   Yeah, I think it's the radio or something.
10       A.   Well, trying muting Mic 1.
11       MR. HIVELEY:  We can go off the record
12  for this.
13            (Discussion off the record.)
14  BY MR. RISSMAN:
15       Q.   Salvosa Exhibit 6, 21:30:36.
16            (Video audio playing.)
17  BY MR. RISSMAN:
18       Q.   There is some breaks in here but at least one
19  phrase is, "Now that I know he was trying to help;" did
20  you hear that?
21       A.   Yes, sir.
22       Q.   There was a break or hard to hear, "But then
23  he raised it at a couple people and turned his back to
24  me."
25            Did you hear that?

Page 175

1        A.   Yes, sir.
2        Q.   And then a -- break, and then, "When I tased
3   him"?
4        A.   Yes, sir.
5        Q.   Does that seem accurate?
6        A.   Yes, sir.
7        Q.   Okay.  I'm going to play another audio clip.
8   This is from Turner.  This is Turner 21:35:35.
9            (Video audio playing.)
10  BY MR. RISSMAN:
11       Q.   Do you hear a voice there that says, "Well, it
12  sounds like he, according to this victim here, he would
13  have got the crowbar from inside the shop from somebody
14  punching on him."  Did you hear that?
15       A.   Yes.
16       Q.   Do you know whose voice that is?
17       A.   That would be Sergeant Coleman.
18       Q.   Sergeant Coleman?
19            (Video audio playing.)
20  BY MR. RISSMAN:
21       Q.   Stopping at 21:35:57.
22            Did you hear a voice there?
23       A.   Yes, sir.
24       Q.   Was that your voice?
25       A.   Yes.

Page 176

1        Q.   And you say, "There's some breaks in here,
2   some ellipses, so I'm comfortable with second degree on
3   this guy.  She filmed it all and she's going to send in
4   the video, but I saw him, when I pulled up, like he was
5   going to strike her.  And then he turned around."
6            Does that sound accurate, like what you just
7   heard?
8        A.   Yes, sir.
9        Q.   So I'm just going to go a little back so we
10  have context.  21:35:45.
11            (Video audio playing.)
12  BY MR. RISSMAN:
13       Q.   So you have your statement about, "I'm
14  comfortable with second degree on this guy."
15            And there's another voice that says, "Which
16  guy"?
17            And someone says, "Khottavongsa."
18            And there's a male voice that says, "Yeah, but
19  I think he grabbed a crowbar after the owner tried to
20  break the fight up."
21            Do you know who made that last statement?
22       A.   I believe it would be Sergeant Coleman.
23       Q.   And then there's a voice that said, "Did you
24  watch the video"?
25            And then someone says, "I don't think.  I said

Page 177

1   maybe disorderly"?
2            Did you catch who made that last comments?
3        A.   I believe Sergeant Coleman, again.
4        Q.   Sergeant Coleman?
5        A.   I can't -- it's hard to tell.
6        Q.   Does that refresh your memory at all as to the
7   conversation you had with Sergeant Coleman about what the
8   appropriate charges would be?
9        A.   A little bit, yes, sir.
10       Q.   Does it appear to you that you recommended
11  second degree and Sergeant Coleman thought you should
12  do -- have a disorderly conduct charge?
13       A.   I think he was saying that I need to do more
14  investigation work and look at the bigger picture here.  I
15  don't think he made a suggestion, but I don't think it was
16  an order.  I think it was more let's re-evaluate this and
17  look at the totality of the circumstances.
18       Q.   Okay.  Were you ever ordered to recommend a
19  certain charge?
20       A.   No.
21       Q.   Use your discretion?
22       A.   Yes, sir.
23       Q.   So I'd like to -- after -- so, I guess, is
24  there anything else, other than interview witnesses
25  that -- that you did at the scene with respect to

Page 178

1  Mr. Khottavongsa?
2      A.   I don't recall, sir.  I think interview
3  witnesses and that was it.  Like everything else that kind
4  of happened was while I was interviewing witnesses.  I
5  think I booked one individual from the incident.  I
6  believe it was Mr. Jackson.
7      Q.   You booked him.  Does that mean you drove him
8  to the station?
9      A.   Yes, sir.
10     Q.   So did you -- so after -- after the scene had
11 stabilized, did you -- you went back to the station?
12     A.   Yes, sir, I brought the -- I booked the one
13 guy on 5th degree assault charges and I think I
14 interviewed him.  I'd have to check my report just to be
15 sure, but that's the best of my recollection without
16 actually reading my report, sir.
17     Q.   Uh-huh.  And then, after you booked him, did
18 you dictate a police report?
19     A.   Yes, sir.
20     Q.   And that would have been at the station?
21     A.   Yes, sir.
22     Q.   And at this point in time, you had not learned
23 of the severity of Mr. Khottavongsa's injuries; correct?
24     A.   Yes, sir.
25              (Whereupon, Exhibit 8 was marked.)

Page 179

1  BY MR. RISSMAN:
2      Q.   Officer Salvosa, you've been handed what's
3  been marked as Exhibit 8, Brooklyn Ctr 0045 through 0046.
4      A.   Yes, sir.
5      Q.   What -- do you know what this document is?
6      A.   Yes, sir.
7      Q.   What does it appear to be?
8      A.   It's the Use of Force Policy, Administrative
9  Review, sir.
10     Q.   Okay.  Do you see under 301 -- 301.4,
11 "Review"?
12     A.   Yes, sir.
13     Q.   It says, "The investigative commander will
14 conduct an administrative review when use of force by a
15 member results in great bodily harm or death to another"?
16     A.   Yes.
17     Q.   At this point in time, when you're writing
18 your police report, did you believe that there would be --
19 well, I'll back up one.
20          So if there is -- it's deemed there's great
21 bodily harm or death to another, there's an automatic
22 review; correct?
23     A.   Yes, sir.
24     Q.   At the time when you were writing your police
25 report, did you believe there would be an automatic review

Page 180

1  because Mr. Khottavongsa had suffered great bodily harm?
2      A.   No, sir.
3      Q.   And in your understanding of the Use of Force
4  policies, is -- is there an automatic administrative
5  review any time force is used?
6      A.   There's not an administrative review, sir.
7  There's the supervisor, Sergeant's review, Use of Force
8  reports.
9      Q.   They would review your report of resistance?
10     A.   And my -- my regular main report, sir.
11     Q.   And your main report?
12     A.   Yes, sir.
13     Q.   Okay.  And have you -- have you tasered --
14 prior to tasering Mr. Khottavongsa in the line of duty,
15 have you tasered other people?
16     A.   Yes, sir.
17     Q.   And was there -- there wasn't any kind of
18 administrative review for those actions, were there?
19     A.   No, sir.
20     Q.   But your Sergeant would have reviewed those
21 incidents?
22     A.   Yes, sir.
23     Q.   And you said he would have looked at the
24 Report of Resistance and your report.  Would there -- in
25 the instances you remember when you tasered someone, did

Page 181

1  they pull your squad car videos?
2      A.   They generally don't for Use of Force reports.
3  They -- they review -- so they review the main report,
4  they review the Use of Force report and they review the
5  video, or at least they're supposed to -- I don't want to
6  say supposed to, but that's part of reviewing it.
7      Q.   They check it against the video?
8      A.   Depends.  You'd have to ask them specifically
9  what they're required to do or not.  I know sometimes they
10 will review the video.  I don't know if that's a
11 requirement they do every time, sir.
12     Q.   Sometimes they do, sometimes they don't?
13     A.   I don't know.  I -- I've never been part of
14 that process, sir.
15     Q.   You don't know one way or the other?
16     A.   Yes, sir.
17     Q.   Okay.
18              (Whereupon, Exhibit 9 was marked.)
19 BY MR. RISSMAN:
20     Q.   Officer Salvosa, you've been handed what's
21 been marked as Exhibit 9.
22     A.   Yes, sir.
23     Q.   Do you know what this document is?
24     A.   Yes, sir.
25     Q.   What is this?

Page 182

1      A.   It's the Brooklyn Center policy on report
2  preparation, sir.
3      Q.   Okay.  And the first part, it says, "Purpose
4  and scope:  The report preparation is a major part of each
5  employee's job.  The purpose of the report is to document
6  information to refresh employee's memory and to provide
7  sufficient information for follow-up investigations and
8  successful prosecution."
9      A.   Yes, sir.
10     Q.   "Our report writing is the subject of
11  substantial formalized on-the-job training."
12          The last one; you would get on-the-job -- you
13  will get formalized and on-the-job training about report
14  preparation?
15     A.   Sorry, sir?
16     Q.   Did you -- did you get that type of training
17  that's described in this policy?
18     A.   Yes, sir.
19     Q.   What -- what did the training consist of?
20     A.   There was a report writing class as part of
21  the skills portion and, obviously, through field training,
22  on-the-job training, you would get evaluated.  You would
23  write reports and your field trainer would obviously
24  evaluate them during the probationary training period,
25  sir.

Page 183

1      Q.   And they would be reviewing them for how
2  accurately you describe the events?
3      A.   Yes, sir.
4      Q.   Okay.  If you look at the Report Preparation,
5  it says, "Employee should ensure that their reports are
6  sufficient for their purpose and reasonably free of errors
7  prior to submission."
8          Do you see that?
9      A.   Yes, sir.
10     Q.   And then, skipping a couple paragraphs down,
11  "All reports shall accurately reflect the identify of the
12  persons involved.  All pertinent information seen, heard
13  or assimilated by any other sense, and any actions taken."
14          Do you see that?
15     A.   Yes, sir.
16     Q.   And it says, "Employees shall not suppress
17  conceal or distort the fact of any reported incidents nor
18  shall any employee make a false report orally or in
19  writing."
20          Do you see that?
21     A.   Yes, sir.
22     Q.   If you want to pull up Exhibit 3.  Exhibit 3
23  is the -- is your police report.  I guess it's the whole
24  incident report?
25     A.   Yes, sir.

Page 184

1      Q.   Do you see that?
2      A.   Yes, sir.
3      Q.   Can you flip to Brooklyn Ctr 5033?
4      A.   Yes, sir.
5      Q.   Is that -- that is your main report?
6      A.   Yes, sir.
7      Q.   Now, you -- I believe you said you dictated
8  that evening but it has an entered date time of 7/1/2015.
9  Is that -- is that when you're dictation was transcribed?
10     A.   I would assume so, yes, sir.  I don't know.  I
11  assume that's when.
12     Q.   Okay.  You didn't write this report on
13  July 1st, 2015; right?
14     A.   No, sir.
15     Q.   And does this appear to be a true and accurate
16  transcription of your dictation?
17     A.   As far as I know, sir, yes.
18     Q.   If you go -- fourth paragraph, do you see --
19  do you see that?
20     A.   Yes, sir.
21     Q.   Okay.  So you just described how you tasered
22  him the first time in the paragraph prior and then you
23  say, "I then ordered everyone else around him to get down
24  on the ground as other squads arrived and we began taking
25  individuals into custody.  The individual that I tasered

Page 185

1  was identified as Sinthanouxay Khottavongsa, date of birth
2  01/58.  Sinthanouxay --" working on my pronunciation of
3  that.  "When he did fall down, I noted that he had
4  clutched the object in his right hand across his chest and
5  while appeared to be a sword, it was actually a crowbar
6  that was reflecting in the light."
7          Everything I've read, so far, sound accurate?
8      A.   Yes, sir.
9      Q.   "I note it had an orange handle and was
10  approximately 2 and a half feet long.  I immediately
11  ordered him to drop it and he would not.  I, then, used my
12  foot to kind of roll him over to his stomach and he began
13  to push back.  He then attempted to get up and fearing
14  that he would still use the crowbar again, I pulled the
15  trigger on the taser and he was shocked for another 5
16  seconds."
17          Do you see that?
18     A.   Yes, sir.
19     Q.   The last portion I read, is that a true and
20  accurate statement?
21     A.   It's what I wrote, sir.
22     Q.   Well, is it -- is it true?
23     A.   At the time that I wrote it, yes, sir.
24     Q.   Sitting here today, do you believe that to be
25  a true statement?  I'll ask it a different way.

Page 186

1          Sitting here today, do you believe it to be an
2  accurate statement?
3      A.   After watching the video, obviously, some
4  parts aren't as accurate as it was.
5      Q.   And that would be the part where you said
6  that, "He attempted to get up, and fearing that he would
7  still use the crowbar again, I pulled the trigger on the
8  taser."
9           Is that the part you would view as inaccurate?
10     A.   I think that he got tased and then I used my
11 foot to roll him over is the part I was looking at.
12     Q.   Okay.  So that part, so you had the order
13 wrong on that part?
14     A.   Yes.
15     Q.   Okay.  Did he still have the crowbar in his
16 hand when you -- when you tasered him the second time?
17     A.   I don't believe so, sir.
18     Q.   Okay.  So if he didn't have the crowbar again,
19 why did you fear that he would still use the crowbar again
20 when he attempted to get up?
21     A.   I, obviously, made an error when I wrote the
22 report, sir.
23     Q.   Is today the first time that you were aware of
24 this error?
25     A.   Yes, sir.

Page 187

1      Q.   You never sought to write a corrected report?
2      A.   No, sir.  Well, they had this sealed for the
3  longest time and it didn't actually get reviewed until
4  months later and I was never told anything different, so I
5  didn't know.
6      Q.   At the time that you wrote this report, it was
7  a couple of hours after the incident?
8      A.   Yes, sir.
9      Q.   The events still have been fresh in your mind?
10     A.   Yes, sir.
11     Q.   And did you forget at the time that
12 Officer Turner removed the crowbar from him?
13     A.   I don't remember, sir.
14     Q.   Did you forget that he says, "Cover me, I'm
15 going to go up and grab it?"
16     A.   I don't recall that at the time, sir.
17     Q.   Did you forget that you threw the crowbar?
18     A.   I know that the crowbar got taken away, yes,
19 sir.
20     Q.   But when you wrote your report, did you forget
21 that fact?
22     A.   I probably just made an error, sir.
23     Q.   Would you agree that this is a material error?
24     A.   Can you define "material," sir?
25     Q.   Well, you are supposed to justify the use of

Page 188

1  your force; correct?
2      A.   Yes, sir.
3      Q.   And your justification for your use of force
4  is that you feared someone would still use a crowbar;
5  correct?
6      A.   Yes, sir.
7      Q.   But he did not have the crowbar; correct?
8      A.   Yes, sir.
9      Q.   So the justification for use of force is not
10 accurate; is that correct?
11     A.   The way it's written, yes, sir.
12     Q.   Were you concerned at the time that your
13 justification for tasering Mr. Khottavongsa a second time
14 was insufficient?
15     A.   No, sir.
16     Q.   Did you intentionally misrepresent that
17 Mr. Khottavongsa had a crowbar in his hand when you
18 tasered him -- when he was tasered the second time?
19     A.   No, sir.  I wrote this report, obviously, as I
20 remembered.  I didn't obviously watch the video when I
21 wrote it, so -- it was not an intentional error.
22     Q.   Put that aside.
23          Did you get any help writing your police
24 report?
25     A.   This report, sir?

Page 189

1      Q.   Correct.
2      A.   No, sir.
3      Q.   Or I should say dictating your police report?
4      A.   No, sir.
5      Q.   I actually have a tape of your dictation.  I
6  guess I can't mark it as an exhibit, but it's a very long
7  file name, ASAL1500_2-arrest_case_number BC15-000179.DS2.
8  This was produced, I believe, by -- I'm not sure if it was
9  the defendant or Hennepin County.  Playing the Salvosa
10 dictation police report.
11          (Audio playing.)
12 BY MR. RISSMAN:
13     Q.   I'm going to stop it there.
14          Do you recognize this to be the sound of your
15 voice?
16     A.   Yes, sir.
17     Q.   This appears to be a -- no reason to doubt,
18 this is the dictation of your police report?
19     A.   Yes, sir.
20     Q.   Skip ahead.  If you take a look in the written
21 part of your police report, the paragraph we just read, in
22 the middle there it says, "I noted that it had an orange
23 handle and was approximately 2 and a half feet long."
24          Do you see that?  Last paragraph from the
25 bottom.

ALAN SALVOSA - 03/30/2017        Pages 190..193

Page 190

1     A.   Yes, sir.
2     Q.   Got that?  So starting at 3:01.
3          (Audio playing.)
4  BY MR. RISSMAN:
5     Q.   In the clip I just played you, did you hear
6  another voice there?
7     A.   Yes.
8     Q.   Do you know whose voice that was?
9     A.   I don't recall.
10    Q.   And you originally say -- I believe you say
11 "it's six feet long" and then you correct yourself and it
12 sounds like you're starting to say "4 feet long" and then
13 someone says "2 and-a-half feet long"?
14    A.   Yes, sir.
15    Q.   Did you hear that?
16    A.   Yes, sir.
17    Q.   Do you have any idea why that person would be
18 assisting you in your police report?
19    A.   Sometimes we don't really have space.  We all
20 have kind of a community room where we do all our reports
21 and a lot of times there will be someone else beside you
22 working on a different report or something.  I'm sure he
23 was just doing something and happened to hear me dictate
24 it and made a minor correction or just --
25    Q.   So sometimes you collaborate in writing police

Page 191

1  reports?
2     A.   No, we don't collaborate, no.
3     Q.   Just if you hear something that doesn't sound
4  right, someone else might correct you or something?
5     A.   Correct.  Or make a suggestion?
6     Q.   Uh-huh.
7     A.   Ultimately, it's my word that gets recorded
8  and obviously, I have the option to erase or edit it
9  before submission, so --
10    Q.   Sure.  When you were at the police station,
11 did you discuss the incident with anyone at that time?
12    A.   I may have.  I don't recall specifically.
13    Q.   Was Cadet Nochez with you at that point?
14    A.   I don't recall.  It's been almost three years
15 now, sir.  I'm sure he was with me, but I don't know
16 specifically if he was in there when I was writing the
17 report.
18    Q.   Do you recall having a discussion with
19 Cadet Jose Nochez about the incidents in the evidence
20 room?
21    A.   I'm sure we had a discussion.  I don't recall
22 what, if it's part of mentoring, to have discussions about
23 calls and things.
24    Q.   So you would have debriefed him on what
25 occurred?

Page 192

1     A.   I don't know about debrief.  Had a discussion,
2  maybe, sir.
3     Q.   Discussion?
4     A.   Yes, sir.
5     Q.   Do you recall what you talked about?
6     A.   Not specifically, no, sir.  Probably about the
7  incident, in general, but as to the specifics, it's been
8  three years.
9          MR. RISSMAN:  Can we take a five-minute
10 break?
11         THE WITNESS:  Yes, sir.
12         (Whereupon, a recess was taken
13         from 3:29 p.m. to 3:38 p.m.)
14         (Whereupon, Exhibit 10 was marked.)
15 BY MR. RISSMAN:
16    Q.   Officer Salvosa, you've been handed what's
17 been marked as Exhibit 10.
18    A.   Yes, sir.
19    Q.   Have you ever seen this document before?
20    A.   Yes, sir.
21    Q.   It says, "Defendant Alan Salvosa, Defendant's
22 Supplemental Answers to Interrogatories, supplement
23 Number 1."
24         Do you see that?
25    A.   Yes, sir.

Page 193

1     Q.   Do you know what an interrogatory is?
2     A.   A little bit.
3     Q.   It's essentially a question and an answer, and
4  the answer is -- is given under oath.
5     A.   Yes, sir.
6     Q.   And do you see that on the second page that
7  you -- is that your signature?
8     A.   Yes, sir.
9     Q.   And you see that it was notarized?
10    A.   Yes, sir.
11    Q.   And signed on January 4th, 2017 or that is
12 what it was dated?
13    A.   30th of December, 2016.  Sorry, it was dated
14 January 4th of 2017.
15         MR. HIVELEY:  That's when I signed it.
16         MR. RISSMAN:  That's when you signed it,
17 got it.
18 BY MR. RISSMAN:
19    Q.   You -- you signed it on December 30th.  Okay.
20 That's fine.  It doesn't matter.
21         The interrogatory in this case is; "Identify
22 each person with whom you had communications related to
23 this incident, including the date of the communication and
24 the nature and medium of the communication and the content
25 of the communication."

ALAN SALVOSA - 03/30/2017      Pages 194..197

Page 194

1          And your answer is; "I do not recall specific
2  conversations that I had regarding the incident.
3  Generally I had discussions about the incidents that are
4  documented in the video, my report and the statement that
5  I gave to Hennepin County.  Later during that night of the
6  incident, someone contacted the department to advise
7  Mr. Khottavongsa's condition had turned critical.
8  Officer Nordby was away from the station at the time, was
9  contacted to return to the station."
10         Given your testimony that you had a
11 conversation with Cadet Nochez about the incident, does
12 this appear to be an accurate statement?
13     A.   I don't recall specifically.  I know we had
14 conversation.  I don't recall specific conversations about
15 the incident with him.
16     Q.   You don't recall that you had a conversation
17 or you don't recall what you talked about?
18     A.   We talked about a lot of things.  This is
19 three years ago, so I don't recall specifically.  I mean,
20 he was in the car with me and he witnessed everything.
21 So --
22              (Discussion off the record.)
23 BY MR. RISSMAN:
24     Q.   So do you recall having a conversation with
25 Cadet Nochez that evening?

Page 195

1      A.   Sure, we were riding together.  I don't
2  specifically recall if we had a conversation about this.
3  It's been three years, so -- it could be possibly.  I
4  don't recall.  I don't even recall what time he left that
5  night, to be honest with you, so --
6           I know we probably talked about things like
7  inventory and stuff and things like that, but I don't know
8  if we discussed the particulars of this case.
9      Q.   You can put that the one aside.
10          Then did you head out, after you dictated your
11 police report that evening and booked one of the
12 individuals to jail, did you head back out in your police
13 car?
14     A.   I don't recall.  I -- I would assume so or --
15 it's been three years, so -- I probably did at some point.
16     Q.   Do you recall, at one point in the evening,
17 you learned of Mr. Khottavongsa's critical condition?
18     A.   Yes.
19     Q.   When was that?
20     A.   Sometime before my shift ended.
21     Q.   And you said you were working until midnight
22 that night; right?
23     A.   Yes, sir.
24     Q.   I'm going to show you this.  It's not a lot to
25 see, but this is the Salvosa Exhibit 6, and then 22:23:39.

Page 196

1          So at this point, you appear to be in the
2  police station?
3      A.   Yes, sir.
4      Q.   Okay.
5              (Video audio playing.)
6  BY MR. RISSMAN:
7      Q.   Stop it at 22:24:40.
8           Do you know -- can you hear the sound of your
9  own voice?
10     A.   A little bit, yes, sir.
11     Q.   And the sound of someone else's voice?
12     A.   Yes, sir.
13     Q.   Whose voice is that?
14     A.   It sounds like Cadet Nochez.
15     Q.   And is he right in the passenger side of the
16 vehicle?
17     A.   I believe so, yes, sir.
18              (Audio playing.)
19 BY MR. RISSMAN:
20     Q.   Okay.  Would you say, "Coleman didn't seem
21 pissed; did he"?
22     A.   I did say that, yes.
23              (Audio playing.)
24 BY MR. RISSMAN:
25     Q.   So Cadet Nochez asked -- you say, "I'm just

Page 197

1  worried --" strike that.
2           So you say, "I'm just worried, the dude may be
3  pissed because I don't know."
4           Did you hear that?
5      A.   Yes, sir.
6      Q.   And then Cadet Nochez asked, "Because you
7  tased someone?"
8           Did you hear that?
9      A.   Yes, sir.
10     Q.   And you said, "I don't know.  I'm freaking out
11 after -- I'm freaking out about using force after my --"
12 and then it appears to cut off; is that correct?
13     A.   Yes, sir.
14     Q.   Did you turn your audio off at that point?
15     A.   I don't recall.  Obviously, the recording
16 stopped or it didn't pick it up.  I don't know, sir.
17     Q.   Well the recording does appear to end; does it
18 not?
19     A.   Yeah, probably shut the camera off.  It was
20 probably on because I was in the jail with the suspect
21 and, obviously, as I was leaving the jail, there was no
22 longer a suspect, there was no reason to record any more
23 conversation.
24     Q.   But would you have manually shut that off?
25     A.   Yes, sir.

Page 198

1    Q.   Do you recall what -- so you said, "I'm
2  freaking out about my use of force after my --" do you
3  know what the rest of that sentence would have been?
4    A.   It probably would have been after my incident
5  in December.
6    Q.   Is that the officer-involved shooting?
7    A.   Yes, sir.
8    Q.   Did being involved in that -- can you just
9  briefly describe to me what happened there?
10   A.   In the officer-involved shooting sir?
11   Q.   Yes.
12   A.   Maple Grove had a homicide at a rest stop.
13  The suspect vehicle fled and came into Brooklyn Center.
14  Myself and a Hennepin County deputy located the vehicle
15  and we had attempted to stop it.  We got into a chase.
16  Suspect vehicle crashed.  The guy came at us with a knife
17  and we shot and killed him.
18   Q.   Did you fire your weapon at him?
19   A.   Yes, sir.
20   Q.   And other people did, as well?
21   A.   Just me and the deputy, sir.
22   Q.   And was there an investigation?
23   A.   Yes, sir.
24   Q.   Okay.  And did they take your statements?
25   A.   Yes, sir.

Page 199

1    Q.   And did they -- was there any video involved
2  there?
3    A.   Yes, sir.
4    Q.   Dash cam video?
5    A.   Yes, sir.
6    Q.   So they reviewed your dash cam videos?
7    A.   Yes, sir.
8    Q.   And I assume there was multiple documents
9  created?
10   A.   Yes, sir, went to a Grand Jury.
11   Q.   Went to a Grand Jury?
12   A.   Yes, sir.
13   Q.   Okay.  And what did the Grand Jury find there?
14   A.   They did not.
15   Q.   Did you testify in front of the Grand Jury?
16   A.   Yes, sir.
17   Q.   Did you find that to be a nerve racking
18  experience?
19   A.   Yes, sir.
20   Q.   Were there witnesses interviewed in that case?
21   A.   Yes sir.
22   Q.   Were you concerned that the Grand Jury would
23  charge you?
24   A.   I guess you're always concerned with a Jury.
25  You never know until they finally just make the decision,

Page 200

1  you never know, sir, so --
2    Q.   Okay.  So you had some firsthand familiarity
3  with an officer-involved death investigation; is that
4  correct?
5    A.   Yes, sir.
6    Q.   So you were leaving the station at -- this
7  tape ended at 22:24:56?
8    A.   Yes, sir.
9    Q.   And then after that, you would have found out
10  about Mr. Khottavongsa's condition; is that correct?
11   A.   Yes, sir, sometime.
12   Q.   Okay.  And once you learned that he was --
13  well, what did you learn, that he was -- his injuries were
14  critical?
15   A.   Yes, sir.
16   Q.   And that -- were you advised that he very
17  likely could die?
18   A.   I was told that he was not in good condition
19  but they didn't say much other than he's in critical
20  condition.
21   Q.   Did -- did they inform you that the - -the
22  Hennepin County Sheriff's Office would be conducting an
23  investigation at that point?
24   A.   Yes, sir.
25   Q.   And you learned that there would be -- I

Page 201

1  assume -- and you knew what that meant from your prior
2  experience with the officer-involved shooting?
3    A.   Yes, sir.
4    Q.   So some days later, you gave a statement?
5    A.   Yes, sir.
6    Q.   Did you watch any videos to prepare for that
7  statement?
8    A.   I don't know.
9    Q.   Or did you watch it in advance?
10   A.   I don't recall if I watched them before or
11  after I gave a statement.
12   Q.   But you knew, based on your prior experience,
13  that certainly others would be watching all of the videos?
14   A.   Yes, sir, at least some of it.
15   Q.   Anything that captured the events that took
16  place?
17   A.   Yes, sir.
18   Q.   And you saw that Officer Turner's dash cam
19  video, we saw that today, it captures Mr. Khottavongsa
20  getting tasered a second time?
21   A.   Yes, sir.
22   Q.   It appears I only have one copy of this
23  statement, Jason, so sorry about that.
24          (Whereupon, Exhibit 11 was marked.)
25  BY MR. RISSMAN:

Page 202

1       Q.    Off Officer Salvosa you've been handed what's
2   been marked as Exhibit 11?
3       A.    Yes, sir.
4       Q.    Do you recognize this document?
5       A.    Yes, sir.
6       Q.    What does this document appear to be?
7       A.    It appears to be a transcript of my statement
8   with Detective Chelmo and Nelson.
9       Q.    Okay.  And you were -- you were represented by
10  counsel at the time?
11      A.    Yes, sir.
12      Q.    And that was -- who were you represented by?
13      A.    Paul Rogosheske, sir.
14      Q.    Did you have a meeting with him prior to
15  making this statement?
16      A.    Yes, sir.
17      Q.    Did you have more than one meeting?
18      A.    I don't recall, sir.  I'm sure one or two.
19      Q.    And -- maybe I already introduced this as an
20  exhibit?
21      A.    Yeah, I think -- if you go to --
22      Q.    Yeah, you jogged my memory.  Let's look at
23  Exhibit 4, and we'll just strike Exhibit 11 or something.
24            So we went through this already and you were
25  -- you were telling the truth when you made this

Page 203

1   statement?
2       A.    Yes, sir.
3       Q.    Okay.  And -- if you go to page 407
4   Brooklyn Ctr 0031; do you see that?
5       A.    Yes, sir.
6       Q.    Do you see what follow-up commands or actions
7   did you take after this?
8       A.    Yes.
9       Q.    And answer:  "When he fell back -- when he
10  fell he was still clutching the weapon in his right hand
11  across his chest.  I was then able to observe that it
12  appeared to be a crowbar with a large handle.  I gave him
13  several commands to drop it and he did not.  He began
14  looking at me and my partners, removed the crowbar and he
15  began to sit up.  I ordered him to get back down and
16  warned him that I would tase him again if he got up."
17            Does this appear to be a true and accurate
18  statement.
19      A.    Yes, sir.  At the time I made it, yes, sir.
20      Q.    And so you would agree this statement
21  conflicts with your police report as to whether
22  Mr. Khottavongsa was holding a crowbar the second time he
23  was tasered?
24      A.    Yes, sir.
25      Q.    So let me see if -- tell me if I get this

Page 204

1   timeline correct.
2            You filled out your police report, or you
3   dictated your police report, you learned that
4   Mr. Khottavongsa's injuries were critical; correct?
5       A.    Yes.
6       Q.    You knew at that time that there would be an
7   investigation; correct?
8       A.    Yes, sir.
9       Q.    And you knew -- and you knew what that
10  entailed?
11      A.    Yes, sir.
12      Q.    And then you gave a statement a few days
13  later; is that correct?
14      A.    Yes, sir.
15      Q.    You can put that one aside.
16      A.    Yes.
17            (Whereupon, Exhibit 11 was re-marked.)
18  BY MR. RISSMAN:
19      Q.    Officer Salvosa, you've been handed what's
20  been marked as Exhibit 11.
21      A.    Yes, sir.
22      Q.    Brooklyn Ctr 0313 through Brooklyn Ctr 0411.
23            Do you see that?
24      A.    Yes, sir.
25      Q.    Okay.  Do you know what this document is?

Page 205

1       A.    Yes, sir.
2       Q.    What does it appear to be?
3       A.    This appears to be my 2015 to 2016 yearly
4   evaluation, sir.
5       Q.    And in addition to that, if you flip through,
6   it appears to be a number of evaluations from different
7   years?
8       A.    Oh.  Yes, sir.
9       Q.    Would this be your -- you would call this your
10  employee file?
11      A.    Yes, sir.
12      Q.    Start from the back.
13            Would you go to Brooklyn Ctr 0382, there's an
14  employee disciplinary notice.  It's for you and it was
15  dated 10/4/2011.
16            Do you see that?
17      A.    Yes, sir.
18      Q.    And I guess this was a getting involved in a
19  preventable motor vehicle accident?
20      A.    Yes, sir.
21      Q.    Do you recall the circumstances of this
22  accident?
23      A.    I struck a pile of concrete in a parking lot.
24      Q.    Okay.  Do you recall whether or not you were
25  responding to an emergency?

Page 206

1      A.   I don't believe I was.
2      Q.   Why do you believe that?
3      A.   Just -- I remember the incident.  I was just
4  leaving the parking lot and there was some concrete on the
5  ground that I didn't see, and I hit it.
6      Q.   Okay.  If you go to the page before, that,
7  Brooklyn Ctr 0381.
8      A.   Uh-huh.
9      Q.   There's another employee disciplinary notice,
10 Preventable Motor Vehicle Accident.
11     A.   Uh-huh.
12     Q.   And there's actually three accidents listed
13 here:  One on September 9th, 2010, one on August 18, 2011,
14 and one on December 4th, 2011.
15          Do you see that?
16     A.   Yes, sir.
17     Q.   And one of them is the one we just discussed
18 where you struck a pile of concrete?
19     A.   Yes, sir.
20     Q.   And is there a fourth one?  It says you
21 rear-ended another vehicle while it was stopped.
22     A.   Yes, sir.
23     Q.   Do you recall that incident?
24     A.   Yes, sir.
25     Q.   What were the circumstances of that?

Page 207

1      A.   I rear-ended another vehicle.
2      Q.   Do you recall if that was -- you were
3  responding to an emergency situation at the time?
4      A.   I was not, sir.
5      Q.   How about the first incident?  It just says,
6  "Involved in a city-owned vehicle deemed preventable."
7          Do you recall that one?
8      A.   I believe so.
9      Q.   What were the circumstances of that accident?
10     A.   I was backing out of our jail.  I had an
11 unruly suspect, and I wasn't paying attention, and I
12 backed into another vehicle.
13     Q.   How were you -- were you attempting to -- was
14 he handcuffed in the back seat?
15     A.   Yes.
16     Q.   Did you have to do some kind of driving
17 training or something?
18     A.   Yep, in the "conditions," it says I had to
19 complete an experienced driver online course.
20     Q.   If you go to Brooklyn Ctr 0343.  I guess the
21 page prior, 0342, there's some performance evaluation
22 summary, it's on January of 2013.
23     Q.   I'm sorry.  Would that have been for 2012?
24     A.   I'd have to take a look, but it would have

Page 208

1  covered 2012 to 2013, sir.  So 2012.
2      Q.   Yeah?  Do you see in the middle of the
3  supervisor's comments, it says, "I did note there were
4  previous concerns about his reports, which I did see some
5  problems initially.  In addition to correcting the
6  reports, I did note it appears he was rushing through
7  reports."
8          Did you see that?
9      A.   Yeah.
10     Q.   And then, the next page 0343, do you see where
11 it says, "Al did receive a verbal reprimand this past year
12 due to leaving a PBT on the hood of a squad and driving
13 off while it's still -- with it still there."
14     A.   Yes, sir.
15     Q.   Do you recall that?
16     A.   Yes.
17     Q.   What was the circumstances of that?
18     A.   It got left on the hood and I drove off with
19 it.
20     Q.   Is that in response to an emergency?
21     A.   I don't recall, sir.
22     Q.   Do you know whether you put your sirens on?
23     A.   I don't recall, sir.
24     Q.   All right.  If you go to Brooklyn Ctr 0317,
25 under, "Communication."

Page 209

1          Do you see Number 2?
2      A.   Yes, sir.
3      Q.   It starts off, "This area is good for Al."
4  Skipping a few sentences down, it says, "As mentioned in
5  the last evaluation, at times Al can be stressed in his
6  ability to communicate.  He is aware of this and works
7  very hard."
8          Do you see that?
9      A.   Yes, sir.
10     Q.   January 16, 205, that incident, would you
11 agree that's a stressful situation?
12     A.   Yes, sir.
13     Q.   Okay.  You can put that one away.
14          Were you in the military?
15     A.   Yes, sir.
16     Q.   Which division?
17     A.   U.S. Army, sir.
18     Q.   Did you serve in Iraq?
19     A.   Yes, sir.
20     Q.   When were you there?
21     A.   03/04 and 05/06.
22     Q.   Were you involved in combat?
23     A.   Yes, sir.
24     Q.   Were you involved in any kind of fire fights?
25     A.   Yes, sir.

ALAN SALVOSA - 03/30/2017          Pages 210..213

Page 210

1      Q.   Did you ever -- do you recall whether you ever
2  killed anyone in action?
3      A.   Not to my --
4            MR. HIVELEY:  I'm going to object.  If
5  there's anything that has any level of -- if there's
6  any -- if there's any clearance issues, you're going to
7  have to tell me about it so we can decide whether to say
8  anything, but if there's any missions or mission-related
9  things, you're not going to talk about that.
10           MR. RISSMAN:  Sure.  No, not that
11 specific.  Just some basic questions.
12           THE WITNESS:  Yes, sir.
13 BY MR. RISSMAN:
14     Q.   And I'm sorry, what was the answer?
15     A.   What was the question, sir?
16     Q.   The question was, do you -- do you know --
17 well, did you ever kill anyone in action?
18     A.   Not that I'm aware of, sir.
19     Q.   And were you finishing the military in '06?
20     A.   '07, sir.
21     Q.   '07?  You suffered from Post-Traumatic Stress
22 Disorder?
23     A.   No, sir.
24     Q.   Flashbacks?  Have you suffered from
25 flashbacks?

Page 211

1      A.   On occasion, sure.
2      Q.   Have you sought treatment for that?
3      A.   Sure.
4      Q.   Is the Brooklyn Center Police Department -- do
5  you know if they're aware of that treatment?
6      A.   Sure.  To my knowledge, yes.  They did a
7  background check.  I saw --
8      Q.   I'm sorry?
9      A.   I also saw someone after my shooting, so --
10     Q.   Okay.  A psychologist?
11     A.   Sure.
12     Q.   After the -- was it the Mar incident?
13     A.   Yes.
14     Q.   Did you see someone similar after this
15 incident?
16     A.   I think I just saw the same person again,
17 just --
18     Q.   I'm not going to ask about anything you talked
19 about.
20     A.   Okay.
21     Q.   Was that multiple sessions or just one?
22     A.   A couple, two or three.
23     Q.   Were you instructed, after you -- so going
24 back to the night in question, you were -- you learned
25 that had Mr. Khottavongsa's injuries were critical.

Page 212

1            Were you called into the station at that
2  point?
3      A.   Yes, I believe so.
4      Q.   What did you do next?
5      A.   I think they contacted my union rep.  I met
6  with, I think, Detective Nelson, and they asked if I would
7  consent to a blood or urine draw.  We did that.
8      Q.   Okay.  What else did you and Detective Nelson
9  discuss, if anything?
10     A.   I think that was it.  It was, basically, doing
11 the blood draw, is the last thing I remember.
12     Q.   Did you meet with anybody else that night?
13     A.   Not that I recall.
14     Q.   Was the union representative, was that -- do
15 you know if that was a lawyer?
16     A.   Yes.  It would have been Mr. Rogosheske.
17     Q.   That's Rogosheske?
18     A.   Yes.
19     Q.   Other than Mr. Rogosheske, did anyone instruct
20 you not to communicate with other officers about the
21 incident?
22     A.   Probably Sergeant Coleman.
23     Q.   Sergeant Coleman?
24     A.   They just said it was a critical incident and,
25 kind of, those rules apply.

Page 213

1      Q.   Is that standard procedure?
2      A.   Sure.
3      Q.   And did you talk to any other officers after
4  that point about the incident?
5      A.   Not that I recall.  No, sir.
6      Q.   Do you recall sending any e-mails about the
7  incident?
8      A.   To my attorney.
9      Q.   Other than your attorney?
10     A.   Not that I recall.
11     Q.   Text messages?
12     A.   No.  No, text messages.
13     Q.   Squad IMs?
14     A.   Not that I recall.
15     Q.   Can you pull up Exhibit 4?
16           If you go to the Brooklyn Ctr 0033, the second
17 question down says:  "Have you had a chance to review your
18 dictated report?"
19           Answer:  "Yes, I did, on January 23rd, 2015."
20           Do you see that?
21     A.   Yes, sir.
22     Q.   Did you notice that your report was inaccurate
23 as to the -- as to whether Mr. Khottavongsa was holding
24 the crowbar in his hand and before you tasered him the
25 second time when you reviewed this dictated report?

Page 214

```
1        A.   I did not.  I did not catch it at that time.
2        Q.   If you did catch it, do you think that should
3  have been something you noted in this statement?
4        A.   Yes.
5        Q.   I guess the answers are -- two questions down,
6  I guess that answered my question.  You mentioned your
7  squad car was equipped with audio and video recording
8  capabilities.
9             "Have you reviewed any of videos prior to this
10 interview?
11            You said:  "No, I have not."
12       Does that sound accurate to you?
13       A.   Yes.  Had I reviewed it, I probably would have
14 caught the mistake, but at the time I wrote it, it's to
15 the best of my knowledge, so --
16       Q.   Okay.  Are you aware of anything else in your
17 police report that is inaccurate?
18       A.   Not at this time.
19       Q.   Do you -- with this knowledge that your police
20 report is inaccurate, do you plan to write a supplemental
21 report?
22       A.   I'll have to talk to my supervisors about it
23 or my attorney and see what the best course of action is.
24            MR. RISSMAN:  Jason's shaking his head
25 no.
```

Page 215

```
1             MR. HIVELEY:  You don't write a
2  supplemental report two years after the event.
3             MR. RISSMAN:  All right.  Subject to any
4  redirect, I don't have any further questions.
5             MR. HIVELEY:  I have no questions.
6  We'll read and sign.
7             (The deposition of Alan Salvosa
8              concluded at approximately 4:18 p.m.)
9             *  *  *  *  *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 216

```
1                      CERTIFICATE
2
3        I, Barbara J. Carey, a Registered Professional
   Reporter and Notary Public for Anoka County, Minnesota
4  hereby certify that I reported the Deposition of Alan
   Salvosa, on the 30th day of March, 2017, in Minneapolis,
5  Minnesota, and that the witness was by me first duly sworn
   to tell the whole truth;
6
        That the testimony was transcribed under my
7  direction and is a true record of the testimony of the
   witness;
8
        That I am not a relative or employee or
9  attorney or counsel of any of the parties or a relative or
   employee of such attorney or counsel;
10
        That I am not financially interested in the
11 action and have no contract with the parties, attorneys,
   or persons with an interest in the action that affects or
12 has a substantial tendency to affect my impartiality;
13      That the right to read and sign the deposition
   by the witness was not waived;
14
        IN WITNESS WHEREOF, I have hereunto set my
15 hand this 10th day of April, 2017.
16
17
                          _____
18                        Barbara J. Carey
                          Registered Professional Reporter
19                        Notary Public
20
21
22
23
24
25
```

Page 217

```
1              - - - - -
                 E R R A T A
2              - - - - -
3  PAGE  LINE  CHANGE
4  ____ ____  _____
       REASON: _____
5  ____ ____  _____
6          REASON: _____
   ____ ____  _____
7          REASON: _____
8  ____ ____  _____
9          REASON: _____
10 ____ ____  _____
11         REASON: _____
   ____ ____  _____
12         REASON: _____
13 ____ ____  _____
14         REASON: _____
   ____ ____  _____
15         REASON: _____
16 ____ ____  _____
17         REASON: _____
18 ____ ____  _____
19         REASON: _____
   ____ ____  _____
20         REASON: _____
21 ____ ____  _____
22         REASON: _____
23 ____ ____  _____
24         REASON: _____
25
```

```
                                          Page 218
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3          I,_____, do

 4   hereby certify that I have read the foregoing pages, and

 5   that the same is a correct transcription of the answers

 6   given by me to the questions therein propounded, except

 7   for the corrections or changes in form or substance, if

 8   any, noted in the attached Errata Sheet.

 9

10   _____

11   ALAN SALVOSA                    DATE

12

13

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 20____.

17   My commission expires:_____

18

19   _____

            Notary Public

20

21

22

23

24

25
```

**-**

**-the**
  200:21

**0**

**0028**
  48:19

**0031**
  203:4

**0033**
  49:11 50:13 213:16

**0045**
  179:3

**0046**
  179:3

**00981**
  16:12

**01/58**
  185:2

**03/04**
  209:21

**0313**
  204:22

**0317**
  208:24

**0342**
  207:21

**0343**
  207:20 208:10

**0381**
  206:7

**0382**
  205:13

**0411**
  204:22

**0435**
  28:8

**0437**
  28:8

**05/06**
  209:21

**06**
  210:19

**07**
  210:20,21

**1**

**1**
  16:9,12 48:19 66:15
  174:10 192:23

**10**
  43:11 48:9 58:18 59:1
  70:15,19 74:24 77:19,
  143:22 192:14,17

**10/4/2011**
  205:15

**100**
  127:14

**10029**
  16:24

**10211**
  16:13

**11**
  201:24 202:2,23 204:17,
  20

**11:07**
  82:11

**11:24**
  82:11

**12:08**
  109:3

**12th**
  28:16

**15**
  10:9 24:11 77:19,22

**15th**
  27:10

**16**
  26:23 209:10

**17**
  96:20 97:12

**18**
  113:3 206:13

**19**
  142:19

**190**
  10:17

**1:03**
  109:3

**1st**
  184:13

**2**

**2**
  28:1,4 185:10 189:23
  190:13 209:1

**2010**
  12:4 206:13

**2011**
  206:13,14

**2012**
  207:24 208:1

**2013**
  207:22 208:1

**2015**
  10:9 184:13 205:3
  213:19

**2016**
  27:11 28:16 48:7 193:13
  205:3

**2017**
  193:11,14

**205**
  209:10

**21:12**
  112:4

**21:14:09**
  86:17

**21:15**
  38:14

**21:15:21**
  86:20

**21:16:06**
  87:21 96:18

**21:16:07**
  87:8

**21:16:13**
  90:12 92:9

**21:16:23**

91:15 92:2,16,23 93:6

**21:16:24**
  91:14

**21:16:26**
  93:7,9,15

**21:16:28**
  94:2

**21:16:29**
  93:15

**21:16:30**
  94:15

**21:16:31**
  94:15 101:14

**21:16:32**
  116:6

**21:17:01**
  142:21

**21:17:21**
  162:8

**21:18:15**
  142:24 157:13

**21:19:39**
  157:16

**21:29:34**
  172:6

**21:30:36**
  174:15

**21:35:35**
  175:8

**21:35:45**
  176:10

**21:35:57**
  175:21

**22:23:39**
  195:25

**22:24:40**
  196:7

**22:24:56**
  200:7

**23rd**
  213:19

**25-foot**
  19:25

**25-story**
19:10

**26th**
48:7 58:13

**2:27**
161:25

**2:39**
161:25

---

**3**

**3**
35:2,5 183:22

**3/16/2012**
30:13

**301**
179:10

**301.4**
179:10

**30th**
193:13,19

**32**
10:12,14,18

**33**
10:11,12

**35**
10:5

**3:01**
190:2

**3:29**
192:13

**3:38**
192:13

---

**4**

**4**
26:21,22 28:19 47:21,24
190:12 202:23 213:15

**4/12/2016**
30:10

**4/7**
28:19

**4/7/2015**
28:22 30:9

**4/9/2015**
28:22

**407**
203:3

**45**
134:9

**45-degree**
72:15,16 134:23

**4:18**
215:8

**4th**
193:11, 206:14

---

**5**

**5**
51:16,19 136:18,21
185:15

**5-foot-8**
10:15

**50**
11:18

**5030**
35:5

**5033**
184:3

**5045**
35:12

**5046**
35:12,22

**5048**
36:24

**5050**
37:22

**5052**
38:12 39:23

**55th**
46:18

**57th**
88:6,8,16,24

**5999**
111:18

**5th**
178:13

---

**6**

**6**
84:15,18 86:16 172:5
174:15 195:25

**60**
11:18

**6004**
111:18

---

**7**

**7**
48:19 111:13,16

**7/1/2015**
184:8

---

**8**

**8**
110:5 178:25 179:3

**8-degree**
110:5

---

**9**

**9**
181:18,21

**90-degree**
73:14

**911**
34:19 35:13,22 36:1,4
37:6,13 38:25 39:3,7,10,
13,17,23 40:13

**9:12**
38:10

**9:14**
38:11

**9:17:21**
162:3

**9:19**
16:8

**9:21**
16:8

**9:30:37**
173:7

**9:30:38**
173:4

**9:45**
31:18

**9:52**
31:18

**9th**
206:13

---

**A**

**A-l-a-n**
6:17

**a.m.**
16:8 31:18 82:11

**ability**
49:8 126:25 144:23,25
209:6

**able**
14:20,21,22 15:8,10 22:7
41:18 139:8,10 141:11
152:15 160:2 203:11

**absent**
154:18

**absolute**
128:7

**Absolutely**
20:2 86:1

**access**
158:17

**accessing**
161:6

**accident**
205:19,22 206:10 207:9

**accidents**
206:12

**account**
22:20 136:3 139:14,18

**accurate**
51:1,23 86:22 103:4
175:5 176:6 184:15
185:7,20 186:2,4 188:10
194:12 203:17 214:12

**accurately**
35:20 183:2,11

**ache**
107:17 159:5

**aches**
108:5,8

**acknowledge**
34:2

**acknowledgment**
151:21

**acting**
12:18,21,22

**action**
168:11 210:2,17 214:23

**actions**
15:8 127:3 128:19
180:18 183:13 203:6

**active**
56:3, 62:18

**actively**
45:13,19,21

**actual**
12:25 107:13 150:23

**add**
49:21 168:12

**addition**
30:9 208:5

**additional**
117:9 126:6 174:2

**address**
34:3 105:5 121:15

**addressing**
124:4 148:10

**administered**
6:5

**administrative**
179:8,14 180:4,6,18

**advance**
201:9

**advice**
86:10,11 174:2

**advise**
194:6

**advised**
200:16

**affect**

**14:25 18:10**

**African**
36:11

**African-american**
36:6 100:25

**age**
14:12

**aggressive**
67:6,9, 99:10

**aggressively**
99:20

**aggressor**
34:14 96:6

**ago**
34:21 42:15,16 194:19

**agree**
140:1 146:14,22 154:20
166:17 187:23 203:20
209:11

**ahead**
189:20

**aid**
106:9

**aiming**
74:16 75:20

**air**
82:21

**aired**
89:10

**AI**
208:11 209:3,5

**Alan**
6:9,15 192:21 215:7

**alcohol**
113:19

**alcohol/drugs**
113:8

**allowed**
41:19

**altered**
151:16

**ambulance**
23:20 155:13,15,17,21
156:3 158:25 159:3,5

**amount**
139:20

**analysis**
14:25 160:3

**analyze**
58:15

**and-a-half**
190:13

**angle**
72:15,16 73:14 82:5
109:14,19 110:5,25
111:7 118:13 134:10,23

**angry**
171:19

**ankles**
166:21

**announces**
119:10

**annoyed**
171:19

**annual**
15:15

**answer**
7:6,10,17, 17:21 48:23
49:7,25 50:7,18 153:8
164:14 193:3,4 194:1
203:9 210:14 213:19

**answered**
167:9,14 214:6

**answers**
192:22 214:5

**anybody**
8:13 9:21,25 41:4 44:25
62:11 63:18,21 75:11
81:7,18,20 99:19 102:14
106:1 114:23 115:3,4,12,
16,23 122:10 166:14
212:12

**anyone's**
106:5 171:1

**apart**
98:16 116:7

**apologize**
82:8 151:11

**appear**
38:2 43:25 86:21 102:24

**103:6 110:12 114:15**
119:5 120:24 133:16
140:22,25 143:7,8,25
158:6,8 162:4,17 163:1,
24 166:6 177:10 179:7
184:15 194:12 196:1
197:17 202:6 203:17
205:2

**appeared**
67:24 69:12 74:9 114:6
135:7 163:19 173:21
185:5 203:12

**appears**
29:6 37:16 48:4 101:17
111:21 116:8 163:3
164:1 189:17 197:12
201:22 202:7 205:3,
208:6

**application**
23:2,3

**applications**
22:14

**apply**
212:25

**approach**
75:22 100:6 146:10,19
150:12 151:16 162:15
164:6

**approached**
60:14 132:19 136:6

**approaching**
43:13 62:19 97:8 98:19
100:11

**appropriate**
168:23,24 177:8

**approximate**
41:14

**approximately**
32:5 53:6 54:3,9 79:8
97:4 102:7 138:20,21
142:3 185:10 189:23
215:8

**April**
28:16

**area**
32:22 52:9 53:24 209:3

**aren't**
127:21 145:8 151:25

186:4

**arm**
82:21 140:24 141:2

**arm's**
121:3

**armed**
7:25 103:17

**arms**
59:19 135:13

**Army**
209:17

**arrest**
113:4 124:17 142:4

**arresting**
124:10

**arrival**
36:19 56:13

**arrive**
39:25 57:22 105:13

**arrived**
36:15 43:25 45:3 56:20
57:19 70:5 117:10
121:20 184:24

**arriving**
40:25 43:23 46:17
121:21

**arts**
42:14

**ASAL1500_2-
ARREST_CASE_
NUMBER**
189:7

**Asian**
36:11 114:6

**aside**
31:14 59:10 113:21
188:22 195:9 204:15

**asked**
49:19 64:9 167:8,13
196:25 212:6

**asking**
21:8 27:4 39:3 58:22
74:8 76:14 78:17 129:8
136:14 138:3 144:8,9
159:20,21 164:19
167:11,12 168:3

**ass**
36:10 94:20

**assault**
169:3,24 170:8,14
178:13

**assaulting**
169:25 170:14

**assess**
25:3 77:15 97:16,19
106:17 147:5 152:21
155:22 156:5 157:12
158:14 159:6 160:1

**assessed**
160:7

**assessing**
136:1 146:25 156:2
159:25 160:10,12,16,18,
23,24 161:14

**assessment**
58:4 106:1 161:4

**assigned**
12:21

**assimilated**
183:13

**assist**
139:8,10

**assisting**
190:18

**associate's**
11:20

**assume**
7:21 31:13 32:18 60:14
70:3 73:11 119:19
127:18 130:19 131:3,4,9,
12 151:1,2 152:3 171:7
184:10,11 195:14 199:8
201:1

**assumed**
156:4

**assuming**
74:17

**assumption**
74:20 130:1

**attached**
122:7,14

**attacking**

55:4 104:13

**attempt**
131:6

**attempted**
50:20 185:13 186:6,20
198:15

**attempting**
207:13

**attending**
29:21

**attention**
62:16 64:14,17 69:16
78:6 100:16 103:15
162:8 207:11

**attorney**
6:19 7:8 8:5,6,14 9:3,13
86:8,12 173:23 213:8,9
214:23

**audio**
50:15 84:24 85:5,11
86:18 87:6,17 88:6 90:8
91:12,25 92:6,14,19
93:3,12 94:4,13 95:1
101:12 142:22 157:14
162:12 171:22,23 172:7,
19 173:5,8 174:16 175:7,
9,19 189:11 190:3 196:5,
18,23 197:14 214:7

**August**
206:13

**automatic**
179:21,25 180:4

**automatically**
119:19

**available**
134:20 139:15

**avoid**
22:14 139:6

**aware**
9:11 13:19 14:15 49:1
56:19 58:18 155:1,2
186:23 209:6 210:18
211:5 214:16

---

**B**

---

**back**
24:1 26:8,22 32:13 43:18

47:4 50:21 56:9,24 57:5
59:14 66:22 67:8 72:12
84:10 90:19 92:18
100:10 102:12 103:20
109:5,9,12,20,21,23
110:1,3,4,16,22 111:11
117:22 118:13 125:2
126:8 134:9,16,17,22
138:14 141:10 143:5
144:1,2 154:14 163:2
164:11 170:15 173:18
174:23 176:9 178:11
179:19 185:13 195:12
203:9,15 205:12 207:14
211:24

**backed**
62:17 207:12

**background**
162:9 211:7

**backing**
55:11,14 67:18 80:19,22,
23,25 81:1 98:18 100:7
137:3 207:10

**backup**
105:19

**backward**
110:18,23 111:1 143:16

**backwards**
82:20

**bad**
76:9 170:20,23,25 171:1,
2,9, 172:12

**ballpark**
11:7

**bandage**
14:19

**bar**
120:12

**baseball**
37:9,10,13,20

**based**
20:14 55:15 58:3 74:20
90:16 118:21 160:25
201:12

**bashed**
80:4,9

**basic**
23:21 106:19 210:11

**basically**
17:2,10 24:18 25:2,5,12,
13 60:2 70:24 71:12 88:7
89:18 97:25 98:17
111:11 117:13 119:3
212:10

**Bass**
43:11

**bat**
33:9,10 34:17 36:21
37:9,20,24 87:3

**Bates**
16:14

**bathroom**
31:16 108:23

**baton**
42:1,2

**bats**
37:11,13

**battery**
146:1

**BC15-000179.DS2.**
189:7

**beach**
19:23

**bearings**
140:20

**beating**
36:11 90:3

**began**
118:20 184:24 185:12
203:13,15

**beginning**
93:10

**belief**
40:22 153:10

**believe**
9:22 10:3 12:13 13:10
24:8 26:25 29:22 31:7
32:11,17 33:1 35:19
40:15,21 47:9 62:17
64:12,20 66:2 69:3 70:6
71:9 73:8 78:15 81:3,6,
13 82:23 83:20 85:2
86:24 89:21 90:16,21
91:15 92:23,25 93:9
95:19 97:7 99:16 103:9

104:17,21 106:19,21
114:20 117:19 119:11
121:1,4 130:13 131:2,24
132:18 134:1 136:17,23
138:16,23 141:13,18
142:8 148:16,22 150:14
151:7,13 156:23 157:20,
24 160:5,15,16 162:19,
23 165:4,9 167:19,25
169:3,20 176:22 177:3
178:6 179:18,25 184:7
185:24 186:1,17 189:8
190:10 196:17 206:1,2
207:8 212:3

**believed**
46:10 159:21

**belt**
42:24,25 43:2 166:23

**bench**
11:5,8

**best**
7:6 18:2 47:18 49:7,24
51:8 58:5 79:18 111:10
135:21 138:25 139:19
147:1 148:14 153:20
156:2 159:17 171:12
172:3 214:15,23

**better**
18:4 58:12,25 85:15 94:1
135:20 155:9,13

**big**
45:13 63:23 117:4 163:5

**bigger**
86:15 177:14

**biggest**
57:14 96:6 123:15,16
127:2 128:9,11,12,18

**birth**
185:1

**bit**
34:8 45:12 53:19 72:3
74:23 76:5 81:25 91:1
100:8 167:24 177:9
193:2 196:10

**blade**
79:16,22

**bleeding**
141:3

**blocked**
46:24,25 98:23

**blocks**
32:8 88:9,20 89:7

**blood**
212:7,11

**bodily**
179:15,21 180:1

**body**
15:7 22:4,6 65:9 67:12
84:9 100:2 102:24
107:20 118:8 128:2,20
130:7 133:11 160:19
174:7

**booked**
178:5,7,12,17 195:11

**boots**
91:9,10

**born**
26:7,8

**bottom**
16:14 37:6 38:16 50:13
103:3 189:25

**Boulevard**
88:7,16,17

**box**
113:2

**boxed**
55:23 58:1

**braced**
134:10

**brake**
59:25 60:11

**brawl**
45:24 56:18

**break**
7:15,16,17 31:15,16 84:9
87:15 97:22 98:10
108:25 161:22 169:21
174:22 175:2 176:20
192:10

**breakdown**
9:3

**breaking**
84:5 98:16

**breaks**
174:18 176:1

**brief**
113:13

**briefly**
198:9

**bring**
36:9 171:24

**broke**
96:4

**broken**
127:12 141:3

**Brooklyn**
11:2,25 13:11,16 16:12,
13,24 25:16 28:8 35:5
36:24 48:19 49:11 88:7,
16,17 111:18 179:3
182:1 184:3 198:13
203:4 204:22 205:13
206:7 207:20 208:24
211:4 213:16

**brought**
178:12

**brown**
42:25

**bruise**
108:9

**build**
129:21

**building**
19:10 20:1

**bunch**
14:7 99:1 125:11 133:2,
24 143:23

**burning**
106:15

**business**
33:1 34:3

**businesses**
32:24 44:5 46:6

**button**
86:3

---

**C**

---

**cadet**

8:20,21 41:5,9 90:2
191:13,19 194:11,25
196:14,25 197:6

**call**
23:20 34:1,3,5 35:13,22
37:16,19 38:3,4,14
39:22,23 41:9 83:8
155:25 156:2 159:4
205:9

**called**
6:10 27:17 158:25 159:3
212:1

**caller**
36:2,5 37:8,15 38:19,24
39:2,6,8,12 40:5

**calls**
31:8 38:2 40:13 154:6
191:23

**calm**
155:21 156:1

**calmed**
141:22

**cam**
84:25 86:22,25 101:8
199:4,6 201:18

**camera**
197:19

**can't**
15:6 18:13 20:15 75:20
95:5,11 96:3 105:4
107:12 108:11 127:18
129:10 139:11 151:4
153:8 177:5 189:6

**capabilities**
50:15 214:8

**capable**
113:15 145:2

**capture**
50:16

**captured**
201:15

**captures**
201:19

**car**
12:24 13:2 40:9 47:6,19,
20 50:14,16,20 51:9,10
53:1,5 55:10,14,25 56:7,

9,10 58:1 59:23 60:3,13
61:8 62:18 68:20,21,22,
24 69:2 75:14,15 78:24
87:10 96:15 97:8 160:6
181:1 194:20 195:13
214:7

**care**
23:21 24:6 152:23 155:9,
10,11,12 158:20 160:4

**carpet**
20:16

**carry**
41:22,23

**cars**
44:14 148:7 161:8

**cartridge**
94:9 141:13,20 142:9

**case**
6:21 10:9 19:5 34:20
58:16,20 70:25 86:7
107:10 117:14 151:15
154:16 193:21 195:8
199:20

**cases**
155:20

**cast**
14:19

**catch**
22:7 54:23 103:6 143:7,8
177:2 214:1,2

**catchall**
49:19

**catches**
64:17

**caught**
33:16 64:14 69:17
173:10 214:14

**cause**
19:2 22:10

**caused**
22:11

**CD**
84:20

**cement**
69:4 118:9 162:3

**center**

11:2,25 13:11, 25:16
50:19 52:2 55:16 182:1
198:13 211:4

**centered**
142:7

**certain**
162:6 177:19

**certainly**
157:5 201:13

**certainty**
139:14

**certifications**
15:16

**certified**
15:15

**chair**
89:14

**chance**
50:1 71:2 141:21 213:17

**change**
127:23 161:12 170:17

**changed**
150:12 161:9

**changes**
13:5 161:7

**chaos**
97:20 98:8

**chaotic**
69:9 136:8

**charge**
107:6 122:4 144:24
169:1 177:12,19 199:23

**charged**
127:13

**charges**
168:23,24 177:8 178:13

**chase**
55:25 56:10 198:15

**check**
142:15 178:14 211:7

**checked**
113:6,7

**Chelmo**
48:5 202:8

**chest**
82:20 120:1,2,6,13 185:4
203:11

**chief**
8:17

**choice**
18:18 146:6

**choose**
18:23 119:20

**chose**
71:11

**chosen**
17:4 18:18

**chucked**
98:25

**circumstance**
20:20 22:17

**circumstances**
17:5 104:12 168:5,14
170:9,16 171:14 177:17
205:21 206:25 207:9
208:17

**city-owned**
207:6

**clarification**
167:24

**clarify**
109:8

**class**
27:16 29:8 30:15 182:20

**clear**
97:15 151:25

**clear-cut**
169:24

**clearance**
210:6

**clip**
148:15 160:17 162:21
173:4 175:7 190:5

**close**
62:6 72:7 74:10 76:21
79:4,8 83:2,4,18 88:15
89:5 90:4 98:24 120:20
122:11 154:1,2 156:9

**closed**
74:24 134:4

**closer**
50:19 62:15 88:5 90:6
114:2

**closest**
73:22 153:23,24

**clutched**
119:25 185:4

**clutching**
203:10

**CO2**
94:9

**Cody**
88:6

**coin**
32:6,21,24 44:22,25
61:17 62:23 63:1 66:4,6,
7,12 67:21,22 69:14,15
72:2 75:14 77:8 80:12
91:18,23 92:5 114:21
115:7,13,16,21,22

**Coleman**
12:12,20 111:22 121:20
168:22 170:1 171:15
175:17,18 176:22 177:3,
4,7,11 196:20 212:22,23

**Coleman's**
169:4

**collaborate**
190:25 191:2

**combat**
209:22

**come**
14:1 21:16 26:4,22
46:19,20 47:1,5 56:6
74:25 85:14, 88:24,25
123:24,25 140:20
145:12,14

**comfortable**
124:10 176:2,14

**coming**
32:3 46:16,21,22,25
55:11 87:18 88:13,25
103:18 119:3

**command**
27:1 30:12 62:20 64:10,
13,21 66:23 70:22 78:2,
3,7 79:2,7 81:3,8 92:2,9,
12,24 95:13 96:8,22

97:12 100:11,16,19
124:21 149:12 150:14,20

**commander**
179:13

**commands**
24:13 62:5,16 67:2,6
70:11,13 77:25 81:12
83:9 90:21 92:22 93:5
95:14,16,20 96:4 99:5
113:16 114:8,10 117:9
119:13,16 121:13 125:1,
23 129:17,23 130:1
145:21 151:19 152:4
203:6,13

**comment**
34:18

**comments**
177:2 208:3

**common**
21:14

**commotion**
56:15 90:6 95:10

**communicate**
25:13 131:6,20 132:9
209:6 212:20

**communicated**
164:23

**communicating**
27:8 147:11

**communication**
121:25 147:20 193:23,
24, 208:25

**communications**
193:22

**community**
190:20

**comparing**
19:18

**Competencies**
28:19

**Competency**
29:4,10 30:9

**complete**
207:19

**completely**
109:12 110:22

**compliance**
108:11,20 125:24 140:14

**compliant**
127:18 160:22

**complied**
127:25 149:12

**comply**
71:2,12, 83:15 117:11
125:25 126:9 127:21
128:2,4,5,21 129:12,15
130:4,7 135:25

**complying**
70:21 105:15 129:1,10,
13 142:7 149:21

**computer**
33:20

**conceal**
183:17

**concern**
57:14 59:3 60:24 72:5
102:16 103:21 124:5
144:2 152:10

**concerned**
60:22 74:3,4,6 98:3
103:14 105:23 106:3,4,7
129:25 152:8 171:15
188:12 199:22,24

**concerns**
14:3 208:4

**concluded**
215:8

**concrete**
20:5 52:14,17 137:4,7,10
205:23 206:4,18

**condemned**
145:23 146:6

**condemning**
145:9 146:1,2

**condition**
194:7 195:17 200:10,18,
20

**conditioning**
14:4

**conditions**
207:18

**conduct**

169:18 177:12 179:14

**Conducted**
9:8

**conducting**
200:22

**Conflict**
28:20 29:5,10

**conflicts**
203:21

**confused**
76:16 115:24 131:15
133:16,19

**connect**
81:20,23

**connected**
81:24

**connects**
44:5

**consciousness**
134:2

**Consecutively**
11:14,17

**consent**
212:7

**consider**
13:22 14:11,14 20:17
60:18 107:22 111:3
146:24 170:15

**consideration**
24:3

**considerations**
41:8

**considered**
60:2 110:9

**consist**
15:14 182:19

**consistent**
20:8 131:2

**constant**
125:24 161:4,10

**constantly**
126:4 161:13

**constitute**
170:7

**contact**
63:17 72:6 73:2 81:17
82:3 83:12 84:4,9 120:11
159:10,15 160:9,23

**contacted**
194:6,9 212:5

**contacts**
131:18,19

**content**
193:24

**context**
176:10

**continued**
150:20

**control**
21:19 63:25 103:19,23
104:5,10 106:17 122:8
123:12,15,18 126:22
128:6,7 135:10,23 145:4

**controlled**
126:24 127:4 145:5

**convenience**
33:2

**conversation**
8:7,9 25:6 131:14 132:3
177:7 194:11,14,16,24
195:2 197:23

**conversations**
194:2,14

**cooperative**
105:12

**cop**
74:18 130:6

**cops**
55:20

**copy**
84:20 201:22

**corner**
33:1,17 51:20

**correct**
15:12 17:13 19:7,17
20:1,24 22:7 28:25 30:24
32:25 37:20 38:3 39:25
40:3 41:23 43:20 44:5
49:24 51:5,11,14 52:5,
12,18,21,24 53:9 54:11
55:2 56:7 57:1 59:4

65:13 67:3 68:15 71:5,10
77:22 78:20,22 81:1
82:15,22 84:25 88:2
92:16 93:7,13,15 94:17
95:18 96:11,18 97:9 99:7
100:12 102:8,10 104:3
106:23 107:4 110:19
112:18 113:16 114:8
121:6 124:14 125:15
126:9 130:15 134:2
136:19 137:15 138:12
148:18,21 149:6,9
150:15 152:12 153:18,
21,24 156:21 165:7
168:9 178:23 179:22
188:1,5,7,10 189:1
190:11 191:4,5 197:12
200:4,10 204:1,4,7,13

**corrected**
187:1

**correcting**
208:5

**correction**
190:24

**couldn't**
27:24 46:5 53:20 56:17
70:14 79:19 95:10 101:7
116:24 117:4,5 126:13
132:22 143:5 164:3,10
173:22

**counsel**
202:10

**count**
70:16

**counting**
70:20

**County**
34:25 43:10 48:5 189:9
194:5 198:14 200:22

**couple**
8:11,12,17 10:19 62:15
66:7 68:19 90:1 113:13
121:14 137:22 138:14,17
142:25 172:1 173:18
174:23 183:10 187:7
211:22

**coupled**
84:4

**course**
207:19 214:23

**court**
6:5,25 7:2,13

**cover**
13:4 119:12 187:14

**covered**
208:1

**covering**
63:21

**cowering**
100:8

**CPR**
106:14

**crap**
90:3

**crashed**
198:16

**created**
96:1 155:4 199:9

**creating**
135:14

**Creek**
32:3 43:7 89:11,12

**crime**
14:3

**crisis**
27:18,23 31:2

**critical**
194:7 195:17 200:14,19
204:4 211:25 212:24

**cross**
41:1 129:19

**crowbar**
60:23 61:4 63:3,15,19
64:3,5,8,22 65:7,15
67:13,19 68:3,5 69:17,19
70:11 71:3,8,21 72:4
73:3, 74:7,21 75:4,20
76:1,15,18,21 78:20,21
79:20,21,23,25 80:1
81:18,21 82:14 83:6,12
84:2 88:1 89:23 90:5
96:14 97:17 98:4,7,18,
20,22 99:3, 100:12,18
104:13 114:14,19
117:12,13,18,20,25
118:15 119:8,23 120:2,
16 121:4,11 126:3,15

127:8,19,24 128:13
129:2 130:17 132:8
137:25 140:3,5,7,10,11,
17 142:20 162:10 170:6
175:13 176:19 185:5,14
186:7,15,18,19 187:12,
17,18 188:4,7,17 203:12,
14,22 213:24

**crowbars**
99:11 127:20

**crowd**
76:15 77:24

**Ctr**
16:12,13,24 28:8 35:5
36:24 48:19 49:11
111:18 184:3 203:4
204:22 205:13 206:7
207:20 208:24 213:16

**Cub**
36:3

**cuff**
123:4 135:13 141:11

**cuffed**
123:13,17 125:2

**cuffing**
123:1

**cuffs**
127:10 144:19

**Cultural**
28:19 29:4,9 30:8,9

**curb**
91:5,6

**curbs**
55:24

**current**
12:9 107:19

**currently**
11:25 12:5

**custody**
21:24 42:5 70:1 71:19
83:16 103:25 105:12
117:11 121:14,16 123:11
124:14 126:1,17,18
128:17 129:22 132:20
141:8,17,24 142:8,12
144:3,5,6,10,12,22
147:6,7,17,18 148:1,2,10
184:25

ALAN SALVOSA - 03/30/2017                    i9

**cut**
103:3 197:12

---

**D**

**danger**
103:17 144:16

**dangerous**
79:22 80:7 144:18 152:1
167:3,6

**dark**
79:15

**darts**
94:9

**dash**
84:24 86:22,25 101:8
199:4,6 201:18

**date**
28:15 184:8 185:1
193:23

**dated**
193:12,13 205:15

**day**
10:11 11:18 12:19 13:6
30:5

**days**
29:23,24,25 48:9 58:18
59:1 201:4 204:12

**dazed**
23:16

**de-escalating**
83:11

**De-escalation**
30:10

**deadly**
72:9

**deaf**
24:22

**deal**
98:1 132:25

**dealing**
24:19 25:14 27:20 31:1,2
146:10,11,16,17,19

**dealt**
20:13,14 25:15,22 27:18
144:9 146:17

**death**
22:11 48:21 179:15,21
200:3

**debrief**
192:1

**debriefed**
191:24

**December**
193:13,19 198:5 206:14

**decide**
20:19 210:7

**decided**
82:24 166:2 169:17

**deciding**
13:23 139:17

**decision**
57:14,23 58:4,7 139:19,
21,23 159:17 169:8
170:18 171:9,10,11
199:25

**decisions**
20:14 171:13

**deem**
127:7

**deemed**
179:20 207:6

**Deering**
8:20 88:10 89:2 121:20
124:1 141:13 142:9

**Deering's**
10:2

**defend**
170:11

**defendant**
189:9 192:21

**Defendant's**
192:21

**define**
125:19 187:24

**deformed**
141:2

**degree**
11:20 134:10 140:1
169:3,24 170:8,13 176:2,
14 177:11 178:13

**degrees**
110:5

**department**
11:4 12:1 194:6 211:4

**dependent**
147:4

**depending**
15:3 19:7 20:20 22:16
34:5

**depends**
15:1 79:24 80:3 108:5,10
143:20 149:14 150:13
151:17 166:16,19 167:7
181:8

**deployed**
73:17

**deposition**
6:22 8:3,10 163:5 215:7

**deputy**
198:14,21

**describe**
33:14,19 43:3 63:6 69:11
79:19 107:24 183:2
198:9

**described**
51:3,4 59:14 71:20 78:12
103:2 107:23 162:15
170:7 182:17 184:21

**description**
103:4

**descriptions**
36:18

**detained**
70:7 105:14 123:17
128:16

**Detective**
202:8 212:6,8

**deteriorate**
161:13

**determine**
20:12

**detriment**
152:2

**Devices**
9:8

**diagram**
54:4

**dictate**
178:18 190:23

**dictated**
184:7 195:10 204:3
213:18,25

**dictating**
189:3

**dictation**
184:9,16 189:5,10,18

**didn't**
12:23,24 45:20 47:13
49:20 50:15 63:24 70:16
71:4,9 72:8 74:12 81:22
82:3,4,7 83:2 86:5 90:4
94:21 97:11 98:6,25
103:13 104:24 119:16
121:1 124:6,7,8 126:20
129:5,11,12,14 131:24
141:1,2 143:12 145:3,13,
20 146:3,5 149:17 150:7,
18 151:22 152:23
159:10,14 160:1 165:22
170:1,2,7 184:12 186:18
187:3,5 196:20 197:16
200:19 206:5

**die**
19:11 112:18,20 200:17

**died**
112:16

**difference**
80:8

**differences**
19:21

**different**
12:15 17:18 18:9,10 19:7
21:20,21 24:19,24 25:1,
14 27:20 33:24 57:20
84:12 105:22 116:18
127:14 143:22 148:6,24
150:21,22,25 151:18
152:6 153:17 155:11
156:18 164:7,21 185:25
187:4 190:22 205:6

**differently**
72:8 107:11 158:5
170:18

**difficult**

ALAN SALVOSA - 03/30/2017                 i10

31:2 98:13 144:12
160:22

**diffusing**
40:23

**direct**
97:12,24 99:5

**directed**
95:21

**directing**
95:22

**direction**
43:23 75:18

**directly**
96:5,22 102:7 109:23
111:2,3 171:18

**disabilities**
24:23

**disability**
131:20

**disadvantage**
46:13 47:2,5 55:21 57:24
58:2 105:18 125:6,8,9

**disarm**
117:13

**disciplinary**
205:14 206:9

**discomfort**
19:2 157:1

**discretion**
177:21

**discuss**
166:1 191:11 212:9

**discussed**
195:8 206:17

**discussion**
22:25 137:1 165:24
168:22 173:25 174:13
191:18,21 192:1,3
194:22

**discussions**
191:22 194:3

**disengage**
47:7 97:21 98:10 141:15

**disengaged**
62:17 64:13,22 66:9,21

67:15 77:23 95:25 97:14,
15 99:9

**disengages**
77:6

**disengaging**
68:1,2,4

**Disorder**
210:22

**disorderly**
169:17 177:1,12

**disoriented**
133:20,24

**dispatch**
32:20 33:6 36:1,4 37:6,
13 38:25 39:3,7,10,13,17

**dispatchers**
33:22

**dispersed**
100:13

**dissipate**
62:14

**distance**
19:13 21:19 41:14 45:23
63:11 74:24 76:21 81:25
96:1 100:9 110:5 137:21

**distances**
154:3

**distinguish**
46:3 75:20 76:1 80:11

**distort**
183:17

**Disturbed**
30:14

**division**
12:5,7 209:16

**document**
16:16 28:5 35:7 48:1,3
111:20 179:5 181:23
182:5 192:19 202:4,6
204:25

**documented**
194:4

**documents**
9:2 199:8

**doesn't**

17:24 22:20 71:1 75:21
99:17 106:10 107:15
108:8 119:19 130:20,22
131:12,17 135:12 149:21
150:3 151:1,2,3,21 168:7
191:3 193:20

**doing**
15:7,10 64:23 68:10
107:16 119:13 124:3
140:17,18 146:25 147:5
148:12,13,14 165:2
171:5 190:23 212:10

**don't**
7:12,19 10:3 11:9 12:20,
25 13:5,25 17:19 20:12
21:6,9,17,19 22:1 23:23
24:14,18,20,21 25:10
28:21 29:18,25 30:1,21,
23 31:7,12 32:7,17
33:15,25 37:8,12 39:8
40:10,15 42:17 45:2,18
47:3 48:17, 57:18,21
58:10 59:13,24 60:10
62:6,13,22 63:4,16 64:1,
7,20 66:15 67:17 68:19,
22 69:23,24 70:3,17
73:24 74:5 76:1 77:14,20
78:3,6,7 79:3 80:5,11
81:8,23 83:10, 89:14,17
94:22,23,24 95:5,6,8
99:18 103:11,12 104:1,
12,23 105:6,16,19 108:7
109:24 110:2 112:12,20
116:3 118:6 119:19,21
120:22 121:1 123:11,12,
23,24,25 124:2,4 126:5
127:17,20,21 129:7,9,23
130:2,21,22 131:15,18,
21,22 132:1,2,5,11,12
134:15 135:9 136:7,9,11,
13,15 138:14,18 139:4
141:1 142:6,15,18 143:6,
12,20,21 144:7 147:15
148:5,11,23,25 149:2,5
150:24 151:4,7,8,14
152:3,5 153:8,12,15
154:2,21 155:17 157:11
158:13,17,21 159:4,20,
22 161:7 162:6,7,25
164:2,15,19 165:6,14
166:24 167:25 169:8
171:23 172:15,21 173:1,
2,10 176:25 177:15
181:2,5,10,12,13,15

184:10 186:17 187:13,16
190:9,19 191:2,12,14,15,
21 192:1 194:13,14,16,
17,19 195:1,4,7,14
197:3,10,15,16 201:8,10
202:18 206:1 208:21,23
215:1,4

**door**
72:15

**doors**
72:15 94:9

**double-check**
161:9

**doubt**
189:17

**dramatic**
138:15

**draw**
212:7,11

**drawing**
53:6,23 54:5 66:16
103:15

**drawn**
62:4 104:8 139:2

**drive**
44:14 47:1,11 50:21
56:24

**driven**
51:25

**driver**
207:19

**driving**
47:18 51:8 207:16
208:12

**drop**
65:20 66:1,10,24 70:11
78:9,10,20,21,23 79:2
93:10,14 95:17,20 98:7
117:12, 119:13,16
141:18,20 142:9 185:11
203:13

**drop-it**
93:17

**drop-its**
93:15

**dropped**
120:10 129:2 169:14

**drove**
96:15 178:7 208:18

**drugs**
24:20 113:19

**drunk**
160:21

**Drunks**
159:1

**duck**
64:8

**dude**
197:2

**due**
208:12

**duly**
6:2,10

**duty**
7:23,24 155:5 180:14

---

**E**

---

**e-mails**
213:6

**earlier**
87:12 89:22 91:15 96:13
97:7 133:4 136:23
165:10

**earliest**
38:3

**earshot**
67:4 79:10 90:22

**easily**
74:23,25 127:12,13
166:20,22

**east**
43:13 46:21,23 53:25
55:17 57:9,10 68:24 69:4
101:21 110:19 121:15

**east-to-west**
102:9

**easy**
123:14

**edge**
19:10

**edit**
191:8

**EDPS**
27:23

**education**
11:19

**effect**
18:8,21

**effective**
22:4 40:23 110:7,9

**effects**
17:3 18:6,9,17 19:6 20:4

**eight**
36:21,23 45:4,5 67:17

**eight-hour**
30:15

**either**
34:11 112:16 116:19

**elapsed**
142:3

**electric**
107:6

**electrical**
107:13

**electricity**
123:8 156:21

**elevated**
93:22

**eliminate**
141:20

**ellipses**
176:2

**else's**
9:21 102:14 152:3
196:11

**eman**
163:11

**emergency**
31:6 205:25 207:3
208:20

**Emotionally**
30:14

**employee**
183:5,18 205:10,14
206:9

**employee's**
182:5,6

**Employees**
183:16

**en**
38:22 40:25

**encounter**
113:22 131:24 150:11
152:18 155:16

**ended**
116:22,23 155:16 195:20
200:7

**Energy**
9:8

**enforcement**
11:24

**engage**
98:1

**engaged**
57:17

**English**
25:8,16,20,23 26:13,16
114:12 131:15,17,19,25
132:4 148:25 150:3,8,19,
24,25 151:1,3,8,14

**English-as-a-second-
language**
26:10

**enjoy**
171:4

**ensure**
71:18 183:5

**entailed**
204:10

**entered**
184:8

**entire**
58:16,20 70:10

**entirely**
22:2

**entrance**
50:22 53:2 54:10

**environment**
106:17

**equals**
108:16

**equipment**

47:7

**equipped**
50:14 214:7

**erase**
191:8

**error**
186:21,24 187:22,23
188:21

**errors**
183:6

**escalate**
139:21

**escalated**
83:11

**especially**
165:2

**essentially**
42:12 193:3

**established**
96:17,25

**evaluate**
15:5,10 156:3 182:24

**evaluated**
182:22

**evaluating**
161:6

**evaluation**
160:25 161:1,10 205:4
207:21 209:5

**evaluations**
205:6

**evening**
184:8 194:25 195:11,16

**event**
215:2

**events**
9:15 48:12 121:8 183:2
187:9 201:15

**eventually**
70:1 126:10 132:21
147:7

**everybody**
147:24 154:4

**everyone's**
64:17 98:18 102:17

105:10 128:17

**evidence**
191:19

**exact**
138:19

**exactly**
20:15 155:17

**EXAMINATION**
6:12

**example**
19:9,23 20:3,7

**exception**
21:18

**exhaustive**
107:17

**exhibit**
16:9,12 28:1,4 35:2,5
47:21,24 51:16,19 84:15,
18 86:16 111:13,16
172:5 174:15 178:25
179:3 181:18,21 183:22
189:6 192:14,17 195:25
201:24 202:2,20,23
204:17,20 213:15

**exit**
60:12

**exited**
60:13

**exiting**
59:23 60:3

**experience**
40:16 108:12 199:18
201:2,12

**experienced**
146:5 207:19

**expert**
143:21

**expressing**
157:1

**expression**
128:24

**extent**
103:19 129:4

**eye**
47:3 72:6 73:2 83:12
84:4,9

**eyes**
134:3

---

**F**

---

**face**
22:21 114:16,18 131:16
133:10,11

**face-to-face**
47:5

**facial**
128:24

**facilitate**
25:5

**facility**
11:1

**facing**
65:7,15 72:17,19,23
101:21 110:19,23 111:7

**fact**
40:5 52:2 56:20 71:3,7
119:15 127:5 139:14
144:13 156:23 160:20
183:17 187:21

**factor**
128:15

**factors**
13:22 14:1,7 125:3
127:11 138:8 146:24
170:15

**facts**
17:16

**failure**
114:10

**fair**
11:11 47:16 53:13 84:3
87:23

**fake**
159:7

**faking**
159:9,13,19 161:2

**fall**
19:12 21:2,7,15,20,23
23:13,16 101:18 102:22,
25 103:6,13 104:18
111:1 137:15,21,23
143:7,8,21 185:3

**fall-related**
19:16 20:23,25 21:4,5

**falled**
143:22

**fallen**
105:3 108:14 110:23
143:21

**falling**
21:11,17 22:1,7 103:3
137:20 153:21

**falls**
22:9,10 143:12

**false**
183:18

**familiar**
13:16 15:11,20 24:1,2
52:9 60:5

**familiarity**
200:2

**family**
26:15,17

**far**
32:5,9 50:22 66:3 88:22
97:25 170:12 184:17
185:7

**fast**
100:14

**fast-moving**
140:23

**fate**
145:9

**fatigued**
157:5,21 158:3

**fear**
74:21 122:16,18 167:16
186:19

**feared**
102:2 188:4

**fearful**
82:25

**fearing**
185:13 186:6

**feature**
86:3

**February**

10:13

**feel**
15:6 71:4 107:13 124:10
126:18,20 170:18,20,23,
25 171:1,2,9,10, 172:12

**feeling**
107:24

**feelings**
19:4

**feet**
74:24 77:19,22 140:23
185:10 189:23 190:11,
12,13

**fell**
82:19 105:1,23 110:15,
18,23 111:6 117:7
134:16 143:24,25 203:9,
10

**felt**
71:14,17 78:13 108:2

**female**
68:21 69:22

**fences**
55:25

**field**
25:10 182:21,23

**fight**
32:21 36:20 40:23 42:12
53:22 54:1,2,19 59:4
61:6 71:8 78:24 80:20
83:8 88:3 116:21 117:2,4
126:3 127:1 135:12
152:5 155:25 169:21
176:20

**fight's**
78:5

**fighting**
34:16 45:14 55:4,18
59:15 62:14,24 78:8
80:17 97:14,17 116:15
155:25

**fights**
40:16,19 209:24

**figure**
25:3 76:2 84:8 97:16,18
122:1 161:19

**figuring**

170:10

**file**
58:16 189:7 205:10

**files**
58:20

**Filipino**
26:3

**fill**
112:1,10,23

**filled**
112:4,8 204:2

**filmed**
176:3

**final**
76:10 77:11 82:13 84:2,
14 99:18 169:7

**finally**
199:25

**find**
199:13,17

**finding**
50:5

**fine**
15:4 109:1 151:23
193:20

**finish**
7:5 151:10

**finishes**
7:10

**finishing**
210:19

**fire**
198:18 209:24

**firearm**
139:2 163:17,25 164:2

**fired**
93:18 109:10

**firing**
15:17

**first**
6:10 23:6,21 32:1 35:24
38:3,10 39:25 48:20
57:22 61:3,4 62:10,20
64:10,21 65:23 78:21,23
79:1,7 86:4,8,21 87:2,

92:9 95:24 98:1 106:9,
13,16 110:3 130:14
131:6 137:4 144:17,19
146:11,17,20 147:2,3
153:18 169:7 170:5
182:3 184:22 186:23
207:5

**firsthand**
200:2

**fist**
120:4

**fists**
116:24

**five**
36:20,23 45:4,5 70:17,19
105:5 125:9 135:18,22
148:6

**five-minute**
82:9 161:22 192:9

**flashbacks**
210:24,25

**flashlight**
83:21,23

**flat**
110:15

**fled**
46:23 55:8 56:14 198:13

**flee**
55:6,16,17,19,22 56:12
58:1 100:5 144:25

**fleeing**
55:10 56:4 59:7 67:25

**flinch**
68:7

**flip**
35:11 36:23 47:12 50:10
135:12,23 184:3 205:5

**flipped**
136:22

**flipping**
135:3,4 136:2

**flower**
109:15

**fluid**
54:7,20 75:5 77:14 147:3
152:1

**flying**
116:25

**focus**
62:4 63:24 105:10 118:5
126:14

**focused**
61:23 64:4 69:18 97:9
101:3,4 105:2 133:8

**follow**
114:10

**follow-up**
182:7 203:6

**followed**
114:7

**following**
6:1

**follows**
6:11

**Foods**
36:3

**foot**
141:8 152:12 162:17
163:2 164:11,24 185:12
186:11

**force**
9:8,9 13:14,17,20,23
15:21,22 16:25 17:4,11
18:12,13,14,16,18,22
21:12,25 24:2,5 31:11
42:3 71:16 72:9 106:4,6,
24 107:1,2 108:16,18,
111:21,23 112:2 134:20
136:1,18,24 138:7 152:9
169:18 171:3 179:8,14
180:3,5,7 181:2,4 188:1,
3,9 197:11 198:2

**forcefully**
132:19

**foreseeable**
17:3,12,14,23,24,25
18:1,2,17,21 19:6,11,12
20:4 136:24

**forget**
27:17 187:11,14,17,20

**form**
17:16 50:2

**formalized**

**former**
8:21 41:5

**forth**
90:19

**forward**
166:21

**found**
200:9

**four**
28:9 32:7 105:5

**fourth**
50:12 116:8 184:18
206:20

**freaking**
197:10,11 198:2

**free**
48:21 183:6

**fresh**
48:12 58:7 187:9

**Fresher**
58:9

**friends**
105:17

**front**
68:25 72:2,14 80:12
82:25 86:3 91:23 92:4
99:13 111:4 114:21
115:6,13,15,21 199:15

**full**
60:18 63:9

**full-on**
77:7

**fully**
45:8 49:7 114:18

**functioning**
85:3

**further**
23:25 44:8 52:23 61:1
144:22 215:4

**furthest**
53:22,25

**former**
182:11,13

## G

**gaps**
85:9

**gathered**
66:5 72:2

**gathering**
80:18

**gear**
90:17

**gears**
168:18

**general**
9:9 43:22 53:24 62:2
75:18 80:25 124:13
164:25 167:5 192:7

**generally**
22:13,15,16 34:1 52:9
55:5 62:4 68:2 81:1,9
95:23 107:3 127:19
130:9 155:21 181:2
194:3

**geographical**
55:15

**getting**
40:9 60:12 80:9 97:8
98:16 119:2 121:11
122:16, 137:18,21
138:13,23 140:19 143:1
201:20 205:18

**give**
10:19 25:11 32:8 48:21
54:8 66:19,20 71:1,12
73:5 78:7 79:1 87:11
88:9 90:1 92:12,24
96:18,21 97:12 98:6
99:4,5 100:11,16 121:23
125:1 129:23,25 130:7
131:16 145:15, 148:16
165:5

**given**
24:11,25 42:7 50:1 54:16
57:22 66:23 78:1,4
119:13 128:24 138:10
145:17 150:20 155:3
158:24 168:5 170:9
171:13 193:4 194:10

**gives**

72:25

**giving**
34:24 58:6 62:5 66:25
67:2,5 70:10 90:21
119:15 121:13 140:14
151:19 160:4

**glass**
66:8 72:21 75:13 102:3

**glimmer**
79:16

**glimpse**
33:17

**go**
7:3 10:25 15:17 16:5
17:20 22:4,6 26:19
32:11,12 38:8,11,21
49:10 63:18 87:16 88:21
92:18 94:20 119:12
122:20 124:17 129:23
130:5 131:6 143:5 144:1,
16 145:24 147:2 154:14
169:17 171:7 174:11
176:9 184:18 187:15
202:21 203:3 205:13
206:6 207:20 208:24
213:16

**goes**
107:9,15 148:8

**going**
10:6 12:4 16:2 18:25
19:1,2,3 21:7,15 24:1
25:3 34:8 36:9,10 40:2
41:1 45:11,19,21 46:15
55:20 56:14 57:3 59:13
71:17 78:5,24 87:19
89:18 90:19 98:4 100:10
104:1 105:4,17 106:6,15,
16,22,25 108:15 111:1
112:18,20 119:12 122:1
126:14 127:11,18,21
128:2,5,21 129:4,6,15,23
132:2,12,17 133:3,12
135:10 136:16 138:14,21
141:15 143:13 144:25
145:17,21 147:17 148:20
150:15 152:6 155:24
161:5,19 162:2 164:23
165:3,6,23 167:8 170:15
171:22 175:7 176:3,5,9
187:15 189:13 195:24
210:4,6,9 211:18,23

**good**
11:18 45:24 75:21 95:12
108:24 109:22 120:3,7,9
141:14 150:11 161:5,11
200:18 209:3

**Google**
51:20

**gotten**
123:14 125:20 133:17,25
145:6

**grab**
19:1 21:2 119:12 124:7
126:25 135:13 144:23
147:8,15 166:21,23
187:15

**grabbed**
176:19

**grabbing**
21:21 59:20

**Grand**
199:10,11,13,15,22

**grappling**
59:21

**grass**
20:6,15

**great**
19:13 174:4 179:15,20
180:1

**greater**
47:4 110:6 137:21
140:10

**green**
43:2

**Greg**
165:23

**grew**
26:5

**grip**
120:3,8,9

**gripping**
65:10 67:13 120:12

**groan**
156:18 157:9,12 158:15
159:1,2,3,4

**groaned**
157:5,7

**groaning**
118:24 156:13 157:4,10,
18,21,24 158:1,2,11,14,
18,24 159:16,18,19,24
160:2

**groans**
158:5 159:6

**ground**
7:3 20:12,18 21:13,22,24
22:10 64:11 65:16,17
68:9,11,22 69:7,11,13,20
75:15 78:9 81:4,7, 90:10
91:16,20,21 92:3,4,5,24
93:6 95:4,14,16,21 96:10
98:9 99:23,24 100:3
103:16 104:5,7,19,20
117:10,15 118:13 120:18
123:20 125:21 127:8
134:9,17 135:1 138:17
139:3 144:1,2 157:18
184:24 206:5

**group**
45:13 46:3 50:23 51:5
61:12,13 62:2,3 63:23
66:5, 67:8,15,16 72:1
74:14 75:7,12,24 76:20,
21 77:1,6,20 79:10 80:12
95:23,24 96:3,10 97:13,
23 98:4,14,22 100:13

**group's**
97:17

**Grove**
198:12

**guess**
15:8 20:10 21:24 34:9
40:12 57:8 58:10,17 60:7
62:25 63:24 66:8 67:18
74:5 75:9 76:4,15,22
79:6,18,23 80:3,5,11,19
83:10,14 84:3,6,10,13
96:24 105:1 108:11,17
109:22 111:3 115:19,23
118:6 121:3 125:19
137:3 138:13 143:12,20,
23 144:16 145:4 146:12
151:22 154:2 157:9
158:5,21 159:2 160:3
162:7,19 163:8,10,24
167:23 168:3 183:23
189:6 199:24 205:18
207:20 214:5,6

ALAN SALVOSA - 03/30/2017                         i15

**gun**
39:5 41:23 127:14 130:6
166:23

**guy**
39:11 60:25 64:4 69:17,
19 74:7 144:17 163:5
176:3,14,16 178:13
198:16

**guys**
36:6 105:17 123:4

**gym**
10:25

─────────────
H
─────────────

**hadn't**
60:2 133:3 137:24 140:5

**half**
185:10 189:23

**hand**
6:3 63:22 65:13 73:7,9
120:5 185:4 186:16
188:17 203:10 213:24

**hand-to-hand**
42:7

**handcuffed**
128:8 156:10 157:8,9
207:14

**handcuffing**
42:4 156:12

**handcuffs**
42:1,2

**handed**
16:11 28:3 35:4 47:23
51:18 84:17 111:15
179:2 181:20 192:16
202:1 204:19

**handle**
122:13 124:1 164:2,24
185:9 189:23 203:12

**hands**
68:7,13 129:2 131:20
141:9,12 155:7

**hands-on**
122:20

**happen**
145:21

**happened**
100:14 121:8,10 147:19
178:4 190:23 198:9

**happening**
43:18 135:20

**hard**
15:4 46:2 54:4 58:17
63:23 70:8 74:15,16 78:6
80:23 98:14,22 138:12
141:1 147:2 162:5
173:16 174:22 177:5
209:7

**harm**
74:19 76:2,3 104:1
149:25 179:15,21 180:1

**hasn't**
125:4 127:9,10

**hauled**
159:15

**haven't**
105:14 123:12,13 125:11
128:10,16

**He'd**
123:14 149:21

**he's**
72:16,20,23 75:6 76:20
77:1 83:8,9 88:8,9,18,20,
22,24,25 96:2,4,5 97:17,
23,24 98:17 99:6,8,10,
11,20 100:3,17 102:8,9,
12 103:22 104:6,7,12
105:3 109:19 110:25
111:1,3,4 120:9,11
123:15 125:5 126:21,22
127:1,2,4,5,8,10,18
128:11,14,18 131:19
135:1,2 136:21 137:9
140:13 156:20 159:23
160:20,21,22 161:2,3,10
163:11 164:1 166:17
200:19

**head**
7:22 11:9 14:20 23:11,18
28:21 30:7 61:22 63:21
68:14,16 73:12 79:9
80:4,9 83:5 103:10,14
104:22 132:6 134:5
143:4,10,13,19 153:9,21
195:10,12 214:24

**health**

28:10,18 30:11

**hear**
46:5 65:24 67:5 79:4
82:7 87:2,14 88:6 90:2,
17 92:9,11 93:21,25
94:5,11,19,21 95:3,6
120:15,18 149:1,5
157:17 172:9,21 173:15,
22 174:20,22,25 175:11,
14,22 190:5,15,23 191:3
196:8 197:4,8

**heard**
15:24 89:2 91:16 123:24
132:11,15 148:24 149:4
150:2 157:25 159:15
165:4,11,13 173:11,14,
17,21 176:7 183:12

**hearing**
94:23 149:2,3 161:15

**held**
145:24

**help**
27:21 41:19 170:12
173:15 174:19 188:23

**Hennepin**
8:24 34:25 48:5 189:9
194:5 198:14 200:22

**hi**
36:2

**high**
24:22 160:21

**higher**
20:5 155:14

**highway**
106:10,11

**hindsight**
170:21 172:13

**hit**
15:4,5 82:4,22 86:2 98:4
103:9 104:19,20,21
115:12,18 116:19,20
120:18 143:4,10,13,19
206:5

**hitting**
37:23 95:4 153:21

**Hiveley**
7:8 11:14 17:15,20 22:23
29:15 35:16 37:2 85:19

86:9 109:1 133:4 154:6
158:8 161:23 164:13
167:8,12 174:1,11
193:15 210:4 215:1,5

**hold**
17:15 145:25 147:17

**holding**
65:8 73:9 79:14 99:3
117:18 120:4,6,9 124:16
203:22 213:23

**Holiday**
36:3

**homeboys**
36:9

**homicide**
198:12

**honest**
195:5

**hood**
208:12,18

**hook**
147:9

**hope**
41:21 84:11 135:12
171:6

**hours**
29:9,10 187:7

**house**
106:15,16

**hurt**
19:1,3 21:15 135:18
159:25

**hurts**
108:1 129:22 159:24

**Hut**
32:22,23 36:3 43:20
44:1,23 52:24 61:16,20,
21 77:3 116:22,23 117:1

─────────────
I
─────────────

**I'd**
14:20 15:9 30:25 60:21
133:19,23 142:15,17
151:20 154:21 159:22,
24,25 177:23 178:14
207:25

ALAN SALVOSA - 03/30/2017                                        i16

**I'll**
6:4 7:6 17:15,18 38:21
40:12 59:13 86:8 101:11
116:17 127:21 153:17
154:6 157:13 164:21
169:14 172:17 179:19
185:25 214:22

**I'm**
9:11 10:6 12:22 20:13,14
21:8,16 24:8,14 25:3
27:4 29:2 30:6 39:3
41:23 44:22 47:20 51:10
55:23 57:8,25 58:18,22
59:13 61:17 62:9,23
65:12 74:5,8,12,17 76:8,
16 77:15 78:4,5,16,17
86:5 101:3 105:2,12,18
106:4,7 115:14,19,23
118:5,14 119:12,20
124:4 125:6 129:8,23
130:2 132:11 136:14
138:3 143:20 144:8,9
145:17 146:5,7,9 147:17
148:14,16 152:6 158:16
159:21 161:5 162:2
163:21 167:8,11 168:3
171:22 175:7 176:2,9,13
187:14 189:8,13 190:22
191:15,21 195:24 196:25
197:2,10,11 198:1
202:18 207:24 210:4,14,
18 211:8,18

**I've**
15:23,24 28:7 58:1,14,
15,16,20 91:18 92:4
103:24 105:11 106:12
146:3 157:6,8,11 181:13
185:7

**ice**
21:1

**idea**
15:23 16:2 88:12 146:7
190:17

**ideally**
21:15 57:16 124:25

**identified**
185:1

**identify**
64:18 68:17 183:11
193:21

**identity**

34:12

**ignore**
119:20

**ignoring**
119:18

**ill**
27:2,5 113:7, 130:15,19,
20

**illness**
130:22

**illuminate**
45:8,14

**immediacy**
168:12

**immediate**
71:5 127:7 129:21
167:20,22,23 168:1,5

**immediately**
61:23 65:20 71:9 102:15
112:10,12 115:7 142:1
185:10

**immobilize**
104:9

**immobilized**
136:21

**impact**
79:18 80:2 109:25

**impaired**
113:7,15

**implies**
146:7

**imply**
120:8

**important**
7:12 49:21

**impossible**
106:25

**impression**
113:11

**IMS**
213:13

**in-between**
77:9,18,19 117:21,24
121:8,10

**in-car**
174:8

**inaccurate**
186:9 213:22 214:17,20

**Inaudible**
39:6

**incapacitate**
135:22

**inches**
137:22 138:14,17

**incident**
9:4,9 10:7,8, 12:11 13:8
14:6 28:25 29:5 31:20,24
36:19 40:18 48:10 49:15
50:17 58:12 59:1 71:19
81:18 84:25 112:6,7,11,
13 113:24 168:6 178:5
183:24 187:7 191:11
192:7 193:23 194:2,6,11,
15 198:4 206:3,23 207:5
209:10 211:12,15
212:21,24 213:4,7

**incidents**
20:13 180:21 183:17
191:19 194:3

**include**
26:24 27:1 31:10

**including**
121:22 193:23

**inconvenience**
136:18

**Inconvenient**
136:20

**increase**
138:15 146:12

**increased**
23:3 137:6 138:10,13

**increases**
137:13 146:20

**indicate**
39:21 40:7 54:17 114:11
128:3,21 156:16 158:11

**indicated**
73:12 129:3 156:17
157:10

**indicating**
47:12 62:24 63:8 65:6,

11,14,19 68:10 72:16,19
73:13,15 75:8 88:19
89:1,13 99:21 100:1,4
109:15,19 111:7 120:1

**indication**
128:1 140:14 141:3

**individual**
63:24 73:20 76:17 178:5
184:25

**individual's**
108:10

**individuals**
24:12 114:24 115:4,5
184:25 195:12

**inflict**
146:3

**influence**
27:19 113:8,19

**inform**
200:21

**information**
36:14 39:23 40:8 58:20
150:4,7,10,11 151:15
159:23 182:6,7 183:12

**informed**
36:14,17,18

**initial**
70:21 77:10 81:3 95:13
96:8,9 137:23

**initially**
63:5 77:2 125:22 144:15
169:1 208:5

**initiate**
142:4

**initiation**
138:23

**injection**
94:8

**injured**
14:18,22,24 24:9 106:11
112:21 137:17,18 140:25
152:8 158:16

**injuries**
14:14,17 17:3,25 18:7,
12,13,17,22 19:6 20:4,
23,25 21:5 22:11 23:9
61:1 105:4,11,24 106:3,

5,7,13,18,22,25 107:1
108:15,17,19 112:16,19
114:15 136:24 137:19
141:2 152:21 153:3,7
155:6 158:22 161:3
178:23 200:13 204:4
211:25

**injury**
17:12 18:9 19:17,25
23:12,18, 107:25 108:3,
19 135:14 137:6,13
152:10 158:12,14,17,20,
21

**inside**
57:18 66:7 69:15 75:13
151:4 175:13

**instances**
180:25

**instants**
129:20

**instruct**
212:19

**instructed**
211:23

**instructs**
7:9

**insufficient**
188:14

**integrate**
15:18

**intent**
83:15 136:12

**intention**
119:10

**intentional**
188:21

**intentionally**
188:16

**interaction**
83:18 113:12

**interference**
172:2

**interpret**
15:6,7 17:22 18:3,6

**interpreters**
25:4

**Interrogatories**
192:22

**interrogatory**
193:1,21

**interrupt**
7:6

**intersection**
88:8,19

**interview**
161:18 169:6 177:24
178:2 214:10

**interviewed**
178:14 199:20

**interviewing**
178:4

**interviews**
168:19,21

**intimidating**
18:11

**intoxicated**
24:20

**introduce**
64:16

**introduced**
202:19

**inventory**
195:7

**investigate**
155:5

**investigation**
48:21 177:14 198:22
200:3,23 204:7

**investigations**
182:7

**investigative**
179:13

**Investigator**
48:5

**involved**
33:9 34:12,17 36:19 87:3
104:14 105:7 117:2
183:12 198:8 199:1
205:18 207:6 209:22,24

**Iraq**
209:18

**isn't**
123:1 136:5 149:23
161:4,10

**isolate**
76:16 97:15 148:5

**isolated**
96:2,4 97:22,23 100:22
104:7 126:22 127:1
144:20

**isolating**
125:25 126:5

**issue**
135:15

**issues**
28:18 144:22 145:7
210:6

**it's**
7:2,12 14:17 15:4 17:25
18:8 19:1,2 20:11 21:14,
19,21 22:19 23:14,17
25:12 26:3 28:8 30:21,
22,25 33:1 34:7 35:10
41:16 44:2,10 54:4
57:13,15 58:17 62:23,24
63:23 70:8 74:14,16,20,
25 75:5,19 76:3,9,20
77:7 78:4,6,8,15,18
79:24 80:8,23 85:18
86:24 98:8,14,22,24
99:8,23,24 100:10 105:2,
9 106:7,8,25 107:2,4,16
108:3,16,20 110:25
118:3 119:1 120:5,8,9
122:25 124:23 130:2,9,
16,17 131:5 137:22
139:12,18 141:25 142:2
143:11 146:4,23,24
147:2, 148:3,9 151:3
152:1,2 155:24 156:19
157:3,7 158:5 159:6
161:3,10,12 162:5,9,23
164:2 166:25 167:4
168:16 171:3,4,23
173:16 174:9 177:5
179:8,20 182:1 183:23
185:21 188:11 189:6
190:11 191:7,14,22
192:7 195:3,15,24
205:14 207:22 208:13
214:14

**J**

**Jackson**
178:6

**jail**
195:12 197:20,21 207:10

**January**
10:9 24:11 27:10 48:7
58:13 193:11,14 207:22
209:10 213:19

**Jason**
85:17 201:23

**Jason's**
214:24

**job**
148:1 182:5

**jobs**
156:5

**jog**
60:20

**jogged**
202:22

**John**
32:4

**Jose**
191:19

**Josh**
6:19

**July**
184:13

**jump**
55:24

**jumping**
140:23

**Jury**
199:10,11,13,15,22,24

**justification**
188:3,9,13

**justify**
187:25

**jutting**
52:14

ALAN SALVOSA - 03/30/2017                                    i18

## K

**keep**
108:17

**kept**
84:6

**Kevin**
6:20

**key**
94:19 121:25

**Khottavongsa**
6:20 40:3 48:16 73:20
80:16,22 81:2 82:14 88:1
89:23 95:4,22 96:1,14,22
97:9 99:2 101:4,15
112:16 113:12 115:7,12
116:7,13 117:7,12 119:8
120:21,25 121:5,11
122:5 123:13,18 124:6
126:12,16 131:25 132:8,
19 133:8 136:6,10,16
138:4,10 140:2 142:13
143:24 152:15,19 153:20
154:25 155:16 156:6,10
157:17 159:8,13 162:15
164:5,12,24 165:20
166:11 167:17 168:24
169:20 170:3 176:17
180:1,14 185:1 188:13,
17 201:19 203:22 213:23

**Khottavongsa's**
113:25 153:2,7 155:6
178:23 194:7 195:17
200:10 204:4 211:25

**kick**
36:10

**kicking**
135:4

**kid**
159:5

**kids**
159:4

**kill**
210:17

**killed**
198:17 210:2

**kind**
13:4,6 14:17 15:23 16:1

18:8,24 20:9 27:14 32:12
38:17,22,25 39:4 42:21
45:13 47:19 51:9 60:19
62:17 63:8,25 64:15,17
65:10,16 66:5,9,21 67:9,
22 68:1,7,10,22,25 69:8,
17 70:8,25 72:1,14,16,
20,21 73:2,4,13,15 77:6,
7,8 79:15,18 80:5,8,18,
20 84:6,8,13 85:24
87:14,16 88:3,4 90:20
93:21 94:11 95:23,25
96:3 98:8,14,15,18 99:11
100:7,8,14,15,17 105:25
106:19 107:23 108:19
109:14,16 110:25 111:1,
5,7 117:22 118:24,25
119:1,25 123:19 124:5
125:6 127:25 128:5
129:12 130:2,7,11
134:10 141:3,22 142:6
147:13,14,16,17,19,21,
23,25 148:3,5,9 149:10
151:20,22,23 152:15
156:17 157:11 158:5
159:4 160:19 166:2
167:21 169:9,23 173:16
178:3 180:17 185:12
190:20 207:16 209:24
212:25

**knew**
36:20 46:15,21 56:18
58:19 79:17 88:14
103:18,23 104:4 105:1,3
147:23,24 171:14 201:1,
12 204:6,9

**knife**
39:5,6 198:16

**knock**
55:24

**know**
7:20 11:12 14:19 18:25
21:6,10 22:2 23:18,22
24:18,22,23 25:2, 27:10
28:5,21 29:14,18 32:7
33:25 34:1 37:12 39:3,8
45:15 46:17 49:14 57:2,
18,21 58:10 62:20,22
63:17 65:24 69:22,25
70:3,17 72:8 73:24 75:21
76:12,17 79:7 81:23
83:10,14,15 86:5,14
88:23,25 89:18 94:24

95:5,6,8 98:24 99:1
103:11,12 104:8,12,23
105:6,16 106:6,14 107:2,
12,16 110:2,3 111:20
112:12,20 118:7 120:22
121:2 123:23 124:12
125:5 126:6 127:17
129:7,9,13 130:10
131:18,19 132:15,16
133:3 135:9 136:11,15
138:1,18 141:1 142:6
147:14,17 148:4,11,
150:23 151:4 152:25
153:4,5,8,12,14 154:2
155:18 158:17 159:11,
20,22 162:6,21 163:11,
12 164:2,3,9,14,15,19
165:1,5,14,22 166:24
171:2 172:15,21 173:14
174:19 175:16 176:21
179:5 181:9,10,13,15,23
184:10,17 187:5,18
190:8 191:15 193:1
194:13 195:6,7 196:8
197:3,10,16 198:3
199:25 200:1 201:8
204:25 208:22 210:16
211:5 212:15

**knowing**
170:20 172:12

**knowledge**
49:24 58:16 150:18
165:19 211:6 214:15,19

**known**
111:23 123:1 150:5

**knows**
131:10

**Kwon**
42:22,23

## L

**lady**
36:6,7 73:24

**Lake**
43:11

**landed**
121:2

**landing**
62:25 72:14,20

**language**
15:7 24:24 25:1,3,5,9,11,
17 65:10 67:12 128:3,20
130:5,8 160:19

**languages**
25:25

**large**
163:12,14 203:12

**laser**
83:23

**Laundromat**
73:25 83:1 99:6,14 101:1
102:5 116:11

**laundry**
32:6,21,24 44:22,25
61:18 62:23 63:1 66:4,6,
7,12 67:21,23 68:20
69:14,15 72:2 75:14 77:8
80:13 91:18,23 92:5
114:21 115:7,13,16,21,
23

**Law**
11:24

**lawyer**
212:15

**learn**
32:20 60:6 169:19
200:13

**learned**
30:23 56:13 60:23
112:15 163:4 170:21,24
178:22 195:17 200:12,25
204:3 211:24

**learning**
170:24

**leave**
36:7 161:8,11

**leaves**
53:14

**leaving**
197:21 200:6 206:4
208:12

**led**
140:12

**left**
52:17 54:14 56:4 63:9,10
90:15 98:17 100:18

ALAN SALVOSA - 03/30/2017                    i19

195:4 208:18

**leg**
21:23 141:3

**leisurely**
67:13

**lessened**
140:2

**lesser**
134:20

**let's**
16:5 22:23 87:16 93:1,24
117:22 147:9 177:16
202:22

**level**
11:19 17:11 22:10 42:24
80:2 127:24 155:9,11,12,
14 157:11 210:5

**life**
19:19

**lifted**
134:17 160:10

**lifting**
160:13

**light**
32:12 91:8 185:6

**lights**
32:16

**liked**
150:5 164:22

**likelihood**
19:16,24

**limited**
25:19 139:20

**line**
25:5,12 97:24 151:23
180:14

**lines**
24:17 28:9 36:15 81:5
151:25 173:17

**lip**
62:25

**list**
13:25

**listed**
206:12

**listen**
33:18 88:5 93:2 127:21
149:22

**listening**
149:23

**literally**
88:23

**little**
25:23 45:12 53:19 72:3
74:23 76:5 78:13 91:1
100:8 139:24 163:10
167:23 177:9 193:2
196:10

**live**
122:14

**lives**
27:21

**located**
198:14

**location**
20:12 55:16

**lock**
102:24

**locked**
45:25

**lockup**
22:4,6

**logical**
46:18

**long**
12:3 34:21 42:15,16
147:21,22 161:11 185:10
189:6,23 190:11,12,13

**longer**
78:13 123:9 135:2
137:20 140:4 141:15
156:21 197:22

**longest**
187:3

**look**
9:5,7,10 14:17 29:8
35:22 48:19 50:12 51:23
72:25 75:21 88:17 111:4,
6 114:18 128:2,20 129:1
131:14,16 145:17 151:22
154:21 161:5 163:19
177:14,17 183:4 189:20

202:22 207:25

**looked**
45:13,23,24 46:1 59:19
68:4 72:3 109:14 114:20
119:3 134:10 140:19
180:23

**looking**
18:16 43:22 89:12 113:3
146:25 186:11 203:14

**lookout**
21:5

**looks**
30:16 73:1 109:19 161:5,
17 162:5 166:8

**lose**
47:10 98:11,20 134:1
148:7

**losing**
47:1 50:23 51:5 56:1

**lost**
55:1 98:23

**lot**
34:8 44:2,3,4,10,11,13
46:2,8,23 47:10 50:23
52:12 53:2 54:10,14
55:1,10,12,13,23 56:14,
21 57:5,15,17,24 58:2
59:20 60:6 61:14,20
71:13 82:6 85:18 88:4
95:10 101:2 113:23
116:25 118:3,4 125:22
126:14 129:3 132:2
133:3,18,21,22,23 165:2
166:1 190:21 194:18
195:24 205:23 206:4

**lots**
58:19 69:13,15,16 159:1

**loud**
67:5 79:11 81:16 165:11

**loudly**
81:12 132:15 165:17

**lower**
82:18 110:2

**lowered**
84:12

**lunch**
108:25

**lunge**
100:22 166:21

**lungs**
79:12 81:15

**luxury**
129:24 130:25

**lying**
120:13

---

**M**

**mace**
42:1,2

**main**
180:10,11 181:3 184:5

**major**
88:8 182:4

**making**
49:5 60:25 83:12 84:4
103:15 105:8,9,24,25
106:1 120:11 124:6
126:1 144:21 160:25
161:1 169:7 202:15

**male**
69:22,23 100:25 163:12
176:18

**malicious**
146:7

**mall**
44:3,5,10

**man**
37:23 86:4 101:21

**Managing**
30:13

**manner**
67:9,11

**manually**
197:24

**map**
59:11 66:14 88:17 89:12,
16

**Maple**
198:12

**Mar**
211:12

Marie
  39:18

mark
  53:4,21,25 66:15 189:6

marked
  16:9,12 28:1,4 35:2,5
  47:21,24 51:16,19 84:15,
  18 111:13,16 178:25
  179:3 181:18,21 192:14,
  17 201:24 202:2 204:20

marking
  66:17

markings
  54:16

martial
  42:14

Martin
  32:4

mat
  19:15 20:16

match
  135:16,17

material
  187:23,24

materials
  9:10

matter
  193:20

max
  70:18

maximize
  86:2,3

mean
  14:6,16 18:24 19:4 20:9,
  10,20 21:14,15,18 24:19,
  21 57:12 58:14 65:2,5
  69:10 71:12 74:4,19 75:5
  76:2,3,14 77:7,23 78:4
  80:5 84:11 90:1,2 97:19
  98:23 108:1,6 110:25
  115:23 116:15 118:12
  119:19 120:4 121:9
  124:11,19 126:1 127:14,
  19 128:4,23 129:4,7
  130:4,9,16,21,22 133:17
  135:9 138:21 145:1
  148:3 149:21 151:1,2,3
  158:4,15 159:4, 160:8

161:3,9 164:20 165:1
168:7 170:12 178:7
194:19

meaning
  38:3

means
  15:25 17:2,8,19

meant
  55:17 56:1 96:10 201:1

measurement
  138:19

measuring
  154:3

medical
  24:2,6 158:20 160:4

medically
  15:8 156:5

medium
  193:24

meet
  212:12

meeting
  8:6,10,17 202:14,17

meetings
  8:11,13

melee
  63:12 98:17 116:23
  147:8

member
  179:15

members
  26:15

memory
  9:14 36:18 49:1 58:25
  182:6 202:22

mental
  28:9,18 30:11 130:22

mentally
  27:2,5 113:7, 130:15,18,
  20

mention
  59:6,8 154:19

mentioned
  11:12 59:3 60:1 67:15
  84:1 209:4 214:6

mentor
  41:6

mentoring
  191:22

mere
  71:7

messages
  213:11,12

met
  212:5

methodical
  147:8, 148:9

mic
  174:7,8,10

micromanage
  148:11

middle
  44:20 62:3 63:12 64:15
  72:20 97:18,20 98:3,9
  102:7,9,10 106:9,11
  155:25 189:22 208:2

midnight
  13:10 195:21

military
  209:14 210:19

million
  145:19

mind
  41:1 48:12 58:7 59:13
  71:17 96:6 129:19 151:5
  187:9

Minnesota
  27:23

minor
  19:2 190:24

minus
  10:19

minute
  22:23 142:6

minutes
  170:23

misrepresent
  188:16

mission-related
  210:8

missions
  210:8

misstates
  17:16 167:9

mistake
  214:14

moan
  157:9,12 158:15 159:1,2,
  4,6

moaned
  157:5,7

moaning
  156:13,24 157:4,9,17,20,
  24,25 158:2,11,14,18,23
  159:16,18,19,23 160:2

moans
  158:4

moment
  40:11 70:24 71:14 72:11
  76:10 102:15 105:5

moments
  80:15

months
  8:12 187:4

motion
  63:6,13 73:15

motor
  205:19 206:10

mouth
  85:20

move
  20:15,16 55:19 56:5
  77:7,8 86:9 98:2 118:20,
  25 140:21 145:17 147:19

moved
  26:8 57:2,4,7,8,10 67:22
  165:25

movement
  46:2 69:14 118:4 133:18,
  23 149:24

moves
  77:24

moving
  50:18,19 54:7 60:4
  62:22,25 72:9 75:6 85:20
  118:3,6,9,21,23 136:11,

15 140:19 145:12

**multiple**
14:6 22:14 119:13,15
121:24,25 126:4 199:8
211:21

**mute**
24:23

**muting**
174:10

**myriad**
166:24

---

**N**

**name**
6:14,17,19 39:17 84:20
189:7

**Narrative**
111:22

**narratives**
154:16

**narrow**
76:4

**natural**
18:24 148:3

**naturally**
147:20

**nature**
83:8 193:24

**near**
89:4

**necessarily**
57:19 166:24

**necessary**
24:6 146:13

**need**
7:15 49:14 71:5 171:23
177:13

**needed**
71:9 128:4 146:21

**needs**
85:20 129:22

**negate**
107:15

**negotiate**

129:24 131:1

**Nelson**
48:6 202:8 212:6,8

**nerve**
199:17

**never**
15:24 18:14 134:1,3
152:4 161:5 163:8
171:17 181:13 187:1,4
199:25 200:1

**new**
64:16

**nice**
165:1

**night**
12:11 13:6,8 31:20
195:5,22 211:24 212:12

**Nochez**
8:20,21 41:5 90:3
191:13,19 194:11,25
196:14,25 197:6

**nodding**
61:22 68:14,16 83:5

**non-compliance**
151:22

**non-compliant**
83:8,9 126:2 137:25
140:13 151:24

**noncompliant**
144:13

**noon**
13:10 31:21

**Nordby**
8:19,20 121:19 124:3
136:5,9 139:1 141:10
152:14,24 153:1,6 156:5
162:4,20,23 163:1,4,16,
17 164:4,9,11,22 165:20
166:5,6 194:8

**normal**
13:3 107:9

**Normandale**
11:22

**north**
44:8,9 56:14

**Northway**

43:9,12 51:21,25

**Notably**
154:18

**notarized**
193:9

**note**
113:24 185:9 208:3,6

**noted**
185:3 189:22 214:3

**notes**
33:16,18,20 34:4,6,12,16

**notice**
45:20 62:11 76:19 85:9
113:25 145:13 147:6
158:19,24 205:14 206:9
213:22

**noticed**
45:18 145:20

**noticing**
136:9

**nudge**
142:10

**number**
16:12 70:18 113:2,3
192:23 205:6 209:1

**numbers**
16:13

---

**O**

**O-s-a**
6:18

**oath**
6:5 7:3 109:6 193:4

**object**
68:8 154:6 167:8 210:4

**objection**
7:10 17:16 167:13

**observation**
114:11 118:19

**observe**
114:5 118:10 203:11

**observed**
71:9

**observing**

71:8

**obstruct**
169:18

**obstructing**
53:17

**obvious**
154:9,11

**obviously**
14:20 15:3,4 18:12 19:21
21:10, 22:18,19 24:20,21
25:4 54:7,20 55:3,20
56:2,14 57:3,17 58:14
60:24 63:5 67:7,12 70:23
75:21 83:15 90:2,6 96:3
97:13,21 105:4,16
106:22 108:9 111:6
116:22 118:12 125:3
126:13 127:17 128:15
131:5,22 132:15 134:16
135:9,15 140:20 142:11
149:24 150:11,22 159:23
171:3 182:21,23 186:3,
21 188:19,20 191:8
197:15,21

**occasion**
211:1

**occupied**
133:1

**occur**
25:8

**occurred**
191:25

**offered**
29:25

**Office**
200:22

**officer**
7:23 9:22,23 10:2,4 12:1,
3 13:11 14:4,5,9 16:11
17:3 22:21 25:16 28:3
35:4 42:19 47:23 51:18
60:1 64:18 84:17 88:10,
14 89:2 101:8 106:6
109:5 111:15 117:19,25
118:15 119:7,22 120:15,
16 121:10,19,20,21
122:11,23 124:1,3,22
131:23 132:7 136:5,9
137:25 139:1 141:10,11,
13 142:9,20 145:15,16

148:10 150:3 152:14,24,
25 153:1,5,6,24,25
156:4,5,7 161:16 162:4,
6,14,20,23 163:1,4,16,17
164:4,9,11,22 165:20
166:5,6,22 169:4 179:2
181:20 187:12 192:16
194:8 201:18 202:1
204:19

**officer-involved**
198:6,10 200:3 201:2

**officers**
8:18,19 17:23 18:1 31:8
38:22 56:20 117:10
121:18,25 122:1 125:9
132:10,18 133:1 135:11,
23 136:2 139:7,10,15
154:12,23 155:8 165:5,
10 173:2 212:20 213:3

**officers'**
154:15

**Oh**
205:8

**okay**
10:16,20 13:2 15:14
16:16,23 17:18 30:8,15
31:14,23 34:10 37:6
38:14,17,25 39:13,17
40:5 43:3,15 53:8,13,21
54:6,16 56:19,23 59:10,
14,22 60:1 63:2 64:25
65:20 68:17 72:23 77:4
78:18 79:13 82:17 84:24
85:22,24 86:6,8,16 87:5
89:9,17 91:4,11 92:10,
16,18 93:1,24 94:3,10
95:12 97:3,11 101:20
105:8 110:21 112:7
113:21 116:5,6 117:7
128:25 133:13,20 149:5
151:12 162:7,17 163:16
164:3,8 165:19 168:15,
21 169:13 173:10,14
175:7 177:18 179:10
180:13 181:17 182:3
183:4 184:12,21 186:12,
15,18 193:19 196:4,20
198:24 199:13 200:2,12
202:9 203:3 204:25
205:24 206:6 209:13
211:10,20 212:8 214:16

**old**

10:4 36:6

**on-the-job**
24:18 25:13 27:14,20
182:11,12,13,22

**once**
7:10 57:17 60:13 64:21
97:14 101:11 103:18
107:3,6 117:7 126:14
135:16 138:11 142:6
147:18 156:1 200:12

**one's**
105:15 110:4

**one-entrance**
57:15

**one-handed**
73:9

**online**
207:19

**operations**
9:9 42:8

**opinion**
104:24 127:23

**opportunity**
70:23 71:12

**opposed**
122:8 126:24

**option**
17:4 18:3,23 21:12 47:6
55:24 135:3,21 138:24,
25 139:19 191:8

**options**
17:24 71:13 134:20
166:24

**orally**
183:18

**orange**
185:9 189:22

**order**
38:2 177:16 186:12

**ordered**
177:18 184:23 185:11
203:15

**originally**
32:22,23 33:7 43:19
190:10

**ourself**
142:7

**outside**
116:11

**overcome**
41:19

**overlap**
13:4,6

**overwhelmed**
47:14,17

**owner**
176:19

---

**P**

**p.m.**
109:3 161:25 192:13
215:8

**page**
16:3,14 35:11 37:22
38:8,12 39:23 48:19
49:10,11 50:10,13 193:6
203:3 206:6 207:21
208:10

**pain**
107:6,9,13,14,17,18,20
108:10,20 146:3 156:17
157:11

**painful**
146:4,8 156:19 157:7
171:2

**pains**
107:15 108:6,8

**paper**
22:18 54:17

**paragraph**
184:18,22 189:21,24

**paragraphs**
183:10

**parallel**
58:3 65:16,17 99:23,24
100:3

**paramedics**
155:8,13

**paramount**
106:8

**parents**
26:10

**park**
87:19

**parked**
53:1,4 57:12 69:3

**parking**
44:2,3,4,9,10,11,13,18,
20 46:7,23 47:10 52:12
53:2 54:10,14 55:1,23
56:20 57:5,15,17 58:2
61:14 113:22 205:23
206:4

**Parkway**
32:3 43:7

**part**
21:3 25:10 27:14,16
44:13,16 45:9 61:20
106:5 113:1 116:21
120:12 127:5 133:9
145:2 159:14 181:6,13
182:3,4,20 186:5,9,11,
12,13 189:21 191:22

**partially**
109:13

**particular**
74:2,13 75:11 76:13,19
102:15 105:2 168:16

**particularly**
69:18 101:3 103:14
139:7 171:4

**particulars**
195:8

**parties**
18:9

**partners**
46:15,22 55:11 57:18
88:12 105:13 141:21
146:25 147:5 149:11
150:1 156:11 159:16
160:8 167:18 203:14

**parts**
45:10 186:4

**pass**
55:22

**passed**
48:16,17 49:2

**passenger**
68:25 69:2 196:15

**passing**
57:23 88:10 89:11

**Pastor**
12:10

**Patrol**
9:9 12:5,7

**Paul**
202:13

**pause**
95:14

**pay**
162:8

**paying**
207:11

**PBT**
208:12

**peeling**
67:18

**pen**
99:25

**pending**
7:16

**people**
8:16 13:5 18:11 20:15
21:1 24:19,20,21,22,23,
24 25:1,8,13,14,15,19,22
26:24,25 27:2,5,8,18,20
29:18 30:12 31:2 33:24
34:12,16 36:19,21,23
37:10 42:4 44:17 45:3,
22,25 55:5,19 56:4,10,
12,16 59:14 62:12,20
63:14,25 64:13,22 66:7
67:16,20 68:6,7,19
69:13,14 72:7,21 73:25
74:10,14 75:7,12,15,17,
22 76:11,15,20,21 81:2,
23 82:4,5,25 90:22 95:11
96:3 97:25 98:14,16,22,
24 99:1,9,11,12,21
100:4,5 101:2,5,23,24
102:1,3,5,18,19 103:25
104:3,8,11,13,14 105:6,
11,13,14 106:1,24
107:11 108:5,6,7,11
115:6,9,10,11,13,15,20,
22,24 116:14,19 117:5,

11 118:6 119:20 121:14,
16,24 123:11,16,21,22,
24 124:5 125:4,5,11,17,
25 126:3,5,7,14 127:20
128:9,12 130:9,17
132:24 133:2,21,24
141:7,16,22 142:7
143:21 144:3,16 147:6,
20 148:2,4,5,6 156:1,2,3
157:6,8 159:1,7 160:18
161:8,14,19 165:2 168:8
169:6,25 170:12,14
172:13,22 173:18 174:23
180:15 198:20

**people's**
62:16 130:7 160:19

**perfect**
22:19

**perfectly**
145:18

**performance**
171:16 207:21

**period**
71:20,22 77:18 100:24
133:14 182:24

**peripheral**
69:17

**peripherals**
101:5

**Perpendicular**
100:2

**person**
19:6,25 23:4,19 24:6
39:14,15 56:13 61:3,4,11
63:2 64:22 68:3,5,18
69:6,20,25 70:1,9,11
73:22 74:2,6,9,13,16,17
101:21 105:3 108:5
116:9 122:21 124:1,9
125:14 128:15 131:17
147:19 148:9,11 155:3
190:17 193:22 211:16

**person's**
14:11 148:12 151:5

**personal**
108:12

**personally**
155:5

**persons**
183:12

**perspective**
102:9

**pertinent**
183:12

**Philippines**
26:5,17,20

**phrase**
174:19

**physical**
10:20 14:4,8,14,16 24:23

**physically**
15:10 145:2

**pick**
197:16

**picture**
53:14 169:7 177:14

**piece**
169:10

**pieced**
169:13,15

**piecing**
127:4

**pile**
205:23 206:18

**pinpoint**
133:13

**pissed**
196:21 197:3

**pitch**
93:22

**Pizza**
32:22,23 36:3 43:20
44:1,23 52:24 61:16,20,
21 77:3 116:22,23 117:1

**place**
201:16

**plain**
170:13

**plaintiff**
6:21

**plan**
214:20

**planning**
165:20

**play**
14:25 94:2 101:11 125:3
127:11 142:18 171:22
172:1,17 175:7

**played**
190:5

**playing**
84:25 86:18 87:6,17 90:8
91:12,25 92:6,14,19
93:3,12 94:4,13 95:1
101:12 142:22 157:14
162:12 163:22 172:7,19
173:5,8 174:16 175:9,19
176:11 189:9,11 190:3
196:5,18,23

**pleasant**
171:4

**please**
6:14

**pleased**
171:16

**plenty**
74:10 135:17 145:20

**pocket**
124:21 127:14

**pockets**
124:7

**point**
48:15,18 53:22 54:1 55:8
61:15 62:5,10 64:25
66:11,24 71:16 72:2,18
78:2 79:13 83:24 87:25
90:5,14 93:19 98:11,19
99:4,6 100:21 103:23
105:13 112:15 114:7
117:3,5,18,19,21 118:7
119:5 121:18 122:6
124:12 128:9 131:24
134:3,15 135:10 140:25
141:12,22,23 142:7
148:23 149:10 150:5,
155:19,20 156:14,20
159:10 166:4,5,11 168:7
169:19 178:22 179:17
191:13 195:15,16 196:1
197:14 200:23 212:2
213:4

**pointed**
74:19 83:17 130:6

**pointing**
53:7,24 54:11 55:9,10,
18,23 56:3,5,18 69:5
76:3 83:9,13 88:18,22
91:3 109:16 130:10

**points**
27:21 130:4

**police**
11:4,25 12:1,3 13:11
25:16 31:8 35:10 38:20,
24 39:2,9,10,14 40:7,9
42:19 55:5 64:18 70:4
106:5 154:15 156:7
179:18,24 188:23 189:3,
10,18,21 190:18,25
191:10 195:11,12 196:2
203:21 204:2,3 211:4
214:17,19

**policies**
9:5,7 22:18 180:4

**policy**
13:17,19 24:2,3 139:11
179:8 182:1,17

**pool**
20:22

**poor**
170:22

**pop**
94:5,7,8,11

**pops**
34:2

**portion**
18:7 24:3 171:22 182:21
185:19

**posed**
140:2,6,8,9

**poses**
23:3

**position**
47:18,19 50:16,20 51:8,9
75:1,3 134:12 143:14,15
166:12,15,18,20,22

**positioned**
61:11 62:21 66:13 72:10

**possibilities**

143:23

**possibility**
31:11 59:7 74:25 108:17
112:22 113:17 130:16,17
143:11

**possible**
20:24,25 23:14,17 70:24
71:14 103:22 105:2
108:16 118:3 122:25
167:20,21,22 168:1,4
169:22

**possibly**
27:3,24 30:6 33:9,10,13
56:4 70:20 87:3 135:24
141:21 142:15 195:3

**Post-traumatic**
210:21

**potential**
135:19 144:15 153:2,7
168:8

**potentially**
137:24

**pounds**
10:17,19

**power**
12:24 13:2 80:10 123:2,5

**Powerpoint**
16:18,20

**practical**
22:19

**practicality**
19:22

**practice**
15:17

**predict**
129:11

**prefer**
81:9

**preference**
80:3,10

**preparation**
182:2,4,14 183:4

**prepare**
8:2 201:6

**prepared**
149:15

**preparing**
34:22

**present**
6:20 139:7,12 140:13

**presentation**
15:18 16:19,20

**press**
11:5,8

**pretty**
7:2 32:6 45:19,24 57:14
67:5 78:4,14 86:6 91:8
108:24 112:19 165:25

**prevent**
23:25 61:1 145:7

**preventable**
22:2 205:19 206:10
207:6

**prevented**
144:21

**previous**
208:4

**primarily**
69:16 124:6

**principle**
124:13

**printout**
51:20

**prior**
8:9 24:11 30:8 34:24
36:19 40:9 56:13 59:23
75:9 76:10,12 79:13
80:15 82:17 95:20
102:25 113:12 115:7
118:15 130:13,14
131:17,19 132:23
133:13,15 140:16 150:5,
10,17 162:9 170:2
180:14 183:7 184:22
201:1,12 202:14 207:21
214:9

**probably**
16:18 20:21 28:19,20
29:1 32:3,7 46:6,15 53:6,
13,19,23 54:5 57:12
59:1,24 60:21 61:5,19
62:3,6,9 64:11 66:16
69:5 70:16 71:17 76:9
78:13 79:3 80:23 84:7
88:17 89:6,7 90:4 91:2,5

93:2 96:4 97:13 98:21
106:15 110:4 122:8
127:2 128:14 134:9
141:14 156:11 158:4
159:24 166:8 173:1
187:22 195:6,15 197:19,
20 198:4 212:22 214:13

**probationary**
182:24

**probes**
82:22 109:25 127:6
134:24 144:14 145:3,5

**problems**
52:7 208:5

**procedure**
213:1

**proceedings**
6:1

**process**
59:23 60:3 142:4 181:14

**produced**
189:8

**progression**
18:25 148:3

**pronunciation**
185:2

**properly**
157:12 158:13

**property**
36:7

**prosecution**
182:8

**protect**
64:2

**provide**
23:20 155:9 174:1 182:6

**provided**
9:3 155:10,11,12

**proximity**
14:4 72:7 74:11 83:2,4
98:24 102:20 156:9

**psychologist**
211:10

**pull**
46:7 55:5 56:20 57:25
89:14 154:13 181:1

183:22 213:15

**pulled**
32:15 34:18 46:5,17 47:9
57:18 127:14 153:25
155:3 176:4 185:14
186:7

**pulling**
43:6 59:18,20 61:5 62:18
78:24

**pulls**
105:20

**punch**
18:25

**punches**
45:22

**punching**
135:4 175:14

**purpose**
124:13 182:3,5 183:6

**push**
163:2 185:13

**pushing**
116:25 164:11

**pushups**
10:24 11:12,13

**put**
29:18,24 31:14 32:10
40:11 46:12 47:4,17 51:7
54:16,17 58:2 59:10,13
68:7 84:3 113:21 124:14,
20 125:1 129:2 140:24
158:19,24 162:17 188:22
195:9 204:15 208:22
209:13

**puts**
33:20 47:2,4,19 51:9

**putting**
57:24

**puzzled**
131:16

---

**Q**

**quantum**
15:21,22 136:24

**question**
7:5,10,16,17,19,21 29:2,

3,4,5,7 39:24 40:12
48:20 49:13,20 50:12,14
76:9 94:19 106:20
108:22 113:1,18,23
114:25 115:17 116:16
139:25 142:1 146:18
151:10 163:24 164:7,21
167:11,13 170:22 193:3
210:15,16 211:24 213:17
214:6

**questions**
49:7,11 78:17 210:11
214:5 215:4,5

**queue**
128:5

**quick**
29:7 31:15,16 33:4 46:19
52:20 56:17 57:14 61:17,
19,21 78:11,14 114:17
165:24

**quickly**
140:22 161:13 165:25

**quite**
12:22 134:14

---

**R**

**race**
113:25 114:11

**racking**
199:17

**radio**
34:1,8,11 87:2 91:17,19,
22 174:9

**raise**
6:3 71:21 73:19,23
74:12,15 75:11,19,23
77:12,17,21 82:14 84:9
99:18

**raised**
72:4,6,11 73:10,16,18
74:21 75:3,10,17,24
76:11 77:24 82:19 83:6,
14 84:13 111:11 114:19
134:22 173:18 174:23

**raises**
73:3 75:8 77:11 111:4

**raising**
74:18 83:11 84:2, 111:5,

8 170:6 172:13,22

**ran**
54:21 60:18 123:22

**rapport**
129:21

**rationalize**
74:5

**re-evaluate**
177:16

**re-evaluating**
147:1

**re-marked**
204:17

**reach**
120:24 121:3 124:7

**reached**
127:13 166:4

**react**
108:13

**reaction**
130:7 169:4

**read**
8:4 33:18 38:11 58:16,20
147:4,21 148:13 160:19
185:7,19 189:21 215:6

**reading**
50:4 178:16

**ready**
60:12

**real**
19:19 56:3

**real-life**
19:22

**realistically**
20:11

**reality**
150:23

**realize**
154:24

**really**
46:5 47:3 79:19 84:10
91:8 107:16 129:10
143:5 153:15 159:10
161:13 190:19

**realtime**
147:1

**rear-ended**
206:21 207:1

**reason**
24:13 35:19 85:2 86:24
132:22 149:23 151:7,8,
13,14 163:16 164:3,9,10,
17 169:20 189:17 197:22

**reasonable**
71:18

**reasonableness**
13:20

**reasonably**
17:2,12,14,23,25 18:1,2,
21 20:4 136:24 183:6

**reasons**
84:1 122:19

**recall**
10:1 12:20,25 21:9 25:10
29:21 30:1,2,17,21,23
31:7,12,23 33:15 40:10
45:2 48:14,17,18 59:24
60:10 62:6,13,22 63:4,16
64:1,6,7,10 67:17 68:9,
19, 69:23, 73:24 75:10
77:14,20,21 79:3 81:8
94:22,23 95:21 100:24
118:11 119:6,7 124:2,4
131:23 132:1,2,5 134:6
136:7,9 139:1,4 142:15
143:9 144:7 149:2,3
154:22 155:17 156:13
161:15 162:25 169:4,8
171:17,21 172:24 173:1,
178:2 187:16 190:9
191:12,14,18,21 192:5
194:1,13,14,16,17,19,24
195:2,4,14,16 197:15
198:1 201:10 202:18
205:21,24 206:23 207:2,
7 208:15,21,23 210:1
212:13 213:5,6,10,14

**receive**
13:12,14 208:11

**received**
16:21 24:17 39:22

**recess**
16:7 31:17 82:10 109:2
161:24 192:12

recognize
173:12 189:14 202:4

recognizing
24:12

recollection
16:1 111:10 132:14
178:15

recommend
177:18

recommendation
169:5,15

recommended
22:15,16 123:6 169:2
177:10

record
6:14 16:5 22:25 29:18
50:20 51:19 173:25
174:11,13 197:22

recorded
191:7

recording
197:15,17 214:7

red
32:11,12 68:21,22,24
69:2

redirect
215:4

reference
37:23

referencing
40:13

referred
136:17

referring
10:6 28:13 118:14

reflect
183:11

reflecting
185:6

refresh
9:14 36:17 49:1 182:6

regaining
118:25 119:4

regard
25:8 27:5

regarding
51:4 194:2

regards
8:10

regular
180:10

regularly
108:7

reholster
124:21

related
193:22

relative
41:16 57:13 58:11 136:2

relatively
88:14

remains
144:4

remember
24:14 31:1 58:12,22
109:24 134:15 169:1
180:25 187:13 206:3
212:11

remembered
188:20

removed
117:20 121:5 122:3
126:15 138:1 140:17
162:10 187:12 203:14

removes
117:25 119:23 132:8
142:20

removing
118:15 119:7 121:11
140:3

rep
212:5

repeat
7:20 18:19 39:24 71:6
114:25 131:11 153:4

repeated
62:15 125:23

rephrase
7:20 170:22

report
12:15,18 34:22 35:10

111:21,23,24 112:8,10,
23 178:14,16, 179:18,25
180:9,10,11,24 181:3,4
182:1,4,5,10,13,20
183:4,18,23,24 184:5,12
186:22 187:1,6,20
188:19,24,25 189:3,10,
18,21 190:18,22 191:17
194:4 195:11 203:21
204:2,3 213:18,22,25
214:17,20,21 215:2

reported
183:17

reporter
6:3,6,8 7:13

reports
8:4,22 154:15,18 180:8
181:2 182:23 183:5,11
190:20 191:1 208:4,6,7

representative
212:14

represented
202:9,12

reprimand
208:11

require
135:11

required
54:13,18 112:1 158:20
181:9

requirement
181:11

resist
135:15

resistance
41:19 111:24 125:22
126:2 180:9,24

resisting
125:18,19

Resolution
28:20 29:5,10

resources
148:7

respect
26:25 152:15 153:2,7
177:25

respond
20:13 32:2

responded
31:8 40:19

responder
23:6

responder-level
23:21

responding
31:23 40:16 41:9 205:25
207:3

response
6:7 45:16 208:20

rest
161:11 198:3,12

resting
120:2,3,7,8,10,11

restrain
165:20

restrained
164:4,12

rests
139:19

result
18:22 63:19

results
179:15

retreating
80:21

return
194:9

review
9:2,9,12 34:22,24 50:1
179:9,11,14,22,25 180:5,
6,7,9,18 181:3,4,10
213:17

reviewed
8:22 34:19 85:5 180:20
187:3 199:6 213:25
214:9,13

reviewing
181:6 183:1

rid
117:12

ride-along

41:10

**riding**
195:1

**right**
6:3 7:11,23 13:3 18:14
19:11 21:15 22:4 29:8
31:10 32:8 36:10 39:14
43:4,8,10,12 46:16 47:15
52:20 53:15 54:20 58:22,
24 59:7 63:9,10 69:5
71:1 72:13 73:8 74:12
76:4 77:8,23 86:6 88:19
89:13 90:22 96:15,25
104:4 106:10 107:1,9
114:2,19 123:10 125:7,
23,24 127:15,19 129:13
135:14 142:19 143:16
145:12 150:25 151:4,6
155:23 158:15,25 159:5,
161:6,8 162:3 165:15
168:17 170:3,6 184:13
191:4 195:22 196:15
203:10 208:24 215:3

**risk**
21:10,17,20,22,25 23:3
57:23 135:1,2 137:6,13
138:3,7,10 140:1,6,9,10,
11 146:13,20

**Rissman**
6:13,19 11:16 16:5,10
17:17 18:5 22:24 23:1
28:2 29:20 31:15,19
35:3,18 37:4 47:22 51:17
82:9,12 84:16 85:17,23
86:13,19 87:7,20 90:9
91:13 92:1,7,15,20 93:4,
13 94:6,14 95:2 101:13
108:24 109:4 111:14
133:6 142:23 154:8
157:15 158:10 161:21
162:1,13 163:23 164:16
167:10,15 172:8,20
173:6,9 174:3,14,17
175:10,20 176:12 179:1
181:19 189:12 190:4
192:9,15 193:16,18
194:23 196:6,19,24
201:25 204:18 210:10,13
214:24 215:3

**road**
43:11 88:21,24

**Rogosheske**

202:13 212:16,17,19

**role**
14:25

**roll**
125:1 141:9 142:10
148:20 149:8,9,13,17,20
152:11 185:12 186:11

**rolled**
127:12 143:22 149:10

**rolling**
55:21

**room**
191:20

**route**
38:22 40:25

**rubbing**
23:11 134:5

**rule**
167:5

**rules**
7:4 212:25

**run**
56:9 60:16,17 62:1 90:24
92:21 121:14 144:23

**running**
10:24 62:8,11,23 66:22,
67:25 70:8 77:15 78:5
79:6 81:24 90:14,16 96:9
97:16 107:19 123:21
125:14 126:4 156:21

**runs**
146:1

**rush**
105:17,20

**rushing**
208:6

---

**S**

**S-a-l**
6:17

**safe**
104:15 105:10,25
106:12,17 142:8 144:4
155:24

**safer**

104:6

**safety**
14:3 41:8 60:24 71:18
74:22 82:25 102:1,14
106:8 129:24 152:3
167:16,18

**Salvosa**
6:9,15,17 7:23 10:4
16:11 28:3 35:4 47:23
51:18 84:17 86:16 109:5
111:15 172:5 174:15
179:2 181:20 189:9
192:16,21 195:25 202:1
204:19 215:7

**sand**
19:24

**satellite**
51:20

**saw**
14:24 34:18 38:19,24
39:2,4 45:12 53:22 54:1,
2 55:8 57:13 60:22
61:10,11,16 63:2,16
64:25 66:11 73:18,23
75:11 77:10 78:1,19,21
81:23 82:3, 83:13 89:22
100:12 103:13 104:17,20
114:14,18 134:1,3
136:14,15 142:25 143:5
144:1 145:11 152:7
153:1,2,6,9,10,11,13,14,
15 154:3,4,13,14 160:13,
17 176:4 201:18,19
211:7,9,16

**saying**
17:10 36:8 39:13 40:6
74:5,12 89:2 91:20
108:18 111:2 119:17,20
128:1 130:2 139:11
149:8 171:7 177:13

**says**
16:24 21:6 28:24 29:8
35:25 36:1,2,4,5 38:17,
19 49:13 50:4 150:24
175:11 176:15,17,18,25
179:13 182:3 183:5,16
187:14 189:22 190:13
192:21 206:20 207:5,18
208:3,11 209:4 213:17

**scale**
88:18,22

**scatter**
99:11

**scattered**
99:12 100:17

**scenario**
22:19 56:25 143:19
145:8

**scenarios**
15:19 31:1,4,5 127:15

**scene**
32:15 41:1 44:16 45:8
60:14 70:4 97:8 106:12
114:20,24 116:4 121:18,
24 125:10,17 128:15
136:8 153:18 170:24
177:25 178:10

**scope**
182:4

**screaming**
69:16

**screen**
34:2 86:3

**sealed**
187:2

**search**
121:17

**searched**
105:14 123:17 125:4,12
127:9,11 128:8,10,16,17
133:3 137:24 140:5,12,
15

**searching**
123:13

**seat**
207:14

**seatbelt**
59:25 60:12 87:18

**second**
16:6 23:2 25:8,17 35:22
73:4,5 91:15 96:18,21
117:22 126:12 132:9
133:15 137:9,12 138:9
139:3,7 141:5 142:16
143:1 145:9 146:13,21
148:16 150:17 152:7
154:5,10,19,24,25
160:11 162:9 166:8,9
167:17 169:3,24 170:8,

13 176:2,14 177:11
186:16 188:13,18 193:6
201:20 203:22 213:16,25

**secondary**
105:9,24

**seconds**
90:2 96:21 97:4,12
113:13 135:18,22
136:18,21 139:24 141:25
142:5 185:16

**section**
44:20

**secure**
147:18

**see**
14:16,23 16:15,24 17:2,6
18:1 28:9,11,15,17
29:12,17 35:14,24 36:12,
25 37:7,8,12,15,17,19,
23,25 38:5,9,14,16,17,23
39:1,4,5,19 40:13 44:17,
25 45:3,22,25 47:3 48:24
49:17 50:8,13,24 52:11,
15 53:1 54:19 56:12
59:17 61:3,4 62:7,12
63:3,18,21 66:3 68:6
74:20 76:12,23,25 77:4,
12 79:5 80:6,15,16
81:17,20,22 82:3,4,17
83:13 84:22 85:13,17,18,
20 88:4 90:5 98:8,13,15,
25 99:17,18 100:5 101:4,
14,20,23 104:17,19
109:21 113:3,9 114:17,
23 115:2,3,9,11,12,15,
17,18,22 116:7,13,19
118:2,18 119:22,23
120:15 121:1 126:7
129:25 134:5 137:15
141:1,2 143:3,5 147:16
151:20 154:24 158:21
159:14 160:15 161:9
162:14,24 164:17 171:24
179:10 183:8,14,20
184:1,18,19 185:17
192:24 193:6,9 195:25
203:4,6,25 204:23
205:16 206:5,15 208:2,4,
8,10 209:1,8 211:14
213:20 214:23

**seeing**
23:15 45:11 64:1,2,6,7

100:5,24 106:8 162:21

**seen**
16:16 23:12 35:7 48:1
78:23 88:1 90:5 101:9
129:1 154:15 157:6,8
183:12 192:19

**selection**
136:17

**self-defense**
169:23

**semi**
106:12

**semi-sitting**
143:15

**send**
34:2 176:3

**sending**
213:6

**sense**
67:14 104:7 106:10
109:17 122:4,13 123:7,
19 126:21 127:1 128:4
134:25 163:14 164:25
170:10 183:13

**senses**
118:25

**sentence**
198:3

**sentences**
209:4

**separate**
99:2 121:16 130:21

**separated**
97:23 100:17

**September**
206:13

**sergeant**
12:9,10,11,12,14,16,17,
18,20,21 111:22 121:20
168:22 170:1 171:15
175:17,18 176:22 177:3,
4,7,11 180:20 212:22,23

**Sergeant's**
180:7

**sergeants**
12:15

**series**
35:12

**serious**
22:11 108:3 141:4 161:3

**seriously**
112:21

**serve**
209:18

**service**
25:12

**sessions**
211:21

**set**
116:4

**seven**
97:4

**severe**
108:6 112:19 158:6,9,12

**severity**
14:3 158:14,17 178:23

**shadows**
45:12

**shaking**
79:9 132:6 214:24

**sharp**
33:16 34:17 39:6,7,8
40:14

**she's**
89:8 176:3

**sheet**
30:16

**Sheriff's**
200:22

**shift**
12:23,24,25 13:2,5,6,9
31:21 195:20

**shifting**
87:14

**shined**
45:17

**Shingle**
32:3 43:7 89:11,12

**shiny**
34:17 36:22

**shock**
107:14

**shocked**
39:9,12,15 40:6 122:16,
18,21,24 123:9 132:17
185:15

**shocking**
141:21

**shooting**
198:6,10 201:2 211:9

**shoots**
94:9

**shop**
33:4 52:20 61:17,19,21
68:20 175:13

**short**
72:8

**shot**
96:2 102:18, 105:19
109:22 198:17

**shoulder**
73:1

**shoulders**
119:1

**shoving**
116:25

**show**
117:4 162:2 195:24

**showed**
130:6

**showing**
40:21,22 131:20

**shows**
130:3

**shut**
197:19,24

**sick**
12:17

**side**
40:11 64:24 65:1,5,13
69:1,2 84:6 99:22 109:13
162:3 196:15

**sidewalk**
44:5,7,9 91:1,5

**sight**

47:1,10 50:23 51:5 56:1
97:24 98:11,20,23

**sign**
50:5 130:3,8 145:14
215:6

**signature**
50:10 193:7

**signed**
193:11,15,16,19

**significant**
80:6

**significantly**
140:2

**signs**
131:21

**similar**
7:2 10:18 51:4 211:14

**single**
14:5 105:19

**Sinthanouxay**
185:1,2

**sir**
9:1,24 10:5,12,15,17
12:2,4,8, 15:13 28:6,12,
23 30:16,18 31:22,25
32:19 33:5 35:6,8,10,21
36:13,16,20 37:3,18,21
38:1,9,13,15,18 39:21,24
40:1,4,10,15,17,24 41:3,
7,10,13,17,21,24 42:9,
13,18,20 43:7,14,16,21,
24 44:2,6,15,21,24 45:2,
7 46:9,12 47:25 48:2,8
49:9,18,22 50:9,11,25
51:2,6,12,15,22,24 52:1,
6,8,10,13,16,19,22,25
53:3,6,10,12,20,23
54:12,15,24 55:3 56:6,8,
11,17,22 57:7,13 58:8,11
59:5,8,12,16 60:15,17
66:2 80:14 81:16,22
82:16,23 84:14,19,23
85:1,4,6,8,10,12 86:1,23
87:1,4,22 90:23 92:17
93:11,16,23 94:16,23,25
95:11 96:12,16,19,23
97:6,10 99:15 101:10,16,
19,22,25 102:3,11,13,23
103:1,5,8,11 107:5,8
109:7,11 110:8,11,14,

111:17,19,25 112:3,6,9
113:10,13 115:5 143:2
146:15,23 152:13,17,20
156:15 162:11,16,18,23,
25 163:3,6,13 164:1
165:8,13,14,18,22
166:13,16,20,24 167:1,4,
18 168:4,10,14,16,20,25
169:3,25 170:4,16,19
171:1,5,8,11,14,17,18,21
172:4,11,14,18,23 173:1,
3,13,16,20 174:21 175:1,
4,6,23 176:8 177:9,22
178:2,9,12,16,19,21,24
179:4,6,9,12,23 180:2,6,
10,12,16,19,22 181:11,
14,16,22,24 182:2,9,15,
18,25 183:3,9,15,21,25
184:2,4,6,10,14,17,20
185:8,18,21,23 186:17,
22,25 187:2,8,10,13,16,
19,22,24 188:2,6,8,11,
15,19,25 189:2,4,16,19
190:1,14,16 191:15
192:2,4,6,11,18,20,25
193:5,8,10 195:23 196:3,
10,12,17 197:5,9,13,16,
25 198:7,10,19,21,23,25
199:3,5,7,10,12,16,19,21
200:1,5,8,11,15,24
201:3,5,14,17,21 202:3,
5,11,13,16,18 203:2,5,
19,24 204:8,11,14,21,24
205:1,4,8,11,17,20
206:16,19,22,24 207:4,
23 208:1,14,21,23 209:2,
9,12,15,17,19,23,25
210:12,15,18,20,23
213:5,21

**sirens**
32:10,18 208:22

**sit**
85:15 140:21, 145:22
203:15

**site**
83:23

**sitting**
100:25 120:8 134:11,12
143:14 166:12,20,22,25
167:2 185:24 186:1

**sittings**
166:14

**situation**
19:7 22:20 34:5,7,15
41:17 54:21 56:3 64:16
71:4 75:6 77:14,16
104:15 124:24 137:3
147:1,3,4,21 149:14,15
150:6 152:1 166:20
167:7 168:4 207:3
209:11

**situation-dependent**
124:23 131:5 139:12
146:23 166:25 167:4

**situations**
15:2 31:6,10 131:8,11

**situps**
10:24

**six**
97:4 121:22 190:11

**size**
10:18 136:2

**skills**
182:21

**Skip**
189:20

**skipping**
183:10 209:4

**slab**
52:17 69:4 102:8 162:4

**slabs**
52:14

**slip**
21:1

**slow**
91:7

**snow**
53:11 90:25 91:1,2,5,6

**softer**
137:7

**sole**
96:5

**solution**
147:2

**somebody**
20:19,21 37:24 42:12
75:15 90:4 124:17 147:9,
15 149:22,23 175:13

**someone's**
21:14 37:19 84:10
119:18 130:20 166:23

**someplace**
106:17

**somewhat**
103:23 104:6

**soon**
67:4 79:3 83:18 89:19
100:12 155:15,24

**sore**
107:13,17 108:4 119:2
145:1 157:8

**soreness**
107:22,23

**sorry**
18:19 24:8 29:1,2,3
35:17 37:3 44:23 57:8
59:2 61:17 71:6 76:8
78:16 81:19 115:14
116:2 131:11 133:5
140:8 146:5,15 153:4
157:23 164:10 182:15
193:13 201:23 207:24
210:14 211:8

**sort**
27:21 40:14 41:15 42:6,7
44:20 49:19 75:9 80:20
84:2 95:3 107:23 113:1
122:4 146:10 152:11
155:5 163:2 164:24
173:21

**sought**
187:1 211:2

**sound**
87:16 94:1 95:3,5,7
158:16 172:9 173:12
176:6 185:7 189:14
191:3 196:8,11 214:12

**sounds**
90:17 163:10 190:12
196:14

**south**
44:8 110:24 111:2,3

**southeast**
52:4,5 72:17,18,19,23
110:20,21 111:7

**space**
190:19

**spaces**
44:18,20

**speak**
24:24 25:1,4,8,16,22,25
26:2,4,13,16 107:12
108:11, 114:12 130:5
131:15,17,18 150:3,7,19,
25 151:1,8,14

**speakers**
26:11

**speaking**
20:11 107:3 172:24

**speaks**
148:25 150:24 151:3

**special**
41:8

**specific**
18:22 20:10 21:9 24:16
27:13 28:18 30:11 36:16
76:7,14 96:1 118:14
169:8 194:1,14 210:11

**specifically**
15:22 21:4,6 22:1 24:15
27:18 30:22 31:12 33:25
40:10 48:17 60:10 63:24
64:7 65:23 69:24 70:8,
76:17 78:3 81:9,22 98:15
101:7 116:24 117:4,5
118:7 132:2 136:13,16
139:4,9 153:15 154:21
173:3 181:8 191:12,16
192:6 194:13,19 195:2

**specifics**
192:7

**spectrum**
19:14

**speculate**
57:21 164:19

**speculation**
154:7 164:13

**spell**
6:16

**spin**
110:13

**split**
73:4 166:8,9

**spoke**

**spot**
75:4

**spotlight**
45:6,14,16

**spots**
44:9 66:17

**spotters**
19:15

**spread**
110:6,10

**sprint**
60:19,21 77:7

**squad**
9:18,19 50:14,16 55:14
148:6 161:8 181:1
208:12 213:13 214:7

**squads**
184:24

**stabbed**
80:4,9

**stabilize**
23:20,24

**stabilized**
178:11

**stable**
170:24

**stamp**
38:5

**Stamps**
16:14

**stand**
55:20 57:3 63:12 89:15
134:7 161:16

**standard**
124:24 213:1

**standing**
19:10,24,25 20:5,6,18
75:1,2,4,19,25 103:22
104:8 115:6,13,20
116:11 135:2 137:4,7
139:1 160:20 166:18,25
167:2

**start**
13:2,5 36:8 38:21 62:5
85:20 97:22 104:11

25:19 131:25 132:3

105:25 127:4 142:19
156:1 157:13 159:25
205:12

**started**
12:25 67:18 88:11 89:6,8
90:21 101:17 103:15
117:14,15 121:5,15
136:6 138:18 141:7
142:4 145:22 155:18,21
161:19

**starting**
35:12 62:24 86:16 88:3
92:23 98:10 140:20,21
142:19,21 145:12 166:13
172:5 190:2,12

**starts**
89:7 135:14 209:3

**state**
6:14

**statement**
8:24 34:25 48:5,7,22
49:5,10,23 50:2,4 51:1,
13,15 56:23 58:6 59:3,8
70:2 172:25 176:13,21
185:20,25 186:2 194:4,
12 201:4,7,11,23 202:7,
15 203:1,18,20 204:12
214:3

**statements**
198:24

**States**
26:16

**Static**
56:2

**station**
178:8,11,20 191:10
194:8,9 196:2 200:6
212:1

**stature**
14:5,8

**stay**
41:11 57:24 85:19
117:15 132:16

**stayed**
126:16 145:17

**stepping**
59:25 60:11 87:15

**stick**

161:7

**stiff**
119:1

**stomach**
125:1 135:12 141:9
142:11 185:12

**stood**
55:3 161:1

**stop**
60:9,25 92:8,11 100:15
142:24 189:13 196:7
198:12,15

**stopped**
197:16 206:21

**stopping**
59:23 86:20 87:8 101:14
157:16 175:21

**store**
33:2 111:3 161:18

**story**
19:25 84:12 170:10

**straight**
143:15

**strain**
93:21

**strategies**
27:7 28:10

**strategy**
86:7

**straw**
84:3,14

**street**
43:5 44:19

**strength**
119:4

**strenuous**
157:3

**Stress**
210:21

**stressed**
209:5

**stressful**
209:11

**strike**
71:21 86:9 113:23 115:4,

16,23 116:14 139:25
142:1 146:18 176:5
197:1 202:23

**strikes**
135:20,24

**striking**
74:9 114:23 117:3,6
135:4,8

**strip**
44:2,4,10

**stripe**
43:2

**stroll**
67:7 99:10

**strong**
163:5,14

**struck**
63:14 68:8 74:11 205:23
206:18

**stubborn**
161:2

**stuck**
55:10

**stuff**
195:7

**stunned**
15:4

**subconsciously**
160:24

**subduing**
134:22

**subject**
10:9 14:5,9 17:12 113:6
182:10 215:3

**subject's**
14:12

**subjective**
22:17 129:13 153:12
158:5 160:3

**submission**
183:7 191:9

**substantial**
182:11

**successful**
182:8

**sudden**
64:16

**suffered**
180:1 210:21,24

**sufficient**
182:7 183:6

**suggestion**
177:15 191:5

**summary**
47:16 207:22

**summertime**
53:14

**Summit**
32:4

**Sunday**
67:7,13 99:10

**super**
20:10

**supervises**
12:16

**supervisor**
13:1 180:7

**supervisor's**
208:3

**supervisors**
214:22

**supplement**
192:22

**supplemental**
111:22 154:16 192:22
214:20 215:2

**supposed**
41:11 181:5,6 187:25

**suppress**
183:16

**sure**
7:18 8:4,15 10:22 12:23
14:13,16 16:4,22 17:1
18:24 19:12,20,23 20:17,
20 22:3,12,22,24 24:14
27:25 30:6 44:12 47:8
60:6,8,25 62:9 63:14
65:12 66:15 70:17,19
74:23 76:6,8 78:16 79:11
90:18 91:24 92:13 96:23
97:2 98:21 101:3,6

103:15,16,25 105:8,9,24
108:1 112:14 114:2
116:1,21 118:6,20,22
120:14 122:2,19 123:3,6
124:4,6 125:12,16
126:15 127:9 128:22
130:16 132:11,24
133:17,21 136:4,20
138:5,18 139:16 143:17
145:13 148:17 149:4
150:10,16 152:9 156:15,
22,25 157:10,19 160:8,
14,18 161:23 162:6
163:9,13,15 168:3
169:10 171:6 173:24
178:15 189:8 190:22
191:10,15,21 195:1
202:18 210:10 211:1,3,6,
11 213:2

**surface**
20:18 137:7 138:12

**surrounding**
168:6

**suspect**
122:20 136:3 197:20,22
198:13,16 207:11

**suspected**
113:8,18 130:15

**suspects**
14:6 125:14

**suspicious**
129:16

**swarmed**
57:25

**swear**
6:4

**swearing**
36:6,8

**swimming**
20:22

**swing**
63:3,9,16 64:2 78:1,19
81:23 82:4 83:3 119:23

**swinging**
60:22,23 61:1,4,16 63:2
65:9 74:7 76:15,25 80:1
83:7 96:14 99:10 117:1,
125:5 127:19,20,24
130:17

**swings**
77:10

**Switching**
168:18

**sword**
79:16,22 80:1 185:5

**sworn**
6:10

**swung**
59:19

**symptom**
23:12

**symptoms**
23:8

---

**T**

**tackling**
21:20

**tactic**
60:2,5 150:21,22 152:6

**tactical**
46:12 47:2,18 51:8 55:21
57:23 58:7

**tactically**
55:12

**tactics**
104:6

**Tae**
42:22,23

**Tagala**
26:3

**take**
7:15,17 10:19 15:18
21:12,22,24 22:23 31:15
43:8 47:3 54:8 66:19,20
71:19 73:5 82:9 87:11
88:9 90:1 96:18,21 97:12
113:24 117:11 121:16,23
123:10 136:3 139:14
141:13,16,23 142:8
144:4,12 166:21 168:11
189:20 192:9 198:24
203:7 207:25

**taken**
6:22 16:7 31:17 43:10,11
70:1 82:10 83:3,16

103:25 105:12 109:2
121:14 126:16,18 129:22
132:19 139:18 144:5,6,
10,22 147:6,7,18 148:2,
10 161:24 168:12 183:13
187:18 192:12

**talk**
7:12 29:17 40:2 84:7,10
159:24 210:9 213:3
214:22

**talked**
8:4 136:23 160:7 192:5
194:17,18 195:6 211:18

**talking**
33:23 37:20 115:25
160:11

**tall**
10:14

**tape**
142:18 189:5 200:7

**Target**
88:11 89:4,11,12

**targeting**
76:17

**tase**
94:20 96:3 103:20 111:5
135:11 137:4,23 145:13,
24 146:13,21 150:1
154:19,24 203:16

**tased**
19:15 72:5 81:25 82:1,19
105:16 107:4 108:13
111:12 114:3 117:17
123:14,19 126:23 127:20
132:12 133:17,22,25
134:16 142:17 143:13
145:6,15,20,22,23 146:3,
7 149:21,23 156:18
157:6 170:5 173:22
175:2 186:10 197:7

**taser**
15:12 19:5 20:19,22
21:3,17 22:4,14 23:3,4
40:22 41:2 70:22 71:5,10
73:17 74:18 82:22,24
83:10,17,21 93:18 94:1,
7,17 95:4 102:21 104:10
105:18,20 107:3,18
109:10,22,25 110:7,12
117:21,24 119:2 122:7,

12,14 124:9,17,20,21
127:6 132:8 134:24
135:20 136:18 137:9,12
139:11,17 141:14,15
144:13,21,24 145:1,3,5
146:8 149:6 155:4,20
164:5 166:7 170:18
171:10 185:15 186:8

**taser-related**
22:10

**tasered**
40:3 71:11 77:12 82:15
97:5 110:15 111:9 117:8
126:11 134:8 136:10
137:18 138:11,16 139:3
140:16 141:5 142:3
143:1 145:9 148:15
149:13 152:7 154:4,10,
25 157:2 165:21 167:17
171:1 180:13,15,25
184:21,25 186:16 188:18
201:20 203:23 213:24

**tasering**
19:9 80:16 82:17 101:15
124:13 132:23 133:15
138:9,24 139:6 150:17
170:3,20,25 180:14
188:13

**tasers**
123:11 127:5,12

**tasing**
71:1 79:13 107:14
113:12 130:13,14 162:9

**taster**
83:13

**taught**
25:2

**technical**
174:2

**technically**
160:9

**teenager**
43:1

**telephone**
25:12

**tell**
14:18,20,21 17:19 20:15
23:23 24:16 54:4 56:17
63:23 65:20 66:10 79:14,

19 87:2 94:1 95:5,11
101:7 116:24 126:13
141:1 142:5 150:3 160:2
161:16 162:5 170:13
173:11 177:5 203:25
210:7

**telling**
125:25 131:23 202:25

**tells**
131:16 141:18

**tend**
55:5 159:7

**tendency**
57:15

**tense**
65:9 67:12 71:4

**term**
15:20,24,25

**terms**
77:25 83:10 95:14 105:8
126:2 128:7 136:21
144:16 168:4

**terrain**
20:13

**test**
15:18

**test-fire**
15:16

**testified**
6:11, 87:25 97:7 99:16
106:21 130:13 154:23
165:10

**testify**
199:15

**testifying**
7:2

**testimony**
96:13 167:9 194:10

**text**
213:11,12

**Thank**
6:8 36:1 52:5 172:18

**themself**
122:23

**theoretically**
152:4 158:15

**there's**
14:7 18:9,10,12,13
19:16,21 21:10,17,20,22,
25 28:9 31:11 33:2 34:8
35:12 36:5 37:10,19 44:7
49:11 52:2,11 53:1,14
55:12,13 59:6,8 72:20,21
74:6,14,15 75:7 81:24
95:10,11,13,16 98:14,21,
22 99:1 101:21 105:7
106:6 107:19 108:17,18,
19 113:1,17 124:24,25
126:3,13 127:11,14
133:3,18,21,22 135:1,2
138:7 139:10,11 146:23
152:10 165:2 171:23
172:2 176:1,15,18,23
179:20,21 180:6,7
205:13 206:9,12 207:21
210:5,6,8

**they'll**
34:7

**they're**
14:18 15:6,10 20:18 21:7
22:6,7 36:8 47:20 51:10
55:4,9,18,19 57:3 64:15
78:8 80:2 84:11 88:3,12
98:9,10,15,16 103:25
104:1 108:13 126:2,3
128:17 134:25 144:3
147:18 148:1,2,13
160:10 181:5,9 211:5

**thing**
39:8 40:14 108:9 109:8
146:4 156:19 161:5
167:21 168:2,16 212:11

**things**
15:10 20:11 27:19 31:3
42:4 57:20 60:7 82:6
84:8 127:16 129:3
130:23 133:25 135:7,17,
22 139:21 140:12 141:7,
22 142:25 144:23 145:19
150:25 155:21 156:1
159:7 161:9,12,13
191:23 194:18 195:6,7
210:9

**think**
17:14,19 18:21 20:7
21:6,17 22:1,17 23:11
27:15,16 29:24,25 30:5,
25 32:22 33:4,15 36:21
44:8 45:18 46:16 49:14

58:15 64:14 67:4 68:1
69:23 70:7,13 73:16,19
74:16 76:25 78:7 79:21,
23 80:1 85:21 87:12,13
89:21 93:20,25 95:8,12,
24 108:7,9,14 112:19
116:8 119:11,16 121:19
125:9 129:5 135:20
138:14 139:19,22 141:7,
8 142:6 143:12,18
145:11 147:13 148:25
150:19,24 154:4,9 155:4
157:11 158:6,13 159:8,
12,18 161:15 163:7,8
164:2,17 169:6,8,17
171:6 172:2 173:10
174:9 176:19,25 177:13,
15,16 178:2,5,13 186:10
202:21 211:16 212:5,6,
10 214:2

**thinking**
18:15 118:11 141:14
143:9

**third**
23:3 37:6 49:13 93:17
142:14 150:1

**thought**
49:20 58:4 67:5 79:4
90:20,22 129:19 130:18
145:11 149:25 177:11

**threat**
96:6 103:22 123:15,16
127:2,7,24 128:6,8,9,11,
12,18 130:12 137:24
166:14,17 167:19,20,22
168:1,5,7,8,13

**threaten**
76:12 142:13 149:6

**threatening**
36:8

**threats**
127:3

**three**
29:23,25 32:7 35:24 36:5
63:4 66:17 77:1,10 78:1
88:9,20 89:7 92:24,25
93:5,15 95:16,20 101:24
116:8 146:3 191:14
192:8 194:19 195:3,15
206:12 211:22

**threw**
120:20,22 121:2 187:17

**throw**
21:13 120:16 148:6

**throwing**
45:22

**thrown**
135:25

**thud**
95:3

**tight**
120:4

**time**
7:9 12:14 18:3 25:15
33:18,23 34:11,21 38:2,5
40:18,22 41:4 42:15,16
45:1 48:13 49:15,16 53:9
57:13,20,22 58:4,15,17,
18 60:22 66:25 67:2
69:18 70:10 71:13,16,18
73:16 75:10 77:9,11,18
81:25 82:1,13 86:4,5
87:9 89:10,22 90:1 96:7
99:18 100:21,24 103:9
104:21 106:4, 108:24
112:2,6,7 113:4 114:1
117:22,24 118:4,15
122:4 123:7,15 124:3
126:12 128:13 129:16,21
130:14,25 132:7,9 133:7,
14,15 134:21,24 135:21
137:9 138:7 139:3,7,20,
22,24 141:5,14 142:2,14
143:1, 145:9 148:7,16
149:2 150:1,17 152:8,9
154:5,10,25 159:3,5,9,21
160:9,23 161:4,15,17
162:24 165:22,25 166:1
167:17,20 170:4,5,21,23
171:3,13,14,16 178:22
179:17,24 180:5 181:11
184:8,22 185:23 186:16,
23 187:3,6,11,16 188:12,
13,18 191:11 194:8
195:4 201:20 202:10
203:19,22 204:6 207:3
213:25 214:1,14,18

**timeline**
9:3,4 76:24 204:1

**times**
63:3,4 77:1,13 78:1

**threw**
120:20,22 121:2 187:17

86:14 92:24 93:2,14
146:4 172:1 190:21
209:5

**timestamp**
78:8

**timing**
96:23

**today**
6:20 10:6 51:3,4 58:9
185:24 186:1,23 201:19

**today's**
8:2,10

**told**
36:7 43:19 74:18 78:20,
21 86:4 117:11,14
141:13 142:9 145:21
187:4 200:18

**top**
11:9 20:10 27:19 28:21
38:6 79:12 81:15

**tops**
73:6

**totality**
17:4 168:14 170:9,16
177:17

**train**
148:4

**trained**
15:12,25 18:20 20:17,23
21:4,8 22:9,13 23:2,6,8,
19,22 31:5 42:3,6,10
113:14 123:4 137:12
138:9 139:6,9 157:12
158:13

**trainer**
182:23

**training**
9:10 10:21 13:12, 15:14,
19 19:18,22 20:8 21:3,9
24:12,16,18,25 25:7,11,
14 26:24,25 27:4,13,14,
17,20,23 28:6,7,13,17,18
29:9,21 30:3,10,11,17,
19,24 42:7,14,21 131:3
182:11,13,16,19,21,22,
24 207:17

**transcribed**
35:20 184:9

**transcript**
202:7

**transcription**
48:4 184:16

**transcripts**
34:19 35:13,20

**transit**
50:19 52:2 55:16

**transition**
103:24 105:21

**transitioned**
117:1

**transitioning**
104:2

**trapped**
47:20 51:10

**treat**
106:10,13

**treatment**
211:2,5

**tree**
103:3

**treeline**
91:2

**trees**
53:14,17

**trick**
163:21

**tricky**
85:21

**tried**
84:7 142:10 145:6
150:21,22 151:18 176:19

**tries**
105:20 126:23

**trigger**
145:24,25 154:14 155:4
185:15 186:7

**tripping**
21:23

**trouble**
130:11

**truck**
106:12

ALAN SALVOSA - 03/30/2017                     i34

**true**
49:23 50:5 86:21 100:10
110:6 136:5 151:2,3
184:15 185:19,22,25
203:17

**trusted**
159:16

**truth**
49:4 202:25

**try**
7:20 21:1 25:3,5 27:21
55:22 76:7 104:1 106:10
118:2 122:13 125:6
135:13,23 141:8 142:16
148:5,11,14 152:6
164:10

**trying**
21:22 33:17 63:25 76:1,
16 77:15 97:16,18,19
100:8,15 106:9, 115:14
118:4,5,7,11,19,24
121:16 123:20 129:24
134:13,17 135:19 146:9,
10 149:25 163:1,21
169:20 170:11 173:14
174:10,19

**tube**
174:4

**tummy**
159:5

**turn**
16:23 54:14 55:9,22
56:3,4 75:19 84:9 88:23
197:14

**turned**
10:12 32:13 54:25 72:4,6
74:24,25 75:2,3 83:14
84:11,13 109:9,16
114:18,19 173:18 174:4,
23 176:5 194:7

**Turner**
8:19,20 60:1 88:14 116:6
117:19,25 118:15 119:7,
22 120:15,16 121:10,19
122:11 131:23 132:7
137:25 141:11 142:20,21
150:3 152:14,24 153:1,5,
25 156:4 157:13 161:16
162:2,6, 175:8 187:12

**Turner's**

**turning**
83:12 111:5,8

**turns**
32:8 43:4 72:23 73:2,3
75:7,8 109:20 111:1,4

**twice**
155:4

**two**
19:15 32:8,24 38:11,21
43:4 52:14 63:4 73:5
74:15 77:1,10,25 81:1
89:7 93:14 94:9 96:4,18,
21 101:23 121:8 123:23
130:21 134:24 135:11,23
150:25 167:24 202:18
211:22 214:5 215:2

**type**
14:6 18:12 34:3 157:20,
25 158:1,23 182:16

**typed**
50:2

**typical**
156:24

**typically**
155:20 156:2

**typing**
33:23

───────────

                 U

**U-turn**
46:11 47:12 50:22 51:5
54:18,19,22 55:17 56:2,5

**U.S.**
209:17

**Uh**
37:12

**Uh-huh**
29:13 35:15,23 37:1 90:7
94:12 112:23 116:10
118:1,17 121:7 133:2
141:5 149:18 152:7
178:17 191:6 206:8,11

**ultimate**
139:18

**Ultimately**

**191:7**

**Um**
36:2

**unbroken**
11:13

**unbuckling**
59:25 60:11

**unconscious**
119:5

**understand**
7:19 17:8 24:21 30:12
47:8 73:20 76:23 78:16
80:5 109:6 115:14
119:17,19 129:5,11
130:1,2,8,21,22 131:12,
21,22 147:25 151:8,14,
21,24 152:3,5

**understanding**
24:13 27:1 55:19 65:12
76:8 113:16 129:17
180:3

**understands**
129:25 131:4 151:21

**understood**
7:21 48:15 128:1,25
129:4,10,12,14 130:19
131:9

**uniform**
130:3

**union**
212:5,14

**United**
26:16

**universal**
130:3

**unknown**
127:3 128:10

**unreal**
86:5

**unruly**
207:11

**unsuccessful**
164:18

**update**
34:6,7,10,11

**updated**
33:8,11

**upper**
110:4

**upset**
86:6

**urine**
212:7

**use**
9:8,9 13:14,17,23 17:24
18:13,14 21:11 24:2,
25:5,11,13 42:3 45:6
66:14 106:4,6,24,25
108:18,21,23 111:21,23
112:2 138:7 149:6 152:9
164:5 171:3 177:21
179:8,14 180:3,7 181:2,4
185:14 186:7,19 187:25
188:3,4,9 198:2

**useful**
141:16

**utilized**
42:19

───────────

                 V

**vacation**
12:17 130:5

**varies**
124:23

**various**
13:22 92:21

**vehicle**
46:23 58:3 196:16
198:13,14,16 205:19
206:10,21 207:1,6,12

**verbal**
83:9 208:11

**verbally**
64:19 130:2

**versus**
14:5,6,9 74:17 80:1
135:18 136:3,21 137:7
153:13 166:25 167:2,5

**victim**
97:18 175:12

**Victor**

**turning** continued above in second column — 9:22,23 101:8 201:18

6:18

**video**
9:4,19 10:2 50:15 84:24
85:7,9 86:17,18,22,25
87:6,17 89:6,7 90:8
91:12,25 92:6,14,19
93:3,12 94:4,13 95:1,6
97:1 101:8,9,12 111:6
116:4,6 142:21,22 149:4
150:2 157:14,25 160:13
161:17 162:2,12 163:22
166:6 172:7,19 173:5,8
174:16 175:9,19 176:4,
11,24 181:5,7,10 186:3
188:20 194:4 196:5
199:1,4 201:19 214:7

**videos**
9:12,14,17,18 58:21
181:1 201:6,13 214:9

**view**
53:17 70:9 98:23 134:19
141:25 142:2 144:8
153:20,22 166:5 170:17
186:9

**violent**
125:6 127:10 128:14

**visible**
141:2 158:21

**vision**
69:17

**voice**
93:21 148:24 172:9
173:12 175:11,16,22,24
176:15,18,23 189:15
190:6,8 196:9,11,13

─────────────

**W**

**wait**
7:5 70:24

**waited**
71:14 100:13

**waking**
134:4

**walk**
60:16 66:3 67:6,10,14
99:10,17,19

**walked**
66:4,8 72:1 75:25 77:19

**walking**
14:21 56:16 64:24,25
65:2,9 66:12 67:7,8
71:24 75:6 77:4,22 99:6,
8,11,20 100:3 161:18

**walks**
99:13

**want**
7:3 16:23 20:21 23:23
47:3,13 78:16 80:4 83:2
85:14,15,17 86:2 89:17
92:11, 119:21 129:12
133:13 144:19 153:15
181:5 183:22

**wanted**
47:17 51:7 70:24 86:14
109:8

**warned**
203:16

**warning**
93:18

**warnings**
148:17

**wasn't**
32:9 65:18 67:7,13 69:18
70:20 74:2 83:15 96:23
99:9 101:2 103:13 105:1
111:2 119:13 120:6
121:3 125:23,24 129:9,
13,20 135:10 146:2
147:8 153:9 154:2,3
166:1 169:23 170:3,4,13
180:17 207:11

**watch**
9:17 10:2 23:8 33:18
116:3 148:2 176:24
188:20 201:6,9

**watched**
58:20 148:15 201:10

**watching**
95:6 103:14 124:5
133:10 149:4 186:3
201:13

**water**
20:21,22

**way**
17:22 40:23 53:18 55:13,
14,22 57:8,10 72:19
79:18 80:6,17 84:3,10

88:21,25 103:7 104:24
116:18 124:24 125:7
132:5 134:7 143:24
148:4 153:17 155:9,15,
18 159:12 163:3,8,19
170:7 171:20 181:15
185:25 188:11

**ways**
18:10 143:22

**we'll**
7:21 75:9 147:18 172:2
202:23 215:6

**we're**
40:2 93:5 95:12 126:4,5
131:14 139:9 153:13
155:25 161:6,10

**weapon**
38:23 39:4,14,16 41:22
61:1 79:18 81:11 105:21
125:5 130:4 144:14,15,
17 198:18 203:10

**weapons**
14:4 33:7,9,12,14 37:7
38:17,25 39:4 60:24 81:2
104:1,14 105:7 121:17
126:6 130:10 138:2

**wearing**
91:9,10 119:2

**weeks**
8:12

**weigh**
10:16

**weight**
11:1

**Weights**
10:23,24

**weird**
12:23 163:10

**Welcome**
109:5

**well-trained**
155:8

**went**
27:16 46:22 66:6 110:2,3
143:15 178:11 199:10,11
202:24

**weren't**

98:3 103:17 108:2
144:25

**west**
32:24 46:16,20, 53:22
55:17 68:24 89:1 101:24

**what's**
11:19,23 16:11 28:3 35:4
39:17 47:23 51:18 84:17
111:15 122:1,17 123:1
179:2 181:20 192:16
202:1 204:19

**wheelchair**
14:19

**Whittenburg**
121:21

**who's**
19:23 97:18,19 103:21
106:11 113:14 122:4
129:1 130:17

**wielding**
79:25

**willing**
50:5

**windows**
66:6 73:25

**windowsill**
100:25

**winter**
53:9

**witness**
6:7,11 61:22 68:14,16
77:17 79:9 83:5 85:22
86:11 97:18 102:21
132:6 164:15 168:19,21
170:1,2 192:11 210:12

**witnessed**
63:7 96:14 164:6 170:2
194:20

**witnesses**
103:2 169:9 177:24
178:3,4 199:20

**witnessing**
77:21

**woman**
75:14

**wondering**
60:8

**word**
191:7

**worded**
18:4

**words**
165:16

**work**
33:24 108:7,8 124:18,19
157:4 177:14

**worked**
103:24 147:13,22

**working**
12:14 31:21 104:11
147:20 185:2 190:22
195:21

**workout**
107:17,24 157:3,22
158:3

**works**
33:19,25 209:6

**world**
56:3 108:10 146:4

**worried**
197:1,2

**worse**
108:9 137:19

**wouldn't**
14:21,22 15:8 20:21
57:16 98:23 107:2
108:20 110:23 118:7
120:3 122:12 123:6,7
144:18,23 145:15 159:11
160:1 165:23

**wrestle**
135:6,19,24

**wrestled**
136:22

**wrestling**
21:16 46:1 135:5,16,17

**wrist**
21:2

**write**
182:23 184:12 187:1
214:20 215:1

**writing**
179:17,24 182:10,20

183:19 188:23 190:25
191:16

**written**
22:18 188:11 189:20

**wrong**
148:8 171:10 186:13

**wrote**
185:21,23 186:21 187:6,
20 188:19,21 214:14

---

**X**

**Xerxes**
46:18,19 51:20

---

**Y**

**yank**
135:13 166:23

**yeah**
18:20 29:1 36:2 39:12,15
41:22 54:3 57:11 69:5
73:2 77:23 88:16,21
90:20 102:6 109:18
115:1,3 117:2 118:14
126:2 138:3,20 141:18
146:9 153:10 171:6
172:17 174:6,9 176:18
197:19 202:21,22 208:2,
9

**year**
11:15 13:1 208:11

**yearly**
205:3

**years**
12:4 191:14 192:8
194:19 195:3,15 205:7
215:2

**yell**
19:3 98:6 126:4 132:14

**yelled**
73:16

**yelling**
46:4 69:15 72:3 78:5
79:11 81:12 95:11,23
125:24 132:11 133:18,
21,22,24

**yellow**

43:2

**yep**
13:4 14:10 17:7 46:1
73:10,13 83:7 89:20,24
90:11 91:17 99:8 124:15
130:8 207:18

**yesterday**
60:1

**you'd**
18:14 29:17 70:6 124:2
129:7 136:12 153:13
181:8

**you'll**
37:5 142:17 149:8

**you're**
7:3,25 13:23 14:15
15:11,23 16:2 18:15,16,
25 19:1,3,18 21:8 23:22
39:13 52:9 56:19 70:10
74:16,17 75:20,25 76:14,
16 80:5 95:15 96:9 97:19
100:11 106:15,16 107:17
108:1,7 109:6 110:22
111:2 124:16 125:8
130:10 132:12 143:23
148:20 155:24 157:4,5,
21 158:2 159:20 160:9,
11,18,22,24,25 161:13
164:19 165:6 168:3
179:17 184:9 190:12
199:24 210:6,9

**you've**
16:11 23:12 27:4,7 28:3
35:4 47:23 51:18 84:17
85:5 111:15 138:8 179:2
181:20 192:16 202:1
204:19

---

**Z**

**zero**
29:10, 108:18