# EXHIBIT S

**Kevin Khottavongsa, as Trustee for the Heirs and Next of Kin of Sinthanouxay Khottavongsa**

**v**

**City of Brooklyn Center et al.**

**Case No: 16-cv-1031-RHK-DTS**
**United States District Court**
**District of Minnesota**

---

**Report**

**of**

**CHARLES W. DRAGO**
**DRAGO PROFESSIONAL CONSULTANTS, LLC**

---

April 24, 2017

# **Table of Contents**

Table of Contents.................................................................................................... 2

Introduction.................................................................................................…... 3

Qualifications.................................................................................................… 3

Opinions...................................................................................................….… 4

Materials considered in forming opinions.................................................…..… 27

Past Expert Witness Testimony.........................................................................… 29

Publications.............................................................................................…….. 38

Compensation.........................................................................................…….... 39

Appendix 1 – Curriculum Vitae of Charles W. Drago

Joshua J. Rissman
Gustafson Gluek, PLLC
120 South Sixth Street
Suite 2600
Minneapolis, Minnesota 55402

Dear Attorney Rissman,

I have been retained as a consultant and expert in the matter known to me as Kevin Khottavongsa,
As Trustee for the Heirs and Next of Kin of Sinthanouxay Khottavongsa vs. City of Brooklyn Center et al. Case
No: 16-cv-1031-RHK-DTS, United States District Court, District of Minnesota.

I was retained by Attorney Rissman and asked to review documents, video and other materials relevant to this
matter and render expert opinions about the police actions of the defendants involved in this matter.

After evaluation of all the facts and circumstances that are known to the witnesses at the time of this incident,
I employed comparative methodology in determining my opinions and in evaluating the officer's actions. This
method of comparing the actions of the officers with accepted practice and training in the law enforcement
profession is a common and consistently applied method when evaluating an officer's actions. Therefore, I
formed a number of opinions to a reasonable degree of professional certainty, as to the use of force, arrest
techniques, training, and police procedures used by the Brooklyn Center police officers in this matter and
whether or not certain actions of the defendant police officers were consistent with accepted police practices.

My opinions are based not only on the facts presented by all parties, but my experience and training concerning
proper policies and police practices in use of force, arrests techniques, and training. Pursuant to the
requirements of Rule 26 of the Federal Rules of Civil Procedure, I have studied the reports and other material
provided to me regarding this case. Please be advised that if there are any additional depositions, policies, or
other materials produced in this case, a supplemental report may be necessary; thus I reserve the right to
supplement my opinions and/or this report.

The material reveals that there is conflicting information between some of the police officers and the civilian
witnesses. Resolving such conflicts involves assessing witness credibility and assigning weight to the given
testimony, and is the responsibility of the trier of fact. Accordingly, the opinions offered in this case related to
facts in dispute are based on assumptions that are identified in the basis for my opinion, and the totality of my
knowledge, training and experience.

## Qualifications

I am a 30 year career law enforcement officer who advanced through the ranks of the police department with
an exemplary record.  Recognized for integrity and leadership, I was appointed as assistant police chief, police
chief as well as deputy chief of staff and senior law enforcement advisor to the Governor of Florida.

As a senior leader of major law enforcement agencies and a member of the department's review boards; I have
investigated hundreds of police misconduct allegations in all areas including use of force/Taser/pepper spray,
deadly force, k-9, and police pursuits. I have broad-based experience in high liability areas including the
management and development of policies and procedures in those areas.

During my career, I have attained a significant amount of experience in police officer involved shootings as a police officer in the field as well as a line supervisor and homicide detective supervisor who investigated police officer involved shootings. As a police executive, I have also developed use of force policies and evaluated trends and individualized cases. In addition, I served as a union representative on many officer involved shootings. I received training in criminal investigations, homicide investigations, police officer bill of rights and internal police investigations.

As an experienced frontline law enforcement officer who was directly or indirectly involved in thousands of arrests, my experience includes service in various capacities with direct hands on involvement and/or supervision in areas such as patrol, street narcotics, SWAT, k-9, street crimes, criminal investigations, training and homicide. I have advanced through the ranks and served as a police officer, field training officer, detective, sergeant, detective sergeant, captain, major, and assistant chief with 18 of those years as a commanding officer. My career includes significant experience with the investigation of police officer use of force, as an officer, immediate supervisor and senior administrator.

My education includes an Associate's Degree in Criminal Justice, a Bachelor's Degree in Criminal Justice, and graduation from the Southern Police Institute Command Officer's School at The University of Louisville. In addition, I have had numerous hours of training in the use of force, Tasers, arrests, firearms, supervision, patrol procedures and the management of those.

As a certified police instructor, I trained thousands of police officers in the use of force, criminal investigations, search warrant procedures, narcotics investigations, and patrol procedures.

**Opinion A: Based on the totality of the circumstances, the force used by Officer Alan Salvosa when he deployed his Taser the first time against Sinthanouxay Khottavongsa would be unreasonable and inconsistent with accepted police practices if Mr. Khottavongsa did not demonstrate an intention to strike someone with the crowbar.**

1. The objectively reasonable standard has been recognized as the legal standard for the use of force by police since the U.S. Supreme Court decision in *Graham v. Connor*. As such, police organizations and police departments across the country have moved away from policies which required compliance with a use of force continuum and have adopted the objective reasonableness standard in their police training and department policies.

2. Police officers are trained that not only might they receive civil and criminal penalties for using unreasonable force but they could also receive departmental discipline. Therefore, the objectively reasonable standard has become the accepted police practice when a police department is evaluating an officer's use of force administratively as well as criminally. Since the policy requires that an officer meets that standard then any unreasonable use of force would be determined to be a violation of the department policy.

3. The reasonableness standard is an accepted police practice and recognized as such by most recognized police organizations in the United States including Brooklyn Center Police Department.

4. The International Association of Chiefs of Police (IACP) brings police chiefs together from all over the country to create Model Policies to guide local police agencies in police best practices. While police agencies are not obligated to follow these model policies, they do serve as generally accepted police practices. IACP formulated a Model Policy on the use of force which clearly delineates Objective Reasonableness as the standard for police use of force.

5. **IACP Model Policy, Use of Force:** (II) *It is the policy of this law enforcement agency that officers use only the force that is reasonably necessary to effectively bring an incident under control, while protecting the lives of the officer and others. It must be stressed that the decision to use force is not a subjective determination and the decision is not left to the unfettered discretion of the involved officer. A use of force must be objectively reasonable. The officer must use only that force which a reasonably prudent officer would use under the same or similar circumstances.*

6. **IACP Model Policy, Use of Force**: *(III) Objectively Reasonable: This term means that, in determining the necessity for and appropriate level of force, officers shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to the community.*

7. U. S. Department of Justice Consent Decree Regarding The New Orleans Police Department required the Police Department to promulgate a use of force policy which incorporated reasonableness as the standard for officer use of force. "(B) (28) The general use of force policy will incorporate the use of force principles articulated above, and shall specify that the unreasonable use of force will subject officers to discipline, possible criminal prosecution, and/or civil liability."

8. **Commission on Accreditation for Law Enforcement Agencies (CALEA)**: *1.3.1: Use of Reasonable Force: A written directive states personnel will use Reasonable Force when force is used to accomplish lawful objectives.*

9. **Police Executive Research Forum (PERF) Guiding Principles on Use of Force**: *Graham v. Connor is the common denominator across the United States; all police agencies must have use-of-force policies that meet Graham's standards.*

10. Officer Salvosa stated in his incident report that he deployed his Taser in the probe mode against Khottavongsa. Officer Salvosa's Taser printout revealed that he deployed the Taser for a full five second cycle. According to Officer Salvosa, the Taser had the desired effect and he fell backwards.

11. The Taser deployment was partially captured on Officer Turner's dashcam. Officer Salvosa can be seen with his arm stretched out while pointing the Taser in Khottavongsa's direction. Khottavongsa appears to show the effects consistent with Neuromuscular Incapacitation (NMI) when he fell backwards.

12. **Taser International Version 19 2013**: *The Motor Nervous System consists of the nerves that go out from the spinal cord and connect to the muscles, controlling muscle movements. These are the nerves we really want to control to stop aggressive subjects – and that's exactly how NMI systems work – they stimulate these*

*motor nerves causing uncontrollable muscle contractions that inhibit the subject from being able to perform coordinated movement.*

13. When Khottavongsa fell, he was unable to block his fall due to the NMI and therefore fell straight backwards striking the back of his head on the concrete pad he was standing on.

14. Police officers receive training on the use of the Taser as well as the dangers and risks associated with its use. The Brooklyn Center police officers received training on the Taser through the Taser International Version 19 training program. The Taser training acknowledges that the Taser is not completely non-lethal and there are certain warnings that Taser teaches regarding these risks. Police officers are trained to understand the "Quantum of Force" associated with the Taser as with any use of force. The term generally means that an officer should consider the potential or foreseeability of injury before deploying the Taser against a person.

15. One such warning involves "injuries from falls". Taser International Training warns NMI frequently causes subjects to fall and falls are often uncontrolled and subjects are often unable to catch him/her self. "Falls even from ground level, can cause serious injuries or death." The training includes an example, that Tasering someone standing on concrete has a higher Quantum of Force (i.e. foreseeable injury) than someone standing on grass.

16. Reasonable officers are expected to consider this warning whenever they encounter a subject standing in in a position where a fall might cause severe injury such as with a concrete pad. Officer Salvosa acknowledged this warning: **Salvosa deposition**: *Q. "And are you trained that -- that falls --Taser-related falls, even from ground level, can cause --have caused serious injuries or death? A. Sure."* However, Officer Salvosa deployed the Taser against Khottavongsa while he stood on a concrete pad.

17. Officer Salvosa stated in his incident report that when he arrived on the scene, he saw Khottavongsa standing amongst a group of people who were "pushing each other and struggling as if they were actively engaging in a fight."

18. Cadet Jose Nochez was riding with officer Salvosa that night and stated in his deposition that he didn't see anyone fighting when they first approached. (Nochez deposition 24:21) Other civilian witnesses dispute Salvosa's claim that people were actively fighting when the police arrived. (Martinez deposition 26:7-12; Sarin deposition 32:20-33:20; Galarza deposition 16:5-17:12). Officer Turner is his police report stated the group was only arguing, although he gives a different version in his statement and says the group was fighting.

19. Officer Salvosa stated in his incident report that he saw a male holding what appeared to be a shiny long object. As the officer got closer he states that the long object appeared to be a sword or a knife. Officer Salvosa stated in his report that he saw the male (Khottavongsa) approach a woman with the object raised in his hand above her head as if "attempting to strike her". In Officer Salvosa's deposition, this statement was contradicted by his testimony that he could not identify a particular woman Khottavongsa threatened, but was generally swinging the crowbar in the middle of a group. (Salvosa deposition 63:2-64:8; 68:6-69:24

("I think it was a male, I don't recall"); 76:10-22. As Officer Salvosa approached, the group that was fighting disengaged. (Salvosa deposition 97:11-98:2). Khottavongsa lowered the crowbar and began to walk back towards the laundromat according to Officer Salvosa. (Salvosa deposition 99:13)

20. Officer Turner stated in his supplemental narrative that he saw "a middle aged Asian male walking amongst the group of people and holding what appeared to be a metal rod or bat type item in the air like a sword". "The male was walking around waving it at certain people in the group." Officer Turner admitted he was quite far away when he witnessed this and it was dark. (Turner Deposition Exhibit 3; Turner deposition 38:5-39:8). Officer Turner testified he only saw Khottavongsa swing the crowbar the one time. (Turner deposition 47:1-30).

21. Several other witnesses dispute Officer Salvosa's account and claim that Khottavongsa never swung, raised, waived or threatened anyone with the crowbar at any point in the encounter. (Martinez deposition 21:9-23:17; Galarza deposition 11:10-12; 12:25-13:25; Elmi deposition 21:20-24:1). Cadet Nochez, who was positioned directly behind Officer Salvosa, also testified he did not see Khottavongsa swing the crowbar at anyone. (Nochez deposition 57:9-19; 64:15-21).

22. After the group disengaged, Khottavongsa walked back toward the laundromat with his arm down and the crowbar parallel to the ground. (Salvosa deposition 99:4-100:4). Officer Salvosa stated in his report that he pointed his Taser at Khottavongsa and told him to get on the ground and drop it. Khottavongsa "looked at me, turned away, and then raised the crowbar as if he was going to strike someone else". Officer Salvosa gave him one final warning and deployed his Taser into Khottavongsa's back causing him to fall backwards.

23. There were several witnesses to Officer Salvosa's use of the Taser. Officer Turner also stated in his report "As I pulled into the parking lot, I saw Officer Salvosa yelling at the man to drop the item; however the man turned away from him and began walking while still holding the long metal object. I then saw as Officer Salvosa deployed his Taser, making contact with the Asian male with the weapon."

24. It is important to note that Officer Turner did not say that Khottavongsa lifted the crow bar as if to strike someone when Officer Salvosa deployed his Taser. Officer Turner testified Khottavongsa was lowering the crowbar when he was Tasered. (Turner deposition 47:1-16). Critically, Officer Turner testified he did not believe Khottavongsa was going to hit someone with the crowbar when Officer Salvosa Tasered him. (Turner deposition 54:5). This is an important difference in testimony since Officer Salvosa stated he deployed the Taser because he thought Khottavongsa was about to strike someone with the crowbar.

25. In order to wield a crowbar, it must be raised above the head or held away from the body. (Turner deposition 37:13-23). A crowbar held in a downward position or close to the body cannot effectively be used as a weapon.

26. Cadet Nochez also confirmed in his deposition that Khottavongsa was not holding the crow bar up in a threatening manner when he was Tasered (Nochez deposition 84:10).

27. Officer Salvosa stated: "had he turned away from me and lowered it, it would have been a different story, but he turned away and raised it, so I guess that was kind of the final straw." (Salvosa deposition 84:11-14).

28. Independent civilian witnesses also corroborated Officer Turner and Cadet Nochez's information related to the Khottavongsa's actions immediately prior to being Tasered. Guadalupe Galarza testified in her deposition that Khottavongsa was not holding the crowbar above his head when he was Tasered. (Galarza deposition 13:15). Maria Cruz-Martinez also testified in her deposition that Khottavongsa never raised the crow bar above his head and that he kept it close to his body. (Martinez deposition 21:25). Kear Som, who was closest to Khottavongsa, testified in his deposition that he never saw Khottavongsa swing the crow bar at anyone and that the crowbar was in a downward position. (Som deposition 20:12). Som testified that Khottavongsa was standing still when he was Tasered. (Som deposition 9:24). Mohamed Elmi was in agreement with the other independent witnesses that Khottavongsa didn't wave the crow bar at anyone nor did he threaten anyone with the crow bar (Elmi deposition 21:20). According to Elmi, Khottavongsa was just standing there. Leang Sarin also testified that the crowbar was in down position when he was Tasered. (Sarin deposition 17:12). Sarin said he did not see Khottavongsa threaten anyone with the crowbar, and the "distance [was] too far" for anyone to feel immediately threatened. (Sarin deposition 36:13).

29. The Turner video also indicates Khottavongsa did not have the crowbar raised above his head as if to strike someone. At 21:16:30, you can see Khottavongsa a split-second after he is Tasered and his ensuing fall. He falls to the ground with the crowbar held close to his body. His arm is clearly not in the position described by Officer Salvosa. Based on the way Khottavongsa fell, it is my opinion the Taser was very effective in that he went into full NMI or "body lockup." Chief Gannon, testified Khottavongsa went into "body lockup." In body lockup, "you fall in the position you were Tasered in." (Gannon deposition 186:2) Cadet Nochez also testified the crowbar was in the same position when Khottavongsa hit the ground as it was when he was standing. (Nochez deposition 85:11).

30. In determining appropriate charges for Mr. Khottavongsa, Sergeant Coleman recommended obstruction without force and disorderly conduct. (Coleman deposition 80:19-81:8). The obstruction without force charge is appropriate for a person who fails to follow commands, but is not violent. Sargent Coleman, after assessing the evidence and his own observations, determined Khottavongsa had not been violent, and did not physically resist officers. (Coleman deposition 92:5-22; 105:5-20).

31. The disorderly conduct charge is not consistent with a suspect attempting to hit someone with a crowbar. (Turner deposition 130:4-20). Disorderly conduct is much less serious than second degree assault. Officer Salvosa initially recommended 2nd degree assault, but Sergeant Coleman disagreed because Khottavongsa was trying to break up the fight and defend the owners of the store. (Coleman deposition 80:9-18). Officer Salvosa then changed his recommendation to disorderly conduct.

32. The important distinction in this event is whether or not Khottavongsa was posing an immediate threat to the officer or anyone else when Officer Salvosa deployed the Taser. The Taser is a painful form of force and can result in serious injuries under certain conditions. Therefore, The Brooklyn Center Police Department

and nationally recognized police organizations have established policies and practices which prohibit the use of the Taser against nonviolent individuals.

33. **Brooklyn Center Police Department 304.5.1:** *Application of the Taser device: The TASER device may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably necessary to control a person: (a) The subject is violent or is physically resisting.(b) The subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, him/herself or others.*

34. **Police Executive Research Forum 2011 ECW Guidelines**: *25. ECWs should be used only against subjects who are exhibiting active aggression or who are actively resisting in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others. ECWs should not be used against a passive subject.*

35. **International Association of Chiefs of Police (IACP): (IV) (C )**: *6.The ECW shall not be used on those who passively resist as defined in this policy…(Passive resistance: A refusal by an unarmed person to comply with an officer's verbal commands or physical control techniques that does not involve the use of physical force, control, or resistance of any kind)*

36. Officer Salvosa reported that he saw Khottavongsa raise the crow bar in a threatening manner and he deployed the Taser against him to protect nearby individuals. (Salvosa deposition 72:1). The officer continued to explain in his deposition that he wouldn't have deployed the Taser at Khottavongsa if he hadn't raised the crow bar over his head.

37. **Salvosa deposition 84:42:** *had he kept it by his side and not done anything, I probably would have tried to talk to him more and -- and figure things out…*

38. The mere fact that Khottavongsa was holding the crow bar would not translate to an immediate threat. The fact that Khottavongsa possessed a crow bar may constitute a potential threat but not an immediate threat and an officer following accepted police practices wouldn't have exposed Khottavongsa to the pain and danger of the Taser.

39. Police officers are taught to recognize persons who may not understand a command. The reason may be due to mental illness, intoxication, lack of ability to speak English, or developmental disability. Although police officers are not required to allow a person who does not understand commands to harm another, if there is only a potential threat, the Officer should try other tactics to disengage the person.

40. Khottavongsa spoke little to no English. (Kevin Khottavongsa deposition 60:22). Witnesses who did not know Khottavongsa, or the fact he did not speak much English, immediately observed that he was not understanding police commands and may not have spoken English. (Martinez deposition 32:8-33:10) (Galarza deposition 14:6). It took Officer Turner only 8 seconds to assess the Khottavongsa was not understanding their commands, because he did not speak English. (Turner deposition 71:21- 74:15). Officer Salvosa believed Khottavongsa was mentally ill and/or intoxicated based on his behavior prior to being Tasered the first time. (Salvosa deposition 113:1). Although Khottavongsa was not intoxicated (see

Toxicology Report), and there is no evidence that he was mentally ill, Officer Salvosa's observations should have led him to suspect Khottavongsa did not comprehend his commands.

41. Police officers are trained to deescalate situations where there is a potential threat. Officer Salvosa was close enough to Khottavongsa so that he could have deployed the Taser if Khottavongsa became an immediate threat. Assuming the crowbar was not in a raised position as if to strike, Officer Salvosa had the time to continue issuing verbal commands, attempt to speak with Khottavongsa in a calmer demeanor and allow back up officers to arrive.

42. Police officers are taught to avoid "Time Compression". This is where an officer becomes so emotionally involved by a person he/she perceives as resistant that the officer over reacts and rushes into a situation when he/she didn't have to. Typical symptoms would be moving too close to the subject, shouting/screaming confusing commands and/or engaging an agitated person who doesn't present an immediate threat.

43. Police policies and training enforce the reasonableness standard and officers are expected to understand and follow the dictum when considering the use of force. The question the officer asks himself should be do I need to use force?  And when using force, what amount of force is reasonably necessary under these circumstances?  Police officers can only use force when it is reasonable to do so under the circumstances facing them.

44. **IACP Model Policy on Use of Force:** *Officers use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others. It must be stressed that the use of force is not left to the unfettered discretion of the involved officer. This is not a subjective determination. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar situation.*

45. Police officers can only use the amount of force necessary to control a situation or to protect themselves or others from harm. An officer's use of force must be proportional to the amount of resistance offered by the suspect.

46. Brooklyn Center PD Policy 300.3.2 requires officers to consider the totality of the circumstances before using force against an individual. Factors to be considered include: Immediacy and severity of the threat to officers or others, officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects), whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others, etc.

47. Several witnesses dispute Officer Salvosa's report that Khottavongsa raised the crow bar over his head. No witnesses corroborate Officer Salvosa's testimony. Instead, the witnesses stated that Khottavongsa never lifted the crow bar and kept it down or close to his body. If the witnesses are correct then the use of force in this instance would be unreasonable and inconsistent with accepted police practices. A reasonable officer would not have deployed the Taser against Khottavongsa if he was holding the crow bar and not threatening

to harm anyone with it. Officer Salvosa would have had the time to seek more information and if he had, he would have learned that Khottavongsa was not the suspect but one of the victims in this case.

**Opinion B: Based on the totality of the circumstances, the force used by Officer Alan Salvosa when he deployed his Taser against Sinthanouxay Khottavongsa the second time was unreasonable and inconsistent with accepted police practices.**

48. The video taken from Officer Deering's dash cam shows Khottavongsa lying in a supine position on the ground and surrounded by several police officers. There are some civilians standing, sitting or lying down in the general vicinity. Officers are yelling commands "Get down on the Ground". The civilians are complying with the commands and getting on the ground. The civilians are calm and the police officers are slowly milling around. Khottavongsa has the crow bar in his right hand which is lying against his torso. Khottavongsa can be seen rubbing his head periodically with his left hand. Khottavongsa's movements are slow and he isn't making any threatening movements at all. Officer Salvosa is heard screaming at Khottavongsa and ordering him to drop the crow bar. Officer Deering approaches Khottavongsa and commands Khottavongsa to drop the crow bar.

49. Officer Turner knew that Khottavongsa had hit his head when he fell and he also suspected that Khottavongsa was intoxicated and unable to understand English. Officer Turner is heard saying something to the effect; "I'm gonna grab it." Officer Turner can be seen on the Deering dash cam video as he walks to Khottavongsa and pulls the crow bar from his hand in one smooth maneuver without notable resistance from Khottavongsa. Officer Turner's actions would indicate that he did not consider Khottavongsa to be a threat. A reasonable police officer would have kept his distance and continued to order Khottavongsa to drop the crow bar from a distance if he considered Khottavongsa a threat.

50. The scene is tranquil at this time except for the officers who were screaming commands over each other. The officers were issuing different commands and didn't identify who they were talking to. Police officers are trained to speak in clear distinct tones when issuing commands. The officers should identify the person to whom they are speaking to ensure that the recipient of the commands understands. Otherwise, the officers can cause confusion for the other police officers as well as the civilians. The scene became more chaotic as more police officers arrived and more officers yelled various and conflicting commands. The officer's actions escalated the situation rather than deescalated the situation.

51. Khottavongsa remained in a supine position for 23 seconds after the crow bar was removed from his person. The police officers continued to scream commands but none of the officers made any attempts to take Khottavongsa into custody. There are at least five police officers around Khottavongsa at this time and Khottavongsa is still attached to the Taser being held by officer Salvosa. Police officers are trained to take an individual into physical custody as quickly as possible to protect the officers as well as the subject. Instead, the police officers made Khottavongsa lie on the concrete when Officer Turner knew that he hit his head. The officers should have taken him into custody and if he resisted, the officers standing around him, the officers could have overcome that resistance. In addition, Officer Salvosa could have easily overcome any

resistance by activating the Taser again if Khottavongsa violently resisted the officers when they attempted to handcuff Khottavongsa.

52. **Officer Deering deposition 54:12**: *Q. Did you see any reason why Mr. Khottavongsa could not have been placed into handcuffs at that point? A. No.*

53. **Sergeant Coleman deposition 56:14:** *Q. Once the crowbar was removed from him, was there any reason he couldn't have been taken into custody, that you -- that you perceived? A. Not that I saw.*

54. The police officers surrounding Khottavongsa had their Tasers and firearms drawn and in the ready position as he lied on the ground. Khottavongsa is then seen on Officer Deering's dash cam video as he leans forward and slowly lifts his upper body from the ground. Officer Salvosa screamed "don't get up; you're going to get it again". The officer then activated his Taser again for a full five second cycle causing NMI for Khottavongsa. Officer Nordby began walking up to Khottavongsa just prior to Officer Salvosa activating the Taser for the second time. Officer Nordby stood over Khottavongsa and placed his left foot on him in an attempt to push him to the ground. Officer Salvosa activated his Taser at about the same time and Khottavongsa fell back to the concrete, striking his head again.

55. Police officers are trained to announce that they are going to deploy the Taser before they do so. In fact Brooklyn PD Conducted Energy Device policy 304.2 also requires a warning. The purpose of the warning is to alert fellow officers and to allow the suspect the opportunity to comply with any commands. In this case Officer Salvosa told Khottavongsa "you're going to get it again". This expression would not suffice for a warning that he was going to activate the Taser again. Police officers are required are required to issue all commands in clearly so there is no need for the subject to interpret the officer's intentions.

56. The actions of Officer Nordby would be inconsistent with an officer who considered Khottavongsa as a threat. A reasonable officer would have waited for Officer Salvosa to activate the Taser before he would have walked up to him if he perceived Khottavongsa as a threat. Officer Nordby's actions also demonstrate that a much less severe use of force was available to restrain Khottavongsa if that became necessary.

57. Khottavongsa remained supine on the concrete after he was exposed to the Taser a second time. The officers didn't handcuff Khottavongsa while he was "under power" as taught in the Taser International Version 19. "Under power" meaning that he was still feeling the NMI effects of the Taser and therefore the officers would be able to easily handcuff Khottavongsa. Instead, the officers left him lying on the concrete and Officer Salvosa continued to threaten to activate the Taser again if Khottavongsa didn't roll over. The officers waited for the effects of the Taser to wear off and then attempted to take him into physical custody when the suspect would have more opportunity to resist.

58. Officer Salvosa provided conflicting stories regarding the reason for activating the Taser against Khottavongsa the second time. The officer originally stated in his incident report (P3-4): "*He then attempted to get up and fearing that he would use the crow bar again I pulled the trigger on the Taser and he was shocked for another five seconds.*"

59. The evidence in this case indicates that the statement provided by the officer in his incident report was inaccurate. Officer Turner had removed the crow bar from Khottavongsa 23 seconds before Officer Salvosa Tasered him the second time. Officer Salvosa admitted in his deposition that he provided the wrong information in his police report.

60. A failure to provide complete, accurate and thorough information in a police report is inconsistent with accepted police practices and Brooklyn Center P.D. policies. Police officers are trained that the incident report is one of the most important documents they will prepare. Those reports may be viewed by supervisors, commanders, prosecutors, defense attorneys, news media, etc. The officers know that all pertinent information must be included in the incident report. That includes any activities by the suspects; force used by any police officers, policy violations etc. This is especially true for a police officer who has used force against an individual. In this case Officer Salvosa is providing the reason for activating the Taser the second time. That reason according to the officer is because Khottavongsa was holding a crow bar and attempting to get up. The officer reported that he was in fear of Khottavongsa using the crow bar. The basis for deploying force didn't actually exist.

61. This type of inaccuracy is not a routine error.  Sergeant Coleman agreed that it uncommon for officers to get a fact "completely wrong." (Coleman deposition 105:1). Chief Gannon also noted that officers getting facts completely wrong is not something he "normally see[s]." (Gannon deposition 105:10).

62. Officer Salvosa didn't give any reason for using the Taser other than his fear of Khottavongsa using the crow bar against someone. In fact, Officer Salvosa stated in his deposition that he wouldn't have deployed his Taser against Khottavongsa when he was standing and holding the crow bar if he hadn't raised it over his head.

63. It was clear from the evidence that Khottavongsa was not a threat to any of the officers when Officer Salvosa activated the Taser the second time. According to the evidence in this matter, there were six police officers on the scene when Khottavongsa was Tasered the second time. While some of them may have diverted their attention to other civilians in the area from time to time, at least three officers stood by Khottavongsa when he was Tasered the second time. Officer Whittenburg stood less than ten feet from him and watched Khottavongsa start to sit up, yet did nothing. (Whittenburg deposition 39:3).  Officer Whittenburg's inaction is not consistent with training officers who witness a threat to the safety of others. (Whittenburg deposition 25:22).

64. **IACP Model Policy on Use of Force:** *Officers use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others. It must be stressed that the use of force is not left to the unfettered discretion of the involved officer. This is not a subjective determination. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar situation.*

65. **Brooklyn Center P.D. Policy 304.5.4 Multiple Applications of the Taser Device**: *Multiple applications of the TASER device against a single individual are generally not recommended and should be avoided unless the*

*officer reasonably believes that the need to control the individual outweighs the potentially increased risk posed by multiple applications.*

66. Police officers can only use the amount of force necessary to control a situation or to protect themselves or others from harm. An officer's use of force must be proportional to the amount of resistance offered by the suspect.

67. **Brooklyn Center P.D. Policy 300.3.2** requires officers to consider the totality of the circumstances before using force against an individual. Factors to be considered include: Immediacy and severity of the threat to officers or others Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects), whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others, etc.

68. Khottavongsa did not pose an immediate or imminent threat to the officers when Officer Salvosa Tasered him the second time, nor did he act violently or threaten violence. A reasonable officer wouldn't have considered Khottavongsa a threat that would require the use of the Taser the second time.

69. **Officer Nordby deposition 72:12:** *And in that position, did you believe him to be an immediate threat or a potential threat? A. A potential threat*

70. **Whittenburg deposition 43:13:** *Q. And did that motion of sitting up present an immediate threat n[t]o your safety? A. No. 44:1: Q. So would you call that -- would you say it was an immediate danger or more potential danger? A. No, not immediate*

71. **Nochez deposition 106:21**: *Q. Right. So, but once the crowbar was removed, if he got into a sitting position without a weapon? A. Oh, without a weapon. Q. Yeah. A. No. I don't perceive that as being a threat, no.*

**Opinion C: Based on the totality of the circumstances, the force used by Officers Salvosa and Nordby when they kicked him to roll him over was unreasonable and inconsistent with accepted police practices**.

72. Officer Turner saw Khottavongsa fall after being Tasered and hit his head on the concrete. 61:17: A. I watched him fall backwards, yes. Q. Did he hit -- did you see him hit his head? A. From what I recall, yes. Q. Would you agree that he "bonked his head" on the concrete pretty good? A.· ·Yes

73. **Officer Turner deposition 112:19**: *Q. … This guy we've had to drag him everywhere. He pissed his pants, he's got two probes in him and he hit his head on the concrete. A. Was that me saying that? Yes. A. Yes*

74. **Officer Turner deposition 127:21**: *You testified earlier that he seemed disoriented right after the first Taser -- after he wasted the first time; is that correct? A.· ·Yes*

75. Khottavongsa can be seen rubbing his head several times on Deering's dash cam video as the police officers mill around him.

76. **Officer Nordby deposition: 141:14**: *And you said: ·" Yes. He appeared to be in an altered mental. He was incapable of answering questions and was not making eye contact. He was unfocused and moaning"*

77. **Officer Nordby deposition 185:23:** So you -- did you say -- do you say at that point in the video: Hey, Al, did this guy hit his head on the ground or anything? A. Yes. Q. And is that Officer Salvosa responding he may have? A. Yes. Q. And Officer Turner responds: Yeah, he got a good clunk? A. Yes.

78. Officers Salvosa, Nordby and Turner knew or should have known that Khottavongsa was in pain and possibly injured. The officers knew that he was Tasered and fell to the concrete and saw Khottavongsa's behavior after the fall.

79. The Deering dash cam video depicts Khottavongsa as he moves slowly, rubs his head with his hand and doesn't appear coherent after he was Tasered the first time and fell to the concrete.

80. At approximately 21:18:04 of the Turner dashcam video, Officer Salvosa is seen ordering Khottavongsa to roll over onto his stomach or he would get it again. Khottavongsa remains on his back and slowly moves his arm and one leg. He continues to stare up at the sky and doesn't react to the police officers presence or their commands. Officer Salvosa and Nordby then began to kick Khottavongsa in an attempt to roll him over. Khottavongsa is not offering any resistance or threatening behavior when the officers kicked him. The officers should have acknowledged that Khottavongsa was injured and left him lying on his back. Instead the officers kicked him several times.

81. Khottavongsa was moaning and showing signs of being injured, the officers shouldn't have moved him and should have called for medical help.

82. Turner dash cam: 21:18:02: Officer Nordby is seen gesturing with his arm to Khottavongsa. Officer Nordby stated in his deposition that he made the gesture because he was concerned that Khottavongsa didn't understand what they were saying (Nordby 117:9).

83. Even if the officers didn't know he was injured, it was not necessary to kick Khottavongsa when he wasn't resisting. Police officers can only use the amount of force necessary to overcome the resistance. A reasonable officer would have rolled Khottavongsa onto his stomach by hand. There were enough officers to do that easily. The situation never rose to the level where kick strikes against Khottavongsa were necessary. The use of force must be proportionate to the resistance.

84. The evidence reviewed indicates that Khottavongsa never offered any physical resistance after he fell to the concrete.

**Opinion D: Based on the totality of the circumstances, the force used by Officers Turner and Nordby forcing Sinthanouxay Khottavongsa's head/neck to the ground was unreasonable and inconsistent with accepted police practices.**

85. The officers had ample evidence by this time in the event and should have known that Khottavongsa was injured and possibly intoxicated and unable to understand English. In spite of that, the officers continued to use unnecessary and unreasonable force against Khottavongsa.

86. Turner dahscam video 21:18:17: Officer Nordby and Turner roll Khottavongsa over onto his stomach while Officer Turner grabs the back of Khottavongsa's head/neck area and forcibly pushes his face down to the gournd .

87. Once again, Khottavongsa is not physically resisting or threatening anyone. The officer should know that he has been injured and possibly unable to understand commands. Even if Khottavongsa wasn't injured, he wasn't physically resisting and the failure to comply with verbal commands would be considered passive resistance. The physical force used by Officer Nordby and Turner would be unnecessary force and would not be proportionate to the level of resistance.

88. The use of unreasonable force at this point is that more egregious when one considers the fact that Khottavongsa has suffered a head injury. Police officers are trained that head injuries can be serious and potentially fatal and therefore officers should not move them and seek immediate medical care.  Grabbing the neck and head area of a person with a head injury violates accepted police practices.

**Opinion E: Based on the totality of the circumstances, the force used by Officers Turner and Nordby when they forcibly lifted and dragged Sinthanouxay Khottavongsa to a police car was unreasonable and inconsistent with accepted police practices.**

89. **Turner dash cam video 21:19; 32**: Officer Turner and Officer Nordby lift Khottavongsa off the concrete. When he is placed in a standing position, Khottavongsa's legs seem to go limp. Khottavongsa doesn't seem to be lifting his legs but they don't seem capable of holding up his weight. Instead of taking note of this and considering that Khottavongsa may have suffered a serious injury, the officer drags him to the police car. The officers testified that they heard him moaning and groaning throughout this event. The moaning and groaning can also be hard on the dash cam video. The moaning and groaning can also be heard on the dash cam video. Instead of acknowledging that his moaning was a signal that he was in need of medical attention, the officers believed Khottavongsa was just "playing games" (Turner deposition 135:7-11).  Nordby admitted he assumed Khottavongsa was faking it.  (Nordby deposition 176:16).

90. Khottavongsa's legs drag underneath him as the officers drag him to the police car. Khottavongsa is not lifting his legs up but rather his legs just seem to be limp underneath him. A reasonable officer would have recognized these signs that Khottavongsa was injured and taken the appropriate care. Trained officer know that they should not move a person who has suffered a head injury.

91. Khottavongsa was not physically resisting nor was he threatening any of the officers. The use of force was not proportionate to the level of resistance. Therefore, the force was unnecessary and unreasonable based on the totality of circumstances.

**Opinion F: Based on the totality of the circumstances, the force used by Officers Turner and Nordby when they dragged Sinthanouxay Khottavongsa from the police car was unreasonable and inconsistent with the accepted police practices.**

92. Khottavongsa appeared to be suffering from an injury during this event. It should have been obvious to the police officers before they dragged Khottavongsa out of the back seat of the car. They recognized that he was danger in the back seat when he fell into the wedge of the seat and unable to get up. Officer Turner yells at Khottavongsa, "Get out or we'll drag you it doesn't matter to me." (Turner Video) Officer Turner gave these commands despite believing Khottavongsa did not speak English and while observing Khottavongsa's obviously perilous condition.

93. Instead of providing medical aid, the officers forcibly dragged him from the back seat and lowered him down on the street without protecting his head, allowing it to strike the side of the door.

94. Khottavongsa was in a medical emergency and the officers used unnecessary force instead of providing medical assistance. The force was unnecessary and unreasonable under the totality of circumstances.

**Opinion G: Officers Salvosa, Turner and Nordby failed to provide adequate medical aid to Khottavongsa contrary to accepted police practices.**

95. The evidence in this matter indicates that Officers Salvosa, Turner and Nordby knew or should have known that Khottavongsa was injured. Officers Salvosa, Turner and Nordby also saw Khottavongsa fall the first time. (Turner dashcam video; Nordby deposition 41:11). Officers Salvosa and Turner knew Khottavongsa hit his head. (Nordby deposition 185:22-186:7) Officer Nordby, while claiming not to have seen Khottavongsa hit his head, should have been concerned seeing the way Khottavongsa fell and given the many other symptoms Khottavongsa demonstrated.

96. Officers Nordby and Salvosa acknowledged that they heard Khottavongsa moaning and groaning as if he was in pain. Khottavongsa can he heard loudly moaning and groaning on the Turner video.

97. **Officer Nordby deposition: 141:14:** *And you said: ·Yes. He appeared to be in an altered mental state."*

98. Officer Turner saw Khottavongsa fall after being Tasered and hit his head on the concrete. *61:17: A. I watched him fall backwards, yes. Q. Did he hit -- did you see him hit his head? A. From what I recall, yes. Q. Would you agree that he "bonked his head" on the concrete pretty good? A.· ·Yes*

99. **Officer Turner deposition 112:19:** *Q. Do you say, This guy we've had to drag him everywhere. He pissed his pants, he's got two probes in him and he hit his head on the concrete. A. Was that me saying that? Yes. A. Yes*

100. **Officer Turner deposition 127:21**: *You testified earlier that he seemed disoriented right after the first Taser -- after he wasted the first time; is that correct? A.· ·Yes*

101. Khottavongsa can be seen rubbing his head several times on Deering's dash cam video as the police officers mill around him.

102. Khottavongsa is seen on the Turner dash cam video as he appears to have difficulty walking. Several officers stated that they believed that Khottavongsa acted like he was in an altered mental state, possibly intoxicated.

103. The police officers had reason to believe that Khottavongsa may have injured his head when he fell backwards. Police training would dictate that the officers immediately call for medical personnel as an emergency and not as a routine call. The officers on the scene should then attempt to keep Khottavongsa still while they wait for the medical personnel.

104. The police officers on the scene should have called for medical personnel to treat Khottavongsa after he was exposed to the Taser in the probe mode as well.

105. **Brooklyn Center P.D. Conducted Energy Device Policy 304.7**: *All persons who have been struck by TASER device probes or who have been subjected to the electric discharge of the device shall be medically assessed prior to booking. Additionally, any such individual who falls under any of the following categories should, as soon as practicable, be examined by paramedics or other qualified medical personnel: (a) the person is suspected of being under the influence of controlled substances and/or alcohol... ...(c) the person reasonably appears to be in need of medical attention.*

106. The police officers had reason to believe that Khottavongsa may have injured his head when he fell backwards, and from the observation of Khottavongsa's symptoms. Police training would dictate that the officers immediately call for medical personnel. The officers on the scene should then attempt to keep Khottavongsa still while they wait for the medical personnel.

107. Officer Whittenburg claimed that he didn't see Khottavongsa fall. Officer Whittenburg expressed concern about Khottavongsa as he saw him lying on the ground next to Officer Turner. Turner just responded that Khottavongsa was "playing games" and rejected Whittenburg's suggestion to step up the ambulance from routine to an emergency. Officer Whittenburg testified that had he known Khottavongsa had hit is head (which was known to Turner and Salvosa), he would not have moved him and would have stepped up the ambulance to an emergency (Whittenburg deposition 54:7-55:22).

108. Sergeant Coleman stated in his deposition that he didn't remember how he learned that Khottavongsa had hit his head after being Tasered. He also stated that he wasn't advised that Khottavongsa was injured until after the para medics arrived. However, Sergeant Coleman testified that the officers should have told him Khottavongsa was injured if they knew that.

109. **Coleman deposition 64: 1:** *If they struck their head and, reasonably, appeared to be in need of medical assistance, should they have told you then? A. Yes.*

110. After reviewing the Coleman dashcam video, Sergeant Coleman recalled that Leang Sarin told him at the scene that Khottavongsa hit his head after he was struck with the Taser (Coleman deposition 70:10).

111. Sergeant Coleman testified in his deposition that he wasn't concerned about Khottavongsa after learning that he hit his head. He didn't check Khottavongsa for injuries, provide any medical assistance or direct his officers to do so.

**Opinion H: Officers Turner and Nordby violated established police practices by failing to intervene before Officer Salvosa activated the Taser against Khottavongsa the second time.**

112. **Brooklyn Center P.D. Use of Force Policy 300.2.1 Duty To Intercede:** *Any officer present and observing another officer using force that is clearly beyond that which objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.*

113. Officer Salvosa yelled "don't get up or you're going to get it again." His voice elevated prior to Tapering Khottavongsa a second time. While this warning violated best police practices in terms of a clear warning to Khottavongsa, it should have been enough to put other officers on notice Officer Salvosa was possibly going to use the Taser again.

114. Officer Turner saw Khottavongsa hit his head on the concrete. The officer also suspected that Khottavongsa was intoxicated, was disoriented and unable to speak English. As a result, it would be logical for any reasonable officer to believe that Khottavongsa was unable to understand the commands made by Officer Salvosa. (Turner deposition 94:4). Officer Turner could have intervened by informing Officer Salvosa he did not believe Khottavongsa spoke English, or that he otherwise was not capable of comprehending commands. Officer Turner gave no reason why he was unable to communicate his belief at his deposition. (Turner deposition 102:10).

115. Officer Turner had walked up to Khottavongsa as he lied supine on the concrete and removed the crow bar from his possession. This action would be inconsistent with an officer who felt that Khottavongsa was an immediate threat requiring the use of the Taser. It would naturally follow that Khottavongsa would be less of a threat when he was Tasered the second time since he didn't have the crow bar in his possession.

116. Officers Whittenburg, Nordby, Deering and Cadet Nochez testified in their depositions that Khottavongsa's behavior before he was Tasered the second time didn't rise to the level of an immediate threat.

117. Officer Nordby believed he could restrain Khottavongsa with just his foot. (Nordby deposition 79:14). He gave no legitimate reason why he could not have communicated his intention to use a foot to restrain Khottavongsa. (Nordby deposition 88:22, 89:1). Nordby's belief that communicating with Salvosa could give away their plans to the suspects on the ground violated best police practices and Brooklyn Center Taser training, given that no one was actively resisting or posing an immediate threat.

118. It should also be noted that Officer Salvosa was threatening to activate the Taser against Khottavongsa a third time before he was taken into custody and none of the officers on the scene attempted to intervene.

119. **Officer Nordby deposition 112:17:** *Q. Okay.· And do you believe it would have been an appropriate use of force for Officer Salvosa to Taser him a third time for failing to roll -- failing to roll over based on your assessment of the situation? A. simply for failing to roll over, I would say, no. (Yet, Officer Nordby didn't intervene when Officer Salvosa threatened to Taser Khottavongsa a third time).*

120. Chief Gannon explained in his deposition how a police officer should stop a police officer involved in using unreasonable force; "You should physically prevent the officer from hurting another person." (deposition 93:24).

121. Another intervention option would have been for Officer Turner to communicate Khottavongsa did not understand, or for Nordby to communicate that he could restrain Khottavongsa with just hit foot, and that he should not shock him again.

122. None of the officers on the scene attempted to intercede and stop Officer Salvosa from deploying the Taser the second time even though Khottavongsa was not offering an immediate threat.

**Opinion I: Officer Salvosa violated established police practices by failing to intervene when Officers Turner and Nordby used unreasonable force against Khottavongsa**

123. Officers Turner and Nordby used unreasonable force when they forcibly lifted and dragged Khottavongsa to a police car.

124. Officers Turner and Nordby used unreasonable force when they forced Khottavongsa's head/neck to the ground.

125. Officer Salvosa is seen standing in close proximity to Officers Turner and Nordby when they handle Khottavongsa as described above.  Khottavongsa is heard loudly moaning and groaning with Salvosa in earshot.  Despite having Tasered him twice and seeing him fall, Salvosa does nothing to intervene or inform Officers Turner and Nordby they should lessen their level of force.

126. Based on the reasons listed previously in this report, Officer Salvosa should have intervened and stopped Officers Turner and Nordby from using unreasonable force against Khottavongsa.

**Opinion J: The City of Brooklyn Center's level of supervision and enforcement of training for Officers Salvosa, Turner and Nordby is inconsistent with accepted police practices and was inadequate in regard to the use of force.**

127. It is my opinion that while the City of Brooklyn Center has appropriate use of force and Taser policies and training on paper, the City of Brooklyn Center's enforcement of these policies violated best police practices and therefore the supervision of Officers Salvosa, Turner and Nordby violated best police practice, and was inadequate.

128. **IACP Concepts and Issues Paper, Reporting Use of Force: (II) (E):** *No policy can be effective if officers become aware that the department does not enforce the policy and/or does not impose sanctions for noncompliance*

129. Officer Salvosa believed that "potential threats" and "immediate threats" are indecipherable. Brooklyn Center Officers are supposed to be trained that a Taser may only be used on an immediate threat, not a potential threat. Taser International Training Manual v 19. The failure to understand that Khottavongsa at most represented a potential threat (assuming he did not raise the crowbar), or the disregard of the fact the threat was not immediate, demonstrates the supervision Officer Salvosa received in this critical area was contrary to best police practices and was inadequate.

130. When specifically asked about his selection to deploy the Taser for the second time instead of using another option, Officer Salvosa referred to it as "five seconds of inconvenience." (Salvosa deposition 135:18). To refer to a significant and painful use of force as a Taser as merely inconvenient, demonstrates a lack of enforcement of training of what a Taser device is and how it should be deployed.

131. The other responding officers display a similar lack of knowledge of specific policies and procedures. Officer Nordby's testimony demonstrates a similar lack of enforcement of training regarding use the Taser. When asked about multiple uses of the Taser, Officer Nordby stated: "I don't think there's anything we get trained that would…necessarily tell us: no, you don't want to try to go for that second time." (Nordby deposition 83:17). Additionally, Officer Nordby noted that there is "not necessarily" an increased risk of using a Taser multiple times. (Nordby deposition 86:13). Officer Nordby was also unaware that officers should consider how an individual will fall after being subjected to a Taser. See Nordby deposition 86:20-25; 87:1-12 ("as far as…the density of the ground that they're standing on and stuff like that, that doesn't normally play into effect."); (Nordby deposition 88:18). Officer Turner's testimony displays a similar lack of training regarding the risk of using a Taser device. Officer Turner did not recall any training stating that falls from ground level could cause serious injuries or death. (Turner deposition 18:20). The failure to understand the risks associated with multiple tasings and Taser-related falls is important to this case, because Officers Nordby and Turner claim they had no reason to believe he may have been injured.

132. Brooklyn Center officers should also be trained to communicate with each other when a suspect is connected to probes. Taser International Training Manual v 19 (notes version), at 155. Effective communication ensures the suspect will be brought into custody with as few applications of the Taser as possible. The Taser Training Manual discusses a scenario similar to the incident in question, "There have been incidents where subjects have been exposed to multiple TASER CEW cycles because the subject would not comply with verbal surrender commands following a TASER CEW deployment. Contact officers were available but did not move in during the cycle while the subject was incapacitated."

133. Officer Nordby believed that officers should not communicate, for fear of telegraphing their plans to suspects. This is not an accepted police tactic in a setting when no one is actively resisting and where a suspect is connected to Taser probes. Officers Nordby, Turner and Salvosa do not communicate with each

other at all in a 20 second period between Officer Turner removing the crowbar from Khottavongsa and the second Tasing. (Turner dashcam video).

134. An agency's disciplinary system is a critical reinforcement of its policies and rules. It is important that an agency's policies are followed and that an appropriate disciplinary scheme is established for violations. An important function of the disciplinary action is the message that is sent to others when an officer is disciplined or when he or she is not disciplined for a policy violation. All officers must understand the importance of the rules and regulations and the consequences for violating them. For example, if an officer is involved in a preventable accident, it is important to have a disciplinary scheme established.

135. A first violation may result in a letter to the file, while a second violation may require some remedial training. A third violation may result in a change of duty so the individual does not have an opportunity to use force to control a suspect. At some point a department will have to take more drastic action and those steps must also be made known to the officers. A policy without a meaningful disciplinary system will not be taken as seriously as one which includes an effective system of discipline. Similarly, a disciplinary system that can be subverted or manipulated will not serve as a deterrent. There is no room for "winking" at a violation and excusing poor judgment or deliberate actions which result in a violation of policy.

136. The Brooklyn Center Police Department did not conduct an objective, complete and thorough investigation into the death of Khottavongsa while in police custody. According to the documentation, the police department allowed the Hennepin County Sheriff's Office to interview the officers in a perfunctory manner and didn't investigate obvious discrepancies in the police reports and statements. It appears as though the investigators in that case accepted the officer's statements and entered the investigation with a pre-determined theory as to what occurred based on the officer's statements. The investigators did not make a serious effort to document information contrary to their theory. Notably, the summaries of the witness statements omit the witness testimony from the audio recordings of interviews that directly contradict Officer Salvosa's statement. See audio recordings for Galarza, Elmi, Cruz-Martinez.

137. The Brooklyn Center Police Department accepted the Investigative Report submitted by the Hennepin County Sheriff's Office without questioning some of the results.

138. Police supervisors were supposed to have had a discussion with Officer Turner for his use of language that displayed a cold and indifferent attitude. (Gannon deposition 66:7-68:6). Despite the official recommendation for an informal discussion with Turner, that discussion never occurred. The failure of a police department to follow through on recommended discipline or "informal discussions" indicates a culture of allowing Officers to violate establish policy and training without suffering consequences.

**Opinion K: The City of Brooklyn Center's level of supervision and enforcement of training for Officers Salvosa, Turner and Nordby received is inconsistent with accepted police practices and was inadequate in regard to their duty to provide medical care for subjects in police custody.**

139. It is my opinion that while the City of Brooklyn Center has appropriate medical aid policies and first responder training on paper, the City of Brooklyn Center's enforcement of these policies violated best

police practices and therefore the supervision of Officers Salvosa, Turner and Nordby violated best police practices, and was inadequate.

140. Police officers are required to protect individuals who are in police custody. The officers in this case failed to take the minimum steps necessary to ensure Khottavongsa's safety and Chief Gannon failed to perform a meaningful investigation of this tragic death while in the custody of these officers.

141. **International Association of Chiefs of Police: (IACP):** *(IV) (E) (5) Post-Arrest Protection (a) Officers shall be aware that, following an arrest, they are legally responsible for the safety of the arrestee, any victims present, and all bystanders. Therefore, officers shall take all steps reasonably necessary to protect (1) the officer from the arrestee, (2) victims and third persons from the arrestee, and (3) the arrestee from self-injury or injury by others.*

142. **Brooklyn Center P.D Use of Force Policy 300.6***:* Medial Consideration*: Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed…Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate*

143. City of Brooklyn Center Police Officers are supposed to be trained first responders. As first responders, Brooklyn Center Officers should be trained to stabilize persons who appear to have head injuries. Deering deposition (15:17-17:4) ("you want to move them as little as possible if you know there's a head injury); Whittenburg deposition (55:13-22); Gannon Deposition (71:2-10) ("To move the victim as little as possible, maintain an open airway, and provide oxygen therapy").

144. Officer Salvosa—the individual responsible for the use of force—disclaimed any responsibility for assessing Khottavongsa's condition. (Salvosa deposition 155:4). Officer Salvosa believed other responding officers would be able to attend to him. By passing his duty to other officers, Officer Salvosa failed to consider that his intimate perspective of the incident rendered him the most capable of performing an adequate assessment, or — at the very least — informing other officers of the likelihood Khottavongsa was injured. Officer Salvosa's passive approach underscores the lack of enforcement of basic Brooklyn Center policy regarding his responsibility to persons in custody.

145. Officer Turner had physical contact with Mr. Khottavongsa; however, the officer failed to provide him medical care in a timely fashion, despite testifying that they knew he had hit his head. (Turner deposition 136:14). (Officer Turner confirmed dashcam and body microphone footage capturing him stating that Khottavongsa had "bonked" his head on the concrete "pretty good"). Officer Nordby also had physical contact with Khottavongsa. Despite his close proximity to the victim, Officer Nordby did not assess or render medical aid to Mr. Khottavongsa. In fact, Officer Nordby believed he was being dramatic. (Nordby deposition 176:16) (Q: At this point, did you believe that Mr. Khottavongsa was just being dramatic? A: Yes.).

146. Officer Turner also stated the he was not provided with any training to deal with head injuries. Officer Turner was also not trained to recognize several tell-tale signs of injury, such as someone rubbing their head after they fell. (Turner deposition 20:12).

147. **Officer Turner Deposition Tr. 19:16-19**: *Q: If you believe someone to have a head injury, are you given any training as to what to do or not to do to that person? A: We are not.*

148. When asked if officers are trained to watch for injuries sustained by individuals who have been Tasered, Turner simply stated "no." (Turner deposition 19:11).

149. Officer Turner said he was not familiar Medical Consideration of the Use of Force Policy, which requires Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable. (Turner Deposition 17:4-6).

150. Officer Nordby's belief that there is "not necessarily" an increased risk of using a Taser multiple times was in direct violation of Brooklyn Center policy. (Nordby deposition 86:13)

151. Because the officers were generally unprepared to deal with Khottavongsa's fatal injuries, they subsequently took actions that contradict generally accepted principles for dealing with head injuries. The officers forcefully arrested Khottavongsa, which included an officer forcefully pushing down on his neck. They then dragged him to the car without any head support. Khottavongsa was then placed in the car, and was not monitored or observed until he fell into the wedge between the front and back seats. At that point, he was roughly pulled from the car hitting his head on the door in the process. Finally, the officers placed him in the "recovery position" on the ground; however, he received no medical care until paramedics arrived. See generally Turner dashcam video. Chief Gannon admitted that "less movement could have occurred." (Gannon Deposition 71:22-23).

152. Mr. Khottavongsa did not receive medical treatment until paramedics arrived. This process was significantly delayed, because Officers Turner and Salvosa were not trained to recognize head injuries. As a result, none of the officers expedited the response time of paramedics by upgrading the call from "routine" to "lights and sirens." (Whittenburg deposition 50:1-25, 51:1-25, 52:1-4).

153. The Brooklyn Center Police Department did not conduct an objective, complete and thorough investigation into the death of Khottavongsa while in police custody. According to the documentation, the police department allowed the Hennepin County Sheriff's Office to interview the officers in a perfunctory manner and didn't investigate obvious discrepancies in the police reports and statements. It appears as though the investigators in that case accepted the officer's statements and entered the investigation with a pre-determined theory as to what occurred based on the officer's statements. The investigators did not make a serious effort to document information contrary to their theory.

**Opinion L: Brooklyn Center Police Officers failed to submit complete and thorough police incident reports**

154. Brooklyn Center P.D. Report Preparation Policy 321: 321.1.1: all reports shall accurately reflect the identity of the persons involved, all pertinent information seen, heard, or assimilated by any other sense, and any

actions taken. Employees shall not suppress, conceal, or distort the facts of any reported incident, nor shall any employee make a false report orally or in writing. Generally, the reporting employee's opinions should not be included in reports, unless specifically identified as such.

155. Police training requires that police officers write complete and through incident reports documenting all the pertinent information related to that event. Officers are warned that if it isn't in writing then "it never happened". Reporting the "who, what, where, when and how" in report writing is one of the most basic classes taught to recruits in the police academy.

156. Officer Salvosa reported in his incident report: (P3-4): "He then attempted to get up and fearing that he would use the crow bar again I pulled the trigger on the Taser and he was shocked for another five seconds."

157. The evidence in this case indicates that the statement provided by the officer in his incident report was inaccurate. Officer Turner had removed the crow bar from Khottavongsa 23 seconds before Officer Salvosa Tasered him the second time. Officer Salvosa admitted in his deposition that he provided the wrong information in his police report. That is a significant error considering the fact that the officer stated that his reason for using force was the crow bar. When in actuality, Officer Turner had removed the crow bar from Khottavongsa in front of Officer Salvosa and the other officers on the scene.

158. Officer Salvosa also stated in his incident report (P3): "I then used my foot to kind of roll him over to his stomach" before he Tasered Khottavongsa the second time. The officer actually did that after he Tasered Khottavongsa.

159. **Brooklyn Center P.D. Use of Force Policy 300.5**: *Any use of force by a member of this department shall be documented promptly, completely and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances. To collect data, for purposes of training resource allocation, analysis, and related purposes, the department may require the completion of additional report forms, as specified in department policy, procedure or law.*

160. There was significant evidence in this case to indicate that Officer Salvosa activated his Taser against Khottavongsa the second time after Officer Turner removed the crow bar from his possession. However, that major discrepancy was never discussed or questioned in the documents reviewed. In fact, Officer Salvosa stated that he didn't know about the discrepancy until pointed out in his deposition. (Salvosa deposition 186:23). This discrepancy should have been noted by the Brooklyn Center P.D. and investigated.

161. Sargent Coleman, upon reviewing Officer Salvosa's report, did not believe it to be necessarily inaccurate. (Coleman deposition 104:9-13). He also testified it was not the type of error that would prompt further investigation, perhaps only a clarification question from Sargent Coleman. (Coleman deposition 105:21-107:5). Although required to send reports to Internal Affairs he believes to be falsified, Sargent Coleman has never done that. (107:8-10).

162. Sargent Coleman, Officer Nordby and Officer Turner all testified that they are not required to document any use of force another officer uses that they witness, or threats to another officer and civilian safety. (Coleman deposition 93:14-94:2; Nordby deposition 18:8-19:5; Turner deposition 34:2-6). This testimony indicates a cultural failure to enforce Brooklyn Center Police Report Policy and a failure to supervise with respect to police reports.

163. Officer Deering submitted a supplemental narrative where she failed to report that she heard Officer Salvosa activate the Taser against Khottavongsa. The officer also failed to mention that she witnessed Officer Turner remove the crow bar from Khottavongsa before he was Tasered the second time. These are both critical issues that should be reported by the officer who witnessed them.

164. Officer Deering is seen in the Turner dash cam video standing next to Officer Turner when he said" I'm going to grab it" referring to the crow bar. The officer is also seen in that same video standing nearby Officer Salvosa when he activated the Taser the second time. Officer Deering stated in her deposition that she did hear the Taser when it was activated the second time. (deposition 68:8)

165. Despite looking directly at Khottavongsa when he was Tasered, Officer Whittenburg failed to mention Khottavongsa at all in his police report. He discusses Khottavongsa in his Hennepin County statement; however, he admitted that his statement was inaccurate on this point. (Whittenburg deposition 36:18-21).

166. Officer Turner fails to mention that Khottavongsa was Tasered a second time in his police report. He also fails to note that Khottavongsa hit his head hard. (Turner police report).

167. Officer Nordby is the only person to correctly document the second application of the Taser. However, in his statement to Hennepin County Sherriff's Office, he omits that Khottavongsa was Tasered a second time. He admitted this would have been information of "significant value." (Nordby deposition 196:14-197:1)

168. **IACP Concepts and Issues Paper, Reporting Use of Force: (II) (E):** *No policy can be effective if officers become aware that the department does not enforce the policy and/or does not impose sanctions for noncompliance.*

**Opinion M: Brooklyn Center failed to provide adequate training for their police officers in regard to dealing with non-English speaking individuals.**

169. Brooklyn Center is a diverse city. The city has several cultural groups living there, including: Hmong, Laotian, Somali, Liberian, and Hispanic or Latino. Currently, there is a greater percentage of non-white than white individuals living in the city. (Gannon deposition 83:6-24).

170. After the incident with Khottavongsa, Brooklyn Center police officers attended a new training called "Cultural Competency and Conflict Resolution Training." These trainings occurred in April 2015, four months after the incident involving Mr. Khottavongsa. See Officer Training files. Prior to the Cultural Competency and Conflict Resolution Training in 2015, Officer Turner could not recall participating in any

other similar training. (Turner deposition 21:11).  Other than vague "on the job training" there is no evidence of training specific to communicating with Non-English speakers.

171. With such a diverse population, the City of Brooklyn Center should have known and expected that their police officers would engage people from these various non English speaking cultures.  As such, The city of Brooklyn Center now holds immigration meetings for the community and the Police Department provides is a member of the Joint Community Police Partnership (JCPP), the police department endeavors to enhance communication and understanding between law enforcement officers and multicultural residents.

172. Officer Salvosa testified that he has dealt with non-English speaking people or people who spoke little English in his capacity as a Brooklyn Center Police Officer. (Salvosa deposition 25:15-24)

173. When asked about training they receive to deal with non-English speakers, Officers Whittenburg and Deering both testified that they had received multicultural training. (Deering deposition 20:9); (Whittenburg deposition 15:5). The multi-cultural training they received was called Cultural Competency and Conflict Resolution Training. (Deering deposition 23:12).  In the training, the officers learned how to identify someone who may not speak English.  (Deering deposition 21:20-22:21).  Cues could include the subject's race, and whether or not they were responding to commands.   One method of confirming a suspicion a person does not speak English is asking them a question to see if they respond or acknowledge.

174. Despite the Cultural Competency/Conflict Resolution training, some officers testified they have received no training.  Officer Turner testified he had no training on recognizing persons who may not be understanding commands.  (Turner deposition 20:18).

175. (Officer Nordby deposition 104:9): Q: If you believe for any of the reasons we've discussed that someone may not be understanding the command… are you trained to communicate to the individual to see if they communicate back? A: No, not in a use of force situation.

176. Either way, no Brooklyn Center Police Officers appear to have received any type of interaction with non-English speakers training prior to January 15, 2016.  The City of Brooklyn Center knew that their police officers would encounter non-English speaking members of the community on a regular basis. Therefore, it was incumbent upon the City and the Police Department to ensure that the police officers received adequate training in dealing with that segment of the community. The failure to train officers in this area is inconsistent with best police training practices.

**Materials Considered:**

Phone calls 21.12.24 OP5, 21.12.53 OP6, 21.13.04 OP21, 21.14.35 OP16, 21.14.47 Op6, 21.15.51 OP15
Statements: Jose Nochez, Kate Deering, Alan Salvosa, Joshua Whittenburg, Cody Turner, Gregg Nordby
02 Track 2 Radio
County Attorney Letter
BCPD Policy Officer Involved Shootings and Deaths
Nordby Training File and List of Classes

BCPD Use of Force Policy
BCPD Use of Force Administrative Review
BCPD Conducted Energy Device Policy
Limited English Proficiency Services Policy
Salvosa Reviews
Salvosa Training File and List
Turner Training File and List
BCPD report Preparation Policy
Nordby Deposition
Turner Deposition
Ambulance Patient Care Report
Salvosa Incident report
Whittenburgh Supplemental Report
Jackson Charging Documents
CAD
Cruz Martinez Deposition
Deering Deposition
Elmi Deposition
Event Details
Still photo of scene
Galarza Deposition
Hennepin County Sheriff's Office Incident Report
Hong Deposition
Jackson Deposition
Deering Supplemental Report
Nordby Supplemental report
Turner Supplemental report
Whittenburg Supplemental report
Coleman Supplemental report
Report of Resistance
Kevin Khottavongsa Deposition
City of Brooklyn Center 30b6 Deposition (Gannon)
Sarin signed Declaration
Nochez deposition
Sarin Deposition
Defendant's Answer To Complaint
Som Deposition
Taser International v19 Power Point (with notes)
Salvosa Taser Printout
Transcribed 911 Call
Whittenburg Deposition
Coleman Deposition
Dashcam videos, Turner, Nordby, Deering, Coleman, Salvosa, Whittenburg
Audio recordings of witness interviews: Elmi, Jackson/Philliips, Martinez, Som, Hong, Sarin, Torres-Rendon, Galarza, Olson.

**Expert Witness Testimony for the Past Four Years:**

Bodden v. Deputy Cole, (plaintiff)
U.S. District Court, Middle District of Florida Case No. 3:11-ev-127-J-20MCR
Use of Force/officer involved shooting/traffic stop
Testified in Deposition

Washington v. Peoria Police Department (plaintiff)
10th Judicial Circuit, Peoria County, Illinois
Testified in Deposition

Murphy V. City of Birmingham, Alabama (plaintiff)
Circuit Court of Birmingham, Alabama
Testified in Deposition

State of Florida v. Smithey (criminal)
18th Judicial Circuit Court, Seminole County
Testified in Deposition

State of Illinois v K Meinders (criminal)
Circuit Court of the 11th judicial Circuit
Woodford County, Ill.
Testified in Trial

State of Florida v. Smithey (criminal)
18th Judicial Circuit Court, Seminole County
Testified in Trial

Murphy V. City of Birmingham, Alabama (plaintiff)
Circuit Court of Birmingham, Alabama
Testified in Trial

Alvin Notice v Town of Plainville (plaintiff)
Connecticut Superior Ct.
Testified in Deposition

State of Arkansas v. Benton Ned Bass (criminal)
District Court of Hot Springs, Garland County
Testified in Trial

Frazier v Kansas City (plaintiff)
Circuit Court of Jackson County, Missouri
Testified in Deposition

Williams V. 711 (plaintiff non police)
7th Judicial Circuit Court, Volusia County, Florida

Testified in Deposition


Williams V. 711 (plaintiff non police)
7th Judicial Circuit Court, Volusia County, Florida
Testified in Trial


Smith v. Sherry Appledorn (plaintiff)
United States District Court, District of Minnesota
Testified in Trial


Cheron Hampton- Bates v City of Gainesville/ Timothy Durst (defense)
United States District Court, Northern District of Florida, Gainesville Division
Testified in Deposition


Kyle Bermingham v. The City of Clermont, Florida (plaintiff)
United States District Court, Middle District of Florida, Ocala Division
Testified in Deposition


Frazier v Kansas City (plaintiff)
Circuit Court of Jackson County, Missouri
Police Vehicular Pursuits
Testified in Trial


Brown v. Orange County Sheriff's Office (plaintiff)
U.S. District Court, Middle District of Florida, Orlando Division
Use of Force
Testified in Deposition


Mitchell Schutt v. City of Ocoee (plaintiff)
United Sates District Court, Middle District of Florida, Orlando Division
Use of Force
Testified in Deposition


State of Florida vs. Juan Caamano (criminal)
10th Judicial Circuit, Polk County, Florida
Use of Force
Testified in Trial


Maurice Washington v. Oktibbeha County, Mississippi, Et al. (defense)
United States District Court for the Northern District of Mississippi Aberdeen Division
Use of Force
Testified in Deposition


Alvin Notice v Town of Plainville (plaintiff)
Connecticut Superior Ct.
Criminal Investigation/Domestic Violence

Testified in Trial

LaDrena Thomas v. The City of Jacksonville, JSO (plaintiff)
Fourth Judicial Circuit Court, Duval County, Florida
Use of Force
Testified in Deposition

Estate of Trey Williams v. City of Shelbyville, et.al. (Plaintiff)
United States District Court, Western District of Kentucky at Louisville
Use of Force
Testified in Deposition

Ramirez v Sheriff Grady Judd (plaintiff)
United States District Court of Florida, Tampa Division Case No. 8:12-CV-2819-T-27EAJ
Use of Force/Negligent Supervision
Testified in Deposition

Martignetti v. Serge Celestin and Broward Sheriff's Office (plaintiff)
17th Circuit Court, Broward County, Florida Case No. 11-05179
Use of Force/Negligent Supervision
Testified in Deposition

Hamilton v Beaufort County Sheriff's Office (plaintiff)
County of Beaufort, 14th Judicial Circuit, State of South Carolina Case No. 2011-CP-07-04548
Negligent Retention, Supervision
Testified in Deposition

State of Florida v. Smithey (criminal)
18th Judicial Circuit Court, Seminole County Case No. 10-01851-CFA
Criminal Investigation/Use of Force/Firearm
Testified in deposition

Johnson v. City of Tampa (plaintiff)
13th Judicial Circuit, Hillsborough County Case No. 10-014672
Police Driving/Accident
Testified in Deposition

Brown v. Orange County Sheriff's Office (plaintiff)
U.S. District Court, Middle District of Florida, Orlando Division Case No. 6:12-cv-1299-Orl-37GJK
Use of Force/Negligent Supervision
Testified in Deposition
Testified in Trial

Brown v City of Kingman (plaintiff)
United States District Court of Arizona Case No. 3:13 cv- 08191
Use of Force

Testified in Deposition

Cutino v City of Miramar (defense)
United States District Court, Southern District of Florida
Miami Division, CASE NO: 1:12-CV-22201
Use of Force
Testified in Deposition

Keefe Harden v. City of St. Petersburg (plaintiff)
Circuit Court of Pinellas County; Case No. 12-1686-CI-15
State of Florida
Use of Force/K-9
Testified in Trial

Davis v. City of Warner Robins (plaintiff)
Houston County Case No. 2012-V-45637
State of Georgia
Vehicular pursuit
Testified in Deposition

Devine v. Fusaro (plaintiff)
United States District Court, District of Connecticut
Case No: 3:14-CV-1019(JAM)
Use of Force/Less Lethal
Testified in Deposition

Florida v. Nannini (criminal)
Circuit Court of 16th Judicial Circuit
Monroe County, Florida
Case No.: 2014-CF-00142-A-P
Use of force, Investigative stops
Testified in Trial

Booth v. Daytona Beach (defense)
Union Arbitration Teamsters 385
Daytona Beach, Florida
Use of force, investigative detentions
Testified in Hearing

State of Florida v. Coleman (criminal defense)
Case No.: 2014-CF-7184
Circuit Court of the Ninth Circuit
Orlando, Florida
Use of Force/Firearm
Testified in Deposition

Earl v Indianapolis Metropolitan Police Department (plaintiff)
Marion County Superior Court
Cause No. 49D04-0904-PL-018356
Indianapolis, Indiana
Police Vehicular Pursuit
Testified in Deposition

State of Florida v. Coleman (criminal defense)
Case No.: 2014-CF-7184
Circuit Court of the Ninth Circuit
Orlando, Florida
Use of Force/Firearm
Testified in Hearing

Rhodera Earl v. Indianapolis Metropolitan Police Department (plaintiff)
Marion County Superior Court
Cause No. 49D04-0904-PL-018356
Indianapolis, Indiana
Police Vehicular Pursuit
Testified in Trial

Brown v. Orange County Sheriff's Office (plaintiff)
U.S. District Court, Middle District of Florida, Orlando Division
Case No. 6:12-cv-1299-Orl-37GJK
Use of Force/Negligent Supervision/Investigative Detention/Arrest Techniques
Testified in Trial

Betancourt v. Miami Dade County (plaintiff)
United States District Court, Southern District
Case No.: 1:13-cv-22614-DLG
Miami, Florida
Confidential Informants/Use of Force/Officer Involved Shooting
Testified in Deposition

Robert Leone v. Towanda Borough, et al. (plaintiff)
United States District Court for the Middle District of Pennsylvania
Case No: 3:12-cv-00429-ARC
Wilkes-Barre, Pa.
Use of Force/Taser/Arrest Techniques
Testified in Trial

Davis v. City of Warner Robbins (plaintiff)
State Court of Houston County, State of Georgia
Case No: 2012-V-45637
Warner Robins, Georgia
Emergency Vehicle Operation/Vehicular Pursuit/Foot Pursuit

Testified in Trial

State of Florida v. Miller (criminal defense)
18th Judicial Circuit
Case No: 2012-01992-CFA
Sanford, Florida
Criminal Investigation
Testified in Deposition

Holcomb v. Winkler (plaintiff non police)
Circuit Court of Mercer County, West Virginia
Case No.: 12-C-544-WS
Charleston, West Virginia
Failure to train/Failure to supervise
Testified in Trial

Cohen v. McGuire et al. (plaintiff)
US District Court, Middle District of Florida
Case No: 3:15-cv-133-J-34JRK
Miami, Florida 33176
Police officer hiring practices
Testified in deposition

Ferguson v. Ken Mascara
19th Judicial Circuit Court
Case No. 56 2014 CA001032 (ON)
St. Lucie County, Florida
Use of Force/Canine
Testified in trial

Kristopher Lee Madson v. City of Gainesville, Florida et al. (plaintiff)
United States District Court
Northern District of Florida
Case No: 1:15-cv-00063-MW-GRJ
Gainesville, Florida
Use of Force/Canine
Testified in deposition

Oberist Lee Saunders v. George Duke et al. (plaintiff)
United States District Court
Middle District of Florida
Case No: 6:10-cv-120-orl-35GJK
Orlando, Florida
Use of force/Narcotics Investigation
Testified in Deposition

Clark (FOP) v. Boca Raton (defense)
City of Boca Raton, Florida Arbitration
Employee Termination/Use of Force/OIS/Vehicular Pursuit
Testified in Arbitration Hearing

Nicasia v. Mickens, et al (plaintiff)
Connecticut Superior Court
New London, Ct.
CV-14-60220885S
Officer Involved Shooting
Testified in Deposition

Crowley v. Town of Enfield (plaintiff)
United States District Court
District of Connecticut
Case No. 3:14CV01903 (MPS)
Use of force/Training/Supervision

Jonathan Santiago v. Thomas Lafferty et al. (plaintiff)
United States District Court
District of Massachusetts
Case No: 13-cv-12172-IT
Confidential Informants
Testified in deposition

Catherine Daniels v. City of Miami Gardens et al. (plaintiff)
United States District Court
Southern District of Florida
Case No.: 1:15-CV-21068-JLK
Officer Involved Shooting
Testified in deposition

Christopher Demski v. Town of Enfield (plaintiff)
United States District Court
District of Connecticut
Case No.: 3:14cv01568 (JAM)
Use of Force/Taser/K-9
Testified in deposition

Stanford v. Union County Sheriff's Office (defense)
Sixteenth Judicial Circuit
Union County, South Carolina
Case No.: 2013-CP-44-227
Vehicular Pursuits
Testified in deposition

Lowrie v. General Motors et al. (plaintiff non police)
Twenty Second Judicial Circuit
St. Louis, Mo.
Case No.: 1422-CC08909
Traffic control/Management
Testified in deposition

Standard v. Conner   (plaintiff non police)
Fifth Judicial Circuit Court
Citrus County, Florida
Case No.: 2013-CA-000071 A
Criminal investigation
Testified in deposition

Robinson v. Easterwood (plaintiff)
United States District Court
Northern District of Alabama
Case No.: 2:14-cv-01886 MHH
Officer Involved Shooting
Testified in deposition

Moody v. Stop Stick et.al (Plaintiff)
Jackson County Circuit Court, Kansas City Mo.
Case No.: 1316-CV03362
Stop Sticks/Vehicular Pursuit
Testified in trial

Jose Diaz v. City of Orlando (plaintiff)
Ninth Judicial Circuit, Orlando, Fl.
Case No.: 2011-CA-014041-0
Use of force
Testified in deposition

Santiago/Mosko v. Thomas Lafferty et al. (plaintiff)
United States District Court
District of Massachusetts
Case No: 13-cv-12172-IT
Confidential Informants
Testified in deposition

Secic v. City of St. Louis (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit (St. Louis City)
Case No: 1522-cc-00228
Vehicular Pursuit
Testified in deposition

Jose Diaz v. City of Orlando (plaintiff)
Ninth Judicial Circuit, Orlando, Fl.
Case No.: 2011-CA-014041-0
Use of force
Testified in trial

Darnell v. Alejandro Rivera et al. (plaintiff)
United States District Court
Middle District of Florida, Orlando Division
Case No.: 6:15-cv-00999-RBD-TBS
Criminal Investigations/False Arrest
Testified in deposition

Perez v. Collier County (plaintiff)
United States District Court
Middle District of Florida
Case No.: 2:15-cv-238-FTM-CM
Use of force/Taser/Flashlight
Testified in deposition

Doel Santiago v. City of New Haven (plaintiff)
Superior Court at New Haven, Ct.
Case No.: NNH-CV-13-6037147-S
Use of Force
Testified in deposition

Parnoff v. Aquarion Company et Al. (plaintiff)
Superior Court, Bridgeport, Ct.
Case No.: CV14-6045191-S
Criminal Investigations/Arrest Procedures
Testified in deposition

Secic v. City of St. Louis (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit (St. Louis City)
Case No: 1522-cc-00228
Vehicular Pursuit
Testified in Trial

Lowrie v. General Motors et al. (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit, St. Louis , Mo.
Case No: 1422-CC08909
Traffic management/control

Michael Ray West v. Bartow County, Georgia et al. (plaintiff)
United States District Court
Northern District of Georgia
Case No: 15-CV-00168
Use of Force (Taser)
Testified in deposition

Ray v. Markley, Cain & Washington City  (Plaintiff)
United States District Court
Western District of Pennsylvania
Pittsburgh, Pa.
Case No.: CV-13-1483-DSC
Use of Force /handcuffing
Testified in trial

Myers v. City of Haleyville et al (plaintiff)
Circuit Court of Marion County, Alabama
Case No.: 49-CV-2015-9000152
Emergency vehicle operation
Testified in deposition

James v City of Chicago (plaintiff)
United States District Court
Northern District of Illinois
Eastern Division
Case No.:14 CV 7955
Use of Force
Testified in deposition

Capasso, et Al. v. City of Westlake, Ohio et Al. (plaintiff)
United States District Court
Northern District of Ohio, Eastern Division
Case No.: 1:16-cv-01753
Vehicular Pursuit/Stop Sticks
Testified in deposition


**Publications:**

Dig Deeper To Address Officer Involved Shootings: Orlando Sentinel, 5/26/13
Police Leaders Must Walk the Walk, Pursuit Driving: Orlando Sentinel, 2/19/12
Save Community Policing: Orlando Sentinel, 5/25/11
State Cracks Down On Unlicensed Activity, Orlando Sentinel, 3/18/09
The Threat Abatement Group, Police and Security News, 11/95

**Compensation**:

My fees for this case are $225.00 per hour to review and analyze relevant material and $325.00 per hour to testify in depositions or trial.

Submitted by:

_____

**Charles W. Drago**