# EXHIBIT HH

**CITY OF BROOKLYN CENTER**
A GREAT PLACE TO START, A GREAT PLACE TO STAY



# MEMORANDUM

**TO:** Tim Gannon, Chief of Police

**FROM:** Tony Gruenig, Commander of Community Service

**DATE:** February 21, 2017

**SUBJECT:** Critical Incident Review of BC16-003249

---

The following internal critical incident review was assigned to me on December 21st, 2016 to ensure that policy, procedure, and orders were followed by all involved. The purpose was also to ensure that the current procedures in place are applicable and appropriate for pursuits. As a Commander in charge of professional standards, I have extensive experience with Brooklyn Center Police Department policies and procedures.

In order to complete this critical incident review I read all case file documents, the officers' training records, video evidence of the incident, and all applicable departmental polices were reviewed.

## THE EVENT

Officers' Salvosa and Lund assisted the Brooklyn Park Police Department officers with a pursuit of a vehicle travelling through Brooklyn Center. The vehicle was being pursued for a possible weapons violation, which occurred in Brooklyn Park. The responding officers attempted to conduct a traffic stop with the vehicle in Brooklyn Park; the vehicle fled and a pursuit ensued. The vehicle travelled southbound on Brooklyn Boulevard into Brooklyn Center.

Officer Salvosa joined the pursuit as the lead vehicle at the 7200 Block of Brooklyn Boulevard, ahead of the pursing Brooklyn Park police vehicles. The pursuit then turned eastbound at 69th and Brooklyn Boulevard and traveled eastbound on 69th until Shingle Creek Parkway. At this point the suspect's vehicle traveled southbound on Shingle Creek Parkway. Upon arrival at the intersection of Shingle Creek and Xerxes, it traveled up onto the grass located at the southeast corner of the intersection. This is presumably because they were attempting to go southbound on Xerxes, but were traveling too fast to make the turn. When the actions of the suspect's vehicle were reported to the Brooklyn Park supervisor via police radio, Brooklyn Park terminated its involvement in the pursuit. The vehicle corrected itself and

CASE 0:16-cv-01031-PAM-DTS   Doc. 74-34   Filed 07/31/17   Page 3 of 9

reentered the roadway, continuing to travel southbound on Shingle Creek Parkway. When Sergeant Pastor heard that the initiating agency terminated, he gave the order to Brooklyn Center officers to terminate the pursuit as well. Shortly after the pursuit was terminated by all agencies, the suspect vehicle struck several vehicles at the intersection of Shingle Creek Parkway and Freeway Boulevard. A passenger in the suspect's vehicle was ejected and thrown from the vehicle. Several civilian vehicles were hit and damaged by the suspect's vehicle, upon its entrance into the intersection.

Three suspects were inside the vehicle at the time of the pursuit. The driver fled on foot when the vehicle crashed; he was apprehended by Detective Vesey and Officer Lund. The front seat passenger sustained a broken leg from the accident and could not be immediately moved. Sgt. Pastor handcuffed the suspect to the steering wheel, making the immediate scene safe until paramedics could assist with first aid efforts and remove the suspect from the vehicle. As previously stated, the rear passenger was ejected and thrown from the vehicle. He was transported to a local hospital and eventually recovered from his injuries.

A handgun and a felony amount of marijuana were eventually recovered from the suspect's vehicle. The Hennepin County Sheriff's Office took over the investigation due to the possible life threatening injuries sustained by the rear passenger. The driver, Faizon Rydell Senter (DOB 10/02/93), was eventually charged with 'Felon in Possession of a Firearm' and 'Fleeing a Peace Officer in a Motor Vehicle'. The front passenger, Jimell Romez Lewis (DOB 09/18/94), was charged with '5th Degree Possession of a Controlled Substance'.

## DOCUMENTED POLICY VIOLATIONS

Upon review of Officer Salvosa's squad video, you can see where and under what circumstance he joined the pursuit. He was about 60-80 feet south of the intersection of Regent and Brooklyn Boulevard, facing northbound on Brooklyn Boulevard. The suspect vehicle passed by him, traveling southbound. He turned his squad, travelling southbound and joined the pursuit. At this point he was the lead vehicle, and in essence cut off the other two pursuing Brooklyn Park vehicles that were already pursuing the suspect and still within visual distance of the suspect vehicle. As Salvosa was waiting to turn and follow the suspect southbound, you can clearly see the two Brooklyn Park marked units, with their emergency lights activated, maneuvering through and beginning to clear the intersection.

Prior to engaging in the pursuit, there was no radio traffic between the Brooklyn Center supervisor (Sgt. Pastor) and Salvosa that authorized him to join the pursuit. There is no documentation in either Salvsoa's statement or Sgt. Pastor's report that authorized Salvosa to join a pursuit from an outside agency. Additionally, there was more than one vehicle in the pursuit and there was no radio traffic from Brooklyn Park asking for assistance with the pursuit.

As the pursuit continued, Officer Salvosa entered the intersection of 69th and France against a red light at approximately 70 MPH. He did not show any attempt to slow down by applying the brake at no point leading up to the intersection. This is very disturbing because this intersection has an obstructed view, especially traveling eastbound, which was the direction Salvosa was traveling.

Officer Lund was the fourth vehicle that joined the pursuit and entered the intersection of 69th and France, also at a high rate of speed and against a red light. The only difference – Officer Lund was the fourth emergency vehicle with its lights and siren on to enter the intersection.

Officer Salvosa was the first officer on scene and addressed the front seat passenger at gunpoint. He gave the passenger several commands to keep his hands up and not move. Sgt. Pastor was second officer on scene and observed the suspect who was ejected. He approached Officer Salvosa and asked him if he was okay and Salvosa affirmed. Throughout the series of commands given to the passenger, Salvosa spoke two disturbing statements: "don't move or I'll blow your head off" and "drop your hands and I drop you."

## TRAINING

The Brooklyn Center Police Department reviews the Pursuit Policy on an annual basis and officers are required to review and acknowledge the policy. Upon review of Salvosa and Lund's training records, both officers are current with regard to the Pursuit Policy, acknowledging on February 3, 2016 and prior to February 15, 2016.

Both officers are also current with regard to their Emergency Vehicle Operator Certification (EVOC) training. The Minnesota POST Board requires renewal of this training every three years, recently changing it to every 5 years. Officer Salvosa received his last refresher on December 18, 2012 and Officer Lund received his last refresher on April 8, 2014.

## FINDINGS – OFFICER ALAN SALVOSA

Policy Violation- 307.7.2 Pursuits Extending into this Jurisdiction
Upon review of reports and video, there were at least two outside agency marked units in a pursuit and within a reasonable distance to be effective in pursuing the suspect vehicle. The outside agencies did not ask for assistance, nor is there any evidence that Sgt. Pastor authorized Officer Salvosa to engage in the pursuit. Therefore, it was not necessary, and directly against policy for Officer Salvosa to join the pursuit. This was a violation of the Pursuit policy 307.7.2

Policy Violation- 307.3.3 Speed Limits
Officer Salvosa entered a partially obstructed intersection, against a red light, at approximately 70 MPH. He failed to slow or brake prior to entering the intersection. He was the lead vehicle in the pursuit. This is a violation of the pursuit policy, 307.3.3 sub (a).

Policy Violation-319.3 (i) Conduct that may Result in Discipline
When Officer Salvosa addressed the front seat passenger at gunpoint, he made two statements of concern: "*don't move or I'll blow your head off*" and "*drop your hands and I drop you.*" The statements were made while Officer Salvosa was holding a rifle, pointed at the front seat passenger, prior to the suspect being taken into custody.  This is a violation of the conduct policy 319.3 sub (i).

## FINDINGS – OFFICER JORDAN LUND

Policy Violation-307.7.2 – Pursuits Extending into this Jurisdiction *Mitigating Circumstances (Below)*
Officer Lund joined the pursuit without permission or the correct circumstances (single emergency vehicle), as it relates to the policy. However, Officer Salvosa had already joined the pursuit, which created conflicting information during high stress situation. Therefore, I believe that Officer Lund should be given the benefit of the doubt with regards to policy violation 307.7.2. Additionally, Officer Lund joined the end of the pursuit, not as the lead vehicle.

Page | 3

<u>Policy Violation- 307.3.3 Speed Limits</u>
Officer Lund entered the intersection of 69th and France, a partially obstructed intersection, against a red light at approximately 70+ MPH. He failed to slow or brake prior to entering the intersection. He was the fourth marked vehicle with full emergency lights and siren to enter the intersection.

## POLICIES VIOLATED

<u>307.7.2   PURSUITS EXTENDING INTO THIS JURISDICTION</u>
The agency that initiates a pursuit shall be responsible for conducting the pursuit. Units from this department should not join a pursuit unless specifically requested to do so by the agency whose peace officers are in pursuit. The exception to this is when a single unit from the initiating agency is in pursuit. Under this circumstance, a unit from this department may join the pursuit until sufficient units from the initiating agency join the pursuit. When a request is made for this department to assist or take over a pursuit from another agency that has entered this jurisdiction, the supervisor should consider these additional following factors:

<u>307.3.3   SPEED LIMITS</u>
The speed of a pursuit is a factor that should be evaluated on a continuing basis by the officer and supervisor. Evaluation of vehicle speeds shall take into consideration public safety, officer safety and the safety of the occupants of the fleeing vehicle.

Should high vehicle speeds be reached during a pursuit, officers and supervisors shall also consider these factors when determining the reasonableness of the speed of the pursuit:

    (a) Pursuit speeds have become unreasonably unsafe for the surrounding conditions.

<u>319.3   CONDUCT THAT MAY RESULT IN DISCIPLINE</u>
Any of the following actions may be deemed sufficient cause for the discipline, discharge, suspension, demotion, or removal of any employee

    (i)    Use of any unreasonable obscene, profane, or derogatory language while on duty or in uniform.

## FINDINGS – SERGEANT STEPHEN PASTOR

Sergeant Pastor monitored the radio system and the pursuit from the onset and as it was evolving. The dispatcher asked Sgt. Pastor to acknowledge the pursuit as it's initiated, which he did right away. Upon review of the video, he started driving to the location of the pursuit from the onset, even before he acknowledged it on the radio. The pursuit was an evolving situation and when the initiating agency terminated, we have very little choice but to terminate the pursuit ourselves, which Sgt. Pastor did almost immediately. I found no policy violations as it relates to Sgt. Pastor and his actions as a supervisor during this incident.

## RECOMMENDATION

To clearly establish that officers have broken from a pursuit when ordered to terminate, it is recommended that we add language to the policy that orders an officer to make a 90 degree turn to the pursuit direction, as soon as practically possible. This has several benefits, first it would force the officer to dump speed and change direction, which the public would perceive as the agency is disengaging from the pursuit. Also, it clearly establishes that the officer is following the direction of the supervisor, and actually terminating the pursuit.

Page | 4

## POLICIES REVIEWED

The policy for vehicle pursuits is quite extensive, thirteen pages long, and therefore I have edited down to the following, which is the current policy during the time of the incident. The entire Pursuit Policy will be included with this review for reference, but as a separate document.

VEHICLE PURSUITS POLICY 307

307.3.1  WHEN TO INITIATE A PURSUIT
Officers are authorized to initiate a pursuit when it is reasonable to believe that a suspect is attempting to evade arrest or detention by fleeing in a vehicle that has been given a signal to stop by a peace officer.

The following factors individually and collectively shall be considered in deciding whether to initiate or continue a pursuit (Minn. Stat. § 626.8458 Subd. 2(2); Minn. R. § 6700.2701):

(a) Seriousness of the known or reasonably suspected crime and its relationship to community safety.
(b) The importance of protecting the public and balancing the known or reasonably suspected offense and the apparent need for immediate capture against the risks to officers, innocent motorists and others.
(c) Apparent nature of the fleeing suspect (e.g., whether the suspect represents a serious threat to public safety).
(d) The identity of the suspect has been verified and there is comparatively minimal risk in allowing the suspect to be apprehended at a later time.
(e) Safety of the public in the area of the pursuit, including the type of area, time of day, the amount of vehicular and pedestrian traffic (e.g., school zones) and the speed of the pursuit relative to these factors.
(f) Pursuing officer's familiarity with the area of the pursuit, the quality of radio communications between the pursuing units and the dispatcher/supervisor, and the driving capabilities of the pursuing officers under the conditions of the pursuit.
(g) Weather, traffic and road conditions that unreasonably increase the danger of the pursuit when weighed against the risks resulting from the suspect's escape.
(h) Performance capabilities of the vehicles used in the pursuit in relation to the speeds and other conditions of the pursuit.
(i) Vehicle speeds.
(j) Other persons in or on the pursued vehicle (e.g., passengers, co-offenders and hostages).
(k) Age of the suspect and occupants.
(l) Availability of other resources, such as aircraft assistance.
(m) The police unit is carrying passengers other than on-duty police officers. Pursuits should not be undertaken with a prisoner in the pursuit vehicle unless exigent circumstances exist, and then only after the need to apprehend the suspect is weighed against the safety of the prisoner in transport. A unit containing more than a single prisoner should not participate in a pursuit.

307.3.2  WHEN TO TERMINATE A PURSUIT
Pursuits should be discontinued whenever the totality of objective circumstances known, or which reasonably ought to be known, to the officer or supervisor during the pursuit indicates that the present risks of continuing the pursuit reasonably appear to outweigh the risks resulting from the suspect's escape.

Operating an emergency vehicle in a pursuit with emergency light(s) and siren does not relieve the operator of an authorized emergency vehicle of the duty to drive with due regard for the safety of all persons, and does not protect the driver from the consequences of his/her reckless disregard for the safety of others (Minn. Stat. § 169.17).

The above factors on when to initiate a pursuit are expressly included herein, and will apply equally to the decision to discontinue as well as the decision to initiate a pursuit. Officers and supervisors must objectively and

continuously weigh the seriousness of the offense against the potential danger to innocent motorists, themselves and the public when electing to continue a pursuit. In the context of this policy, the term "terminate" shall be construed to mean discontinue or to stop chasing the fleeing vehicle.

In addition to the factors listed above, the following factors should be considered when deciding whether to terminate a pursuit (Minn. Stat. § 626.8458 Subd. 2 (2)):

(a) Distance between the pursuing officers and the fleeing vehicle is so great that further pursuit would be futile or require the pursuit to continue for an unreasonable time or distance.
(b) Pursued vehicle's location is no longer definitely known.
(c) Officer's pursuit vehicle sustains damage or a mechanical failure that renders it unsafe to drive.
(d) Pursuit vehicle suffers an emergency equipment failure that causes the vehicle to no longer qualify for emergency operation use.
(e) Extended pursuits of violators for misdemeanors not involving abuse or risk of serious harm (independent of the pursuit) are discouraged.
(f) Hazards to uninvolved bystanders or motorists.
(g) If the identity of the offender is known and it does not reasonably appear that the need for immediate capture outweighs the risks associated with continuing the pursuit, officers should strongly consider discontinuing the pursuit and apprehending the offender at a later time.
(h) When directed to terminate the pursuit by a supervisor.

### 307.3.3  SPEED LIMITS
The speed of a pursuit is a factor that should be evaluated on a continuing basis by the officer and supervisor. Evaluation of vehicle speeds shall take into consideration public safety, officer safety and the safety of the occupants of the fleeing vehicle.

Should high vehicle speeds be reached during a pursuit, officers and supervisors shall also consider these factors when determining the reasonableness of the speed of the pursuit:

(a) Pursuit speeds have become unreasonably unsafe for the surrounding conditions.
(b) Pursuit speeds have exceeded the driving ability of the officer.
(c) Pursuit speeds are beyond the capabilities of the pursuit vehicle thus making its operation unsafe.

### 307.4.2  PRIMARY UNIT RESPONSIBILITIES
The initial pursuing officer will be designated as the primary pursuit unit and will be responsible for the conduct of the pursuit unless it is unable to remain reasonably close enough to the violator's vehicle. The primary responsibility of the officer initiating the pursuit is the apprehension of the suspect(s) without unreasonable danger to him/herself or other persons (Minn. Stat. § 626.8458 Subd. 2 (4)).

The primary unit should notify Dispatch, commencing with a request for priority radio traffic, that a vehicle pursuit has been initiated, and as soon as practicable provide information including, but not limited to:

(a) Reason for the pursuit.
(b) Location and direction of travel.
(c) Speed of the fleeing vehicle.
(d) Description of the fleeing vehicle and license number, if known.
(e) Number of occupants.
(f) The identity or description of the known occupants.
(g) Weather, road and traffic conditions.
(h) Identity of other agencies involved in the pursuit.
(i) Information concerning the use of firearms, threat of force, injuries, hostages or other unusual hazards.
(j) Request for medical assistance for any person injured in the course of the pursuit (Minn. Stat. § 626.8458 Subd. 2 (6); Minn. R. § 6700.2701).

Unless relieved by a supervisor or secondary unit, the officer in the primary unit shall be responsible for broadcasting the progress of the pursuit. Unless circumstances reasonably indicate otherwise, the primary unit should relinquish the responsibility of broadcasting the progress of the pursuit to a secondary unit or aircraft joining the pursuit to minimize distractions and allow the primary unit to concentrate foremost on safe pursuit tactics (Minn. R. § 6700.2701).

### 307.5  SUPERVISORY CONTROL AND RESPONSIBILITIES
It is the policy of this department that available supervisory and management control will be exercised over all vehicle pursuits involving officers from this department (Minn. Stat. § 626.8458 Subd. 2 (4)).

The sergeant of the officer initiating the pursuit, or if unavailable, the senior officer will be responsible for the following:

(a) Upon becoming aware of a pursuit, immediately notify involved officers and Dispatch of supervisory presence, and ascertain all reasonably available information to continuously assess the situation and risk factors associated with the pursuit to ensure that the pursuit is conducted within established Department guidelines.
(b) Engage in the pursuit, when appropriate, to provide on-scene supervision.
(c) Exercise management and control of the pursuit, even if not engaged in it.
(d) Ensure that no more than the number of required law enforcement units needed are involved in the pursuit under the guidelines set forth in this policy.
(e) Direct that the pursuit be terminated if, in his/her judgment, it is not justified to continue the pursuit under the guidelines of this policy.
(f) Ensure that aircraft assistance is requested, if available.
(g) Ensure that the proper radio channel is being used.
(h) Ensure the notification and/or coordination of outside agencies if the pursuit either leaves or is likely to leave the jurisdiction of this agency.
(i) Control and manage BCPD units when a pursuit enters another jurisdiction.

### 307.5.1  SHIFT SERGEANT RESPONSIBILITIES
Upon becoming aware that a pursuit has been initiated, the Shift Sergeant should monitor and continually assess the situation and ensure the pursuit is conducted within the guidelines and requirements of this policy. The Shift Sergeant has the final responsibility for the coordination, control and termination of a vehicle pursuit and shall be in overall command (Minn. Stat. § 626.8458 Subd. 2 (4); Minn. R. § 6700.2701).

The Shift Sergeant shall review all pertinent reports for content and forward them to the Division Commander.

### 307.7.2  PURSUITS EXTENDING INTO THIS JURISDICTION
The agency that initiates a pursuit shall be responsible for conducting the pursuit. Units from this department should not join a pursuit unless specifically requested to do so by the agency whose peace officers are in pursuit. The exception to this is when a single unit from the initiating agency is in pursuit. Under this circumstance, a unit from this department may join the pursuit until sufficient units from the initiating agency join the pursuit.
When a request is made for this department to assist or take over a pursuit from another agency that has entered this jurisdiction, the supervisor should consider these additional following factors:

(a) Ability to maintain the pursuit.
(b) Circumstances serious enough to continue the pursuit.
(c) Adequate staffing to continue the pursuit.
(d) The public's safety within this jurisdiction.
(e) Safety of the pursuing officers.

As soon as practicable, a supervisor or the sergeant should review a request for assistance from another agency. The sergeant or supervisor, after consideration of the above factors, may decline to assist in or assume the other agency's pursuit.

Assistance to a pursuing outside agency by officers of this department will terminate at the City limits provided that the pursuing peace officers have sufficient assistance from other sources. Ongoing participation from this department may continue only until sufficient assistance is present.

In the event that a pursuit from another agency terminates within this jurisdiction, officers shall provide appropriate assistance to peace officers from the outside agency including, but not limited to, scene control, coordination and completion of supplemental reports, and any other assistance requested or needed.

### 319.3   CONDUCT THAT MAY RESULT IN DISCIPLINE

The following causes for disciplinary action constitute a portion of the disciplinary standards of this department. This list is not intended to cover every possible type of misconduct, and does not preclude the recommendation of disciplinary action for specific action or inaction that is detrimental to efficient department service.

Employees shall conduct themselves, whether on duty or off duty, in accordance with the Constitution of the United States, the Minnesota Constitution, and all applicable laws, ordinances, and rules enacted or established pursuant to legal authority.

Any of the following actions may be deemed sufficient cause for the discipline, discharge, suspension, demotion, or removal of any employee:

(i) Use of any unreasonable obscene, profane, or derogatory language while on duty or in uniform.