UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kevin Khottavongsa, as trustee
for the heirs and next-of-kin of
Sinthanouxay Khottavongsa,

          Plaintiff,

v.

City of Brooklyn Center; Alan
Salvosa, Police Officer, acting in
his individual capacity as City of
Brooklyn Center police officer;
Cody Turner, Police Officer, acting
in his individual capacity as City of
Brooklyn Center police officer; and
Gregg Nordby, Police Officer, acting in
his individual capacity as City of
Brooklyn Center police officer,

          Defendants.

Case No. 16-cv-1031 (RHK/DTS)

**MEMORANDUM AND ORDER**

_____

      This matter is before the Court on Defendants' Motion for Summary Judgment and to Exclude Expert Witnesses, and Plaintiff's Motion to Exclude Expert Witnesses. For the following reasons, the Motion for Summary Judgment is granted in part and denied in part, and the Motions to Exclude are granted in part and denied in part.

**BACKGROUND**

      On the night of January 16, 2015, Sinthanouxay Khottavongsa, a 57-year-old Laotian immigrant, was visiting the auto-repair shop owned by the parents of his friend, Leang Sarin, in Brooklyn Center. (Hively Aff. (Docket No. 38) Ex. 2 (Sarin Dep.) at 9.) The shop was attached to a laundromat, Coin Laundry, also owned by Mr. Sarin's

parents. While Mr. Khottavongsa was in the repair shop, three African-American individuals entered the Coin Laundry. Ms. Taing Hong, the owner of the laundromat, told them that it was closing time and asked them to leave. (Hively Aff. Ex. 3 (Hong Dep.) at 5-6.)

The individuals ostensibly made inappropriate comments to Ms. Hong. (Id. at 5; see also Hively Aff. Ex. 8 (Cruz-Martinez Dep.) at 9.) Mr. Sarin got involved, attempting to lock the door to prevent the individuals from re-entering the laundromat. (Sarin Dep. at 10-11.) The individuals then dragged Mr. Sarin from the laundromat and started physically fighting with him. (Id. at 12) Ms. Hong sprayed mace in the face of one of the individuals. (Hong Dep. at 9, 11.) Her husband, Kear Som, grabbed a baseball bat. (Hively Aff. Ex. 4 (Som Dep.) at 41.) Mr. Khottavongsa was involved in the altercation as well, with one witness reporting that he fell to the ground and was kicked and punched. (Hively Aff Ex. 8 (Cruz-Martinez Dep.) at 14, 17-18.) Eventually, Mr. Khottavongsa went back into the repair shop and emerged with a crowbar. (Som Dep. at 19.)

Several individuals called 9-1-1 to report the melee. (E.g., Cruz-Martinez Dep. at 14-15.) At least one reported that someone in the fight had a bat. (Id. at 14) Defendant Officer Alan Salvosa and a cadet trainee, Jose Nochez, were the first police officers to arrive on the scene, although they did not activate their police cruiser's lights or siren. (Rissman Decl. (Docket No. 74) Ex. N (Salvosa dashcam video).) They parked some distance away and thus the cruiser's dashcam video did not capture the events; audio from the dashcam did record the sound of what happened. According to Plaintiff, by the

time the police arrived, the fight was over and many of the participants had fled. (Sarin Dep. at 32-34.) Shortly after Salvosa and Nochez arrived, Defendants Officers Gregg Nordby and Cody Turner, as well as other officers not named as Defendants here, arrived on the scene. The other cruisers' dashcams recorded the events.

Officer Salvosa ran to the area of the fight and commanded everyone to get down on the ground. (Hively Aff. Ex. 10 (Salvosa Dep.) at 64.) The parties vigorously dispute Mr. Khottavongsa's English proficiency; Plaintiff contends that he spoke only broken English, while Defendants say that he spoke enough English to understand the officer's commands. When Salvosa arrived, Mr. Khottavongsa had his back turned to him and was holding the crowbar. Salvosa yelled at Mr. Khottavongsa to "drop it drop it drop it." (Rissman Decl. Ex. N (Salvosa dashcam video) at 9:16:26.) Mr. Khottavongsa began to turn his head to look at Salvosa, and Salvosa tased him. (Id. at 9:16:30; Salvosa Dep. at 73.) Mr. Khottavongsa's body tensed and he fell to the ground, striking the back of his head against the pavement. (Salvosa dashcam video at 9:16:30.)

Mr. Khottavongsa then lay on the ground, still holding the crowbar. Mr. Sarin tried to come to his aid but the police ordered him to the ground. Officer Turner took the crowbar out of Mr. Khottavongsa's grasp. (Hively Aff. Ex. 11 (Turner Dep.) at 69-70.) The officers apparently recognized that Mr. Khottavongsa was not able to understand what they were saying; Officer Turner can be heard commenting that Mr. Khottavongsa did not understand, later telling the other officers, "I don't think he speaks English." (Rissman Decl. Ex. J (Turner dashcam video) at 21:17.37.)

3

Officer Turner yelled to the group to "lay flat on your stomach!" (Id. at 21:14:15-17.) Mr. Khottavongsa, who had been lying on his back, then began moving very slowly. (Id. at 21:17:23.) Officer Salvosa tased him again, causing Mr. Khottavongsa to fall back, again striking his head on the pavement. (Id. at 21:17:24.) The officers again ordered him to roll to his stomach, and when he did not immediately comply, they began to push or kick him with their feet, trying to roll him over. (Id. at 21:18:04).

Turner and Nordby eventually handcuffed Mr. Khottavongsa and ordered him to stand. He was unable to do so, and they dragged him to a cruiser. (Id. at 21:19:32.) Mr. Khottavongsa can be heard moaning loudly and constantly throughout this encounter. The officers put Mr. Khottavongsa in the back of the cruiser and he slumped over, falling forward to the floor of the car. (Id. at 21:20:16.) After several minutes, the officers pulled him out of the car and left him on the ground, face down. Eventually, the officers called an ambulance. (Hively Aff. Ex. 5 (Nordby Dep.) at 180-81.) The ambulance transported Mr. Khottavongsa to the hospital, but physicians there were unable to revive him. He was in a coma for two days and eventually removed from life support. (Id. Ex. 1 (K. Khottavongsa Dep. at 9, 12.)

Plaintiff Kevin Khottavongsa is Mr. Khottavongsa's son and the trustee of his estate. The Complaint (Docket No. 1) raises a § 1983 claim for excessive force and deliberate indifference to serious medical needs against the three officers,[1] a § 1983

---

[1] Plaintiff's Opposition Memorandum states that Plaintiff is also raising a failure-to-intervene claim against Officers Turner and Nordby for their failure to keep Officer Salvosa from tasing Mr. Khottavongsa a second time. The Complaint does not mention

failure-to-train and unconstitutional policies and practices claim against the City of Brooklyn Center, and a state-law wrongful death claim against all Defendants.

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**1. Qualified Immunity**

Defendants contend that the officers are entitled to qualified immunity on the § 1983 claim. Qualified immunity protects police officers from suit unless "their conduct . . . violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To evaluate whether an officer is entitled to qualified immunity, the Court must determine whether the facts alleged "make out a violation of a constitutional right."

---

any failure to intervene as part of the § 1983 claim against the officers, and the Court will not consider this claim.

5

Pearson v. Callahan, 555 U.S. 223, 232 (2009). The Court must also determine whether the right at issue was "clearly established" at the time of the alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Thus, a police officer is "entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." Capps v. Olson, 780 F.3d 879, 884 (8th Cir. 2015).

Plaintiff's § 1983 claim against the officers rests on two grounds. First, he contends that the officers used excessive force on Mr. Khottavongsa. Second, he claims that the officers were deliberately indifferent to Mr. Khottavongsa's serious medical needs. Defendants first ask the Court to determine that the uses of force here were reasonable as a matter of law.

But there are too many factual disputes in the record to allow the Court to make this determination. There are questions as to whether Officer Salvosa deployed his taser too quickly, and indeed whether the use of a taser was necessary at all. There is a question whether the officers knew or should have known that Mr. Khottavongsa had limited English proficiency and thus might not have understood their commands. There are questions regarding whether the officers recognized or should have recognized the extent of his injuries after the first tasing or the second tasing. There are questions regarding the amount of force the officers used to handcuff Mr. Khottavongsa and whether moving him in and out of the police car was warranted considering his injuries. There are questions as to whether the officers recognized the extent of his injuries but

ignored those injuries. Testimony from the officers at the scene and from eyewitnesses paints no clear picture on any of these issues. Moreover, the video and audio of the scene show officers using force against an immobilized individual who appears to be in great distress. The record is replete with factual disputes. Thus, the Court cannot say that any of the uses of force were objectively reasonable as a matter of law.

Similarly, there are fact questions as to whether the officers knew and disregarded Mr. Khottavongsa's serious medical needs. A claim for deliberate indifference to serious medical needs requires establishing that there was a substantial risk of serious harm and that the defendant was deliberately indifferent to that risk. Letterman v. Does, 789 F.3d 856, 861 (8th Cir. 2015). There is no dispute that Mr. Khottavongsa was seriously injured and that he needed medical attention. The question here is whether Defendants knew of and disregarded his need for medical treatment. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The Court "can infer knowledge if the risk was obvious." Letterman, 789 F.3d at 862. Deliberate indifference requires more than mere negligence, but less than willfulness or maliciousness; the "inquiry must show a mental state akin to criminal recklessness." Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006). "[T]he obvious inadequacy of a response . . . may support an inference that the officer recognized the inappropriateness of his conduct." Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009).

Defendants argue that Mr. Khottavongsa's injuries were not obvious, but there are facts in dispute about this component of a deliberate-indifference claim. There is testimony that Mr. Khottavongsa hit his head extremely hard after the first tasing, with a

7

terrible sound audible on the dashcam videos. Mr. Khottavongsa was groaning loudly enough to be heard on the audio recording above the din of the scene. Some witnesses described him as obviously disoriented. Whether this is enough to establish that his injuries were objectively obvious is something a jury must determine.

Moreover, there are factual disputes as to whether the officers knew of the risk that Mr. Khottavongsa was seriously injured and deliberately disregarded that risk. The officers testified that they thought Mr. Khottavongsa was faking it, or that he was being a "drama queen," or that he was intoxicated. But they saw him fall and heard the sound of his head hitting the pavement. A reasonable jury could conclude from these facts that the officers knew of his injuries and disregarded them. Summary judgment is inappropriate on the individual Defendants' qualified immunity.

### 2. Monell

Plaintiff seeks to hold the City of Brooklyn Park liable for the officers' alleged unconstitutional conduct. A government entity may be vicariously liable for the unconstitutional actions of individual police officers only if a municipal custom or policy is the "moving force [behind] the constitutional violation." Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978).

Defendants' only argument on the Monell claim is that there is no underlying constitutional violation. But there are fact questions as to the existence of a constitutional violation, and thus Defendants have not established that the Monell claim is amenable to summary judgment.

8

### 3. Wrongful Death

Defendants contend that they are entitled to official immunity on the state-law wrongful death claim. Because there can be no dispute that police officers acting in the scope of their duties are undertaking discretionary actions, to hold the officers liable for a state-law tort, Plaintiff must establish that the officers' actions constituted a "willful or malicious wrong." Elwood v. Rice Cty., 423 N.W.2d 671, 677 (Minn. 1988).

Plaintiff's opposition memorandum does not thoroughly address this issue, stating only that the facts establish that the officers acted willfully and maliciously. But the bar to overcome official immunity for state torts is very high. Plaintiff must establish that the officers "so unreasonably put at risk the safety and welfare of others that as a matter of law it could not be excused or justified." Kari v. City of Maplewood, 582 N.W.2d 921, 924 (Minn. 1998). The officers' conduct here might constitute recklessness, but a reasonable jury could not conclude that the officers were willful or malicious. Summary judgment is appropriate on the wrongful death claim.

### B. Motions to Exclude Expert Witnesses

The Supreme Court has assigned district courts with the role of "gatekeeper" to ensure that only relevant and reliable expert testimony is admitted under Fed. R. Evid. 702. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). To determine reliability, the Court should examine (1) whether the theory or technique can be and has been tested, (2) whether it has been subjected to peer review and publication, (3) the known rate of potential error, and (4) whether the theory or technique has been generally accepted. Id. at 592-95.

But "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) (citation and quotation omitted). The Court should exclude an expert witness "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury." Id. at 929-30.

### 1. Defendants' Motion

Defendants have moved to exclude two of Plaintiff's expert witnesses: Charles W. Drago, a police-practices and use-of-force expert, and Dr. Robert A. Beatty, a neurologist.

#### a. Drago

According to Defendants, Drago's testimony should be excluded because he opines that the Defendant police officers acted unreasonably, thus invading the province of the jury regarding the ultimate legal issue in this case. But Drago in fact states that the officers' conduct is unreasonable in light of accepted police practices. While Drago cannot tell the jury that a particular use of force was unreasonable, he can certainly express his opinion as to whether that use of force comported with accepted police practices and training without couching his opinion in "reasonableness" terms. Should he stray into offering testimony on ultimate legal issues, Defendants may object to that testimony.

### b. Dr. Beatty

Defendants first argue that Dr. Beatty is unqualified to testify regarding the brain injury the decedent suffered because his practice focused on spinal injuries. But if Dr. Beatty has no expertise with brain injuries, then Defendants' cross-examination can expose that weakness. And Defendants overstate Dr. Beatty's alleged lack of qualifications in any event. He has experience with brain neurology and he is therefore qualified to testify.

Defendants also take issue with Dr. Beatty's "differential diagnosis." Dr. Beatty considered all plausible causes of the decedent's injury and then ruled out the least plausible causes until the one that remained is, in his opinion, the most likely cause of Mr. Khottavongsa's injury and death. Defendants contend that Dr. Beatty did not consider that Mr. Khottavongsa might have suffered a head injury during the fracas before police arrived. But this is not a reason to exclude Dr. Beatty's testimony; rather it is fodder for cross-examination. The Motion to Exclude Dr. Beatty is denied.

### 2. Plaintiff's Motions

Plaintiff has moved to exclude three of Defendants' expert witnesses: use-of-force expert Michael Brave, Dr. Mark Kroll, and Dr. Uzma Samadani.

### a. Brave

Plaintiff contends that Brave's opinions are unsupported by specific facts in the record, and that he offers inadmissible legal conclusions as to the reasonableness of the force used. As with Defendants' Motion to exclude Plaintiff's use-of-force expert, however, most of the deficiencies Plaintiff notes go to the weight the jury should give

Brave's testimony, not its admissibility. And to the extent that Brave opines as to the ultimate legal conclusion in this case, Plaintiff can object to that testimony at trial. This Motion is denied.

      **b.**      **Dr. Samadani**

Dr. Samadani opines that Mr. Khottavongsa's brain injury occurred before he was tased, and that he likely would have died from that injury even absent the further blows to the head he suffered as a result of and after the tasings. She contends that the fatal injury was a blow to the front of Mr. Khottavongsa's head, whereas the tasings resulted in him falling on the back of his head. Plaintiff contends that there is no evidence that Mr. Khottavongsa suffered any blows to the head before he fell to the ground after being tased. According to Plaintiff, no eyewitness testified to seeing him being hit in the head, and the autopsy report states that he died "from striking his head after being subdued by a taser."

But the scene before the police arrived was chaotic, and at least one witness reported that Mr. Khottavongsa was knocked to the ground during the fight and was kicked and punched while on the ground. Thus, it is possible that the evidence will show that he suffered a blow to the head before the tasings. This factual dispute is a matter for the jury to determine. Plaintiff can cross-examine Dr. Samadani about the bases for her opinion and challenge her conclusions, but her opinion is not excludable. This Motion is denied.

### c. Dr. Kroll

Dr. Kroll is not a medical doctor, but rather a biomedical scientist specializing in the interaction of electricity and the body. Plaintiff challenges two of his opinions: that the second tasing and fall to the ground did not cause Mr. Khottavongsa any further injury, and that the use of the taser was the safest option available to the police officers.

Dr. Kroll is the author of a published and peer-reviewed report on fatal head injuries resulting from a taser. He uses a methodology called Head Impact Criterion (HIC) to determine that the impact from second tasing would not have caused the decedent's fatal injuries. Although Plaintiff believes that Dr. Kroll's use of the HIC here is faulty, that challenge goes to the weight to be afforded Dr. Kroll's testimony and not its reliability. Certainly, although not a medical doctor, Dr. Kroll is qualified to testify about how a fall causes a skull fracture and the forces required to cause the injuries at issue. If Dr. Kroll failed to take into account Mr. Khottavongsa's first fall, which was from a much greater height and likely caused greater head trauma, or the cumulative effects of the two falls together, then this is a matter for cross-examination.

Plaintiff also contends that Dr. Kroll's "supplemental" report should be excluded because it offers new opinions and changes wholesale some of the opinions in Dr. Kroll's original report. If the supplemental report requires exploration in a supplemental deposition, Defendants should make Dr. Kroll available for such a deposition. Should that deposition reveal that Dr. Kroll's new opinions are unreliable or unhelpful to the jury, Plaintiff can move in limine to exclude those opinions.

However, Dr. Kroll is not qualified to offer opinions on the force options available to the police officers who responded to the scene here. Nor can he testify that the use of the taser was the "safest" option the police had. That is simply beyond his expertise. Plaintiff's Motion regarding Dr. Kroll is therefore granted in part and denied in part.

**CONCLUSION**

Factual disputes prevent the entry of summary judgment on whether qualified immunity protects Defendants from Plaintiff's § 1983 claims, and whether the City can be liable for the individual Defendants' conduct under <u>Monell</u>. Plaintiff's wrongful-death claim fails as a matter of law, however. And most of the challenges to expert witnesses are more appropriately raised in objections at trial. Accordingly, **IT IS HEREBY ORDERED that**:

1. Defendants' Motion for Summary Judgment (Docket No. 36) is **GRANTED in part** and **DENIED in part**;

2. Defendants' Motion to Exclude Expert Testimony (Docket No. 40) is **DENIED**;

3. Plaintiff's Motion to Exclude Testimony of Dr. Uzma Samadani (Docket No. 45) is **DENIED**;

4. Plaintiff's Motion to Exclude Testimony of Michael Brave (Docket No. 53) is **DENIED**; and

5. Plaintiff's Motion to Exclude Testimony of Dr. Mark Kroll (Docket No. 59) is **GRANTED in part** and **DENIED in part**.

Dated: August 30, 2017

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge