Kevin Flicek, as Trustee for the Heirs and Next of Kin of Sinthanouxay Khottavongsa,

Court File No. 16-cv-1031 PAM/DTS

Plaintiff,

vs.

City of Brooklyn Center, Police Officers Alan Salvosa, Cody Turner, and Gregg Nordby, acting in their individual capacities as City of Brooklyn Center Police Officers,

Defendants.

## DEFENDANTS' TRIAL BRIEF

## INTRODUCTION

This case arises from the deployment of a Taser to effect the arrest of Sinthanouxay Khottavongsa on the evening of January 16, 2015, when Brooklyn Center police responded to several 911 calls reporting a large fight involving a bat and other weapons. Khottavongsa was armed with a crowbar and did not follow commands to drop it when Officer Alan Salvosa deployed his Taser. The Taser was effective, and Khottavongsa fell to the ground. Amid a still unsecured fight scene, Salvosa reactivated the Taser for a second cycle when Khottavongsa tried to get up, despite commands not to do so. Khottavongsa was subsequently

transported by ambulance to North Memorial Hospital after his arrest. A CT scan revealed inoperable injuries to his brain, and Khottavongsa ultimately died from blunt force craniocerebral injuries.

Khottavongsa's son, Kevin Flicek, filed this § 1983 action asserting claims of excessive force and deliberate indifference to serious medical needs against Officers Salvosa, Turner, and Nordby. *Count I.* Specifically, Flicek asserts Salvosa used unreasonable force when he deployed the Taser; and Turner and Nordby unreasonably kicked and pushed Khottavongsa while he was handcuffed and escorted to the squad car. *Count I.* He then asserts the officers were deliberately indifferent to Khottavongsa's injuries and did not obtain medical care soon enough. *Count I.*

Flicek also asserts a *Monell* claim against the City of Brooklyn Center on the basis the City failed to properly train on use of force, handling of "already Tasered suspects," and risks on multiple deployments of Taser; failure to discipline for unnecessary use of Tasers; and permitting officers to use unconstitutional use of force and deliberately disregard serious medical needs. *Count II.*

This Court dismissed Flicek's wrongful death claim, after determining a reasonable jury could not conclude the officer's conduct was willful or malicious. *Doc. 84.*

**FACTS EXPECTED TO BE PROVED**

On January 16, 2015, Randall Jackson, his girlfriend Erika Phillips, and another male known as "Little Homey," walked from the Metro Transit Center on Xerxes Avenue to the nearby Coin Laundry to use the bathroom. All three are African Americans. Randall claimed he and Little Homey waited outside while Erika entered the laundry to use the bathroom. She was denied access to the bathroom and was told by the female Asian owner, Taing Hong, to "get the f*ck out." Erika left and told Randall what happened, and he entered the laundry to tell the female owner not to talk to her like that.

Taing's Asian male family members, husband Kear Som and son Leang Sarin, pushed Randall out of the store. The Asian males were joined by a friend of the family, Sinthanouxay Khottavongsa, and they proceeded to attack Randall. Randall alleged Khottavongsa struck him several times with a baseball bat. A witness named Linda Miller observed Khottavongsa with the bat and a crowbar, and she also believed Khottavongsa and the Asian males were assaulting the African Americans.

Taing Hong told a different story and indicated they had just cleaned the bathroom and were closing the laundry when Randall, Erika and Little Homey all entered the laundry. They were not polite and demanded to use the bathroom. Taing simply told them the bathroom was closed and they needed to

leave. Little Homey responded by yelling, "I'm going to kill that bitch," and Randall repeated the same threat as Taing retreated to the back room to tell her son, Leang Sarin, what was happening. Leang confronted the men and told them to leave, but they grabbed him, pulled him outside to the parking lot and started fighting with him.

Randall eventually ended up on top of Leang and punched him several times in the face. Taing tried to intervene but Erika hit her in the back of the head. Taing responded by spraying Erika with mace. Taing's husband, Kear Som, grabbed a bat and went to help Leang. Khottavongsa grabbed a crowbar and joined him. Little Homey ran away when he saw Kear and Khottavongsa approaching with their weapons.

Who the aggressors were and who the victims were during the fight will not be determined at trial. But the information known to the officers when they responded will be. At approximately 9:15 p.m., Brooklyn Center Officers were dispatched to the Pizza Hut parking lot and the Metro Transit Bus Station on Xerxes Avenue in response to reports of a fight in progress. The first of several 911 callers reported there were eight people physically fighting including three African American men, an Asian man, and an elderly lady. One of the African American men was beating up the Asian man. This first caller did not observe any weapons. The second caller was an employee of Pizza Hut and reported

similar information and indicated the fight was "big." A third caller was calling from the Coin Laundry and stated the individuals were "getting really aggressive" and reported seeing someone with a bat and a belt.

Officer Alan Salvosa arrived on the scene and observed a large group in front of the Coin Laundry. Several people were pushing each other and fighting. As he drew closer, he saw a male later identified as Khottavongsa holding a shiny long object and using it as a weapon. The object reflected light as though it was a bladed weapon like a sword or long knife. Khottavongsa approached a woman with the object in his raised right hand as if he was going to strike the woman. Officer Salvosa pointed his Taser at Khottavongsa and told him to get down on the ground and drop the object. Khottavongsa looked at Officer Salvosa, turned away from him, and raised the object as if he was going to strike someone else. Fearing for the safety of the multiple people within Khottavongsa's striking range, Officer Salvosa gave him one final warning and deployed his Taser.

The Taser probes made contact with Khottavongsa's back and he fell backwards. As other officers arrived, Officer Salvosa ordered everyone else to get down. After Khottavongsa went down, he was still clutching the object which turned out to be a 2½ foot long crowbar. Officer Salvosa ordered Khottavongsa to drop the crowbar but he refused. Officer Turner took the crowbar from

Khottavongsa's hand. The scene remained unsecured, with other officers holding their guns drawn. Khottavongsa attempted to get up, despite Salvosa's warning not to. Khottavongsa fell back to the pavement after Officer Salvosa pulled the trigger on his Taser for another cycle. Khottavongsa was then handcuffed and searched, and Officers Turner and Nordby carried him to Officer Turner's squad car.

After a few minutes, Khottavongsa was observed being unresponsive and Officers Turner and Nordby removed him from the squad car. They diverted an incoming ambulance to Khottavongsa. He was transported by ambulance to North Memorial Hospital where he was later declared brain dead. The Hennepin County Medical Examiner determined the cause of death was a blunt force craniocerebral injury (CCI).

**CONTROLLING CASE LAW**

**Unreasonable Use of Force**

A claim of excessive force under § 1983 invokes the Fourth Amendment's guarantee of the right to be free from unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). To establish a seizure in violation of the Fourth Amendment, a plaintiff must prove (1) his person was seized; and (2) the seizure was unreasonable. *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989); *Andrews v. Fuoss*, 417 F.3d 813, 816 (8th Cir. 2005). Apprehending a suspect "'by means of

physical force'" is a "'seizure' triggering the Fourth Amendment's protections." *Graham*, 490 U.S. at 395 n. 10 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)). Whether the seizure is unreasonable must be judged under the Fourth Amendment's objective reasonableness standard. *Graham*, 490 U.S. at 395-97.

Whether a seizure is reasonable is determined by the totality of the circumstances and must be judged from the viewpoint of a reasonable officer on the scene, "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Determining reasonableness "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396. "The calculus of reasonableness" allows officers deference because they "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97. Proper application of this test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 386. Courts must not use the benefit of hindsight and calm deliberation when reviewing an officer's judgment about the amount of force

necessary in a given situation. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012); *Cook v. City of Bella Villa*, 582 F.3d 840, 851 (8th Cir. 2009).

The use of force is objectively reasonable in a number of situations, including where a suspect resists arrest or fails to comply with officer orders. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (resisting arrest); *Schoettle v. Jefferson County*, 788 F.3d 855, 859–60 (8th Cir. 2015) (failing to comply with orders). Failure to comply with commands alone is enough to justify the use of force because an "officer reasonably perceives a heightened risk of serious physical harm when a suspect disobeys the officer's orders." *Billingsley v. City of Omaha*, 277 F.3d 990, 993-94 (8th Cir. 2002) (failing to halt after being ordered to stop multiple times).

**Deliberate Indifference to Serious Medical Need**

An arrestee's claim is properly analyzed under the standard applied to a pretrial detainee under the substantive due process clause of the Fourteenth Amendment. *Stetter v. Riddick*, 6 F. App'x 522, 522–23 (8th Cir. 2001). The due process clause entitles persons who have been injured while in police custody protection at least as great as that afforded convicted prisoners under the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying needed medical care only if the person "knows of and

disregards an excessive risk" to health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). An official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*.

The Eighth Circuit applies the deliberate indifference standard to denial-of-medical-care claims brought by arrestees. *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). The deliberate-indifference standard requires "both an objective and subjective analysis." *Id*.

To meet the objective component of the deliberate-indifference standard, Plaintiff must prove facts sufficient to demonstrate Khottavongsa "suffered from an objectively serious medical need." *Id*. "To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id*.

The subjective component requires a showing the officers actually knew Khottavongsa "needed medical care and disregarded a known risk to the arrestee's health." *Id*., at 965. "This showing requires a mental state akin to criminal recklessness. *Id*. Plaintiff must establish "more than negligence, more even than gross negligence." *Id*. Plaintiff must also prove causation; that officials'

"unconstitutional actions in fact caused [Khottavongsa's] injuries." *Senty-Haugen v. Goodno*, 462 F.3d 876, 890 (8th Cir. 2006).

Furthermore, where there is no dispute officers ultimately provided medical assistance, and the plaintiff claims "a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). An individual's "failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs." *Id.*, see also *Senty-Haugen*, 462 F.3d 890; *Reece v. Groose*, 60 F.3d 487, 491-92 (8th Cir. 1995).

*Monell*

"Under 42 U.S.C. §1983, a municipality may not be held vicariously liable for the unconstitutional acts of employees." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). "A municipality may be held liable under Section 1983 only if a municipal custom or policy caused the deprivation of the right protected by the constitution or federal law." *Angarita v. St. Louis County*, 981 F.2d 1537, 1547 (8th Cir. 1992). "For a municipality to be liable, a plaintiff must prove that municipal policy or custom was the 'moving force [behind] the constitutional violation.'" *Mettler*, 165 F.3d at 1204. The Plaintiff must demonstrate a causal

connection between the official's creation of the policy or failure to correct it and the alleged constitutional deprivation. *Canton v. Harris*, 489 U.S. 378, 385-86 (1989). The lack of a pattern of unconstitutional misconduct effectively ends the court's inquiry. *See Thelma D. ex rel. Delores A. v. Bd. of Educ.*, 934 F.2d 929, 933 (8th Cir. 1991). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 824-25 (1985).

A City may be liable for failure to train or supervise employees when (1) the City's training practices are inadequate; (2) the City acted with deliberate indifference towards the rights of citizens when adopting its policies; and (3) the alleged deficiency actually caused plaintiff's injury. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996).

## TRIAL

Jason M. Hiveley and Stephanie A. Angolkar will try this case. Their contact information is in the signature block and below:

| | |
|---|---|
| Jason M. Hiveley | Stephanie A. Angolkar |
| Direct: (952) 548-7209 | Direct: (952) 548-7216 |
| Fax: (952) 548-7210 | Fax: (952) 548-7210 |
| jasonh@irc-law.com | stephanie@irc-law.com |

IVERSON REUVERS CONDON

Dated:  July 16, 2018

By s/ Stephanie A. Angolkar
   Jason M. Hiveley, #311546
   Stephanie A. Angolkar, #388336
Attorneys for Defendants
9321 Ensign Avenue South
Bloomington, MN  55438
(952) 548-7200
jasonh@irc-law.com
stephanie@irc-law.com