Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2

 3         Court File No.: 16-cv-1031 RHK/KMM

 4

 5   Kevin Khottavongsa,
     As Trustee for the Heirs
     And Next of Kin of
 6   Sinthanouxay Khottavongsa,

 7              Plaintiff,

 8         v.

 9   City of Brooklyn Center,
     Police Officers Alan Salvosa,
10   Cody Turner, and Gregg Nordby,
     acting in their individual
11   capacities as City of Brooklyn
     Center police officers,
12
                Defendants.
13

14

15         DEPOSITION OF LINDA MILLER
                Pages 1 through 105
16

17

                    June 22, 2017
18              3:24 p.m. - 5:20 p.m.
                 Almerico & Mooney
19               Meridian One Building
               4350 West Cypress Street
20                   Suite 275
                   Tampa, FL 33607
21

22

23         Stenographically Reported By:
                Teresa R. Cruise
24      Notary Public, State of Florida
             U.S. Legal Support, Inc.
25              (813) 876-4722
```

Exhibit A

Page 2

```
 1    APPEARANCES:
 2
      On Behalf of the Plaintiff:
 3
          Gustafson Gluek, PLLC
 4        120 South Sixth Street
          Suite 2600
 5        Minneapolis, MN 55402
          (612) 333-8844
 6        Jrissman@gustafsongluek.com
          BY: JOSHUA J. RISSMAN, ESQUIRE
 7
 8    On Behalf of the Defendants:
 9        Iverson Reuvers Condon
          9321 Ensign Avenue S
10        Bloomington, MN 55438
          (952) 548-7200
11        Jon@irc-law.com
          BY: JON K. IVERSON, ESQUIRE
12
13
14
15
16
17              INDEX OF PROCEEDINGS
18
      Deposition of LINDA MILLER            Page
19
      Examination by Mr. Rissman               4
20    Examination by Mr. Iverson              88
      Stipulations                           101
21    Certificate of Oath                    102
      Certificate of Reporter                103
22    Witness Review Letter                  104
      Errata Sheet                           105
23
24
25
```

Page 3

```
 1              INDEX TO EXHIBITS
 2    PLAINTIFF'S EXHIBITS:
 3
      NO.  DESCRIPTION                       PAGE
 4    1    Letter from Iverson Reuvers Condon with
           Attached Affidavit of Linda L. Miller...  9
 5    2    Photograph............................  55
 3    3    Photograph............................  63
 6    4    Deposition Transcript of Guadalupe
           Galarza................................  72
 7    5    Deposition Transcript of Maria
           Cruz-Martinez..........................  75
 8
 9
      DEFENDANT'S EXHIBITS:
10
11    NO.  DESCRIPTION                       PAGE
12
                (NO EXHIBITS MARKED)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         The deposition of LINDA MILLER, was taken pursuant
 2    to notice by counsel for the Plaintiff on
 3    Thursday, June 22, 2017, commencing at 3:24 p.m.
 4    at Almerico & Mooney, Meridian One Building,
 5         4350 West Cypress Street, Suite 275,
 6              Tampa, Florida 33607.
 7    Said deposition was reported by Teresa R. Cruise,
 8         Notary Public, State of Florida at Large.
 9              - - - - - - - - -
10         THE COURT REPORTER:  Would you raise your
11    right hand, please?  Do you swear or affirm that
12    the testimony you are about to give will be the
13    truth, the whole truth, and nothing but the
14    truth, so help you God?
15         THE WITNESS:  Yes.
16    THEREUPON:
17              LINDA MILLER,
18    having been first duly sworn, was examined and
19    testified as follows:
20              EXAMINATION
21    BY MR. RISSMAN:
22    Q.   Good afternoon, ma'am.  Could you please
23    state your name for the record?
24    A.   Linda Miller.
25    Q.   All right.  Ms. Miller, have you ever had
```

Page 5

```
 1    your deposition taken before?
 2    A.   Yeah, maybe, some years ago.
 3    Q.   Okay.  What type of case was that?
 4    A.   A criminal murder (sic).
 5    Q.   Did you say "criminal murder"?
 6    A.   It was a murder case, yes.
 7    Q.   Okay.  Were you a witness?
 8    A.   Yes.
 9    Q.   And did you testify in court?
10    A.   Yes.
11    Q.   Do you remember when that was?
12    A.   Oh, wow.
13    Q.   Approximately.
14    A.   Maybe 2002, 2005.
15    Q.   Do you remember the name of the person --
16    the defendant?
17    A.   No.
18    Q.   Do you remember the name -- did you know the
19    name of the person who was murdered?
20    A.   No.  I know the -- the attempted murder
21    charges was on a guy named PD.  I don't remember his
22    real name, but they called him PD.
23    Q.   Okay.  And so it was an attempted murder or
24    a murder?
25    A.   It was a murder/attempted murder.
```

Page 6

1    Q.   Oh, okay.
2    A.   Two people were shot.
3    Q.   Two people, gotcha.
4    A.   Yeah, two people.
5    Q.   Two people were shot.
6         And you saw them shot?
7    A.   Uh-huh.
8    Q.   Okay.
9    A.   Well, I didn't see them shot.  I was in the
10   vicinity; and the guy that survived, I drove him to
11   the hospital.
12   Q.   Okay.  Do you know if they were convicted?
13   A.   I'm not sure.
14   Q.   Okay.  Well, it's probably going to be a --
15   well, similar to that, just that we're not in a
16   courtroom; but you are under oath.
17        I'm going to ask you questions, you answer
18   the questions.  If there's a question you don't
19   understand, let me know, and I'll try to clarify it.
20   If you want me to repeat the question, that's fine.
21   A.   Okay.
22   Q.   We might watch some video here today or
23   listen to some audio, and so you can ask me to repeat
24   the audio or the video as many times as you want.
25   But if you respond to a question, we'll assume you

Page 7

1    understood it.
2    A.   Yes.
3    Q.   That make sense?
4    A.   Uh-huh.
5    Q.   Please give verbal answers, "Yes," or "No,"
6    it's much better than "Huh-uh," or "Um," because the
7    court reporter here is taking everything down we're
8    saying.
9    A.   Okay.
10   Q.   Okay.  And it tends to happen sometimes, we
11   try to -- we talk over each other in the course of
12   conversation.  But because the court reporter is
13   taking down everything you say, it's good if I -- I
14   will do my best to let you finish your answer if you
15   can let me finish my question.  And Mr. Iverson here
16   may, from time to time, object.
17   A.   Okay.
18   Q.   And he may also have some questions for you
19   after I'm done.
20   A.   Okay.
21   Q.   And so that's kind of how everything works.
22   Does that make sense?
23   A.   Makes sense.
24   Q.   Okay.  Is there anything that would prevent
25   you from testifying truthfully today?

Page 8

1    A.   No.
2    Q.   Did you do anything to prepare for today's
3    deposition?
4    A.   No.
5    Q.   Okay.  Are you currently a resident of
6    Florida?
7    A.   Yes.
8    Q.   Okay.  What's your address?
9    A.   1817 French Creek Road, Apartment 4, Tampa,
10   Florida 33613.
11   Q.   Okay.  And you were previously a resident in
12   Minnesota?
13   A.   Yes.
14   Q.   Do you still have property in Minnesota?
15   A.   No.
16   Q.   Okay.  And why did you move to Florida?
17   A.   A life change.
18   Q.   Okay.  And where do you work?
19   A.   I work for Optum, O-p-t-u-m.
20   Q.   And what do you do for Optum?
21   A.   I am a fraud investigator.
22   Q.   How long have you done that?
23   A.   I just received that role as of March, I
24   believe, of this year.  I've been within the company
25

Page 9

1    permanently for two and a half years, been within the
2    company for over ten years.
3    Q.   Okay.
4         THE COURT REPORTER:  Exhibit 1 or A, sir?
5         MR. RISSMAN:  Let's go with 1.
6         (Plaintiff's Exhibit No. 1 was marked for
7         identification.)
8    BY MR. RISSMAN:
9    Q.   Ms. Miller, you've been handed what's been
10   marked as Exhibit 1.  The first page is a letter from
11   Iverson Reuvers Condone, and then after that you
12   have -- it says the, "Affidavit of Linda Miller," and
13   then on page -- I guess that's the fourth page,
14   there's a statement.  Do you see that?
15   A.   Yes.
16   Q.   Okay.  And on the fourth page at the bottom,
17   there's a signature at the bottom.  Do you see that?
18   A.   Yes.
19   Q.   Is that your signature?
20   A.   Yes.
21   Q.   Okay.  And so I take it you -- this is your
22   affidavit?
23   A.   Yes.
24   Q.   And how did you come to write this
25   affidavit?

Page 10

1    A.   I received a call from an attorney, which I
2  assume it was LeAnn -- I'm not exactly sure of her
3  name -- but she just -- she gave me a call and asked
4  me to do a deposition.  She sent the notary to my
5  house, had it notarized -- or not deposition, sworn
6  statement.
7    Q.   Sworn statement.
8         And was that -- and do you know if it was
9  LeAnn Hildebrandt?
10   A.   I believe so.
11   Q.   Okay.  Do you remember when LeAnn
12 Hildebrandt contacted you, approximately?
13   A.   Oh, gosh.  February -- I believe it was
14 March she contacted me.  I don't know an exact date.
15 I know it was shortly right after I got here.
16   Q.   Okay.  And did you give her a description of
17 what you might say in the affidavit?
18   A.   Did I?  I believe -- yes, I did.
19   Q.   And, then, did you -- and so the second page
20 here where it says, "Affidavit of Linda Miller," and
21 it's sort of -- can you flip back one page after the
22 letter, yep -- did you -- did they provide that part
23 for you?
24   A.   I'm sorry?
25   Q.   If you look on the second page where it

Page 11

1  says, "Affidavit of Linda Miller" -- yes -- did they
2  provide -- did LeAnn Hildebrandt provide that part
3  for you or did you type that up?
4    A.   She provided this portion.
5    Q.   Okay.  And then did you write the part that
6  starts on page four, "To Whom it May Concern"?
7    A.   Yes, I did.
8    Q.   Did they give you any help writing that?
9    A.   No.
10   Q.   Did they give you any suggestions as to what
11 you should put in?
12   A.   No.
13   Q.   Okay.  Is there anything they told you not
14 to put in there?
15   A.   No.
16   Q.   Okay.  And at the bottom of that, it says,
17 "This is my sworn" -- and I'm sorry -- do you
18 remember when you sent it back to Ms. Hildebrandt?
19   A.   I would -- gosh, no, I don't.  I don't know
20 the exact date.  I would have to check my e-mails.
21   Q.   Okay.  At the bottom of the page four, where
22 you are, it says, "This is my sworn statement on what
23 I recall from that evening."
24   A.   Yes.
25   Q.   Do you see that?  And so you put everything

Page 12

1  important in this affidavit that you could remember?
2    A.   Yes.
3    Q.   Sitting here today, is there anything that
4  you can remember that you forgot to put in the
5  affidavit?
6    A.   I believe there was a belt used in the
7  assault against the African American guy that was
8  there by the -- I'm not sure of the nationality,
9  Chinese, Vietnamese -- the young man -- the gentleman
10 that had passed away.
11   Q.   Okay.  Anything else?
12   A.   Not that I can think of offhand.  I believe
13 that's the only detail I left out.
14   Q.   Okay.
15   A.   I guess I would actually have to read over
16 it again.
17   Q.   Do you want to read over it now?
18   A.   Sure.
19   Q.   We're going to go over it so you might as
20 well read over it now --
21   A.   Okay.
22   Q.   -- and get familiarized.
23   A.   Okay.
24   Q.   Okay.  And I'm just going to ask you the
25 same question:  Anything that you remember, sitting

Page 13

1  here today, that you forgot to put in there, other
2  than the reference to the belt?
3    A.   No.
4    Q.   Okay.  What time did you arrive at the coin
5  laundry that evening, approximately?
6    A.   Oh, gosh, Daylight Savings -- I'm going to
7  say approximately 4:00 p.m. I believe it got dark
8  around 6:00 or 7:00 p.m. in Minnesota at that time,
9  so I went about 4:00 p.m.
10        I believe that this all happened at
11 approximately 5:30 p.m., 6:00 p.m., 6:30, maybe, at
12 the latest.  But I'm not 100 percent sure about that.
13   Q.   Okay.  And when the altercation started,
14 were you almost finished with your laundry?
15   A.   Yes.
16   Q.   So you were -- were you getting ready to
17 leave?
18   A.   My stuff was in the dryer.
19   Q.   Your stuff was in the dryer?
20   A.   Yeah.  The last few minutes of the dryer,
21 maybe ten or fifteen minutes.
22   Q.   And were you with anybody?
23   A.   My daughter and my grandson.
24   Q.   How old is your grandson?
25   A.   He is five now.  He -- I believe he was

Page 14

1   three or four when this happened.
2        Q.   Okay.  Yeah.  I mean, I should say the
3   incident that we're discussing took place on
4   January 16, 2015 (sic).
5        A.   Okay.  Okay.  Thank you.
6        Q.   Does that seem right to you?
7        A.   Yep.  Sounds right.
8             MR. IVERSON:  2015.
9             MR. RISSMAN:  I'm sorry, 2015.  Thank you.
10            THE WITNESS:  Yes, 2015.
11            MR. RISSMAN:  January 16th, 2015.  That's
12   right.
13   BY MR. RISSMAN:
14        Q.   And how old, at that time, was your
15   daughter?
16        A.   Oh, gosh.  She was 18, I believe, 18 or 19,
17   because she's 21 now.
18        Q.   Okay.  Does she still live in Minnesota?
19        A.   Yes.
20        Q.   What's her name?
21        A.   Shaquira, S-h-a-q-u-i-r-a, last name,
22   Palmer, P-a-l-m-e-r.
23        Q.   Palmer?
24        A.   Palmer, yes.
25        Q.   And what's her address?

Page 15

1        A.   She doesn't have an address right now.
2   She's actually staying from house to house.
3        Q.   Okay.  Does she have a phone number?
4        A.   Yes.  And I don't believe her phone is on,
5   but I'll give you her number -- best way to reach her
6   is probably Facebook -- (612) 245-4136.
7        Q.   4-1-3-6?
8        A.   Correct.
9        Q.   And did she -- did she witness -- do you
10   know if she witnessed the same events that you did?
11        A.   Yes, she did.
12        Q.   Okay.  Did you drive a vehicle to the coin
13   laundry?
14        A.   Yes.
15        Q.   What kind of vehicle?
16        A.   An '02 Chevy TrailBlazer, red.
17        Q.   Okay.  And did you come to that location to
18   do laundry before?
19        A.   Yes.
20        Q.   Often?
21        A.   Often.
22        Q.   Had you ever spoken to the owners?
23        A.   "Hi," "Bye," "Dryer's not working."
24        Q.   You didn't know them personally?
25        A.   No.

Page 16

1        Q.   And who do you understand the owners to be?
2        A.   As I said, I'm not sure of the nationality,
3   Vietnamese or Chinese American people.
4        Q.   Asian?
5        A.   Asian.  Okay.
6        Q.   Is that a man and a woman?
7        A.   I mainly saw the lady.
8        Q.   Okay.
9        A.   I seen the man maybe once, but I seen the
10   lady every time I went.  I generally did laundry
11   probably twice a month there.
12        Q.   Okay.  Did you see the -- so you referenced
13   the three African American people in your affidavit
14   on the first and second line there.  "When three
15   African American people (one woman and 2 men) walked
16   in with a small bag."
17             Do you see that?
18        A.   Yes.
19        Q.   Okay.  Did you see them enter the premises?
20        A.   Yes.
21        Q.   Okay.  And what did they do?
22        A.   They were walking in the direction towards
23   the restroom.  The Asian lady owner told them they
24   couldn't come in.  The lady held up a bag and said,
25   "I'm doing laundry."  The Asian lady was, like, "No,

Page 17

1   you're not.  You guys need to leave."
2             And as they were leaving out, they were back
3   and forth at each other.  All three African Americans
4   were speaking back to the Asian lady, basically,
5   yelling at each other.
6        Q.   Okay.
7        A.   And -- but they began to walk out the door.
8   After she said, "No, you're not," they turned and
9   slowly began to walk out the door.
10        Q.   At any point did they refuse to leave?
11        A.   No.
12        Q.   And how long would you say they were in
13   there before they -- you say they walked out the
14   door?
15        A.   Give them, tops, 20 seconds.
16        Q.   20 seconds?
17        A.   Yeah.  In and out.
18        Q.   Okay.
19        A.   She caught them as soon as they were walking
20   in the door; maybe the door closed behind the last
21   person.  They were proceeding to the restroom, and
22   she stopped them.
23             And they said, "I'm doing laundry."  She's,
24   like, "No, you're not.  Get out."  And they're, like,
25   "We're doing laundry," and cussing back and forth at

**Page 18**

1  each other.

2  Q.  Uh-huh.

3  A.  But, at the same time, they were leaving
4  when she asked them to leave.

5  Q.  Okay.  So did you hear the African
6  American -- one or more of the African American
7  people use profanity towards the Asian woman?

8  A.  That, I don't recall exactly what was said.
9  I can't say who cussed at who first, who cussed at
10  who the most.  I just know that they were verbally
11  going back and forth at each other.

12      I'm not exactly sure what they were saying,
13  besides the fact that, "We'll leave your laundry
14  mat," or -- I'm not 100 percent sure.

15  Q.  But they were cussing that night?

16  A.  They were.

17  Q.  They were cussing at her?

18  A.  They were both going back and forth at each
19  other, yes.

20  Q.  They were cussing at each other?

21  A.  Yes.

22  Q.  Okay.  But it was just, at this point, the
23  Asian owner exchanging words with three people,
24  right?

25  A.  Correct.

**Page 19**

1  Q.  Okay.  And the Asian owner is pretty --
2  she's pretty small, right?

3  A.  Yes.

4  Q.  Did you ever hear them threaten her?

5  A.  No.

6  Q.  Are you positive they didn't or you just
7  didn't hear it?

8  A.  I'm positive no one threatened anyone.
9  Everybody's just like -- she's just, like, "Get out."
10  And they're like, "Well, we were doing laundry.  F
11  (sic) your laundry mat," you know, back and forth.
12  She's, like, "Whatever, get out, get out."  And
13  they're steadily talking trash while they're walking
14  out.

15      And as they were getting to the door, she
16  yelled in the back and a couple of the guys came from
17  the back.  The first guy and the lady made it out the
18  door; the door was still open for the third guy to
19  come out.  By this time the two Asian guys came from
20  the back, running out the back.

21      And they grabbed the last guy going out and
22  brought -- pulled him back in.  They were fighting on
23  the chairs right there at the door, on the left side
24  facing the door inside the laundry mat.  My grandson
25  was in that third -- second or third chair by the

**Page 20**

1  door.  I snatched him up, and I'm, like, "You guys
2  are fighting by my grandson."

3      They continued to rough around a little bit
4  in that area.  I proceeded to grab my grandson, go to
5  the back of the laundry mat, told my daughter, "Hurry
6  up, get the stuff out of there."  When I looked up --
7  I'm not exactly sure how long it was -- but when I
8  looked up they were outside.  They were outside
9  fighting.  Well, not even fighting.

10      The two Asian guys grabbed the one black guy
11  that they pulled back in and fought inside.  One
12  guy -- not the guy that passed away, the other Asian
13  guy -- had the guy like this (indicating).  And the
14  guy's, like, "Let me go, let me go."

15      And the other Asian guy had -- I believe the
16  first weapon was a belt.  So I think he was hitting
17  him with the belt buckle as the other guy's holding
18  him.

19  Q.  Okay.

20  A.  And he's telling him, "I'm not going
21  nowhere.  Stop hitting me."  I don't know if the belt
22  broke, if he lost handle of the belt, but somehow or
23  another, a rod, a metal rod came about.

24      By the time all of this is going on, my
25  daughter and I had snatched all our stuff out the

**Page 21**

1  dryer, hurry up, threw it in the car; and I put my
2  grandson in the car.

3      So I see him there with the metal rod.  And
4  the lady walks up to him -- the black lady walks up,
5  and I think she said, "Why are you hitting my
6  husband," or "Stop hitting my husband," or "My
7  boyfriend."  And the guy that passed away, he turned
8  around and he hit her with the rod; if I'm not
9  mistaken, she was pregnant.

10      She backed up and he continued to beat the
11  guy.  And I'm, like, "Why are you hitting him?  He's
12  not fighting you back."  And I'm guessing they didn't
13  hear me, or they blocked me out; no one turned around
14  or anything.

15      I grab my phone -- my daughter was in the
16  car, my grandson's in the car, all my laundry -- I
17  grabbed my phone to record, but it didn't record.  I
18  thought I was recording.  And the gentleman that
19  passed away, he saw me, he walked my way.  He's,
20  like, "Stop recording me.  Put the fucking camera" --
21  or "Put the damn -- stop damn recording me,"
22  something of that effect.

23      And I'm, like, "You better not hit me with
24  that rod."  And he went like this, and in the back of
25  me I heard someone saying, "Put it down.  Drop it,

Linda Miller
June 22, 2017                                                22 to 25

Page 22

1    drop it now."  And I looked back and it was the
2    police.  So I ran -- kind of walked back because he
3    wasn't that far behind me -- kind of went back there
4    with him.
5            And he's -- the police officer's holding the
6    Taser and he's, like, "Put it down, drop the -- drop
7    it, drop it."  The Asian guy turned around and -- turned
8    away from us and started walking towards the laundry
9    mat door.  And I believe he had -- the police already
10   had the black guy on the ground.  And the guy was
11   like he was going to hit him even though he was
12   already on the ground.
13           And that's when the police Tased (sic) him,
14   and he fell and he hit his head.
15       Q.   Okay.  Well, I appreciate you giving us the
16   whole account.
17       A.   Uh-huh.
18       Q.   Unfortunately, we have to kind of go through
19   things --
20       A.   Okay.
21       Q.   -- kind of piece-by-piece.  So let me see if
22   we can back up a little bit here.  So I'll kind of
23   start at the end there.
24           So you said that the guy who was Tasered was
25   going to hit the black guy who was on the ground

Page 23

1    right before he was Tasered?
2        A.   Correct.
3        Q.   Okay.
4        A.   He still had the rod up.
5        Q.   He had the rod up?
6        A.   He had --
7        Q.   He was going -- so he was going to hit him,
8    the black guy, with the Taser?
9        A.   Yeah.
10       Q.   So his back was turned to the police
11   officer?
12       A.   As he was walking towards the other --
13   yes -- gosh.  "Put it down," ran back there, put the
14   Taser down -- he -- yes.  He was getting ready to
15   walk towards -- or he was walking towards -- back
16   towards the laundry mat doors.
17           If I'm not mistaken, the black guy was on
18   the ground right there by the door.  And the Asian
19   guy walked up, was just like this (indicating),
20   walking towards him.
21           And the officer was still yelling at him to,
22   "Drop it."  He kept saying -- he said it several
23   times -- "Drop it.  Drop the weapon, drop the rod,"
24   whatever he said.  He just kept saying, "Drop it,"
25   and the Asian guy never dropped it.

Page 24

1        Q.   And then you saw him get Tasered?
2        A.   Then I saw him get Tased (sic).
3        Q.   Okay.  And I don't know if you know how a
4    Taser works, but basically two darts come out --
5        A.   Uh-huh.
6        Q.   -- and then the person's shot.  Did you see
7    him get -- the darts kind of hit him?
8        A.   No.
9        Q.   Did you see him fall?
10       A.   I seen him fall.
11       Q.   Okay.
12       A.   And you heard him fall.
13       Q.   You heard him fall?
14       A.   Because you could hear his head hit the
15   ground.
16       Q.   Okay.
17           MR. IVERSON:  Counsel, I don't mean to
18   interrupt your flow, but for the record, you said
19   he had his arms, "like this."  And "like this,"
20   you have your arm up, cocked at a 45-degree
21   angle; is that correct?
22           THE WITNESS:  Correct.  Ready to swing.
23   That's the way he looked.
24           MR. IVERSON:  So kind of like throwing a
25   baseball motion with your hand right now or --

Page 25

1            THE WITNESS:  Yeah.
2            MR. IVERSON:  Okay.  Thank you.
3    BY MR. RISSMAN:
4        Q.   Okay.  And are you sure of that?
5        A.   I'm pretty sure of that.
6        Q.   Why --
7        A.   I'm positive of that because I know he still
8    had the rod up and the officer's telling him to drop
9    it.  He was facing me first.  I ran behind the
10   officer, so he saw the officer right there.  The
11   officer's yelling at him, "Drop the Taser" -- or,
12   "Drop it, drop it."  I'm not sure if he said, rod,
13   stick, or whatever, he just kept telling him to drop
14   it.  And he didn't drop it.
15           His arm stayed up.  He turned around and he
16   started walking towards the people that were on the
17   ground, which was the black man that was on the
18   ground; and he was Tased.
19       Q.   Okay.
20       A.   I'm not sure if the Tase (sic) hit him in
21   the side, or hit him in the back, but I know he was
22   Tased.
23       Q.   Okay.  If you look at your statement -- or
24   your affidavit --
25       A.   Uh-huh.

Page 26

1    Q.   -- if you go down towards near the end, it
2    says -- I guess let's start at the part where it
3    says, "I said, 'You better not hit me.'" Do you see
4    that? It's about -- let's see -- eight lines up from
5    the bottom.
6    A.   Yep. "I said, 'You better not hit me' --
7    Q.   Yeah.
8    A.   -- 'with that rod.'"
9    Q.   Yeah. So let me just read that to you.
10   "So I said, 'You better not hit me with that
11   rob (sic).'" I assume you mean rod?
12   A.   Rod. Yeah.
13   Q.   Okay. "He drew back like he was going to
14   hit me, and that is when I heard a voice behind me
15   saying to, 'Put it down, put it down.' It was the
16   police. The man turned and walked away approaching
17   one of the black men with the rod still up like he
18   was going to hit him. The officer said several times
19   to, 'Drop it.'
20        I believe, but not sure, the man turned
21   towards the officer with the rod right up like he was
22   going to hit him and the officer Tased him."
23        Do you see that?
24   A.   Yes.
25   Q.   Okay.

Page 27

1    A.   I do.
2    Q.   So isn't that -- that's different --
3    A.   That --
4    Q.   -- than what you just said today.
5    A.   It is.
6    Q.   Is that correct?
7    A.   Yes, it is.
8    Q.   Okay. So which one is true?
9    A.   I believe he turned towards -- he turned
10   away from the officer and was going towards the
11   people on the street -- or, the black people that
12   were sitting on the curb. So, no, he was not
13   pointing at the officer, he was not swinging at the
14   officer.
15   Q.   Okay. Why did you say that was swinging at
16   the officer if he wasn't swinging at the officer?
17   A.   At that time, everything's going through my
18   mind, I'm trying to remember everything that was
19   going on. So that was definitely a mistake on my
20   part.
21   Q.   Okay. And if you look, you signed this --
22   if you look on the next page, you signed this on
23   April 27, 2017.
24   A.   Oh, at my statement or the notary?
25   Q.   Oh, I'm sorry. That's the affidavit of

Page 28

1    service. Let me see here.
2        You signed this on April 18, 2017.
3    A.   Yes.
4    Q.   And so that was about two months ago.
5    A.   I guess.
6    Q.   Okay. And so two months ago you were having
7    trouble remembering what happened?
8    A.   Yeah. I'm not 100 sure -- percent sure on
9    how everything went down, and the exact order. But,
10   yes, that right there, I believe, is a misprint -- or
11   I misspoke as far as him with the rod towards the
12   officer.
13   Q.   Okay. I want to back up a little bit, kind
14   of more towards the beginning of the altercation.
15        You said that -- you said here today that
16   two men came out when the lady called them; is that
17   right?
18   A.   Yes.
19   Q.   Okay. Do you see in your affidavit that you
20   said -- the third line down, it says, "The owner then
21   called about two to three men" --
22   A.   Uh-huh.
23   Q.   -- "from the back office"?
24   A.   Uh-huh.
25   Q.   So is it two men or is it two to three men?

Page 29

1    A.   It's two men.
2    Q.   Okay.
3    A.   I believe it was only two men that came from
4    the back.
5    Q.   Okay. And one of those men was not -- and
6    what did those -- what did the two men look like who
7    came from the back?
8    A.   One was an older Asian guy; the other, he
9    was an Asian guy as well. I'm not sure of his age
10   range or what they exactly looked like, I just recall
11   them running -- coming from the back.
12   Q.   Okay. And the guy that got Tasered, did he
13   come from the back --
14   A.   Yes.
15   Q.   -- at that time?
16   A.   Yes. When she called -- she said something
17   in the back, I believe she said it in their language,
18   and the two guys came from the back.
19   Q.   Okay. So you heard her say something that
20   wasn't English?
21   A.   Correct.
22   Q.   Okay. And one of the two people that came
23   out was -- your testimony is that that was the guy
24   that got Tasered?
25   A.   Yes.

Page 30

1    Q.    Are you positive it was not the owner, the
2    male owner of the shop?
3    A.    I don't know who the owner is.  I don't -- I
4    mean, I know it was her and two guys.
5    Q.    Okay.  And then throughout the fight -- or,
6    the altercation, did -- how many Asian males were
7    there?
8    A.    I want to say there was only two Asian males
9    and the one Asian lady.
10   Q.    Okay.  Are you positive of that or are you
11   not sure?
12   A.    I know for a fact there was one woman, two
13   men, Asian, in the laundry mat.
14   Q.    In the laundry mat.
15   A.    Yeah.
16   Q.    How about outside?
17   A.    Outside, too much commotion.
18   Q.    So there --
19   A.    Yeah, there was people everywhere.  People
20   came out of the stores and from the transit center,
21   so...
22   Q.    Okay.  And so did anybody else -- did you
23   see anybody else get involved, other than the Asian
24   males and the three African American individuals?
25   A.    No.

Page 31

1    Q.    Did --
2    A.    That was it.
3    Q.    There is a Quick Shop next door, isn't
4    there?
5    A.    Yeah.
6    Q.    Did you see anybody from the Quick Shop get
7    involved?
8    A.    Not that I recall.  I know they were
9    outside, but were they involved physically?  I'm not
10   sure.  I believe the store guy said he was calling
11   the police.
12   Q.    Did you ever call the police?
13   A.    I believe I called the police and my
14   daughter called the police, or it was either/or, one
15   of us two, because I may have told her, "Get in the
16   car, call 911."  I may have been on the phone with
17   911 and called them.  I'm not exactly sure.
18   Q.    So it was either you or your daughter who
19   called the police?
20   A.    It was either me or my daughter, or me and
21   my daughter.
22   Q.    Okay.  So at least one of you, maybe both of
23   you?
24   A.    Yes.
25   Q.    Okay.  Do you recall whether you gave your

Page 32

1    name to the police?
2    A.    Yes, I did.
3    Q.    Okay.  And do you know if your daughter gave
4    her name to the police?
5    A.    I'm not sure.
6    Q.    Did you ever see a bat, a metal baseball
7    bat, involved?
8    A.    Oh, gosh, a bat -- a bat -- there were a few
9    weapons involved.  There's a metal rod, a belt --
10       THE COURT REPORTER:  I'm sorry, ma'am.
11   Could you please take your hands down?
12       THE WITNESS:  I'm sorry.
13       THE COURT REPORTER:  Thank you.
14       THE WITNESS:  I know there was a metal rod,
15   a belt, and I want to say there was a bat
16   involved, but I'm 100 percent sure about that.  I
17   know there were different weapons involved.
18   BY MR. RISSMAN:
19   Q.    And so going back to the Asian males that
20   were involved, I'll represent to you that the owner
21   of the laundry mat testified already in this case
22   that he was involved --
23   A.    Okay.
24   Q.    -- and his son testified that he was
25   involved --

Page 33

1    A.    Okay.
2    Q.    -- and the mom testified that she was
3    involved --
4    A.    Uh-huh.
5    Q.    -- and, then, of course, there's the man who
6    passed away.
7    A.    Okay.
8    Q.    Okay.  Do you understand that?
9    A.    Yeah.
10   Q.    Okay.  So that would make -- that would make
11   one woman and three men --
12   A.    Okay.
13   Q.    -- is that right?
14   A.    Yeah.
15   Q.    Does that make you -- do you have any reason
16   to doubt that there were three Asian males there?
17   A.    No, I don't.
18   Q.    Okay.
19   A.    I believe that's why I put two or three --
20   Q.    Two or three.  Okay.
21   A.    -- so...
22   Q.    And earlier you mentioned one guy had his
23   arms around one of the African Americans and the
24   other guy was -- did you say he was hitting him?
25   A.    Yes.

Linda Miller
June 22, 2017                                    34 to 37

---

**Page 34**

1    Q.    Okay.  And can you say for sure which two
2    Asian males those -- were involved in that specific
3    incident?
4    A.    The one -- I don't know which one was
5    holding him, but the one that was hitting him is the
6    one that passed away.
7    Q.    Okay.
8         MR. IVERSON:  When you say, "holding him,"
9    you -- kind of like a bear hug?  Is that what
10   you --
11        THE WITNESS:  A bear hug.  He had him from
12   the back.  So, you know, his front was on the
13   black guy's back.  He was holding him like this
14   (indicating), arms down -- the black guy had his
15   arms down by his side and the Asian guy was
16   holding him like this (indicating).
17        MR. IVERSON:  And, again, "like this" you
18   mean in a -- like a bear hug?
19        THE WITNESS:  In a bear hug, yes.
20        MR. IVERSON:  The court reporter can't take
21   down descriptions.
22        THE WITNESS:  Yeah.  Uh-huh.
23   BY MR. RISSMAN:
24   Q.    But you don't ever recall seeing the male
25   owner involved at all, do you?

---

**Page 35**

1    A.    I don't know which one the male owner is.  I
2    don't know who is who.  I just know the one that
3    passed away, that got Tased, is the one that was
4    hitting the black guy with the metal rod, the same
5    gentleman that came over and held the rod up to me
6    like he was going to hit me because he thought, and I
7    thought, I was recording it.
8    Q.    Uh-huh.
9    A.    And he came to me and he's, like, Stop
10   "recording me, put the fucking phone down," or
11   something like that.  And I just simply said, "You
12   better not hit me with that."  And that's when I
13   heard the police in the back -- in the back of me.
14   Q.    Do you remember another older Asian male
15   involved at all?
16   A.    I can't say that I do.
17   Q.    Okay.  And I believe -- kind of going
18   backwards again -- we're kind of jumping around here
19   and I apologize for that --
20   A.    Okay.
21   Q.    -- going back to when you were still inside
22   the laundry mat and you said the fighting began and
23   you grabbed your grandson, right?
24   A.    Yes.
25   Q.    And you went to go -- you told your daughter

---

**Page 36**

1    to go get the laundry?
2    A.    Yes.
3    Q.    And you said you moved to the back of the
4    store?
5    A.    Yes.
6    Q.    All right.  And at that point in time, did
7    you not see everything that was happening with the
8    fight?
9    A.    The last part of the fight is when -- that I
10   saw inside of the laundry mat is when the guys came
11   from the back, they -- one of them, maybe two of
12   them, pulled the last black guy back in, he was
13   semi-out the door.  He was almost out the door --
14   Q.    Uh-huh.
15   A.    -- and they pulled him back in, and they
16   pushed him down on the chairs right there.  I ran, I
17   grabbed my grandson, ran to the back, told my
18   daughter, "Get the stuff."
19        So -- and from that point, when I turned
20   around, I'm not sure how long after, but it all ended
21   up outside.
22   Q.    Okay.
23   A.    So I just saw the first ten seconds of a
24   tussle right there at the door on those chairs when I
25   grabbed my grandson.

---

**Page 37**

1    Q.    Uh-huh.
2         And so when you looked back, they were -- it
3    was already outside?
4    A.    They were outside.
5    Q.    Okay.  And then you walked outside after
6    that?
7    A.    No, no.  I got --
8    Q.    You stayed inside the laundry mat?
9    A.    I got my laundry and loaded it in my truck
10   really quick.  By this time, they were in the parking
11   lot to the left of the laundry mat, kind of right in
12   front of the Quick Stop (sic) store.
13   Q.    So --
14   A.    But they were at the end of the parking lot.
15   Q.    Okay.  So when you say "to the left," you
16   mean towards the Quick Shop?
17   A.    Towards the Quick Shop, yes.
18   Q.    And is there a Pizza Hut down there or
19   something?
20   A.    Yes, yes.
21   Q.    Okay.  Did it eventually make its way back
22   to -- in front of the coin laundry?
23   A.    Not until the officer came.
24   Q.    Not until the officer came?
25   A.    Yes.

---

Page 38

1   Q.   Okay. How long, would you say,
2   approximately, the altercation lasted between when
3   you saw it go outside and when the officer came?
4       A.   Gosh, it seemed like it happened quick.
5   But, then again, it seemed like it took a long time
6   for the police to get there.
7       Q.   Uh-huh.
8       A.   I'm going to say approximately five to
9   seven minutes of a fight outside.
10      Q.   And did you see what was happening that
11  entire time in terms of the fight?
12      A.   No, not the whole time they were outside,
13  because once I moved my grandson, I grabbed my
14  laundry, we hurried up and --
15      Q.   Uh-huh.
16      A.   -- bagged it up, stuck it in my truck, put
17  my grandson in my truck, I told my daughter to get in
18  the truck. Then -- well, I guess, I was paying
19  attention along the way just to make sure the drama
20  didn't come over by where we were.
21      Q.   Uh-huh.
22      A.   So the fight -- I saw the majority of it --
23      Q.   Uh-huh.
24      A.   -- from the time I got my clothes out the
25  laundry until I got to my truck and called myself

Page 39

1   recording.
2       Q.   Okay. But it's possible you didn't see --
3   there's parts of it you didn't see?
4       A.   Yes. There's parts I did not see.
5       Q.   Okay. And about in the middle of your
6   affidavit, you -- let's see, it's one, two, three --
7   eight lines down -- you say, "The black people were
8   not fighting them back." Do you see that?
9       A.   Yes.
10      Q.   So if you didn't see all of it, is it
11  possible that the black people you reference here
12  were fighting back at some point?
13      A.   I wouldn't say so because one of the black
14  guys was never -- he didn't stick around. He was
15  standing on the outside of the gate. The lady, she
16  stood there while the guy was getting beat.
17           I don't think -- I think the tussle went
18  along the laundry room; and when they got outside,
19  they were still holding him.
20      Q.   Uh-huh.
21      A.   You know, they were holding him. They
22  grabbed him, pulled him back in the laundry mat, they
23  tussled. They went outside, I turned my head, get my
24  stuff. When I came back outside, he had him in a
25  bear hug and the guy was hitting him with different

Page 40

1   objects --
2       Q.   Okay.
3       A.   -- the belt, the rod.
4       Q.   So he hit him -- and you said that's the
5   guy, who was eventually Tasered --
6       A.   Yes.
7       Q.   -- he hit him with a rod?
8       A.   Yes.
9       Q.   In the face?
10      A.   He was swinging. He was just hitting him.
11      Q.   Was he making contact?
12      A.   Yes. He was definitely making contact.
13      Q.   So he hit him -- what kind of rod was it?
14      A.   It was a long, skinny rod. I want to say it
15  was a metal rod, it looked metal.
16      Q.   Uh-huh.
17      A.   From when he came up to me, it looked like
18  it was a metal rod. You know how a rod has little
19  swirly things going up it?
20      Q.   Okay.
21      A.   You get what I'm saying?
22      Q.   Yeah, I think so.
23      A.   I don't know if you understand. But, to me,
24  it looked like a metal rod.
25      Q.   Okay. So he hit him repeatedly in the head

Page 41

1   with a metal rod?
2       A.   He may have been hitting him on his
3   shoulder. He was swinging, hitting him on his arms.
4   I don't know. But he was swinging the metal rod at
5   the guy. The look, from me, it looks like he was
6   just hitting him in his head.
7       Q.   Uh-huh.
8       A.   Like he was just beating him in the head
9   with the rod. And that's why I was, like, "Why are
10  you guys hitting him? He's not fighting back." And
11  the guy was yelling, "I'm not fighting back, why are
12  you hitting me? I'm not going anywhere. Call the
13  police. I'll stay here till they come."
14           But they -- the guy continually beat on him
15  while the other guy held him.
16      Q.   Are you aware that the man who I believe
17  you're -- I believe the man you're describing is
18  Randal Jackson, he was involved in the altercation.
19  Did you know him at all?
20      A.   No.
21      Q.   Okay. Did you know that he was charged with
22  assault?
23      A.   No.
24      Q.   Okay. Did you know that he was the only one
25  charged with the assault?

Linda Miller
June 22, 2017                                    42 to 45

Page 42

1    A.   No.  And he shouldn't have been.
2    Q.   Okay.  Do you know that he did not go to the
3  hospital?
4    A.   No.  I wasn't aware of anyone going to the
5  hospital except for the gentleman that got Tased.
6    Q.   Uh-huh.
7         Wouldn't you expect someone who got hit in
8  the head multiple times with a metal rod --
9    A.   Uh-huh.
10   Q.   -- to need some medical attention?
11   A.   Uh-huh.  Definitely.
12   Q.   But does it surprise you that this guy
13 didn't have to go to the hospital --
14   A.   Yeah.
15   Q.   -- after getting hit many times --
16   A.   Yes.
17   Q.   -- with a metal rod?
18   A.   Yes.  But I know for a fact he was being
19 beat than by the guy.  I saw with my own eyes, so...
20   Q.   Are you sure that he wasn't being beaten by
21 the younger Asian male?
22   A.   No.  Same guy that approached me with the
23 rod is the same guy that got Tased, which is the same
24 guy that was hitting him with the rod while the other
25 Asian guy was holding him in a bear hug.

Page 43

1    Q.   Okay.
2    A.   I know that for a fact.
3    Q.   All right.  And you are positive that
4  the black male, who you say was being held, did not
5  punch either of the Asian males?
6    A.   No, I'm not positive.
7    Q.   Okay.
8    A.   From what I saw, he did not.
9    Q.   From what you saw he did not?
10   A.   Correct.
11   Q.   Okay.  So was your daughter in the backseat
12 with your grandson?
13   A.   No, she was in the front seat.
14   Q.   She was in the front seat.
15        Okay.  Was the grandson in a car seat or
16 something?
17   A.   My grandson was in the backseat in his car
18 seat.
19   Q.   Okay.  Were you concerned for their safety?
20   A.   Very much so.  That's why I told them to get
21 in the car.
22   Q.   Okay.  And why didn't you drive away?
23   A.   The police were blocking me in.  As I was --
24 when I started to record, I was going to get in my
25 truck and roll and just drive away --

Page 44

1    Q.   Uh-huh.
2    A.   -- but I noticed them holding and beating
3  the guy.  So that's when I pulled out my phone to
4  record; and did not record not even -- I'm going to
5  say maybe 15 seconds at most -- did the gentleman
6  turn around and come at me with the rod.
7    Q.   Okay.  And in your affidavit, you say that
8  he -- you put in quotes, "Put the damn phone down,
9  stop recording me."
10   A.   Yes.
11   Q.   Okay.  Is that a word-for-word quote or is
12 that -- you're sort of estimating?
13   A.   Estimate.
14   Q.   Did he say it in -- was it kind of in broken
15 English?
16   A.   You know, I don't recall.  It at all
17 happened so fast.  But I know it was in English
18 because I understood what he said.
19   Q.   And you mentioned that the -- one of the
20 other African American males, he had -- did he run
21 away?
22   A.   No, he didn't run away.  He just stood back.
23   Q.   Okay.  And what did he look like?
24   A.   Couldn't tell you.  I don't know.
25   Q.   Okay.  What did the guy, the black guy who

Page 45

1  you say was getting beaten up, what did he look like?
2    A.   I'm not sure.  Dark skinned, I'm going to
3  say approximately, maybe, 5'8, 5'9.
4    Q.   Do you remember what he was wearing?
5    A.   No.
6    Q.   And so you said that there was a belt and
7  then you said at some point there was a rod --
8    A.   Yes.
9    Q.   -- is that right?
10   A.   Yes.
11   Q.   Okay.  So what was happening in -- so how
12 did you -- did you see what happened in between there
13 when there was a belt and a rod?
14   A.   No, I did not.
15   Q.   Okay.  So there was a period of time there
16 that you weren't --
17   A.   Yes.
18   Q.   -- seeing what was happening?
19   A.   Correct.
20   Q.   Okay.  Did the African American man who you
21 said -- you say was getting beaten up, did he get
22 knocked unconscious?
23   A.   Not that I recall.
24   Q.   Do you recall if there was a chain involved?
25   A.   It sounds familiar, but I can't be

**Page 46**

1  100 percent sure.

2      Q.    Okay.  Direct you to your Exhibit 1 there,

3  your affidavit, about the sixth line down.

4      A.    Okay.

5      Q.    You said, "They ended up outside where the

6  man from the back office began beating the black

7  people with rods, stick, and I believe there was some

8  kind of chain involved as well."

9      A.    Uh-huh.

10      Q.    You see that?

11      A.    Yes.

12      Q.    So that last part about the chain, you're

13  just not sure about that?

14      A.    I'm not 100 percent sure about that.

15      Q.    Okay.

16      A.    But I believe the police did find a chain

17  outside.

18      Q.    Why did you put it in your affidavit if you

19  weren't sure about it?

20      A.    Because I'm trying to remember everything

21  that happened back then.  It's been so long.

22      Q.    Uh-huh.

23      A.    You know, I'm putting in what I believe

24  happened.

25      Q.    Uh-huh.

**Page 47**

1      A.    And, yes, everything is not 100 percent in

2  this sworn statement that I typed up --

3      Q.    Okay.

4      A.    -- but I --

5      Q.    So you -- I'm sorry.  Were you finished?

6      A.    No.  Go ahead.

7      Q.    Okay.  And so is your memory of the events

8  of January 16, 2015 better today than it was on

9  April 18th, earlier this year?

10      A.    I'm remembering just itty-bitty bits and

11  pieces more than itty-bitty pieces less.  So it's --

12  I don't know.  I cannot be 100 percent sure.  It's

13  been a few years.

14      Q.    So your memory is fading of the events, is

15  that fair to say?

16      A.    Kind of, yes.  Yes.  Some parts I remember

17  very well, some parts are vague.

18      Q.    Okay.  You said -- and you said in your --

19  that the -- well, I'll just read your affidavit here.

20  So if you go eleven lines down, starts with, "The

21  lady."  Do you see that?  "The lady approached the

22  men."  Do you see that?

23      A.    Eleven lines?

24      Q.    Uh-huh.  Maybe twelve.

25      A.    "The lady approached the men."

**Page 48**

1      Q.    Yeah.  So the lady -- I'll just read it

2  there:  "The lady approached the men as they were

3  holding and hit the man -- holding and hit the man

4  she was with and ask them to stop."

5          Okay.  Did you ever see the lady -- and

6  that's the lady you say -- you thought was maybe

7  pregnant?

8      A.    Yeah.

9      Q.    Did you ever see her get maced?

10      A.    Gosh, it sounds familiar.  It is possible,

11  but I can't be 100 percent sure.

12      Q.    Okay.  And you say that the man that was

13  Tasered hit her with the rod, too?

14      A.    Yes.

15      Q.    Where did he hit her with the rod?

16      A.    I can't be sure.  It was frontward facing.

17  She was standing right there and he swung the rod at

18  her, hit her, and she stepped back.

19      Q.    Okay.  Do you know if it was in the head?

20      A.    I don't know.

21      Q.    Okay.  How many times did he hit her?

22      A.    What I saw, just once.

23      Q.    And you're 100 percent positive that wasn't

24  a different Asian male?

25      A.    No, no, the same man.

**Page 49**

1      Q.    Same man.  Okay.

2      A.    You're twisting me up now.

3      Q.    I'm not.  I'm just asking --

4      A.    The one man was the aggressor -- is the one

5  that passed away -- may he rest in peace -- he was

6  the aggressor.  He was the one with the weapons.  He

7  was the one hitting everybody that I saw.  Point

8  blank.  That's it.

9          The same guy that approached me with the

10  rod, he was the aggressor.  He was the one hitting

11  everybody -- or hitting the -- hitting the guy and

12  hit the lady once when she approached him and asked

13  him not to hit him.

14      Q.    Okay.  Did she appear to be bleeding?

15      A.    No, not that I noticed.

16      Q.    Okay.  Does it surprise you you can get hit

17  with a rod and not be bleeding?

18      A.    It's possible, depending on how hard you're

19  hit.

20      Q.    Did it appear that she didn't get hit very

21  hard?

22      A.    I believe she got hit pretty hard because

23  she stepped back.

24      Q.    But you don't recall her getting maced ever;

25  is that right?

Page 50

1    A.   I'm not sure.

2    Q.   Not sure.

3         Okay.  And your car, was it parked --
4    there's kind of a cement slab that comes out of the
5    coin laundry.

6    A.   Uh-huh.

7    Q.   Do you know what I'm talking about?

8    A.   Yes.

9    Q.   Was your -- if you're facing the coin
10   laundry, was your car parked just to the left?

11   A.   Facing?  Yes.  It was the first lot next to
12   that concrete in front of the --

13   Q.   First parking stall?

14   A.   Yeah.

15        MR. IVERSON:  Counsel, may I interrupt here
16   and show her a picture?

17        MR. RISSMAN:  I was going to maybe do that,
18   so I got it.  Thanks.

19   BY MR. RISSMAN:

20   Q.   Okay.  When you pulled out your cell phone
21   to record, you say the man approached you, where were
22   you positioned at that point?

23   A.   Right there on that concrete, right in front
24   of the doors, right -- a couple of steps towards the
25   front of my truck, but right there by my driver's

Page 51

1    door.

2    Q.   By the driver's door?

3    A.   Yeah.

4    Q.   And the car was facing out, right?

5    A.   Yes.  Pull straight and go.

6    Q.   So you can pull straight out --

7    A.   Yeah.

8    Q.   -- and you don't have to back up, right?

9    A.   Correct.

10   Q.   Got it.  So the driver's side door was next
11   to the concrete slab?

12   A.   Yes.

13   Q.   And did you -- and when he did that, did you
14   turn and run?

15   A.   No.

16   Q.   Weren't you afraid he was going to hit you
17   with the rod?

18   A.   He was already close to me by -- at that
19   point.  He was right here and he's like -- I'm, like,
20   backing up, "You better not hit me with that rod."
21   I'm backing up towards the front end of my truck.  So
22   we literally ended up right in front of my truck; and
23   that's the when the police came up behind me.

24   Q.   When you backed up, did he move in towards
25   you --

Page 52

1    A.   Yeah.

2    Q.   -- or did he stand -- hold his ground?

3    A.   He was walking towards me.

4    Q.   Okay.  Did you put your hands up to protect
5    yourself?

6    A.   Yeah.

7    Q.   Can you show me what that looks like?

8    A.   And I had my phone in this hand, I was like
9    this (indicating), and he's walking up to me.  Well,
10   I had my phone directly in front of my face -- you
11   know, about face length; and I thought I was
12   recording.

13        He's walking towards me and he's, like, "Put
14   the damn phone down," or "Stop recording me."  And
15   I'm, like, "You better not hit me with that rod
16   (indicating)."

17   Q.   So you were trying to record him and block
18   anything he might do to you at the same time; is that
19   right?

20   A.   Basically, yes.

21   Q.   Okay.  And let the record reflect that you
22   had your hand over your face.

23   A.   Yes.

24   Q.   Is that right?

25   A.   Yes.

Page 53

1    Q.   I don't want to put words in your mouth.

2         And, prior to that, had you been -- had you
3    been yelling at anybody?

4    A.   I'm sorry?

5    Q.   Had you been, like, yelling at anybody to,
6    "Stop," or --

7    A.   No.

8    Q.   -- get involved in any way?

9    A.   No.

10   Q.   Okay.

11   A.   Well, I did say, "Why are you hitting him?
12   He's not fighting back."

13   Q.   Did you --

14   A.   I don't believe anybody heard me.

15   Q.   Did you say it calmly, as you just did now,
16   or was it more of a yell?

17   A.   I think it was a little more louder, a
18   little -- yeah, a little louder.  It wasn't a
19   regular, calm voice.  It was more of a shocked, "Why
20   are you guys still hitting him?  He's not fighting
21   you back."  You know, "Why are you hitting him?"  So
22   more of a raised tone.

23   Q.   Uh-huh.

24        And so you were standing -- so at that
25   point, you backed, sort of, into your car?

Page 54

1    A.    Yeah.  Right there.  And -- well, I wouldn't
2    say I backed into my car.  We were standing right
3    there, and as I'm recording -- maybe I'm recording
4    and moving back at the same time.
5          But somehow or another we ended up right at
6    the front end of my car -- well, I ended up right on
7    the -- the front end of my car.  I believe he was on
8    the concrete slab in front of the doors, but close to
9    my car.
10         And I was able to move back; and the police
11   was right there.  So we were right -- kind of right
12   in front of my truck.
13   Q.    And when you heard the officer -- when you
14   heard the officer, did you -- did you stay in the
15   same place?
16   A.    Huh-uh.
17   Q.    Where did you go then?
18   A.    No.  I quickly moved back towards the
19   officer.
20   Q.    Okay.  And where was that?
21   A.    Maybe two or three feet behind me, if that.
22   I'm not good with feet.
23   Q.    Okay.
24   A.    But he was very close that maybe I probably
25   had to take two or three big steps back.  And then I

Page 55

1    was on the side of the officer at that time, or maybe
2    just a little bit behind his arm.
3          MR. RISSMAN:  Let me sort of put a visual to
4    it here.
5          (Plaintiff's Exhibit No. 2 was marked for
6          identification.)
7    BY MR. RISSMAN:
8    Q.    Ms. Miller, you have been handed what's been
9    marked as Exhibit 2.  Do you recognize this photo?
10   A.    Yes.
11   Q.    Does this appear to be the scene of the
12   incident at the coin laundry?
13   A.    Yes.
14   Q.    Okay.  And I'll represent to you this is a
15   Google Earth image, and there's a -- you see there's
16   a slight bit of distortion on the word, "Coin
17   Laundry --"
18   A.    Yes.
19   Q.    -- but I represent I did my best to print it
20   off the Internet.
21   A.    Okay.
22   Q.    Okay.  So why don't you -- I have a pen
23   here -- why don't you -- why don't you tell me where
24   you were standing before he -- why don't you mark
25   with a "1" where you were standing before the man who

Page 56

1    was Tasered, you -- when he approached you.
2    A.    I'd say approximately right -- right in here
3    (indicating).
4    Q.    Can I see that?
5    A.    (Handing.)
6    Q.    Okay.  And, then, can you mark with a "2"
7    where you moved to after the police arrived?
8    A.    Approximately here -- right here, maybe
9    (indicating).
10   Q.    Okay.
11   A.    Maybe a little closer in, because my truck
12   was there, and we were right in front of my truck
13   when the officer approached (indicating).
14   Q.    Uh-huh.
15         And where you marked number "2," is that
16   where you were standing when the man was Tasered and
17   fell?
18   A.    I don't know.  Actually, I believe so, yeah.
19   I was in that same spot maybe walking towards that
20   way a little bit or getting out of the way of the
21   officer.  But I'm going to say I was in that same
22   vicinity right there (indicating).
23   Q.    Okay.  When you say walking "that way,"
24   which way were you walking?
25   A.    I believe I was getting ready to walk back

Page 57

1    that way and get in my car.  But when the Tasing
2    (sic) went, I was right -- I was probably right in
3    between "1" and "2."
4    Q.    Okay.
5    A.    Or it is quite possible that I just stood
6    right at number "2."
7    Q.    I'm going to show you a dash cam video --
8    A.    Uh-huh.
9    Q.    -- from Officer Turner --
10   A.    Okay.
11   Q.    -- who was the second officer to arrive, and
12   ask you a few questions.
13         THE COURT REPORTER:  Counsel, did you want
14   that on the record or off the record?
15         MR. RISSMAN:  On the record.  And I'll say
16   what -- what time stamp I'm starting and stopping
17   at.
18         THE COURT REPORTER:  Thank you.
19         MR. RISSMAN:  I'll do my best to do that.
20   Okay.  Is it okay if I come over and show
21   this to you?
22         THE WITNESS:  Yes, yes.
23         MR. RISSMAN:  Well, let me just ask you some
24   questions first.  I'm sorry to ask you questions
25   while I'm over here.

Linda Miller
June 22, 2017                                    58 to 61

---

Page 58

```
1   BY MR. RISSMAN:
2        Q.   When the officer Tased him, do you think he
3   was close enough to hit you with the crowbar?
4        A.   Yeah.
5        Q.   Okay.  That was a yes?
6        A.   Yes.
7             MR. RISSMAN:  All right.  So I'm starting
8        the Turner video at 21:16:27 -- you can see
9        there's a time stamp there -- and I'll play it
10       for you a couple times.
11            THE WITNESS:  Okay.
12  (By request of counsel, video played but not transcribed
13            as there was no audio.)
14            MR. RISSMAN:  Stopping at 9:16:33.
15  BY MR. RISSMAN:
16       Q.   Did you see the man who was Tasered fall on
17  the ground?
18       A.   Yes.
19       Q.   Okay.  In this frame right here -- do you
20  think you're in this frame right here?
21       A.   No.
22       Q.   Okay.
23            MR. IVERSON:  This frame right here is
24       21:16:33?
25            MR. RISSMAN:  Yes.  Thank you.
```

---

Page 59

```
1   (By request of counsel, video played but not transcribed
2             as there was no audio.)
3   BY MR. RISSMAN:
4        Q.   And so I'm going to -- I'm going to stop at
5   21:16:31.  And you can -- do you see that -- and at
6   this point in time you can see Mr. Khottavongsa is
7   starting to fall?
8        A.   Uh-huh.
9        Q.   Okay.  Do you see a person to the left of
10  the car?
11       A.   Yes.
12       Q.   Do you believe that's you?
13       A.   I believe so.  I'm not exactly sure, but I
14  believe so.
15       Q.   Okay.  I'll play it forward for you in slow
16  motion.
17  (By request of counsel, video played but not transcribed
18            as there was no audio.)
19  BY MR. RISSMAN:
20       Q.   But you don't believe you're any of these
21  people?
22       A.   No.  I'm not inside at the time --
23       Q.   Okay.
24       A.   -- because I actually heard him hit the
25  ground.
```

---

Page 60

```
1        Q.   Uh-huh.
2             I'll play it for you again.  If you want to
3   focus on this person right here (indicating) --
4        A.   Okay.
5        Q.   -- and take a look and see if that might be
6   you.
7   (By request of counsel, video played but not transcribed
8             as there was no audio.)
9             THE WITNESS:  Stop.
10  BY MR. RISSMAN:
11       Q.   Uh-huh.
12       A.   You can go.  I can't see.  You do it again,
13  please.
14       Q.   Sure.  I'll do it in slow motion, how 'bout
15  that?
16  (By request of counsel, video played but not transcribed
17            as there was no audio.)
18            THE WITNESS:  I believe that is me.
19  BY MR. RISSMAN:
20       Q.   Were you wearing --
21       A.   I can't --
22       Q.   -- a white sweatshirt that night?
23       A.   I don't know.
24       Q.   Okay.  Do you see anybody else other than --
25  and so you don't believe you're any of these people
```

---

Page 61

```
1   that are on the cement at this point?
2        A.   No, I don't believe so.
3        Q.   Okay.
4        A.   I believe I'm one on the side there.
5        Q.   Okay.  So that would be -- I believe that's
6   to the -- towards the Metro PCS --
7        A.   Yes.
8        Q.   -- on the passenger's side --
9        A.   Uh-huh.
10       Q.   -- door?
11       A.   Uh-huh.
12       Q.   Okay.  And you can see where Mr. -- the man
13  who was Tasered, his name is Mr. Khottavongsa --
14       A.   Uh-huh.
15       Q.   -- do you see where he's standing?
16       A.   Yeah.
17       Q.   Do you believe that he could have hit you
18  from that position?
19       A.   No, no.
20       Q.   So earlier when you said you thought he
21  could have hit you in the position he was Tasered in,
22  that's not true, right?
23       A.   No.  When he approached me with the rod
24  back, he was close enough to hit me dead in my
25  forehead with that rod.
```

Page 62

1    Q.    Uh-huh.
2    A.    The police -- now that I know -- came behind
3  me -- well, I heard the voice behind me saying, "Drop
4  it, drop it."  I scoot over there by the police; he
5  ends up getting Tased.  So, no, once he got Tased,
6  no -- or, in the midst of being Tased, no; before he
7  was Tased, yes --
8    Q.    Okay.
9    A.    -- he was that close to me that he could
10  have hit me.
11    Q.    I understand what you're saying.
12          So in the very moment before getting
13  Tasered, he couldn't have hit you --
14    A.    No.
15    Q.    -- with the rod?
16    A.    No.  He had walked away.
17    Q.    He had walked away?
18    A.    Yes.
19    Q.    And, ma'am, you can see that I stopped the
20  video at -- and where you just identified yourself at
21  21:16:31.
22    A.    Yes.
23    Q.    Do you see that?
24    A.    Yes.
25          MR. RISSMAN:  I'm going to hand you an

Page 63

1  Exhibit here.
2          (Plaintiff's Exhibit No. 3 was marked for
3  identification.)
4  BY MR. RISSMAN:
5    Q.    Ms. Miller, you've been handed what's been
6  marked as Exhibit 3, and this is a still shot of the
7  video we just watched.  You can see on the top
8  there's 21:16:31.  Do you see that?
9    A.    Uh-huh.  Yes.
10    Q.    And the image of the person circled in blue,
11  you believe that to be you?
12    A.    Yes.
13    Q.    And the person circled in red would be
14  Mr. Khottavongsa, the man that was Tasered?
15    A.    Yes.
16    Q.    Okay.  And so in between you and him,
17  there's actually a car in between there, correct?
18    A.    I'm sorry?
19    Q.    Your vehicle is in between you and him?
20    A.    Correct.
21    Q.    Okay.  And so you would have had to sort of
22  look through the vehicle to see him?
23    A.    To be Tased, yes.
24    Q.    So -- yeah.  To see what -- him being
25  Tased --

Page 64

1    A.    Yes.
2    Q.    -- and the moments before, you would have
3  look through the vehicle.
4    A.    Yes.
5    Q.    Correct?
6          Did that obstruct your view at all?
7    A.    No.
8    Q.    You could see perfectly?
9    A.    I wouldn't say I could see perfectly.  It
10  was dark outside, my back windows on my TrailBlazer
11  were tinted.  So I wouldn't say I had a 100 percent
12  sure clear view, but I did see it happen.
13    Q.    Okay.  And you had to look through the
14  tinted windows; is that right?
15    A.    I believe so, yes.
16    Q.    Okay.  You can put that one aside.
17          And when you walked over there, at some
18  point did you turn your back to the scene?
19    A.    Walked over?
20    Q.    Well -- I'm sorry.  I'll strike the
21  question.
22          So when you walked from the cement slab to
23  that position in Exhibit 3, where you've circled in
24  blue, correct --
25    A.    Yes.

Page 65

1    Q.    -- did you turn your back to the cement slab
2  to walk over there?
3    A.    I'm not sure if I backed back or if I turned
4  around and walked.  So I'm not sure.
5    Q.    Not sure either way?
6    A.    I'm not sure.
7    Q.    And it's just because you don't remember?
8    A.    I don't remember.
9    Q.    So what was the -- I'm sorry, you said this
10  already -- but what was the first thing you heard the
11  officer say?
12    A.    "Put it down."
13    Q.    "Put it down"?
14    A.    Yep.
15    Q.    And is that a direct quote or was it --
16  could it -- well --
17    A.    It could have been "Put it down," or it
18  could have been, "Drop it."
19    Q.    Okay.
20    A.    And he repeated it several times.
21    Q.    So either, "Put it down," or, "Drop it"?
22    A.    Correct.
23          MR. RISSMAN:  I'm going to play you Officer
24  Salvosa's video; and this is the man who Tasered
25  Mr. Khottavongsa.

Page 66

1      THE WITNESS:  Okay.
2      MR. RISSMAN:  There isn't really anything to
3  see because it doesn't -- it's not directed to
4  the scene, but we're just going to listen to the
5  audio.
6      THE WITNESS:  Okay.
7      MR. RISSMAN:  But I'll point it towards you
8  so you can at least see the time stamps, I guess.
9  BY MR. RISSMAN:
10     Q.   And were there -- I mean, was there a lot
11 of -- when the officer approached, was there a lot
12 of -- did you hear other commotion and yelling at
13 that time?
14     A.   I'm not sure.  It all happened so fast.
15     Q.   Not sure either way?
16     A.   No.  But I'm pretty sure it was commotion
17 because, like I said, there were people out there,
18 so...
19     MR. RISSMAN:  Okay.  I'm starting the
20 Salvosa video at 21:15:16.
21 (By request of counsel, audio played and transcribed to
22     the best of my ability as follows:)
23     "OFFICER SALVOSA:  Get down on the ground.
24 Get down on the ground.  Get down on the ground.
25 Get down on the ground.  Drop it, drop it, drop

Page 67

1  it."
2      (End of audio transcription.)
3      MR. RISSMAN:  Okay.  Stopping it at
4  21:16:32.
5  BY MR. RISSMAN:
6      Q.   Did you hear the officer -- the officer who
7  was speaking -- and I'll represent -- and I think we
8  all agree -- is Officer Salvosa.  Did you hear him
9  say, "Drop it" there.
10     A.   Yes.
11     Q.   Was that the first thing you heard him say?
12     A.   I believe so.  It was the main thing I
13 heard.  I know he had the rod pointed at my head, I
14 don't recall everything, but I know I heard someone
15 coming up behind me saying, "Drop it."
16     Q.   So before he says, "Drop it," he says -- did
17 you hear him say, "Get down on the ground, get down
18 to the ground, get down on the ground?"  Just now?
19     A.   Just now, yes.
20     Q.   Yeah.
21     A.   Yes.
22     Q.   But you don't recall him saying that --
23     A.   Huh-uh.
24     Q.   You don't recall hearing that at the time?
25     A.   Exactly.  Yes.  Correct.

Page 68

1      MR. RISSMAN:  Okay.  And I'm going to start
2  it again at 19:16:28 Salvosa video.
3  (By request of counsel, audio played and transcribed to
4     the best of my ability as follows:)
5      "OFFICER SALVOSA:  Drop it.
6      MS. MILLER:  Tase his ass.  There you go."
7      (End of audio transcription.)
8  BY MR. RISSMAN:
9      Q.   Did you hear someone say, "Tase his ass.
10 There you go"?
11     A.   That was me.
12     Q.   That was you?
13     A.   That was me, yes.
14     Q.   Okay.  And I believe you testified earlier
15 that you saw him fall and hit his head?
16     A.   Yes.
17     Q.   Okay.  And you believe -- it was obvious to
18 you?
19     A.   It wasn't a -- gosh, it felt like I was just
20 right there.  I could hear him hit the ground.  I may
21 have been looking through my truck, saw him get
22 Tased, but you can definitely hear him hit the
23 ground.
24     Q.   And after he hit the ground -- and you
25 thought his head hit the ground, right?

Page 69

1      A.   Uh-huh.
2      Q.   And after you saw him -- his head hit the
3  ground, did you appear injured to you?
4      A.   Yes.
5      Q.   Did he -- did he appear to be in need of a
6  doctor after he hit his head?
7      A.   Yes.
8      Q.   All right.  And you don't have any medical
9  training, right?
10     A.   Nursing assistant, but no, basically.
11     Q.   I'm sorry?
12     A.   Nursing assistant.
13     Q.   Oh, okay.
14     A.   I did that for ten years in a hospital.
15     Q.   Okay.  But you're not a trained first
16 responder or anything?
17     A.   No.
18     Q.   After he was Tasered and hit his head, did
19 you ever see him threaten anyone else?
20     A.   Not that I recall.  I recall just maybe
21 seeing him sit up, maybe the police helped him sit
22 up, or laid him down after he had already sat up.
23     But you can just tell in his face that he
24 was dazed and something was wrong.  You could look at
25 him and tell he needed medical attention right away.

Page 70

1    Q.    Uh-huh.
2          And so you saw him sit up?
3    A.    I'm not sure if I saw him sit up or if he
4    was laying down.  I saw his eyes, I saw his face --
5    no, I did not see him sit up.  He was on the ground,
6    they Tased him.  I believe they handcuffed him on the
7    ground.  When I saw him sitting up was in the chair
8    of the paramedics.
9    Q.    Okay.
10   A.    And that's only because they had it lifted
11   up for him to sit up, like the -- you know, upward
12   motion.
13   Q.    Uh-huh.
14         So you didn't see him -- he didn't appear
15   violent to you after he was Tasered, did he?
16   A.    No.
17   Q.    And I take it that, from what you've said
18   today, that none of the African American individuals
19   were ever beating up the man who got Tasered?
20   A.    Not that I saw.  I did not see not one of
21   them swing or be aggressive towards them at all, even
22   with the tussle of them pulling him -- the one guy
23   back in the laundry mat.  They did tussle.
24         Again, I grabbed my grandson, turned the
25   other way, the black guy may have hit him, I don't

Page 71

1    know.  I didn't see the black guy assault anyone, I
2    didn't see the other black guy assault anyone, and I
3    didn't see the woman assault anyone.
4    Q.    Okay.  And did you ever get involved in the
5    incident?
6    A.    No.
7    Q.    Did you ever physically touch anyone who was
8    involved in the incident?
9    A.    No.
10   Q.    And did you swing at anybody?
11   A.    No.
12   Q.    Did you ever yell at anyone to get away from
13   your truck?
14   A.    No, not that I recall.
15   Q.    Do you recall some other women that were in
16   the laundry mat, who weren't part of the altercation,
17   who were also witnesses?
18   A.    They came in as the fight was -- I want to
19   say maybe they came in a couple of seconds before the
20   entire fight started off, or maybe they came in right
21   after --
22   Q.    Uh-huh.
23   A.    -- I don't recall.  But I do recall seeing
24   maybe three, maybe four other ladies.  I want to --
25   I'm not even going to try to guess on the

Page 72

1    nationality, but I believe there was three or four
2    other ladies in the laundry mat, which looks like
3    those are the ones that are standing in the doorway.
4    Q.    Uh-huh.
5    A.    I don't know if they came before the
6    altercation started or during it, but I do recall
7    seeing them.
8    Q.    Did they appear to be Latino or Hispanic?
9    A.    I believe so.
10   Q.    And you had never met them before?
11   A.    No.
12   Q.    Okay.  Two of those women had also
13   testified, just like you did, under oath.  One of
14   their names is Guadalupe Galarza and the other name
15   is Maria Cruz-Martinez.
16   A.    Uh-huh.
17   Q.    I assume you didn't know that?
18   A.    Okay.
19         (Plaintiff's Exhibit No. 4 was marked for
20   identification.)
21   BY MR. RISSMAN:
22   Q.    All right.  You've been handed what's been
23   Marked 4, and this is a deposition transcript of
24   Guadalupe Galarza, taken on March 21st, 2017.  And
25   it's condensed, so each page -- there's four pages on

Page 73

1    each actual page.  Do you see that?
2    A.    Okay.  Uh-huh.
3    Q.    So the way these are numbered, each of those
4    has a page number then there's a line number.  Do you
5    see that?
6    A.    Okay.
7    Q.    That's kind of how we read these.
8    A.    Okay.
9    Q.    If you go to page 17 -- it's that page,
10   yeah, it would be up there -- page 17 --
11   A.    Okay.
12   Q.    -- and line 13 of 17.  Do you see that?
13   A.    Line 13.  Yes.
14   Q.    Okay.  It says:
15         "Question:  Did you see anyone else fighting
16   right before the police came.
17         Answer:  The lady, the woman with the red
18   truck, she was in the coin laundry.  She was --
19   already had folded.  She was ready to leave?  She
20   was in her truck, and when they were fighting
21   outside, she came out and said, you know, 'Get
22   away from my truck.'  And, you know, she kept
23   saying, 'Call the cops.'  And me and Jackie, we
24   calling the cops, she wasn't calling the cops.
25         And then she noticed that the friend who

Page 74

1    took out the bat, she got out of her truck and
2    she started -- she got involved.
3        Question:  Okay.  How did she get involved?
4    Answer:  She was swinging at one of the Asian
5    guys."
6        If you turn to next page, page 18.
7    A.   Uh-huh.
8    Q.   And she says:
9        "I'm not sure if it was the friend or the
10   owner, but it was one of the older ones.
11   Question:  You don't know if it was the owner or
12   the friend?  Answer:  Yeah, I'm not sure.
13   Question:  But it was one of the two.
14       Answer:  Yeah, because she hit her.  She
15   hit -- she hit one of them from the back.  I
16   don't know if she pushed him, but it was the back
17   part, not the front, but the back.  And, then,
18   when she heard the siren from the cops, she
19   went -- she went back next to her truck.  I think
20   she went inside or stood by the door, but she was
21   there."
22       Do you see that?
23   A.   Uh-huh.  That is incorrect.
24   Q.   You believe that to be inaccurate?
25   A.   I know that's inaccurate.  I never pulled

Page 75

1    out a bat, I never swung at anybody, I never got
2    involved.
3    Q.   Are you upset that she has said this about
4    you?
5    A.   That's just her account.  I mean, I'm not
6    upset, but it's wrong.  I never -- I never got
7    involved in that.
8    Q.   Okay.
9    A.   And I didn't know either party, so why would
10   I get involved?  I have a daughter and a grandson
11   with me --
12   Q.   Uh-huh.
13   A.   -- that has nothing to do with me.  I tried
14   to record for the police, and for this purpose, to
15   show that -- who was the aggressor in this situation.
16   But I never got involved in anything.
17       (Plaintiff's Exhibit No. 5 was marked for
18       identification.)
19   BY MR. RISSMAN:
20   Q.   Ms. Miller, you have been handed Exhibit 5.
21   A.   Uh-huh.
22   Q.   This is the deposition of Maria
23   Cruz-Martinez, also taken on March 21st, 2017 --
24   A.   Uh-huh.
25   Q.   -- also testimony under oath.  And if you go

Page 76

1    to -- if you go to page 33 --
2    A.   Okay.
3    Q.   -- line 24.
4    A.   Yes.
5    Q.   Do you see that?
6    A.   Yes.
7    Q.   Okay.  It starts with, "When you mentioned."
8    Do you see that?
9    A.   Yes.
10   Q.   It says, "When you mentioned --"
11       "Question:  When you mentioned the woman who
12   was by the red Ford Explorer was yelling" -- if
13   you go to page 34 --
14       "Answer:  Yes.  Question:  Did you see her
15   get involved in the altercation?  Answer:  When
16   she -- when they were fighting, she was yelling.
17   And she went over there to, like, the big brawl
18   that they had because it was not in front of the
19   door, it was kind of like to the side.  But,
20   like, in between the laundry mat and the Quick
21   Store.
22       Question:  Okay.  Answer:  So it was in the
23   parking lot.  And she was over there hitting
24   whoever was fighting, but not attacking the
25   teenagers or the African American people that

Page 77

1    were involved, she was hitting the Asian people.
2        Question:  Okay.  Do you know which one?
3    Answer:  I don't recall who she was hitting.  But
4    then she went -- afterwards, when she heard the
5    sirens and everyone was leaving, she went and
6    stood next to the red truck."
7        Do you see that?
8    A.   Yes.
9    Q.   Okay.  And I take it you don't agree with
10   this account?
11   A.   Not at all.  I never hit anyone.  I would
12   have no reason to hit anyone.
13   Q.   All right.  Are you upset that two different
14   people have testified under oath that you did hit
15   somebody?
16   A.   I don't know.
17       MR. IVERSON:  Object to the form.
18       MR. RISSMAN:  You can answer.
19       MR. IVERSON:  It misstates the testimony.
20   It doesn't indicate that she was involved at all.
21   BY MR. RISSMAN:
22   Q.   Do you know of anyone else who had a red
23   truck?
24   A.   No.
25   Q.   But I'll ask the question again, because I

Page 78

1  don't think I caught your answer.
2          Does it upset you that two people have
3  testified that you had hit somebody?
4          MR. IVERSON:  Object to the form of the
5  question.
6          MR. RISSMAN:  You can answer.
7          THE WITNESS:  I wouldn't say it upsets me.
8      I'm not mad about it.  That's just their account
9      and what they thought saw, just like my account
10     of what I think I saw.  Everybody's entitled to
11     their opinion.
12         No, I never struck anybody.
13  BY MR. RISSMAN:
14     Q.    Uh-huh.
15     A.    Again, I would have no reason to.  I don't
16  know any of them people.  And I go to that laundry
17  mat twice -- well, I was going to that laundry mat
18  twice a month to do laundry.
19     Q.    Did you ever go back to the laundry mat
20  after that?
21     A.    No.
22     Q.    Because of this incident?
23     A.    I guess so, because I didn't want to be
24  involved -- no, as a matter of fact, I did go back.
25  I have been back since then.

Page 79

1      Q.    And do you recall if the police asked you if
2  you got involved in the altercation?
3      A.    No, I don't recall that.
4      Q.    Okay.  If you go back to -- I think it's
5  exhibit -- I'm sorry, I'm not doing a very good
6  job here -- Exhibit 4, which is the Galarza
7  testimony -- yep, you've got it -- go to page 20 --
8      A.    Okay.
9      Q.    -- line eight.
10     A.    Okay.
11     Q.    Well, actually, we'll go back to line five.
12     A.    Okay.
13     Q.    "Whereupon, an audio recording was played."
14     And then that's me, Mr. Rissman.
15     "Question:  I'm going to stop at 15:38
16  there.
17         So consistent with what you told us today,
18  the woman with the red truck was involved and hit
19  the owner?  Answer:  Uh-huh.  Question:  And you
20  mentioned that she told the cops she wasn't
21  involved, and she told the cops that she was a
22  witness, and that that was a lie; is that -- is
23  that right?  Answer:  That's correct.
24         Question:  Okay.  When did you -- she was
25  giving a statement after -- after things had

Page 80

1  calmed down?  Answer" -- 19 -- "I think we were
2  all giving a statement at the same time.  There
3  was -- there were other officers there."
4          21, "Question:  Uh-huh.  Answer:  The
5  officer said she was a witness.  But she got
6  involved because she was in her truck, and she
7  got out because after she saw that they were
8  hitting one of the guys, one the black guys,
9  that's when she got involved and hit one of the
10  owners.
11         Question:  Okay.  But she didn't tell the
12  police that she hit somebody?  Answer:  No,
13  because the officer said that she was a witness
14  and we said yes.  But she also got involved."
15         And, then, number six:
16         "Question:  Yeah.  And did she -- did it
17  seem like maybe she was trying to avoid being
18  arrested to you?  Mr. Hiveley:  Objection, calls
19  for speculation.  Witness:  I don't know."
20         Do you see that?
21     A.    Uh-huh.  Yes.
22     Q.    And you didn't want to be arrested, did you?
23         MR. IVERSON:  Well, is there a question?
24         MR. RISSMAN:  I asked her if she saw that.
25         MR. IVERSON:  Well, then, I move to strike

Page 81

1  your reading another witness's testimony without
2  any reference to it or question.
3          MR. RISSMAN:  Okay.
4          MR. IVERSON:  So you can ask the -- she
5  answered your last question.
6          MR. RISSMAN:  Okay.
7  BY MR. RISSMAN:
8      Q.    Do you dispute this testimony?
9      A.    Yes --
10         MR. IVERSON:  Object to the form of the
11  question.
12         THE WITNESS:  Yes, I do.
13         MR. RISSMAN:  Are you going to withdraw your
14  motion to strike now?
15         MR. IVERSON:  No.
16         MR. RISSMAN:  Okay.
17         MR. IVERSON:  I think it's improper
18  questioning, so that's why I'm objecting to the
19  form of the question; and we'll let the judge
20  decide.
21         MR. RISSMAN:  Okay.
22  BY MR. RISSMAN:
23     Q.    And does it upset you that someone else has
24  testified under oath that you were lying to the
25  police?

Linda Miller
June 22, 2017                                          82 to 85

Page 82

1   A.   No.  I'm not that easily upset.
2   Q.   Okay.  Does it surprise you --
3   A.   It surprises --
4   Q.   -- that someone that you -- that you don't
5   know would testify under oath that you lied to the
6   police when you say didn't?
7   A.   Yes, it does, because I know that I never
8   hit anyone.  I was not involved in that altercation.
9   I pulled my phone out to record to help the police;
10  and why they say I'm involved, I have no clue.
11  Q.   Okay.  So you have no explanation for
12  that --
13       MR. IVERSON:  Object to the form.
14  BY MR. RISSMAN:
15  Q.   -- for their testimony?
16  A.   They lied.  That's the explanation.  They
17  lied.
18  Q.   Do you have any reason why -- do you know
19  any reason why these two women would lie?
20  A.   Why would they lie in their testimony?
21  There's the question.  No, I don't.  I don't know
22  these ladies.  I didn't know anyone at the scene.
23  Q.   And you didn't see either of these -- these
24  women, these Latina ladies at the laundry mat, you
25  didn't see them get involved at all, did you?

Page 83

1   A.   Not that I know of, no.
2   Q.   Okay.  You can put that one aside,
3   Ms. Miller.  I'm going to switch gears a little
4   bit --
5   A.   Uh-huh.
6   Q.   -- and ask you about some of your
7   background.
8        Other than a parking ticket or a speeding
9   ticket, have you ever been convicted of a crime?
10  A.   Yes.
11  Q.   What have you been convicted of?
12  A.   Driving under the influence, DUI or DWI, I'm
13  not sure exactly which one it was, blew a .08.
14  Q.   You blew a .08?
15  A.   Uh-huh.
16  Q.   Okay.  And do you remember when that was?
17  A.   It's been over ten years, I believe, seven
18  to ten years ago.
19  Q.   Okay.  If I told you it was in December of
20  2007, does that ring a bell?
21  A.   Yeah.  Well, about ten years ago.
22  Q.   Okay.  And did you serve any jail time as a
23  result of that?
24  A.   I did a weekend in the workhouse, I
25  believe -- nope, nope, nope.  For that, no, I didn't

Page 84

1   do any jail time.  Community service, suspended
2   license, reinstatement fees, all that stuff.
3   Q.   So you mention suspended license, community
4   service.  Did you have a certain number of hours of
5   community service?
6   A.   I'm not -- I don't recall how many hours,
7   but yes.
8   Q.   There was some number that you were given?
9   A.   Yeah.
10  Q.   Okay.  Did you have to complete any type of
11  treatment for alcohol --
12       MR. IVERSON:  Object to the form.
13  BY MR. RISSMAN:
14  Q.   -- or any of that?
15  A.   Volunteer, yes.
16  Q.   I'm sorry?
17  A.   Volunteer, yes.  That wasn't forced, to take
18  an AA class, but I took an AA class thinking it would
19  help me.
20  Q.   Okay.  How many of those did you take?
21  A.   Three, I believe.
22  Q.   Okay.  And did you believe you had an
23  alcoholism problem at the time?
24       MR. IVERSON:  Object to form.
25       THE WITNESS:  No.

Page 85

1   BY MR. RISSMAN:
2   Q.   No?
3   A.   No.
4        MR. RISSMAN:  He's going to object so it's
5   kind of a pause.
6        THE WITNESS:  Okay.
7        MR. RISSMAN:  Yeah.  It's kind of a weird
8   dynamic.
9   BY MR. RISSMAN:
10  Q.   So did you -- after these three classes, did
11  you continue to drink alcohol from time to time?
12  A.   Yes.  Still do.
13  Q.   Okay.  Were you intoxicated the night of
14  January 16, 2015?
15  A.   No.
16  Q.   Do you use any other recreational drugs?
17  A.   Smoke marijuana.
18  Q.   The night of January 16, 2015, had you
19  smoked marijuana?
20  A.   I'm not sure.
21  Q.   So it's possible you did?
22  A.   It's possible I did, it's possible I didn't.
23  Q.   How often do you smoke marijuana?
24  A.   Every once in a while, maybe once a week.
25  Q.   Okay.  Have you ever been sued before?

Page 86

1        MR. IVERSON:  Object to the form.
2        THE WITNESS:  Sued?  Yes, I've been sued.
3   BY MR. RISSMAN:
4    Q.    Okay.  And what were those cases about?
5    A.    It was just one case, and it was back rent.
6    Q.    I'm sorry?
7    A.    Back rent.
8    Q.    Back rent?
9    A.    Yes.
10   Q.    And was that your landlord sued you for back
11  rent?
12   A.    Correct.
13   Q.    And was her name Karen Pelek?
14   A.    Yes.
15   Q.    And did you owe her $2,000, approximately?
16   A.    Approximately.
17   Q.    Okay.  Is that for about -- was it for
18  multiple months' rent?
19   A.    It was rent, repairs.
20   Q.    And did you -- did she get a judgment
21  against you?
22   A.    Yes.  Paid in full.
23   Q.    Have you ever been sued by Payday Loans
24  before?
25   A.    Oh, yeah, I have.

Page 87

1    Q.    Okay.  What was the circumstance of that?
2    A.    I lost my job, couldn't pay them, got sued,
3   paid them with the next paycheck or whatnot.
4    Q.    So you had taken out a loan --
5    A.    Uh-huh.
6    Q.    -- and you couldn't pay on time?
7    A.    Correct.
8    Q.    Okay.  This case -- so as you may know, this
9   is a civil case against the City of Brooklyn Center
10  and three individual officers.
11   A.    Uh-huh.
12   Q.    The case may go to trial this year or next
13  year.  Would you be willing to fly to Minnesota and
14  be a witness at trial?
15   A.    If it's in the summertime.  Yes, I am.
16  Seriously, I will, yes.  As long as you guys pay for
17  all my accommodations.
18   Q.    Okay.
19        THE WITNESS:  Can I ask about how much
20   longer this will take?
21        MR. RISSMAN:  I'm just looking to see if I
22   have anything else.
23        THE WITNESS:  Okay.
24        MR. RISSMAN:  But we're almost done.
25        THE WITNESS:  While you're doing that, may I

Page 88

1   use the restroom, please?
2        MR. RISSMAN:  Yeah.  Why don't we do that,
3   take a couple-minute break.  Go off the record.
4   That sounds good.
5        (A recess was held at 5:00 p.m. and the
6   foregoing deposition resumed at 5:03 p.m.)
7        MR. RISSMAN:  We can go back on the record.
8   Ms. Miller, I don't have any further
9   questions.  Thank you for your time.
10        MR. IVERSON:  Ms. Miller, my name is Jon
11  Iverson.  I'm one the attorneys representing the
12  City Defendants' in this case.
13             EXAMINATION
14  BY MR. IVERSON:
15   Q.    You testified the one that was the aggressor
16  was the one that passed away?
17   A.    Correct.
18   Q.    Now, the -- do you believe that he was a
19  threat to you at any time?
20   A.    Yes.
21   Q.    Prior to him coming at you with a crowbar,
22  had he threatened you?
23   A.    No.
24   Q.    Did you believe that he was going to hit you
25  with that crowbar?

Page 89

1    A.    Yes.
2    Q.    Was it the police running up hollering,
3   "Drop it" that got him away from you?
4    A.    Yes.
5        MR. RISSMAN:  Object to the form, calls for
6    speculation.
7   BY MR. IVERSON:
8    Q.    Is it your belief that when he heard the
9   police running up that that's when he moved away from
10  you?
11        MR. RISSMAN:  Objection to form, calls for
12   speculation.
13        THE WITNESS:  Correct.  Yes.
14  BY MR. IVERSON:
15   Q.    And, at that point, you saw him turn and you
16  believe he was going towards the black guy sitting on
17  the curb?
18   A.    Correct.
19   Q.    Was he a threat, in your opinion, to that
20  individual?
21        MR. RISSMAN:  Object to the form, calls for
22   speculation.
23        THE WITNESS:  Yes.  He still had the rod up.
24   He still had the rod up like he was going to hit
25   somebody with it.

Page 90

BY MR. IVERSON:

Q.    And you testified you were the one that said, "Tase his ass"?

A.    Yes.

Q.    Why'd you say that?

A.    I was scared he was going to hit me in my head. I mean, he would have hit me dead in my forehead with that rod, he was that close; and he was drawing back. So, to me, it was just like he wasn't -- I don't know if he was in his right mind, I don't know, but he scared me. You know, I thought he was going to hit me.

And the way he was beating on the other guy -- I'm sorry he passed away, I'm even sorry I said that -- but, yes, I said that. And I said it because, at that moment, I felt like, you know, you're out here beating on these people you deserve what you get. Not death. No one deserves to die in this matter, so I don't want anyone to think I'm being harsh about his death. I wish he would have never passed away.

But, yes, I was the one that said, "Tase him."

Q.    In your opinion, was he -- did he deserve to be Tased in that moment?

Page 91

A.    Yes.

Q.    Did the guy that approached you with the crowbar speak to you in English?

A.    Yes.

Q.    Clear English?

A.    Yes. I understood exactly what he said. I'm not sure if it was broken Asian-English or if it was just straight English. But I know he told me to stop recording him or, "Put your phone down," and things of that sort. I understood him clearly.

Q.    Were you at all confused when the police arrived?

A.    Yes.

Q.    You knew that it was police arriving?

A.    I didn't know police were arriving until I heard him behind me telling him to drop it.

Q.    Now, were there other people around hollering?

A.    There was a lot of people out there.

Q.    You said there was a lot of commotion?

A.    Yes.

Q.    And how many people actively were involved in this fight?

A.    As far as I saw, it was just the -- the three people, the Asian man holding the black man and

Page 92

the Asian man swinging and hitting people. That is what I saw.

Q.    There was a 911 call at 9:15:05 where a bystander says, "There's, like, a big old fight over here. There's a man hitting somebody with a bat. It's crazy over here right now."

A.    Uh-huh.

Q.    Do you recognize that statement being something that you or your daughter might have made?

MR. RISSMAN: Object to the form, calls for speculation.

THE WITNESS: I'm not sure. It could have been my daughter, but I don't believe it was me. But it could have been. I'm not sure.

BY MR. IVERSON:

Q.    When the man was down on the ground after being Tased, did he let go of the crowbar?

A.    I don't recall.

Q.    Do you remember officers telling him to, "Drop it"?

A.    Before he was Tased and as he was being Tased, yes.

Q.    Had he dropped it?

A.    I'm not sure -- no, no. He didn't drop -- he was Tased. If he -- if any time he dropped that

Page 93

crowbar, or that rod, he was Tased first, because the officer told him to, "Drop it, drop it, put it down." He did not put it down. He still had it raised, then he was Tased. So he may have dropped it when he got Tased.

Q.    Do you remember it being dropped at all?

A.    No.

Q.    Do you remember him holding the crowbar after he had been Tased?

A.    No.

MR. RISSMAN: Objection, asked and answered.

THE WITNESS: No. I don't -- don't recall.

BY MR. IVERSON:

Q.    Do you remember or did you see him get a seven-second application from the Taser?

A.    I don't recall.

Q.    You don't recall whether he was --

A.    Tased twice?

Q.    -- Tased a second time?

A.    No, I don't.

Q.    You didn't see that?

A.    I don't -- no, I didn't see a second Tase. I didn't see the first Tase. I didn't see it literally go in him. But I knew -- you could hear something. He was Tased and he hit the ground.

Page 94

1    Q.   I'll represent to you that there was a
2  second application of the Taser device.
3    A.   Okay.
4    Q.   You didn't hear or see that?
5    A.   No.
6    Q.   You don't know how long afterwards that
7  would have been?
8    A.   No.
9    Q.   Do you recall hearing any commands to the
10 individual about, "Roll over, get on your stomach"?
11   A.   I don't recall.
12   Q.   Do you recall the officers directing
13 everyone to, "Get down"?
14        MR. RISSMAN:  Object to the form.
15        THE WITNESS:  I don't recall.
16 BY MR. IVERSON:
17   Q.   So after he was Tased, you don't have a real
18 vivid memory of the events --
19   A.   Correct.
20   Q.   -- is that fair?
21   A.   Correct.  That is true.
22        MR. RISSMAN:  Object to form.
23 BY MR. IVERSON:
24   Q.   So you remember the events up to the first
25 Taser; and after that is kind of a blur?

Page 95

1    A.   After that --
2        MR. RISSMAN:  Object to form.
3        THE WITNESS:  -- not all of it is a blur.  I
4  remember the police coming up talking to me,
5  taking a statement, asking me to send the
6  recording to his phone, one of the officers; and
7  then I realized the phone never recorded.
8        So I remember bits and pieces of it.  I
9  don't remember him being Tased twice.  I don't
10 recall if they told him to roll over, I don't
11 recall if he tried to get back up.  I don't
12 recall all of that.
13 BY MR. IVERSON:
14   Q.   Did you ever see the woman, that you
15 believed pregnant, trying to protect the friends that
16 she was with?
17   A.   Yes.
18   Q.   What was she doing?
19   A.   She -- when the one Asian guy had the bear
20 hug on the black guy, and the other guy with the
21 crowbar or the metal rod was hitting him, she walked
22 up and she was like, "Please stop hitting him," like
23 this (indicating).
24        And I think she had her bag on her wrist, or
25 maybe cupped in her arm; and the Asian guy struck her

Page 96

1  with it.
2    Q.   And did you see the Asian woman approach any
3  of the individuals?
4    A.   No.  She was a total blackout to me.  I
5  don't recall seeing her throughout -- from the time
6  they -- we got out and put my clothes in the -- my
7  car, I don't recall seeing her at all.
8    Q.   Do you recall smelling Mace?
9        MR. RISSMAN:  Objection, lacks foundation.
10        THE WITNESS:  I don't.
11 BY MR. IVERSON:
12   Q.   Do you recall hearing anyone saying that
13 they couldn't see because they were Maced or pepper
14 sprayed?
15   A.   No.  And I was right there.  I would guess I
16 would have smelled it, felt it, or something.  I
17 don't recall any Mace.
18   Q.   You indicated that the man that was Tased
19 hit his head and appeared injured, correct?
20   A.   Correct.
21   Q.   How long after he was Tased did that -- are
22 you basing that statement -- that was a bad question.
23        Can you describe how many seconds it was
24 from the time he was Tased until you made the
25 observation that he was injured?

Page 97

1    A.   I'll say approximately -- I don't know --
2  15, 20 seconds, maybe 30 seconds.  I really don't
3  recall.
4    Q.   Was that when he was sitting on the ground
5  or was he on the stretcher?
6    A.   He was on -- he was on the ground.  I recall
7  seeing him, I believe, facedown on the ground.  Next
8  time I looked in his face, he was in the chair of the
9  paramedics, the bed of the paramedics, sitting up,
10 and he was dazed in his face.
11   Q.   So it was when he was sitting up with the
12 paramedics that he appeared dazed?
13   A.   Correct.
14        MR. RISSMAN:  Objection, misstates her
15        testimony.
16 BY MR. IVERSON:
17   Q.   Did he appear dazed before that?
18   A.   Yeah.
19   Q.   How?
20   A.   Laying on the ground.  Just his eyes, just
21 looking in his eyes, you can tell that either the
22 Tase -- the Tase did something to him or him hitting
23 his head on the ground did something to him.  You can
24 just look in his eyes and see -- and tell that he
25 wasn't all there at the moment.  He looked totally

Linda Miller
June 22, 2017                                                    98 to 101

Page 98

1    different than what he did when he was being
2    aggressive.
3        Q.    And what were the police doing at that
4    moment?
5        A.    At which moment?
6        Q.    When he was sitting on the ground.
7        A.    Walking around getting statements, talking
8    to people.  I believe talking to the other Asian
9    people as well as the black people.
10            It was a lot of commotion out that day, so
11   I'm going to assume everybody was just -- they were
12   walking around, talking.  And, of course, they were
13   there tending to him.
14       Q.    How many people were placed in handcuffs?
15   Did you see?
16       A.    No.
17       Q.    Did you hear the officers direct people to
18   lay down on their stomachs?
19       A.    No.
20       Q.    You don't remember that?
21       A.    I don't remember that.
22       MR. IVERSON:  That's all I have.  Thank you.
23       MR. RISSMAN:  I don't have any further
24   questions.
25       So, Ms. Miller, you have an -- so the court

Page 99

1    reporter here is going to a transcript, and you
2    have an opportunity to read it, and review it,
3    and see if there's any errors in it.
4        THE WITNESS:  Uh-huh.
5        MR. RISSMAN:  You can waive that right if
6    you want or you can have the transcript mailed to
7    you.  Which would you prefer?
8        THE WITNESS:  I'd like it mailed to me,
9    please.
10       THE COURT REPORTER:  Actually, you would
11   come to our office, which our office is in this
12   building.  It's on the seventh floor.
13       So if you want to read it, that's the
14   procedure.  I would send you out a letter stating
15   your transcript is ready, and you'd schedule an
16   appointment with our office to come here and do
17   that.
18       MR. RISSMAN:  Okay.  Sure.
19       THE WITNESS:  Okay.
20       MR. RISSMAN:  And just leave her your
21   address.
22       THE COURT REPORTER:  It will be on the
23   letter that she receives.
24       MR. RISSMAN:  Okay.  And you have her
25   address?

Page 100

1        THE COURT REPORTER:  It's in the transcript.
2    Is that the correct address in the transcript --
3        THE WITNESS:  Yes.
4        THE COURT REPORTER:  -- the French Creek, I
5    believe you said?
6        THE WITNESS:  Yes.
7        MR. RISSMAN:  Okay.  Thank you.
8        MR. IVERSON:  Thank you very much.
9        THE COURT REPORTER:  And, Counsel, you did
10   want to order this today?
11       MR. RISSMAN:  Yeah.
12       THE COURT REPORTER:  Regular time or did you
13   need it quicker?
14       MR. RISSMAN:  What's your regular time?
15       THE COURT REPORTER:  Eight business days.
16       MR. RISSMAN:  Yeah, that should be fine.
17       THE COURT REPORTER:  Counsel, did you want a
18   copy, as well?
19       MR. IVERSON:  Yeah.
20       (The foregoing proceedings were concluded at
21   5:20 p.m.)
22       (Reading and signing of the deposition was
23   not waived by the witness and all parties.)
24
25

Page 101

1        S T I P U L A T I O N S
2
3
4        It was stipulated by and between counsel for the
5    respective parties herein that:
6        1.  Reading and signing of the deposition by the
7    deponent are reserved.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 102

```
1              CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF HILLSBOROUGH

4

5       I, Teresa R. Cruise, Notary Public, State of

6    Florida, certify that LINDA MILLER personally

7    appeared before me on the 22nd day of June, 2017 and

8    was duly sworn.

9

10              Signed this 3rd day of July, 2017.

11

12

13

14

15              _____

                TERESA R. CRUISE,

16              Notary Public - State of Florida

                Commission Number: FF203811

17              Expiration Date:  02/25/19

18

19

20

21

22

23

24

25
```

Page 103

```
1              C E R T I F I C A T E

2

     State of Florida

3    County of Hillsborough

4

5          I, Teresa R. Cruise, Court Reporter,

     certify that I was authorized to and did

6    stenographically report the deposition of LINDA

     MILLER, pages 1 through 105; that a review of the

7    transcript was requested; and that the transcript is

     a true record of my stenographic notes.

8

9          I further certify that I am not a relative,

     employee, attorney, or counsel of any of the parties,

10   nor am I a relative or employee of the parties'

     attorney, nor am I financially interested in the

11   action.

12

           Dated this 3rd day of July, 2017.

13

14

15

16              _____

                TERESA R. CRUISE

17

18

19

20

21

22

23

24

25
```

Page 104

```
1                    ERRATA SHEET

2    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES ON THIS

                              PAGE

3

     IN RE: K. Khottavongsa v. City of Brooklyn Center

4           Deposition of:  LINDA MILLER

                   June 22, 2017

5           U.S. Legal Job No.: 1588059

6

     Page No.   Line No.        Change           Reason

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Under penalties of perjury, I declare that I have

     read the foregoing document and that the facts stated

21   in it are true.

22

23   _____    _____

     Date                   LINDA MILLER

24

25
```

## Exhibits

**EX 0001 Linda Miller 0**
**62217**
**EX 0002 Linda Miller 0**
**62217**
**EX 0003 Linda Miller 0**
**62217**
**EX 0004 Linda Miller 0**
**62217**
**EX 0005 Linda Miller 0**
**62217**

## $

**$2,000**   86:15

## (

(sic).'   26:11

## 0

**02**   15:16
**08**   83:13,14

## 1

**1**   9:4,5,6,10 46:2
  55:25 57:3
**100**   13:12 18:14 28:8
  32:16 46:1,14 47:1,
  12 48:11,23 64:11
**13**   73:12,13
**15**   44:5 97:2
**15:38**   79:15
**16**   14:4 47:8 85:14,18
**16th**   14:11
**17**   73:9,10,12
**18**   14:16 28:2 74:6
**1817**   8:9
**18th**   47:9
**19**   14:16 80:1
**19:16:28**   68:2

## 2

**2**   16:15 55:5,9 56:6,

---

  15 57:3,6
**20**   17:15,16 79:7 97:2
**2002**   5:14
**2005**   5:14
**2007**   83:20
**2015**   14:4,8,9,10,11
  47:8 85:14,18
**2017**   4:3 27:23 28:2
  72:24 75:23
**21**   14:17 80:4
**21:15:16**   66:20
**21:16:27**   58:8
**21:16:31**   59:5 62:21
  63:8
**21:16:32**   67:4
**21:16:33**   58:24
**21st**   72:24 75:23
**22**   4:3
**24**   76:3
**27**   27:23
**275**   4:5

## 3

**3**   63:2,6 64:23
**30**   97:2
**33**   76:1
**33607**   4:6
**33613**   8:10
**34**   76:13
**3:24**   4:3

## 4

**4**   8:9 72:19,23 79:6
**4-1-3-6**   15:7
**4350**   4:5
**45-degree**   24:20
**4:00**   13:7,9

## 5

**5**   75:17,20
**5'8**   45:3
**5'9**   45:3
**5:00**   88:5
**5:03**   88:6
**5:20**   100:21

---

**5:30**   13:11

## 6

**612 245-4136**   15:6
**6:00**   13:8,11
**6:30**   13:11

## 7

**7:00**   13:8

## 9

**911**   31:16,17 92:3
**9:15:05**   92:3
**9:16:33**   58:14

## A

**AA**   84:18
**ability**   66:22 68:4
**accommodations**   87:17
**account**   22:16 75:5
  77:10 78:8,9
**actively**   91:22
**actual**   73:1
**address**   8:8 14:25
  15:1 99:21,25 100:2
**affidavit**   9:12,22,25
  10:17,20 11:1 12:1,5
  16:13 25:24 27:25
  28:19 39:6 44:7
  46:3,18 47:19
**affirm**   4:11
**afraid**   51:16
**African**   12:7 16:13,15
  17:3 18:5,6 30:24
  33:23 44:20 45:20
  70:18 76:25
**afternoon**   4:22
**age**   29:9
**aggressive**   70:21 98:2
**aggressor**   49:4,6,10
  75:15 88:15
**agree**   67:8 77:9
**ahead**   47:6
**alcohol**   84:11 85:11
**alcoholism**   84:23

Linda Miller
June 22, 2017
2

**Almerico**  4:4
**altercation**  13:13
  28:14 30:6 38:2
  41:18 71:16 72:6
  76:15 79:2 82:8
**American**  12:7 16:3,
  13,15 18:6 30:24
  44:20 45:20 70:18
  76:25
**Americans**  17:3 33:23
**angle**  24:21
**answers**  7:5
**Apartment**  8:9
**apologize**  35:19
**appeared**  96:19 97:12
**application**  93:15
  94:2
**appointment**  99:16
**approach**  96:2
**approached**  42:22
  47:21,25 48:2 49:9,
  12 50:21 56:1,13
  61:23 66:11 91:2
**approaching**  26:16
**approximately**  5:13
  10:12 13:5,7,11
  38:2,8 45:3 56:2,8
  86:15,16 97:1
**April**  27:23 28:2 47:9
**area**  20:4
**arm**  24:20 25:15 55:2
  95:25
**arms**  24:19 33:23
  34:14,15 41:3
**arrested**  80:18,22
**arrive**  13:4 57:11
**arrived**  56:7 91:12
**arriving**  91:14,15
**Asian**  16:4,5,23,25
  17:4 18:7,23 19:1,19
  20:10,12,15 22:7
  23:18,25 29:8,9
  30:6,8,9,13,23 32:19
  33:16 34:2,15 35:14
  42:21,25 43:5 48:24
  74:4 77:1 91:25 92:1
  95:19,25 96:2 98:8
**Asian-english**  91:7
**ass**  68:6,9 90:3
**assault**  12:7 41:22,25
  71:1,2,3

**assistant**  69:10,12
**assume**  6:25 10:2
  26:11 72:17 98:11
**attacking**  76:24
**attempted**  5:20,23
**attention**  38:19 42:10
  69:25
**attorney**  10:1
**attorneys**  88:11
**audio**  6:23,24 58:13
  59:2,18 60:8,17
  66:5,21 67:2 68:3,7
  79:13
**avoid**  80:17
**aware**  41:16 42:4

**B**

**back**  10:21 11:18
  17:2,4,25 18:11,18
  19:11,16,17,20,22
  20:5,11 21:12,24
  22:1,2,3,22 23:10,
  13,15 25:21 26:13
  28:13,23 29:4,7,11,
  13,17,18 32:19
  34:12,13 35:13,21
  36:3,11,12,15,17
  37:2,21 39:8,12,22,
  24 41:10,11 44:22
  46:6,21 48:18 49:23
  51:8 53:12,21 54:4,
  10,18,25 56:25 61:24
  64:10,18 65:1,3
  70:23 74:15,16,17,19
  78:19,24,25 79:4,11
  86:5,7,8,10 88:7
  90:9 95:11
**backed**  21:10 51:24
  53:25 54:2 65:3
**background**  83:7
**backing**  51:20,21
**backseat**  43:11,17
**backwards**  35:18
**bad**  96:22
**bag**  16:16,24 95:24
**bagged**  38:16
**baseball**  24:25 32:6
**basically**  17:4 24:4
  52:20 69:10

**basing**  96:22
**bat**  32:6,7,8,15 74:1
  75:1 92:5
**bear**  34:9,11,18,19
  39:25 42:25 95:19
**beat**  21:10 39:16
  41:14 42:19
**beaten**  42:20 45:1,21
**beating**  41:8 44:2
  46:6 70:19 90:13,17
**bed**  97:9
**began**  17:7,9 35:22
  46:6
**beginning**  28:14
**belief**  89:8
**believed**  95:15
**bell**  83:20
**belt**  12:6 13:2 20:16,
  17,21,22 32:9,15
  40:3 45:6,13
**big**  54:25 76:17 92:4
**bit**  20:3 22:22 28:13
  55:2,16 56:20 83:4
**bits**  47:10 95:8
**black**  20:10 21:4
  22:10,25 23:8,17
  25:17 26:17 27:11
  34:13,14 35:4 36:12
  39:7,11,13 43:4
  44:25 46:6 70:25
  71:1,2 80:8 89:16
  91:25 95:20 98:9
**blackout**  96:4
**blank**  49:8
**bleeding**  49:14,17
**blew**  83:13,14
**block**  52:17
**blocked**  21:13
**blocking**  43:23
**blue**  63:10 64:24
**blur**  94:25 95:3
**bottom**  9:16,17 11:16,
  21 26:5
**bout**  60:14
**boyfriend**  21:7
**brawl**  76:17
**break**  88:3
**broke**  20:22
**broken**  44:14 91:7

Brooklyn  87:9
brought  19:22
buckle  20:17
building  4:4 99:12
business  100:15
Bye  15:23
bystander  92:4

### C

call  10:1,3 31:12,16
  41:12 73:23 92:3
called  5:22 28:16,21
  29:16 31:13,14,17,19
  38:25
calling  31:10 73:24
calls  80:18 89:5,11,
  21 92:10
calm  53:19
calmed  80:1
calmly  53:15
cam  57:7
camera  21:20
car  21:1,2,16 31:16
  43:15,17,21 50:3,10
  51:4 53:25 54:2,6,7,
  9 57:1 59:10 63:17
  96:7
case  5:3,6 32:21 86:5
  87:8,9,12 88:12
cases  86:4
caught  17:19 78:1
cell  50:20
cement  50:4 61:1
  64:22 65:1
center  30:20 87:9
chain  45:24 46:8,12,
  16
chair  19:25 70:7 97:8
chairs  19:23 36:16,24
change  8:17,18
charged  41:21,25
charges  5:21
check  11:20
Chevy  15:16
Chinese  12:9 16:3
circled  63:10,13
  64:23
circumstance  87:1

City  87:9 88:12
civil  87:9
clarify  6:19
class  84:18
classes  85:10
clear  64:12 91:5
close  51:18 54:8,24
  58:3 61:24 62:9 90:8
closed  17:20
closer  56:11
clothes  38:24 96:6
clue  82:10
cocked  24:20
coin  13:4 15:12 37:22
  50:5,9 55:12,16
  73:18
commands  94:9
commencing  4:3
commotion  30:17
  66:12,16 91:20 98:10
community  84:1,3,5
company  8:25 9:2
complete  84:10
Concern  11:6
concerned  43:19
concluded  100:20
concrete  50:12,23
  51:11 54:8
condensed  72:25
Condone  9:11
confused  91:11
consistent  79:17
contact  40:11,12
contacted  10:12,14
continually  41:14
continue  85:11
continued  20:3 21:10
conversation  7:12
convicted  6:12 83:9,
  11
cops  73:23,24 74:18
  79:20,21
copy  100:18
correct  15:8 18:25
  23:2 24:21,22 27:6
  29:21 43:10 45:19
  51:9 63:17,20 64:5,
  24 65:22 67:25 79:23
  86:12 87:7 88:17
  89:13,18 94:19,21

96:19,20 97:13 100:2
counsel  4:2 24:17
  50:15 57:13 58:12
  59:1,17 60:7,16
  66:21 68:3 100:9,17
couple  19:16 50:24
  58:10 71:19
couple-minute  88:3
court  4:10 5:9 7:7,12
  9:4 32:10,13 34:20
  57:13,18 98:25
  99:10,22 100:1,4,9,
  12,15,17
courtroom  6:16
crazy  92:6
Creek  8:9 100:4
crime  83:9
criminal  5:4,5
crowbar  58:3 88:21,25
  91:3 92:17 93:1,8
  95:21
Cruise  4:7
Cruz-martinez  72:15
  75:23
cupped  95:25
curb  27:12 89:17
cussed  18:9
cussing  17:25 18:15,
  17,20
Cypress  4:5

### D

damn  21:21 44:8 52:14
dark  13:7 45:2 64:10
darts  24:4,7
dash  57:7
date  10:14 11:20
daughter  13:23 14:15
  20:5,25 21:15 31:14,
  18,20,21 32:3 35:25
  36:18 38:17 43:11
  75:10 92:9,13
day  98:10
Daylight  13:6
days  100:15
dazed  69:24 97:10,12,
  17
dead  61:24 90:7

Linda Miller
June 22, 2017

4

**death** 90:18,20
**December** 83:19
**decide** 81:20
**defendant** 5:16
**Defendants'** 88:12
**depending** 49:18
**deposition** 4:1,7 5:1
  8:3 10:4,5 72:23
  75:22 88:6 100:22
**describe** 96:23
**describing** 41:17
**description** 10:16
**descriptions** 34:21
**deserve** 90:17,24
**deserves** 90:18
**detail** 12:13
**device** 94:2
**die** 90:18
**direct** 46:2 65:15
  98:17
**directed** 66:3
**directing** 94:12
**direction** 16:22
**directly** 52:10
**discussing** 14:3
**dispute** 81:8
**distortion** 55:16
**doctor** 69:6
**door** 17:7,9,14,20
  19:15,18,23,24 20:1
  22:9 23:18 31:3
  36:13,24 51:1,2,10
  61:10 74:20 76:19
**doors** 23:16 50:24
  54:8
**doorway** 72:3
**doubt** 33:16
**drama** 38:19
**drawing** 90:9
**drew** 26:13
**drink** 85:11
**drive** 15:12 43:22,25
**driver's** 50:25 51:2,
  10
**Driving** 83:12
**drop** 21:25 22:1,6,7
  23:22,23,24 25:8,11,
  12,13,14 26:19 62:3,
  4 65:18,21 66:25
  67:9,15,16 68:5 89:3

91:16 92:20,24 93:2
**dropped** 23:25 92:23,
  25 93:4,6
**drove** 6:10
**drugs** 85:16
**dryer** 13:18,19,20
  21:1
**Dryer's** 15:23
**DUI** 83:12
**duly** 4:18
**DWI** 83:12
**dynamic** 85:8

### E

**e-mails** 11:20
**earlier** 33:22 47:9
  61:20 68:14
**Earth** 55:15
**easily** 82:1
**effect** 21:22
**either/or** 31:14
**eleven** 47:20,23
**end** 22:23 26:1 37:14
  51:21 54:6,7 67:2
  68:7
**ended** 36:20 46:5
  51:22 54:5,6
**ends** 62:5
**English** 29:20 44:15,
  17 91:3,5,8
**enter** 16:19
**entire** 38:11 71:20
**entitled** 78:10
**errors** 99:3
**Estimate** 44:13
**estimating** 44:12
**evening** 11:23 13:5
**events** 15:10 47:7,14
  94:18,24
**eventually** 37:21 40:5
**Everybody's** 19:9
  78:10
**everything's** 27:17
**exact** 10:14 11:20
  28:9
**EXAMINATION** 4:20
  88:13
**examined** 4:18

**exchanging** 18:23
**exhibit** 9:4,6,10 46:2
  55:5,9 63:1,2,6
  64:23 72:19 75:17,20
  79:5,6
**expect** 42:7
**explanation** 82:11,16
**Explorer** 76:12
**eyes** 42:19 70:4
  97:20,21,24

### F

**face** 40:9 52:10,11,22
  69:23 70:4 97:8,10
**Facebook** 15:6
**facedown** 97:7
**facing** 19:24 25:9
  48:16 50:9,11 51:4
**fact** 18:13 30:12
  42:18 43:2 78:24
**fading** 47:14
**fair** 47:15 94:20
**fall** 24:9,10,12,13
  58:16 59:7 68:15
**familiar** 45:25 48:10
**familiarized** 12:22
**fast** 44:17 66:14
**February** 10:13
**fees** 84:2
**feet** 54:21,22
**fell** 22:14 56:17
**felt** 68:19 90:16
  96:16
**fifteen** 13:21
**fight** 30:5 36:8,9
  38:9,11,22 71:18,20
  91:23 92:4
**fighting** 19:22 20:2,9
  21:12 35:22 39:8,12
  41:10,11 53:12,20
  73:15,20 76:16,24
**find** 46:16
**fine** 6:20 100:16
**finish** 7:14,15
**finished** 13:14 47:5
**flip** 10:21
**floor** 99:12
**Florida** 4:6,8 8:6,10,
  16

flow   24:18
fly   87:13
focus   60:3
folded   73:19
forced   84:17
Ford   76:12
foregoing   88:6 100:20
forehead   61:25 90:8
forgot   12:4 13:1
form   77:17 78:4
 81:10,19 82:13
 84:12,24 86:1 89:5,
 11,21 92:10 94:14,22
 95:2
forward   59:15
fought   20:11
foundation   96:9
fourth   9:13,16
frame   58:19,20,23
fraud   8:22
French   8:9 100:4
friend   73:25 74:9,12
friends   95:15
front   34:12 37:12,22
 43:13,14 50:12,23,25
 51:21,22 52:10 54:6,
 7,8,12 56:12 74:17
 76:18
frontward   48:16
fucking   21:20 35:10
full   86:22

## G

Galarza   72:14,24 79:6
gate   39:15
gave   10:3 31:25 32:3
gears   83:3
generally   16:10
gentleman   12:9 21:18
 35:5 42:5 44:5
give   4:12 7:5 10:16
 11:8,10 15:5 17:15
giving   22:15 79:25
 80:2
God   4:14
good   4:22 7:13 54:22
 79:5 88:4
Google   55:15

gosh   10:13 11:19 13:6
 14:16 23:13 32:8
 38:4 48:10 68:19
gotcha   6:3
grab   20:4 21:15
grabbed   19:21 20:10
 21:17 35:23 36:17,25
 38:13 39:22 70:24
grandson   13:23,24
 19:24 20:2,4 21:2
 35:23 36:17,25
 38:13,17 43:12,15,17
 70:24 75:10
grandson's   21:16
ground   22:10,12,25
 23:18 24:15 25:17,18
 52:2 58:17 59:25
 66:23,24,25 67:17,18
 68:20,23,24,25 69:3
 70:5,7 92:16 93:25
 97:4,6,7,20,23 98:6
Guadalupe   72:14,24
guess   9:13 12:15 26:2
 28:5 38:18 66:8
 71:25 78:23 96:15
guessing   21:12
guy   5:21 6:10 12:7
 19:17,18,21 20:10,
 12,13,15 21:7,11
 22:7,10,24,25 23:8,
 17,19,25 29:8,9,12,
 23 31:10 33:22,24
 34:14,15 35:4 36:12
 39:16,25 40:5 41:5,
 11,14,15 42:12,19,
 22,23,24,25 44:3,25
 49:9,11 70:22,25
 71:1,2 89:16 90:14
 91:2 95:19,20,25
guy's   20:14,17 34:13
guys   17:1 19:16,19
 20:1,10 29:18 30:4
 36:10 39:14 41:10
 53:20 74:5 80:8
 87:16

## H

half   9:1
hand   4:11 24:25 52:8,
 22 62:25

handcuffed   70:6
handcuffs   98:14
handed   9:9 55:8 63:5
 72:22 75:20
Handing   56:5
handle   20:22
hands   32:11 52:4
happen   7:10 64:12
happened   13:10 14:1
 28:7 38:4 44:17
 45:12 46:21,24 66:14
happening   36:7 38:10
 45:11,18
hard   49:18,21,22
harsh   90:20
head   22:14 24:14
 39:23 40:25 41:6,8
 42:8 48:19 67:13
 68:15,25 69:2,6,18
 90:7 96:19 97:23
hear   18:5 19:4,7
 21:13 24:14 66:12
 67:6,8,17 68:9,20,22
 93:24 94:4 98:17
heard   21:25 24:12,13
 26:14 29:19 35:13
 53:14 54:13,14 59:24
 62:3 65:10 67:11,13,
 14 74:18 77:4 89:8
 91:16
hearing   67:24 94:9
 96:12
held   16:24 35:5 41:15
 43:4 88:5
helped   69:21
Hildebrandt   10:9,12
 11:2,18
Hispanic   72:8
hit   21:8,23 22:11,14,
 25 23:7 24:7,14
 25:20,21 26:3,6,10,
 14,18,22 35:6,12
 40:4,7,13,25 42:7,15
 48:3,13,15,18,21
 49:12,13,16,19,20,22
 51:16,20 52:15 58:3
 59:24 61:17,21,24
 62:10,13 68:15,20,
 22,24,25 69:2,6,18
 70:25 74:14,15
 77:11,12,14 78:3
 79:18 80:9,12 82:8

88:24 89:24 90:6,7,
12 93:25 96:19
**hitting** 20:16,21
21:5,6,11 33:24 34:5
35:4 39:25 40:10
41:2,3,6,10,12 42:24
49:7,10,11 53:11,20,
21 76:23 77:1,3 80:8
92:1,5 95:21,22
97:22
**Hiveley** 80:18
**hold** 52:2
**holding** 20:17 22:5
34:5,8,13,16 39:19,
21 42:25 44:2 48:3
91:25 93:8
**hollering** 89:2 91:18
**hospital** 6:11 42:3,5,
13 69:14
**hours** 84:4,6
**house** 10:5 15:2
**hug** 34:9,11,18,19
39:25 42:25 95:20
**Huh-uh** 7:6 54:16
67:23
**hurried** 38:14
**hurry** 20:5 21:1
**husband** 21:6
**Hut** 37:18

**I**

**identification** 9:7
55:6 63:3 72:20
75:18
**identified** 62:20
**image** 55:15 63:10
**important** 12:1
**improper** 81:17
**inaccurate** 74:24,25
**incident** 14:3 34:3
55:12 71:5,8 78:22
**incorrect** 74:23
**indicating** 20:13
23:19 34:14,16 52:9,
16 56:3,9,13,22 60:3
95:23
**individual** 87:10
89:20 94:10
**individuals** 30:24
70:18 96:3

**influence** 83:12
**injured** 69:3 96:19,25
**inside** 19:24 20:11
35:21 36:10 37:8
59:22 74:20
**Internet** 55:20
**interrupt** 24:18 50:15
**intoxicated** 85:13
**investigator** 8:22
**involved** 30:23 31:7,9
32:7,9,16,17,20,22,
25 33:3 34:2,25
35:15 41:18 45:24
46:8 53:8 71:4,8
74:2,3 75:2,7,10,16
76:15 77:1,20 78:24
79:2,18,21 80:6,9,14
82:8,10,25 91:22
**itty-bitty** 47:10,11
**Iverson** 7:15 9:11
14:8 24:17,24 25:2
34:8,17,20 50:15
58:23 77:17,19 78:4
80:23,25 81:4,10,15,
17 82:13 84:12,24
86:1 88:10,11,14
89:7,14 90:1 92:15
93:13 94:16,23 95:13
96:11 97:16 98:22
100:8,19

**J**

**Jackie** 73:23
**Jackson** 41:18
**jail** 83:22 84:1
**January** 14:4,11 47:8
85:14,18
**job** 79:6 87:2
**Jon** 88:10
**judge** 81:19
**judgment** 86:20
**jumping** 35:18
**June** 4:3

**K**

**Karen** 86:13
**Khottavongsa** 59:6
61:13 63:14 65:25

**kind** 7:21 15:15 22:2,
3,18,21,22 24:7,24
28:13 34:9 35:17,18
37:11 40:13 44:14
46:8 47:16 50:4
54:11 73:7 76:19
85:5,7 94:25
**knew** 91:14 93:24
**knocked** 45:22

**L**

**lacks** 96:9
**ladies** 71:24 72:2
82:22,24
**lady** 16:7,10,23,24,25
17:4 19:17 21:4
28:16 30:9 39:15
47:21,25 48:1,2,5,6
49:12 73:17
**laid** 69:22
**landlord** 86:10
**language** 29:17
**Large** 4:8
**lasted** 38:2
**latest** 13:12
**Latina** 82:24
**Latino** 72:8
**laundry** 13:5,14
15:13,18 16:10,25
17:23,25 18:13
19:10,11,24 20:5
21:16 22:8 23:16
30:13,14 32:21 35:22
36:1,10 37:8,9,11,22
38:14,25 39:18,22
50:5,10 55:12,17
70:23 71:16 72:2
73:18 76:20 78:16,
17,18,19 82:24
**lay** 98:18
**laying** 70:4 97:20
**Leann** 10:2,9,11 11:2
**leave** 13:17 17:1,10
18:4,13 73:19 99:20
**leaving** 17:2 18:3
77:5
**left** 12:13 19:23
37:11,15 50:10 59:9
**length** 52:11

letter  9:10 10:22
  99:14,23
license  84:2,3
lie  79:22 82:19,20
lied  82:5,16,17
life  8:17,18
lifted  70:10
Linda  4:1,17,24 9:12
  10:20 11:1
lines  26:4 39:7
  47:20,23
listen  6:23 66:4
literally  51:22 93:24
live  14:18
loaded  37:9
loan  87:4
Loans  86:23
location  15:17
long  8:23 17:12 20:7
  36:20 38:1,5 40:14
  46:21 87:16 94:6
  96:21
longer  87:20
looked  20:6,8 22:1
  24:23 29:10 37:2
  40:15,17,24 97:8,25
lost  20:22 87:2
lot  37:11,14 50:11
  66:10,11 76:23
  91:19,20 98:10
louder  53:17,18
lying  81:24

**M**

Mace  96:8,17
maced  48:9 49:24
  96:13
mad  78:8
made  19:17 92:9 96:24
mailed  99:6,8
main  67:12
majority  38:22
make  7:3,22 33:10,15
  37:21 38:19
Makes  7:23
making  40:11,12
male  30:2 34:24 35:1,
  14 42:21 43:4 48:24

males  30:6,8,24 32:19
  33:16 34:2 43:5
  44:20
man  12:9 16:6,9 25:17
  26:16,20 33:5 41:16,
  17 45:20 46:6 48:3,
  12,25 49:1,4 50:21
  55:25 56:16 58:16
  61:12 63:14 65:24
  70:19 91:25 92:1,5,
  16 96:18
March  8:24 10:14
  72:24 75:23
Maria  72:15 75:22
marijuana  85:17,19,23
mark  55:24 56:6
marked  9:6,10 55:5,9
  56:15 63:2,6 72:19,
  23 75:17
mat  18:14 19:11,24
  20:5 22:9 23:16
  30:13,14 32:21 35:22
  36:10 37:8,11 39:22
  70:23 71:16 72:2
  76:20 78:17,19 82:24
matter  78:24 90:19
me.'  26:3
medical  42:10 69:8,25
memory  47:7,14 94:18
men  16:15 26:17
  28:16,21,25 29:1,3,
  5,6 30:13 33:11
  47:22,25 48:2
mention  84:3
mentioned  33:22 44:19
  76:7,10,11 79:20
Meridian  4:4
met  72:10
metal  20:23 21:3
  32:6,9,14 35:4
  40:15,18,24 41:1,4
  42:8,17 95:21
Metro  61:6
middle  39:5
midst  62:6
Miller  4:1,17,24,25
  9:9,12 10:20 11:1
  55:8 63:5 68:6 75:20
  83:3 88:8,10 98:25
mind  27:18 90:10

Minnesota  8:12,14
  13:8 14:18 87:13
minutes  13:20,21 38:9
misprint  28:10
misspoke  28:11
misstates  77:19 97:14
mistake  27:19
mistaken  21:9 23:17
mom  33:2
moment  62:12 90:16,25
  97:25 98:4,5
moments  64:2
month  16:11 78:18
months  28:4,6
months'  86:18
Mooney  4:4
motion  24:25 59:16
  60:14 70:12 81:14
mouth  53:1
move  8:16 51:24 54:10
  80:25
moved  36:3 38:13
  54:18 56:7 89:9
moving  54:4
multiple  42:8 86:18
murder  5:4,5,6,20,23,
  24,25
murder/attempted  5:25
murdered  5:19

**N**

named  5:21
names  72:14
nationality  12:8 16:2
  72:1
needed  69:25
night  18:15 60:22
  85:13,18
notarized  10:5
notary  4:8 10:4 27:24
notice  4:2
noticed  44:2 49:15
  73:25
number  15:3,5 56:15
  57:6 73:4 80:15
  84:4,8
numbered  73:3
Nursing  69:10,12

## O

O-P-T-U-M  8:20
oath  6:16 72:13 75:25
  77:14 81:24 82:5
object  7:16 77:17
  78:4 81:10 82:13
  84:12,24 85:4 86:1
  89:5,21 92:10 94:14,
  22 95:2
objecting  81:18
Objection  80:18 89:11
  93:11 96:9 97:14
objects  40:1
observation  96:25
obstruct  64:6
obvious  68:17
offhand  12:12
office  28:23 46:6
  99:11,16
officer  23:11,21
  25:10 26:18,21,22
  27:10,13,14,16 28:12
  37:23,24 38:3 54:13,
  14,19 55:1 56:13,21
  57:9,11 58:2 65:11,
  23 66:11,23 67:6,8
  68:5 80:5,13 93:2
officer's  22:5 25:8,
  11
officers  80:3 87:10
  92:19 94:12 95:6
  98:17
older  29:8 35:14
  74:10
open  19:18
opinion  78:11 89:19
  90:24
opportunity  99:2
Optum  8:20,21
order  28:9 100:10
owe  86:15
owner  16:23 18:23
  19:1 28:20 30:1,2,3
  32:20 34:25 35:1
  74:10,11 79:19
owners  15:22 16:1
  80:10

## P

P-A-L-M-E-R  14:22
p.m.  4:3 13:7,8,9,11
  88:5,6 100:21
pages  72:25
paid  86:22 87:3
Palmer  14:22,23,24
paramedics  70:8 97:9,
  12
parked  50:3,10
parking  37:10,14
  50:13 76:23 83:8
part  10:22 11:2,5
  26:2 27:20 36:9
  46:12 71:16 74:17
parties  100:23
parts  39:3,4 47:16,17
party  75:9
passed  12:10 20:12
  21:7,19 33:6 34:6
  35:3 49:5 88:16
  90:14,21
passenger's  61:8
pause  85:5
pay  87:2,6,16
paycheck  87:3
Payday  86:23
paying  38:18
PCS  61:6
PD  5:21,22
peace  49:5
Pelek  86:13
pen  55:22
people  6:2,3,4,5
  16:3,13,15 18:7,23
  25:16 27:11 29:22
  30:19 39:7,11 46:7
  59:21 60:25 66:17
  76:25 77:1,14 78:2,
  16 90:17 91:17,19,
  22,25 92:1 98:8,9,
  14,17
pepper  96:13
percent  13:12 18:14
  28:8 32:16 46:1,14
  47:1,12 48:11,23
  64:11
perfectly  64:8,9

## P (continued)

period  45:15
permanently  9:1
person  5:15,19 17:21
  59:9 60:3 63:10,13
person's  24:6
personally  15:24
phone  15:3,4 21:15,17
  31:16 35:10 44:3,8
  50:20 52:8,10,14
  82:9 91:9 95:6,7
photo  55:9
physically  31:9 71:7
picture  50:16
piece-by-piece  22:21
pieces  47:11 95:8
Pizza  37:18
place  14:3 54:15
Plaintiff  4:2
plaintiff's  9:6 55:5
  63:2 72:19 75:17
play  58:9 59:15 60:2
  65:23
played  58:12 59:1,17
  60:7,16 66:21 68:3
  79:13
point  17:10 18:22
  36:6,19 39:12 45:7
  49:7 50:22 51:19
  53:25 59:6 61:1
  64:18 66:7 89:15
pointed  67:13
pointing  27:13
police  22:2,5,9,13
  23:10 26:16 31:11,
  12,13,14,19 32:1,4
  35:13 38:6 41:3
  43:23 46:16 51:23
  54:10 56:7 62:2,4
  69:21 73:16 75:14
  79:1 80:12 81:25
  82:6,9 89:2,9 91:11,
  14,15 95:4 98:3
portion  11:4
position  61:18,21
  64:23
positioned  50:22
positive  19:6,8 25:7
  30:1,10 43:3,6 48:23
prefer  99:7
pregnant  21:9 48:7
  95:15

Linda Miller
June 22, 2017

9

premises  16:19
prepare  8:2
pretty  19:1,2 25:5
  49:22 66:16
prevent  7:24
previously  8:11
print  55:19
prior  53:2 88:21
problem  84:23
procedure  99:14
proceeded  20:4
proceeding  17:21
proceedings  100:20
profanity  18:7
property  8:14
protect  52:4 95:15
provide  10:22 11:2
provided  11:4
Public  4:8
pull  51:5,6
pulled  19:22 20:11
  36:12,15 39:22 44:3
  50:20 74:25 82:9
pulling  70:22
punch  43:5
purpose  75:14
pursuant  4:1
pushed  36:16 74:16
put  11:11,14,25 12:4
  13:1 21:1,20,21,25
  22:6 23:13 26:15
  33:19 35:10 38:16
  44:8 46:18 52:4,13
  53:1 55:3 64:16
  65:12,13,17,21 83:2
  91:9 93:2,3 96:6
putting  46:23

Q

question  6:18,20,25
  7:15 12:25 64:21
  73:15 74:3,11,13
  76:11,14,22 77:2,25
  78:5 79:15,19,24
  80:4,11,16,23 81:2,
  5,11,19 82:21 96:22
questioning  81:18
questions  6:17,18
  7:18 57:12,24 88:9

98:24
quick  31:3,6 37:10,
  12,16,17 38:4 76:20
quicker  100:13
quickly  54:18
quote  44:11 65:15
quotes  44:8

R

raise  4:10
raised  53:22 93:3
ran  22:2 23:13 25:9
  36:16,17
Randal  41:18
range  29:10
reach  15:5
read  12:15,17,20 26:9
  47:19 48:1 73:7
  99:2,13
reading  81:1 100:22
ready  13:16 23:14
  24:22 56:25 73:19
  99:15
real  5:22 94:17
realized  95:7
reason  33:15 77:12
  78:15 82:18,19
recall  11:23 18:8
  29:10 31:8,25 34:24
  44:16 45:23,24 49:24
  67:14,22,24 69:20
  71:14,15,23 72:6
  77:3 79:1,3 84:6
  92:18 93:12,16,17
  94:9,11,12,15 95:10,
  11,12 96:5,7,8,12,17
  97:3,6
received  8:24 10:1
receives  99:23
recess  88:5
recognize  55:9 92:8
record  4:23 21:17
  24:18 43:24 44:4
  50:21 52:17,21
  57:14,15 75:14 82:9
  88:3,7
recorded  95:7
recording  21:18,20,21
  35:7,10 39:1 44:9
  52:12,14 54:3 79:13

91:9 95:6
recreational  85:16
red  15:16 63:13 73:17
  76:12 77:6,22 79:18
reference  13:2 39:11
  81:2
referenced  16:12
reflect  52:21
refuse  17:10
regular  53:19 100:12,
  14
reinstatement  84:2
remember  5:11,15,18,
  21 10:11 11:18 12:1,
  4,25 27:18 35:14
  45:4 46:20 47:16
  65:7,8 83:16 92:19
  93:6,8,14 94:24
  95:4,8,9 98:20,21
remembering  28:7
  47:10
rent  86:5,7,8,11,18,
  19
repairs  86:19
repeat  6:20,23
repeated  65:20
repeatedly  40:25
reported  4:7
reporter  4:10 7:7,12
  9:4 32:10,13 34:20
  57:13,18 99:1,10,22
  100:1,4,9,12,15,17
represent  32:20
  55:14,19 67:7 94:1
representing  88:11
request  58:12 59:1,17
  60:7,16 66:21 68:3
resident  8:5,11
respond  6:25
responder  69:16
rest  49:5
restroom  16:23 17:21
  88:1
result  83:23
resumed  88:6
Reuvers  9:11
review  99:2
ring  83:20
Rissman  4:21 9:5,8
  14:9,11,13 25:3

32:18 34:23 50:17,19
55:3,7 57:15,19,23
58:1,7,14,15,25
59:3,19 60:10,19
62:25 63:4 65:23
66:2,7,9,19 67:3,5
68:1,8 72:21 75:19
77:18,21 78:6,13
79:14 80:24 81:3,6,
7,13,16,21,22 82:14
84:13 85:1,4,7,9
86:3 87:21,24 88:2,7
89:5,11,21 92:10
93:11 94:14,22 95:2
96:9 97:14 98:23
99:5,18,20,24 100:7,
11,14,16
**Road** 8:9
**rob** 26:11
**rod** 20:23 21:3,8,24
23:4,5,23 25:8,12
26:11,12,17,21 28:11
32:9,14 35:4,5 40:3,
7,13,14,15,18,24
41:1,4,9 42:8,17,23,
24 44:6 45:7,13
48:13,15,17 49:10,17
51:17,20 52:15
61:23,25 62:15 67:13
89:23,24 90:8 93:1
95:21
**rod.'** 26:8
**rods** 46:7
**role** 8:24
**roll** 43:25 94:10
95:10
**room** 39:18
**rough** 20:3
**run** 44:20,22 51:14
**running** 19:20 29:11
89:2,9

---

**S**

**S-H-A-Q-U-I-R-A** 14:21
**safety** 43:19
**Salvosa** 66:20,23 67:8
68:2,5
**Salvosa's** 65:24
**sat** 69:22
**Savings** 13:6

**scared** 90:6,11
**scene** 55:11 64:18
66:4 82:22
**schedule** 99:15
**scoot** 62:4
**seat** 43:13,14,15,18
**seconds** 17:15,16
36:23 44:5 71:19
96:23 97:2
**semi-out** 36:13
**send** 95:5 99:14
**sense** 7:3,22,23
**serve** 83:22
**service** 28:1 84:1,4,5
**seven-second** 93:15
**seventh** 99:12
**Shaquira** 14:21
**shocked** 53:19
**shop** 30:2 31:3,6
37:16,17
**shortly** 10:15
**shot** 6:2,5,6,9 24:6
63:6
**shoulder** 41:3
**show** 50:16 52:7 57:7,
20 75:15
**sic** 5:4 14:4 19:11
22:13 24:2 25:20
37:12 57:2
**side** 19:23 25:21
34:15 51:10 55:1
61:4,8 76:19
**signature** 9:17,19
**signed** 27:21,22 28:2
**signing** 100:22
**similar** 6:15
**simply** 35:11
**sir** 9:4
**siren** 74:18
**sirens** 77:5
**sit** 69:21 70:2,3,5,11
**sitting** 12:3,25 27:12
70:7 89:16 97:4,9,11
98:6
**situation** 75:15
**sixth** 46:3
**skinned** 45:2
**skinny** 40:14
**slab** 50:4 51:11 54:8
64:22 65:1

**slight** 55:16
**slow** 59:15 60:14
**slowly** 17:9
**small** 16:16 19:2
**smelled** 96:16
**smelling** 96:8
**smoke** 85:17,23
**smoked** 85:19
**snatched** 20:1,25
**son** 32:24
**sort** 10:21 44:12
53:25 55:3 63:21
91:10
**sounds** 14:7 45:25
48:10 88:4
**speak** 91:3
**speaking** 17:4 67:7
**specific** 34:2
**speculation** 80:19
89:6,12,22 92:11
**speeding** 83:8
**spoken** 15:22
**spot** 56:19
**sprayed** 96:14
**stall** 50:13
**stamp** 57:16 58:9
**stamps** 66:8
**stand** 52:2
**standing** 39:15 48:17
53:24 54:2 55:24,25
56:16 61:15 72:3
**start** 22:23 26:2 68:1
**started** 13:13 22:8
25:16 43:24 71:20
72:6 74:2
**starting** 57:16 58:7
59:7 66:19
**starts** 11:6 47:20
76:7
**state** 4:8,23
**statement** 9:14 10:6,7
11:22 25:23 27:24
47:2 79:25 80:2 92:8
95:5 96:22
**statements** 98:7
**stating** 99:14
**stay** 41:13 54:14
**stayed** 25:15 37:8
**staying** 15:2

steadily  19:13
stepped  48:18 49:23
steps  50:24 54:25
stick  25:13 39:14
  46:7
stomach  94:10
stomachs  98:18
stood  39:16 44:22
  57:5 74:20 77:6
stop  20:21 21:6,20,21
  35:9 37:12 44:9 48:4
  52:14 53:6 59:4 60:9
  79:15 91:9 95:22
stopped  17:22 62:19
stopping  57:16 58:14
  67:3
store  31:10 36:4
  37:12 76:21
stores  30:20
straight  51:5,6 91:8
street  4:5 27:11
stretcher  97:5
strike  64:20 80:25
  81:14
struck  78:12 95:25
stuck  38:16
stuff  13:18,19 20:6,
  25 36:18 39:24 84:2
sued  85:25 86:2,10,23
  87:2
suggestions  11:10
Suite  4:5
summertime  87:15
surprise  42:12 49:16
  82:2
surprises  82:3
survived  6:10
suspended  84:1,3
swear  4:11
sweatshirt  60:22
swing  24:22 70:21
  71:10
swinging  27:13,15,16
  40:10 41:3,4 74:4
  92:1
swirly  40:19
switch  83:3
sworn  4:18 10:5,7
  11:17,22 47:2

swung  48:17 75:1

### T

taking  7:7,13 95:5
talk  7:11
talking  19:13 50:7
  95:4 98:7,8,12
Tampa  4:6 8:9
Tase  25:20 68:6,9
  90:3,22 93:22,23
  97:22
Tased  22:13 24:2
  25:18,22 26:22 35:3
  42:5,23 58:2 62:5,6,
  7 63:23,25 68:22
  70:6 90:25 92:17,21,
  22,25 93:1,4,5,9,18,
  19,25 94:17 95:9
  96:18,21,24
Taser  22:6 23:8,14
  24:4 25:11 93:15
  94:2,25
Tasered  22:24 23:1
  24:1 29:12,24 40:5
  48:13 56:1,16 58:16
  61:13,21 62:13 63:14
  65:24 69:18 70:15,19
Tasing  57:1
teenagers  76:25
telling  20:20 25:8,13
  91:16 92:19
ten  9:2 13:21 36:23
  69:14 83:17,18,21
tending  98:13
Teresa  4:7
terms  38:11
testified  4:19 32:21,
  24 33:2 68:14 72:13
  77:14 78:3 81:24
  88:15 90:2
testify  5:9 82:5
testifying  7:25
testimony  4:12 29:23
  75:25 77:19 79:7
  81:1,8 82:15,20
  97:15
thing  65:10 67:11,12
things  22:19 40:19
  79:25 91:10

thinking  84:18
thought  21:18 35:6,7
  48:6 52:11 61:20
  68:25 78:9 90:11
threat  88:19 89:19
threaten  19:4 69:19
threatened  19:8 88:22
threw  21:1
throwing  24:24
Thursday  4:3
ticket  83:8,9
till  41:13
time  7:16 13:4,8
  14:14 16:10 18:3
  19:19 20:24 27:17
  29:15 36:6 37:10
  38:5,11,12,24 45:15
  52:18 54:4 55:1
  57:16 58:9 59:6,22
  66:8,13 67:24 80:2
  83:22 84:1,23 85:11
  87:6 88:9,19 92:25
  93:19 96:5,24 97:8
  100:12,14
times  6:24 23:23
  26:18 42:8,15 48:21
  58:10 65:20
tinted  64:11,14
today  6:22 7:25 12:3
  13:1 27:4 28:15 47:8
  70:18 79:17 100:10
today's  8:2
told  11:13 16:23 20:5
  31:15 35:25 36:17
  38:17 43:20 79:17,
  20,21 83:19 91:8
  93:2 95:10
tone  53:22
top  63:7
tops  17:15
total  96:4
totally  97:25
touch  71:7
Trailblazer  15:16
  64:10
trained  69:15
training  69:9
transcribed  58:12
  59:1,17 60:7,16
  66:21 68:3

Linda Miller
June 22, 2017

12

transcript  72:23
  99:1,6,15 100:1,2
transcription  67:2
  68:7
transit  30:20
trash  19:13
treatment  84:11
trial  87:12,14
trouble  28:7
truck  37:9 38:16,17,
  18,25 43:25 50:25
  51:21,22 54:12
  56:11,12 68:21 71:13
  73:18,20 74:1,19
  77:6,23 79:18 80:6
truck.'  73:22
true  27:8 61:22 94:21
truth  4:13,14
truthfully  7:25
turn  44:6 51:14 64:18
  65:1 74:6 89:15
turned  17:8 21:7,13
  22:7 23:10 25:15
  26:16,20 27:9 36:19
  39:23 65:3 70:24
Turner  57:9 58:8
tussle  36:24 39:17
  70:22,23
tussled  39:23
twelve  47:24
twisting  49:2
type  5:3 11:3 84:10
typed  47:2

### U

Uh-huh  6:7 7:4 18:2
  22:17 24:5 25:25
  28:22,24 33:4 34:22
  35:8 36:14 37:1
  38:7,15,21,23 39:20
  40:16 41:7 42:6,9,11
  44:1 46:9,22,25
  47:24 50:6 53:23
  56:14 57:8 59:8
  60:1,11 61:9,11,14
  62:1 63:9 69:1 70:1,
  13 71:22 72:4,16
  73:2 74:7,23 75:12,
  21,24 78:14 79:19
  80:4,21 83:5,15

87:5,11 92:7 99:4
unconscious  45:22
understand  6:19 16:1
  33:8 40:23 62:11
understood  7:1 44:18
  91:6,10
upset  75:3,6 77:13
  78:2 81:23 82:1
upsets  78:7
upward  70:11

### V

vague  47:17
vehicle  15:12,15
  63:19,22 64:3
verbal  7:5
verbally  18:10
vicinity  6:10 56:22
video  6:22,24 57:7
  58:8,12 59:1,17
  60:7,16 62:20 63:7
  65:24 66:20 68:2
Vietnamese  12:9 16:3
view  64:6,12
violent  70:15
visual  55:3
vivid  94:18
voice  26:14 53:19
  62:3
Volunteer  84:15,17

### W

waive  99:5
waived  100:23
walk  17:7,9 23:15
  56:25 65:2
walked  16:15 17:13
  21:19 22:2 23:19
  26:16 37:5 62:16,17
  64:17,19,22 65:4
  95:21
walking  16:22 17:19
  19:13 22:8 23:12,15,
  20 25:16 52:3,9,13
  56:19,23,24 98:7,12
walks  21:4
watch  6:22

watched  63:7
weapon  20:16 23:23
weapons  32:9,17 49:6
wearing  45:4 60:20
week  85:24
weekend  83:24
weird  85:7
West  4:5
whatnot  87:3
white  60:22
Why'd  90:5
windows  64:10,14
withdraw  81:13
witness's  81:1
witnessed  15:10
witnesses  71:17
woman  16:6,15 18:7
  30:12 33:11 71:3
  73:17 76:11 79:18
  95:14 96:2
women  71:15 72:12
  82:19,24
word  55:16
word-for-word  44:11
words  18:23 53:1
work  8:19,20
workhouse  83:24
working  15:23
works  7:21 24:4
wow  5:12
wrist  95:24
write  9:24 11:5
writing  11:8
wrong  69:24 75:6

### Y

year  8:25 47:9 87:12,
  13
years  5:2 9:1,2 47:13
  69:14 83:17,18,21
yell  53:16 71:12
yelled  19:16
yelling  17:5 23:21
  25:11 41:11 53:3,5
  66:12 76:12,16
young  12:9
younger  42:21