# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Kevin Flicek<br>as Trustee for the Heirs<br>and Next of Kin of<br>Sinthanouxay Khottavongsa,<br><br>          Plaintiff,<br><br>v.<br><br>City of Brooklyn Center, and Alan<br>Salvosa, Cody Turner, and Gregg Nordby,<br>acting in their individual capacities as<br>City of Brooklyn Center Police Officers,<br><br>          Defendants. | Court File No. 16-cv-1031 PAM/DTS<br><br>**PLAINTIFF'S TRIAL BRIEF** |

This matter is set for trial before the Honorable Paul A. Magnuson, Senior United States District Judge, in Courtroom 7D, of the United States Courthouse, 734 Federal Building, 315 N. Robert St., St. Paul, Minnesota beginning on or after Monday, July 30, 2018 at 9:00 A.M.

## INTRODUCTION

On April 20, 2016, Kevin Flicek (formerly Kevin Khottavongsa), as trustee for Sinthanouxay Khottavongsa's heirs and next of kin, filed a complaint against Defendants City of Brooklyn Center, and Officers Alan Salvosa, Cody Turner, and Gregg Nordby under 28 U.S.C. § 1983 for using excessive force and failing to give adequate care medical care to his father, Sinthanouxay Khottavongsa, thereby causing his death in

2015. Plaintiff submits the following trial brief which outlines the facts that Plaintiff intends to present at trial and discusses the relevant legal issues in this case.

## STATEMENT OF FACTS[1]

Plaintiff will establish the following facts and evidence at trial:

Sinthanouxay Khottavongsa was 57 years old, 5'5", and weighed approximately 145 pounds. He was a Laotian immigrant, devoted father, friend, and an active member of his community and church. On January 16, 2015, Mr. Khottavongsa visited his friends, the Som family, at their auto repair shop and adjoining laundromat. Sarin Decl. ¶ 2, ECF. No. 74-4. Shortly thereafter, three individuals visited the laundromat and proceeded to become violent against the Som family after they were asked to leave because they were not customers. *Id.* ¶¶ 5-6; Cruz-Martinez Tr. 8:8-10:17, ECF No. 74-2. When the fight progressed, Mr. Khottavongsa tried to break it up and defend his friends. Cruz-Martinez Tr. 13:25:15:5, ECF No. 74-2; Sarin Decl. ¶¶ 6-11, ECF. No. 74-4. Onlookers called 911. *See* 911 Call Transcripts, ECF No. 74-7.

Officer Alan Salvosa and trainee Jose Nochez arrived on the scene first. Salvosa Tr. 39:25-41:7, ECF No. 74-12. Salvosa failed to activate his vehicle lights and/or siren upon approach to the scene and elected to park some distance away from where the fight was occurring. *Id.* 32:10-19; 53:1-54:15. His choice to park away from the scene prevented the dashcam in his vehicle from capturing the actions of both himself and the

---

[1] The Court is familiar with the facts of the January 16, 2015 incident having considered and denied Defendants' motion for summary judgment. A more detailed account of the facts is set forth in Pltf.'s Mem. in Opp'n. to Defs.' Mot. for Summ. J., ECF No. 73, at 1-30.

participants in the incident as he approached the scene. Rissman Decl, Ex. N., Salvosa Video starting at 21:16. According to witnesses, when they arrived, the fight was already over. Cruz Martinez Tr. 20:11-21; 26:7-17, ECF No. 74-2; Sarin Tr. 32:2-33, ECF No. 74-5. Also, according to witnesses, Officer Salvosa rapidly approached, failed to identify himself as a police officer, and commanded (in a muffled manner) everyone to get down on the ground. At this point, witnesses and Officer Salvosa agree that Mr. Khottavongsa was holding a crowbar, with his back facing Officer Salvosa. Officer Salvosa yelled "drop it drop it drop it." As Mr. Khottavongsa began to turn his head to look at Officer Salvosa, Officer Salvosa tasered him in the back. Mr. Khottavongsa immediately tensed, went into Neuromuscular Incapacitation (NMI), and fell to the ground, striking the back of his head against the pavement loudly. It is with this backdrop of facts, that this Court previously concluded that a reasonable jury could find that Officer Salvosa deployed his taser too quickly. Summ. J. Order, ECF No. 84, at 6.

Officer Salvosa claims Mr. Khottavongsa was swinging the crowbar, and that after they had made eye contact, he raised the crowbar in a threatening manner. However, video footage and several sworn witness accounts, including that of two other officers on the scene, contradict this claim. *See, e.g.,* Cruz-Martinez Tr. 21:25-22:23, ECF No. 74-2; Elmi Tr. 21:20; 22:12-24:1, ECF No. 74-17; Turner Tr. 54:5-13, ECF No. 74-20. Mr. Khottavongsa was in body lockup from the taser, and thus the crowbar's downward position at the time of his fall, was the same as when he was tasered. Drago Rep. ¶ 29; *see, e.g.*, Elmi Tr. 21:20; 22:12-24:1, ECF No. 74-17. This Court concluded that a

reasonable jury could find that Salvosa's use of the taser was not necessary at all. Summ. J. Order, ECF No. 84, at 6.

After Mr. Khottavongsa fell and was incapacitated, Officer Turner approached him and easily removed the crowbar from his hands. Turner Video 21:16:59; Coleman Tr. 47:20-22, ECF No. 74-8. The officers recognized that Mr. Khottavongsa was unable to understand what they were saying. Turner Tr. 71:21-74:15, ECF No. 74-20. Officer Turner continuously yelled commands at the group to "lay flat on your stomach!" Turner Video 21:14:15-17. Mr. Khottavongsa, still on his back from the fall, began moving very slowly. Turner Video 21:17:23; Elmi Tr. 17:24-18:5, ECF No. 74-17. As he started to sit up and roll, Officer Salvosa yelled "don't get up, or you'll get it again." As evidenced by video of the incident, a single second later, Officer Salvosa tasered Mr. Khottavongsa, causing him to fall back—striking his head on the pavement a second time. Turner Video 21:17:16.

Mr. Khottavongsa, already seriously injured from the first fall, was in worse condition after the second head impact. Cruz-Martinez Tr. 28:14-29:13; Officers again ordered him to roll to his stomach, and when he did not immediately comply, Officers began to push and kick him with their feet, trying to roll him over. Turner Video 21:18:04. Officer Turner grabbed the back of Mr. Khottavongsa's neck and pushed his head into the ground. Turner Video 21:18:17. Once officers had forcefully flipped him over and handcuffed him, they ordered Mr. Khottavongsa to stand. Turner Video 21:19:28-21:19:35. Severely injured, Mr. Khottavongsa was unable to comply. *Id.* Turner and Nordby then dragged his limp body to a squad car and planted him face first onto the

backseat. Turner Video (rear) 21:20:00-21:20:10. He tried to turn over but instead fell into the backseat footwells. Turner Video (rear) 21:20:14-21:20:23. Throughout this entire ordeal, Officers ignored Mr. Khottavongsa's loud and constant cries and moans of pain, loss of bladder control, inability to walk, and deteriorating mental state.

After several minutes of Mr. Khottavongsa slumped in the footwells of the squad car, Officers Turner and Nordby dragged him out without supporting his head or neck. Turner Video 21:21:30. They left him there on the ground, face down and motionless. Nordby Video 9:21:45. As this Court noted, "the video and audio of the scene show officers using force against an immobilized individual who appears to be in great distress." Summ. J. Order, ECF No. 84, at 7. Eventually, the officers called an ambulance, on a non-emergency basis, that later transported Mr. Khottavongsa to the hospital. Whittenburg Tr. 50:1-52:4, ECF No. 74-26. Although a different ambulance was on the way for another individual, that ambulance was also called on a routine, non-emergency basis. *Id.* Mr. Khottavongsa lapsed into a coma for two days before dying as a result of his injuries.

## **DISPUTED ISSUES**

The central disputes are: (1) whether Officers' use of force on Mr. Khottavongsa were reasonable; (2) whether Officers were deliberately indifferent Mr. Khottavongsa's serious medical needs; and (3) whether violations of Mr. Khottavongsa's constitutional rights were the result of Defendant City of Brooklyn Center's failure to adequately supervise and/or train Officers.

**1) Officers' use of force on Mr. Khottavongsa was unreasonable.**

Plaintiff's claim for excessive force arises from Officers' continuous misconduct beginning when Mr. Khottavongsa was first tasered to his leaving in an ambulance. An individual's Fourth Amendment right to be free from excessive force is violated if the force used was objectively unreasonable under the circumstances. *Johnson v. Carroll*, 658 F.3d 819, 824 (8th Cir. 2011). Reasonableness is determined by the totality of the circumstances, including the severity of the crime, the immediate threat one poses to others' safety, and whether one is actively resisting or attempting to flee. *Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012). A dangerous use of force, like the taser, requires sufficient justification. *McKenney v. Harrison*, 635 F.3d 354, 364 (8th Cir. 2011). The risk of bodily harm that officers' actions posed to the plaintiff in light of the threat officers were trying to eliminate must be considered. *See Scott v. Harris*, 550 U.S. 372, 383 (2007). Further, the result of officers' use of force should be considered. *McKenney*, 635 F.3d at 359.

There are two modes in which to fire a Taser. The first, drive-stun mode merely causes mild discomfort. The other mode, "dart mode" (like the one used on Mr. Khottavongsa) fires two darts, sending electric currents through the body and incapacitating the individual being tasered. Courts have agreed that Tasers deployed in "dart mode" constitute a greater use of force and has a much greater risk of injury and death compared to drive-stun mode. *E.g.*, *Brooks v. City of Seattle*, 599 F.3d 1018, 1026–31 (9th Cir. 2010). As such, death or serious injury is a foreseeable consequence. *See also*

*Bachtel v. TASER Int'l, Inc.*, 747 F.3d 965, 969 (8th Cir. 2014) (noting that a taser causing death is not unique).

First, Plaintiff's evidence will show that Officer Salvosa reacted too quickly and unnecessarily in tasering Mr. Khottavongsa the first time. Officer Salvosa fired the taser within 4 seconds of his command to "drop it," never identified himself as a police officer, and gave the commands to Mr. Khottavongsa's back in the midst of other people yelling. In short, Mr. Khottavongsa never had a chance to know that the person yelling at him was a police officer until a split second before he was hit with the taser.

Moreover, Mr. Khottavongsa was not an immediate threat to the safety of others as he had not been swinging to the crowbar prior to Salvosa's commands, did not raise the crowbar as if to strike someone after the commands were given, and was not lunging towards anyone. Mr. Khottavongsa had just re-entered the chaotic scene. He had the crowbar lowered and close to his body—the same position it was when his body locked up, going into Neuromuscular Incapacitation (NMI). Witnesses reported he was "just standing there." Even Officer Turner did not think Mr. Khottavongsa appeared poised to use the crowbar as a weapon. Turner Tr. 54:5-13, ECF No. 74-20. Sergeant Coleman even concluded that Mr. Khottavongsa, at most, at failed to follow commands but never physically resisted arrest or was violent. Coleman Tr. 92:5-22; 105:5-20, ECF No. 74-8.

Second, Plaintiff's evidence will show that Officer Salvosa again reacted too quickly in tasering Mr. Khottavongsa the second time when he attempted to slowly roll to his stomach. Mr. Khottavongsa no longer had the crowbar and was not threatening any violence. Considering the above, his obvious and serious injury and position on the

7

ground, officers' contradictory commands, and his apparent confusion, his smaller size in comparison to the six police officers and a cadet he was surrounded by, lesser use of force readily available, and a controlled scene where none of the civilians were being violent, aggressive, otherwise resisting arrest—all factors known to Salvosa at the time—tasering Mr. Khottavongsa one split second after he warns him not to get up was unreasonable. Even more concerning, it appeared from the video Mr. Khottavongsa was attempting to comply with Officer Turner's command to lay flat on his stomach, which would require Mr. Khottavongsa to lean up and roll over. Plaintiff's neurosurgery expert, Dr. Robert Beatty, will testify that this second head impact not only significantly contributed to the intracranial bleeding that killed Mr. Khottavongsa but also that this additional impact more likely than not caused irreversible brain hemorrhage and caused him additional pain and suffering.

Third, Plaintiff's evidence will show that Officers Turner and Nordby's subsequent excessive force when placing Mr. Khottavongsa in custody after the second tasering was unreasonable in light of the foreseeable risk and particular circumstances. *See Schoettle v. Jefferson Cty.*, 788 F.3d 855, 860 (8th Cir. 2015) (less force required in situations where officer knows plaintiff is injured). Despite their knowledge that Mr. Khottavongsa had sustained serious head injuries, Officers continued to use force in restraining, dragging, kicking, flipping, kneeing, pushing, and hitting his head a third time.

2) **Officers were deliberately indifferent to Mr. Khottavongsa's serious medical needs.**

To succeed on a deliberate indifference claim, a pretrial detainee must show that he suffered from an objectively serious medical need and that one or more defendants had actual knowledge of that need but deliberately disregarded it. *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017) (quotations omitted). The objective component is established if the medical condition is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* The subjective component may be established through circumstantial evidence. *Id.*

As detailed above and in previous briefing, Mr. Khottavongsa can be heard moaning and groaning constantly throughout this entire ordeal. Officers knew he had struck his head on the concrete yet failed to stabilize Mr. Khottavongsa. Instead, they did just the opposite. Officers Salvosa, Turner and Nordby dragged and banged a handcuffed and injured Mr. Khottavongsa around only eventually concluding, after the damage was done, to call an ambulance for him—and not even on an emergency basis. Moreover, Plaintiff's expert Dr. Beatty will testify the post-tasering use of force and deliberate indifference significantly contributed to the internal bleeding that caused Mr. Khottavongsa's untimely death.

3) **The City of Brooklyn Center failed to adequately supervise and/or train its Officers.**

Once Plaintiff establishes individual liability, the jury will then determine Brooklyn Center's failure to supervise and train its officers. A police department is liable for failing to train its officers, if the inadequacy is likely to result in a violation of

constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). A city is liable for failing to supervise its employees where the failure is deliberately indifferent to the rights of others. *Lund v. Hennepin County*, 427 F.3d 1123, 1125 (8th Cir. 2005); *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998).

Brooklyn Center is liable for failing to train and supervise its officers to properly handle situations like this that led to Plaintiff's lawsuit. This includes lack of training for proper on-scene assessment, de-escalation tactics, and proper supervision for Officer Salvosa. Brooklyn Center police are often first responders to stressful, potentially dangerous situations with possibly injured people. The collective expectation that the community has for Police Officers is that of assistance and protection. That is not what the Plaintiff received that evening of January 16, 2015. Brooklyn Center knew Officer Salvosa often did not react well under pressure and tended to escalate situations. Salvosa Tr. 209:3-7, ECF No. 74-12; Rissman Decl., Ex. JJ, ECF No. 74-36.

More disturbingly, Officers Salvosa and Turner attended an 8 hour "Bulletproof Mind" training where they were instructed that they were at war with the local population, told it that "killing was not that big a deal," and that if they killed someone, they would "have the best sex they've had in months." https://www.youtube.com/watch?v=HE7C8OUZFas at 14:11-14:16; 14:45-15:21. This "warrior" mentality training exacerbated Officer Salvosa's escalation tendencies and led him to fire his taser too quickly, and disregard the safety of Mr. Khottavongsa either before or after being tased.

10

In addition, the evidence will show that Brooklyn Center failed to ensure that the basic use of force and basic medical training that its officers did receive were adequate. This, among other inadequacies in Brooklyn Center's training program and supervision customs were so likely to result in violation of constitutional rights that Brooklyn Center policy makers can reasonably be said to have been deliberately indifferent to the need for such training and supervision. The officers' lack of training and supervision of Officers was the moving force behind the violations of Mr. Khottavongsa's constitutional rights.

## **COMPENSATORY AND PUNITIVE DAMAGES**

42 U.S.C. § 1983 provides that a person who, acting under color of state law violates another's federally protected rights, "shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress." The U.S. Supreme Court has recognized that 1983 damages are "a vital component...for vindicating cherished constitutional guarantees." *Owen v. City of Independence*, 445 U.S. 622, 651. Plaintiff seeks relief in the form of compensatory damages such as medical expenses and for general damages endured by Mr. Khottavongsa such as pain and suffering. Recently, in a case involving standing and damages related to Minnesota's wrongful death statute, the Eighth Circuit noted that while standing could be circumscribed by the state statute, "damages are an inquiry distinct from standing, and a limitation on the type of damages a party may receive in a state law action does not limit who may have standing to bring a § 1983 claim or the damages available under § 1983." *Estate of Guled by & through Abdi v. City of Minneapolis*, 869 F.3d 680 (8th Cir. 2017). In *Andrews v. Neer*, 253 F.3d 1052, 1056-57 (8th Cir. 2001), the Eighth Circuit found that the damages available to the

plaintiff could not be entirely defined by the Missouri state statute. Rather, the Eighth Circuit concluded that damages in § 1983 death cases should be the damages "to the party injured." Accordingly, the daughter of the deceased victim in *Andrews* could not recover her own damages. *Id.*

The *Andrews* court adopted the Tenth's Circuit's approach in *Berry v. City of Muskogee, Okl.,* 900 F.2d 1489, 1506-07 (10th Cir. 1990) for the damages available in § 1983 death cases. *Andrews*, 253 F.3d at 1063. The *Berry* court, found that "[t]he remedy should be a survival action, brought by the estate of the deceased victim, in accord with § 1983's express statement that the liability is 'to the party injured.'" As for compensatory damages, the Supreme Court's statement in *Memphis Community School District v. Stachura,* 477 U.S. 299 (1986):

> We have repeatedly noted that 42 U.S.C. § 1983 creates 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution. Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined accordingly to principles derived from the common law of torts. ... [D]amages in tort cases are designed to provide '*compensation* for the injury caused to the plaintiff by the defendant's breach of duty.' To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'

Interpreting *Memphis*, the *Berry* court concluded that in a death case, the "appropriate compensatory damages would include medical and burial expenses, pain and suffering before death, loss of earnings based upon the probable duration of the victim's life had not the injury occurred, the victim's loss of consortium, and other damages recognized in common law tort actions." *Id.* Accordingly, the Minnesota wrongful death statute's

prohibition on damages to the injured is not consistent with federal law, and thus, the damages available in this case should include pre-death pain and suffering, loss of life, loss of consortium with family members.

Plaintiff will establish at trial that compensatory damages sustained were proximately caused by Officers' actions in using excessive force against Mr. Khottavongsa in violation of his Fourth Amendment rights. *See Martinez v. Cal.*, 444 U.S. 277, 285 (1990). Plaintiff further seeks relief in the form of punitive damages from Officers. Under 42 U.S.C. § 1983, if the jury determines that Officers' conduct involved reckless or callous indifference to Mr. Khottavongsa's constitutionally protected rights, the jury may award punitive damages. *See Smith v. Wade*, 461 U.S. 30 (1983). The Officers disregard for the obvious risks of their unnecessary use of force, and the obviousness of the Mr. Khottavongsa's injuries they ignored and exacerbated make punitive damages appropriate.

## TRIAL DOCUMENTS

Filed herewith are Plaintiff's motions in limine, witness list, proposed jury instructions, proposed voir dire questions, and joint exhibit list. Defendants will be filing the joint special verdict form.

Dated: July 16, 2018							Respectfully submitted,

							s/Joshua J. Rissman
							Daniel E. Gustafson (#202241)
							Amanda M. Williams (#0341691)
							Joshua J. Rissman (#391500)
							**Gustafson Gluek PLLC**

14

120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Phone: (612) 333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com
jrissman@gustafsongluek.com

William A. Gengler (#0210626)
**Lockridge Grindal Nauen P.L.L.P**
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Phone: (612) 339-6900
wagengler@locklaw.com

*Attorneys for Plaintiff*

14